SOLICITATION VERSION

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| WOM S.A., *et al.*,[1] | |
| Debtors. | Case No. 24-10628 (KBO) |
| | (Jointly Administered) |

## DISCLOSURE STATEMENT FOR AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR WOM S.A. AND ITS AFFILIATED DEBTORS

**RICHARDS, LAYTON & FINGER, P.A.**
John H. Knight (No. 3848)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
Alexander R. Steiger (No. 7139)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
knight@rlf.com
steele@rlf.com
schlauch@rlf.com
steiger@rlf.com

**WHITE & CASE LLP**
John K. Cunningham (admitted *pro hac vice*)
Richard S. Kebrdle (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
jcunningham@whitecase.com
rkebrdle@whitecase.com

Philip M. Abelson (admitted *pro hac vice*)
Andrea Amulic (admitted *pro hac vice*)
Lilian Marques (admitted *pro hac vice*)
Claire M. Campbell (admitted *pro hac vice*)
Peter Strom (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
philip.abelson@whitecase.com
andrea.amulic@whitecase.com
lilian.marques@whitecase.com
claire.campbell@whitecase.com
peter.strom@whitecase.com

*Co-Counsel to Debtors and Debtors-in-Possession*

---

[1] The Debtors in these chapter 11 cases (these "**Chapter 11 Cases**"), and each Debtor's federal tax identification number in their applicable jurisdiction of incorporation, are as follows: Kenbourne Invest S.A. (2018 2206 815) (Luxembourg); NC Telecom II AS (59.208.720-0) (Norway); WOM Mobile S.A. (99.517.000-0) (Chile); WOM S.A. (78.921.690-8) (Chile); Conect S.A. (96.965.220-k) (Chile); and Multikom S.A. (78.456.640-4) (Chile). The location of the Debtors' service address in the Chapter 11 Cases is: General Mackenna No. 1369, Santiago, Chile.

Dated: January 23, 2025
       Wilmington, Delaware

## DISCLAIMERS

THIS DISCLOSURE STATEMENT CONTAINS IMPORTANT INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE PLAN. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING VOTES TO ACCEPT AND SHOULD NOT BE RELIED UPON FOR ANY OTHER PURPOSE. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, AND ANY ATTACHMENTS, EXHIBITS, SUPPLEMENTS, AND ANNEXES RELATED TO THE PLAN. IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN OR OTHER PLAN-RELATED DOCUMENTS, THE PLAN OR SUCH OTHER PLAN-RELATED DOCUMENTS, AS THE CASE MAY BE, SHALL CONTROL.

PLEASE READ AND CAREFULLY CONSIDER THE ENTIRE DISCLOSURE STATEMENT, THE PLAN, AND ANY ATTACHMENTS, EXHIBITS, SUPPLEMENTS, AND ANNEXES RELATED TO THE PLAN BEFORE SUBMITTING BALLOTS IN RESPONSE TO SOLICITATION OF THE PLAN. INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT. THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED. ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. EACH HOLDER OF A CLAIM OR INTEREST SHOULD CONSULT ITS OWN LEGAL, FINANCIAL AND TAX ADVISOR(S) AS TO LEGAL, TAX, AND OTHER MATTERS CONCERNING ITS CLAIM OR INTEREST.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN OBTAINED FROM, AMONG OTHER SOURCES, THE DEBTORS' BOOKS AND RECORDS, MOTIONS AND OTHER PAPERS FILED WITH THE BANKRUPTCY COURT BY THE DEBTORS, AND IS BASED ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES. REASONABLE EFFORTS HAVE BEEN MADE TO PRESENT ACCURATE INFORMATION AND SUCH INFORMATION IS BELIEVED TO BE CORRECT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED. WHILE THE DEBTORS BELIEVE THAT SUCH INFORMATION FAIRLY REFLECTS THE DEBTORS' FINANCIAL CONDITION AS OF THE DATE HEREOF

2

**AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS. THIS DISCLOSURE STATEMENT IS INTENDED, AMONG OTHER THINGS, TO SUMMARIZE THE PLAN AND MUST BE READ IN CONJUNCTION WITH THE PLAN AND ITS EXHIBITS.**

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL, STATE, OR LOCAL SECURITIES LAW OR OTHER APPLICABLE NON-BANKRUPTCY LAW. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.**

**THE SECURITIES TO BE ISSUED ON OR AFTER THE EFFECTIVE DATE OF THE PLAN WILL BE ISSUED WITHOUT REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933, THE CHILEAN SECURITIES LAW NO. 18,045, OR SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN SECURITIES LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC, THE CHILEAN FINANCIAL MARKET COMMISSION (*COMISION PARA EL MERCADO FINANCIERO*) OR ANY OTHER FEDERAL, STATE, LOCAL OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC, THE CHILEAN FINANCIAL MARKET COMMISSION (*COMISION PARA EL MERCADO FINANCIERO*) NOR ANY OTHER FEDERAL, STATE, LOCAL OR FOREIGN REGULATORY AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN.**

**THE PLAN PROVIDES FOR THE DISTRIBUTION OF SUBSCRIPTION RIGHTS TO ELIGIBLE HOLDERS OF ALLOWED UNSECURED NOTES CLAIMS AND EACH ELIGIBLE HOLDER OF ALLOWED GENERAL UNSECURED CLAIMS. THE SUBSCRIPTION RIGHTS ARE NOT TRANSFERABLE INDEPENDENT OF THE ASSOCIATED ALLOWED UNSECURED NOTES CLAIMS AND ALLOWED GENERAL UNSECURED CLAIMS. THE DEBTORS URGE HOLDERS OF UNSECURED NOTES CLAIMS AND GENERAL UNSECURED CLAIMS TO REVIEW THE RIGHTS OFFERING PROCEDURES CAREFULLY IN CONNECTION WITH THE PLAN.**

**CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE AND PROJECTED FINANCIAL INFORMATION (INCLUDING UNDER <u>EXHIBIT D</u>), AND OTHER FORWARD-LOOKING STATEMENTS ARE BASED ON ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS,**

3

UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

READERS ARE FURTHER CAUTIONED THAT MANY OF THE ASSUMPTIONS, RISKS, AND UNCERTAINTIES RELATING TO THE FORWARD LOOKING STATEMENTS CONTAINED HEREIN, INCLUDING THE IMPLEMENTATION OF THE PLAN, ARE BEYOND THE CONTROL OF THE DEBTORS. IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "CERTAIN RISK FACTORS TO CONSIDER BEFORE VOTING" BELOW, AS WELL AS THE ABILITY OF MANAGEMENT TO EXECUTE ITS PLANS TO MEET ITS GOALS AND OTHER RISKS INHERENT IN THE DEBTORS' BUSINESSES. PARTIES ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS. THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND TO, AND UNDERTAKE NO OBLIGATION TO, UPDATE OR OTHERWISE REVISE ANY FORWARD LOOKING STATEMENTS, INCLUDING ANY PROJECTIONS CONTAINED HEREIN, TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DID NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.

IF THE PLAN IS NOT CONFIRMED, OR IS CONFIRMED BUT DOES NOT BECOME EFFECTIVE, THIS DISCLOSURE STATEMENT AND THE STATEMENTS CONTAINED HEREIN SHALL HAVE NO FORCE OR EFFECT. NEITHER THE DISCLOSURE STATEMENT NOR ANY STATEMENT CONTAINED HEREIN CONSTITUTES AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PERSON. NOTHING IN THIS DISCLOSURE STATEMENT SHALL BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS AND DEBTORS-IN-POSSESSION IN THESE CASES.

## <u>TABLE OF CONTENTS</u>

I.     INTRODUCTION ...........................................................................................1
      A.     Overview...........................................................................................1
      B.     Purpose of the Disclosure Statement ................................................1
      C.     Overview of the Plan ........................................................................2
      D.     Summary of Classification and Treatment of Claims against and Interests in the Debtors ....................................................................................4
II.    GENERAL INFORMATION REGARDING THE COMPANY.......................7
      A.     The Debtors' Prepetition Business Operations ..................................7
      B.     The Debtors' Prepetition Corporate Structure...................................8
      C.     The Debtors' and Management and Board of Directors .....................8
             1.     NC Telecom II .......................................................................8
             2.     Kenbourne .............................................................................8
             3.     WOM Mobile .........................................................................9
             4.     WOM .....................................................................................9
             5.     Conect ....................................................................................9
             6.     Multikom ...............................................................................9
      D.     The Debtors' Capital Structure..........................................................9
             1.     Senior Unsecured Notes.......................................................10
             2.     Other Funded Indebtedness..................................................10
             3.     Other Unsecured Debt..........................................................12
             4.     Intercompany Obligations....................................................12
III.   EVENTS LEADING TO THE COMMENCEMENT OF CHAPTER 11 CASES ...........12
      A.     Delayed Rollout of 5G Project.........................................................13
      B.     Credit Agency Downgrades..............................................................14
      C.     Material Prepetition Litigation against the Company ......................15
             1.     Civil and Commercial Litigation .........................................15
             2.     Administrative Litigation and Investment-State Dispute with Chile........15
             3.     Antitrust Litigation..............................................................16
      D.     Prepetition Litigation initiated by the Company..............................16
      E.     Operational Mitigation Efforts.........................................................16
      F.     Retention of Advisors and Financing Raise.....................................16
IV.    OVERVIEW OF THE CHAPTER 11 CASES .................................................18
      A.     Commencement of the Chapter 11 Cases .........................................18
      B.     First Day and Second Day Relief .....................................................18
             1.     First Day Orders...................................................................18
             2.     Second Day Orders ..............................................................19
             3.     DIP Facility..........................................................................19
      C.     Appointment of the Official Committee of Unsecured Creditors.........20
      D.     Formation of the Special Committee ................................................20
      E.     The Ad Hoc Group of WOM Noteholders .......................................20
      F.     The Benesch Ad Hoc Group .............................................................20
      G.     Abandonment of Certain Assets .......................................................21
      H.     Key Employee Incentive and Retention Programs; Severance Payments ...........21
      I.     Schedules and Statements and Claims Bar Dates.............................21
             1.     Schedules and Statements of Financial Affairs ...................21
             2.     Claims Bar Dates .................................................................21
             3.     Claims Reconciliation Process .............................................22
             4.     Exclusivity ...........................................................................22
      J.     Executory Contracts and Unexpired Leases .....................................23
      K.     Material pending litigation...............................................................24

# TABLE OF CONTENTS

1.    Precautionary injunctive relief to suspend the collection of guarantee policies. ........................................................................................................ 24
2.    Claim for abuse of dominant position against WOM followed before the Antitrust Court (*Tribunal de Defensa de la Libre Competencia*) ("**TDLC**"), for alleged anticompetitive and exclusionary practices, in its capacity as dominant in the SMS A2P market ..................................... 25
3.    Litigation against fines imposed by SUBTEL .......................................... 25
4.    Collection of FON (*Fibra Óptica Nacional*) project performance bond ("boleta de garantía") for an amount of UF 96,000 (approximately CLP 3,770,501.34) related to the Central-South Macrozone ............................ 26
5.    Claim of unfair competition against WOM ................................................ 27
6.    Non-contentious consultation filed by Entel before the Antitrust Court .. 27
7.    Attachment over main offices located in Rosas Street, Santiago, owned by WOM ...................................................................................................... 27
8.    Disputes with Telecomunicaciones P&T Systems SpA ........................... 28
9.    Labor Disputes ......................................................................................... 28
10.   Construction Claims ................................................................................. 29
11.   PTC insolvency proceedings ..................................................................... 29
12.   Collection of FON (Fibra Óptica Nacional) project performance bond ("boleta de garantía") for an amount of UF 115,166 (approximately CLP 4,424,863,137) related to the North Macrozone .............................. 29
13.   Other pending proceedings ....................................................................... 29
L.    Key Settlements and Negotiations in the Chapter 11 Cases ........................... 29
1.    Ad Hoc Group Litigation and Settlement .................................................. 29
M.    Special Committee Investigation .................................................................... 30
N.    Development and Negotiation of the Plan and Plan Sponsor Agreement ........... 31
1.    Marketing Process ..................................................................................... 31
2.    Designation of Successful Bid .................................................................. 32
3.    Plan Sponsor Agreement; Backstop Agreement ...................................... 33
4.    Rights Offering ......................................................................................... 39
5.    Reorganization Transactions ..................................................................... 40
V.    SUMMARY OF THE PLAN .................................................................................. 42
A.    Unclassified Claims ....................................................................................... 43
1.    Administrative Claims .............................................................................. 43
2.    Professional Claims .................................................................................. 44
3.    DIP Claims ................................................................................................ 46
4.    Priority Tax Claims ................................................................................... 46
5.    Foreign Vendor Claims ............................................................................. 47
6.    Restructuring Expenses ............................................................................. 47
7.    U.S. Trustee Fees ...................................................................................... 47
B.    Classification and Treatment of Claims and Interests ................................... 48
1.    Summary of Classification ....................................................................... 48
2.    Non-Debtor Intercompany Claims ........................................................... 49
3.    Treatment of Claims and Interests ........................................................... 49
3.    Subordinated Claims ................................................................................ 54
4.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code ..................................................................................... 54
5.    Special Provision Governing Unimpaired Claims .................................... 54
6.    Elimination of Vacant Classes ................................................................. 54
7.    Voting Classes; Deemed Acceptance by Non-Voting Classes ................ 55
8.    Separate Classification of Other Secured Claims .................................... 55
9.    Controversy Concerning Impairment ....................................................... 55

## TABLE OF CONTENTS

C.    Means of Implementation of the Plan ...................................................................55
      1.    No Substantive Consolidation............................................................... 55
      2.    Reorganization Transactions; Effectuating Documents.......................... 55
      3.    Sources of Consideration for Plan Distributions ................................... 56
      4.    Rights Offering ....................................................................................... 57
      5.    Issuance and Distribution of the Plan Securities................................... 58
      6.    Corporate Existence ............................................................................... 61
      7.    Exemption from Registration ................................................................. 62
      8.    New Corporate Governance Documents ................................................ 63
      9.    Officers and Boards of Directors ........................................................... 63
      10.   Management Incentive Plan ................................................................... 63
      11.   Vesting of Assets in the Reorganized Debtors ...................................... 64
      12.   Cancellation of Existing Documents, Instruments, and Securities........... 64
      13.   Corporate Action .................................................................................... 66
      14.   Wind-Down of Kenbourne Estate .......................................................... 66
      15.   Exemption From Certain Taxes and Fees .............................................. 67
      16.   Preservation of Causes of Action........................................................... 67
      17.   Insurance Policies ................................................................................... 68
      18.   Indemnification of Directors, Managers, Officers, and Employees ......... 69
      19.   Employee Obligations............................................................................. 69
      20.   Workers' Compensation Programs .......................................................... 70
      21.   Closing of the Chapter 11 Cases ............................................................ 70
D.    Plan Trust ..............................................................................................................70
      1.    Establishment of the Plan Trust ............................................................. 70
      2.    Purpose of the Plan Trust ....................................................................... 71
      3.    The Plan Trustee ..................................................................................... 72
      4.    Transferability of Plan Trust Interests ................................................... 72
      5.    Certain Tax Matters ................................................................................ 72
E.    Provisions Governing Distributions.......................................................................72
      1.    Timing and Calculation of Amounts to be Distributed........................... 72
      2.    Rights and Powers of Distribution Agent .............................................. 74
      3.    Delivery of Distributions and Undeliverable or Unclaimed
            Distributions........................................................................................... 75
      4.    Withholding and Reporting Requirements; Compliance Matters............ 77
      5.    Claims Paid or Payable by Third Parties ............................................... 77
      6.    Setoffs and Recoupment ......................................................................... 78
      7.    Allocation between Principal and Accrued Interest................................. 79
      8.    Foreign Currency Exchange Rate ........................................................... 79
F.    Procedures for Resolving Disputed Claims or Interests ........................................79
      1.    Objections to Claims............................................................................... 79
      2.    Allowance of Claims............................................................................... 79
      3.    Estimation of Claims............................................................................... 80
      4.    Elimination of Duplicate Claims ............................................................ 80
      5.    No Distributions Pending Allowance ..................................................... 81
      6.    Distributions After Allowance ................................................................ 81
      7.    No Postpetition Interest........................................................................... 81
      8.    Resolution of Claims............................................................................... 81
      9.    Disputed Claims Reserve ........................................................................ 82
      10.   Disallowance of Claims .......................................................................... 83
      11.   Amendments to Claims and Late Filed Claims ...................................... 83
      12.   Single Satisfaction of Claims................................................................. 84
G.    Assumption and Rejection of Executory Contracts and Unexpired Leases ..........84

iii

## TABLE OF CONTENTS

|  |  |  |  |
|---|---|---|---|
|  | 1. | Assumption and Rejection of Executory Contracts and Unexpired Leases | 84 |
|  | 2. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 85 |
|  | 3. | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 86 |
|  | 4. | Assumption Dispute Resolution | 87 |
|  | 5. | Pre-Existing Payment and Other Obligations | 87 |
|  | 6. | Indemnification Obligations | 88 |
|  | 7. | Contracts and Leases Entered into After the Petition Date | 88 |
|  | 8. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 88 |
|  | 9. | Reservation of Rights | 88 |
|  | 10. | Non-Occurrence of Effective Date; Bankruptcy Code Section 365(d)(4) | 89 |
| H. | | Settlement, Releases, Injunction and Related Provisions | 89 |
|  | 1. | Compromise and Settlement of Claims, Interests, and Controversies | 89 |
|  | 2. | Release of Liens | 89 |
|  | 3. | Discharge and Satisfaction of Claims and Termination of Interests | 90 |
|  | 4. | Term of Injunctions or Stays | 90 |
|  | 5. | Releases by the Debtors | 90 |
|  | 6. | Releases by Holders of Claims | 92 |
|  | 7. | Exculpation | 93 |
|  | 8. | Injunction | 93 |
|  | 9. | Term of Injunctions or Stays | 94 |
|  | 10. | The SEC and Comisión para el Mercado Financiero (CMF) | 94 |
|  | 11. | Protection Against Discriminatory Treatment. | 95 |
| I. | | Conditions Precedent to the Effective Date | 95 |
|  | 1. | Conditions Precedent to the Effective Date | 95 |
|  | 2. | Waiver of Conditions Precedent | 98 |
|  | 3. | Substantial Consummation | 99 |
|  | 4. | Effect of Vacatur of Confirmation Order. | 99 |
| J. | | Modification, Revocation or Withdrawal of the Plan | 99 |
|  | 1. | Modifications and Amendments | 99 |
|  | 2. | Revocation or Withdrawal of Plan | 100 |
| K. | | Retention of Jurisdiction by Bankruptcy Court | 100 |
| VI. | | CERTAIN TAX CONSEQUENCES OF THE PLAN | 102 |
| A. | | Certain U.S. Federal Income Tax Consequences | 102 |
|  | 1. | General | 102 |
|  | 2. | U.S. Federal Income Tax Consequences to the Debtors | 103 |
|  | 3. | Certain U.S. Federal Income Tax Consequences of the Plan to New Secured Notes/Equity Treatment Electing Creditors. | 103 |
|  | 4. | U.S. Tax Treatment of the Take Back New Secured Notes and the New Money New Secured Notes (collectively, the "New Secured Notes") | 107 |
|  | 5. | U.S. Tax Treatment of Holding New Holdco Units | 109 |
|  | 6. | U.S. Tax Treatment of Holding New Money Convertible Notes | 113 |
|  | 7. | Tax Treatment of the Plan Trust | 121 |
|  | 8. | U.S. Federal Income Tax Consequences to U.S. General Unsecured Creditors that do not Elect to be Participate in the Exchange | 122 |
|  | 9. | U.S. Taxation of the Disputed Claims Reserve | 122 |
|  | 10. | Information Reporting by U.S. Holders | 123 |
| B. | | Certain Chilean Tax Consequences | 123 |
|  | 1. | General | 123 |

iv

**TABLE OF CONTENTS**

2.      Chilean Tax Consequences of the Reorganization Transactions ............ 124
VII.    SOLICITATION AND VOTING PROCESS ............................................................. 147
        A.    Holders of Claims Entitled to Vote on the Plan ...................................... 147
        B.    Voting Record Date ................................................................................. 147
        C.    Voting Deadline ....................................................................................... 148
        D.    Ballots ...................................................................................................... 148
VIII.   CERTAIN RISK FACTORS TO CONSIDER BEFORE VOTING ....................... 148
        A.    Certain Bankruptcy Law Considerations ................................................ 148
              1.    Risk of Non-Confirmation or Delay of the Plan ........................... 148
              2.    Proposed Releases and Exculpation under the Plan ...................... 149
              3.    Risk of Failing to Satisfy Vote Requirement ............................... 150
              4.    Risks Related to Recoveries Under the Plan .................................. 153
              5.    Country-Specific Risk Factors ...................................................... 154
              6.    Additional Factors to be Considered .............................................. 173
IX.     ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE
        PLAN ....................................................................................................................... 174
        A.    Alternative Chapter 11 Plan .................................................................... 174
        B.    Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law ....... 175
X.      CONFIRMATION OF THE PLAN ......................................................................... 175
        A.    General Requirements for Confirmation .................................................. 175
        B.    Acceptance of the Plan ............................................................................ 176
        C.    Confirmation Without Necessary Acceptances; Cramdown ................... 176
        D.    Best Interests Test ................................................................................... 177
        E.    Feasibility ................................................................................................ 177
        F.    Notices and Confirmation Hearing .......................................................... 178
XI.     CONCLUSION AND RECOMMENDATION ......................................................... 179

**EXHIBITS**

**Exhibit A**:    Plan of Reorganization
**Exhibit B**:    Organizational Chart
**Exhibit C**:    Liquidation Analysis
**Exhibit D**:    Financial Projections
**Exhibit E**:    Plan Term Sheet
**Exhibit F**:    Plan Sponsor Agreement
**Exhibit G**:    Backstop Agreement
**Exhibit H**:    Rights Offering Procedures

## I.    INTRODUCTION

### A.    Overview

WOM S.A. ("**WOM**") and certain of its affiliates, as debtors and debtors-in-possession (collectively, the "**Debtors**" or the "**Company**") submit this disclosure statement (as may be amended, revised, or supplemented from time to time, the "**Disclosure Statement**") in connection with the solicitation of votes on the *Amended Joint Chapter 11 Plan of Reorganization for WOM S.A. and Its Affiliated Debtors* (as may be amended, revised, or supplemented from time to time, the "**Plan**")[1] attached hereto as <u>**Exhibit A**</u>. Each of the exhibits to this Disclosure Statement, including the Plan, is incorporated as if fully set forth herein and made part of the Disclosure Statement. The Plan constitutes a separate chapter 11 plan for each of the Debtors. The summaries of the Plan and the Reorganization Transactions provided herein are qualified in their entirety by reference to the Plan. In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

The Plan incorporates the material terms set forth in the Plan Sponsor Agreement and contemplates a comprehensive restructuring of the Debtors' prepetition obligations. The Plan maximizes the value of the Debtors' assets, preserves the going-concern value of the Debtors' business, and provides the best recovery available to the Debtors' stakeholders. The Debtors, in consultation with their legal and financial advisors, have determined that recoveries to creditors will be maximized through the continuation of certain Reorganized Debtors as a going concern and will result in greater recoveries to creditors than such creditors would receive upon liquidation of the Debtors.

---

### RECOMMENDATION OF THE DEBTORS

**The Plan is supported by the Debtors, the Committee, and the Consenting Noteholders. Each of the Debtors and the Committee urges all Holders of Claims or Interests whose votes are being solicited to accept the Plan.**

---

### B.    Purpose of the Disclosure Statement

The purpose of this Disclosure Statement is to describe the Plan and its provisions and to provide adequate information, as required under section 1125 of the Bankruptcy Code, to holders of Claims against the Debtors who are entitled to vote to accept or reject the Plan.

This Disclosure Statement includes, among other things, (i) information pertaining to the Debtors' prepetition business operations, (ii) a summary of the events leading up to commencement of the Chapter 11 Cases, (iii) an overview of the Chapter 11 Cases, (iv) a summary of the Plan, including the rights of holders of Claims or Interests under the Plan, and (v) disclosures related to the effects of confirmation of the Plan, certain risk factors associated with the Plan, and the manner in which distributions will be made under the Plan. This Disclosure Statement also discusses the confirmation process and the procedures for voting on the Plan that must be followed

---

[1] Capitalized terms used but not defined in this Disclosure Statement have the meanings ascribed to such terms in the Plan.

by holders of Claims entitled to vote on the Plan for their votes to be counted.

## C.      Overview of the Plan[2]

The Plan is a result of extensive good faith negotiations, overseen by the Board or, to the extent permitted by applicable law, the Special Committee (as defined below), among the Debtors and certain stakeholders. The Plan is supported by the Debtors' key funded debt creditors, the Ad Hoc Group of WOM Noteholders (the "**Ad Hoc Group**" or "**AHG**"), as well as the official committee of unsecured creditors (the "**Committee**"), as set forth in the Plan Sponsor Agreement. The members of the Ad Hoc Group hold approximately 60% of the Unsecured Notes Claims. The transactions contemplated in the Plan will strengthen the Company by providing new capital to fund distributions to creditors and working capital, deleveraging the Debtors' balance sheet, and allowing the Company to operate post emergence, all to the benefit of its stakeholders.

The Plan is premised on an implied total enterprise value of the Debtors of approximately $1.6 billion. The Debtors believe that the investment-backed value implied by the Plan following a robust marketing process is the best available indicator of value of the Debtors.

As further described below, under and subject to the terms and conditions of the Plan, the holders of Allowed Claims in the Voting Classes (Classes 3 and 4) will receive, in addition to Plan Trust Interests and/or a share of the proceeds of any pre-Effective Date settlements of LT Claims and any Unused Plan Trust Funding, the treatment described as follows:

➢ **Class 3 – Unsecured Notes Claims**

Holders of Allowed claims evidenced by or arising under or on account of the 2024 Notes, the 2028 Notes and the related indentures will receive their pro rata share of the New Secured Notes/Equity Treatment consisting of:

- their pro rata share of 100% of the equity interests in New Holdco, which will indirectly own all of the equity interests in the Reorganized Debtors, *plus*

- their pro rata share of $225 million in aggregate principal amount of Take Back New Secured Notes, *plus*

- their pro rata share of the Subscription Rights, which Subscription Rights provide such holders with the opportunity to participate in the Rights Offering for the purchase of:

    o  their pro rata share of $95 million of New Money New Secured Notes to be issued by Reorganized WOM Mobile; *plus*

    o  their pro rata share of up to $405 million of New Money New Convertible Notes to be issued by Chile Newco.

        ▪  The New Money New Convertible Notes, along with certain New

---

[2]   This overview is qualified in its entirety by reference to the Plan. You should read the Plan in its entirety before voting to accept or reject the Plan.

Convertible Notes issued to the Backstop Parties as a premium, shall be convertible into equity interests of Chile Newco (or, at the option of Chile Newco, into equity interests of New Holdco), at a 35% discount to plan equity value.

▪ The equity interests received through conversion of the New Convertible Notes shall be economically equivalent to up to 92% of the aggregate outstanding New Holdco Units (depending on the aggregate principal amount of New Convertible Notes Issued, and subject to dilution by the New Holdco Units issued under the Management Incentive Plan).

➢ **Class 4 – General Unsecured Claims**

Holders of Allowed General Unsecured Claims will receive:

- either their pro rata share of the GUC Cash Pool ($72.5 million subject to certain reductions under the Plan), or

- if such holder of an Allowed General Unsecured Claim is an Eligible Holder that is a New Secured Notes/Equity Treatment Electing Creditor, such holder shall receive, in lieu of the GUC Cash Pool Treatment, their pro rata share of the New Secured Notes Equity Treatment described in the immediately preceding section entitled "Class 3 – Unsecured Notes Claims."

Any New Secured Notes/Equity Treatment Electing Creditor's pro rata share of the New Secured Notes/Equity Treatment (including Subscription Rights for participation in the Rights Offering) will be calculated taking into account the Guaranty Claim Enhancement for Holders of Allowed Unsecured Notes Claims. The effect of the Guaranty Claim Enhancement is to provide Holders of Allowed Unsecured Notes Claims with a greater pro rata share of the New Secured Notes/Equity Treatment than New Secured Notes/Equity Treatment Electing Creditors. The Guaranty Claim Enhancement, however, has no effect on, and therefore does not reduce, the GUC Cash Pool Treatment Creditors' pro rata sharing in the GUC Cash Pool.

The Plan constitutes a separate Plan for each Debtor, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. All Holders of Allowed Claims in Classes 3 and 4 (including Holders of Allowed Unsecured Notes Claims (which are Claims against each of the Debtors)), however, will receive a single, aggregate distribution under the Plan on account of their Claims.

The Plan contemplates a recapitalization of the Debtors through a combination of the issuance of debt and treatment of existing Claims against and Interests in the Debtors pursuant to the Plan. Notably, the Plan provides Holders of General Unsecured Claims a distribution consisting of such Holder's pro rata share of GUC Cash Pool of $72,500,000 (subject to reduction as set forth in the Plan), and Plan Trust Interests. This treatment of General Unsecured Claims was the product of months of arm's-length negotiations between the Debtors, Committee and Ad Hoc Group.

3

In order to fund distributions under the Plan, the Debtors will conduct a Rights Offering as detailed in the Rights Offering Procedures, attached hereto as **Exhibit H**, and summarized as follows:

- Following entry of the Rights Offering Procedures Order and the Disclosure Statement and Solicitation Procedures Order, the Debtors shall conduct the Rights Offering in accordance with the Rights Offering Procedures and Backstop Agreement. Eligible Holders of Allowed Unsecured Notes Claims and Eligible Holders of Allowed General Unsecured Claims that elect the New Secured Notes/ Equity Treatment will be issued their pro rata allocations (based on the proportions set forth in the Plan, taking into account the Guaranty Claim Enhancement for Holders of General Unsecured Notes Claims) of Subscription Rights to purchase, pursuant to the terms of the Rights Offering Procedures, the New Money New Secured Notes and New Money New Convertible Notes. Any transfer of an Allowed Unsecured Notes Claim prior to the earlier of (i) the transferee making a Binding Rights Election (as defined in the Rights Offering Procedures) or (ii) the Rights Offering Expiration Time (as defined in the Rights Offering Procedures) shall include the applicable Subscription Rights.

- Pursuant to and subject to the terms and conditions of the Backstop Agreement, each of the Backstop Parties agreed, on a several and not joint basis, to (a) exercise all Subscription Rights issued to such Backstop Party in connection with the Rights Offering, and (b) acquire such Backstop Party's Backstop Percentage of the Unsubscribed Rights Offering Securities. In exchange for the Backstop Parties' commitments under the Backstop Agreement, the Backstop Parties will receive the Backstop Put Premium and the Expense Reimbursement (as defined in the Backstop Agreement) pursuant to and subject to the terms and conditions of the Backstop Agreement.

D.     **Summary of Classification and Treatment of Claims against and Interests in the Debtors**

The following table summarizes the classification of Claims and Interests under the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code and is qualified in its entirety by reference to the Plan. For a summary of the treatment of each Class of Claims and Interests, see Article V.B below.

| Class | Designation[3] | Status | Estimated Allowed Amount | Projected Recovery[4] |
|-------|----------------|--------|--------------------------|------------------------|
| Class 1 | Other Secured | Unimpaired | $17 million | 100% |

---

[3]   The Debtors reserve the right to eliminate any Class of Claims in the event they determine that there are no such Claims in such Class.

[4]   Actual recoveries may vary widely within these ranges, and any changes to any of the assumption underlying these amounts could result in adjustments to recovery estimates provided herein and/or the actual distribution receive by holders of Allowed Claims. The projected recoveries are based on information available to the Debtors as of the date hereof, and reflect the Debtors' good-faith estimates as of the date hereof only. In addition to the cautionary notes contained here and elsewhere in the Disclosure Statement, it is to be expressly understood that the Debtors make no representation as to the accuracy of these projected recovery estimates, and the Debtors

4

| Class | Designation[3] | Status | Estimated Allowed Amount | Projected Recovery[4] |
|-------|----------------|--------|--------------------------|------------------------|
| | Claims | Not Entitled to Vote (Presumed to Accept) | | |
| Class 2 | Other Priority Claims | Unimpaired Not Entitled to Vote (Presumed to Accept) | TBD | 100% |
| Class 3 | Unsecured Notes Claims | Impaired Entitled to Vote | (i) the sum of $347.997 million in 2024 Notes Claims plus $8,240,762.29 in accrued and unpaid interest and any accrued and unpaid fees on the 2024 Notes through the Petition Date and<br><br>(ii) the sum of $290 million in 2028 Notes Claims plus $2,574,555.56 in accrued and unpaid interest and any accrued and unpaid fees on the 2028 Notes through the Petition Date, in each case multiplied by the Guaranty Claim Enhancement. | 43%-46%[5] |
| Class 4 | General Unsecured Claims | Impaired Entitled to Vote | $215 - $253 million | 29% - 34%[6] |
| Class 5 | Intercompany Claims | Unimpaired / Impaired Not Entitled to Vote (Presumed to Accept or Reject) | N/A | N/A |
| Class 6 | Existing Equity Interests | Impaired Not Entitled to Vote (Presumed to Reject) | N/A | N/A |
| Class 7 | Intercompany Interests | Unimpaired / Impaired Not Entitled to Vote (Presumed to Accept or Reject) | N/A | N/A |

**A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN CLASSES 3 AND 4, ENTITLED TO**

---

expressly disclaim any obligation to update any estimates or assumptions after the date hereon on any basis (including new or different information received and/or errors discovered).

[5]    Percentage reflects only the recovery on account of the Take Back New Secured Notes and New Holdco Units as a percentage of outstanding principal amount of Unsecured Notes (without taking into account accrued interest), and does not reflect potential returns on account of Rights Offering Securities that holders of Allowed Unsecured Note Claims may purchase for new money through participation in the Rights Offering. The percentage also does not reflect any recovery on account of the Plan Trust Interests. Further, this percentage assumes that no Allowed General Unsecured Claims elect to receive the New Secured Notes/Equity Treatment, and that the full amount of the $455,600,000 of New Convertible Notes are issued.

[6]    This percentage assumes that all Holders of Allowed General Unsecured Claims are GUC Cash Pool Treatment Creditors. Further, the percentage does not account for the Plan Trust Interests and assumes that the size of the GUC Cash Pool is $72,500,000.

5

**VOTE ON THE PLAN. A DETAILED EXPLANATION OF THE VOTING PROCESS CAN BE FOUND IN ARTICLE VII OF THIS DISCLOSURE STATEMENT.**

The separate classification of Class 3 Unsecured Notes Claims from Class 4 General Unsecured Claims was determined by the Debtors after good faith, arm's-length negotiations among the Debtors, the Committee, and the Ad Hoc Group. Although both of these Classes are unsecured, the legal character and nature of the Claims under each of these Classes differ significantly. Among other things, the Unsecured Notes Claims have recourse to all of Debtors and have rights that are different from General Unsecured Claims. Pursuant to the 2024 Notes Indenture and 2028 Notes Indenture, the obligations under the Unsecured Notes are unsecured obligations of the Debtors, issued by Kenbourne and guaranteed jointly and severally by all of the other Debtors. Holders of Class 3 Unsecured Notes Claims are therefore contractually entitled to assert the full amount of their Claims against each of the Debtors. No creditors other than the holders of the Unsecured Notes Claims are in the same or similar position.

Because the Unsecured Notes were issued under certain exemptions from registration under United States and other securities laws, the Holders of Unsecured Notes must be eligible to hold them under applicable securities laws. Accordingly, Holders of Unsecured Notes should be eligible to receive the New Secured Notes/Equity Treatment (including Subscription Rights to participate in the Rights Offering), which is the only treatment offered to Holders of Unsecured Notes Claims. By contrast, Class 4 General Unsecured Claims are held by various types of creditors—including trade creditors—that may not be eligible to receive exempt securities. Accordingly, although Holders of Class 4 General Unsecured Claims have the option to participate in the New Secured Notes/Equity Treatment if they are Eligible Holders (on a lesser pro rata basis than Holders of Allowed Unsecured Notes Claims due to the Guaranty Claim Enhancement), their default treatment is a pro rata share of the GUC Cash Pool, which treatment does not require the Holder to be eligible under any securities law exemption.

In addition, because Holders of Allowed Unsecured Notes Claims hold independent unsecured Claims against each of the Debtors, they are entitled to a greater recovery than holders of General Unsecured Claims that do not have guarantees. The Plan effectuates this greater recovery through the Guaranty Claim Enhancement, which is also the product of extensive arm's-length negotiations between the Debtors, the Committee, and the Ad Hoc Group. The Guaranty Claim Enhancement provides for a deemed increase in Allowed Unsecured Notes Claims by multiplying the outstanding principal and accrued interest and fees through the Petition Date under the Unsecured Notes and related indentures by a factor of 1.52. This factor was calculated taking into account the assets at each of the Debtors, including providing Holders of Allowed Unsecured Notes Claims with the benefit of deemed recoveries by Kenbourne and the Debtor Guarantors on account of their Intercompany Claims against each other Debtor. The Guaranty Claim Enhancement has no effect on, and therefore does not reduce, the GUC Cash Pool Treatment Creditors' pro rata sharing in the GUC Cash Pool.

In connection with a potential Plan confirmation objection, BCI has requested discovery from the Debtors and the AHG in respect of certain guarantees provided by the Debtor Guarantors on certain unsecured notes issued by Kenbourne and the corresponding Guaranty Claim Enhancement provided in Class 3 – Unsecured Notes Claims, as BCI questions the propriety of the Guaranty Claim Enhancement. Subject to their objections to BCI's discovery requests, the

6

Debtors and the AHG are working to provide certain non-privileged information responsive to these requests in connection with the Plan confirmation process.

## II.    GENERAL INFORMATION REGARDING THE COMPANY

### A.    The Debtors' Prepetition Business Operations

WOM was founded in 2015, through the acquisition of Nextel Chile S.A. by Novator Partners LLP's investment vehicle, NC Telecom AS ("**NCT**"). WOM quickly established itself as Chile's fastest-growing mobile services provider in terms of total subscribers and revenues. The Company's key revenue-generating business consists of, among others, mobile voice and data services and mobile broadband services to individuals and small and medium enterprises in Chile. The Company expanded its offerings to include "fiber to the home" broadband service in 2020 and 5G service for its mobile network in 2022.

WOM grew from having virtually no market share in 2015 to establishing itself as the second-largest mobile network operator in Chile. The Company serves over 8.5 million customers and has 27% of the port-in market share across pre- and post-paid customers. WOM also has the largest 5G coverage area in Chile—the 5G wireless broadband services deliver internet access to over one million customers, with 5G coverage in 320 of Chile's 345 "comunas". WOM's award winning network provides extensive coverage, large download capacity, high speed and stable connectivity. In addition, with the use of national roaming agreements, WOM provides 4G coverage in all of Chile's "comunas".

The Company's offerings and services are marketed and distributed through a network of physical stores and kiosks, many of which are in prime locations across Chile. The Debtors currently operate 197 WOM-branded stores throughout the country. The Debtors exercise significant control over their distribution network by directly leasing all store locations, including those operated by local partners. The Debtors also maintain strong remote sales channels, including their website, mobile applications, and a call center. Remote sales through online transactions or telesales represent approximately 40% of the Debtors' sales.

The Company also holds several concessions granted by the Ministry of Transportation and Telecommunications (*Ministerio de Transportes y Telecomunicaciones de Chile*) ("**MTT**"), in advanced wireless services and radio spectrum in densely populated areas of Chile, including concessions in connection with WOM's fiber optic network (*Fibra Óptica Nacional*) ("**FON**") and the deployment of its 5G program in certain regions of Chile. During 2021, WOM was awarded concessions to complete its 5G deployment project. Due to post-pandemic shipping restrictions and delays, social unrest in various parts of Chile, and administrative delays in connection with securing specific additional permits, WOM had achieved an overall completion rate of approximately 80% by the target completion deadline of October 7, 2023.

In July 2022, the Company entered into a sale and leaseback agreement with Phoenix Tower International ("**PTI**"), a global tower infrastructure operator, to sell 3,800 of its network towers to PTI. Pursuant to this transaction, the Company sold a total of 2,597 network towers for a net payment of approximately $670 million in 2022, of which $340 million was used to make distributions to the Company's shareholders and approximately $285 million was used to repay

7

debt and implement operational improvement initiatives. The agreement contemplated a further sale of 1,203 network towers from the Company by December 31, 2024 for which the Company would receive additional proceeds. To date, the Company has sold an additional 482 network towers to PTI in exchange for approximately $85 million in net proceeds. The Company and PTI are working together to implement a revised network tower delivery schedule, as regulatory and liquidity issues prevented the Company from meeting the target delivery date. The Company currently has approximately $36 million in unrestricted cash, and expects to utilize the proceeds of the Reorganization Transactions to continue to deliver network towers to PTI under a revised schedule. The PTI leaseback agreement is an eight-year agreement that is scheduled to mature on June 30, 2030 with an automatic two-year renewal.

The Company employs, directly or indirectly, approximately 6,503 people in Chile. The Debtors do not have any operations or employees in the United States.

### B.      The Debtors' Prepetition Corporate Structure

The Debtors in these Chapter 11 Cases are: (i) Kenbourne Invest S.A. ("**Kenbourne**"); (ii) NC Telecom II AS ("**NC Telecom II**"); (iii) WOM Mobile S.A. ("**WOM Mobile**"); (iv) WOM; (v) Multikom S.A. ("**Multikom**"); and (vi) Conect S.A. ("**Conect**"). As of the Petition Date, non-debtor entity NCT is the direct parent of NC Telecom II. NC Telecom II wholly owns Kenbourne and holds approximately 99.9% of the equity interests in WOM Mobile. The remaining 0.01% equity interests in WOM Mobile is held by non-debtor NCT. WOM Mobile holds approximately 99.9% of equity interests in WOM, Conect, and Multikom. The remaining 0.01% equity interests in WOM, Conect, and Multikom is held by NC Telecom II.

An organizational chart depicting the corporate structure of both Debtor and related non-Debtor affiliates is attached hereto as **Exhibit B**.

### C.      The Debtors' and Management and Board of Directors

The Debtors' management team is led by Chief Executive Officer ("**CEO**") Martín Vaca Narvaja, who was hired on April 4, 2024, following the departure of former CEO Chris Bannister. On June 10, 2024, Inés Ostenrieder replaced Álvaro Araya as WOM's Chief Financial Officer. Six members of the management team report directly to the CEO. The management team performs a variety of functions for the Debtors, including critical management, operations, and finance services, and has been leading the Debtors through these Chapter 11 Cases.

Each of the Debtors is overseen by a board of directors. The board composition for each of the Debtors is below:

1.      NC Telecom II

      (i)      Hans Gustav Clemetsen;
      (ii)     Alex Snogdal Jensen;
      (iii)    Timothy P. O'Connor; and
      (iv)     Christopher S. Sontchi.

2.      Kenbourne

(i)      Novator (Luxembourg) S.à r.l.;
(ii)     Timothy P. O'Connor; and
(iii)    Christopher S. Sontchi

3.     <u>WOM Mobile</u>

(i)      Kristopher Brigham;
(ii)     Thomas Leslie;
(iii)    Martín Vaca Narvaja;
(iv)    Timothy P. O'Connor;
(v)     Christopher S. Sontchi; and
(vi)    Jaroslav Valiukevic.

4.     <u>WOM</u>

(i)      Kristopher Brigham;
(ii)     Thomas Leslie;
(iii)    Martín Vaca Narvaja;
(iv)    Timothy P. O'Connor;
(v)     Christopher S. Sontchi; and
(vi)    Jaroslav Valiukevic.

5.     <u>Conect</u>

(i)      Thomas Leslie;
(ii)     Martín Vaca Narvaja;
(iii)    Timothy P. O'Connor;
(iv)    Christopher S. Sontchi; and
(v)     Jaroslav Valiukevic.

6.     <u>Multikom</u>

(i)      Thomas Leslie;
(ii)     Martín Vaca Narvaja;
(iii)    Timothy P. O'Connor;
(iv)    Christopher S. Sontchi; and
(v)     Jaroslav Valiukevic.

**D.**    **The Debtors' Capital Structure**

As of the date of this Disclosure Statement, the Debtors have approximately $870 million of funded debt obligations, approximately 76% of which is unsecured, and other third-party obligations.[7]

---

[7]   The descriptions herein of the Company's debt, including any security in respect of such debt, are provided for the convenience of the Bankruptcy Court and parties in interest. In certain cases, amounts stated are approximate.

| Funded Debt | Approximate Outstanding Amount |
|---|---|
| DIP Loan Facility | $210,000,000 |
| 2024 Notes | $356,000,000 |
| 2028 Notes | $293,000,000 |
| BCI Loan | $10,900,000 |
| IDB Transfers | $0 |
| | |
| **Total Funded Debt Obligations** | $869,900,000 |

1.    Senior Unsecured Notes

Debtor Kenbourne is the issuer of two series of senior unsecured notes. Pursuant to the indenture dated November 26, 2019 (the "**2024 Notes Indenture**"), Kenbourne issued the 6.875% Senior Notes (the "**2024 Notes**") due November 26, 2024 for the aggregate principal amount of $450,000,000. Pursuant to the indenture dated January 22, 2021 (the "**2028 Notes Indenture**" and, together with the 2024 Notes Indenture, the "**Unsecured Notes Indentures**"), Kenbourne issued the 4.700% Senior Notes due January 22, 2028 (the "**2028 Notes**" and together with the 2024 Notes, the "**Unsecured Notes**") for the aggregate principal amount of $450,000,000.[8] U.S. Bank Trust Company, N.A. (the "**Unsecured Notes Trustee**") is the indenture trustee in respect of the Unsecured Notes. Each of the other Debtors (including NC Telecom II, WOM, WOM Mobile, Conect and Multikom) is a guarantor in respect of the Unsecured Notes. The Unsecured Notes Indentures are governed by New York law. As of the date of this Disclosure Statement, approximately $356 million in aggregate principal amount is outstanding under the 2024 Notes and approximately $293 million in aggregate principal amount is outstanding under the 2028 Notes.

2.    Other Funded Indebtedness

(i)    *BCI Loan*

On April 6, 2023, WOM entered into a loan agreement with, and issued a promissory note (*pagaré*) to the order of, BCI for a principal amount of $10 million[9] (the "**BCI Loan**"), with a maturity date of April 1, 2024. As of the date of this Disclosure Statement, approximately $10.9 million of principal and accrued and unpaid interest is outstanding under the BCI Loan. The BCI Loan is an obligation of WOM only and not any of the other Debtors.

(ii)    *IDB Transfers*

The Company also maintained an accounts receivables transfer agreement with Inter-

---

The descriptions are not intended to be comprehensive nor should they be construed as an admission with respect to the terms, amount, validity or enforceability of any debt, any lien or security, or any other right or obligation. These descriptions are qualified in their entirety by the operative relevant debt and related documents. The Debtors and their advisors are continuing to review their debt obligations and related matters and expressly reserve all rights relating thereto.

[8]    The Unsecured Notes are listed and quoted on the Singapore Exchange (SGX).

[9]    All amounts contained herein are listed in U.S. dollars unless otherwise noted. All amounts have been converted from Chilean pesos to U.S. dollars using the currency exchange rate of 980 Chilean pesos per U.S. dollar.

American Investment Corporation, an affiliate of the Inter-American Development Bank ("**IDB**"). Under such agreement, WOM agreed to sell to IDB, from time to time, receivables arising from the sale of (a) mobile equipment devices and other equipment necessary to connect to broadband networks and (b) cloud, data and other digital services for personal and corporate consumers. WOM, acting as collection agent, periodically remitted such receivables to IDB (the "**IDB Transfers**").

Upon WOM's receipt of the relevant purchase amount, all right, title and interest in, to and under such receivables was sold, assigned and transferred to IDB. Accordingly, such receivables were property of IDB and WOM only acted as a pass-through entity with respect thereto. WOM had an obligation in favor of IDB to pay or procure the payment of each payment amount. WOM's obligation to remit payments to IDB could be discharged only by complete performance and survives the termination or default under the relevant documents regarding the IDB Transfers, even in the event of a bankruptcy filing by WOM. The Debtors were authorized to continue transferring amounts to IDB on account of the IDB Transfers pursuant to the orders entered by the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), on an interim and final basis, in connection with the Cash Management Motion (as defined below).

WOM no longer initiates new sales of receivables to IDB, and as of the date of this Disclosure Statement, all amounts outstanding have been transferred by the Debtors on account of the IDB Transfers.

(iii)    <em>EF Securitization Facility</em>

WOM was also the borrower under a securitization facility provided pursuant to a framework agreement (*Contrato Marco para la Cesión de Créditos y Derechos sobre Flujos de Pago*) (as amended, restated, supplemented or modified through the Petition Date, the "**EF Framework Agreement**") and an issuance agreement (*Contrato de Emisión Desmaterializada de Títulos de Deuda de Securitización con Formación de Patrimonio Separado por Línea*), dated as of January 18, 2024 (as amended, restated, supplemented or modified through the Petition Date, "**EF Securitization Agreement**" and, together with the EF Framework Agreement and related transaction documents, the "**EF Securitization Documents**" and the securitization facility provided pursuant thereto, the "**EF Securitization Facility**"). The EF Securitization Facility provided approximately $51 million of financing, including (a) a $26 million offset against a previous bridge loan, (b) $15 million in subordinated unsecured bonds, and (c) $10 million in cash.

Pursuant to the EF Securitization Documents, the Debtors were obligated to sell and assign certain receivables to EF (the "**EF Transfers**"), which obligations were secured by first priority liens on, and security interests in, certain agreements with banks and other servicing channels who received the payments of such receivables and certain pledged bank accounts in which payment for such receivables was received.

As of the Petition Date, approximately $39 million was outstanding on account of the EF Transfers. The Debtors obtained authority to repay and satisfy in full the EF Securitization Facility pursuant to the Interim DIP Order and Final DIP Order, and such repayment was completed on April 4, 2024.

11

3.    Other Unsecured Debt

As of the Petition Date, the Debtors' books and records listed over $450 million in non-contingent, undisputed, liquidated and unliquidated unsecured debt to vendors, taxing authorities, employees, and other contract counterparties. Since the Petition Date, the Debtors have negotiated with such counterparties to agree on reduced go-forward payment amounts, amended payment terms, and repaid certain debts pursuant to relief granted in the first day orders entered on an interim and final basis, including the Taxes Motion, the Foreign Vendors Motion, and the Wages Motion (each as defined below). Accordingly, as of the date of this Disclosure Statement, the Debtors estimate that approximately $250 million[10] of obligations remain outstanding to such creditors.

As of November 30, 2024, the Debtors have successfully negotiated approximately 120 payment plans with Independent Contractors comprising of approximately $34.4 million dollars of prepetition debt with an average reduction of 12% or approximately $4.1 million dollars.[11]

As of November 30, 2024, the Debtors have successfully negotiated approximately 140 payment plans with Foreign Vendors comprising of approximately $60.5 million dollars of prepetition debt with an average reduction of 11% or approximately $6.8 million dollars.[12]

4.    Intercompany Obligations

In the ordinary course of business, the Debtor entities maintain business relationships with each other, resulting in intercompany receivables and payables.

From time to time, a Debtor will transfer funds through the cash management system to another Debtor (such transfers among Debtors, the "**Intercompany Transfers**"). In particular, in the ordinary course of business, Debtor WOM periodically transfers funds to Debtor Kenbourne, issuer of the 2024 Notes and 2028 Notes and borrower under the DIP Loan Facility, on account of debt service. These transfers are first booked as a reduction of WOM Mobile's intercompany receivable balance with WOM and then as a reduction of Kenbourne's intercompany receivable balance with WOM Mobile. Conversely, each of these intercompany receivable balances increases as DIP Loan Facility funds are drawn and as interest accrues. Debtor WOM, as the primary operating company, also pays the shared expenses of certain other Debtors in the ordinary course, resulting in an increase in the intercompany receivable balance owed to WOM from each such Debtor whose expenses are paid.

These Intercompany Transfers are critical to the efficient operation of the Debtors' business, particularly because the Intercompany Transfers are used to ensure adequate funding for each Debtor's obligations, including, but not limited to, funding debt repayments.

## III.    EVENTS LEADING TO THE COMMENCEMENT OF CHAPTER 11 CASES

In the years prior to the Petition Date, as part of its plan to expand its portfolio of customer

---

[10]    This amount is inclusive of payment plans and disbursements that are committed by the Debtors after the date of this Disclosure Statement.
[11]    Signed and drafted agreements converted at 979 CLP/USD.
[12]    Signed and drafted agreements converted at 979 CLP/USD.

services and increase its market share, the Company made certain significant investments aimed at improving wireless infrastructure in Chile. These investments were necessary to, among other things, allow the Company to participate in bidding for concessions to operate 5G frequencies and support the growth of its consumer base. Against this backdrop, the Company suffered certain financial setbacks, including the downgrading of its debt as well as the delayed rollout of its 5G network buildout, each of which led to more negative impacts on the Company's liquidity.

### A.      Delayed Rollout of 5G Project

WOM was granted public concessions to operate in four 5G spectrum bands in January and February of 2021 via public bid processes to develop, install and operate a 5G network according to specified radio electric spectrum requirements (the "**5G Project**"). Such concessions have an initial 30-year duration.

Unfortunately, high costs and other operational difficulties led to a delay in the deployment and development of the upgraded 5G network. Complications included the significant delay in the permit approval process by the Chilean regulatory authorities, which was a necessary first step in the project. In particular, as WOM requested that State agencies grant access to their land to build the so-called base stations, it became clear that the Undersecretariat of Telecommunications (*Subsecretaría de Telecomunicaciones de Chile*) ("**SUBTEL**") and the other State agencies had not coordinated. Chile's Armed Forces and Order and Security Forces, the Ministry of National Assets (*Ministerio de Bienes Nacionales*), and the National Forestry Corporation (*Corporación Nacional Forestal*), among other public entities, refused to timely authorize WOM to access the land under their control to build base stations. Similarly, various municipalities denied WOM's permit applications to build base stations.

Additional complications included supply chain issues - mainly during the Covid-19 pandemic - which delayed the receipt of construction materials (particularly the iron that WOM needed to build base stations and electric panels), and civil unrest (including violence in the *Araucanía* region) in communities opposed to the construction of the new infrastructure necessary to complete the 5G Project. Despite these challenges, WOM made significant progress toward completing the 5G Project but still needed (and requested) two reasonable extensions of the 5G Project deadlines from SUBTEL. Those extensions were denied and WOM appealed the decisions denying its extension requests.[13]

After denying the Company's requests, SUBTEL initiated administrative sanctioning proceedings against WOM. In October 2023, SUBTEL threatened to call certain performance bonds that were issued by WOM related to the construction of the 5G Project and to terminate the concessions if the Company did not promptly complete the totality of the 5G Project. In response, WOM filed a request for provisional measures in the First Civil Court of Santiago, preventing SUBTEL from taking these actions, which was granted. Despite several challenges to this injunction filed by the Counsel of Defense of State (*Consejo de Defensa del Estado*) ("**CDE**") in various instances – some of which are currently pending – the First Civil Court of Santiago has maintained the measure, which currently prevents the Chilean authorities from collecting on the

---

[13]    The resolution of these two appeals is still pending.

performance bonds relating to the 5G Project.[14]

On December 11, 2023, a Notice of Dispute was sent to Chile, with a request for settlement, detailing the reasons for the delay in project completion. Subsequently, after the Republic of Chile decided not to engage in negotiations, on July 5, 2024, WOM, together with its affiliates NCT, NC Telecom II and WOM Mobile, filed a request for arbitration against Chile before the International Centre for Settlement of Investment Disputes ("**ICSID**"), including a request for provisional measures, asking the ICSID tribunal to order Chile to refrain from calling the performance bonds associated with the 5G concessions, as Chile had been threatening to do. WOM's claims in the arbitration are based on the *Agreement Between the Government of the Republic of Chile and the Government of the Kingdom of Norway on the Promotion and Reciprocal Protection of Investments*. On the same date, the claimants also requested from the ICSID tribunal a provisional measure, consisting of issuing an order that would prevent Chile from calling the performance bonds until the end of the arbitration proceedings. WOM also timely renewed the performance bonds, demonstrating its continued commitment to completing the 5G Project. This ongoing dispute is described in more detail in Article IV.K hereof.

The 5G Project delay and related disputes had cascading impacts on the forecasted increase in revenues associated with the expansion of the Company's portfolio, despite positive year-over-year results with respect to total revenues and number of subscribers. For instance, the Company had paid around $31 million for hardware and towers that could not be deployed due to the delays. The Company's inability to build the towers at the expected pace also prevented the Company from selling the constructed towers under the sale-leaseback agreement with PTI as expected, which deprived the Company of an additional $45 million of liquidity.

## B. Credit Agency Downgrades

In March 2023, Fitch Ratings downgraded WOM S.A.'s long-term foreign currency issuer default rating and local currency issuer default rating from BB- to B+ and the Unsecured Notes from B+ to BB-. Soon after, in April 2023, Moody's Investors Service ("**Moody's**") similarly issued a downgrade of the Debtors' credit rating from B1 to B2. Moody's issued a second downgrade of the Debtors' credit rating in November 2023 from B2 to Caa1, suggesting that the Debtors' rating outlook remained negative given the Company's uncertain path to deleveraging.

These downgrades significantly impacted the Debtors' liquidity. In April 2023, IDB reduced its credit facility to the Company from $100 million to $50 million, cutting in half an important source of liquidity used by the Company to finance the customer receivables generated from the collections on the sale of handsets. Following the second downgrade, IDB closed its credit facility altogether. As a result, the Company lost an important source of liquidity and was forced to absorb an additional $35 million hit in liquidity to pay down the remaining balance with IDB. In response to resulting margin calls following the November 2023 downgrade, the Debtors paid a total of $41 million to initially post collateral to continue their hedging transactions and later close out their hedging positions, and have not pursued new hedging transactions.

---

[14]    On August 14, 2024, the First Civil Court of Santiago denied the latest challenge to the injunction filed by the CDE, and the same court also rejected the CDE's request for reconsideration on September 2, 2024.

### C.    Material Prepetition Litigation against the Company

Prior to the Petition Date and during these Chapter 11 Cases, the Debtors have been the subject of legal administrative proceedings initiated by SUBTEL, as well as litigation initiated by creditors and other stakeholders in Chile.

### 1.    Civil and Commercial Litigation

Prior to April 1, 2024, the Debtors were the subjects of more than twenty legal proceedings that involved significant amounts or could have an adverse impact on the Debtors' estates. Some of these proceedings are still ongoing, while a significant number have been resolved during these Chapter 11 Cases.

The Debtors have been the subject of invoice collection proceedings, executive collection proceedings, arbitration proceedings, involuntary requests for Chilean liquidation (which have been resolved), claims for breach of contracts and torts, consumer protection law proceedings, and special proceedings before local police courts. The aggregate amounts in controversy with respect to these proceedings is approximately CLP 84,902,502,191.

Resolved proceedings include, among others, one arbitration proceeding, executive proceedings for unpaid invoices, involuntary petitions for Chilean insolvency liquidation, attachments over the Debtors' main offices due to unpaid governmental fees and taxes[15] and attachments over bank accounts due to unpaid invoices.

### 2.    Administrative Litigation and Investment-State Dispute with Chile

The Debtors' dispute with Chile over the 5G Project in which the Debtors are seeking to prohibit Chile from invoking guarantees related to the 5G Project, amounting to approximately CLP 42,449 million (approximately $46 million) and seeking additional damages, is a significant ongoing proceeding. The Debtors commenced this litigation and subsequent investment arbitration after SUBTEL, the Chilean telecommunications regulator, threatened to collect these guarantees due to delays in the 5G Project completion, among other reasons. The Debtors maintain that the delays were beyond their control, being largely attributable to the actions of Chile, that Chile improperly denied justified requests for extensions and that the provisional measures that were granted by Chilean Courts limiting Chile's ability to collect the performance bonds should be ratified by the Arbitral Tribunal once constituted.

Separately, the Company is also involved in ongoing disputes over the collection of guarantee bonds for the National Optical Fiber Project (the "**FON Project**"), including the recent collection of a performance bond for the amount of UF 115,166 (approximately $4.5 million) related to the North Macrozone, fines imposed by SUBTEL for delays in 5G infrastructure deployment, other administrative proceedings against SUBTEL, and environmental law proceedings.

---

[15]    These debts are now subject to tax payment agreements ("*acuerdos de pago*") with the Chilean treasury, which allow the Company to pay the total amount in installments. Although these payment agreements are in place (and thus the Company is no longer in default), the Chilean treasury is not required to release the attachments until it receives full payment.

These proceedings are described in more detail in Article IV.K hereof.

3.      Antitrust Litigation.

The ongoing antitrust proceedings also include a claim for abuse of dominant position in the SMS A2P market.

This proceeding is described in more detail in Article IV.K hereof.

**D.      Prepetition Litigation initiated by the Company.**

The Company has also initiated civil, commercial, and criminal litigation against third-parties, including, regulatory authorities, competitors, counterparties, and former employees.

**E.      Operational Mitigation Efforts**

Due to the Company's deteriorating liquidity position, it was forced to make certain operational changes in the year leading up to the Petition Date.

Approximately nine months prior to the Petition Date, the Company determined that it was unable to pay certain amounts owed to vendors and other creditors. The Company therefore requested that such Chilean operational vendors delay the collection of payments or otherwise reduce outstanding debts to allow the Company to preserve liquidity in the short term while maintaining their operations.

The Company also analyzed its fiber to the home business ("**FTTH Business**") workforce in late 2023 and planned to optimize headcount. The workforce was reduced in two stages, during November 2023 and January 2024. Approximately 150 full-time employees were impacted each of these months. The reduced workforce primarily comprised sales executives, technical installers, and employees in other support areas for the FTTH Business. As a result of this workforce reduction, the FTTH Business became streamlined and more efficient.

**F.      Retention of Advisors and Financing Raise**

In addition to these mitigation efforts, prior to the Petition Date, the Company retained professionals, including White & Case, Rothschild, Riveron, and RLF to assist the management team and their existing advisors (including Carey as Chilean counsel) in providing financial advice, management support and strategic advice. Still, the Company's liquidity position continued to deteriorate.

Prior to the Petition Date, Rothschild worked closely with the Company's management team and other advisors to understand the Company's capital structure, liquidity needs, and business operations. Beginning in July 2023, Rothschild began regular discussions with the Debtors on potential refinancing solutions for the 2024 Notes, which had an upcoming maturity. Rothschild evaluated raising financing from a broad array of potential counterparties, including under four potential structures: (i) a term loan from a regional and/or international bank; (ii) a term loan from private credit funds; (iii) a private credit term loan raised concurrently with a preferred equity raise; or (iv) an exchange offer with existing noteholders.

In September and October 2023, Rothschild conducted a comprehensive lender outreach and request for proposal process, which yielded seven indicative financing term sheets. While the financial institutions that were solicited had some appetite to fund, the indicative offers were not actionable or were only partial solutions and the proposals received could not be combined to ensure a complete solution. As the maturity of the 2024 Notes approached, the Company experienced a credit rating downgrade and additional liquidity challenges, and some financial institutions that had made proposals indicated less interest in moving forward in the process.

Through December 2023, Rothschild continued to engage with multiple counterparties, including JPMorgan Chase Bank, N.A. ("**JPM**"), in order to arrive at a refinancing solution. It soon became clear to the Debtors that JPM was the only counterparty that might be able to provide a full and timely solution. In January 2024, Rothschild focused its efforts on structuring a debt refinancing transaction with JPM including, (i) a $200 million senior springing 2L secured loan underwritten by JPM, and (ii) an additional $90 million senior 1L secured loan underwritten by JPM (the "**JPM Refinancing**"). This out-of-court financing process contemplated an equity contribution from Novator. Although the Company was actively negotiating the JPM Refinancing and engaging in a robust due diligence process with JPM in early 2024, and were close to execution by late February, the equity contribution was not provided and the JPM Refinancing did not close. Rothschild immediately pivoted to exploring and soliciting alternative financing sources, including sourcing out-of-court and DIP financing proposals from numerous financial institutions, including the Ad Hoc Group. In March of 2024, Rothschild contacted approximately 29 financial institutions to solicit first round proposals and 11 parties executed non-disclosure agreements in connection therewith. The parties that executed non-disclosure agreements were provided access to a virtual data room, confidential presentations, information about the Company's assets and liabilities, financial projections, liquidity analyses, and other relevant information.

The Company received three proposals for out-of-court financing transactions and five proposals for DIP financing transactions through this process, including proposals from JPM and the Ad Hoc Group. The boards of the Debtors evaluated all of the financing proposals in consultation with the Debtors' management team and advisors. In reviewing the financing alternatives, the Debtors considered each lender's ability to fund, the cost of the debt (including fees and interest), repayment requirements, the funding timing, and the overall flexibility of the proposed financing, among other factors. Based on the feedback from potential financing sources and the proposals received, it became apparent that the Company would not be able to obtain sufficient liquidity on an out-of-court basis to operate in the ordinary course of business and address the maturity of the 2024 Notes. The boards of the Debtors determined, after several rounds of negotiations, that the DIP financing proposal by JPM was the highest and best proposal because it provided the Company with the necessary liquidity it sought on the most favorable terms available pursuant to the competitive process that Rothschild conducted.

Meanwhile, certain of the Company's unpaid Chilean creditors initiated at least six ongoing executive proceedings and made at least two attempts to force the Debtors into involuntary liquidation proceedings in Chile prior to the Petition Date. The Company was able to negotiate and consensually resolve such proceedings, but remained subject to considerable risk of additional involuntary liquidation requests or requests for attachment of the Company's assets by other Chilean creditors. To prevent the further exercise of self-help and other remedies against the

Debtors' assets, and to obtain access to valuable DIP financing, the Company decided that commencing the Chapter 11 Cases provided the best option for obtaining necessary financing to sustain operations and prevent disruption for vendors and customers.

## IV.    OVERVIEW OF THE CHAPTER 11 CASES

### A.    Commencement of the Chapter 11 Cases

On April 1, 2024 (the "Petition Date"), the Debtors commenced these Chapter 11 Cases in the Bankruptcy Court. The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### B.    First Day and Second Day Relief

1.    First Day Orders

Upon the commencement of these Chapter 11 Cases, the Debtors filed multiple motions with the Bankruptcy Court seeking various forms of relief designed to facilitate a smooth transition for the Debtors into chapter 11 and minimize any disruptions to the Debtors' operations (collectively, the "**First Day Motions**"). Between April 2 and April 3, 2024, the Bankruptcy Court granted substantially all of the relief requested in the First Day Motions and entered orders authorizing the Debtors to, among other things:[16]

- Jointly administer these Chapter 11 Cases for ease of administration [D.I. 58];

- Obtain postpetition debtor-in-possession financing [D.I. 70] ("**Interim DIP Order**");

- Enforce the automatic stay [D.I. 80];

- Pay certain prepetition employee wages, workforce obligations, and continue certain related programs [D.I. 81] (**"Interim Wages Order"**);

- Continue the use of the Debtors' cash management system, bank accounts, and business forms [D.I. 82] ("**Interim Cash Management Order**");

- File a consolidated list of creditors and modify certain notice and personal identification requirements [D.I. 83];

- Pay certain foreign vendors and service providers [D.I. 84] ("**Interim Foreign Vendors Order**");

---

[16]    On May 23, 2024, the Bankruptcy Court granted further interim relief in connection with the Debtors' taxes motion [D.I. 215], wages motion [D.I. 216], cash management motion [D.I. 217] and insurance motion [D.I. 218]. The Bankruptcy Court granted further interim relief in connection with the Debtors' foreign vendors motion on May 30, 2024 [D.I. 233] and June 25, 2024 [D.I. 450]. On June 20, 2024 and June 21, 2024, the Bankruptcy Court granted final relief in connection with the Debtors' creditor matrix motion [D.I. 419], wages motion [D.I. 420], insurance motion [D.I. 421], DIP motion [D.I. 428], taxes motion [D.I. 432] and cash management motion [D.I. 433]. The Bankruptcy Court granted the relief in connection with the Debtors' foreign vendors motion on a final basis on July 26, 2024 [D.I. 593].

18

- Pay certain prepetition taxes and fees [D.I. 85] ("**Interim Taxes Order**"); and

- Continue insurance programs and pay related obligations [D.I. 86].

    2.    <u>Second Day Orders</u>

Shortly following the commencement of the Chapter 11 Cases, the Debtors filed motions seeking additional relief, including motions to (a) retain and pay professional in the ordinary course of business and (b) establish procedures for interim compensation and reimbursement of expenses for professionals retained during these Chapter 11 Cases, which were granted by the Bankruptcy Court on June 20, 2024 [D.I. 422, 423]. The Bankruptcy Court also authorized the retention, as of the Petition Date, of various professionals and advisors to assist the Debtors during the Chapter 11 Cases, including:

- White & Case LLP ("**White & Case**"), as counsel [D.I. 369];

- Richard, Layton & Finger P.A. ("**RLF**"), as co-counsel [D.I. 370];

- Riveron RTS, LLC and Inversiones Moyano Luco Limitada LLC (together, "**Riveron**"), as restructuring advisor [D.I. 413];

- Rothschild & Co US Inc. and Asesorias Financieras RP Spa (together, "**Rothschild**"), as investment banker [D.I. 431]; and

- Kroll Restructuring Administration LLC ("**Kroll**"), as claims and noticing agent [D.I. 79] and administrative advisor [D.I. 371];

    3.    <u>DIP Facility</u>

Pursuant to the *Debtors' Motion for Entry of Interim and Final Orders Pursuant to Sections 105, 362, 363 and 364 of the Bankruptcy Code and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (a) Authorizing the Debtors to Obtain Secured Superpriority Postpetition Financing and Granting Liens and Superpriority Administrative Claims, (b) Scheduling a Final Hearing; and (c) Granting Related Relief* (the "**DIP Motion**") [D.I. 12], the Debtors requested authority, among other things, to enter into a superpriority senior secured credit facility (the "**DIP Facility**", and the credit agreement executed in connection therewith, as amended, supplemented, or otherwise modified from time to time, the "**DIP Credit Agreement**") from JPM (the "**DIP Lender**").

The DIP Facility is a multi-draw term loan facility for an aggregate principal amount of up to $210 million, of which (i) up to $100 million was made available upon entry of the interim DIP order entered on April 2, 2024 [D.I. 70], and (ii) up to $110 million was made available upon entry of the final DIP order entered on June 20, 2024 [D.I. 428] (the "**Final DIP Order**"). The Debtors have drawn all amounts available to them under the DIP Facility.

On May 6, 2024, the Debtors and the DIP Lender entered into that certain First Amendment to the DIP Credit Agreement, which, among other things, extended certain financial reporting obligations. On May 29, 2024, the Debtors and the DIP Lender entered into that certain Second

Amendment to the DIP Credit Agreement, which, among other things, modified the date by which the Final DIP Order was to be entered. On June 28, 2024, the Debtors and the DIP Lender entered into that certain Third Amendment to the DIP Credit Agreement, which, among other things, modified (a) the date by which Kenbourne Invest S.A., the borrower, was required to borrow the delayed draw term loans under the DIP Credit Agreement, and (b) the timing for drawing the final $10 million of the DIP Facility, which was to be made available at the DIP Lender's discretion. On August 5, 2024, the Debtors and the DIP Lender entered into that certain Fourth Amendment to the DIP Credit Agreement, which, among other things, included the DIP Lender's agreement to the $10 million increase of the DIP Facility in accordance with the terms of the DIP Credit Agreement.

### C.    Appointment of the Official Committee of Unsecured Creditors

On April 12, 2024, the Office of the United States Trustee of the District of Delaware (the "**U.S. Trustee**") appointed the five-member Committee for these Chapter 11 Cases [D.I. 115], composed of (i) U.S. Bank Trust Company, N.A., in its capacity as the Unsecured Notes Trustee for the 2024 Notes; (ii) Banco de Credito e Inversiones; (iii) Phoenix Tower International Chile SpA; (iv) ATC Sitios de Chile S.A.; and (v) M&G plc.

The Committee retained Willkie Farr & Gallagher LLP as counsel, McDermott Will & Emery LLP as Delaware Counsel, Morales y Besa Abogados Ltda. as Chilean counsel, FTI Consulting, Inc. as financial advisor, and Jefferies LLC as investment banker.

### D.    Formation of the Special Committee

In early June 2024, the Debtors also formed the special committee (the "**Special Committee**"). The Special Committee is composed of the two independent directors of each of the Debtors: (a) Christopher S. Sontchi, as chair, and (b) Timothy P. O'Connor, and is represented by RLF. The Special Committee is tasked with, among other things, overseeing all actions taken by the Debtors in connection with the Chapter 11 Cases, including actions related to the use or other disposition of assets or reorganization of the Debtors or a material portion of their assets. The Special Committee is also empowered with full authority to, among other things, investigate and analyze potential claims or causes of action that one or more of the Debtors may assert under applicable law arising from transactions between the Company and related parties. As further described in Article IV.M herein, the Special Committee has engaged in an ongoing investigation since its formation.

### E.    The Ad Hoc Group of WOM Noteholders

On April 1, 2024, the Ad Hoc Group consisting of four members, which currently hold over approximately $384.43 million in Claims, appeared in the Chapter 11 Cases [D.I. 38, 410]. The Ad Hoc Group is represented by Dechert LLP as counsel, Young Conaway Stargatt & Taylor, LLP as Delaware co-counsel, Ducera Partners LLC as financial advisor, and Bofill Mir Abogados as Chilean counsel.

### F.    The Benesch Ad Hoc Group

On December 12, 2024, the Benesch Ad Hoc Group consisting of three members, which

hold approximately $33.7 million in Claims, appeared in the Chapter 11 Cases [D.I. 897, 905]. The Benesch Ad Hoc Group is represented by Benesch Friedlander Coplan & Aronoff LLP as counsel.

### G.    Abandonment of Certain Assets

Prior to the Petition Date, WOM was awarded certain licenses authorizing it to operate telecommunications services at a 26GHz frequency band throughout Chile. Upon further consideration, WOM determined that the 26GHz technology was obsolete and would not be profitable. On May 1, 2024, the Debtors therefore sought approval to abandon these licenses and pay any surety bond obligations in connection therewith, which was approved by the Bankruptcy Court [D.I. 197], saving the estates an estimated $10 million in operational costs.

As a result of the abandonment of these licenses, and despite the Company's opposition, SUBTEL collected the performance bonds associated with the 26GHz licenses, which is currently being challenged by the Company in Chile.

### H.    Key Employee Incentive and Retention Programs; Severance Payments

The Debtors obtained approval of a key employee incentive program (the "**KEIP**") and a key employee retention program (the "**KERP**") [D.I. 645] on August 14, 2024. The KEIP and KERP were designed to ensure that the Debtors' workforce remains intact during these Chapter 11 Cases and the Debtors' senior management team is properly incentivized and motivated to continue to drive improved business performance and consummate a restructuring transaction that will benefit all the Debtors' stakeholders. The KEIP participants are currently on pace to earn payouts with respect to the achievement of certain operating metrics related to revenue and adjusted EBITDA, demonstrating the effectiveness of the program. The Debtors were also authorized to make severance payments to two former insiders in accordance with requirements under Chilean labor law [D.I. 649].

### I.    Schedules and Statements and Claims Bar Dates

#### 1.    Schedules and Statements of Financial Affairs

On June 28, 2024, the Debtors filed their schedules of assets and liabilities [D.I. 487-492] and statements of financial affairs [D.I. 475-480] (collectively, the "**Schedules**"). On September 10, 2024, certain of the Debtors filed certain amended Schedules [D.I. 714-715].

#### 2.    Claims Bar Dates

On July 29, 2024, the Bankruptcy Court entered an order [D.I. 602] (the "**Bar Date Order**") approving: (i) September 27, 2024 at 5:00 p.m., prevailing Eastern Time, as the deadline for all persons or entities (except governmental units) to file proofs of claim in the Chapter 11 Cases (the "**General Bar Date**"); (ii) September 30, 2024 at 5:00 p.m. prevailing Eastern Time, as the deadline for governmental units to file proofs of claim in the chapter 11 cases (the "**Governmental Bar Date**"; (iii) the latter of (a) the General Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m. prevailing Eastern Time, on the date that is thirty (30) days after service of an order of the Bankruptcy Court authorizing the Debtors' rejection of the

executory contract or unexpired lease giving rise to the applicable rejection damages claim (the "**Rejection Damages Bar Date**"); and (iv) the latter of (a) the General Bar Date or the Governmental Bar Date, as applicable, and (b) 5:00 p.m. prevailing Eastern Time on the date that is thirty (30) days after the date on which the Debtors provide notice of an amendment or supplement to the Debtors' Schedules as the deadline for such persons or entities affected by such amendment or supplement to file proofs of claim in the Chapter 11 Cases. (the "**Amended Schedules Bar Date**," and together with the General Bar Date, the Governmental Bar Date, and the Rejection Damages Bar Date, the "**Bar Dates**") [D.I. 602].[17]

On July 31, 2024, the Debtors mailed a notice of the Bar Dates to all parties as required by the Bar Date Order. In further compliance with the Bar Date Order, the Debtors caused such notice to be published in English in the *New York Times* on August 8, 2024 and in Spanish in *El Mercurio* on August 19, 2024 [D.I. 676].

      3.      Claims Reconciliation Process

As of the date of this Disclosure Statement, approximately 183 proofs of claim have been filed against the Debtors. The Debtors and their professionals are in the process of reconciling the amount and classification of the proofs of claim filed in the Chapter 11 Cases.

The Debtors filed their first omnibus (non-substantive) objection to certain duplicate claims, and certain amended and superseded claims, on December 23, 2024 [D.I. 968] ("**First Omnibus (Non-Substantive) Objection**"). On January 21, 2025, the Court entered an order sustaining the First Omnibus (Non-Substantive) Objection [D.I. 1035].

On January 3, 2025, the Debtors filed three notices of satisfaction regarding scheduled claims that have been satisfied in full after the Petition Date [D.I. 984-986]. The Debtors further filed two notices of satisfaction on January 17, 2025 regarding scheduled claims as well as filed claims that have been satisfied in full after the Petition Date [D.I. 1025, 1026]. On January 21, 2025, the Debtors filed their sixth notice of satisfaction regarding scheduled claims that have been satisfied in full after the Petition Date [D.I. 1035].

The Debtors' assessment of the validity of claims received is ongoing. These claims will be reconciled to amounts recorded in the Company's books and records. Differences in amounts determined by the Debtors and claims filed by creditors will continue to be investigated and resolved, including through the filing of claim objections with the Bankruptcy Court where appropriate. Certain claims may be duplicative, have been later amended or superseded, are without merit, are overstated or should be disallowed for other reasons. The claims reconciliation process will continue throughout these Chapter 11 Cases and may continue after the Debtors emerge from bankruptcy.

      4.      Exclusivity

Section 1121(b) of the Bankruptcy Code provides for an initial period of 120 days after the

---

[17]    The Bar Date Order, among other things, authorized the Debtors to extend the applicable Bar Date to certain holders of claims by stipulation where the Debtors determine that such extension is in the best interests of their estates. D.I. 602 ¶ 25.

commencement of a chapter 11 case during which a debtor has the exclusive right to file a plan of reorganization (the "**Exclusive Plan Period**"). In addition, section 1121(c)(3) of the Bankruptcy Code provides that, if a debtor files a plan within the Exclusive Plan Period, it has a period of 180 days after commencement of the chapter 11 case to obtain acceptances of such plan (the "**Exclusive Solicitation Period**," and together with the Exclusive Plan Period, the "**Exclusive Periods**"). Pursuant to section 1121(d) of the Bankruptcy Code, the Bankruptcy Court may, upon a showing of cause, extend the Exclusive Periods.

On July 28, 2024, the Debtors filed a motion [D.I. 597] (the "**Exclusivity Motion**") to extend the Exclusive Plan Period through and including December 31, 2024 and the Exclusive Solicitation Period through and including March 1, 2025. On August 12, 2024, the Bankruptcy Court granted the Exclusivity Motion and entered an order extending the Exclusive Period [DI. 636].

On December 30, 2024, the Debtors filed a second motion [D.I. 978] (the "**Second Exclusivity Motion**") to extend the Exclusive Plan Period through and including March 21, 2025 and the Exclusive Solicitation Period through and including May 20, 2025, without prejudice to the Debtors' right to seek additional extensions. The Second Exclusivity Motion was approved by the Bankruptcy Court on January 16, 2025 [D.I. 1016].

## J.    Executory Contracts and Unexpired Leases

As of the Petition Date, the Debtors were parties to numerous executory contracts and unexpired leases. As part of their restructuring efforts, the Debtors, in consultation with their advisors, have undertaken, and continue to undertake, a review of their executory contracts and unexpired leases with a view to rejecting or renegotiating those agreements that are overly burdensome to the Debtors and assuming those which are beneficial to the Debtors.

To date, the Debtors have filed two omnibus motions to assume executory contracts and unexpired leases [D.I. 462, 799]. The Debtors obtained Court approval to assume certain executory contracts related to the offering of international roaming capabilities, to help prevent potential interruptions in service for customers traveling internationally [D.I. 547]. The Debtors' second omnibus motion to assume certain unexpired leases of nonresidential real property is scheduled to be heard at a hearing on March 6, 2025.

Whereas chapter 11 debtors are generally free to assume or reject executory contracts and unexpired leases at any time prior to confirmation of a plan, section 365(d)(4)(A) of the Bankruptcy Code provides that a debtor has an initial period of 120 days after the commencement of the chapter 11 case to assume or reject unexpired leases of nonresidential real property (the "**Lease Assumption Period**"). Pursuant to section 365(d)(4)(B), the Bankruptcy Court may, upon a showing of cause, extend the Lease Assumption Period by an additional ninety (90) days.

On July 26, 2024, the Debtors filed a motion to extend the Lease Assumption Period through and including October 28, 2024 [D.I. 594], which was granted by order of the Bankruptcy Court on August 12, 2024 [D.I. 635]. The Bankruptcy Court entered two orders approving stipulations extending the Lease Assumption Period, with respect to certain lessors, through and including [December 31, 2024] [D.I. 783, 871].

**K.        Material pending litigation**

The Debtors are facing some proceedings that involved significant amounts or that could have adverse effects:

1.      Precautionary injunctive relief to suspend the collection of guarantee policies.

The Debtors filed a petition for precautionary measures (*medidas prejudiciales precautorias*) in the First Civil Court of Santiago, Chile requesting the suspension of the collection of the three guarantee policies that ensured the faithful compliance with the implementation of WOM's 5G project, which, in total, amounted to approximately CLP 42,449,682,600. The precautionary measure was granted by the First Civil Court of Santiago on 7 November 2023, which orders Chile to refrain from calling the guarantee policies.

The Company filed this petition for precautionary measures in response to SUBTEL's statements that it would collect the above-mentioned guarantee policies based on purported breaches in the deployment of the technical project of the 5G concession commitments by the Company, among other reasons. However, the non-timely delivery of 100% of the 5G operational network was due to causes beyond WOM's control (for example, as a result of delays in obtaining necessary permits from public entities), and SUBTEL's improper denials of deadline extensions. For such reasons, among others, Debtors WOM, WOM Mobile, and NC Telecom II, and non-Debtor NCT (collectively, the "**Claimants**"), initiated arbitration proceedings under the ICSID rules, alleging breaches of the *Agreement Between the Government of the Republic of Chile and the Government of the Kingdom of Norway on the Promotion and Reciprocal Protection of Investments*, in force since September 7, 1994.

As part of the domestic litigation, the CDE has challenged the resolution issued by the First Civil Court of Santiago that granted the precautionary measures, as well as the resolution that maintained the precautionary measures (since it is required in Chile that, after a preliminary measure is granted, a lawsuit must be filed within a certain period of time, which requirement the First Civil Court of Santiago deemed to have been complied with when the Notice of Dispute was sent to Chile). In view of this, there are pending appeals by the CDE before the Court of Appeals of Santiago, the hierarchical superior of the First Civil Court of Santiago, which are expected to be reviewed in the next 6 to 8 months.

Separately, at the time of the commencement of the ICSID arbitration proceedings, the Claimants requested the maintenance and ratification in the arbitration of the precautionary measures originally granted by the Chilean Courts, seeking to avoid the collection of the performance bonds during the prosecution of the ICSID arbitration.

Although the Claimants and Chile have each appointed arbitrators, the arbitral tribunal has not yet been constituted,[18] and the Claimant's request will be addressed by the tribunal once

---

[18]      The procedural history of the ICSID Arbitration is as follows:

- August 2, 2024: The Acting Secretary-General registers a request for the institution of arbitration proceedings.
- August 12, 2024: The Acting Secretary-General fixes time limits pursuant to ICSID Arbitration Rule 47(2)

constituted.

Although SUBTEL has threatened to collect the full amount of the performance bonds, the Company's position is that, to the extent that SUBTEL has any right to collect such bonds, such collection should be proportional to the level of completion of the 5G Project. Thus, given that WOM had achieved an overall completion rate of approximately 80% by the target completion deadline of October 7, 2023, the Company believes that any right of SUBTEL to collect the performance bonds should be limited to, at most, 20% of the amount of such bonds. In public interviews, the Undersecretary of Telecommunications has acknowledged that collection of performance bonds should be proportional to the level of compliance. However, it must be considered that there is no definitive statement from that authority in this regard.

The Company has engaged in discussions with SUBTEL and other government entities regarding resolution of the ICSID arbitration, other litigation, and operational issues related to the relevant concessions. However, as of the date of the filing of this Disclosure Statement, no agreed resolution has been reached.

2.      Claim for abuse of dominant position against WOM followed before the Antitrust Court (*Tribunal de Defensa de la Libre Competencia*) ("**TDLC**"), for alleged anticompetitive and exclusionary practices, in its capacity as dominant in the SMS A2P market

Connectus SpA, Altera and other plaintiffs filed a lawsuit against WOM on August 2, 2022. The lawsuit, referred to as the "A2P Case", alleges that WOM engaged in anticompetitive practices and unfair treatment, by introducing unilateral changes to their agreements, including imposing higher rates for A2P SMS services and refusing to enable short numbering essential to their operations. The plaintiffs argue that WOM's actions have resulted in financial losses and hindered their ability to compete in the market.

Oral arguments before the Antitrust Court took place on October 22, 2024. After the oral arguments, the case was submitted for decision ("*en acuerdo*") and is awaiting the ruling. Against this decision the defeated party has the right to request a review of the ruling by the Chilean Supreme Court (*recurso de reclamación*).

3.      Litigation against fines imposed by SUBTEL

WOM S.A. was collectively fined by SUBTEL, for an aggregate amount of UTM 3,800 (approximately US $260,275.00), for alleged delays in the deployment of the infrastructure for Phase 1 of the 5G project. This amount does not include additional daily fines that WOM has also

---

for the parties to present observations on the Claimants' request for provisional measures contained in the request for arbitration.

- October 8, 2024: Chile files observations on the Claimants' request for provisional measures.
- November 4, 2024: Following appointment by the Claimants, Oscar M. Garibaldi (Argentine/U.S.) accepts his appointment as arbitrator.
- November 5, 2024: Following appointment by Chile, Alexis Mourre (French) accepts his appointment as arbitrator.
- November 13, 2024: The Claimants file a reply on their request for provisional measures.
- December 13, 2024: Chile files a rejoinder on the Claimants' request for provisional measures.

disputed.

Currently, the litigation is being held before the Court of Appeals of Santiago, Chile on three separate dockets. This litigation, however, is currently suspended by order of the Chilean Constitutional Court (*Tribunal Constitucional de Chile*). The pending proceedings before the Chilean Constitutional Court are based on a constitutional action filed by WOM seeking the inapplicability (*inaplicabilidad por inconstitucional*) of certain provisions of the Chilean Telecommunications Act that would violate the Chilean Constitution. WOM expects to have a final decision by the Constitutional Court in the first half of 2025.

In addition, WOM was fined by SUBTEL in an aggregate amount of UTM 1,000 (approximately US $68,493.58), for alleged delays in the deployment of the infrastructure for mandatory locations (*localidades obligatorias*) of the 5G project. This amount does not include additional daily fines that WOM has also disputed. Currently, the litigation is being held before the Court of Appeals of Santiago, Chile. Also, with respect to this proceeding, a request of inapplicability for unconstitutionality was filed, which is awaiting a decision by the Constitutional Court.

SUBTEL has also initiated additional sanctioning procedures for alleged delays in the deployment of the 5G project, including, but not limited to delays related to the deployment of infrastructure for routes and industrial areas (*polígonos industriales*), the fines for which (if any) are currently being determined by SUBTEL.

There is an additional request from WOM to extend the deadline for the deployment of the 5G Project due to force majeure. This was partially accepted by SUBTEL on October 17, 2024, due to the existing violence in the *Macrozona Sur*, only with respect to a group sites, but SUBTEL rejected the additional causes invoked by WOM. WOM filed an appeal for reconsideration (*recurso de reposición*) of this administrative resolution. On November 10, 2024, SUBTEL issued a new resolution with respect to other sites, partially rejecting the request for an extension. WOM also filed an appeal for reconsideration of this administrative resolution. In any case, SUBTEL has not issued a resolution regarding other sites where an extension of term was requested by WOM.

Finally, WOM filed an appeal for reconsideration before SUBTEL on July 17, 2024 (SUBTEL case No. 90.315 of 2024), against the collection of performance bonds in the 26 GHz Band (telecommunications concessions abandoned by WOM) for an aggregate amount which can be estimated at approximately UF 120,000 ($4,716,699.21), which is still pending of resolution by SUBTEL.

4.      Collection of FON (*Fibra Óptica Nacional*) project performance bond ("boleta de garantía") for an amount of UF 96,000 (approximately CLP 3,770,501.34) related to the Central-South Macrozone

On December 12, 2023, SUBTEL issued a resolution ordering the execution of the guarantees associated with the FON Project for the central-south macro zone, alleging (i) that such guarantees had not been timely renewed and (ii) that the deadlines for the commencement of service in the central-south (CTS) macro zone were not met.

WOM filed several administrative remedies and a constitutional action (*recurso de*

26

*protección*) against SUBTEL's resolution, all of which were rejected by the corresponding authority and courts.

WOM is now evaluating judicial alternatives against SUBTEL.

5.    Claim of unfair competition against WOM

ENTEL PCS Comunicaciones S.A. and Empresa Nacional de Telecomunicaciones S.A. (jointly "**Entel**") filed a lawsuit against WOM on April 6, 2018 alleging anti-competitive practices, based on the broadcasting of two advertising spots in November 2017 and March 2018 and the projection of WOM's logo in the "Entel Tower" located in Santiago in October 2017.

On May 30, 2018, WOM responded to the lawsuit requesting its complete rejection.

On April 28, 2022, the 7th Civil Court of Santiago rejected Entel's lawsuit in its entirety.

On May 13, 2022, Entel filed an annulment remedy (*recurso de casación en la forma*) together with an appeal, in order to have the decision annulled or revoked, requesting that its claim be accepted.

On May 16, 2022, WOM also appealed the judgment, requesting that certain rejected defenses should be accepted and that Entel should be ordered to pay the trial costs for having been totally defeated in the trial and not having plausible grounds to litigate.

Since June 2, 2022 the status of the case is that it is in line for hearing ("*en relación*"). As of December 2024, the oral arguments for this case are still pending.

6.    Non-contentious consultation filed by Entel before the Antitrust Court

The Antitrust Court has initiated a new non-contentious consultation at the request of Entel. The purpose of this consultation is to determine whether there are new circumstances that would justify leaving *Resuelvo* No. 2 of Resolution No. 62/2020 without effect. This resolution determined the compatibility of SUBTEL's resolutions regarding the use and exploitation of the 3.4-3.6 GHz band, if the current concessionaires are not exempted from participating in future bids.

Therefore, Entel seeks for the Antitrust Court to determine that the concessionaires of public telecommunications services may request SUBTEL to add specific services to their current concessions.

The hearing before the Antitrust Court took place on November 10, 2024, at which time the case was submitted for the Antitrust Court's decision ("*en acuerdo*"). As of the time of the filing of this amended Disclosure Statement, no decision has been entered by the Antitrust Court.

7.    Attachment over main offices located in Rosas Street, Santiago, owned by WOM

Attachments were registered over the main offices located in Rosas Street N° 2451, Santiago, owned by WOM, as a result of collection proceedings initiated by the Chilean Treasury Service (*Tesorería General de la República*) (the "**Chilean Treasury**") against the Company for

27

unpaid governmental fees (for use of the radioelectric spectrum and for unpaid VAT) for a total amount of CLP 18,603,985,939.

The attachments were registered under: (i) Folio 827 N°. 1207 of the year 2024 ordered by the Chilean Treasury, Collection Department Rol N°19912-2023; (ii) Folio 828 N° 1208 of the year 2024 ordered by the Chilean Treasury, Collection Department Rol N° 19910-2023; (iii) Folio 828 N° 1209 of the year 2024 ordered by the Chilean Treasury, Collection Department Rol N° 19898-2023; and (iv) Folio 829 N° 1210 of the year 2024 ordered by the Chilean Treasury, Collection Department Rol N° 10000-2024.

These debts are now subject to payment agreements (*Convenios de Pago*) entered into by the Company and the Chilean Treasury, which allow the Company to pay the total amount in installments. The Company has complied with these payment agreements and the current outstanding amount is approximately CLP 15,639,878,369. Although these payment agreements are in place (and thus the Company is no longer in default), the Chilean Treasury is not required to release the attachments and, although the release can be requested, it is unlikely that the Chilean Treasury will accept such request or do it in a timely manner.

8.      Disputes with Telecomunicaciones P&T Systems SpA

WOM is currently involved in an arbitration proceeding with Telecomunicaciones P&T Systems SpA. Although Telecomunicaciones P&T Systems SpA had previously initiated civil and bankruptcy-related litigation against WOM, which was settled, it still claims certain outstanding amounts, which WOM has denied. The amounts in controversy in this arbitration proceeding is approximately UF 68,236. On December 2, 2024, WOM replied to the claim and proceeded to file a counterclaim against Telecomunicaciones P&T Systems SpA. On December 19, 2024, Telecomunicaciones P&T Systems SpA, replied to WOM's counterclaim.

In addition, the Debtors are expecting a second arbitration proceeding to be initiated by Telecomunicaciones P&T Systems SpA, for UF 21,040.

9.      Labor Disputes

The Debtors are currently involved in several litigation proceedings initiated by, among others, former employees, purported employees, employees of third-party service providers, unions, and/or regulatory authorities (*Inspeccion del Trabajo*), where the Debtors have been sued for administrative fines, their alleged direct labor liability and/or secondary labor liability (indirect claims filed against the Debtors for their potential secondary labor liability in the event that third-party service providers have failed to meet their obligations to their own employees).

In addition, certain former senior executives, have delivered communications to WOM asserting alleged obligations by WOM to pay certain amounts under their employment contracts. The total aggregate amount (including the full requested amounts by the plaintiffs) is approximately $4,200,000 (which amount corresponds to the amount of the current claim in addition to possible indemnification expenses of these senior executives).

As of December 2024, the Debtors were involved in a total of 160 labor disputes, with claims amounting to approximately $4,285,609 in aggregate.

28

10. <u>Construction Claims</u>

On December 13th, 2024, WOM was served with a civil ordinary lawsuit, regarding a claim for civil works (*obras civiles*) allegedly completed but not paid by WOM, for CLP 408,005,969. The case is currently pending before the 14th Civil Court of Santiago.

11. <u>PTC insolvency proceedings</u>

In May 2024, Partners Telecom Colombia S.A.S. ("**PTC**"), an entity related to the Debtors, was admitted into a business reorganization proceeding under the laws of Colombia. The Debtors may have claims against PTC. In addition, WOM is a party to a licensing agreement with PTC and the licensing rights related thereto may provide future value to the Reorganized Debtors. The Debtors have engaged Colombian legal counsel to protect the Debtors' rights, claims, and interests in PTC's reorganization proceeding, including, but not limited to, protecting their rights and interests in the licensing rights and related assets.

12. <u>Collection of FON (Fibra Óptica Nacional) project performance bond ("boleta de garantía") for an amount of UF 115,166 (approximately CLP 4,424,863,137) related to the North Macrozone</u>

On December 26, 2024, WOM was served with Exempt Resolution No. 2,291, issued by SUBTEL, which ordered the collection of the guarantee for the commencement of service in the North Macrozone, amounting to UF 115,166 (approximately $4.5 million).

On January 3, 2024, WOM filed an appeal for reconsideration and a hierarchical appeal ("*recurso de reposición con jerárquico en subsidio*") against the aforementioned exempt resolution, which are pending resolution.

13. <u>Other pending proceedings</u>

The Debtors have many other pending proceedings for lower amounts, which include invoice collection proceedings, unfair competition proceedings, claims for breach of contracts and/or torts, proceedings before antitrust entities, consumer protection law proceedings, other administrative proceedings against SUBTEL, intellectual property claims, environmental law proceedings, and special proceedings before local police courts (including customer-related disputes). The Debtors believe that the amounts involved in the proceedings that are not specifically disclosed in this Disclosure Statement do not have the ability to cause a material adverse effect on the business, financial standing, growth prospects or results of the Debtors.

**L.    Key Settlements and Negotiations in the Chapter 11 Cases**

1. <u>Ad Hoc Group Litigation and Settlement</u>

On April 23, 2024, the Ad Hoc Group filed a motion to dismiss the Chapter 11 Cases, and in the alternative, sought the appointment of a trustee (the "**Motion to Dismiss**") [D.I. 143], arguing, among other things, that the Debtors lack of meaningful connections with the United States and that the Bankruptcy Court lacked jurisdiction to grant effective relief in the Chapter 11 Cases. The Debtors and the Committee opposed the Motion to Dismiss.

In addition, the Ad Hoc Group objected to all of the final relief requested in the Debtors' First Day Motions (such objections, the "**AHG First Day Objections**") [D.I. 252-257, 260, 263].

During the first several months of the Chapter 11 Cases, the Debtors and the Ad Hoc Group engaged in an extensive discovery process in connection with the Motion to Dismiss and the AHG First Day Objections. This process consisted of 17 in-person and virtual depositions, as well as the production of over 48,000 pages of documents.

On June 20, 2024, prior to the anticipated two-day evidentiary hearing on the Motion to Dismiss, the Debtors, the Committee, and the Ad Hoc Group successfully settled their disputes in connection with the Motion to Dismiss and the AHG First Day Objections.

On June 24, 2024, the Debtors filed a motion to approve the proposed settlement among the Debtors, the Ad Hoc Group, and the Committee [D.I. 449] (the "**AHG Settlement Motion**"). After notice and a hearing, the Bankruptcy Court entered the order approving the AHG Settlement Motion, over the objection of the U.S. Trustee, on July 16, 2024 [D.I. 531]. Among other things, the settlement required the withdrawal of the Motion to Dismiss and the AHG First Day Objections, and definitively ended months of litigation among the parties. Further, the settlement allowed the parties to support a strategy to market the Debtors' business in a fair and competitive process designed to maximize the value of the Debtors' estates for the benefit of all stakeholders.

## M.     Special Committee Investigation

Promptly after its formation in June 2024, the Special Committee commenced an investigation into related-party transactions between the Debtors and their Novator affiliates, including potential claims relating to approximately $340 million in distributions that the Debtors transferred to their shareholders in 2022 (the "**Investigation**").

The Special Committee directed RLF and Riveron to lead the Investigation under its oversight. The Special Committee also is receiving advice from local counsel in Chile, Luxembourg, and Norway with respect to potential claims that could arise under the local laws of those jurisdictions.

The Special Committee's Investigation has taken place over a period of approximately four months and has included extensive factual and legal analysis. On behalf of the Special Committee, RLF requested and received pertinent information from the Debtors and their Novator-affiliated shareholders. RLF then ran a document review process to narrow hundreds of thousands of documents down to a set of approximately 55,000, which received first- and second-level review to further narrow the documents to those most likely to yield relevant information. RLF then shared relevant documents with Riveron and foreign counsel, who performed their own review as part of their assessment of claims. RLF and Riveron also conducted eight interviews that they deemed reasonably necessary to understand the Debtors' prepetition related-party transactions.

RLF and Riveron are analyzing causes of action in a four-year lookback period, including, among other causes of action, actual fraudulent transfer, constructive fraudulent transfer, insider fraudulent transfer, preferential transfer, breach of fiduciary duties, unlawful distribution, recharacterization, and similar causes of action under the United States laws, and foreign local laws of Chile, Luxembourg, and Norway. Throughout the course of the investigation, RLF has

updated the Special Committee on progress, both at formal meetings of the Special Committee and informally. RLF and Riveron also hold bi-weekly meetings with the professionals for the Official Committee of Unsecured Creditors pursuant to a common interest agreement to discuss Investigation matters.

The Investigation is substantially complete. The Special Committee is evaluating the appropriate course of action with respect to certain Causes of Action subject to the Investigation. Such Causes of Action will constitute LT Claims, as defined in the Plan, to the extent the Special Committee (in consultation with the Committee) does not settle such Causes of Action or otherwise determines such Causes of Action should not be pursued prior to the Effective Date. Upon the Effective Date, the LT Claims will be Plan Trust Assets and transferred to the Plan Trust.

### N.    Development and Negotiation of the Plan and Plan Sponsor Agreement

1.    <u>Marketing Process</u>[19]

Since the Petition Date, several strategic buyers and financial institutions conveyed expressions of interest in the Debtors' assets and ongoing business. With the assistance of Rothschild, the Debtors sought to commence a marketing process that would provide interested parties a meaningful opportunity to review and diligence the Debtors' assets and business plan and position them to submit bids. Rothschild, with input from the Committee's advisors, identified approximately 100 parties that were reasonably likely to be interested in consummating a proposed transaction, including both strategic buyers and financial institutions.

On June 13, 2024, the Debtors filed a motion to obtain Bankruptcy Court approval and establishment of certain bidding procedures designed to facilitate a value-maximizing marketing process, which was developed in collaboration with the Special Committee and the Committee (the "**Marketing Process**") for a sale or plan sponsorship of the Debtors [D.I. 365]. On July 16, 2024, the Bankruptcy Court granted the bidding procedures motion and approved the bidding procedures (the "**Bidding Procedures**") [D.I. 536] (the "**Bidding Procedures Order**").

Rothschild first distributed a non-confidential "teaser" to the approximately 100 parties that had been identified as potential bidders. Of these, 23 potential bidders executed non-disclosure agreements ("**NDAs**") after several rounds of negotiation. Parties under NDA were then provided access to a "Phase I" virtual data room and other diligence materials, including a confidential information memorandum developed collaboratively by the Debtors and their advisors.

On July 25, 2024, the Debtors filed a notice extending certain dates and deadlines in the Bidding Procedures Order, including the deadline for bidders to submit non-binding indications of interest (the "**IOIs**") from August 9, 2024 to September 9, 2024; the deadline to designate a stalking horse bidder and execute a stalking horse agreement from September 20, 2024 to October 18, 2024; and deadline for bidders to submit binding bids from October 18, 2024 to November 15, 2024 [D.I. 588]. The deadline to designate a stalking horse bidder and execute a stalking horse agreement was subsequently extended from October 18, 2024 to October 25, 2024 [D.I. 736], and

---

[19]    Capitalized terms used but not defined in this section have the meanings ascribed to such terms in the Bidding Procedures Order.

further extended from October 25, 2024 to November 1, 2024 [D.I. 771].

The Debtors received three IOIs for a partial sale of the FTTH Business and six IOIs for transactions involving the entire Company. The Special Committee, in consultation with the Committee, reviewed the IOIs, taking into consideration relevant factors, including execution risk, the form(s) of consideration for the proposed transaction, the marketability of such consideration, regulatory approval process, and the present value of such consideration at market rates under prevailing market conditions. The Debtors' advisors communicated certain feedback to Potential Bidders and allowed them to improve their IOIs. Ultimately, two of the three Potential Bidders that had submitted an IOI for the FTTH Business and each of the Potential Bidders that had submitted an IOI for a transaction involving the entire Company were invited to a "Phase II" virtual data room, which contained additional materials, including market information, tax diligence, information and documents regarding business and technical operations, material contracts, financial statements, concessions and permits, corporate organizational documents, and form Plan Documents. Six of those Potential Bidders were invited to attend presentations given by the Debtors' management team.

2.    Designation of Successful Bid

Following the conclusion of the comprehensive marketing process, the Debtors received two Qualified Bids – one for the FTTH Business and one for a plan plan sponsorship transaction from the AHG.[20] The Special Committee reviewed the Qualified Bids, taking into consideration all relevant factors, including (without limitation) execution risk, the form(s) of consideration for the proposed transaction, the marketability of such consideration, regulatory approval process, and the present value of such consideration at market rates under prevailing market conditions, in consultation with the Committee.

On November 1, 2024, the Debtors filed the *Notice Regarding Update on Sale and Marketing Process* [Docket No. 817], which attached a statement issued by the Special Committee, confirming that the Debtors had received a binding stalking horse bid, subject to final negotiation and documentation, Court approval, and the conclusion of the Debtors' ongoing marketing process. The Debtors did not identify the AHG as the bidder in that notice because definitive documents had not been finalized.

Following extensive and good faith discussions and negotiations among the AHG and the Debtors' principals and advisors, the AHG submitted a revised bid on November 15, 2024, the bid deadline under the Bidding Procedures Order. The Debtors only received one other binding bid by the bid deadline, which was a bid for a partial sale and not a comprehensive transaction.

Ultimately, the Special Committee, on behalf of the Debtors and in consultation with the Committee, determined that the revised bid submitted by the AHG was the highest or otherwise best offer. On December 7, 2024, the Debtors filed a notice of cancellation of the auction and designation of the AHG's bid as the Successful Bid in accordance with the Bidding Procedures [D.I. 890].

---

[20]    The AHG binding bid for a plan transaction was submitted on October 29, 2024.

3.    Plan Sponsor Agreement; Backstop Agreement

On December 7, 2024, the Debtors and the Consenting Noteholders (collectively, the "**Plan Sponsor Parties**"), following extensive arm's-length negotiations, entered into that certain Plan Sponsor Agreement attached hereto as **Exhibit F** and that certain Backstop Agreement attached hereto as **Exhibit G**. The Debtors have since further documented the terms of the Reorganization Transactions contemplated thereby, including in the Plan.

On December 6, 2024, the Debtors filed a motion seeking authority and approval of the Bankruptcy Court for the Debtors' entry into the Plan Sponsor Agreement, and the Backstop Agreement and the incurrence of certain payments and indemnification in connection therewith [D.I. 885] (the "**Backstop and PSA Motion**"). On December 20, 2024, after notice and a hearing, the Bankruptcy Court approved the Backstop and PSA Motion [D.I. 959].

The Plan Sponsor Agreement was amended on January 13, 2025 to reflect a deal reached among the Plan Sponsor Parties and the Committee, and the Committee subsequently executed a joinder to the amended Plan Sponsor Agreement on January 15, 2025 [D.I. 1011].

Approval of the Plan Sponsor Agreement and the Backstop Agreement represents a significant step in the Debtors' restructuring process. Pursuant to the Plan Sponsor Agreement, the Reorganization Transactions are supported by Holders of Unsecured Notes in aggregate principal amount of $384.43 million of Unsecured Notes Claims, and the Committee. The Reorganization Transactions contemplated by the Plan will eliminate approximately $650 million of the Debtors' funded debt obligations and provide them with $500 million of new equity capital at exit. With a substantially deleveraged balance sheet and ample go-forward liquidity, the Reorganized Debtors will be well positioned to implement the Company's business plan and achieve long-term success, including, the compliance with the Debtors' 5G project commitments.

The Debtors believe that the deleveraging and liquidity-enhancing Reorganization Transactions embodied in the Plan represent the most value-maximizing path forward.

The following table summarizes the material terms of the Plan Sponsor Agreement:[21]

| Summary of Material Terms of the Plan Sponsor Agreement | |
| --- | --- |
| Milestones<br><br>*See* Plan Sponsor Agreement § 4 | The Debtors shall take commercially reasonable efforts to implement, subject to approval of the Bankruptcy Court (where applicable), the Reorganization Transactions, in accordance and compliance with the following Milestones unless (i) any Milestone is extended or waived in writing (e-mail among counsel being sufficient) by the Required Consenting Noteholders or (ii) the failure to comply with any Milestone is caused solely by an act or omission of a Consenting Noteholder: |

---

[21]    Capitalized terms used but not otherwise defined in this table shall have the meaning ascribed to such terms in the Plan Sponsor Agreement. The summaries of the Plan Sponsor Agreement and Backstop Agreement are qualified in their entireties by reference to the provisions of the respective agreements.

|  | 1. | by no later than December 6, 2024, the Debtors shall have filed with the Bankruptcy Court a notice cancelling the Auction and designating the Ad Hoc Group Bid as the Successful Bid; |
|  | 2. | by no later than December 6, 2024 (the "<u>Backstop and PSA Motion Deadline</u>"), the Debtors shall have filed with the Bankruptcy Court the Backstop and PSA Motion; and a motion to shorten notice with respect to the Backstop and PSA Motion; |
|  | 3. | by no later than December 20, 2024 (the "<u>Backstop and PSA Order Deadline</u>"), the Debtors shall have obtained the entry by the Bankruptcy Court of the Backstop and PSA Order; |
|  | 4. | by no later than December 19, 2024, the Debtors shall have filed the Plan, the Disclosure Statement, the Disclosure Statement Motion, and the Rights Offering Procedures Approval Motion; |
|  | 5. | by no later than January 23, 2025, the hearing to approve the Disclosure Statement, the Disclosure Statement Motion, and the Rights Offering Procedures Approval Motion shall have concluded; |
|  | 6. | by no later than the date that is two (2) Business Days after the conclusion of the hearing to approve the Disclosure Statement, the Disclosure Statement Motion, and the Rights Offering Procedures Approval Motion, the Debtors shall have obtained the entry by the Bankruptcy Court of the Rights Offering Procedures Order and the Disclosure Statement and Solicitation Procedures Order; |
|  | 7. | by no later than the date that is five (5) Business Days after entry of the Disclosure Statement and Solicitation Procedures Order (the "<u>Solicitation Date Milestone</u>"), the Debtors shall have commenced the solicitation of the Plan and the Rights Offering and distributed the Disclosure Statement and the Solicitation Materials to holders of Claims entitled to vote to accept or reject the Plan; |
|  | 8. | by no later than the date that is twenty-eight (28) days after the Solicitation Date Milestone (the "<u>Solicitation Completion Milestone</u>"), the Debtors shall have completed solicitation of the Plan and the Rights Offering; |
|  | 9. | by no later than the date that is five (5) Business Days after the Solicitation Completion Milestone, the Debtors shall have obtained entry by the Bankruptcy Court of the Confirmation Order; and |
|  | 10. | the Plan Effective Date shall have occurred by the Effective Date Deadline. |
| **Debtors' Fiduciary Obligations** | <u>Additional Provisions Regarding the Company Parties' Commitments</u>:<br><br>Section 5(e)(1) provides, in relevant part, that the Company Parties' Commitments (as set forth in Section 5(d) of the Plan Sponsor Agreement) "will not limit any of the Debtors' rights to directly or indirectly, engage in or participate, prior to the entry of the |

| | |
|---|---|
| *See* Plan Sponsor Agreement §§ 5(e)(1); 8(c)(1)(C); 10(o) | Disclosure Statement and Solicitation Procedures Order, in any unsolicited discussions, inquiries or negotiations in connection with any unsolicited proposal, expression of interest or offer relating to an Alternative Transaction, afford access to the business, properties, assets, books or records of or provide any non-public information relating to the Debtors to, otherwise cooperate in any way with, or knowingly assist, participate in, facilitate or encourage any effort by any Person that is seeking to make, or has made, an Alternative Transaction Proposal . . ." |
| | Debtor Termination Events: |
| | Section 8(c)(1)(C) of the Plan Sponsor Agreement provides, in relevant part, that the Debtors may terminate the Plan Sponsor Agreement "if the Board, with the consent of the Special Committee, prior to the entry of the Disclosure Statement and Solicitation Procedures Order, determines that a proposal or offer for an Alternative Transaction (an "<u>Alternative Transaction Proposal</u>") from any Person not solicited in violation of Section 5(e)(1) of [the Plan Sponsor Agreement] constitutes a Superior Proposal and that, based upon advice of competent outside counsel, proceeding with the Reorganization Transactions contemplated [in the Plan Sponsor Agreement] and in the Plan, and confirmation and consummation of the Plan, would violate the Board's fiduciary duties under applicable law . . ." |
| | Debtors' Fiduciary Obligations: |
| | Section 10(o) of the Plan Sponsor Agreement provides, in relevant part, notwithstanding anything to the contrary in the Plan Sponsor Agreement, "nothing in [the Plan Sponsor Agreement] shall require a Debtor, the Special Committee, or the board of directors, board of managers, or similar governing body of a Debtor, to take any action or to refrain from taking any action prior to entry of the Disclosure Statement and Solicitation Procedures Order with respect to the Restructuring Transactions to the extent taking or failing to take such action would, based on the advice of competent outside counsel, violate the Board's fiduciary duties under applicable law *provided* that the Debtors shall give prompt written notice to counsel to the Backstop Parties and Committee (e-mail among counsel being sufficient) of any determination made under Section 10(o) of [the Plan Sponsor Agreement]; *provided, further* that, for the avoidance of any doubt, the Debtors shall not be entitled to terminate [the Plan Sponsor Agreement] pursuant to Section 8(c)(1)(C) of [the Plan Sponsor Agreement] except as expressly set forth in Section 8(c)(1)(C) of [the Plan Sponsor Agreement]; *provided, further* that nothing shall prevent or impede the Required Consenting Noteholders from terminating [the Plan Sponsor Agreement] pursuant to Section 8(a) of [the Plan Sponsor Agreement] to the extent that taking or failing to take any action under Section 10(o) of [the Plan Sponsor Agreement] results in any Consenting Noteholder Termination Event; *provided, further* that upon termination of [the Plan Sponsor Agreement] by the Required Consenting Noteholders due to any action or failure to act under Section 10(o) of [the Plan Sponsor Agreement], the Backstop Parties shall be entitled to payment of the Cash Put Premium Amount and Expense Reimbursement, but the Debtors shall not be liable for any other damages." |
| **Consenting Noteholders'** | The Plan Sponsor Agreement may be terminated by the Required Consenting Noteholders upon certain specified events as detailed in Section 8(a) of the Plan Sponsor Agreement. These termination events are summarized below, in relevant part, in the summaries of the |

| Termination Events | Expense/Fee Termination Provision and Expense Only Termination Provision. *See infra* ¶¶ 31-32. |
|---|---|
| **Debtor Termination Events** | The Plan Sponsor Agreement may be terminated by the Debtors upon certain specified events as detailed in Section 8(c) of the Plan Sponsor Agreement. These termination events are summarized below, in relevant part, in the summaries of the Expense/Fee Termination Provision and Expense Only Termination Provision. *See infra* ¶¶ 31-32. |
| **Automatic Termination**<br><br>*See* Plan Sponsor Agreement § 8(d) | Notwithstanding anything in the Plan Sponsor Agreement to the contrary, the Plan Sponsor Agreement shall terminate automatically without any further required action or notice upon:<br><br>1. the occurrence of the Plan Effective Date;<br><br>2. the Company Parties' failure to file the Backstop and PSA Motion by the Backstop and PSA Motion Deadline (as may be extended or waived from time to time pursuant to Section 4 of the Plan Sponsor Agreement);<br><br>3. [Reserved]<br><br>4. the Company Parties' failure to obtain entry by the Bankruptcy Court of the Backstop and PSA Order by the Backstop and PSA Order Deadline (as may be extended or waived from time to time pursuant to Section 4 of the Plan Sponsor Agreement;);<br><br>5. termination of the Backstop Agreement in accordance with its terms;<br><br>6. termination of Plan Sponsor Agreement; by the Debtors in accordance with Section 8(c) of the Plan Sponsor Agreement;<br><br>7. the Bankruptcy Court approving or authorizing an Alternative Transaction or any of the Debtors (i) entering into any Contract providing for the consummation of any Alternative Transaction, (ii) filing any motion or application seeking authority to propose, join in or participate in the formation of any actual or proposed Alternative Transaction, or (iii) publicly announcing its intention to take any such action listed in Section 8(d)(7) or to materially breach its obligations under Section 5(e)(1) of the Plan Sponsor Agreement;<br><br>8. any Debtor (i) publicly announcing or otherwise informing the Consenting Noteholders or their advisors its intention to withdraw, abandon, revoke, or modify without the consent of the Required Consenting Noteholders the Plan, terminate the Reorganization Transactions or otherwise not to consummate the Reorganization Transactions on terms and conditions consistent in all material respects with this Agreement, the Plan Term Sheet, the Backstop Agreement, and the Plan or (ii) filing, proposing or otherwise supporting in writing any plan of liquidation, asset sale, or plan of reorganization other than the Plan;<br><br>9. (x) the Debtors' filing of any motion or other request for relief seeking to (i) withdraw the Plan, (ii) convert one or more of the Chapter 11 Cases of the Debtors to a case under chapter 7 of the Bankruptcy Code, (iii) appoint a trustee or examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases of the Debtors or (iv) dismiss one or more of the Chapter 11 Cases of the Debtors or (y) the Bankruptcy Court's entry of an order (i) dismissing any of the Chapter 11 Cases of the Debtors or |

36

| | converting any of the Chapter 11 Cases of the Debtors to cases under chapter 7 of the Bankruptcy Code, (ii) directing the appointment of a trustee or an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code in one or more of the Chapter 11 Cases of the Debtors, or (iii) denying confirmation of the Plan or approval of the Disclosure Statement (other than denial of confirmation of the Plan or approval of the Disclosure Statement subject only to the making of ministerial or immaterial modifications to the Plan or Disclosure Statement, as applicable) in each case the effect of which would render any of the Debtors incapable of consummating the Plan on the terms set forth in the Plan Sponsor Agreement; or |
|---|---|
| | 10. the amendment, modification or filing of a pleading by any of the Company Parties seeking to amend or modify any of the Definitive Documents without the consent of the Required Consenting Noteholders in accordance with their approval rights under this Agreement, and such action has not been withdrawn prior to the earlier of (i) one (1) Business Day of the Company Parties' receiving written notice in accordance with Section 10(1) of the Plan Sponsor Agreement from counsel to the Required Consenting Noteholders that such motion or pleading violates this Agreement and (ii) entry of an order of the Bankruptcy Court approving such motion. |

The following table summarizes the material terms of the Backstop Agreement: [22]

| **Summary of Material Terms of the Backstop Agreement** | |
|---|---|
| **Expense Reimbursement Upon Closing**<br><br>*See* Backstop Agreement § 1.2(e) | Upon the closing of the transactions contemplated by the Backstop Agreement, or as otherwise set forth in the Backstop Agreement and further described below, the Debtors shall pay the documented, reasonable third-party fees and expenses of each Backstop Party, including the reasonable and documented fees and expenses of counsel and other professionals retained by such Backstop Party, that have been and are incurred in connection with the negotiation, preparation and implementation of the Backstop Commitments and the Rights Offering, the Backstop Parties' negotiation, preparation and implementation of the Backstop Agreement (including the Backstop Commitments and the other transactions contemplated thereby), the Transaction Documents, the Plan, the Chapter 11 Cases, and the other agreements contemplated thereby and all other definitive documents necessary to consummate the restructuring contemplated in the Plan Sponsor Agreement, including, but not limited to, the fees and expenses of Dechert LLP, Young Conaway Stargatt & Taylor LLP, Bofill Mir Abogados (including the fees and expenses of Fischer y Cia, outside tax counsel to Bofill Mir Abogados), Ogier (Cayman) LLP and Ducera Partners LLC, and any advisory fees that may be payable to Chris Bannister (which such advisory fees, for the avoidance of doubt, shall not include any fees and expenses (and retainers) of any advisors to Chris Bannister).<br><br>The Debtors shall request that the Confirmation Order authorize payment of the Expense Reimbursement on the Effective Date, and the consummation of the transactions contemplated by the Backstop Agreement shall be conditioned on the Debtors' payment of any Expense Reimbursement invoiced (including a good faith estimate of fees and |

---

[22] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Backstop Agreement.

| | expenses to be incurred through the Effective Date) to the Debtors at least two (2) Business Days prior to the Effective Date.<br><br>The Expense Reimbursement shall constitute an allowed administrative expense of the Debtors under Sections 503(b) and 507 of the Bankruptcy Code and shall not be subject to set-off, recharacterization, avoidance, or disallowance. |
|---|---|
| **Representations and Warranties** | The Backstop Agreement includes representations and warranties of the Debtors and Backstop Parties that are customary for transactions of this type. Such representations and warranties are set forth in Articles II and III of the Backstop Agreement, respectively. |
| **Conditions to the Obligations** | The obligations of each Backstop Party and the Debtors under the Backstop Agreement are subject to the satisfaction of certain conditions (unless, to the extent permitted by applicable Law, waived by the Required Backstop Parties or the Debtors, as applicable) prior to or at the Effective Date, including, among other things, entry of certain orders, obtaining of antitrust approvals, and occurrence of the effective date of the Plan. Such conditions to obligations are set forth in Sections 5.1 and 5.2 of the Backstop Agreement, respectively. |
| **Termination by the Backstop Parties**<br><br>*See* Backstop Agreement § 6.1 | The Required Backstop Parties may terminate the Backstop Agreement upon two (2) Business Days' written notice from the Required Backstop Parties delivered to the Debtors in accordance with Section 8.2 of the Backstop Agreement or without notice for any automatic termination events set forth in Section 6.1 of the Backstop Agreement. These termination events are summarized below, in relevant part, in the summaries of the Expense/Fee Termination Provision and Expense Only Termination Provision. *See infra* ¶¶ 31-32. |
| **Termination by the Debtors**<br><br>*See* Backstop Agreement § 6.2 | The Debtors may terminate the Backstop Agreement upon two (2) Business Days' written notice from the Debtors delivered to the Backstop Parties and New Holdco in accordance with Section 8.2 of the Backstop Agreement or without notice for any automatic termination events as set forth in Section 6.2 of the Backstop Agreement. These termination events are summarized below, in relevant part, in the summaries of the Expense/Fee Termination Provision and Expense Only Termination Provision. *See infra* ¶¶ 31-32. |
| **Indemnification Obligations**<br><br>*See* Backstop Agreement, Art. VII | Subject to the conditions set forth in the Backstop Agreement, the Debtors additionally agreed, among other things, "to indemnify and hold harmless each Backstop Party and its Affiliates, equity holders, members, partners, general partners, managers and its and their respective representatives and controlling Persons (each, an "<u>Indemnified Person</u>") from and against any and all losses, claims, damages, liabilities and costs and expenses (other than Taxes of the Backstop Parties incurred as a result of participating in the transactions contemplated by the Backstop Agreement or the Plan) (collectively, "<u>Losses</u>") that any such Indemnified Person has actually incurred or to which any such Indemnified Person has actually become subject, arising out of or in connection with the Backstop Agreement, the Plan and the transactions contemplated by the Backstop Agreement and the Plan, or any claim, challenge, litigation, investigation or Legal Proceeding relating to any of the foregoing . . . and reimburse each Indemnified Person upon demand for reasonable and documented out-of-pocket fees and expenses of counsel (which shall be limited to one law firm and one local counsel (to the extent necessary), each serving as counsel for the Indemnified Persons) and other reasonable and |

<table>
<tr><td></td><td>documented out-of-pocket third-party expenses actually incurred in connection with investigating, preparing to defend or defending, or providing evidence in or preparing to serve or serving as a witness with respect to, any lawsuit, investigation, claim or other Legal Proceeding relating to any of the foregoing (including in connection with the enforcement of the indemnification obligations set forth in the Backstop Agreement), irrespective of whether or not the transactions contemplated by the Backstop Agreement or the Plan are consummated or whether or not the Backstop Agreement is terminated . . . *provided*, that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses (i) as to any Indemnified Person to the extent arising from a material breach or failure by any Backstop Party of the Backstop Agreement . . . or (ii) to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the bad faith, willful misconduct, gross negligence or fraud of such Indemnified Person."

The Indemnification Obligations shall constitute allowed administrative expenses of the Debtors' estate under Sections 503(b) and 507 of the Bankruptcy Code and are payable without further order of the Bankruptcy Court.</td></tr>
</table>

4.    <u>Rights Offering</u>

On December 19, 2024, the Debtors filed a motion to approve the Rights Offering Procedures [D.I. 950]. On January 9, 2025, after notice and a hearing, the Bankruptcy Court entered the Rights Offering Procedures Order [D.I. 995].[23]

Following entry of the Rights Offering Procedures Order and the Disclosure Statement and Solicitation Procedures Order, the Debtors shall conduct the Rights Offering in accordance with the Rights Offering Procedures and Backstop Agreement. Each Holder of Allowed Unsecured Notes Claims will be issued its pro rata share (based on the proportion that its Allowed Unsecured Notes Claim (which definition includes the Guaranty Claim Enhancement) bears to the aggregate amount of (a) all Allowed Unsecured Notes Claims *plus* (b) all Allowed General Unsecured Claims for which their Holders have elected the New Secured Notes/Equity Treatment) of Subscription Rights to purchase, pursuant to the terms of the Rights Offering Procedures, its allocation of the Rights Offering Securities, *provided that* the exercise of Subscription Rights shall require such Holder to purchase both New Money New Convertible Notes and New Money New Secured Notes, in each case, in the proportion that each of the New Money New Convertible Notes Rights Offering Amount and the New Money New Secured Notes Rights Offering Amount, as applicable, bears to the Rights Offering Amount. Each Eligible Holder of an Allowed General Unsecured Claim that is a New Secured Notes/Equity Treatment Electing Creditor will be issued its pro rata share (based on the proportion that (a) its Allowed General Unsecured Claim bears to (b) the aggregate amount of (i) all Allowed Unsecured Notes Claims (which definition includes the Guaranty Claim Enhancement) *plus* (ii) all Allowed General Unsecured Claims for which their Holders have elected the New Secured Notes/Equity Treatment) of Subscription Rights to purchase, pursuant to the terms of the Rights Offering Procedures, its allocation of the Rights

---

[23]    Capitalized terms used but not otherwise defined in this section shall have the meaning ascribed to such terms in the Rights Offering Procedures.

Offering Securities, *provided that* the exercise of Subscription Rights shall require such Holder to purchase both New Money New Convertible Notes and New Money New Secured Notes, in each case, in the proportion that each of the New Money New Convertible Notes Rights Offering Amount and the New Money New Secured Notes Rights Offering Amount, as applicable bears to the Rights Offering Amount.

Each Eligible Holder of an Allowed General Unsecured Claim that wishes to be a New Secured Notes/Equity Treatment Electing Creditor must make such election on its Election Form (as defined in the Rights Offering Procedures) prior to the Election Expiration Time (as defined in the Rights Offering Procedures), and all eligible participants in the Rights Offering must make any elections to exercise Subscription Rights prior to the Rights Expiration Time.

Any transfer of an Allowed Unsecured Notes Claim prior to the earlier of (i) the transferee making a Binding Rights Election (as defined in the Rights Offering Procedures) or (ii) the Rights Offering Expiration Time (as defined in the Rights Offering Procedures) shall include the applicable Subscription Rights. Any transfer of an Allowed General Unsecured Claim prior to the transferee making an election to receive New Secured Notes/Equity Treatment on its Election Form shall include the applicable Subscription Rights.

Pursuant to and subject to the terms and conditions of the Backstop Agreement, the Backstop Parties agreed, on a several and not joint basis, to (a) exercise all Subscription Rights issued to such Backstop Party in connection with the Rights Offering, and (b) acquire such Backstop Party's Backstop Percentage of the Unsubscribed Rights Offering Securities. In exchange for the Backstop Parties' commitments under the Backstop Agreement, the Backstop Parties will receive the Backstop Put Premium and the Expense Reimbursement (as defined in the Backstop Agreement) pursuant to and subject to the terms and conditions of the Backstop Agreement and the Backstop and PSA Order.

The consummation of the Rights Offering is conditioned on the satisfaction or waiver of the conditions specified in the terms of the Backstop Agreement.

5.    Reorganization Transactions

The key terms of the Reorganization Transactions include the following:

- The Debtors will commence the Rights Offering and issue to Eligible Holders of Allowed Unsecured Notes Claims and Eligible Holders of Allowed General Unsecured Claims that elect the New Secured Notes/ Equity Treatment Subscription Rights to acquire their pro rata share (based on the proportions set forth in the Plan) of the New Money Convertible Notes and New Money New Secured Notes in accordance with the Rights Offering Procedures. The Backstop Parties will commit, severally and not jointly, to backstop the Rights Offering on the terms set forth in the Backstop Agreement attached as **Exhibit G** hereto and purchase the Subscription Rights on the terms set forth therein.

- On or prior to the Effective Date, New Holdco, Chile Newco and New Chile PIF shall be formed.

- On the Effective Date, Reorganized Debtor WOM Mobile will issue the Take Back New Secured Notes to the holders of Allowed Unsecured Notes Claims and New Secured Notes/ Equity Treatment Electing Creditors in exchange for such creditors' Allowed Unsecured Notes Claims or Allowed General Unsecured Claims, as applicable, the New Money New Secured Notes to the Rights Offering participants that purchased such notes (including the Backstop Parties), and the Backstop Put Premium New Secured Notes to the Backstop Parties.

- On the Effective Date, Chile Newco will issue the New Money New Convertible Notes to the participants in the Rights Offering (including the Backstop Parties) and the Backstop Put Premium New Convertible Notes to the Backstop Parties.

- On the Effective Date, New Holdco shall issue the New Holdco Units to the holders of Allowed Unsecured Notes Claims and New Secured Notes/Equity Treatment Electing Creditors in exchange for such creditors' Allowed Unsecured Notes Claims or Allowed General Unsecured Claims, as applicable.

- On and after the Effective Date, as outlined in the Plan, holders of Allowed General Unsecured Claims that are not New Secured Notes/Equity Treatment Electing Creditors will be entitled to a pro rata share of the GUC Cash Pool and Plan Trust Interests.

- On the Effective Date, all Existing Equity Interests in NC Telecom II shall be cancelled, released, and extinguished.

- On the Effective Date, all Existing Equity Interests in WOM Mobile shall be redeemed for no or nominal consideration, cancelled, released, and extinguished.

- On the Effective Date, all Existing Equity Interests in WOM, Conect and Multikom held by NC Telecom II shall be redeemed for no or nominal consideration, cancelled, released and extinguished.

- On the Effective Date, WOM Mobile (which shall have been converted to a *Sociedad* por *Acciones* (an "**SpA**") on or prior to the Effective Date) shall issue a single class of common equity interests with 100% economic and voting rights (the "**WOM Mobile Units**"), and (iv) Reorganized NC Telecom II shall issue a single class of common equity interests with 100% economic and voting rights (the "**NCT II Units**").

- On the Effective Date, (i) the WOM Mobile Units will be distributed to Chile Newco and (ii) the NCT II Units will be distributed to New Holdco.

- On or prior to the Effective Date, WOM Mobile, WOM, Conect, and Multikom will be each be converted to a *Sociedad por Acciones*.

- All assets of Kenbourne shall be transferred to WOM or another entity owned directly or indirectly by New Holdco, and thereafter Kenbourne may be wound down and dissolved by the Reorganized Debtors.

Consummation of the Reorganization Transactions will position the Debtors well to

41

capitalize on their core strengths and achieve long-term success. For these reasons and the reasons described further in this Disclosure Statement, the Debtors strongly urge you to vote to accept the Plan.

## V.    SUMMARY OF THE PLAN

This section of the Disclosure Statement summarizes the Plan, a copy of which is attached hereto as **Exhibit A**. The summary of the Plan contained herein is qualified in its entirety by the terms of the Plan, and in the event of any inconsistency, the Plan shall control in all respects.

The Debtors believe that the Plan provides the best and most prompt possible recovery to holders of Claims. The Debtors believe that (a) through the Plan, holders of Allowed Claims will obtain a recovery from the Estates equal to or greater than the recovery that they would receive if the Debtors' assets were liquidated under chapter 7 of the Bankruptcy Code and (b) consummation of the Plan will maximize the recovery of the holders of Allowed Claims.

The consummation of a plan is the principal objective of a chapter 11 case. A plan sets forth the means for satisfying claims against, and interests in, a debtor. Confirmation of a plan makes the plan binding upon the debtor and any creditor of, or equity holder in, the debtor, whether or not such creditor or equity holder (a) is impaired under or has accepted the plan or (b) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, a confirmation order discharges the debtor from any debt that arose prior to the effective date of the plan and substitutes therefor the obligations specified under the confirmed plan.

A chapter 11 plan may specify that the legal, contractual, and equitable rights of the holders of claims or interests in certain classes are to remain unaltered by the plan. Such classes are referred to as "unimpaired" and, because of such favorable treatment, are deemed to accept the plan. Accordingly, a debtor need not solicit votes from the holders of claims or interests in such classes. A chapter 11 plan may also specify that certain classes will not receive any distribution of property or retain any claim against a debtor. Such classes are deemed not to accept the plan and, therefore, need not be solicited to vote to accept or reject the plan. Any classes that are receiving a distribution of property under the plan but are not unimpaired will be solicited to vote to accept or reject the plan.

Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding the plan. To satisfy the requirements of section 1125 of the Bankruptcy Code, the Debtors are submitting this Disclosure Statement to Holders of Claims against the Debtors who are entitled to vote to accept or reject the Plan.

THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE STRUCTURE AND MEANS FOR IMPLEMENTATION OF THE PLAN AND THE CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN. THIS SECTION IS QUALIFIED IN ITS ENTIRETY BY AND IS SUBJECT TO THE PLAN, AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN.

42

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN. REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS. UPON OCCURRENCE OF THE EFFECTIVE DATE, THE PLAN AND ALL SUCH DOCUMENTS WILL BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND INTERESTS IN THE DEBTORS AND THEIR ESTATES AND ALL OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT OR INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND SUCH OTHER OPERATIVE DOCUMENT SHALL CONTROL.

STATEMENTS AS TO THE RATIONALE UNDERLYING THE TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN ARE NOT INTENDED TO, AND SHALL NOT, WAIVE, COMPROMISE, OR LIMIT ANY RIGHTS, CLAIMS, OR CAUSES OF ACTION IN THE EVENT THE PLAN IS NOT CONFIRMED.

### A.     Unclassified Claims

1.    <u>Administrative Claims</u>

(i)    *Administrative Claims Generally*

Subject to the provisions of sections 330(a), 331 and 503(b) of the Bankruptcy Code, each Allowed Administrative Claim shall be paid in full by the Reorganized Debtors, at the election of the Reorganized Debtors, with the consent of the Required Consenting Noteholders (solely as to whether such payment in full shall be made pursuant to the following clauses (i)-(iii)): (i) in Cash, in such amount as such Administrative Claim is Allowed on or as soon as reasonably practicable after the Effective Date or, if such Administrative Claim is not Allowed as of the Effective Date, upon entry of a Final Order allowing such Administrative Claim or as soon as reasonably practicable thereafter; (ii) upon such other terms or in Cash in such other amount as may exist or be incurred in the ordinary course of the Debtors' business; or (iii) upon such other less favorable terms as may be agreed upon in writing between the Holder of such Allowed Administrative Claim and the Debtors or Reorganized Debtors, in each case in full satisfaction, settlement, discharge and release of such Allowed Administrative Claim.

(ii)    *Deadline to File Administrative Claims*

Holders of Administrative Claims, other than (a) Professional Claims; (b) Administrative Claims that have been Allowed on or before the Effective Date; (c) Section 503(b)(9) Claims; (d) Administrative Claims arising, in the ordinary course of business, out of the employment by one

or more Debtors of an individual from and after the Petition Date, but only to the extent that such Administrative Claims are solely for outstanding obligations under any Employee Obligation Documents; (e) DIP Claims and (f) Administrative Claims held by the United States Trustee, must File with the Bankruptcy Court and serve upon the Debtors, or the Reorganized Debtors, as applicable, **proof of such Administrative Claim so as to be received by 5:00 p.m. (prevailing Eastern Time) on the applicable Administrative Claims Bar Date**. Such proof of Administrative Claim must include at a minimum: (i) the name of the applicable Debtor that is purported to be liable for the Administrative Claim; (ii) the name of the Holder of the Administrative Claim; (iii) the asserted amount of the Administrative Claim; (iv) the basis of the Administrative Claim; and (v) supporting documentation for the Administrative Claim.

**HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE OR WERE REQUIRED TO, BUT DO NOT OR DID NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS BY THE APPLICABLE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS OR THEIR PROPERTY, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.**

The Debtors or the Reorganized Debtors, as applicable, may file and serve objections to Administrative Claims on or before the Administrative Claims Objection Deadline.

(iii)    *Treatment of Allowed Administrative Claims*

The Reorganized Debtors may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval. The Debtors or the Reorganized Debtors, as applicable, may also choose to object to any Administrative Claim no later than the Administrative Claims Objection Deadline, subject to extensions by the Bankruptcy Court upon a motion by the Reorganized Debtors or an agreement in writing of the parties. Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely-Filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be Allowed and, if so, in what amount.

2.    Professional Claims

(i)    *Deadline to File Professional Claims*

Any Professional seeking approval by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 328, 330, 331, or 503(b)(2) of the Bankruptcy Code shall File, on or before the Professional Claim Bar Date, final requests for payment of such Professional Claims. The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims in accordance with the procedures established by order of the Bankruptcy Court, the Bankruptcy Code, and/or the Bankruptcy Rules.

(ii)    *Payment of Professional Claims*

The Debtors or the Reorganized Debtors, as applicable, shall pay Professional Claims in Cash to the applicable Professionals in the amounts approved by the Bankruptcy Court, as soon as reasonably practicable after all such Professional Claims are Allowed by entry of a Final Order of the Bankruptcy Court.

(iii)    *Final Fee Applications*

All final requests for allowance and payment of Professional Claims must be Filed with the Bankruptcy Court no later than the Professional Claim Bar Date unless otherwise ordered by the Bankruptcy Court. Any objections to Professional Claims shall be Filed and served no later than twenty-one (21) days after the Filing of final requests for allowance and payment of Professional Claims.

(iv)    *Professional Claim Escrow Account*

No later than the Effective Date, the Debtors shall establish and fund the Professional Claim Escrow Account with Cash equal to the Professional Claim Escrow Amount. The sole source of payment of Allowed Professional Claims shall be the amounts held in the Professional Claim Escrow Account. The Professional Claim Escrow Account shall be maintained in trust solely for the Professionals until all Professional Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Claim Escrow Account or Cash held in the Professional Claim Escrow Account in any way. No funds held in the Professional Claim Escrow Account shall be property of the Estates of the Debtors, the Reorganized Debtors, the Plan Trust, or any respective successors thereto, as applicable, except to the extent such funds exceed the Professional Claims Allowed by the Bankruptcy Court. When all Professional Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Claim Escrow Account shall be turned over to the Reorganized Debtors to be used for working capital, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

(v)    *Post-Effective Date Fees and Expenses*

Except as otherwise specifically provided in the Plan or the Plan Supplement, from and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Debtors or the Reorganized Debtors, as applicable, on and after the Effective Date. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Plan Trustee may employ and pay any Professional in the ordinary course of business for the period after the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

45

3.      DIP Claims

The DIP Claims shall be Allowed as of the Effective Date in an amount equal to the full amount due and owing under the DIP Orders and the other DIP Loan Documents, including, for the avoidance of doubt, (a) the principal amount outstanding under the DIP Loan Documents on such date, (b) all interest accrued and unpaid thereon through and including the date of payment, (c) all accrued and unpaid fees, expenses and noncontingent indemnification obligations payable under the DIP Loan Documents and (d) all other "Obligations" as provided for in the DIP Credit Agreement. The DIP Claims shall be paid in full, in Cash, on the Effective Date in full and final satisfaction, settlement and release, and in exchange for the DIP Claims. Upon satisfaction of the DIP Claims as set forth in the preceding sentence, all Liens of the DIP Lender on any property of the Estates shall be deemed fully released without any further action of any party, unless such action is required by Law to deregister Liens on property located in Chile.

On the Effective Date, all Liens and security interests granted by the Debtors to secure the obligations under the DIP Loan Documents shall be of no further force or effect; *provided* that any indemnification and reimbursement obligations under the DIP Loan Documents shall survive any cancellation, conversion, or discharge under the Plan in accordance with its terms, and any rights that the DIP Agents may have under the agency provisions of the DIP Credit Agreement shall survive any such cancellation or discharge, as further described in Article V.L of the Plan, and be paid by the Debtors in Cash as and when due under the DIP Loan Documents. Notwithstanding anything in the Plan to the contrary, all mortgages, deeds of trust, Liens, pledges, or other security interests granted under the DIP Loan Documents shall continue in full force and effect and shall not be released until all DIP Claims (other than contingent indemnification and reimbursement obligations as to which no claim has been asserted by the Person entitled thereto) have been paid in full in Cash. For the avoidance of doubt, the DIP Claims shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

4.      Priority Tax Claims

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Reorganized Debtors, with the consent of the Required Consenting Noteholders (solely as to whether such payment in full shall be made pursuant to the following clauses (i)-(ii)): (i) Cash in an amount equal to such Allowed Priority Tax Claim on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter), (b) the first Business Day after the date that is thirty (30) days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course, or as soon thereafter as is reasonably practicable, or (ii) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Petition Date. Except as set forth in the Final DIP Order, the Holders of Allowed Priority Tax Claims shall retain their tax Liens on their collateral to the same validity, extent and priority as existed on the Petition Date until all validly determined taxes and related interest, penalties, and fees (if any) have been paid in full. To the extent a Holder of an Allowed Priority

Tax Claim is not paid in the ordinary course of business, payment of the Allowed Priority Tax Claim shall include interest through the date of payment at the applicable state statutory rate, as set forth in sections 506(b), 511, and 1129 of the Bankruptcy Code.

     5.    <u>Foreign Vendor Claims</u>

The Reorganized Debtors will continue to honor outstanding obligations to make payments after the Effective Date as authorized by the Bankruptcy Court under the Vendor Order pursuant to all postpetition agreements between the Debtors and any Foreign Vendor Claimant (as defined in the Vendor Order) that obligate the Debtors to make such payments (such agreements, the "**Payment Agreements**"). For the avoidance of doubt, such Foreign Vendor Claimants shall not receive any distributions under, or be entitled to vote on, the Plan on account of a Foreign Vendor Claim subject to a Payment Agreement.

     6.    <u>Restructuring Expenses</u>

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall constitute Allowed Administrative Claims and shall be paid in full in cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid during the course of these Chapter 11 Cases) in accordance with, and subject to the terms of, the Plan and the Backstop Agreement. Such payment shall not be subject to any requirement that (i) any party file any application with the Bankruptcy Court or (ii) the Bankruptcy Court enter any further orders.

Each invoice for Restructuring Expenses may include a good faith estimate of fees and expenses to be incurred through the Effective Date and all such invoices shall be delivered to the Debtors at least two (2) Business Days before the Anticipated Effective Date; *provided, however*, that any such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.

     7.    <u>U.S. Trustee Fees</u>

All fees under section 1930 of Title 28 of the United States Code plus any interest thereon pursuant to 31 U.S.C. § 3717 ("<u>Quarterly Fees</u>") payable on or before the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date. On and after the Effective Date, the Reorganized Debtors and the Plan Trust shall be jointly and severally liable for paying any and all Quarterly Fees in full in Cash when due in each Chapter 11 Case for each quarter (including any fraction thereof) until the earliest of such Chapter 11 Case being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code; *provided* that the Plan Trust shall not be liable for any Quarterly Fees required to be paid on account of any activity of the Reorganized Debtors that does not involve the Plan Trust. The Debtors shall file all monthly operating reports due before the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Reorganized Debtors and the Plan Trust shall file with the Bankruptcy Court a post-confirmation quarterly report for each Chapter 11 Case for each quarter (including any fraction thereof) such case is pending, using UST Form 11-PCR. Notwithstanding anything to the contrary in the Plan, (i) Quarterly Fees are Allowed; (ii) the U.S. Trustee shall not be required to file any

proof of claim or any other request(s) for payment with respect to Quarterly Fees; and (iii) the U.S. Trustee shall not be treated as providing any release under the Plan.

### B.    Classification and Treatment of Claims and Interests

1.    <u>Summary of Classification</u>

Except for Claims not classified as specified in Article II of the Plan, all Claims against and Interests in the Debtors are classified in the Classes set forth in Article III of the Plan for all purposes, including voting, confirmation of the Plan, and distributions pursuant to the Plan and in accordance with section 1122 and section 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

The classification of the Claims and Interests pursuant to the Plan is set forth below.[24] Certain of the Debtors may not have Claims or Interests in a particular Class or Classes. The Plan constitutes a separate Plan for each Debtor, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors. Each holder of an Allowed Unsecured Notes Claim (which Allowed Unsecured Notes Claim is a Claim against each of the Debtors), however, will receive a single, aggregate distribution under the Plan on account of such Claim.

Any Class of Claims or Interests that does not have a holder of an Allowed Claim shall be deemed eliminated from the Plan solely for purposes of (i) voting to accept or reject the Plan and (ii) determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code. For all purposes under the Plan, each Class will contain sub-Classes for each Debtor. Tabulation of votes accepting or rejecting the Plan shall be conducted on a Debtor-by-Debtor basis.

| Class | Claims and Interests | Status | Voting Rights |
|-------|---------------------|--------|---------------|
| Class 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| Class 3 | Unsecured Notes Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Entitled to Vote |

---

[24]    Such classification shall not affect any Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets.

48

| Class | Claims and Interests | Status | Voting Rights |
|---|---|---|---|
| Class 5 | Intercompany Claims | Unimpaired/Impaired | Not entitled to Vote (Presumed to Accept/ Presumed to Reject) |
| Class 6 | Existing Equity Interests | Impaired | Not entitled to Vote (Presumed to Reject) |
| Class 7 | Intercompany Interests | Unimpaired/Impaired | Not entitled to Vote (Presumed to Accept/ Presumed to Reject) |

2.    <u>Non-Debtor Intercompany Claims</u>

To the extent any non-Debtor direct or indirect parent or subsidiary entity of a Debtor holds a Claim against a Debtor, such Holder of a Claim will not receive any distributions under the Plan.

3.    <u>Treatment of Claims and Interests</u>

(i)    *Class 1 – Other Secured Claims*

- *Classification*: Class 1 consists of all Other Secured Claims against the applicable Debtor.

- *Treatment*: Except to the extent that a Holder of an Allowed Other Secured Claim and the applicable Debtor agree to less favorable treatment, on the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the Debtors' option with the consent of the Required Consenting Noteholders, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Other Secured Claim: (a) payment in full in Cash; (b) the collateral securing its Allowed Other Secured Claim; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

- *Voting*: Class 1 is Unimpaired under the Plan. Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

(ii)    *Class 2 – Other Priority Claims*

- *Classification*: Class 2 consists of all Other Priority Claims against the applicable Debtor.

- *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim and the applicable Debtor agree to less favorable treatment, on the Effective Date, each Holder of an Allowed Other Priority Claim shall receive, at the Debtors' option with the consent of the Required Consenting Noteholders, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for

49

such Allowed Other Priority Claim: (a) payment in full in Cash; (b) Reinstatement of its Allowed Other Priority Claim; or (c) such other treatment rendering its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

- *Voting*: Class 2 is Unimpaired under the Plan. Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

  (iii)    *Class 3: Unsecured Notes Claims*

- *Classification*: Class 3 consists of all Unsecured Notes Claims against the applicable Debtor.

- *Allowance*: As of the Effective Date, the Unsecured Notes Claims shall be Allowed in the following amounts: (i) the sum of $347.997 million in 2024 Notes Claims *plus* $8,240,762.29 in accrued and unpaid interest and any accrued and unpaid fees on the 2024 Notes through the Petition Date and (ii) the sum of $290 million in 2028 Notes Claims *plus* $2,574,555.56 in accrued and unpaid interest and any accrued and unpaid fees on the 2028 Notes through the Petition Date, in each case *multiplied by* the Guaranty Claim Enhancement.[25]

  (i)    *Treatment:* Except to the extent that a Holder of an Allowed Unsecured Notes Claim and the applicable Debtor agree to less favorable treatment, on the Effective Date, each Eligible Holder of an Allowed Unsecured Notes Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Unsecured Notes Claim:

     (a)    if, as of the Plan Effective Date, LT Claims exist that the Special Committee (in consultation with the Committee) (A) has not settled and (B) has determined should be pursued:

        (i)    its pro rata share of the Plan Trust Interests (based on the proportion that (a) its Allowed Unsecured Notes Claim bears to (b) the aggregate amount of (i) all Allowed Unsecured Notes Claims plus (ii) all Allowed General Unsecured Claims); *and*

        (ii)    its pro rata share (based on the proportion that (a) its Allowed Unsecured Notes Claim bears to (b) the aggregate amount of all Allowed Unsecured Notes Claims) of 50% of the Unused

---

[25]    The "Guaranty Claim Enhancement" means a factor of 1.52 to account for the full amount of each Unsecured Notes Claim against each Debtor, including on account of deemed recoveries by the issuer and guarantors of the Unsecured Notes on their Intercompany Claims against each other Debtor. The Unsecured Notes are issued by Kenbourne and each of the other Debtors is a guarantor under the Unsecured Notes Documents.

Plan Trust Funding, which 50% of the Unused Plan Trust Funding may, at the option of the Required Consenting Noteholders, (i) be distributed to holders of Unsecured Notes, (ii) reduce the aggregate principal amount of New Money New Convertible Notes, or (iii) be retained by the Reorganized Debtors for working capital purposes; *or*

(b)    if the Special Committee determines (by agreement with the Committee and the Required Consenting Noteholders) prior to the Effective Date that the Plan Trust Interests do not need to be distributed on the Effective Date because the Special Committee (in consultation with the Committee) has settled all potential LT Claims or determined that no potential LT Claims should be pursued as of the Plan Effective Date, or such LT Claims have been settled but such settlement has not closed as of the Plan Effective Date, its pro rata share (based on the proportion that (a) its Allowed Unsecured Notes Claim bears to (b) the aggregate amount of all Allowed Unsecured Notes Claims) of (1) the Unsecured Notes Litigation Proceeds and (2) 50% of the Unused Plan Trust Funding, which in each case of (1) and (2) may, at the option of the Required Consenting Noteholders, (i) be distributed to holders of Unsecured Notes, (ii) reduce the aggregate principal amount of New Money New Convertible Notes, or (iii) be retained by the Reorganized Debtors for working capital purposes); *and*

(c)    its pro rata share of the New Secured Notes/Equity Treatment (based on the proportion that (a) its Allowed Unsecured Notes Claim bears to (b) the aggregate amount of (i) all Allowed Unsecured Notes Claims *plus* (ii) all Allowed General Unsecured Claims for which their holders have elected the New Secured Notes/Equity Treatment).

- *Voting*: Class 3 is Impaired under the Plan. Holders of Allowed Unsecured Notes Claims are entitled to vote to accept or reject the Plan.

    (iv)    *Class 4: General Unsecured Claims*

- *Classification*: Class 4 consists of all General Unsecured Claims against the applicable Debtor.

- *Allowance*: The Allowed amount of all General Unsecured Claims will be determined pursuant to the terms of the Plan, the Bankruptcy Code, and other applicable law.

- *Treatment*: Except to the extent that a Holder of an Allowed General Unsecured Claim and the applicable Debtor agree to less favorable treatment, on the Effective Date, each Eligible Holder of an Allowed General Unsecured Claim shall receive,

51

in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed General Unsecured Claim:

(a)     if, as of the Plan Effective Date, LT Claims exist that the Special Committee (in consultation with the Committee) (A) has not settled and (B) has determined should be pursued, (1) its pro rata share (based on the proportion that (a) its Allowed General Unsecured Claim bears to (b) the aggregate amount of (i) all Allowed Unsecured Notes Claims plus (ii) all Allowed General Unsecured Claims) of the Plan Trust Interests and (2) its pro rata share (based on the proportion that (a) its Allowed General Unsecured Claim bears to (b) all Allowed General Unsecured Claims) of 50% of the Unused Plan Trust Funding; *or*

(b)     if the Special Committee determines (by agreement with the Committee and the Required Consenting Noteholders) prior to the Effective Date that the Plan Trust Interests do not need to be distributed on the Plan Effective Date because the Special Committee (in consultation with the Committee) has settled all potential LT Claims or determined any potential LT Claims should not be pursued as of the Plan Effective Date, or such LT Claims have been settled but such settlement has not closed as of the Plan Effective Date, its pro rata share (based on the proportion that (a) its Allowed General Unsecured Claim bears to (b) all Allowed General Unsecured Claims) of (1) the GUC Litigation Proceeds and (2) 50% of the Unused Plan Trust Funding; *and*

(c)     the GUC Cash Pool Treatment; *provided* that, to the extent the election can be offered and solicited in accordance with applicable securities laws, each holder of an Allowed General Unsecured Claim that is an Eligible Holder shall have the option to elect to receive, in lieu of the GUC Cash Pool Treatment, its pro rata share of the New Secured Notes/Equity Treatment (based on the proportion that (a) its Allowed General Unsecured Claim bears to (b) the aggregate amount of (i) all Allowed Unsecured Notes Claims (which definition includes the Guaranty Claim Enhancement) *plus* (ii) all Allowed General Unsecured Claims for which their holders have elected the New Secured Notes/Equity Treatment).

- *Voting*: Class 4 is Impaired under the Plan. Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

(v)     *Class 5: Intercompany Claims*

- *Classification*: Class 5 consists of all Intercompany Claims held by a Debtor against another Debtor.

- *Treatment*: Except to the extent that a Holder of an Allowed Intercompany Claim and the applicable Debtor agree to less favorable treatment, on the Effective Date, each Holder of an Allowed Intercompany Claim shall have its Claim, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Intercompany Claim: (a) Reinstated or (b) cancelled, released, and extinguished and without any distribution, in each case, at the Debtors' election with the consent of the Required Consenting Noteholders.

- *Voting*: Holders of Intercompany Claims are either Unimpaired or Impaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted or deemed to have rejected the Plan under section 1126(f) or section 1126(g) of the Bankruptcy Code, as applicable. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

    (vi)    *Class 6: Existing Equity Interests*

- *Classification*: Class 6 consists of all Existing Equity Interests in each Debtor.

- *Treatment*: Unless otherwise determined by the Required Consenting Noteholders (in consultation with the Debtors), on the Effective Date and in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Existing Equity Interest:

    (a)    all Existing Equity Interests in NC Telecom II AS shall be cancelled, released, and extinguished; and

    (b)    all Existing Equity Interests in WOM Mobile S.A. shall be redeemed for no or nominal consideration, cancelled, released, and extinguished.

- *Voting*: Holders of Existing Equity Interests are Impaired, and such Holders of Existing Equity Interests are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

    (vii)    *Class 7: Intercompany Interests*

- *Classification*: Class 7 consists of all Intercompany Interests in each Debtor held by another Debtor.

- *Treatment*: Unless otherwise determined by the Required Consenting Noteholders (in consultation with the Debtors), on the Effective Date and in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Intercompany Interest:

    (a)    all Intercompany Interests in WOM S.A., Conect S.A., and Multikom S.A. held by WOM Mobile shall be Reinstated;

(b)        all Intercompany Interests in WOM S.A., Conect S.A., and Multikom S.A. held by NC Telecom II shall be cancelled, released, and extinguished; and

(c)        all Intercompany Interests in Kenbourne held by NC Telecom II shall be Reinstated.

- *Voting*: Holders of Intercompany Interests are either Unimpaired or Impaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted or deemed to have rejected the Plan under section 1126(f) or section 1126(g) of the Bankruptcy Code, as applicable. Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

3.      <u>Subordinated Claims</u>

Except as expressly provided herein or in the Plan, the allowance, classification, and treatment of all Allowed Claims against, and Allowed Interests in, the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Reorganized Debtors, as applicable, reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

4.      <u>Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code</u>

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

5.      <u>Special Provision Governing Unimpaired Claims</u>

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

6.      <u>Elimination of Vacant Classes</u>

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

RLF1 32274174v.1

7.    Voting Classes; Deemed Acceptance by Non-Voting Classes

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the Holders of such Claims or Interests in such Class.

8.    Separate Classification of Other Secured Claims

Each Other Secured Claim, to the extent secured by a Lien on collateral different from the collateral securing another Other Secured Claim, shall be treated as being in a separate sub-Class for purposes of receiving distributions under the Plan.

9.    Controversy Concerning Impairment

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**C.    Means of Implementation of the Plan**

1.    No Substantive Consolidation

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

2.    Reorganization Transactions; Effectuating Documents

Prior to, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, and subject to the consent rights of the Required Consenting Noteholders in, and the other terms and conditions of, the Plan Sponsor Agreement and the Backstop Agreement, may take any and all actions as may be necessary or appropriate in the Debtors' or the Reorganized Debtors' reasonable discretion to effectuate the Reorganization Transactions described in, approved by, contemplated by, or necessary to effectuate the Plan, in accordance with the Plan Sponsor Agreement, the Backstop Agreement, and the other Definitive Documents, including: (i) the execution and delivery of any agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, formation, organization, arrangement, continuance, dissolution, sale, purchase, or liquidation, in each case, containing terms that are consistent with the terms of the Plan; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (iii) the filing of the New Corporate Governance Documents, including any appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or law; (iv) such other transactions that are required to effectuate the Reorganization Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, issuance of shares, formations (including the formation of new Entities), organizations, dissolutions, release of liens, or

55

liquidations; (v) the solicitation and implementation of the Rights Offering; (vi) the execution and delivery of the New Secured Notes Documents; (vii) the execution and delivery of the New Convertible Notes Documents; and (viii) all other actions that the Debtors or the Reorganized Debtors, as applicable, determine to be necessary or appropriate, including in connection with making filings or recordings that may be required by applicable law in connection with the Plan. The Reorganization Transactions shall be implemented pursuant to the Steps Plan and structured in a manner that takes into account the tax position, and to maximize all tax efficiencies thereof, of creditors, the Debtors, the Reorganized Debtors, the New Company Entities, and the Backstop Parties.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363, 1123, and 1142(b) of the Bankruptcy Code, authorize and direct, among other things, all actions as may be necessary or appropriate by any necessary parties to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Reorganization Transactions, the cancellation of any Existing Equity Interests or cancellation or redemption of Intercompany Interests (as applicable), the waiver of any rights of a shareholder under applicable law, and the transfer of any and all rights of such shareholder in compliance with Bankruptcy Code section 1129(b), the Plan, and the Confirmation Order.

Except as otherwise set forth in the Plan, including Article IV thereof, each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Debtors or the Reorganized Debtors, as applicable, whether taken prior to or as of the Effective Date, shall be authorized without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan and the other Definitive Documents (as applicable) or required under the Debtors' or Reorganized Debtors' applicable corporate documents or applicable foreign nonbankruptcy law, consistent with the terms and conditions of the Plan and the other Definitive Documents (as applicable). Such actions may include (i) the appointment of any officers or directors of any Reorganized Debtor or New Company Entity, (ii) the authorization, issuance and distribution of the Plan Securities and any other securities to be authorized, issued and distributed pursuant to the Plan, and (iii) the approval of any guarantee to be granted under the Definitive Documents.

On and after the Effective Date, the Reorganized Debtors and New Company Entities, and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, File, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan and the other Definitive Documents (as applicable) or required under the Debtors' or Reorganized Debtors' applicable corporate documents or applicable foreign nonbankruptcy law consistent with the terms and conditions of the Plan and the other Definitive Documents (as applicable).

3.    Sources of Consideration for Plan Distributions

Except as otherwise provided in the Plan or the Confirmation Order, the Reorganized

56

Debtors shall fund distributions or make payments under the Plan with (i) Cash on hand from the Debtors, including Cash from business operations, and (ii) Cash proceeds from the Rights Offering.

4.      Rights Offering

Following entry of the Rights Offering Procedures Order and the Disclosure Statement and Solicitation Procedures Order, the Debtors shall conduct the Rights Offering in accordance with the Rights Offering Procedures and Backstop Agreement. Each Holder of Allowed Unsecured Notes Claims will be issued its pro rata share (based on the proportion that its Allowed Unsecured Notes Claim (which definition includes the Guaranty Claim Enhancement) bears to the aggregate amount of (a) all Allowed Unsecured Notes Claims *plus* (b) all Allowed General Unsecured Claims for which their Holders have elected the New Secured Notes/Equity Treatment) of Subscription Rights to purchase, pursuant to the terms of the Rights Offering Procedures, its allocation of the Rights Offering Securities, *provided that* the exercise of Subscription Rights shall require such Holder to purchase both New Money New Convertible Notes and New Money New Secured Notes, in each case, in the proportion that each of the New Money New Convertible Notes Rights Offering Amount and the New Money New Secured Notes Rights Offering Amount, as applicable, bears to the Rights Offering Amount. Each Eligible Holder of an Allowed General Unsecured Claim that is a New Secured Notes/Equity Treatment Electing Creditor will be issued its pro rata share (based on the proportion that (a) its Allowed General Unsecured Claim bears to (b) the aggregate amount of (i) all Allowed Unsecured Notes Claims *plus* (ii) all Allowed General Unsecured Claims for which their Holders have elected the New Secured Notes/Equity Treatment) of Subscription Rights to purchase, pursuant to the terms of the Rights Offering Procedures, its allocation of the Rights Offering Securities, *provided that* the exercise of Subscription Rights shall require such Holder to purchase both New Money New Convertible Notes and New Money New Secured Notes, in each case, in the proportion that each of the New Money New Convertible Notes Rights Offering Amount and the New Money New Secured Notes Rights Offering Amount, as applicable bears to the Rights Offering Amount.

Each Eligible Holder of an Allowed General Unsecured Claim that wishes to be a New Secured Notes/Equity Treatment Electing Creditor must make such election on its Election Form (as defined in the Rights Offering Procedures) prior to the Election Expiration Time (as defined in the Rights Offering Procedures), and all eligible participants in the Rights Offering must make any elections to exercise Subscription Rights prior to the Rights Expiration Time.

Any transfer of an Allowed Unsecured Notes Claim prior to the earlier of (i) the transferee making a Binding Rights Election (as defined in the Rights Offering Procedures) or (ii) the Rights Offering Expiration Time (as defined in the Rights Offering Procedures) shall include the applicable Subscription Rights. Any transfer of an Allowed General Unsecured Claim prior to the transferee making an election to receive New Secured Notes/Equity Treatment on its Election Form shall include the applicable Subscription Rights.

Pursuant to and subject to the terms and conditions of the Backstop Agreement, the Backstop Parties agreed, on a several and not joint basis, to (a) exercise all Subscription Rights issued to such Backstop Party in connection with the Rights Offering, and (b) acquire such Backstop Party's Backstop Percentage of the Unsubscribed Rights Offering Securities. In

exchange for the Backstop Parties' commitments under the Backstop Agreement, the Backstop Parties will receive the Backstop Put Premium and the Expense Reimbursement (as defined in the Backstop Agreement) pursuant to and subject to the terms and conditions of the Backstop Agreement and the Backstop and PSA Order.

The consummation of the Rights Offering is conditioned on the satisfaction or waiver of the conditions specified in the terms of the Backstop Agreement.

5.    Issuance and Distribution of the Plan Securities

(i)    *General Requirements for the Issuance and Distribution of the New Equity Securities and New Debt Securities*

As a condition to receiving New Equity Securities and New Debt Securities under the Plan, each (x) Holder of an Allowed Unsecured Notes Claim and (y) Eligible Holder of an Allowed General Unsecured Claim that is a New Secured Notes/Equity Treatment Electing Creditor is required to (i) provide satisfactory KYC Information required for the distribution for the New Equity Securities and New Debt Securities, and (ii) execute the New Holdco Shareholder Agreement; *provided, however*, that the Backstop Parties are deemed Eligible Holders under the Plan.

To receive its entitlement pursuant to the Plan, each Holder of an Allowed Unsecured Notes Claim is required to take one of the following actions:

- on or prior to the Distribution Election Deadline, (a) tender its Unsecured Notes into ATOP and submit the required information, including the Investor Certification, through ATOP[26] and (b) provide to the Distribution Agent (x) satisfactory KYC Information, and (y) a signature page to the New Holdco Shareholder Agreement; or

- after the Distribution Election Deadline, but on or prior to the date that is one hundred twenty (120) days after the Effective Date, (a) if ATOP is available, (1) tender its Unsecured Notes into ATOP and submit the required information, including the Investor Certification, through ATOP and (2) provide to the Distribution Agent (x) satisfactory KYC Information, and (y) a signature page to the New Holdco Shareholder Agreement or (b) if ATOP is not available, review, complete, and return to the Distribution Agent a duly-completed Letter of Transmittal together with documents required in connection therewith (including (x) satisfactory KYC Information, and (y) a signature page to the New Holdco Shareholder Agreement) and surrender its Unsecured Notes via DWAC.

---

[26]    The Debtors will commence an ATOP event on or about February 13, 2025 which will be kept open through the Distribution Election Deadline (and which may be run in conjunction with the Rights Offering).

On or promptly after the Effective Date, the Debtors will reserve the right to request that DTC impose a "chill order" on any Unsecured Notes positions that have not been validated prior to the Distribution Election Deadline.

To receive its entitlement pursuant to the Plan, each Eligible Holder of an Allowed General Unsecured Claim that is a New Secured Notes/Equity Treatment Electing Creditor is required to review, complete, and return a duly-completed Letter of Transmittal together with the documents required in connection therewith (including (a) satisfactory KYC Information, and (b) a signature page to the New Holdco Shareholder Agreement) and provide its DWAC information on or prior to the date that is one hundred twenty (120) days after the Effective Date.

Any New Equity Securities and New Debt Securities to be issued on the Effective Date on account of Allowed General Unsecured Claims of New Secured Notes/Equity Treatment Electing Creditors or Holders of Allowed General Unsecured Notes Claims that did not participate in the ATOP event and that have not (or have not yet) delivered their duly-completed Letter of Transmittal and associated documentation (including (a) satisfactory KYC Information, and (b) a signature page to the New Holdco Shareholder Agreement) will be issued and held in treasury on the Effective Date and will only distributed to such New Secured Notes/Equity Treatment Electing Creditors upon their satisfaction of the requirements specified in the Plan.

Any (x) Holder of an Allowed Unsecured Notes Claim and (y) Eligible Holder of an Allowed General Unsecured Claim that is a New Secured Notes/Equity Treatment Electing Creditor that fails to comply with the foregoing procedures, as applicable, shall have forfeited its right to receive a distribution of any New Equity Securities and New Debt Securities under the Plan on account of its Allowed Unsecured Notes Claim and/or Allowed General Unsecured Claim, as applicable. Any New Equity Securities and New Debt Securities issued in respect of such forfeited Allowed Unsecured Notes Claim and/or Allowed General Unsecured Claim that is a New Secured Note/Equity Treatment Electing Creditor shall revert (i) to New Holdco, with respect to the New Equity Securities, and (ii) to the applicable Issuer, with respect to the New Debt Securities and in each case shall be cancelled and extinguished.

(ii)    *Issuance and Distribution of the New Equity Securities*

To the extent permitted by applicable Law, the issuance of the New Equity Securities in accordance with the Plan shall be authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.

On the Effective Date, (i) the WOM Mobile Units will be distributed to Chile Newco and (ii) the NCT II Units will be distributed to New Holdco, in each case in accordance with the Plan Sponsor Agreement, the Plan Term Sheet and the Plan.

The New Holdco Units shall be deemed distributed upon their issuance in register form in the name of each (x) Holder of an Allowed Unsecured Notes Claim and (y) Eligible Holder of an Allowed General Unsecured Claim that is a New Secured Notes/Equity Treatment Electing Creditor as of the Distribution Record Date. As soon as practicable on or after the Effective Date, the Distribution Agent shall provide each (x) Holder of an Allowed Unsecured Notes Claim and

(y) Eligible Holder of an Allowed General Unsecured Claim that is a New Secured Note/Equity Treatment Electing Creditor as of the Distribution Record Date with notice of their final allocation of New Holdco Units.

Any Entities' acceptance of any of the New Equity Securities, as applicable, shall be deemed to be its agreement to be bound by the applicable New Corporate Governance Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms. The New Corporate Governance Documents, as applicable, shall be binding on all Entities receiving, and all holders of, the New Equity Securities (and their respective successors and assigns), whether any such New Equity Securities are received or to be received on or after the Effective Date, in each case, pursuant to the Plan and regardless of whether such Entity executes or delivers a signature page to the applicable New Corporate Governance Documents.

All of the shares of New Equity Securities issued pursuant to the Plan shall be, to the extent applicable, duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Equity Securities under the Plan shall be governed by the terms and conditions set forth in the Plan and the New Corporate Governance Documents applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

All documents, agreements and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan, including the New Corporate Governance Documents and any other agreement or document related thereto or entered into in connection therewith, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity (other than as expressly required by such applicable agreement, document or instrument, or applicable law).

(iii)    *Issuance and Distribution of the New Debt Securities*

The issuance of the New Debt Securities in accordance with the Rights Offering Procedures, Backstop Agreement, the other Definitive Documents (as applicable), and the Plan shall be authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.

Each distribution and issuance of the New Debt Securities under the Plan shall be governed by the terms and conditions set forth in the Plan, the New Secured Notes Documents, and the New Convertible Notes Documents, the Rights Offering Procedures, and the Backstop Agreement, as applicable, to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

All documents, agreements and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan, including the New Secured Notes Documents, the New Convertible Notes Documents any other agreement or document related thereto or entered into in connection therewith, shall become effective and binding in accordance

SOLICITATION VERSION

with their respective terms and conditions upon the parties thereto, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity (other than as expressly required by such applicable agreement, document or instrument, or applicable law).

On the Effective Date, the guarantees, pledges, liens, mortgages, and other security interests, as applicable, granted pursuant to the New Secured Notes Documents (whether prior to or on the Effective Date) shall be deemed to have been granted in good faith as an inducement to the Eligible Holders of the New Money New Secured Notes to agree to the treatment contemplated by the Plan and (a) shall be deemed to be approved, (b) shall be legal, binding, and creating or continuing enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Notes Documents, (c) shall be deemed perfected on the earlier of the date originally perfected and the Effective Date, subject only to such Liens and security interests as may be permitted under the New Secured Notes Documents, as the case may be, and (d) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non bankruptcy law, including any applicable law of the Republic of Chile. The Reorganized Debtors and their affiliates granting such Liens and the persons and entities granted such Liens and security interests are authorized and directed to make all filings and recordings, and to obtain all governmental approvals and consents necessary to continue as perfect or to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection or continuance of perfection shall occur automatically by virtue of the entry of the Confirmation Order and no such filings, recordings, approvals, and consents shall be necessary), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

6.   <u>Corporate Existence</u>

Unless otherwise determined by the Required Consenting Noteholders with the reasonable consent of the Debtors, on or prior to the Effective Date, each of WOM Mobile, WOM, Conect, and Multikom shall each be converted to a s*ociedad por acciones*. Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Effective Date, each Reorganized Debtor, as applicable, shall continue to exist as a separate *sociedad anónima*, s*ociedad por acciones*, s*ociété anonyme, aksjeselskap*, corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which the particular Debtor is incorporated or formed and pursuant to their respective certificate of incorporation and bylaws (or other similar formation and governance documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other similar formation and governance documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite formalities, filings, and/or publications required under applicable state, provincial, local, or federal law).

7.    Exemption from Registration

The issuance of the New Secured Notes and the New Convertible Notes (and all shares issuable upon conversion thereof) under the Plan shall be exempt from registration under applicable U.S. securities laws pursuant to section 4(a)(2) of the Securities Act and Regulation S under the Securities Act and similar Blue Sky Laws provisions, as applicable, and any indentures governing such notes shall be exempt from qualification under the Trust Indenture Act of 1939 pursuant to Section 304(b) thereof.

Each of the New Secured Notes and the New Convertible Notes (and all shares issuable upon conversion thereof) will be considered "restricted securities" and may not be offered, sold, resold, pledged, delivered, allotted or otherwise transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as Rule 144A or Regulation S under the Securities Act, or under certain conditions, the resale provisions of Rule 144 of the Securities Act and in compliance with any applicable state securities laws. Such securities shall bear a legend restricting their transferability until no longer required under applicable requirements of the Securities Act and state securities laws.

The issuance of the New Holdco Units under the Plan shall be exempt from registration under applicable securities law pursuant to the exemption provided by section 1145 of the Bankruptcy Code or other exemption from such registration. The New Holdco Units may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the Holder is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

In addition, none of Chile Newco, Reorganized WOM Mobile S.A., the New Convertible Notes (or the shares issuable upon conversion of the New Convertible Notes) nor the New Secured Notes have been or will be registered in the Securities Registry or in the Foreign Securities Registry of the CMF. The Debtors represent that neither the New Convertible Notes (or the shares issuable upon conversion of the New Convertible Notes) nor the New Secured Notes shall be publicly offered in Chile and, as a result, neither Chile Newco nor Reorganized WOM Mobile S.A. will be overseen by the CMF or make periodic disclosures (which registered issuers are required to make under applicable Law). Each and all communication used to offer the New Convertible Notes (or the shares issuable upon conversion of the New Convertible Notes) and the New Secured Notes shall include a legend outlining the aforementioned.

To the extent required under applicable Chilean securities law and regulation, prior to the offering of the New Convertible Notes and New Secured Notes, Chile Newco and Reorganized WOM Mobile S.A. shall file a notice to the CMF describing certain information about the applicable Plan Securities, as set forth under applicable Chilean regulation. No approval or consent from the CMF will be sought.

Should the Reorganized Debtors elect, on or after the Effective Date, to reflect all or any portion of the ownership of the New Holdco Units, the New Secured Notes and/or the New

62

Convertible Notes through the facilities of DTC, the Reorganized Debtors shall not be required to provide any further evidence other than the Plan or Final Order with respect to the treatment of such applicable portion of the New Holdco Units, the New Secured Notes and/or the New Convertible Notes, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of the Reorganized Debtors, as applicable, in all respects.

DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Holdco Units, the New Secured Notes and/or the New Convertible Notes are exempt from registration pursuant to applicable securities Laws and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Holdco Units, the New Secured Notes and/or the New Convertible Notes are exempt from registration.

8.    New Corporate Governance Documents

To the extent permitted by applicable Law, on or immediately prior to the Effective Date, the New Corporate Governance Documents shall be adopted automatically by the Reorganized Debtors and New Company Entities, as applicable. To the extent required under the Plan or applicable non-bankruptcy law, the Reorganized Debtors and New Company Entities shall file their respective New Corporate Governance Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation, and comply with any other formality required in accordance with the corporate laws of the respective states, provinces, or countries of incorporation. The New Corporate Governance Documents shall, among other things: (1) authorize the issuance of the Plan Securities; and (2) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity securities of the Debtors. After the Effective Date, each Reorganized Debtor may amend and restate its New Corporate Governance Documents as permitted by the laws of its respective jurisdiction of formation and the terms of the New Corporate Governance Documents.

9.    Officers and Boards of Directors

On the Effective Date, the New Board shall initially consist of 5 individuals, consisting of the Chief Executive Officer of WOM Mobile as of the Effective Date and the Initial AHG Directors. The composition of the boards of directors or managers, as applicable, of each Reorganized Debtor (if any and to the extent known) shall be identified no later than the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code.

10.    Management Incentive Plan

Promptly after the Effective Date, the New Board shall adopt the Management Incentive Plan, with amounts, structure, awards and terms of the Management Incentive Plan to be determined by the New Board in its business judgment and reasonably acceptable to the Required Consenting Noteholders. All New Holdco Units issued under the Management Incentive Plan will be dilutive of all other New Holdco Units.

11.    <u>Vesting of Assets in the Reorganized Debtors</u>

Except as otherwise provided in the Plan or the Plan Supplement, or in any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets in each Debtor's Estate, including all claims, rights, and Causes of Action (other than the Plan Trust Assets, which shall be transferred to the Plan Trust), all Executory Contracts and Unexpired Leases assumed but not assigned by any of the Debtors, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges and/or other encumbrances. On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise or settle any Claims or Interests with respect to, or Causes of Action vested in, the Reorganized Debtors without further notice to, action, or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

12.    <u>Cancellation of Existing Documents, Instruments, and Securities</u>

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan, or the Plan Supplement, on the Effective Date (i) the Unsecured Notes, the other Unsecured Notes Documents, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing or creating indebtedness or obligations of (or ownership interest in) the Debtors that are Reinstated pursuant to the Plan) shall be deemed canceled, discharged and of no force or effect, without further action or approval of the Bankruptcy Court, the Debtors, or any Holder and the Unsecured Notes Trustees and their respective agents, successors and assigns shall each be automatically and fully released and discharged of and from all duties as applicable under the respective Unsecured Notes Documents, except, as applicable, as necessary to (a) maintain, enforce, or exercise the rights, Claims and interests (including, without limitation, any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other Claim or entitlement that the Unsecured Notes Trustees may have under the Plan) of the Unsecured Notes Trustees, and, as applicable, any predecessor thereof vis-à-vis parties other than the Released Parties, (b) allow the receipt of and distributions under the Plan and, as applicable, the subsequent distribution of such amounts in accordance with the respective terms of the Unsecured Notes Documents, (c) preserve any rights of the Unsecured Notes Trustees and any predecessor thereof as against any money or property distributable to Holders of Unsecured Notes Claims, including any priority in respect of payment and the Indenture Trustee Charging Lien pursuant to the terms of the Unsecured Notes Documents, and (d) allow the Unsecured Notes Trustees to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, including, without limitation, to enforce the respective obligations owed to such parties under the Plan or the Unsecured Notes Documents; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any other contracts, agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, loans, credit facilities (including, without limitation, the DIP Credit Facility), purchase rights, options, warrants, or other instruments or documents evidencing or

64

creating any indebtedness or obligation of the Debtors (except such agreements, indentures, certificates, notes, or other instruments or documents evidencing or creating indebtedness or obligations of the Debtors that are Reinstated pursuant to the Plan) shall be released and discharged; except that the DIP Loan Documents shall continue in effect solely for the purpose of: (a) allowing the DIP Lenders to receive distributions from the Debtors under the Plan as set forth in Article V of the Plan; (b) preserving the DIP Lenders' and the DIP Agents' right to all amounts due under the DIP Loan Documents; and (c) preserving the DIP Agents' and the DIP Lenders' right to indemnification from the Debtors pursuant and subject to the terms of the DIP Loan Documents.

Subsequent to the performance by the Unsecured Notes Trustees of their respective obligations under the Plan, the Unsecured Notes Trustees and their respective agents shall be relieved of all further duties and responsibilities related to the Unsecured Notes.

To the extent the Unsecured Notes Trustees, at the request of the Required Consenting Noteholders or the Reorganized Debtors, provide additional services or incur costs or expenses, including professional fees, related to or in connection with the Plan, the Confirmation Order, the Unsecured Notes Documents from and after the Effective Date, the Unsecured Notes Trustees, in their respective capacities as such, shall be entitled to receive from the Reorganized Debtors, without further Bankruptcy Court approval, compensation in full for such post-Effective Date services and reimbursement of reasonable and documented out-of-pocket expenses and be indemnified by the Reorganized Debtors against any and all losses, liabilities or expenses (including attorneys' fees and expenses), incurred in connection with such post-Effective Date services. The payment of such compensation and expenses and indemnity will be made promptly by the Reorganized Debtors upon receipt by the Reorganized Debtors of reasonably detailed invoices from the applicable Unsecured Notes Trustee or as otherwise agreed to by the Unsecured Notes Trustees and the Debtors. In connection with any such post-Effective Date services, the Unsecured Notes Trustees shall be entitled to the releases provided herein related to the administration and implementation of the Plan. For the avoidance of doubt, the Debtors, the Reorganized Debtors, the Unsecured Notes Trustees and the Distribution Agent may (x) make post-Effective Date distributions or take such other action to exercise their rights (including asserting the Indenture Trustee Charging Lien against any such post-Effective Date distributions) and discharge their obligations relating to the interests of the Holders of such Claims in accordance with the Plan and the Unsecured Notes Documents and (y) take any other action necessary to implement the terms of the Plan.

If the record Holder of any of the Unsecured Notes is represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such Holder of the Unsecured Notes shall be deemed to have surrendered such Holder's note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

The commitments and obligations, if any, of each DIP Lender to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the DIP Loan Documents (as defined in the Final DIP Order), as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect solely in connection with such cancellations, terminations, satisfactions, releases or discharges. Except as set forth in the Plan and the Confirmation Order, nothing contained in the Plan shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under (i) any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder or (ii) any Claims that are Reinstated pursuant to the terms of the Plan.

13.    Corporate Action

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, and the Debtors or the Reorganized Debtors, as applicable, shall be authorized to take all further corporate actions necessary to effectuate the Plan and the Reorganization Transactions, including, as applicable: (i) the issuance of the Plan Securities; (ii) the selection and appointment of the directors and officers for the New Company Entities and the Reorganized Debtors; (iii) implementation of the Reorganization Transactions; and (iv) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date). To the extent permitted by applicable Law, upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the New Company Entities and the Reorganized Debtors, and any corporate action required by the Debtors, the New Company Entities, or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the shareholders, directors, or officers of the Debtors, the New Company Entities, or the Reorganized Debtors, unless required by applicable Chilean Law. On or before the Effective Date, as applicable, the appropriate officers of the Debtors, the New Company Entities, or the Reorganized Debtors shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of the New Company Entities and the other Reorganized Debtors, as applicable and to the extent not previously authorized by the Bankruptcy Court. To the extent permitted by applicable Law, the authorizations and approvals contemplated by Article IV of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

14.    Wind-Down of Kenbourne Estate

Prior to the Effective Date, unless otherwise determined by the Required Consenting Noteholders, any and all of Kenbourne's Assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date such Assets shall be transferred to and vest in Reorganized WOM S.A. or another entity owned directly or indirectly by New Holdco as determined by the Required Consenting Noteholders. The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, the winding down and dissolution of Kenbourne's Estate.

On the Effective Date, the Intercompany Interests in Kenbourne held by NC Telecom II shall be Reinstated solely for the purpose of administering the winding down and dissolution of Kenbourne. The Reorganized Debtors shall pay the reasonable and documented expenses associated with the wind down and dissolution of Kenbourne.

15.    Exemption From Certain Taxes and Fees

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code and applicable law, the (i) issuance, transfer or exchange of any securities, instruments, or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) any transfers (directly or indirectly) of property pursuant to the Plan or the Plan Supplement, (iv) any assumption, assignment, or sale by the Debtors of their interests in Executory Contracts or Unexpired Leases pursuant to section 365(a) of the Bankruptcy Code, (v) the grant of collateral under the New Secured Notes Documents, as applicable, and (vi) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

16.    Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all of the Retained Causes of Action, including any Retained Causes of Action specifically enumerated in the Plan, the Confirmation Order, the Plan Supplement, or the Disclosure Statement. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Retained Causes of Action.

No Entity may rely on the absence of a specific reference in the Plan, the Confirmation Order, the Plan Supplement, or the Disclosure Statement to any Retained Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, shall not pursue any and all available Retained Causes of Action against it. Unless such Retained Causes of Action against any Entity are expressly waived, relinquished, exculpated, released, compromised, assigned, or settled in the Plan or a Final Order, all such Retained Causes of Action shall be expressly reserved by the Debtors (pre-Effective Date) or the Reorganized Debtors (post-Effective Date), as applicable, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial,

equitable, or otherwise), or laches, shall apply to any Retained Cause of Action upon, after, or as a consequence of the occurrence of the Confirmation Date or the Effective Date.

The Reorganized Debtors reserve and shall retain such Retained Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Retained Causes of Action on and after the Effective Date.

**Notwithstanding anything to the contrary contained in Article IV.P of the Plan, on the Effective Date, all Avoidance Actions other than LT Claims shall be Retained Causes of Action. The Reorganized Debtors shall not affirmatively bring Avoidance Actions against trade creditors that continue to do business with the Reorganized Debtors after the Effective Date, but may use Avoidance Actions solely in the Claims reconciliation process for Claims reduction, setoff or defensive purposes.**

17.   Insurance Policies

(i)   *Director and Officer Liability Insurance*

On the Effective Date, the Reorganized Debtors shall be deemed to have assumed all D&O Policies with respect to the Debtors' directors, managers, officers, and employees, as applicable, who served in such capacity at any time on or prior to the Effective Date pursuant to sections 105 and 365 of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the D&O Policies.

After the Effective Date, none of the Debtors or the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Policies in effect on the Effective Date with respect to conduct occurring prior thereto, and all officers, directors, managers, and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date, *provided* that nothing in this paragraph shall (i) preclude a reduction in the amount of available policy proceeds under the D&O Policies through payment of claims under any D&O Policies to or on behalf of the Debtors or the Reorganized Debtors, to the extent each D&O Policy provides for such reduction, or (ii) obligate the Reorganized Debtors to renew any existing D&O Policies.

(ii)   *Assumption of Insurance Policies*

On the Effective Date, each Insurance Policy shall be assumed by the applicable Reorganized Debtor pursuant to sections 105 and 365 of the Bankruptcy Code, unless such Insurance Policy (i) was rejected by the Debtors pursuant to an order of the Bankruptcy Court, or (ii) is the subject of a motion to reject pending on the Effective Date. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of such Insurance Policies.

(iii)   *Insurance Neutrality*

68

Nothing in the Plan or the Confirmation Order, shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the rights or obligations of any Insurer or (b) any rights or obligations of the Debtors or the Reorganized Debtors arising out of or under any Insurance Policy. The Insurers, the Debtors, and Reorganized Debtors, as applicable, shall retain all rights and defenses under such Insurance Policies, and such Insurance Policies shall apply to, and be enforceable by and against, the insureds and the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date. Further, for all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Insurance Policies shall control. For the avoidance of doubt, nothing contained in the Plan or the Confirmation Order shall operate to require any Insurer to indemnify or pay the liability for any claim that it would not have been required to pay in the absence of the Plan and Confirmation Order.

18.    Indemnification of Directors, Managers, Officers, and Employees

For purposes of the Plan, the Indemnification Obligations shall be assumed and irrevocable and shall survive Confirmation of the Plan and the Effective Date. On and after the Effective Date, the coverage under any of the D&O Policies in effect on the Petition Date shall not be terminated or otherwise reduced by or on behalf of the Debtors, and all directors, managers, officers, and employees of the Debtors at any time shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors, managers, officers, and/or employees remain in such positions after the Effective Date.

Notwithstanding anything to the contrary in the Plan, any obligation of the Debtors to indemnify, defend, reimburse, or limit the liability of any Non-Released Party in any capacity against any claim, demand, Cause of Action, suit, proceeding, judgment, fine, loss, damage, or other amount, whether under applicable law or in the Debtors' bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment, consultant, or subcontractor agreements or other contracts, or otherwise, shall not be assumed and shall terminate and be discharged upon Confirmation of the Plan.

19.    Employee Obligations

The Reorganized Debtors shall honor the Debtors' obligations under the Employee Obligation Documents and, to the extent required by applicable law, the Debtors' obligations under the Employee Obligation Documents shall become obligations of the Reorganized Debtors in accordance with their terms. The Employee Obligation Documents will be deemed assumed as of the Effective Date and the obligations thereunder shall be paid in the ordinary course consistent with the terms thereof, subject to the rights of the Reorganized Debtors to dispute and contest the validity of all asserted obligations; *provided*, that, the consummation of the Reorganization Transactions and any associated organizational changes shall not constitute a "change of control," "change in control," or other similar event under any of the Employee Obligation Documents. Notwithstanding anything else set forth in this paragraph, the cure provisions of Article VII.C of the Plan shall apply to any Employee Obligation Document arising from an Executory Contract assumed in accordance with the provisions of Article VII.A of the Plan.

RLF1 32274174v.1

Notwithstanding anything to the contrary in the foregoing paragraph, the Reorganized Debtors shall assume, continue, and maintain in all respects, and shall not in any way reduce or diminish, the bonus programs approved by the Bankruptcy Court pursuant to the KEIP/KERP Order in accordance with the respective terms of such programs, including by timely paying all awards earned by the participants therein in accordance with the terms thereof.

On the Effective Date, each Employment Agreement will be deemed assumed and shall become obligations of the Reorganized Debtors in accordance with their terms.

Notwithstanding anything to the contrary in the Plan, as of the Effective Date, any provision of an Employee Obligation Document that provides for equity-based awards, including any termination-related provisions with respect to equity-based awards, shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

Notwithstanding anything to the contrary in the Plan, in accordance with section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to honor all retiree benefits, as such term is defined in section 1114(a) of the Bankruptcy Code, as and to the extent required by the agreements giving rise to such obligations.

20.    Workers' Compensation Programs

As of the Effective Date, the Reorganized Debtors shall continue to honor their obligations under: (i) all applicable workers' compensation laws in jurisdictions in which the Reorganized Debtors operate or the Debtors previously operated; and (ii) the Debtors' (a) written contracts, agreements, and agreements of indemnity, in each case relating to workers' compensation, (b) self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and (c) workers' compensation insurance policies and programs. All Proofs of Claim filed by the Debtors' current or former employees on account of workers' compensation claims shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court based upon the treatment provided for in the Plan; *provided*, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and plans.

21.    Closing of the Chapter 11 Cases

On and after the Effective Date, the Reorganized Debtors shall be permitted to close one or more of the Debtors' Chapter 11 Cases in accordance with Bankruptcy Rule 3022.

**D.    Plan Trust**

1.    Establishment of the Plan Trust

On the Effective Date, the Debtors will establish the Plan Trust. The Plan Trust will have no other objectives other than as set forth in the Plan Trust Agreement. The Plan Trustee shall fulfill the Plan Trust's purpose in accordance with the Plan Trust Agreement, which for the avoidance of doubt shall include the reconciliation of Class 4 General Unsecured Claims.

The Plan Trust Agreement shall be Filed in the Plan Supplement, in form and substance consistent with the Plan Sponsor Agreement, the Backstop Agreement, and all annexes to each of the foregoing and reasonably acceptable to the Debtors, the Committee, and the Required Consenting Noteholders. The Plan Trust Agreement shall contain the mechanics for distribution of the Plan Trust Interests and holdbacks of Plan Trust Interests for Disputed Claims. On the Effective Date, the Plan Trust Agreement shall be executed by the Debtors and the Plan Trustee. On the Effective Date, the Plan Trust Assets shall vest in the Plan Trust free and clear of all Claims, Interests, Liens, and other encumbrances, except as otherwise provided under the Plan. All expenses (including taxes) incurred by the Plan Trust shall be recorded on the books and records (and reported on all applicable tax returns) as expenses of the Plan Trust.

The Reorganized Debtors shall, upon reasonable notice, cooperate with the Plan Trustee in the administration of the Plan Trust, including by providing the Plan Trustee reasonable access, during normal business hours, to the Reorganized Debtors' personnel and books and records, to the extent the Reorganized Debtors have such information and/or documents, to enable the Plan Trustee to perform its duties expressly authorized hereunder and as set forth in greater detail in the Plan Trust Agreement. Access and documents that do not require the Reorganized Debtors or their personnel to expend material time or resources outside the ordinary course of business shall be provided to the Plan Trust and Plan Trustee without charge. To the extent that the Reorganized Debtors determine that responding to any particular information request from the Plan Trustee requires the Reorganized Debtors or their personnel to expend material time or resources outside the ordinary course of their operations or responsibilities, the Reorganized Debtors or their personnel shall communicate the same to the Plan Trustee, together with a range of expected costs to satisfy such information request. To the extent the parties are unable to reach an agreement on the amount and payment of such costs, the Reorganized Debtors shall not be required to satisfy such request unless otherwise ordered by the Bankruptcy Court.

2.    <u>Purpose of the Plan Trust</u>

The Plan Trust shall be established for the purposes of: (i) holding, administering, liquidating, and distributing the Plan Trust Assets for the benefit of the Plan Trust Beneficiaries in accordance with the terms and conditions of the Plan, the Confirmation Order and the Plan Trust Agreement; (ii) prosecuting and monetizing the LT Claims and distributing Litigation Proceeds in a timely manner for the benefit of the Plan Trust Beneficiaries in accordance with the Plan, the Confirmation Order, and the Plan Trust Agreement; (iii) performing such other functions as are provided for in the Plan or the Plan Trust Agreement; (iv) distributing the GUC Cash Pool to GUC Cash Pool Treatment Creditors; and (v) reconciling Class 4 General Unsecured Claims. The liquidation of the LT Claims may be accomplished either through the prosecution, compromise and settlement, abandonment, or dismissal of any or all LT Claims or otherwise, in accordance with the Plan, the Confirmation Order, and the Plan Trust Agreement. Distributions of the Plan Trust Assets for the benefit of the Plan Trust Beneficiaries as provided for under the Plan, the Confirmation Order, and the Plan Trust Agreement shall be made in accordance with Treasury Regulations section 301.7701-4(d). The Plan Trust is intended to qualify as a liquidating trust pursuant to Treasury Regulations section 301.7701-4(d) and shall have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Plan Trust. The Plan Trust shall not be deemed a

successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the Plan Trust Agreement.

The Bankruptcy Court shall have continuing jurisdiction over the Plan Trust.

3.      The Plan Trustee

The identity of the Plan Trustee shall be set forth by the Debtors in the Plan Supplement, subject to the consent of the Required Consenting Noteholders and the Committee. As further set forth in the Plan Supplement, the Plan Trustee shall succeed to all privileges of the Debtors, including but not limited to the attorney-client privilege.

4.      Transferability of Plan Trust Interests

Any and all Plan Trust Interests shall not be evidenced by any certificate, security, receipt or in any other form or manner whatsoever, except on the books and records of the Debtors, Reorganized Debtors, or the Plan Trust, as applicable. Further, any and all Plan Trust Interests shall be nontransferable and nonassignable except by will, intestate, succession, or operation of law. In addition, any and all Plan Trust Interests shall not constitute "securities" and shall not be registered pursuant to the Securities Act or any applicable state or local securities law. To the extent beneficial interests in the Plan Trust are deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable securities laws, the exemption provisions of section 1145 of the Bankruptcy Code would be satisfied and such securities would be exempt from registration.

5.      Certain Tax Matters

The Plan Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes with the Reorganized Debtors treated as the grantor of the Plan Trust. As such, the income and expenses of the Plan Trust shall be reported on the tax returns of the Reorganized Debtors. As soon as reasonably practicable after the Effective Date, the Plan Trustee (to the extent that the Plan Trustee deems it necessary or appropriate in its sole discretion) will determine the fair market value of the Plan Trust Assets as of the Effective Date, and all parties must consistently use such valuation for all U.S. federal income tax purposes, such as in the determination of gain, loss, and tax basis.

**E.      Provisions Governing Distributions**

1.      Timing and Calculation of Amounts to be Distributed

(i)      *GUC Cash Pool Treatment Creditors*

On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall distribute the Initial GUC Cash Pool Funding to the GUC Cash Pool Distribution Agent. Until the occurrence of the GUC Cash Pool Final Reconciliation Date, the Reorganized Debtors shall make one or more Interim GUC Cash Pool Fundings, beginning on the date agreed by the GUC Cash Pool Distribution Agent and the Reorganized Debtors that is between the 90th and 180th day after the Effective Date and no more than every six months thereafter, in amounts to be agreed between the

72

Case 24-10628-KBO    Doc 1055    Filed 01/23/25    Page 83 of 189

SOLICITATION VERSION

Reorganized Debtors and the GUC Cash Pool Distribution Agent (both acting reasonably), taking into account, among other things, the amounts of the then-Disputed General Unsecured Claims and Administrative Claims. On or as soon as practicable after GUC Cash Pool Final Reconciliation Date, the Reorganized Debtors shall distribute the Remaining GUC Cash Pool Funding to the GUC Cash Pool Distribution Agent. The GUC Cash Pool Distribution Agent shall hold the Initial GUC Cash Pool Funding, any Interim GUC Cash Pool Fundings, and the Remaining GUC Cash Pool Funding in trust for (a) the Holders of Allowed GUC Cash Pool General Unsecured Claims and (b) the Reorganized Debtors, to the extent that, after calculation of the final amount of the GUC Cash Pool on the GUC Cash Pool Final Reconciliation Date, the amounts funded by the Reorganized Debtors to the GUC Cash Pool Distribution Agent exceed the final amount of the GUC Cash Pool. In the event of any excess funding as provided in (b) in the immediately preceding sentence, the GUC Cash Pool Distribution Agent shall pay over such excess funding to the Reorganized Debtors within three (3) Business Days of the GUC Cash Pool Final Reconciliation Date.

Except (a) as otherwise provided herein, (b) upon a Final Order, or (c) as otherwise agreed to by the Plan Trustee (with the consent of the Reorganized Debtors, not to be unreasonably withheld), and the Holder of the applicable GUC Cash Pool General Unsecured Claim, on the Initial GUC Cash Pool Distribution Date, the GUC Cash Pool Distribution Agent shall make initial distributions under the Plan on account of each Holder of an Allowed GUC Cash Pool General Claim up to the full amount of the distributions that the Plan provides for Allowed GUC Cash Pool General Unsecured Claims.

On each Semi-Annual Distribution Date, the GUC Cash Pool Distribution Agent, with the consent of the Reorganized Debtors (not to be unreasonably withheld), shall make the distributions required to be made on account of Allowed GUC Cash Pool General Unsecured Claims under the Plan on such date; *provided* that, that the GUC Cash Pool Distribution Agent may, in its reasonable discretion and with the consent of the Reorganized Debtors (not to be unreasonably withheld), determine not to make a distribution on a Semi-Annual Distribution Date in the event any such distribution would be in an amount determined to be immaterial.

Any distribution that is not made on the Initial General Unsecured Claims Distribution Date or on any other date specified herein because the GUC Cash Pool General Unsecured Claim that would have been entitled to receive that distribution is not an Allowed Claim on such date, shall be distributed on the first Semi-Annual Distribution Date after such Claim is Allowed (to the extent a distribution is made on such Semi-Annual Distribution Date).

The GUC Cash Pool Distribution Agent shall be authorized, with the consent of the Reorganized Debtors (not to be unreasonably withheld), to make partial distributions on the Initial GUC Cash Pool Distribution Date and each Semi-Annual Distribution Date on account of Allowed GUC Cash Pool General Unsecured Claims before all GUC Cash Pool General Unsecured Claims are Allowed. If and to the extent that there are Disputed GUC Cash Pool General Unsecured Claims, the GUC Cash Pool Distribution Agent may establish Disputed Claim Reserves, and distributions on account of any such Disputed GUC Cash Pool General Claims shall be made, pursuant to the provisions set forth in Article VI.

73

RLF1 32274174v.1

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

Holders of GUC Cash Pool General Unsecured Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Notwithstanding anything herein to the contrary, on the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall also distribute to the GUC Cash Pool Distribution Agent (i) any GUC Litigation Proceeds and (ii) 50% of any Unused Plan Trust Funding. The GUC Cash Pool Distribution Agent shall hold such funds in trust for holders of all Allowed General Unsecured Claims and distribute such funds in accordance with the Plan.

(ii)     *All Other Claims*

Except (a) as otherwise provided herein (including, without limitation, in Article V.A.1 of the Plan), (b) upon a Final Order, or (c) as otherwise agreed to by the Debtors or the Reorganized Debtors, as applicable, and the Holder of the applicable Claim, the Distribution Agent shall make initial distributions under the Plan on the Effective Date or as soon as reasonably practicable thereafter to each Holder of an Allowed Claim up to the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class. If a Claim is not an Allowed Claim on the Effective Date, the Distribution Agent shall make such distribution on the next Distribution Date after such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter. Unless the Bankruptcy Court orders otherwise, if, after an initial payment in respect of a Claim, additional amounts are Allowed in respect of such Claim, the Reorganized Debtors shall make distributions in respect of such additional Allowed amounts on the first Distribution Date after such additional amounts are Allowed or as soon as practicable thereafter. In the event that any payment or distribution under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution may be completed on the following Business Day but shall be deemed to have been completed as of the required date. Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VI of the Plan.

2.     Rights and Powers of Distribution Agent

(i)     *Powers of the Distribution Agent*

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties and exercise its rights under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities and powers; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to

implement the provisions of the Plan.

(ii)    *Expenses Incurred on or after the Effective Date*

Except as otherwise ordered by the Bankruptcy Court, (i) the amount of any reasonable fees and expenses incurred by the GUC Cash Pool Distribution Agent on or after the Effective Date and any reasonable compensation and expense reimbursement claims (including reasonable attorney and/or other professional fees and expenses) made by the GUC Cash Pool Distribution Agent shall be paid in Cash from the GUC Cash Pool and (ii) the amount of any reasonable fees and expenses incurred by any other Distribution Agent on or after the Effective Date and any reasonable compensation and expense reimbursement claims (including reasonable attorney and/or other professional fees and expenses) made by such Distribution Agent shall be paid in Cash by the Reorganized Debtors. The Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

3.    <u>Delivery of Distributions and Undeliverable or Unclaimed Distributions</u>

(i)    *Distributions Generally*

Except as otherwise provided in the Plan, the applicable Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder.

All distributions to Holders of Unsecured Notes Claims shall be deemed to be made to or by the Unsecured Notes Trustees. Regardless of whether such distributions are made by the Unsecured Notes Trustees or by the Distribution Agent, the applicable Indenture Trustee Charging Lien shall attach to the property to be distributed to the Holders of Unsecured Notes Claims in the same manner as if such distributions were made through the Unsecured Notes Trustees.

(ii)    *Distributions on Account of Obligations of Multiple Debtors*

For all purposes associated with distributions under the Plan, any obligation that could be asserted against more than one Debtor shall result in a single distribution under the Plan. Any such Claims shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code. For the avoidance of doubt, nothing in Article V.C.2 of the Plan shall affect the Guaranty Claim Enhancement.

(iii)    *Record Date of Distributions*

The Debtors or the Reorganized Debtors, as applicable, shall, by notice on the docket in the Chapter 11 Cases, establish the Distribution Record Date. On the Distribution Record Date, the various transfer registers for each Class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims or Interests. The applicable Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure Claim or disputes over any Cure Claim, neither the Debtors, the Reorganized Debtors, nor any Distribution Agent shall have any obligation to

75

recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Cure Claim.

(iv)     *De Minimis Distributions; Minimum Distributions*

The Distribution Agent shall not make any Cash distributions to any Holder of an Allowed Claim or Interest pursuant to Article III and Article V of the Plan on account of such Allowed Claim or Interest if such distribution is valued, in the reasonable discretion of the Distribution Agent, at less than $50.00 and each Holder of an Allowed Claim or Interest to which this limitation applies shall not be entitled to any distributions under the Plan.

(v)     *No Fractional Shares or Subscription Rights*

No fractional Subscription Rights or shares of New Equity Securities shall be distributed, and no Cash shall be distributed in lieu of such fractional shares or rights. When any distribution pursuant to the Plan on account of an Allowed Claim otherwise would result in the issuance of Subscription Rights or New Equity Securities that are not a whole number, such shares or rights, as applicable, shall be rounded as follows: (i) fractions of greater than one-half shall be rounded to the next higher whole number, and (ii) fractions of one-half or less shall be rounded to the next lower whole number with no further payment on account thereof. The total number of Subscription Rights or New Equity Securities in each case, to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

(vi)     *Undeliverable and Unclaimed Distributions*

No distribution to Holders of Allowed Claims or Interests shall be made unless and until the applicable Distribution Agent has determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided, however*, that Unclaimed Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Effective Date. After such date, (i) all unclaimed property that was Cash from the GUC Cash Pool shall revert to the GUC Cash Pool Distribution Agent automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned, or unclaimed property laws to the contrary) for distribution to holders of Allowed GUC Cash Pool General Unsecured Claims, and the Claim of any Holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred, and (ii) all other such unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder or its successors with respect to such property or interest in property shall not be entitled to any distributions under the Plan.

(vii)     *Manner of Payment Pursuant to the Plan*

At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check, wire transfer, automated clearing house, credit card, or as otherwise provided in

applicable agreements.

    4.    <u>Withholding and Reporting Requirements; Compliance Matters</u>

In connection with the Plan, the Debtors, the Reorganized Debtor, or the Distribution Agent, as applicable, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements lawfully imposed on them by any Governmental Unit, including related interest, penalties, inflation adjustments, and fees (if any) and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements; *provided, however*, that Debtors, the Reorganized Debtors, or the Distribution Agent, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond. The Debtors, the Reorganized Debtors, or the Distribution Agent, as applicable, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. At the reasonable discretion of the Reorganized Debtors or the Distribution Agent, no distribution shall be made to or on behalf of such Holder of a Claim pursuant to the Plan unless and until such Holder of a Claim has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations, and any Cash, Plan Securities and all related documents, and/or other consideration or property to be distributed pursuant to the Plan shall, pending the implementation of arrangements pursuant to the previous clause, be treated as an Unclaimed Distribution, which shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Effective Date. After such date, all such unclaimed property or interests in property shall revert to the Reorganized Debtors or the GUC Distribution Agent in accordance with Article V.C.7 of the Plan automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall not be entitled to any distributions under the Plan. Notwithstanding any other provision of the Plan to the contrary, (a) each Holder of a Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such distribution, and (b) any amounts deducted or withheld from any distribution to a Holder by the Reorganized Debtors or the Distribution Agent in respect of any tax shall be treated as if distributed to such Holder in connection with satisfaction of such Holder's Claim.

    5.    <u>Claims Paid or Payable by Third Parties</u>

    (i)    *Claims Paid by Third Parties*

The Debtors, the Reorganized Debtors, or the Plan Trust, as applicable, shall reduce a Claim or Interest, and such Claim or Interest (or portion thereof) shall be Disallowed without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim or Interest

receives a payment on account of such Claim or Interest from a party that is not the Debtors or the Reorganized Debtors, as applicable. To the extent a Holder of a Claim or Interest receives a distribution on account of such Claim or Interest and receives payment from a party that is not the Debtors or the Reorganized Debtors, as applicable, on account of such Claim or Interest, such Holder shall, within ten (10) Business Days of receipt thereof, repay, return, or deliver any distribution held by or transferred to the Holder to the Reorganized Debtors to the extent the Holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such distribution under the Plan. The failure of such Holder to timely repay, return, or deliver such distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the ten (10) Business Day grace period specified above until the amount is repaid.

(ii)    <em>Claims Payable by Third Parties</em>

No distributions under the Plan shall be made on account of an Allowed Claim or Interest that is an Insured Claim until the Holder of such Allowed Claim or Interest has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim or Interest (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then, immediately upon such payment, such Claim or Interest may be expunged or reduced on the Claims Register by the Claims Agent to the extent of any such payment without an objection to such Claim or Interest having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(iii)    <em>Applicability of Insurance Policies</em>

Except as otherwise provided in the Plan, payments made to Holders of Claims or Interests shall be made in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan or the Confirmation Order shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any rights, claims, defenses, or Cause of Action that the Debtors, or any other Entity may hold against any other Entity, including insurers, under any policies of insurance, agreements related thereto, or applicable indemnity, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the applicable Insurance Policies, agreements related thereto, and applicable non-bankruptcy law.

6.    <u>Setoffs and Recoupment</u>

Except as otherwise expressly provided for in the Plan, each Debtor or the Reorganized Debtors or the Plan Trust, as applicable, or such Entity's designee as instructed by such Debtor or Reorganized Debtors or the Plan Trust, as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, set off against or recoup from an Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, any claims, rights, and Causes of Action of any nature whatsoever that the Debtors, the Reorganized Debtors, or the Plan Trust, as applicable, may have against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on

78

or prior to the Effective Date (whether pursuant to the Plan or otherwise). Notwithstanding the foregoing, except as expressly stated in Article VIII of the Plan, neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors, the Reorganized Debtors, or the Plan Trust of any such claims, rights, or Causes of Action the Debtors, the Reorganized Debtors, or the Plan Trust may possess against such Holder. In no event shall any Holder of Claims be entitled to set off any Claim against any claim, right, or Cause of Action of the Debtor, the Reorganized Debtor, or the Plan Trust, as applicable, unless such Holder has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 or otherwise.

7.    Allocation between Principal and Accrued Interest

Except as otherwise provided in the Plan, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof and as determined for federal income tax purposes) and second, to the extent the consideration exceeds the principal amount of the Allowed Claims, to the remaining portion of such Allowed Claims, if any.

8.    Foreign Currency Exchange Rate

Except as otherwise provided in a Final Order of the Bankruptcy Court, as of the Effective Date, any Claim asserted in a government-issued currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in the Wall Street Journal, National Edition, on the Petition Date.

**F.    Procedures for Resolving Disputed Claims or Interests**

1.    Objections to Claims

As of the Effective Date, objections to, and requests for estimation of, Claims (other than Professional Claims) against the Debtors may be interposed and prosecuted by the Reorganized Debtors or, with respect to GUC Cash Pool General Unsecured Claims, the Plan Trustee. Such objections and requests for estimation shall be served and filed on or before the Claims Objection Deadline or the Administrative Claims Objection Deadline, as applicable.

2.    Allowance of Claims

After the Effective Date, each of the Reorganized Debtors or, with respect to GUC Cash Pool General Unsecured Claims, the Plan Trustee, shall have and retain any and all rights, claims, Causes of Action and defenses that the Debtors had with respect to any Claim against a Debtor, except with respect to any Claim deemed Allowed under the Plan. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

Following the Effective Date:

- GUC Cash Pool General Unsecured Claims may be settled or compromised solely by the Plan Trustee in consultation with the Reorganized Debtors; *provided* that in the event the Reorganized Debtors notify the Plan Trustee that they do not agree with a proposed settlement or compromise of any GUC Cash Pool General Unsecured Claim, the Plan Trustee cannot settle or compromise such Claim without approval of the Bankruptcy Court, and the Reorganized Debtors shall have the right to object to any motion seeking such approval; and

- the Reorganized Debtors shall have the exclusive right to settle or compromise all Claims (including Administrative Claims) that are not GUC Cash Pool General Unsecured Claims in consultation with the Plan Trustee; *provided* that in the event the Plan Trustee notifies the Reorganized Debtors that it does not agree with a proposed settlement or compromise of any Claim that is not a GUC Cash Pool General Unsecured Claim, the Reorganized Debtors cannot settle or compromise such Claim without approval of the Bankruptcy Court, and the Plan Trustee shall have the right to object to any motion seeking such approval.

3.    Estimation of Claims

The Debtors (in consultation with the Committee), the Reorganized Debtors, or, with respect to GUC Cash Pool General Unsecured Claims, the Plan Trustee, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim, pursuant to section 502(c) of the Bankruptcy Code regardless of whether any party in interest previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or the maximum limit of such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors, the Reorganized Debtors, or the Plan Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

4.    Elimination of Duplicate Claims

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors, as applicable, upon stipulation between the parties in interest without a Claims objection having to be filed and without any further notice or action, order, or approval of the Bankruptcy Court. If a Claim has been satisfied, the Debtors or the Reorganized Debtors, or the applicable claimant, as applicable, may amend the Claims Register indicating that such Claim has been satisfied.

5.      No Distributions Pending Allowance

Notwithstanding any other provision of the Plan to the contrary, no payment or distributions of any kind or nature provided under the Plan shall be made with respect to all or any portion of a Disputed Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest or has otherwise been resolved by settlement or Final Order; *provided, however*, that, if the Debtors, the Reorganized Debtors, or, with respect to GUC Cash Pool General Unsecured Claims, the Plan Trustee, as applicable, do not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim or Interest, the applicable Distribution Agent may make a partial distribution on account of that portion of such Claim or Interest that is not Disputed at the time and in the manner that the Distribution Agent makes distributions to similarly situated Holders of Allowed Claims or Interests pursuant to the Plan.

6.      Distributions After Allowance

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.

With respect to a Disputed GUC Cash Pool General Unsecured Claim that becomes an Allowed Claim, the GUC Cash Pool Distribution Agent shall provide the Holder of such Allowed GUC Cash Pool General Unsecured Claim a distribution on the first Semi-Annual Distribution Date after such Claim is Allowed in accordance with Article V.A.1 of the Plan.

With respect to all other Disputed Claims or Interests, as soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing such Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Allowed Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Allowed Claim or Interest unless required under applicable bankruptcy law.

7.      No Postpetition Interest

Unless otherwise specifically provided for in the Plan or by Final Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim, including with respect to the period from the Effective Date to the date on which a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

8.      Resolution of Claims

Except as otherwise provided herein (including the release and exculpation provisions hereof) or in the Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Reorganized Debtors, or, with respect to GUC Cash Pool General Unsecured Claims, the Plan Trust, as applicable, may enforce, sue on,

81

settle, or compromise (or decline to do any of the foregoing) all claims, disputed claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors, the Reorganized Debtors, or the Plan Trust, as applicable, may hold against any Entity, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith. From and after the Effective Date, and subject to the terms of the Plan Trust Agreement, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court; *provided* that, for the avoidance of doubt, following the Effective Date:

- GUC Cash Pool General Unsecured Claims may be settled or compromised solely by the Plan Trustee in consultation with the Reorganized Debtors; *provided* that in the event the Reorganized Debtors notify the Plan Trustee that they do not agree with a proposed settlement or compromise any GUC Cash Pool General Unsecured Claim, the Plan Trustee cannot settle or compromise such Claim without approval of the Bankruptcy Court, and the Reorganized Debtors shall have the right to object to any motion seeking such approval; and

- the Reorganized Debtors shall have the exclusive right to settle or compromise all Claims (including Administrative Claims) that are not GUC Cash Pool General Unsecured Claims in consultation with the Plan Trustee; *provided* that in the event the Plan Trustee notifies the Reorganized Debtors that it does not agree with a proposed settlement or compromise of any Claim that is not a GUC Cash Pool General Unsecured Claim, the Reorganized Debtors cannot settle or compromise such Claim without approval of the Bankruptcy Court, and the Plan Trustee shall have the right to object to any motion seeking such approval.

9.    <u>Disputed Claims Reserve</u>

On or after the Effective Date,

- the GUC Cash Pool Distribution Agent (with the consent of the Reorganized Debtors, not to be unreasonably withheld) shall be authorized, but not directed, to establish one or more Disputed Claims Reserves from the GUC Cash Pool for any Disputed GUC Cash Pool General Unsecured Claims, which Disputed Claim Reserves shall be administered by the GUC Cash Pool Distribution Agent; and

- the Reorganized Debtors (with the consent of the Required Consenting Noteholders) shall be authorized, but not directed, to establish one or more Disputed Claims Reserves for any Disputed Claims other than GUC Cash Pool General Unsecured Claims, which Disputed Claims Reserves shall be administered by the Reorganized Debtors.

After the Effective Date, the Reorganized Debtors (with the consent of the Required Consenting Noteholders) or, with respect to the GUC Cash Pool, the GUC Cash Pool Distribution Agent (with the consent of the Reorganized Debtors, not to be unreasonably withheld), may hold any property to be distributed pursuant to the Plan, in the same proportions and amounts as provided for in the Plan, in the Disputed Claims Reserve in trust for the benefit of the Holders of Claims ultimately determined to be Allowed after the Effective Date. The Reorganized Debtors or

GUC Cash Pool Distribution Agent shall distribute any such amounts or other property (net of any expenses, including taxes related thereto) to Holders of Claims ultimately determined to be Allowed after the Effective Date in accordance with the terms of the Plan, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date under Article III of the Plan solely to the extent of the amounts available in the applicable Disputed Claims Reserves. To the extent property that would otherwise be held in the Disputed Claims Reserve is New Holdco Units, rather than issue such New Holdco Units to be held in the Disputed Claims Reserve, the Reorganized Debtors may instead issue out of "treasury stock" or newly issued New Holdco Units as Disputed Claims become Allowed Claims as of the Effective Date.

To the extent property (e.g., New Holdco Units) is deposited into the Disputed Claims Reserve as opposed to being issued out of "treasury stock" or as newly issued New Common Stock by the Reorganized Debtors directly to Holders of Claims, then with respect to any of the assets that are subject to potential disputed claims of ownership or uncertain distributions (including, in particular, the Disputed Claims Reserve), the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state, local, and non-U.S. tax purposes.

10.    <u>Disallowance of Claims</u>

Any Claims or Interests held by an Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN, BY AN ORDER OF THE BANKRUPTCY COURT, OR AS AGREED TO BY THE DEBTORS OR THE REORGANIZED DEBTORS, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.**

11.    <u>Amendments to Claims and Late Filed Claims</u>

Following the Effective Date, except as otherwise provided in the Plan or the Confirmation Order, as applicable, no Claim may be filed, amended, or supplemented without the approval of the Bankruptcy Court or without the prior written authorization of the Reorganized Debtors, as applicable.

12.    <u>Single Satisfaction of Claims</u>

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed one hundred (100) percent of the underlying Allowed Claim plus applicable interest, if any.

**G.    Assumption and Rejection of Executory Contracts and Unexpired Leases**

1.    <u>Assumption and Rejection of Executory Contracts and Unexpired Leases</u>

On the Effective Date, except as otherwise provided in the Plan, all Executory Contracts or Unexpired Leases shall be deemed rejected by the applicable Reorganized Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts and Unexpired Leases that: (i) have been previously assumed, assumed and assigned, or rejected by a Final Order; (ii) are the subject of a motion to assume Executory Contracts or Unexpired Leases that is pending on the Effective Date; (iii) the Debtors have, as of the Effective Date, received authority to assume pursuant to an order of the Bankruptcy Court and the effective date of such assumption is after the Effective Date; (iv) are listed on the Schedule of Assumed Contracts and Leases and are not removed from such schedule at the option of the Required Consenting Noteholders (in consultation with the Debtors) prior to the Effective Date; and (v) provide for payment of severance or other benefits to former employees of the Debtors whether in the form of a plan or individual agreement; *provided*, that nothing in the Plan or Confirmation Order shall constitute an admission or finding that any plan or agreement referenced in the immediately preceding clauses constitutes an Executory Contract or Unexpired Lease; and *provided further*, that the Debtors reserve the right to seek enforcement of or other relief with respect to an assumed or assumed and assigned Executory Contract or Unexpired Lease following the Confirmation Date, including but not limited to seeking an order of the Bankruptcy Court for the rejection of such Executory Contract or Unexpired Lease for cause. The terms of any Final Order entered by the Bankruptcy Court prior to the entrance of the Confirmation Order that provide for the assumption and assignment of nonresidential real property shall control over the terms of the Plan and Confirmation Order.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions of the Executory Contracts and Unexpired Leases set forth on the Schedule of Assumed Contracts and Leases and the rejections of Executory Contracts and Unexpired Leases, as set forth in the Plan and the Schedule of Assumed Contracts and Leases, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Except as otherwise specifically set forth in the Plan, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date. The Debtors are authorized to abandon any of the Debtors' personal property at or on the leased premises subject to an Unexpired Lease rejected pursuant to the Plan, and the counterparties to rejected leases may dispose of any such personal property remaining at or on the leased premises following the applicable lease rejection date.

Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law (in each case, in accordance with applicable law, including by consent of the counterparty to such Executory Contract or Unexpired Lease). Subject to applicable law, including section 365(d)(4) of the Bankruptcy Code, any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors, with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date. To the maximum extent permitted by applicable Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts, conditions or prevents, or purports to restrict, condition or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "anti-assignment," "change of control," consent right, or similar provision), then such provision shall be deemed modified such that the transaction contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. The consummation of the Plan and the implementation of the Reorganization Transactions are not intended to, and shall not, constitute a "change of control," "change in control," or other similar event under any lease, contract, or agreement to which a Debtor is a party.

2.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims, if any, that are not subject to an Assumption Dispute on the Effective Date, or to the extent necessary, on the later of the Effective Date (or as soon as reasonably practicable thereafter), as such amounts would otherwise come due in the ordinary course of business, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. The Reorganized Debtors may settle any Cure Claims on account of any Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as set forth below, any Cure Claims shall be satisfied for the purposes of section 365(b)(1) of the Bankruptcy Code by payment in Cash of the Cure Claim set forth on the Schedule of Assumed Contracts and Leases for the applicable Executory Contract or Unexpired Lease, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtors or the Reorganized Debtors, as applicable, may otherwise agree or as determined by the Bankruptcy Court by a Final Order. Any Cure Claims shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of such Cure Claims, as applicable.

Unless otherwise provided by an order of the Bankruptcy Court, the Debtors shall use reasonable best efforts to File the Schedule of Assumed Contracts and Leases no later than twenty-eight (28) days prior to the earlier to occur of (a) the Voting Deadline and (b) the deadline for objecting to the Plan. The Debtors shall cause all Filed Schedules of Assumed Contracts and

85

Leases or notices of proposed assumption, proposed amounts of Cure Claims, and proposed rejections to be served by first class mail on counterparties to Executory Contracts and Unexpired Leases to be assumed or rejected pursuant to the Plan that are identified in such schedule. The Required Consenting Noteholders shall have the right to designate any Executory Contract or Unexpired Lease to be added or removed from the Schedule of Assumed Contracts and Unexpired Leases at any time prior to the Effective Date after consultation with the Debtors. To the extent that the Required Consenting Noteholders seek to add or remove any Executory Contract or Unexpired Lease, the Required Consenting Noteholders and the Debtors will endeavor to provide the Committee with a draft of the proposed revised Schedule of Assumed Contracts and Leases as soon as practicable prior to the filing of such schedule. Any objection to the assumption or rejection of an Executory Contract or Unexpired Lease under the Plan, including all requests for payment of Cure Claims that differ from the amounts proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed, served and actually received by the Debtors by the later of (a) the Confirmation Objection Deadline or (b) with respect to any Executory Contract or Unexpired Lease that is added to the Assumed Executory Contract and Unexpired Leases Schedule after the date that is fourteen (14) days prior to the Confirmation Objection Deadline, the date that is fourteen (14) days following the filing of the relevant supplement to the Schedule of Assumed Contracts and Leases.

**Any party that fails to timely object to the assumption of its Executory Contract or Unexpired Lease (including the ability of the applicable Reorganized Debtor or assignee to provide "adequate assurance of future performance" under such Executory Contract or Unexpired Lease within the meaning of section 365 of the Bankruptcy Code) or the amount of the Cure Claims listed on the Schedule of Assumed Contracts and Leases as set forth in the paragraph above, shall be (i) deemed to have consented to the assumption of its Executory Contract or Unexpired Lease and to such Cure Claims and (ii) forever barred, estopped, and enjoined from disputing the amount of the Cure Claims set forth on the Schedule of Assumed Contracts and Leases (including a Cure Claim of $0.00) and/or from asserting any Claim against the applicable Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code.**

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, subject to the payment of the applicable Cure Claims as set forth in the Plan Supplement, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court upon payment of the applicable Cure Claims.

3.      Claims Based on Rejection of Executory Contracts or Unexpired Leases

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court by the later of thirty (30) days from (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation

Order) approving such rejection, or (ii) the effective date of the rejection of such Executory Contract or Unexpired Lease. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary.** Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III.G.4 of the Plan, and such claims may be objected to in accordance with the Plan.

4.      Assumption Dispute Resolution

In the event of a timely Filed objection regarding: (i) the amount of any Cure Claims; (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption or payment of a Cure Claim required by section 365(b)(1) of the Bankruptcy Code, such dispute (an "**Assumption Dispute**") shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. To the extent an Assumption Dispute relates solely to the amount of a Cure Claim, the Debtors may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of such Assumption Dispute; *provided*, that the Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the counterparty or counterparties to such Executory Contract or Unexpired Lease, and *provided further* that the Bankruptcy Court shall have the authority to hear any disputes regarding such reserve. To the extent that the Assumption Dispute is resolved or determined unfavorably to the Debtors, the Debtors, with the consent of the Required Consenting Noteholders, may reject the applicable Executory Contract or Unexpired Lease after such determination, which rejection shall supersede, nullify, and render of no force or effect the earlier assumption and/or assumption and assignment.

For the avoidance of doubt, if the Debtors are unable to resolve an Assumption Dispute relating solely to the amount of a Cure Claim prior to the Confirmation Hearing, such Assumption Dispute may be scheduled to be heard by the Bankruptcy Court after the Confirmation Hearing.

5.      Pre-Existing Payment and Other Obligations

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors or Reorganized Debtors, as applicable, under such contract or lease. In particular, notwithstanding any applicable non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide: (a) payment to the

contracting Debtors or Reorganized Debtors, as applicable, of outstanding and future amounts owing thereto under or in connection with rejected Executory Contracts or Unexpired Leases or (b) warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected Executory Contracts.

6.      Indemnification Obligations

Notwithstanding anything in the Plan to the contrary, each Indemnification Obligation shall be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise, unless such obligation (i) was rejected by the Debtors pursuant to a Final Order or (ii) is the subject of a motion to reject that is pending as of the Effective Date. Each Indemnification Obligation assumed by the applicable Debtor shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

7.      Contracts and Leases Entered into After the Petition Date

Contracts and leases entered into after the Petition Date by the Debtors, and any Executory Contracts and Unexpired Leases assumed by the Debtors and not assigned to a non-Debtor Entity, will be performed by the Debtors or the Reorganized Debtors in the ordinary course of their operations. Accordingly, such contracts and leases (including any assumed Executory Contract and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

8.      Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

9.      Reservation of Rights

Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' Schedules, the Schedule of Assumed Contracts and Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the

Reorganized Debtors, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease. For the avoidance of doubt, the Debtors reserve all rights with respect to any Retained Causes of Action or other right with respect to any Executory Contract or Unexpired Lease.

10.    Non-Occurrence of Effective Date; Bankruptcy Code Section 365(d)(4)

If the Effective Date fails to occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to further extend the deadline for assuming or rejecting Unexpired Leases under section 365(d)(4) of the Bankruptcy Code.

## H.    Settlement, Releases, Injunction and Related Provisions

1.    Compromise and Settlement of Claims, Interests, and Controversies

Pursuant to section 1123 of the Bankruptcy Code and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed to be a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein and in the Plan shall be deemed nonseverable from each other and from all other terms of the Plan. In accordance with the provisions of the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

2.    Release of Liens

Except (a) with respect to the Liens securing Allowed Other Secured Claims that are Reinstated under the Plan, or (b) as otherwise provided in the Plan or in any Definitive Document, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Debtors and vest in the Reorganized Debtors, as applicable, on the Effective Date; *provided, however*, that notwithstanding anything in the Plan to the contrary, all mortgages, deeds of trust, Liens, pledges, or other security interests granted under the DIP Loan Documents shall continue in full force and effect and shall not be released until all DIP Claims (other than contingent indemnification and reimbursement obligations as to which no claim has been asserted by the Person entitled thereto) have been paid in full in Cash, at which time the applicable DIP Secured Parties shall execute a deed of release and any other documentation reasonably requested by the Debtors in order to release such Liens according to applicable law; *provided*, *further*, that any action taken by any DIP Secured Party under Article

VIII.B of the Plan shall be without any expenses or representations from any DIP Secured Party.

3.      Discharge and Satisfaction of Claims and Termination of Interests

Pursuant to sections 105 and 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in respect of, the Debtors or any of their Assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, any Claims for withdrawal liability that relate to services performed by employees of the Debtor before the Effective Date or that arise from a termination of employment, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has voted to accept or reject the Plan. Any default or "*event of default*" by the Debtors with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring. For the avoidance of doubt, the distributions, rights, and treatment that are provided in the Plan shall not function as a discharge of the Debtors' non-Debtor Affiliates.

4.      Term of Injunctions or Stays

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

5.      Releases by the Debtors

**Notwithstanding anything in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released by each of the Debtors, their respective Estates, and any Person seeking to exercise the rights of any of the Debtors or their Estates (including any successors to any of the Debtors or their Estates or any estate representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), in each case, on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons who may purport to assert any claim or Cause of Action, derivatively, by, through, for, or because of**

90

any of the foregoing Persons, from any and all claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort or otherwise, that any of the Debtors, the Reorganized Debtors, the Plan Trust, their respective Estates, or any successors to or representatives of the foregoing appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or that any holder of any Claim against or any Interest in, any of the Debtors could have asserted on behalf of any of the Debtors, the Reorganized Debtors, the Plan Trust, or their respective Estates, based on, relating to, or in any manner arising from, in whole or in part, any of the Debtors (including the capital structure, management, ownership, or operations thereof), any Security of any of the Debtors, the subject matter of, or the transactions or events giving rise to, any such claim or Cause of Action, the business or contractual arrangements between any Debtor and a Released Party, any of the Debtors' restructuring efforts, any Avoidance Actions held by any of the Debtors or their Estates, any intercompany transactions performed by any of the Debtors, the Chapter 11 Cases (including the Filing thereof and any relief obtained by the Debtors therein), the formulation, preparation, dissemination, negotiation, or Filing of the Plan (including, for the avoidance of any doubt, the Plan Supplement), the Disclosure Statement, the Bidding Procedures Order (and the procedures approved thereby), any Definitive Document, or any other contract, instrument, release, or other agreement or document (including any legal opinion requested by any Person regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order with respect to the Plan in lieu of such legal opinion) created or entered into, whether before or during the Chapter 11 Cases, in connection with the Filing of the Debtors' Chapter 11 Cases, the Bidding Procedures Order, the Disclosure Statement, the Plan (including, for the avoidance of any doubt, the Plan Supplement), the Plan Sponsor Agreement, the Backstop Agreement, the DIP Loan Documents, any Reorganization Transactions, any other Definitive Document, the solicitation of votes with respect to the Plan, the pursuit of Confirmation of the Plan, the pursuit of Consummation of the Plan, and the administration and the implementation of the Plan, including the issuance or distribution of the Plan Securities or any other property pursuant to the Plan, or any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date other than claims or Causes of Action resulting therefrom arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, in each case, solely to the extent determined by a Final Order.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date Claims or obligations of any Person under the Plan, the Confirmation Order with respect to the Plan, any Reorganization Transactions, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (b) any right of objection, defense, mandatory counterclaim, or right of setoff to any Claim against or Interest in the Debtors.

Notwithstanding anything to the contrary contained in the Plan, nothing in the Plan

shall release, waive, or otherwise limit the LT Claims or the Retained Causes of Action.

6.      Releases by Holders of Claims

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released by each Releasing Party from any and all claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, any of the Debtors (including the capital structure, management, ownership, or operation thereof), any security of any of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the assertion or enforcement of rights and remedies against any of the Debtors, the Debtors' in-or out-of-court restructuring efforts, any Avoidance Actions held by any of the Debtor(s) or their Estates, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, or Filing of the Chapter 11 Cases, the Bidding Procedures, the Bidding Procedures Order, Disclosure Statement, the Plan (including, for the avoidance of any doubt, the Plan Supplement), the Plan Sponsor Agreement, the Backstop Agreement, the DIP Loan Documents, any other Definitive Document, any Reorganization Transactions, any contract, instrument, release, or other agreement or document created or entered into, whether before or during the Chapter 11 Cases, in connection with the Filing of the Debtors' Chapter 11 Cases, the Bidding Procedures, the Bidding Procedures Order, the Disclosure Statement, the Plan (including, for the avoidance of any doubt, the Plan Supplement), the Plan Sponsor Agreement, the Backstop Agreement, the DIP Loan Documents, any other Definitive Document, any Reorganization Transactions, the solicitation of votes with respect to the Plan, the pursuit of Confirmation of the Plan, the pursuit of Consummation of the Plan, and the administration and implementation of the Plan. Notwithstanding anything to the contrary in the foregoing, the releases set forth in Article VIII.F of the Plan shall not be construed as: (i) releasing any Released Party from claims and Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; (ii) releasing any post-Effective Date obligations of or under (A) any party or Entity under the Plan, (B) any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order, or (C) any document, instrument, or agreement executed to implement the Plan; (iii) releasing any rights to distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order; or (iv) releasing or discharging any properly-pled direct claim (other than claims against the Debtors) held by a creditor that is not a Releasing Party.

7.    Exculpation

**Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on, without limitation, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Bidding Procedures, the Bidding Procedures Order, the Plan (including, for the avoidance of any doubt, the Plan Supplement), the Plan Sponsor Agreement, the Backstop Agreement, the DIP Loan Documents, any other Definitive Document, any Reorganization Transactions, any contract, instrument, release, or other agreement or document created or entered into, without limitation, in connection with the Disclosure Statement, the Bidding Procedures, the Bidding Procedures Order, the Plan (including, for the avoidance of any doubt, the Plan Supplement), the Plan Sponsor Agreement, the Backstop Agreement, the DIP Loan Documents, any other Definitive Document, any Reorganization Transactions, the filing of the Chapter 11 Cases, the administration of the Claims reconciliation process, the implementation of orders of the Bankruptcy Court entered during the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation of the Plan, the administration of the Chapter 11 Cases, the administration and implementation of the Plan, including the issuance of the Plan Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of any doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

8.    Injunction

Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, members, managers, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan in relation to any Claim, Interest or Cause of Action extinguished or released pursuant to the Plan.

Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a Holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether or not proof of such Claims or Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, members, managers, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests,

93

and Causes of Action that will be or are extinguished, or released pursuant to the Plan from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Reorganized Debtors, the Plan Trust, or the property of any of the Debtors, the Reorganized Debtors, the Plan Trust, or their respective properties or Estates, as applicable; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, the Plan Trust, or the property of any of the Debtors or their respective Estates, the Reorganized Debtors, or the Plan Trust; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Reorganized Debtors, the Plan Trust, or the property of any of the Debtors, the Reorganized Debtors, the Plan Trust, the Reorganized Debtors, or against their respective Estates; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtors, the Reorganized Debtors, as applicable, or against property or interests in property of any of the Debtors, the Reorganized Debtors, or the Reorganized Debtors, as applicable except as contemplated or allowed by the Plan, and except to the extent a setoff is asserted in a Filed proof of Claim or by way of a motion filed prior to the confirmation of the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

The Non-Released Parties and each of their Affiliates are enjoined from interfering with the Debtors' or Reorganized Debtors', as applicable, administration of the Retained Causes of Action (including the claims and Causes of Action in connection with the ICSID Arbitration) and the LT Claims, and may not take any action to interfere with Consummation of the Plan or any of the Reorganization Transactions.

By accepting distributions pursuant to the Plan, each Holder of an Allowed Claim or Interest extinguished, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in Article VIII.H of the Plan; *provided*, *however*, that the acceptance of these distributions shall not be construed as an agreement to, and does not constitute an opt-in or consent to, any third party release under Article VIII.F of the Plan.

The injunctions in Article VIII.H of the Plan shall extend to any successors of the Debtors, the Reorganized Debtors, as applicable, and their respective property and interests in property.

9.    Term of Injunctions or Stays

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

10.    The SEC and Comisión para el Mercado Financiero (CMF)

Notwithstanding any language to the contrary in the Plan, no provision shall (a) preclude

the SEC or CMF, as applicable, from enforcing its police or regulatory powers; or (b) enjoin, limit, impair or delay the SEC or CMF, as applicable, from commencing or continuing any claims, causes of action, proceeding, or investigations against any non-Debtor person or non-Debtor entity in any forum.

11.    Protection Against Discriminatory Treatment.

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**I.    Conditions Precedent to the Effective Date**

1.    Conditions Precedent to the Effective Date

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

(i)    the Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, in form and substance consistent in all respects with the Plan Sponsor Agreement and the Plan Term Sheet and otherwise in form and substance reasonably acceptable to the Required Consenting Noteholders, the Debtors and the Committee, which shall:

a.    authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan in a manner consistent in all respects with the Plan Term Sheet, the Plan Sponsor Agreement, and the Backstop Agreement and subject to the consent rights set forth in the Plan and therein;

b.    decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;

c.    authorize New Holdco, New Chile PIF, Chile Newco, the Debtors, or Reorganized Debtors, as applicable/necessary, to: (i) implement the Reorganization Transactions; (ii) distribute all securities pursuant to the exemption from registration under the Securities Act of 1933 provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (C) make all distributions and issuances as required under the Plan; and (D) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, in each case, in a manner consistent in all respects with the terms of the Plan Term Sheet, the Plan Sponsor Agreement, and the Backstop Agreement, and subject to the consent rights set forth in the Plan and therein;

95

    d.   authorize the implementation of the Plan in accordance with its terms, including, without limitation, directing all necessary parties required to consummate the Reorganization Transactions under applicable Law; and

    e.   provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax, to the extent permissible under applicable Law;

    (ii)   the Plan Sponsor Agreement and the Backstop Agreement shall each remain in full force and effect and shall not have been terminated at any time;

    (iii)   the Debtors and the Consenting Noteholders shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

    (iv)   the Rights Offering shall have been completed in accordance with the Rights Offering Procedures Order, and shall have, together with the purchase of the Unsubscribed Rights Offering Securities (as defined in the Backstop Agreement) resulted in gross proceeds of at least the Rights Offering Amount;

    (v)   (i) Debtor NC Telecom II shall have taken all actions (including executing all documents) and provided all consents necessary under local law or otherwise to effectuate the cancellation and release of the Intercompany Interests in WOM Mobile, (ii) NCT shall have taken all actions (including executing all documents) and provided all consents necessary under local law or otherwise to effectuate, as applicable, the redemption, cancellation, and release of the Existing Equity Interests in WOM Mobile and NC Telecom II, (iii) all shareholders' meetings required to effectuate (A) the redemption, cancellation, release, and extinguishment of Existing Equity Interests and Intercompany Interests, as applicable, in accordance with Plan and (B) any other Reorganization Transactions shall have occurred, and all resolutions necessary to effectuate the foregoing shall have passed;

    (vi)   the final version of each of the Plan, the Definitive Documents, and all documents contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein, shall have been executed or filed, as applicable, in form and substance consistent in all respects with the Plan Sponsor Agreement, the Plan Term Sheet and the Plan, and comply with the applicable consent rights set forth in the Plan Sponsor Agreement, the Plan Term Sheet and the Plan for such documents, and shall not have been modified without the consent of the Required Consenting Noteholders;

    (vii)   the New Secured Notes Documents and the New Convertible Notes Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of such documents shall have been satisfied or duly waived in writing

96

in accordance with the terms of each of such documents and the issuance of each of the New Secured Notes and the New Convertible Notes shall have occurred;

(viii)    the Debtors shall have not (i) entered into any agreement to sell any assets with a value greater than (x) $5 million individually or (y) $10 million in the aggregate without the prior written consent of the Required Consenting Noteholders (not to be unreasonably withheld) or (ii) filed with the Bankruptcy Court after the date of the Backstop Agreement any motion or application seeking authority to use, sell, abandon or otherwise dispose of any assets, whether outside the ordinary course of business or otherwise, which motion or application is not reasonably acceptable to the Required Backstop Parties;

(ix)    the DIP Loan Documents and the Final Order approving the DIP Credit Facility shall remain in full force and effect and no event of default shall have occurred and be continuing thereunder;

(x)    the Debtors shall have paid all accrued but unpaid fees and expenses required to be paid under the DIP Loan Documents for which an invoice has been delivered to the Debtors prior to the Effective Date (which invoices may include a reasonable, good faith estimate of such fees and expenses through the Anticipated Effective Date);

(xi)    (i) no government regulator, authority or Chilean authority shall have imposed any action, charge, collection of performance or surety bond, Sanction, levy, or fine (including, but not limited to, relating to the Chilean Agreements (as defined in the Backstop Agreement) or the Debtors' business operations or transactions) that has resulted in: (A) a material and adverse effect on the ability of the Debtors to conduct their business operations in a manner substantially consistent with their current practices, other than as a result of a delay in the deployment of the North Macrozone and the Arica y Parinacota Macrozone of the FON project, (B) the imposition of felony criminal liability on any of the Debtors or any current Senior Executive (as defined in the Backstop Agreement) of any such Debtor or such Senior Executive's direct reports (in each case, in their respective capacities as executive or employees of the Debtors), (C) tax or labor liability on any of the Debtors in an amount in excess of $10 million becoming due and payable, or (D) other than in connection with a delay in the deployment of the North Macrozone and the Arica y Parinacota Macrozone of the FON project, the aggregate cash costs of all fines, penalties, remedial measures, consumer liability, tax liability, labor liability, or other obligations associated with such action, charge, collection of performance or surety bonds, Sanction, levy or fine becoming due and payable in excess of $10 million, unless the Debtors have challenged such collection of performance or surety bonds, Sanction, levy, or fine within ten (10) Business Days of the date of such issuance, and such collection of performance or surety bonds, Sanction, levy, or fine is permanently enjoined, withdrawn, reversed or cancelled within fifteen (15) Business Days of the date of its occurrence; or (ii) other than in connection with a delay in the deployment of the North Macrozone and the Arica y Parinacota Macrozone of the FON project, none of the Debtors shall have received any official communication from any government regulator, authority or Chilean authority after the date of the Backstop Agreement of any threat of a material action, charge, collection of performance or surety bonds, Sanction, levy, or fine that, if sustained by any applicable court, government authority, or regulator of competent jurisdiction would have the effects described any of the foregoing clauses (A) through (D);

97

(xii)    the Required Backstop Parties shall have received evidence, in form and substance reasonably acceptable to the Required Backstop Parties, establishing that, as of the Effective Date, all rights to pursue, prosecute, and control the ICSID Arbitration (to the extent still pending or otherwise unresolved), and all rights to receive any injunctive relief or damages from any award in favor of any party that is, on or at any time prior the Effective Date, a claimant in the ICSID Arbitration, shall belong to an entity owned directly or indirectly by New Holdco;

(xiii)    from and after the date of execution of the Plan Sponsor Agreement, the Debtors have not taken any action to assume or reject any Executory Contracts or Unexpired Leases under section 365 of the Bankruptcy Code without the prior approval of the Required Consenting Noteholders (not to be unreasonably withheld, conditioned or delayed);

(xiv)    the Required Backstop Parties shall be satisfied, in their reasonable discretion, that, other than payments approved under the KEIP/ KERP Order, no severance, change of control payments, stay bonuses, retention bonuses, long term incentive payments, other transaction-related bonuses, or other similar compensation in an aggregate amount in excess of $2,000,000 shall be due and payable by the Debtors to any current or former employees of or service providers that provide employment, consulting or similar services to the Debtors, as a result of the consummation of the Reorganization Transactions or the Plan;

(xv)    the Debtors' estimate of the aggregate prepetition amounts owed to Foreign Vendor Claimants (whether paid or unpaid) does not exceed the caps set forth in paragraph (iii) of the Vendor Order;

(xvi)    all Restructuring Expenses shall have been paid in full in cash;

(xvii)    the Reorganized Debtors and New Company Entities shall be established and validly existing;

(xviii)    all Professional Claims that, as of the Effective Date, were due and payable under an order of the Bankruptcy Court shall have been paid in full, other than any Professional Claims subject to approval by the Bankruptcy Court after the Effective Date;

(xix)    the Debtors shall have funded the Professional Claim Escrow Account in accordance with Article II.C of the Plan;

(xx)    all authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan as of the Effective Date shall have been received, waived or otherwise resolved; and

(xxi)    all documents and agreements necessary to implement the Plan, including those set forth in the Plan Supplement, shall have (i) been tendered for delivery and (ii) been effectuated or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

2.    <u>Waiver of Conditions Precedent</u>

Each of the conditions precedent in Article IX of the Plan may be waived in writing by the

98

Debtors (in consultation with the Committee), with the consent of the Required Consenting Noteholders. Any such waivers may be effectuated at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

3.   Substantial Consummation

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

4.   Effect of Vacatur of Confirmation Order

If the Confirmation Order is vacated, (i) no distributions under the Plan shall be made, (ii) the Debtors and all Holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein or in the Plan shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise.

**J.    Modification, Revocation or Withdrawal of the Plan**

As provided in section 1127 of the Bankruptcy Code, modification of the Plan may be proposed in writing by the Debtors at any time before Confirmation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors have complied with section 1125 of the Bankruptcy Code. The Debtors may modify the Plan at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modifications. A holder of a Claim that has accepted the Plan shall be deemed to have accepted such Plan as modified if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

1.   Modifications and Amendments

(ii)   *Plan Modifications*

The Plan may be amended, modified or supplemented by the Debtors (in consultation with the Committee) prior to the Effective Date, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, subject to the consent of the Required Consenting Noteholders. In addition, after the Confirmation Date, the Debtors or the Reorganized Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

(iii)   *Other Amendments*

99

Subject to the conditions and limitations set forth in the Support Agreements, before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and any of the documents prepared in connection herewith without further order or approval of the Bankruptcy Court.

2.      Revocation or Withdrawal of Plan

Subject to the conditions and limitations set forth in the Support Agreements, the Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any Debtor or all Debtors, prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall: (A) constitute a waiver or release of any Claims or Interests; (B) prejudice in any manner the rights of the Debtors, the Debtors' Estates, or any other Entity; or (C) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Debtors' Estates, or any other Entity.

**K.      Retention of Jurisdiction by Bankruptcy Court**

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, to:

1.      hear and determine motions and/or applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

2.      resolve any matters related to Executory Contracts or Unexpired Leases, including: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims or other Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (iii) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

3.      determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date, including any such motion, adversary proceeding, application, contested matter, or other litigated matter brought by the Reorganized Debtors;

4.      ensure that distributions to Holders of Allowed Claims are accomplished as provided in the Plan;

5.      consider Claims or the allowance, classification, priority, compromise, estimation or payment of or objection to any Claim;

6.      enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

7.      issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to (a) restrain interference by any Person with the Consummation, implementation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court and (b) direct any necessary party to take all such actions required to consummate the Plan, including the execution of documents required by applicable law to release liens, encumbrances, and Interests;

8.      hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

9.      hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Effective Date;

10.     hear and determine disputes, including regulatory disputes, arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

11.     take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following Consummation, including directing any necessary party to act in furtherance of consummating the Plan;

12.     determine such other matters and for such other purposes as may be provided in the Confirmation Order;

13.     hear and determine matters concerning state, local, foreign, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

14.     adjudicate any and all disputes arising from or relating to distributions under the Plan;

15.     hear and determine any other matters over which the Bankruptcy Court has jurisdiction;

16.     enter one or more final decrees closing the Chapter 11 Cases;

17.     recover all assets of the Debtors and property of the Debtors' Estates, wherever located;

18.     hear and determine any rights, claims or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

19.     hear and determine all matters related to, including all matters pursued by, the Plan Trust;

20.     hear and determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, Rights Offering Procedures Order (and any Final Orders approving the same), or any contract, instrument, release, indenture, or other agreement or document created in connection therewith;

21.     resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, the Disclosure Statement Supplement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to the amount of a cure, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purposes; and

22.     enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter, the provisions of this Article V.K shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## VI.     CERTAIN TAX CONSEQUENCES OF THE PLAN

### A.     Certain U.S. Federal Income Tax Consequences

1.     <u>General</u>

The following discussion summarizes certain anticipated U.S. federal income tax consequences of the Consummation of the Plan to the Debtors and to Holders of Allowed Claims. This summary does not address the U.S. federal income tax consequences to (i) Holders of Claims or Interests not entitled to vote to accept or reject the Plan, (ii) Holders whose Claims are unimpaired or otherwise entitled to payment in full in cash under the Plan or (iii) Holders who are deemed to reject the Plan. This summary is based on the U.S. Internal Revenue Code of 1986, as amended from time to time (the "**IRC**"), U.S. Treasury regulations, judicial authorities, published positions of the U.S. Internal Revenue Service ("**IRS**"), and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect, so as to result in U.S. federal tax consequences different from those discussed below. The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS, or any other authorities, with respect to any of the tax consequences of the Plan. This discussion below is not binding upon the IRS or the courts of the United States.

102

The following summary is for informational purposes only. The tax treatment of a beneficial owner of Claims may vary depending upon such holder's particular situation. This summary does not purport to address all of the tax consequences that may be relevant to the Debtors or to certain Holders in light of their individual circumstances. Each Holder of a Claim or Interest is urged to consult its own tax advisor for the U.S. federal, state, provincial, local and other tax consequences applicable under the Plan. This discussion does not address non-U.S., state, or local tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers, non-U.S. taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, Holders that are, or hold Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or non-U.S. currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax or the "Medicare" tax on unearned income, persons who use the accrual method of accounting and report income on an "applicable financial statement," and persons holding Claims that are part of a straddle, hedging, constructive sale, or conversion transaction. In addition, this discussion does not address U.S. federal taxes other than income taxes, nor does it address the Foreign Account Tax Compliance Act.

     2.    <u>U.S. Federal Income Tax Consequences to the Debtors</u>

The Debtors do not have a material income tax presence in the United States, and therefore any U.S. federal tax consequences to the Debtors as a result of the Plan are expected to be immaterial.

     3.    <u>Certain U.S. Federal Income Tax Consequences of the Plan to New Secured Notes/Equity Treatment Electing Creditors.</u>

As used in this Disclosure Statement, except as otherwise provided, a "U.S. Holder" means a beneficial owner of an Allowed Unsecured Notes Claim that elects to participate in the Exchange (as defined below) and a New Secured Notes/Equity Treatment Electing Creditor, that is, for U.S. federal income tax purposes a citizen or resident of the United States or a domestic corporation or that is otherwise subject to U.S. federal income taxation on a net income basis in respect of the Allowed Claim.

     (a)    *U.S. Taxation of the Exchange*

Generally, a U.S. Holder will receive in exchange for its Allowed Claims, (i) New Holdco Units issued by New Holdco, (ii) Take Back New Secured Notes issued by Reorganized WOM Mobile S.A., (iii) the Subscription Rights to acquire its pro-rata portion of the New Money Convertible Notes issued by Reorganized Chile Newco and the New Money New Secured Notes issued by Reorganized WOM Mobile S.A. and (iv) its pro rata portion of the Plan Trust Interests (the "**Exchange**"). Because the Unsecured Notes were issued by Kenbourne Invest SA and not WOM SA (or Reorganized WOM Mobile S.A.), it is expected that except with respect to the receipt of the New Holdco Units (as described below), the Exchange generally will not qualify as a tax-deferred transaction. Consequently, except in respect of the receipt of the New Holdco Units,

generally a U.S. Holder will recognize gain or loss on the exchange under the Plan of its Allowed Claim in an amount equal to the difference between (1) the sum of (A) the issue price of the Take Back New Secured Notes (as described below under "*U.S. Tax Treatment of the Take Back New Secured Notes and the New Money New Secured Notes (collectively, the "New Secured Notes")— Issue Price of the New Secured Notes*"), and (B) the fair market value of the portion of the Plan Trust Interests (other than any such consideration attributable to a Claim for accrued but unpaid interest, which will be taxable as interest income to the extent not previously included in the U.S. Holder's gross income) and (2) the adjusted tax basis of the Allowed Claim exchanged (other than the portion of the basis attributable to the New Holdco Units, as described below). It is possible, however, that the Exchange could be treated instead as a contribution of the Allowed Claims in a Tax Deferred Transaction (as defined bellow) in exchange for New Holdco Units, an exchange of the Allowed Claims by New Holdco for the Takeback Notes and Plan Trust Interest, and then a distribution by New Holdco of the Takeback Notes and Plan Trust Interest to the transferring U.S. Holders (the "**Alternative Treatment**"). In such Alternative Transaction, any gain (but generally not loss) from the exchange of the Allowed Claim by New Holdco generally would be allocated to such U.S. Holders.

A U.S. Holder's adjusted tax basis in their Allowed Claim generally would equal such U.S. Holder's purchase price of the relevant Unsecured Notes subject to the Allowed Claim, increased by market discount, if any, previously taken into account by the U.S. Holder and reduced by any amortizable bond premium previously amortized by the U.S Holder, in each case, with respect to such Notes. Except as provided below with respect to accrued market discount, gain or loss from the Exchange will be long-term capital gain if a U.S. Holder held its Unsecured Notes for more than one year at the time of the Exchange. Certain non-corporate U.S. Holders are eligible for preferential rates of U.S. federal income taxation in respect of long-term capital gains. The ability of a U.S. Holder to deduct a capital loss is subject to limitations under the IRC. Each U.S. Holder of an Allowed Claim should consult its own tax advisor to determine whether gain or loss recognized by such U.S. Holder will be long-term capital gain or loss and the specific tax effect thereof on such U.S. Holder.

New Holdco intends to make an election to be classified as a non-U.S. partnership for U.S. federal income tax purposes. Although not free from doubt, the transfer of the Allowed Claim in exchange for New Holdco Units is expected to be treated for U.S. federal income tax purposes as a tax-deferred contribution of a portion of the Allowed Claim to New Holdco in exchange for the New Holdco Units pursuant to Section 721 of the IRC (a "**721 Tax Deferred Transaction**"). In such case, in general, no gain or loss is expected to be recognized with respect to the portion of the Allowed Claim treated as exchanged for the New Holdco Units, and a U.S. Holder's initial U.S. federal income tax basis and holding period in the New Holdco Units received will reflect such U.S. Holder's tax basis and holding period in the portion of the Allowed Claim treated as exchanged for the New Holdco Units. Alternatively, if the Exchange were instead treated under the Alternative Treatment, then a U.S. Holder's tax basis in the New Holdco Units received would equal such U.S. Holder's entire adjusted tax basis in the Allowed Claims, increased by the amount of gain (or reduced by the amount of loss) recognized by New Holdco on the exchange of the Allowed Claims by New Holdco for the Takeback Notes and Plan Trust Interest, and reduced by the fair market value of the Takeback Notes and Plan Trust Interests received by such U.S. Holder.

104

It is possible that New Holdco could be treated as a "publicly traded partnership" taxable as a corporation for U.S. federal income tax purposes. In such case, while not free from doubt, it is likely that New Holdco may be eligible for the "qualifying income" exception. It is expected that the organizational documents for New Holdco will provide certain limitations on the type of activities New Holdco can engage in, the type of assets New Holdco can hold, and the type of income that New Holdco can generate. Those limitations may help reduce the risk that New Holdco becomes treated as a "publicly traded partnership" taxable as a corporation for U.S. federal income tax purposes.  However, if New Holdco were treated as a "publicly traded partnership" taxable as a corporation for U.S. federal income tax purposes, the preceding paragraph would not apply. In such case, although not free from doubt, the transfer of the Allowed Claim in exchange for New Holdco Units may be treated for U.S. federal income tax purposes as a tax-deferred contribution of a portion of the Allowed Claim to New Holdco in exchange for the New Holdco Units pursuant to Section 351 of the IRC, if immediately following Exchange, the beneficial owners of the Allowed Unsecured Notes Claims that elect to participate in the Exchange and all New Secured Notes/Equity Treatment Electing Creditors hold, in the aggregate, equity interests in New Holdco possessing at least 80 percent of the total combined voting power of all equity interests entitled to vote and at least 80 percent of the total number of equity interests in New Holdco of all other classes of equity interests of New Holdco (a "**351 Tax Deferred Transaction**", and together with a 721 Tax Deferred Transaction, a "**Tax Deferred Transaction**"). In such case, except as noted below, in general, no gain or loss is expected to be recognized with respect to the portion of the Allowed Claim treated as exchanged for the New Holdco Units, and a U.S. Holder's initial U.S. federal income tax basis and holding period in the New Holdco Units received will reflect such U.S. Holder's tax basis and holding period in the portion of the Allowed Claim treated as exchanged for the New Holdco Units. It is also possible that the transaction could be characterized as the Alternative Transaction, which could result in a U.S. Holder recognizing gain (but not loss) up to an amount not exceeding the amount by which the sum of (A) the issue price of the Take Back New Secured Notes (as described below under "*U.S. Tax Treatment of the Take Back New Secured Notes and the New Money New Secured Notes (collectively, the "New Secured Notes")— Issue Price of the New Secured Notes*"), and (B) the fair market value of the portion of the Plan Trust Interests (other than any such consideration attributable to a Claim for accrued but unpaid interest, which will be taxable as interest income to the extent not previously included in the U.S. Holder's gross income) received by such U.S. Holder exceeds such U.S. Holder's tax basis in the Allowed Claim. However, it is possible that Section 351 of the IRC might not apply to the Exchange to make the Exchange a tax-deferred contribution by reason of the application of rules under Section 367 of the IRC. U.S. Holders should consult their own tax advisors regarding the tax consequences of the Exchange, including the characterization of New Holdco, the potential tax-free treatment of the receipt of the New Holdco Units and the application of Section 367 of the IRC and possible exceptions thereto.

The remainder of this discussion assumes that the New Holdco will properly qualify as a partnership that is not taxable as a corporation for U.S. federal income tax purposes.

### (ii)    *Interest Income with Respect to Allowed Claims*

Pursuant to Article V (Distributions) G. (Allocation between Principal and Accrued Interest) of the Plan, all distributions in respect of Allowed Claims will be allocated first to the

principal amount of the Allowed Claim (to the extent thereof and as determined for U.S. federal income tax purposes), with any excess allocated to accrued but unpaid interest. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes. In general, to the extent any amount received (whether stock, cash or other property) by a U.S. Holder of a debt is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income). Conversely, a U.S. Holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each U.S. Holder of an Allowed Claim is urged to consult its own tax advisor regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

### (iii)    Market Discount

Subject to a de minimis exception, generally, if Unsecured Notes underlying the Allowed Claims were acquired by the U.S. Holder (generally other than at original issue) at a discount from the principal amount of such Unsecured Note (i.e., a "market discount"), then, (i) with respect to such Unsecured Notes that are considered exchanged in a taxable event, any gain recognized on the exchange would be characterized as ordinary income to the extent of the accrued market discount on such Unsecured Notes as of the date of the Exchange, and (ii) with respect to such Unsecured Notes that are considered exchanged in a Tax-Deferred Transaction, it is not clear whether the accrued market discount on such Notes will carry over only to the Take Back New Unsecured Notes, or whether the accrued market discount should be apportioned among the Take Back New Unsecured Notes, New Holdco Units, and the Plan Trust Interests based on their relative fair market value, and then taxed as interest income to the U.S. Holder when the Take Back New Unsecured Notes, New Holdco Units, and the Plan Trust Interests, as applicable, are disposed of by sale, retirement or other disposition.

### (iv)    Consequences to U.S. Holders of Disputed Claims

Although the matter is not free from doubt, U.S. Holders of Disputed Claims should recognize gain or loss in an amount equal to the difference between (i) the amount of cash and the fair market value of any other property actually distributed to such U.S. Holder and (ii) the adjusted tax basis of its Claim.

### (v)    Foreign Tax Credits

Any gain or loss recognized by a U.S. Holder on the Exchange generally should be treated as U.S.-source income or loss for U.S. foreign tax credit purposes. Accrued interest income with respect to the Unsecured Notes that is treated as paid as a result of the Exchange (including accrued market discount not previously included in income by the U.S. Holder) will constitute income from sources outside the United States and generally will constitute "passive category income" for U.S. foreign tax credit purposes. Subject to significant limitations, a U.S. Holder generally will be entitled to a foreign tax credit against its U.S. federal income tax liability in respect of any Chilean withholding taxes imposed on accrued interest. Alternatively, if a U.S. Holder does not claim the benefits of the foreign tax credit in respect of any non-U.S. income taxes, a U.S. Holder is entitled to a deduction for Chilean withholding tax. The rules governing U.S. foreign tax credits are complex, and a U.S. Holder is urged to consult its tax advisor regarding the application of the rules

106

to its particular circumstances.

4.      <u>U.S. Tax Treatment of the Take Back New Secured Notes and the New Money New Secured Notes (collectively, the "New Secured Notes")</u>

(i)      *Issue Price of the New Secured Notes*

A New Secured Note's "issue price" will generally be the first price at which a substantial amount of the Class of New Secured Notes are treated as issued for cash (excluding sales to bond houses, brokers, or similar persons acting as underwriters, placement agents, or wholesalers). Because the New Money New Secured Notes are issued for cash pursuant to the Rights Offering, it is expected that the price paid by the U.S. Holders for such Notes will establish the "issue price" of the entire series of New Secured Notes.

(ii)      *Interest and Original Issue Discount ("OID")*

The New Secured Notes will be treated as issued with OID if the excess of the New Secured Note's stated redemption price at maturity over its issue price (as described above under the heading "*U.S. Tax Treatment of the Take Back New Secured Notes and the New Money New Secured Notes (collectively, the "New Secured Notes- Issue Price of the New Secured Notes"*) equals or exceeds a de minimis amount (0.25 per cent of the New Secured Note's stated redemption price at maturity multiplied by the number of complete years from its issue date to the maturity). The stated redemption price at maturity is the sum of all payments provided by the debt instrument other than "qualified stated interest". Qualified stated interest is stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually at a single fixed rate. U.S. Holders, whether on the cash or accrual method of accounting for U.S. federal income tax purposes, generally must include the OID in gross income (as ordinary income) as it accrues (on a constant yield to maturity basis), regardless of whether cash attributable to such OID is received at such time.

As described in Annex II of the Plan Term Sheet, for the first year, all accrued interest on the New Secured Notes will be paid in kind ("**PIK Interest**"), and for the second year, the New Secured Notes Issuer will have the option to pay a combination of PIK Interest and cash interest ("**PIK/Cash Interest**") at a premium in lieu of only paying cash interest. Under applicable U.S. Treasury regulations, the New Secured Notes are treated as having alternative payment schedules, and are treated as having qualified stated interest to the extent of the lowest fixed rate at which qualified stated interest would be payable under any schedule. Because the New Secured Note Issuer is required to pay PIK Interest for the first year, none of the interest payable on the New Secured Notes is expected to be treated as qualified stated interest and all interest payable on the New Secured Notes may be added to the stated redemption price at maturity.

In general, the amount of OID included in income by a U.S. Holder of a New Secured Note will be the sum of the "daily portions" of OID on such New Secured Note for all days during the taxable year that the U.S. Holder held such New Secured Note. The daily portions of OID are determined by allocating to each day in an accrual period a ratable portion of the OID allocable to that accrual period. Accrual periods may be any length and may vary in length over the term of the New Secured Note, provided that no accrual period is longer than one year and each scheduled payment of principal or interest occurs on either the final day or the first day of an accrual period.

The amount of OID on a New Secured Note allocable to each accrual period is determined by multiplying the "adjusted issue price" (as defined herein) of the New Secured Note at the beginning of the accrual period by the "yield to maturity" (as defined herein) of such New Secured Note (appropriately adjusted to reflect the length of the accrual period). The yield to maturity of a New Secured Note is the discount rate that causes the present value of all payments on the New Secured Note as of its issue date to equal the issue price of the New Secured Note. The adjusted issue price of a New Secured Note at the beginning of an accrual period will generally be the sum of its issue price (determined as set forth above) and the amount of OID allocable to all prior accrual periods, reduced by the amount of all cash payments made with respect to such New Secured Note in all prior accrual periods.

Under applicable Regulations, for purposes of determining the yield to maturity of the New Secured Notes, the New Secured Notes Issuer will be deemed to have exercised an option if the exercise of that option would lower the yield of the New Secured Notes for U.S. federal income tax purposes. Conversely, if the exercise of such option would increase the yield of the New Secured Notes for U.S. federal income tax purposes, the New Secured Note Issuer will be deemed to not exercise such option. For purposes of computing the yield to maturity of the New Secured Notes and the amount of OID attributable to each accrual period, it is expected that the New Secured Note Issuer and each U.S. Holder will be entitled to use a payment schedule in which, for year 2, all of the stated interest on the New Secured Notes is initially assumed to be paid in cash (rather than PIK/Cash Interest). This assumption is made solely for U.S. federal income tax purposes and does not constitute a representation by the New Secured Note Issuer regarding the likelihood that interest on the New Secured Notes will be paid in cash. If, contrary to this assumption, any PIK Interest is actually paid on the New Secured Notes, then solely for the purposes of recomputing the OID accruals on the New Secured Notes going forward, the New Secured Notes will be treated as retired and reissued on the date of such change in circumstances for an amount equal to their then adjusted issue price and the yield to maturity on the New Secured Notes will be redetermined taking into account such change in circumstances.

The rules regarding OID are complex and the rules described above may not apply in all cases. Accordingly, prospective beneficial owners should consult their own tax advisors regarding their application.

The amount included in the income of a U.S. Holder will include the gross amount before deduction of Chilean taxes, and will include any additional amounts received in respect thereof. Interest and OID accruals on the New Secured Notes will be treated as non-U.S. source income for U.S. federal income tax purposes. The rules governing the foreign tax credit are complex and recently issued Regulations addressing foreign tax credits impose additional requirements for non-U.S. taxes to be eligible for a foreign tax credit, and there can be no assurance that those requirements will be satisfied. A notice from the IRS indicates that the U.S. Department of the Treasury and the IRS are considering proposing amendments to such regulations and allows, subject to certain conditions, taxpayers to defer the application of many aspects of such regulations for taxable years beginning on or after December 28, 2021 and ending before the date that further IRS guidance is released. The limitation on non-U.S. taxes eligible for the U.S. foreign tax credit is calculated separately with respect to specific "baskets" of income. Interest on the New Secured Notes generally will constitute "passive category income," or, in the case of certain U.S. Holders,

"general category income." As an alternative to the tax credit, a U.S. Holder may elect to deduct such taxes (the election would then apply to all non-U.S. income taxes such U.S. Holder paid in that taxable year). U.S. Holders are urged to consult their tax advisors regarding the availability of the foreign tax credit, or a deduction, under their particular circumstances.

(iii)     *Sale, Exchange, Retirement or Other Taxable Disposition of New Secured Notes*

Upon the sale, exchange, retirement or other taxable disposition of a New Secured Note by a U.S. Holder, such Holder will recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange, retirement or other taxable disposition (other than accrued but unpaid stated interest which will be taxable as interest), and such U.S. Holder's adjusted tax basis in the New Secured Note determined as described above, decreased by the amount of any amortizable bond premium and increased by any accrued OID. Any such gain or loss will generally be capital gain or loss. Under current law, the maximum marginal U.S. federal income tax rate applicable to the gain recognized by a non-corporate U.S. Holders, generally will be lower than the maximum marginal U.S. federal income tax rate applicable to ordinary income (other than certain dividends) if such Holder's holding period for the New Secured Notes exceeds one year (i.e., such gain is long-term capital gain). Any gain or loss realized on the sale, exchange, retirement or other taxable disposition of a New Secured Note generally will be treated as U.S. source gain or loss, as the case may be. Consequently, such U.S. Holder may not be able to claim a credit for any Chilean or other non-U.S. tax imposed upon a disposition of a New Secured Note unless such credit can be applied (subject to applicable limitations) against tax due on other income treated as derived from non-U.S. sources. The deductibility of capital losses is subject to limitations.

5.     <u>U.S. Tax Treatment of Holding New Holdco Units</u>

(i)     *General*

As noted above, it is intended that New Holdco be treated as a non-U.S. partnership for U.S. federal income tax purposes. Under this treatment, each U.S. Holder that holds New Holdco Units will be required to recognize its allocable share of items of income, gain, loss, deduction and credit of the New Holdco for each taxable year of New Holdco ending with or within the U.S. Holder's taxable year, regardless of whether any distribution has been or will be received from New Holdco. Each item generally will have the same character and source (either U.S. or non-U.S.) as though the U.S. Holder had realized the item directly.

(ii)     *Phantom Income.*

Taxable income, if any, allocated to a U.S. Holder that holds a New Holdco Unit may exceed cash distributions, if any, made to such holder, in which case such holder would have to satisfy tax liabilities arising from an investment in New Holdco from such Holder's own funds. Additionally, as noted below under "*U.S. Tax Treatment of Holding New Money Convertible Notes—Tax Classification of the New Money Convertible Notes*", a U.S. Holder may be required to recognize its allocable portion of any cancellation of indebtedness income recognized by New Holdco upon the conversion of a New Money Convertible Note into New Holdco Units.

(iii)     *Basis*

Subject to the limitations discussed below, each U.S. Holder that holds a New Holdco Unit will generally be entitled to deduct its allocable share of New Holdco's losses to the extent of its tax basis in its New Holdco Units (as described above under the heading "*U.S. Taxation of the Exchange*") at the end of the tax year of New Holdco in which such losses are recognized. As described above under "*Certain U.S. Federal Income Tax Consequences of the Plan to New Secured Notes/Equity Treatment Electing Creditors — U.S. Taxation of the Exchange*", a U.S. Holder's tax basis in its New Holdco Unit will, in general, be equal to the U.S. Holder's tax basis in the portion of the Allowed Claim treated as exchanged for the New Holdco Units in the Exchange, increased by its allocable share of the income and liabilities of New Holdco, and decreased by distributions it has received from New Holdco and its allocable share of losses and reductions in such liabilities. If cash distributed or deemed distributed to a U.S. Holder in any year exceeds that Holder's share of the taxable income of New Holdco for that year, the excess will reduce the tax basis of the Holder's New Holdco Units and any distribution in excess of such basis will result in taxable gain.

(iv)     *Limits on Deductions for Losses and Expenses*

Various New Holdco expenses and losses allocable to U.S. Holders may be subject to limits on their deductibility for U.S. federal income tax purposes. For example, each U.S. Holder will not be entitled to deduct its share of the New Holdco's losses in excess of its tax basis at the end of the tax year of New Holdco in which such losses are recognized.

(v)     *Partnership Audit Rules*

New Holdco does not intend to file a U.S. partnership tax return. However, if New Holdco were audited by the IRS, the U.S. tax treatment of partnership items of income, gain, loss, deduction and credit generally would be determined at the partnership level. Under current law, an audit adjustment of a U.S. tax return of New Holdco required to be filed for any tax year (a "**Prior Year**") could result in a tax liability (including interest and penalties) imposed on New Holdco for the year during which the adjustment is determined (the "**Current Year**"). This tax liability generally will be determined by using the highest tax rates under the IRC applicable to U.S. taxpayers, in which case the Current Year investors of New Holdco could bear the audit tax liability arising from audit adjustments at significantly higher rates (including interest and penalties). In addition, because the interests of certain Current Year investors may not be the same as they were in the year under audit, certain Current Year investors may bear such tax liability in an amount that is unrelated to their Prior Year interests in partnership items of New Holdco that were adjusted.

To mitigate the potential adverse consequences described above, in such case, New Holdco may be able to elect with the IRS to pass through such audit adjustments for any year to the investors who participated in New Holdco during the Prior Year, in which case each Prior Year participating investor (and not New Holdco) generally would be responsible for the payment of any tax deficiency, determined after including their share of the adjustments on their tax returns for the Current Year and calculated using the tax rates generally applicable to the individual investors. The investors may also be able to mitigate such adverse consequences by filing an

RLF1 32274174v.1

amended U.S. tax return for the Prior Year and paying tax, if any, on their share of the partnership items adjusted on audit after the audit adjustments are made.

(vi)    *Distributions*

As previously noted, there can be no assurance that the amount of taxable income allocated to a U.S. Holder that holds New Holdco Units will correspond closely to the amount of cash actually distributed to such Holder for each taxable year of New Holdco or that New Holdco will distribute cash sufficient to pay any taxes payable as a result of such income allocation. In addition, a U.S. Holder may be subject to tax on the receipt of distributions from New Holdco under certain circumstances. Any cash distributed in excess of a U.S. Holder's adjusted tax basis in its interest in New Holdco (as determined above) generally will be treated as gain from the sale or exchange of such U.S. Holder's interest in New Holdco.

(vii)   *Foreign Tax Credits*

Subject to applicable limitations on foreign tax credits, a U.S. Holder generally should be entitled to elect to treat non-U.S. taxes withheld from such U.S. Holder's share of New Holdco's income, if any, as non-U.S. income taxes eligible for credit against such U.S. Holder's U.S. federal income tax liability with respect to such U.S. Holder's income from sources outside the U.S. Similarly, each U.S. Holder's share of any non-U.S. taxes which may be imposed on income realized by New Holdco generally should be treated as creditable non-U.S. income taxes. A U.S. Holder's share of capital gains realized by New Holdco, however, may be considered to be from sources within the U.S., which may effectively limit the amount of foreign tax credits allowed to such U.S. Holder. Other complex tax rules may also limit the availability or use of foreign tax credits, depending on each U.S. Holder's particular circumstances. Because of these limitations, U.S. Holders may be unable to claim a credit for the full amount of their proportionate shares of any non-U.S. taxes paid by New Holdco. U.S. Holders that do not elect to treat their shares of non-U.S. taxes as creditable generally may claim a deduction against their U.S. taxable income for such taxes (subject to applicable limitations on losses and deductions). Because the availability of a credit or deduction depends on the particular circumstances of each U.S. Holder, U.S. Holders are advised to consult their own tax advisors.

(viii)  *Controlled Foreign Corporations*

Special tax rules under the IRC apply to the ownership of shares in a non-U.S. corporation which is a "controlled foreign corporation" ("**CFC**"). Generally, a CFC is any non-U.S. corporation if more than 50% of the total combined voting power of all classes of stock of such corporation entitled to vote or more than 50% of the total value of the stock of such corporation is owned (directly or indirectly, or applying certain attribution rules) by one or more "United States shareholders." The term "United States shareholder" means with respect to any non-U.S. corporation a United States person who owns (directly or indirectly, or applying certain attribution rules) 10% or more of the total combined voting power of all classes of stock entitled to vote of such non-U.S. corporation or 10% or more of the total value of shares of all classes of stock of such non-U.S. corporation. In general, a U.S. Holder will be treated as owning its proportionate share of non-U.S. stock owned by New Holdco for purposes of determining whether a non-U.S. corporation is a CFC. Complex attribution rules apply for purposes of determining stock

111

ownership, including indirect and constructive ownership through U.S. and non-U.S. corporations.

In general, if a corporation is a CFC at any time during a taxable year, its "United States shareholders" will be required to recognize on a current basis their respective shares of "Subpart F" income, even if the income has not been distributed to the shareholders in the form of dividends or otherwise, provided that such United States shareholder owns (directly or indirectly) stock in such corporation on the last day, in such year, on which the corporation is a CFC. Subpart F income generally includes passive income, such as dividends, interest, rents and royalties, and net gains from the sale or exchange of property producing such income. In addition, United States shareholders of a CFC may be required to include in their gross income on a current basis "global intangible low-taxed income" ("**GILTI**"), which generally is comprised of the active income of a CFC with certain adjustments. For purposes of determining GILTI or Subpart F inclusions, U.S. Holders should be treated as owning a share of CFC stock held by New Holdco, and New Holdco should not be treated as owning such CFC stock. Accordingly, only U.S. Holders who or that are themselves United States shareholders should be required to include GILTI or Subpart F income in their gross income.

Moreover, if a United States person recognizes gain from a sale (including an allocation of such gain recognized by New Holdco) of stock of a non-U.S. corporation as to which such person (directly or indirectly, or applying certain attribution rules) owned 10% or more of the total combined voting power of all classes of stock entitled to vote at any time during the five-year period ending on the date of sale when the non-U.S. corporation was a CFC, a portion or all of any gain recognized on the sale will be treated as a dividend to the extent of such person's allocable share of the earnings and profits accumulated in taxable years during which the non-U.S. corporation was a CFC.

Whether Reorganized WOM Mobile S.A. will be treated as a CFC will depend on make-up of the owners of the New Holdco Units (which is currently unknown). Accordingly, there can be no assurance that Reorganized WOM Mobile S.A. will not be a CFC and that New Holdco will not hold an interest in a CFC or that any U.S. Holder will not be subject to the rules applicable to United States shareholders of a CFC.

(ix)    *Passive Foreign Investment Companies*

A non-U.S. corporation in which New Holdco has an interest may be classified as a passive foreign investment company ("**PFIC**") in one or more taxable years while such corporation's stock is held by New Holdco. In general, a non-U.S. corporation will be classified as a PFIC if either (i) 75% or more of the gross income of such corporation is "passive income" or (ii) 50% or more of its assets (by value) produce "passive income." If Reorganized WOM Mobile S.A. were to qualify as a PFIC or if New Holdco were to otherwise hold an equity interest in a PFIC, a U.S. Holder's share of any gain on disposition of stock of such PFIC as well as income realized on certain "excess distributions" by the PFIC would be treated as though realized ratably over the shorter of a U.S. Holder's holding period of its interest in New Holdco or New Holdco's holding period for the stock of the PFIC and taxed at ordinary income rates. In addition to the taxation of such gain or income as ordinary income, an interest charge would be imposed on the U.S. Holder based on the tax deferred from prior years. If Reorganized WOM Mobile S.A. were to qualify as a PFIC or if New Holdco were to otherwise hold an equity interest in a PFIC and a U.S. Holder made an

election to treat the PFIC as a "qualified electing fund" (a "**QEF election**") under the IRC, in lieu of the foregoing treatment, such U.S. Holder would be required to include in income each year a portion of the ordinary earnings and net capital gains of the PFIC, even if not distributed. Each such U.S. Holder would also, among other things, be required to supply the IRS annually with an information statement regarding the ordinary earnings and net capital gain (if any) of the PFIC. There is no assurance that New Holdco will provide or otherwise be able to obtain from a PFIC the information required for a U.S. Holder to make and maintain a QEF election.

If New Holdco were to own an interest in a non-U.S. corporation that qualified as a PFIC and such PFIC were also treated as a CFC, such non-U.S. corporation will not be treated as a PFIC with respect to any U.S. Holder treated as a United States shareholder of the CFC for the period during which such non-U.S. corporation remains a CFC and such U.S. Electing Shareholder remains a United States shareholder of the CFC.

The U.S. tax rules regarding characterizing a non-U.S. entity as either a CFC or a PFIC are complex. U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of owning an interest in New Holdco, including if Reorganized WOM Mobile S.A. were to be treated as either a CFC or a PFIC.

(x)    *Sale or Disposition*

A U.S. Holder of New Holdco Units that sells or otherwise disposes of a New Holdco Unit in a taxable transaction generally will recognize gain or loss equal to the difference, if any, between the amount realized from the sale or exchange and the U.S. Holder's adjusted basis in the New Holdco Unit. The amount realized from the sale or exchange will include such Holder's share of New Holdco's liabilities outstanding at the time of the sale or exchange. Gain or loss will generally be capital gain or loss (and will be long-term capital gain or loss if the New Holdco Unit was held for more than one year on the date of such sale or exchange) if the New Holdco Unit was held as a capital asset and New Holdco would have recognized capital gain or loss on a sale of its assets. Long-term capital gain of individuals is currently taxed at reduced rates. In the event of a sale or other disposition of a U.S. Holder's New Holdco Units at any time other than the end of New Holdco's taxable year, the share of income and losses of New Holdco for the year of disposition attributable to such New Holdco Units transferred will be allocated for U.S. federal income tax purposes between the transferor and the transferee on either an interim closing-of-the-books basis or a *pro rata* basis reflecting the respective periods during such year that each of the transferor and the transferee owned the New Holdco Units. However, gain attributable to PFICs or CFCs owned by New Holdco may be treated as ordinary income. Moreover, a U.S. Holder will recognize ordinary income rather than capital gain with respect to the U.S. Holder's allocable share of New Holdco's inventory items and "unrealized receivables," which include accrued but untaxed market discount on assets held by New Holdco.

6.    U.S. Tax Treatment of Holding New Money Convertible Notes

(i)    *Tax Classification of Chile Newco*

In light of the expectation that the Issuer Conversion Option (discussed below) will be exercised, it is intended that Chile Newco will make an election to be classified as an entity that is disregarded as separate from New Holdco for U.S. federal income tax purposes. Accordingly,

although not free from doubt, it is expected that the New Money Convertible Notes issued by Chile Newco will be treated for U.S. federal income tax purposes as issued by New Holdco, so long as no Holder Conversion Option (as defined below) is exercised without the corresponding exercise of the Issuer Conversion Option (as defined below). Each U.S. Electing Holder that participates in the issuance of the New Money Convertible Notes (a "**U.S. Convertible Note Holder**") should consult its own tax advisor regarding the U.S. federal income tax consequences of making an investment in the New Money Convertible Notes.

The New Money Convertible Notes are convertible into Chile Newco Units at the option of each U.S. Holder thereof with respect to such Holder's New Convertible Notes at any time until the close of business on the business day preceding the Convert Maturity Date ("**Holder Conversion Option**"). However, instead of delivering Chile Newco Units, Chile Newco has the option to deliver New Holdco Units to each U.S. Holder that exercises its Holder Conversion Option (the "**Issuer Conversion Option**").

(ii)    *Tax Classification of the New Money Convertible Notes*

The U.S. federal income tax treatment of the New Money Convertible Notes is unclear. Because Chile Newco, the issuer of the New Money Convertible Notes, is expected to be an entity disregarded as separate from New Holdco, if the New Money Convertible Notes are properly treated as indebtedness, such Notes would be considered indebtedness of New Holdco (the "**Indebtedness Approach**"). As discussed above, the New Money Convertible Notes are convertible into Chile Newco Units if the Holder Conversion Option is exercised without the corresponding exercise of the Issuer Conversion Option, and following such conversion, Chile Newco is expected to be treated as a non-U.S. partnership for U.S. federal income tax purposes, assuming that Chile Newco does not otherwise qualify as a publicly traded partnership taxable as a corporation for U.S. federal income tax purposes. Accordingly, following such conversion, any outstanding New Money Convertible Notes may be considered indebtedness of Chile Newco (rather than New Holdco) for U.S. federal income tax purposes. U.S. Holders are urged to consult with their own tax advisors regarding the U.S. federal income tax consequences of such a conversion, including as to the consequences of a potential taxable deemed exchange of the New Holdco debt for Chile Newco debt if Chile Newco becomes treated as a non-U.S. partnership for U.S. federal income tax purposes. It is expected that Chile Newco will exercise the Issuer Conversion Option upon a holder exercising the Holder Conversion Option, although no assurance can be given in this regard. The remainder of this discussion assumes that the New Money Convertible Notes will not be converted into Chile Newco Units, except as described herein.

Alternatively, if the New Money Convertible Notes are instead considered equity, such Notes would be considered equity in Chile Newco, causing Chile Newco to qualify as a non-U.S. partnership for U.S. federal income tax purposes (the "**Equity Approach**").

- **Indebtedness Approach**

    *Tax Treatment of the New Money Convertible Notes as Contingent Payment Debt Instruments*

    The tax characterization of the New Money Convertible Notes is unclear. U.S. Convertible Note Holder's may be entitled to certain

114

SOLICITATION VERSION

contingent interest on their New Money Convertible Notes (see "—"). Under applicable Regulations, if, based on all the facts and circumstances as of the date on which the New Money Convertible Notes are issued, there is a remote likelihood that a contingent payment will be made, it is assumed that such payment will not be made and, therefore, such contingent amounts will not cause the New Money Convertible Notes to be treated as contingent payment debt instruments ("**CPDIs**"). New Holdco and Chile Newco believe that, as of the expected issue date of the New Money Convertible Notes, the likelihood of such payments being made is for this purpose remote. New Holdco's and Chile Newco's determination is not binding on the IRS, and if the IRS were to challenge this determination, U.S. Convertible Note Holders may be required to accrue income on the New Money Convertible Notes that is in excess of stated interest, and to treat as ordinary income rather than capital gain any income realized on the taxable disposition of such New Money Convertible Note before the resolution of the contingency. In the event that such contingency were to occur, it would affect the amount and timing of the income that U.S. Convertible Note Holders recognize. U.S. Convertible Note Holders are urged to consult their own tax advisors regarding the potential application to the New Money Convertible Notes of the CPDI rules and the consequences thereof. The remainder of this discussion assumes that the New Money Convertible Notes will not be treated as CPDIs

### *Original Issue Discount*

The New Money Convertible Notes will be treated as issued with OID if the excess of the New Money Convertible Note's stated redemption price at maturity over its issue price equals or exceeds a de minimis amount (0.25 per cent of the New Money Convertible Note's stated redemption price at maturity multiplied by the number of complete years from its issue date to the maturity). U.S. Convertible Note Holders, whether on the cash or accrual method of accounting for U.S. federal income tax purposes, generally must include the OID in gross income (as ordinary income) as it accrues (on a constant yield to maturity basis), regardless of whether cash attributable to such OID is received at such time. The "issue price" of the New Money Convertible Notes will be the first price at which a substantial amount of the New Money Convertible Notes is sold to the investors for cash, excluding sales to bond houses, brokers or similar persons or organizations acting in the capacity of underwriter, placement agent or wholesaler. Because the New Money Convertible Notes provide only for PIK interest, none of the interest will qualify as qualified stated interest. Accordingly, the New Money Convertible Notes will be treated as issued with OID.

In general, the amount of OID included in income by a U.S.

115

Convertible Note Holder of a New Money Convertible Note will be the sum of the "daily portions" of OID on such New Money Convertible Note for all days during the taxable year that the U.S. Convertible Note Holder held such New Money Convertible Note. The daily portions of OID are determined by allocating to each day in an accrual period a ratable portion of the OID allocable to that accrual period. Accrual periods may be any length and may vary in length over the term of the New Money Convertible Note, provided that no accrual period is longer than one year and each scheduled payment of principal or interest occurs on either the final day or the first day of an accrual period. The amount of OID on a New Money Convertible Note allocable to each accrual period is determined by multiplying the "adjusted issue price" (as defined herein) of the New Money Convertible Note at the beginning of the accrual period by the "yield to maturity" (as defined herein) of such New Money Convertible Note (appropriately adjusted to reflect the length of the accrual period). The yield to maturity of a New Money Convertible Note is the discount rate that causes the present value of all payments on the New Money Convertible Note as of its issue date to equal the issue price of the New Money Convertible Note. The adjusted issue price of a New Money Convertible Note at the beginning of an accrual period will generally be the sum of its issue price (determined as set forth above) and the amount of OID allocable to all prior accrual periods, reduced by the amount of all cash payments made with respect to such New Money Convertible Note in all prior accrual periods.

The amount of interest and OID accruals included in the income of a U.S. Convertible Note Holder will include the gross amount before deduction of Chilean taxes, and will include any additional amounts received in respect thereof. Interest and OID accruals on the New Money Convertible Note will be treated as non-U.S. source income for U.S. federal income tax purposes. The rules governing the foreign tax credit are complex and recently issued Regulations addressing foreign tax credits impose additional requirements for non-U.S. taxes to be eligible for a foreign tax credit, and there can be no assurance that those requirements will be satisfied. A notice from the IRS indicates that the U.S. Department of the Treasury and the IRS are considering proposing amendments to such regulations and allows, subject to certain conditions, taxpayers to defer the application of many aspects of such regulations for taxable years beginning on or after December 28, 2021 and ending before the date that further IRS guidance is released. The limitation on non-U.S. taxes eligible for the U.S. foreign tax credit is calculated separately with respect to specific "baskets" of income. Interest on the New Money Convertible Note generally will constitute "passive category income," or, in the case of certain U.S. Convertible Note Holders, "general category income." As an alternative to the tax credit, a U.S. Convertible Note Holder may elect to deduct such taxes (the election would then

116

apply to all non-U.S. income taxes such U.S. Convertible Note Holder paid in that taxable year). U.S. Holders are urged to consult their tax advisors regarding the availability of the foreign tax credit, or a deduction, under their particular circumstances.

### *Sale, Exchange, Redemption, Retirement or other Taxable Disposition of New Money Convertible Notes*

Except as provided below under "*Conversion of a New Money Convertible Note*", upon the sale, exchange, retirement or other taxable disposition of New Money Convertible Note by a U.S. Convertible Note Holder, such Holder will recognize taxable gain or loss equal to the difference, if any, between the amount realized on the sale, exchange, retirement or other taxable disposition (other than accrued but unpaid stated interest which will be taxable as interest), and such U.S. Convertible Note Holder's adjusted tax basis in the New Money Convertible Note determined as described above, decreased by the amount of any amortizable bond premium and increased by any accrued OID. Any such gain or loss will generally be capital gain or loss. Under current law, the maximum marginal U.S. federal income tax rate applicable to the gain recognized by a non-corporate U.S. Convertible Note Holder, generally will be lower than the maximum marginal U.S. federal income tax rate applicable to ordinary income (other than certain dividends) if such Holder's holding period for the New Money Convertible Note exceeds one year (i.e., such gain is long-term capital gain). Any gain or loss realized by a U.S. Holder on the sale, exchange, retirement or other taxable disposition of a New Money Convertible Note generally will be treated as U.S. source gain or loss, as the case may be. Consequently, such U.S. Convertible Note Holder may not be able to claim a credit for any Chilean or other non-U.S. tax imposed upon a disposition of a New Money Convertible Note unless such credit can be applied (subject to applicable limitations) against tax due on other income treated as derived from non-U.S. sources. The deductibility of capital losses is subject to limitations.

### *Conversion of New Money Convertible Notes*

The U.S. federal income tax treatment of the conversion of New Money Convertible Notes depends on whether they are converted into Chile Newco Units pursuant to the exercise of the Holder Conversion Option without a corresponding exercise of the Issuer Conversion Option or, alternatively, are converted into New Holdco Units pursuant to the joint exercise of the Holder Conversion Option and the Issuer Conversion Option.

Upon the first exercise by a U.S. Holder of the Holder Conversion Option without a corresponding exercise of the Issuer Conversion

117

Option, the resulting conversion of the New Money Convertible Notes into Chile Newco Units generally would be expected to be treated, first, as a taxable exchange, whereby New Holdco is deemed to exchange with such U.S. Holder the relevant portion of the assets and liabilities of Chile Newco for such New Money Convertible Notes, and, second, as a contribution by such U.S. Holder of such assets and liabilities to Chile Newco in a generally tax-deferred transaction. Thereafter, Chile Newco should be treated as a non-U.S. partnership for U.S. federal income tax purposes, assuming that Chile Newco does not otherwise qualify as a publicly traded partnership taxable as a corporation for U.S. federal income tax purposes, with consequences similar to those described below under the heading *"Equity Approach—U.S. Tax Treatment of Holding New Money Convertible Notes*." In connection with such exercise, such U.S. Holder should recognize gain or loss equal to the difference, if any, between its tax basis in the New Money Convertible Notes and the fair market value of the Chile Newco Units received and should receive a tax basis in such Chile Newco Units equal to their fair market value. In addition, New Holdco may recognize cancellation of indebtedness income to the extent that the issue price of the New Money Convertible Notes exceeds the value of the Chile Newco Units exchanged therefor, and all or a portion of such income may be allocable to the U.S. Holders that own New Holdco Units. As discussed above, it is expected that Chile Newco will exercise the Issuer Conversion Option upon a holder exercising the Holder Conversion Option, although no assurances can be given in this regard. The above discussion in this paragraph describes the U.S. federal income tax consequences of the first exercise of the Holder Conversion Option without a corresponding exercise of the Issuer Conversion Option. If the Holder Conversion Option is so exercised without the corresponding exercise of the Issuer Conversion Option, then, following the conversion of New Money Convertible Notes into Chile Newco Units, Chile Newco is expected to be treated as a non-U.S. partnership for U.S. federal income tax purposes and thereafter any outstanding New Money Convertible Notes may be considered indebtedness of Chile Newco (rather than New Holdco) for U.S. federal income tax purposes. Accordingly, if the Issuer Conversion Option is not exercised with respect to any exercise of the Holder Conversion Option, then the U.S. federal income tax consequences of any subsequent exercise of the Holder Conversion Option may differ from the consequences described above. U.S. Holders are urged to consult with their own tax advisors regarding the U.S. federal income tax consequences of such an exercise.

If a U.S. Holder exercises the Holder Conversion Option, and Chile Newco exercises the Issuer Conversion Option, and as a result, the New Money Convertible Notes are converted into New Holdco Units,

then, generally, such conversion is expected to be a generally tax-deferred transaction, except to the extent that the exercise price is satisfied with New Holdco's obligation to the U.S. Holder for unpaid interest (including accrued original issue discount) that accrued on or after the beginning of the Holder's holding period for the New Money Convertible Notes. However, New Holdco may recognize cancellation of indebtedness income to the extent that the issue price of the New Money Convertible Notes exceeds the value of the New Holdco Units exchanged therefor. Moreover, to the extent that the New Money Convertible Notes are treated as partnership non-compensatory options, New Holdco may be required to make certain adjustments and special allocations to the capital accounts of the holders of New Money Convertible Notes, both before and after the conversion thereof, including corrective allocations so that capital accounts reflect the liquidation value of the New Holdco Units issued upon conversion of the New Money Convertible Notes. The U.S. federal income taxation of partnership non-compensatory options is complex. U.S. Holders are urged to consult with their tax advisors as to the impact on such U.S. Holder of acquiring, holding, exercising and disposing the New Money Convertible Notes, including such adjustments and special allocations. As discussed above, it is expected that Chile Newco will exercise the Issuer Conversion Option upon a Holder exercising the Holder Conversion Option, although no assurances can be given in this regard. The foregoing discussion in this paragraph assumes that the Issuer Conversion Option will be exercised whenever the Holder Conversion Option is exercised. If the Issuer Conversion Option is not exercised with respect to any exercise of the Holder Conversion Option, then the U.S. federal income tax consequences of any subsequent exercise of the Holder Conversion Option may differ from the consequences described above. U.S. Holders are urged to consult with their own tax advisors regarding the U.S. federal income tax consequences of such an exercise.

- **Equity Approach.**

*U.S. Tax Treatment of Holding New Money Convertible Notes*

Under the Equity Approach, assuming Chile Newco does not otherwise qualify as a publicly traded partnership taxable as a corporation for U.S. federal income tax purposes, Chile Newco will qualify as a non-U.S. partnership for U.S. federal income tax purposes, and each U.S. Holder of such New Money Convertible Notes will be required recognize its allocable share of items of income, gain, loss, deduction and credit of Chile Newco for each taxable year of Chile Newco ending with or within the U.S. Holder's taxable year, regardless of whether any distribution has been or will be received from the Chile Newco. Each item generally will have the same character and source

(either U.S. or non-U.S.) as though the U.S. Holder had realized the item directly. Additionally, generally, the discussion of the U.S. federal income tax consequences of holding the New Holdco Units discussed above under paragraphs (a) through (i) under heading "*U.S. Tax Treatment of Holding New Holdco Units*" would apply, *mutatis mutandis*, to U.S. Holders of New Money Convertible Notes with respect to Chile Newco.

*Potential Treatment of New Money Convertible Notes as Non-Compensatory Options of Chile Holdco*

If the New Money Convertible Notes are treated as equity of Chile Newco, then the New Money Convertible Notes may also be treated as partnership non-compensatory options of Chile Newco in accordance with Treasury Regulation Section 1.721-2(g)(3). In such case, Chile Newco may make, or in certain cases would be required to make, certain adjustments and special allocations to its capital accounts in respect of the New Money Convertible Notes. Such adjustments and allocations may impact allocations of income, gain, loss, deduction, and credit to U.S. Holders. The U.S. federal income taxation of partnership non-compensatory options is complex. U.S. Holders are urged to consult with their own tax advisors regarding the tax consequences of acquiring, holding, exercising and disposing the New Money Convertible Notes.

Whether or not the Issuer Conversion Option is exercised, the exercise of the Holder Conversion Option is expected to be treated as generally tax-deferred transaction for U.S. federal income tax purposes. One possibility is that such exercise is treated as the exercise of a non-compensatory option of Chile Newco. Another possibility is that such exercise is treated, first, as a contribution of New Holdco Units by New Holdco to Chile Newco and, second, as a distribution of New Holdco Units by Chile Newco to the exercising U.S. Holder.

*Sale or Disposition*

For a discussion regarding the U.S. tax consequences of the sale or disposition of (i) New Holdco Units received upon the exercise of the Issuer Conversion Option, see the discussion above under "*U.S. Tax Treatment of Holding New Holdco Units—Sale or Disposition*" and (ii) the Chile Newco Units received upon the exercise of the Holder Conversion Option where Chile Newco did not exercise the Issuer Conversion Option, see the discussion above under "*U.S. Tax Treatment of Holding New Holdco Units—Sale or Disposition*" applying such discussion, *mutatis mutandis*, to the sale or disposition of the Chile Newco Units by a U.S. Holder.

120

7.      Tax Treatment of the Plan Trust

Upon the Effective Date, the Plan Trust shall be established for the benefit of U.S. Holders of Allowed Claims, whether such claims become Allowed Claims on or after the Effective Date.

(i)      *Classification of the Plan Trust*

The Plan Trust is intended to qualify as a liquidating trust for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a disregarded entity).

However, merely establishing a liquidating trust does not ensure that it will be treated as a grantor trust for federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Plan Trust has been structured with the intention of complying with such general criteria. In conformity with Revenue Procedure 94-45, all parties (including the Plan Trustee and U.S. Holders of Allowed Claims) are required to treat, for federal income tax purposes, the Plan Trust as a grantor trust of which the U.S. Holders are the owners and grantors. The following discussion assumes that the Plan Trust will be so respected for U.S. federal income tax purposes. However, no ruling has been requested from the IRS and no opinion of counsel has been requested concerning the tax status of the Plan Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. Were the IRS to successfully challenge such classification, the U.S. federal income tax consequences to the Plan Trust and the U.S. Holders of Allowed Claims could vary from those discussed herein.

(ii)      *General Tax Reporting by the Trust and Beneficiaries*

For all U.S. federal income tax purposes, all parties must treat the transfer of the Plan Trust Assets to the Plan Trust as a transfer of such assets directly to the U.S. Holders (including the LT Claims), followed by the transfer of such assets by the U.S. Holders to the Plan Trust. Consistent therewith, all parties must treat the Plan Trust as a grantor trust of which such U.S. Holders are the owners and grantors. Thus, such U.S. Holders (and any subsequent holders of interests in the Plan Trust) will be treated as the direct owners of an undivided interest in the Plan Trust Assets for all U.S. federal income tax purposes. Pursuant to the Plan, as soon as reasonably practicable, the Plan Trustee (to the extent that the Plan Trustee deems it necessary or appropriate in its sole discretion) will determine the fair market value of the Plan Trust Assets as of the Effective Date, and all parties, including the U.S. Holders, must consistently use such valuation for all U.S. federal income tax purposes, such as in the determination of gain, loss, and tax basis. The valuation will be made available as necessary for tax reporting purposes (on an asset or aggregate basis, as relevant).

Accordingly, each U.S. Holder will be required to report on its U.S. federal income tax return its allocable share of any income, gain, loss, deduction, or credit recognized or incurred by the Plan Trust. The character of items of income, deduction, and credit to any U.S. Holder and the ability of such U.S. Holder to benefit from any deductions or losses may depend on the particular situation of such U.S. Holder.

The federal income tax reporting obligations of a U.S. Holder are not dependent upon the

121

Plan Trust distributing any cash or other proceeds. Therefore, a U.S. Holder may incur a federal income tax liability with respect to its allocable share of the income of the Plan Trust even if the Plan Trust has not made a concurrent distribution to the U.S. Holder. In general, a distribution of cash by the Plan Trust to a U.S. Holder will not be taxable to the U.S. Holder as such U.S. Holder is regarded for federal income tax purposes as already owning the underlying assets or realizing the underlying income.

The Plan Trustee will file with the IRS returns for the Plan Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Plan Trustee will also send as soon as reasonably practicable to each record U.S. Holder a separate statement setting forth the information necessary for such holder to determine its share of items of income, gain, loss, deduction, or credit and will instruct the holder to report such items on its federal income tax return or to forward the appropriate information to the beneficial holders with instructions to report such items on their federal income tax returns. Such items generally would be reported on the Holder's state and/or local tax returns in a similar manner.

8.     U.S. Federal Income Tax Consequences to U.S. General Unsecured Creditors that do not Elect to be Participate in the Exchange

U.S. General Unsecured Creditors (which for this paragraph shall mean a U.S. Holder that does not participate in the Exchange) will receive its pro rata share of the Litigation Trust Interests and its pro rata share of the GUC Cash Pool Treatment.  In such case, such Creditor will recognize gain or loss equal to the difference between (i) the sum of (A) the fair market value of such Creditor's pro rata share of the Litigation Trust Interests and (B) such Creditor's pro rata portion of the GUC Cash Pool and (ii) such Creditor's adjusted tax basis of its Allowed General Unsecured Claim.  Such gain or loss will be long-term capital gain if such General Unsecured Creditor held its Claim for more than one year at the time of the Effective Date. Certain non-corporate U.S. General Unsecured Creditors are eligible for preferential rates of U.S. federal income taxation in respect of long-term capital gains. The ability of a U.S. General Unsecured Creditor to deduct a capital loss is subject to limitations under the IRC.   Each U.S. General Unsecured Creditor of an Allowed Claim should consult its own tax advisor to determine whether gain or loss recognized by such U.S. General Unsecured Creditor will be long-term capital gain or loss and the specific tax effect thereof on such U.S. General Unsecured Creditor.

9.     U.S. Taxation of the Disputed Claims Reserve

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, it is expected that the Disputed Claims Reserve will be treated as a "disputed ownership fund" governed by Treasury Regulation Section 1.468B-9.  As such, the Disputed Claim Reserve would be treated as the owner of the property deposited into the Disputed Claim Reserve and generally taxed as a corporation on all interest and earnings of the reserves unless all such property consists of passive assets (in which case, the "disputed ownership fund" would be taxable as a "qualified settlement fund").  Any income tax liability of the Disputed Claims Reserve shall be paid from the assets held by the Disputed Claims Reserve.  Accordingly, no U.S. Holder of a Claim would be treated as the grantor or deemed owner of the property subject to the Disputed Claims Reserve until such Holder received or is allocated an interest in such property and any such distributions shall be net of any taxes relating to, or

122

imposed on, the reserves.  Each U.S. Holder is urged to consult its own tax advisor regarding the tax consequences of the Disputed Claims Reserve as it relates to their particular circumstance.

10.    Information Reporting by U.S. Holders

Generally, United States persons that own certain controlling interests (calculated in some instances by reference to vote or value) in a non-U.S. corporation or partnership (including in some cases a 10% interest in a non-U.S. partnership) or that acquire, dispose of or otherwise change their proportionate interests in a non-U.S. partnership in transactions involving 10% or more of the non-U.S. partnership, in each case after applying certain attribution rules, are required to provide the IRS with certain information relating to such corporation or partnership and such transactions in an annual information return. In addition, a United States person is required to comply with certain reporting requirements upon a contribution to a non-U.S. partnership in situations where: (i) immediately after the transfer, such United States person holds directly, indirectly or constructively, at least a 10% interest in the non-U.S. partnership or (ii) the value of the property and amount of cash transferred (directly or indirectly) to the non-U.S. partnership during the 12 month period ending on the date of the transfer exceeds US$100,000. U.S. Holders may be required to comply with such reporting requirements for transfers to a non-U.S. corporation or partnership in exchange for interests or for other transactions. Other reporting requirements may also apply. Accordingly, U.S. Holders are urged to consult their tax advisors with respect to the application of these and any other reporting requirements to their particular situations.

EACH PROSPECTIVE U.S. HOLDER IS URGED TO CONSULT ITS OWN TAX ADVISORS WITH RESPECT TO THE LOCAL, NON-U.S. AND OTHER TAX CONSEQUENCES TO SUCH U.S. HOLDER OF THE PARTICIPATION IN THE EXCHANGE AND THE ACQUISITION, OWNERSHIP AND DISPOSITION THE NEW HOLDCO UNITS, INTEREST IN THE SENIOR SECURED NOTES AND THE NEW MONEY CONVERTIBLE NOTES.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND UNCERTAIN. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED, IN THE STRONGEST TERMS POSSIBLE, TO CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS. THE FOREGOING SUMMARY DOES NOT CONSTITUTE TAX OR LEGAL ADVICE TO HOLDERS OF CLAIMS OR INTERESTS.

**B.    Certain Chilean Tax Consequences**

1.    General

The following discussion summarizes certain anticipated Chilean tax consequences relating to the Plan. The information contained in this section is limited to the conclusions

123

specifically set forth herein and is based on the completeness and accuracy of the stated facts, assumptions, and representations as described in the preceding sections. In preparing this section we have considered the relevant provisions of the Chilean laws, as amended, the regulations thereunder, and the administrative interpretations thereof, all as they currently exist as of the date of this Disclosure Statement and all of which are subject to change, possibly with retroactive effect, so as to result in Chilean tax consequences different from those discussed below.

The following summary is for general information only. The tax treatment of a beneficial owner of Claims may vary depending upon such Holder's particular situation. This summary does not address all of the tax consequences that may be relevant, therefore, each Holder should consult its tax advisor for information that may be relevant to its particular situation and circumstances, and the particular tax consequences to such Holder of the transactions contemplated by the Plan.

ACCORDINGLY, THE FOLLOWING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN CHILEAN TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE FOLLOWING DISCUSSION IS FOR INFORMATION PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. THIS DISCUSSION IS NOT BINDING ON THE CHILEAN TAX AUTHORITY OR CHILEAN COURTS. ACCORDINGLY, EACH HOLDER IS STRONGLY URGED TO CONSULT ITS TAX ADVISOR REGARDING THE CHILEAN AND APPLICABLE NON-CHILEAN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.

2.    Chilean Tax Consequences of the Reorganization Transactions

The Reorganization Transactions shall encompass the following transactions (among others): (i) conversion of WOM Mobile, WOM, Multikom, and Conect into a *Sociedades por Acciones* (SpAs); (ii) incorporation of New Holdco, New Chile PIF and Chile Newco; (iii) cancellation, release and extinction of the existing equity interests in NC Telcom II and issuance of NCT II Units; (iv) redemption, cancellation, release and extinction of the existing equity interests in WOM Mobile for no or nominal consideration and issuance of WOM Mobile Units; (v) issuance of New Secured Notes by Reorganized WOM Mobile S.A.; and (vi) issuance of New Convertible Notes by Chile Newco.

(i)    *Conversion of WOM Mobile, WOM, Multikom and Conect into Sociedades por Acciones (SpAs)*

The conversion of a stock corporation (Sociedad Anónima – S.A.), whether open (public) or closed (private), into a *Sociedad por Acciones* (SpA) should not give rise to any tax consequence under Chilean tax law.

According to Article 8, No. 13 of the Chilean Tax Code, the conversion of companies is defined as "*the change of kind or type of company executed by virtue of a reform of the articles of incorporation or bylaws, while the legal personality subsists*".

The Chilean Tax Authority ("**Chilean IRS**") has clarified that in the conversion of a company from one corporate structure to another, for tax purposes, the same legal entity and

taxpayer subsists under a different organization structure or corporate name, and therefore, no material tax implications should arise upon the conversions. The entity being converted should not be obliged to terminate its business or give cease-of-activities notice, it will continue to be liable for all its tax obligations accrued prior to the conversion, and to be entitled to use all the tax deferred assets it had in its favor prior to the change of corporate name, including monthly provisional payments, net operating losses, among others.

(ii)    *Incorporation of New Holdco, New Chile PIF and Chile Newco*

- **Incorporation of New Holdco**

    *General Considerations*

    The incorporation of New Holdco should have no tax implications in Chile.

    The deemed distribution of New Holdco Units to the eligible Holders of Claims in the terms described in the Plan upon the issuance of the shares in register form in the name of such Holders should not trigger tax implications in Chile, assuming that it does not impact the qualification of New Holdco as an institutional investor under Chilean corporate and securities laws and regulations and in no way results in New Chile PIF breaching the investor's composition requirements established in Law No. 20,712 (*Ley sobre Administración de Fondos de Terceros y Carteras Individuales* or "**LUF**"), in the terms explained in the following section (*Incorporation of New Chile PIF*).

    *Chilean Indirect Transfer Tax Rules*

    The potential disposal of New Holdco Units in the future could potentially trigger tax implications in Chile by virtue of the Chilean Indirect Transfer Rules ("**ITR**").

    Under the Chilean ITR, capital gains derived by a non-resident on the transfer of an offshore entity that owns, directly or indirectly, certain Chilean underlying assets (i.e., shares, real estates, among others)[27] are generally subject to a 35% withholding tax ("**WHT**") in Chile. This taxation would apply provided any of the following thresholds are verified:

---

[27]    Article 10 of the ITL lists the following assets: (i) shares, rights, quotas, or other titles of participation in the ownership, control, or profits of a company, fund, or entity established in Chile; (ii) an agency or other type of permanent establishment in Chile of a taxpayer without domicile or residence in the country, which is considered for tax purposes as an independent company from its parent or main office; and (iii) any type of movable or immovable property located in Chile, or securities or rights related thereto, owned by a company or entity without domicile or residence in Chile.

(i)      If a 10% or more interest in the target entity is transferred – considering transfers made in the 12 month period preceding the sale, directly or by transferor's related persons – and if the Chilean underlying assets, in the proportion indirectly owned by the seller, either (a) are valued in an amount higher or equal to approximately US $170 million[28] at the moment of the transfer or at any time in the previous 12 months; or (b) represent 20% or more of the market value of the interest held by the seller in the target entity at the moment of the transfer or at any time in the previous 12 months. The 20% threshold is tested based on the market value assigned to the Chilean asset, and the portion such value represents in the overall market value of the foreign entity being transferred, or

(ii)     If the target is domiciled or was incorporated in a jurisdiction considered as harmful preferential tax regime.[29] In this case, taxation should be triggered even if the Chilean assets represent less than 20% of the overall value of the transaction. However, this threshold should not be satisfied if all the following requirements are met: (a) in the foreign transferred company, there is no partner, shareholder, owner or beneficiary with residence or domicile in Chile with a 5% or more direct or indirect stake or benefit in the capital or profits of such transferred foreign company; and (b) the partners, shareholders, owners, or beneficiaries that control, directly or indirectly, 50% or more of the capital or profits of the foreign transferred company, are domiciled or were incorporated in a territory or jurisdiction that does not have a harmful preferential tax regime.

If any of these thresholds is met, WHT at a 35% tax rate should apply on the difference between the purchase price allocated to the Chilean entities and the sellers' tax basis. For these purposes, broadly speaking, shareholders may elect to

---

[28]   210,000 annual tax units, which is an index adjusted by inflation.

[29]   The ITL outlines criteria for identifying such preferential harmful tax regimes, including the effective tax rate, exchange of information conventions, and adherence to OECD principles. The Chilean IRS periodically issues a list of jurisdictions considered as preferential tax regimes, which is currently contained in Resolution No. 55/2018. The Cayman Islands is included in the list. However, by virtue of the amendments introduced by Law No. 21,713 on Tax Compliance, from January 1, 2025, the definition of harmful tax regime will change and a jurisdiction will be considered to have a preferential tax regime if it meets the following cumulative requirements: (i) It has not entered into an agreement with Chile that allows the effective exchange of information for tax purposes, or such an agreement is not in force, or if it is in force, it contains limitations preventing effective information exchange; and (ii) It does not meet the conditions to be considered compliant or substantially compliant in terms of transparency or exchange of information for tax purposes. The Chilean IRS will issue updated instructions on these new definitions.

126

use either the foreign cost or the local cost, in the corresponding proportions.

The applicable WHT must be withheld and paid by the acquirer (i) at a rate of 20% over the gross purchase price allocated to the transaction; or (ii) at a final rate of 35% over the taxable gain. Alternatively, the transferor may choose to declare the tax at the definitive rate within the month following the sale or transfer (as sporadic income - "*renta esporádica*"), releasing the acquiror from its withholding obligation.

The transferor must declare the annual tax return (Form N°22) in April following the year of the transfer. However, this return is not mandatory if the acquirer declares and withholds the WHT at a 35% final tax rate or if the applicable WHT is declared by the transferor as sporadic income.

Reporting obligations must be fulfilled, through the submission of Sworn Statement No. 1921 before the Chilean IRS within the month following the month of the transfer, even if no taxation is triggered, provided that the shares transferred exceed 10% of the total shares of the target. When the foreign entity being transferred is resident in a harmful preferential tax regime, Sworn Statement No. 1921 must be submitted regardless of the percentage of shares transferred. This Form may be submitted by the transferor, the acquirer or the Chilean entity being transferred, with a Chilean Tax ID being required for these purposes.

The acquirer and the indirectly transferred Chilean entity are jointly and severally liable for the taxes triggered by the indirect transfer.

If the holder disposing the New Holdco Units is resident in Chile for tax purposes, Chilean indirect transfer tax should not apply. Such holder should be subject to the general taxation regime of the Income Tax Law ("**ITL**") if a capital gain is verified upon the disposal. Therefore, if the holder is a Chilean-resident company subject to the general taxation regime, the 27% Corporate Income Tax ("**CIT**") should apply. On the other hand, the Personal Income Tax ("**PIT**"), which is progressive with a marginal top rate of 40%, should apply if the holder is a Chilean-resident individual. Other specific tax treatments could apply depending on the circumstances of the Holder (e.g., no taxation should apply upon

127

disposal of the Units if the Holder is a public or private investment fund).

- **Incorporation of New Chile PIF**

*Public Investment Funds composition requirements*

Article No. 5 of the LUF establishes that a Public Investment Fund ("**PIF**"), as of the first year of the deposit of its internal regulations in the Commission for the Financial Market (*Comisión para el Mercado Financiero* or "**CMF**") must have more than 50 shareholders, except if, among them, there is an institutional investor.

At the same time, any shareholders of the fund (in case of any) that do not qualify as institutional investors would only be allowed to hold up to 35% of the quotas of the fund, either individually or jointly with their related persons or with whom it maintains a joint action agreement.

LUF allows an institutional investor to be the sole shareholder and hold 100% of the quotas of a PIF.

*Institutional Investors Background*

Article 4 bis letter e) of Law N° 18,045 or Capital Markets Act provides that the following entities shall be considered as "institutional investors": local banks, local insurance companies and reinsurers, fund administrators authorized by Chilean law and those entities indicated by the CMF, pursuant to a general rule issued by the CMF.

According to the above, the CMF has issued General Rule N°410 in which further elaborates the concept of institutional investor, stating that its scope will also extend to, among others, foreign funds or other foreign collective investment vehicles that comply with at least one of the following conditions: (i) the body in charge of its investment decisions or the managers playing that role, are supervised by a public or private agency with similar authorities and supervising scope than the CMF or the Chilean Pension Fund regulator (*Superintendencia de Pensiones* or "**SP**"); or (ii) the fund or vehicle itself is supervised by a public or private agency with similar authorities and supervising scope than the CMF or the SP.

*Tax treatment of PIFs*

Subject to compliance with composition requirements of LUF, PIFs are not subject to CIT on the profits they earn or accrue.

128

Therefore, New Chile PIF should not be subject to CIT on the dividends distributed by the Chilean entities in which it invests (e.g., Chile Newco) or on the capital gains derived from the sale of the shares of such Chilean entities (e.g., sale of Chile Newco Units).

This is without prejudice to the applicability to the New Chile PIF of the penalty tax of Article 21 of the ITL on certain disbursements made by the fund, such as disbursements that are not "necessary" for the development of the activities, loans from the PIF to its owners who are Chilean-resident individuals (subject to PIT) or non-resident entities or individuals (subject to WHT) (taxpayers subject to WHT and taxpayers subject to PIT, together "**Final Taxpayers**"), among others.

In general, a 40% penalty tax applies to the amount of unallowed disbursement. However, when the disbursements correspond to loans from the PIF to its contributors, to the use by contributors of fund's assets, or to the guarante of contributors' obligations, and such disbursements have benefited one or more specific contributors who are Final Taxpayers, then WHT or PIT should apply on the corresponding disbursement, increased by an amount equivalent to 10% of the amount of the disbursement.

*Tax treatment of investors (New Holdco)*

Subject to compliance with composition requirements of LUF, New Holdco, as sole investor of New Chile PIF, should be subject to a 10% sole tax (1) on dividends distributed by the New Chile PIF, with no credit for the corporate taxes paid by the Chilean subsidiaries of the New Chile PIF, and (2) on capital gains derived from the sale of the New Chile PIF quotas.

Returns of capital verified on the occasion of the liquidation of the New Chile PIF should not be subject to taxation in Chile, provided that (i) they do not correspond to capitalized profits pending taxation; (ii) the imputation and ordering rules (under which taxable profits are deemed distributed before capital) are verified; (iii) the amount received upon the distribution does not exceed the value of the effective contribution performed by the relevant investor; and (iv) it is documented as such, in compliance with the applicable corporate and legal requirements.

A full exemption regime is available for foreign investors in the case of Chilean PIFs that substantially invest outside of Chile, which should not be applicable to this case.

*General Anti Avoidance Rule (GAAR) considerations*

129

According to the GAAR, the Chilean IRS is entitled to disregard the form of acts or business carried out by taxpayers when taxable events are avoided by way of abuse or simulation. "*Abuse*" is defined as the total or partial avoidance, reduction, or deferral of a tax, or the access to a tax benefit or a special tax regime, by way of one or more actions or dealings that do not have any relevant legal or economic effects aside from tax effects. "*Simulation*" is defined as actions or dealings that conceal the existence or the elements of a taxable event, or the taxable event's true amount or triggering date, or as the simulation of legal acts or transactions to access a tax benefit or a special tax regime.

If the existence of abuse or simulation in such terms is declared by a tax court (upon requirement of the National Director of the Chilean IRS), all corresponding taxes that were avoided would be applied, together with the corresponding fines, interest, and inflation adjustments.

In this case, if the incorporation of a PIF by a non-resident entity or individual, or the incorporation of an institutional investor in the PIF, is disregarded under the GAAR (because abuse or simulation is declared by a tax court), the beneficial treatment applicable to PIFs could be denied and the general taxation regime should be applied to the non-resident investors on dividends and capital gains arising from the PIF. This could be the case if the business, commercial, and other non-tax reasons of the structure, including the relevant role of the institutional investors participating in the PIF could not be justified and demonstrated.

While there is no certainty as to how the general regime could be applied in a GAAR-type of challenge, the general regime generally applies as follows:

(i)     Income derived by the PIF should be subject to CIT.

(ii)    Dividends paid abroad should be subject to a 35% WHT with a total (100%) or partial (65%) credit for the CIT paid by the Chilean subsidiaries, depending on whether the beneficiary of the dividend is resident in a jurisdiction that has a Convention for the avoidance of Double Taxation ("CDT") in force with Chile or not. The Cayman Islands do not have a CDT signed with Chile.

130

    (iii)    Capital gains derived from the sale of PIF quotas should be subject to a 35% WHT, except where a special regime is applicable.[30]

    (iv)    Returns of capital should not be subject to WHT, provided that there are no profits pending taxation in the New Chilean PIF and the requirements for the tax-free capital reduction explained above are met.

- **Incorporation of Chile Newco**

Chile Newco should be subject to CIT at a rate of 27% on its annual net taxable income, generally determined on an accrued basis, and payable within April of the year following the one in which income was generated. For these purposes, companies' annual net taxable income is defined, broadly speaking, as their gross income less direct costs of goods and services, and necessary expenses to produce that income, adjusted for inflation and corrected as provided by Articles 31 to 33 of the ITL.

Payments made abroad under agreements with related parties are deductible as tax expenses on a cash basis (i.e., in the tax year when the payment is verified) and provided that the applicable WHT is withheld, declared and paid.

New Chile PIF should not be subject to CIT on the dividends distributed by Chile Newco or on the capital gains derived from the sale of the shares of Chile Newco.

Regarding dividends received from WOM Mobile, dividends between two Chilean tax resident entities are exempt from tax in Chile. When paid out of retained earnings, dividends will carry an imputation credit equal to the lesser of: (i) the dividend amount multiplied by a factor[31] equal to the CIT rate in effect in the year the dividend is paid divided by one minus the CIT rate, and (ii) the amount recorded by the distributing company as an imputation credit carryforward as of December 31 of the year in which the dividend is paid, reduced by any imputation credits associated with previous dividends paid during the same calendar year. Imputation credits on

---

[30]    In accordance with Article 107 of the ITL, a 10% sole tax may apply to capital gains obtained in the sale of shares of open stock corporations incorporated in Chile or quotas of investment or mutual funds incorporated in Chile with a stock exchange presence, subject to certain requirements. When the gain is derived by an institutional investor, a full exemption regime is available.

[31]    Under these rules, for a dividend paid during a calendar year when the corporate tax rate is the 27% currently in effect, the factor under (i) above is equal to $((27 / (100 - 27)) = 0.36986$.

131

dividends received by a Chilean tax resident entity increase the amount of its balance of imputation credits to be carried forward.

The distributions made by WOM Mobile to Chile Newco corresponding to capital reductions should not be subject to taxes, subject to the imputation rules of ITL and provided that the capital reduction is formalized as such.

(iii)    *Cancellation of NC Telecom II Shares*

Chilean tax legislation does not provide for a special tax treatment applicable to the *cancellation* of shares of Chilean or foreign entities.

Depending on how it is implemented, if the cancellation of NC Telecom II shares is deemed as a disposal of such shares by NCT, the ITR could apply, subject to verification of the thresholds described above in *Incorporation of New Holdco*. However, since no material price would be paid to NCT or NC Telecom II upon the cancellation, no taxable gain should arise over which the ITR could apply.

The cancellation of NC Telecom II shares could still have to be reported to the Chilean IRS through Form No. 1921, as over 10% of the shares of NC Telecom II are being disposed of.

(iv)    *Redemption of WOM Mobile shares*

- **Tax Considerations for WOM Mobile**

The tax treatment of the redemption of shares is not specifically addressed in the applicable Chilean tax laws.

However, at the administrative level, the Chilean IRS has recognized the provisions of Commercial Code (Article 438) stating that a *Sociedad por Acciones* may acquire and hold buy-back stock, except as prohibited by its bylaws.

These buy-back shares so acquired by the relevant company must be disposed of by the relevant company within the term established in the bylaws, or, if the bylaws are silent on the matter, within one year of their acquisition. Otherwise, the capital shall be reduced by virtue of the law and the shares shall be removed from the company's shareholders registry. In such cases, the amount of capital reduction shall be equal to the acquisition cost of the cancelled shares (i.e., price paid by the company upon the redemption, duly adjusted to reflect inflation).

Regarding the tax treatment of the amounts disbursed by the company to acquire its own shares, Law No. 21,210 of 2020 removed the provision that stated that such amounts should be considered as disallowed expenses subject to the 40% penalty tax. The Chilean IRS has clarified that such legal amendment does not necessarily imply that the amounts disbursed to acquire own shares should be accepted as an expense necessary to produce

the income, but rather that such amounts should be reincorporated for purposes of determining the CIT basis. Considering that the buy-back shares would be acquired at a nominal value, the company would have to add such nominal acquisition value to the net taxable income determined for CIT purposes.

Finally, WOM Mobile should in principle be subject to withholding obligations upon the redemption. However, since no taxable capital gain should arise as it is explained below, WOM Mobile could be released from such withholding obligations, provided that it maintains available the documentation supporting the no gain/loss result, in the terms instructed by the Chilean IRS in Resolution No. 42/2015.[32]

- **Tax Considerations for WOM Mobile's Shareholders**

The redemption of shares of a company incorporated in Chile should be considered, for Chilean tax purposes, as a sale of the company whose shares are being redeemed. Thus, the shareholder disposing its shares would be subject to capital gains tax in Chile on any gain arising from the redemption, where the gain is determined as the redemption price minus the tax cost basis.

In this case, considering the redemption price would be nominal and NC Telcom II tax basis in WOM Mobile would be approximately $1 million, no gain should arise. The purchase price could be challenged by the Chilean tax authority if it does not reasonably reflect WOM Mobile's fair market value, although this risk should be low considering the fact that commercially NC Telecom II does not receive cash, and the financial stress of the company. The Chilean IRS may inquire on the effectiveness of these circumstances in the event of an audit.

(v)   *Issuance of New Secured Notes by Reorganized WOM Mobile S.A.*

- **Stamp Tax Considerations**

Pursuant to Article 1 No. 3 of the Stamp Tax Law, the issuance of documents evidencing indebtedness for borrowed money, including loans, notes and bond issuances are subject to the stamp tax. In the case of documents issued abroad, the Stamp Tax applies upon entry of the document to Chile, notarization or registration of the transaction in the borrower's accounting records, whichever occurs first.

The stamp tax rate for term-loans is the lesser of (i) 0.8% and (ii) 0.066% multiplied by the number or fraction of a month to maturity. Loans without

---

[32]   This supporting documentation includes a detail of the calculations made to arrive to the loss result; original copy of the contract, agreement or document evidencing the transaction; a third-party appraisal report evidencing the market value of the disposed assets; among others.

a maturity date or which are payable on demand are subject to a tax of 0.332%. The stamp tax applies over the principal amount of the debt.

Stamp tax must be declared and paid by the local issuer/borrower, within the month following the issuance of the notes/loans.

- **Income Tax Consequences for Reorganized WOM Mobile S.A.**

To the extent that the New Secured Notes are issued by WOM Mobile for an amount equal to the sum of (i) cash proceeds (New Money) received by Reorganized WOM Mobile S.A. ($95 million); (ii) the face value of the Allowed Unsecured Claims of the Holders receiving the Take Back New Secured Notes ($225 million); and (iii) with respect to the Backstop Put Premium New Secured Notes, the value of Backstop Commitments ($11,875 million), and provided that the New Secured Notes are issued at face value (with no discount), their issuance should not generate Chilean income or expense recognition for Reorganized WOM Mobile S.A. (for the avoidance of doubt, this refers to the issuance itself and not to the tax treatment of the interest).

- **Tax treatment of Interest**

*Interest deductibility by Reorganized WOM Mobile S.A.*

The Chilean ITL provides that interest are generally deductible for corporate income tax purposes on an accrual basis, subject to the general expense deductibility requirements.[33]

However, interests paid to non-Chilean resident related parties would be deductible during the relevant commercial year when they are effectively paid, and the respective WHT has been declared and paid by the borrower to the Chilean treasury.

*Interest taxation*

➢ Chilean resident Holders

Holders of the New Secured Notes who are entities resident in Chile for tax purposes should be subject to the general taxation regime on the interest arising from the New Secured Notes, corresponding to a 27% CIT upon accrual of the interest and WHT or PIT upon distribution to Final Taxpayers.

➢ Non-Chilean resident Holders

---

[33] These general requirements correspond to (i) ability of the disbursement to generate income; (ii) the disbursement have not been previously deducted as cost; (iii) being related to the relevant company's ordinary line of business (iii) being paid or owed in the relevant exercise; (iv) being duly justified and supported before the Chilean IRS.

134

*General rules*

In the case of non-Chilean resident Holders of the New Secured Notes, as a general rule, Article 59 of the Chilean ITL imposes a 35% WHT over Chilean-source income derived by non-resident persons without domicile or residence in Chile, among which interest payments made by a Chilean-resident are included. This is notwithstanding that reduced rates may apply as explained below.

*Interest arising from bonds*

Under the Chilean ITL, interest arising from bonds issued by companies incorporated in Chile paid abroad would be subject to a 4% WHT. In order to apply such tax treatment, the respective financial instruments issued must qualify as a "bond". Although the domestic law does not provide a definition, there are pronouncements of the Chilean IRS as to what should be understood by "bond" and what requirements it must satisfy. Through Circular No. 160 of 1977, the Chilean IRS defines a bond as a financial instrument that is placed in the public as a transferable security. Additionally, the Chilean IRS concluded, in Ruling No. 3445/2021, that for a security to qualify as a "bond" and therefore be subject to the 4% WHT rate on interest payments, it must be placed to the public regardless of the public or private nature of the offering. In this regard, the Chilean IRS makes reference to the regulations of the Chilean Securities and Exchange Commission (General Rule No. 336 of 2012) for requirements on public and non-public offerings, which imposes requirements related to the form of dissemination of the offering and regulates the public to which it is directed and its number, as well as the amount of the instruments.

*Interest arising from credits granted by a Foreign Financial Institution ("FFI")*

On the other hand, interest arising from credits granted abroad by a foreign bank, an FFI or a foreign insurance company and payable by a Chilean debtor may also benefit from the reduced WHT of 4%. FFIs must comply with certain conditions to be qualified as such for the purposes of this preferential WHT regime, including for its main purposes or business line to be granting credits, financing, or other operations for such purposes, and having a paid-up capital and reserves equal to or greater than half of the minimum required for the establishment of foreign

135

banks in Chile, as per the General Banking Law (approximately $15,000,000), among other conditions.

Additionally, to be eligible for the 4% WHT rate, the foreign bank or FFI must not have entered into a "structured agreement" (i.e., an agreement in which the FFI receiving the interest transfers these amounts to another non-resident person who would not be entitled to such a reduced WHT rate if they had received the interest directly from the Chilean debtor).

The Chilean IRS keeps a Voluntary Registry of FFIs, in which, upon request to the Chilean IRS, those institutions that meet the aforementioned requirements to qualify as a FFI shall be included. According to the guidelines from the Chilean IRS, from the date of inclusion of the respective entity in the voluntary registry, and as long as such registration is valid (registration must be renewed annually), it will be understood that such entity meets the requirements for the application of the reduced rate of 4%. However, registration in the registry is not a requirement for the 4% rate to apply, and therefore financial institutions that are not registered in said registry may also benefit from the 4% rate to the extent that they can prove compliance with the general requirements mentioned above.

*Reduced rates under Tax Treaties*

Reduced interest WHT rates may also be applicable under a CDT if the beneficial owner of the interest is a resident of a jurisdiction that has a CDT in force with Chile.

By way of example, the Chile-US CDT establishes, as general rule, a reduced residual rate of 15% WHT on interest payments abroad until February 2029, which then would be reduced to 10%. Such treaty also establishes a reduced WHT rate of 4% on interest payments if the creditor is (i) a bank; (ii) an enterprise substantially deriving its gross income from lending or finance business with unrelated parties; (iii) and an enterprise that sells machinery or equipment when the interest is paid in connection with the sale on credit of such assets, or (iv) or an enterprise that meets specific requirements to be deemed a financial institution (i.e., more than 50% of its liabilities derive from the issuance of bonds in the financial markets or similar, and more than 50% of the assets consist of debt-claims against persons not related).

In order to be eligible for reduced rates under a CDT, the foreign lenders would have to provide to the Chilean borrower/issuer: (i)

136

a tax residence certificate (apostilled), issued by the relevant tax authority; and (ii) a signed affidavit, stating that a) they do not carry out activities in Chile through a permanent establishment or fixed base to which the income would be attributable, and b) that they do comply with the requirements to be beneficiary of the relevant CDT. Depending on the specific tax treaty, this last item may include compliance with the principal purpose test, the qualified residence under a "Limitation of Benefits Clause", among others.

*Thin-capitalization rules*

In general, a 35% tax is applied on interest (and other payments related to borrowing) paid to a foreign related party by a Chilean borrower that is in an excess debt position at the end of the year in which the interest (and other payments related to borrowing) is paid ("**Thin-cap Tax**"). Any tax withheld on interest or other items paid to related non-resident parties can be credited against the Thin-cap Tax. The Thin-cap Tax has to be filed and paid by the Chilean borrower who can deduct it for income tax purposes.

These rules impose a debt-to-equity ratio limit of 3:1. This ratio is computed considering the total amount of debt of the borrower (i.e., including both external and domestic debt, and related and unrelated party debt). The 3:1 debt-to-equity ratio is assessed every year-end and applicable with respect to interest paid during that same year. Although the debt-to-equity ratio is calculated considering both intercompany and third-party debt, as well as domestic and foreign debt, the Thin-cap Tax is only applicable over interest (or other payments related to the financing) paid on foreign related party debt.

Under the thin capitalization rules, a lender or creditor will be deemed to be related to the borrower if: (i) the beneficiary is incorporated, domiciled, resident or established in one of the territories or jurisdictions that qualifies as a "preferential tax regime" pursuant to Article 41 H of the Chilean ITL; (ii) the beneficiary, which is incorporated, domiciled, resident or established outside of Chile, and the borrower, belong to the same corporate group, or they directly or indirectly, have interest in 10% or more of the capital or profits of the other, or they have a common partner or shareholder which, directly or indirectly, has interest in 10% or more of the capital or profits of both; (iii) the indebtedness is guaranteed directly or indirectly by a third party that is "related" to the borrower in the terms described in numbers (i), (ii) and (iv), provided that such third party is domiciled or

137

resident abroad and is the beneficial owner of the interests; (iv) the relevant financial instruments evidencing such indebtedness are placed and acquired by independent entities and that are subsequently acquired or transferred to a related entity according to numbers (i) through (iii) above; or (v) one party conducts one or more operations with a third party which, in turn, directly or indirectly conducts one or more similar or identical operations with a related party of the other.

Consequently, and in the case of interest paid to related-party foreign noteholders under the interest-bearing New Secured Notes, interest payments made under cross-border related party debt borrowings could fall within the scope of these rules if Reorganized WOM Mobile S.A. is in an excessive-indebtedness position (i.e., accumulated tax losses), This tax should be borne, declared and pay by Reorganized WOM Mobile S.A.

(vi)    *Issuance of New Convertible Notes by Chile Newco[34]*

- **Stamp Tax Considerations**

Stamp tax should apply in the terms explained above.

- **Income Tax Consequences for Chile Newco**

To the extent that the New Convertible Notes are issued by Chile Newco for an amount equal to the cash proceeds received by Chile Newco under the Plan and are issued at face value (with no discount), their issuance should not generate Chilean income or expense recognition for Chile Newco (for the avoidance of doubt, this refers to the issuance itself and not to the tax treatment of the interest).

- **Tax Treatment of interest**

*Interest deductibility by Chile Newco*

Chile Newco should be able to deduct as expenses for tax purposes interest paid abroad in the same terms and subject to the same limitations as explained above.

*Interest taxation*

---

[34]    These considerations are exclusively applicable to the New Convertible Notes issued by Chile Newco and convertible into Chile Newco Units and does not apply to New Convertible Notes which are convertible into New Holdco Units.

The same considerations as explained above for the interest arising from New Secured Notes, including Chilean resident Holders and Non-Chilean resident Holders should apply for interest arising from New Convertible Notes.

- **Thin-capitalization rules**

Thin-capitalization rules should apply in the terms explained above.

- **Income Tax Considerations upon Conversion of New Convertible Notes**

If as a result of the conversion of the notes into Chile Newco Stock (or the alternative right of receiving New Holdco Stock), a Holder of the New Convertible Notes receives shares representing share capital for an amount lesser than the face value of its New Convertible Notes, the conversion may give rise to taxable income to Chile Newco for an amount equal to the portion of the New Convertible Notes' face value not satisfied.

In this case, such taxable income would have to be included in Chile Newco's gross income determination in the calendar year in which the conversion is made and be subject to a 27% corporate income tax. Any available tax loss in Chile Newco may be used to offset the amount of taxable income arising in this specific situation, provided that the legal requirements are met.

The conversion of the New Convertible Notes into Chile Newco stock should not be subject to Stamp Tax or other transfer or indirect taxes in Chile.

- **Chilean Tax Considerations on ownership of Chile Newco stock (after the conversion of the New Convertible Notes)**

*Distributions by Chile Newco*

➢ Distributions by Chile Newco to Chilean Holders

Dividends between two Chilean tax resident entities are exempt from tax in Chile. Dividends paid out of retained earnings shall carry the CIT imputation credit. Returns of capital received by Chilean owners of Chile Newco should not be subject to taxes, subject to the imputation orders of ITL, and provided that the capital reduction is formalized as such.

If the Chilean Holder is an individual, dividends should be subject to PIT which is progressive with a marginal top rate of 40%.

139

➢ Distributions by Chile Newco to non-Chilean Holders

- *Non-treaty country residents*

Dividends paid from Chile to a non-resident shareholder that is not in a country that has a CDT in effect with Chile are subject to a WHT of 35% minus a "partial" imputation credit that is equal to 65% of the lesser of: (x) the dividend amount multiplied by a factor equal to the CIT rate in effect in the year the dividend is paid divided by one minus the CIT rate, and (y) the amount recorded by the distributing company as an imputation credit carryforward as of December 31 of the year in which the dividend is paid, reduced by any imputation credits associated with previous dividends paid during the same calendar year. An amount equal to 100% of the lesser of (x) and (y) above shall be added to the dividend amount for the purposes of calculating the 35% WHT from which the "partial" imputation credit is deducted in determining the tax payable.

The table below shows the tax payable on a $1,000,000 dividend paid to a non-treaty resident shareholder:

| | |
|---|---|
| a) Dividend amount | 1,000,000 |
| (b) Lesser of (i) credit factor, and (ii) imputation credit carryforwards | 369,860 |
| (c) Taxable dividend amount | 1,369,860 |
| (d) Tax at 35% rate | 479,451 |
| (e) Partial imputation credit (b) x 65% | 240,409 |
| (f) Dividend tax payable (d) – (e) | 239,042 |
| **Effective tax rate (f) / (a)** | **23.9%** |
| **Total effective tax rate on the income generated (b) + (f) / (c)** | **44.45%** |

As a result of the partial imputation credit rules described above and the grossing-up of the dividend for the amount of imputation credit available, in a scenario where the amount of (x) is equal or greater than the amount of (y), which for example would be the case if dividends are paid out of retained earnings that have paid the 27% CIT when earned, the dividend WHT will be payable at an effective rate of

140

23.9%. If the amount in (y) is zero, which can be the case when dividends are paid out of financial retained profits that have not been subject to tax because of temporary or permanent book to tax differences (e.g. tax depreciation different than under IFRS, expensing rules, amortization, valuation methodologies, etc.), then no credit will be available and no grossing up of the dividend amount shall be made. As a consequence, the dividend WHT will be payable at an effective rate of 44.45% on the dividend amount with no gross-up.

- *Treaty country residents*

Dividends paid from Chile to a shareholder resident in a country that has a tax treaty in effect with Chile (e.g. USA, Brazil, Mexico, UK, Spain, Ireland, Switzerland, Belgium, etc.[35]) are subject to WHT of 35% minus a "full" imputation credit equal to the lesser of (x) the dividend amount multiplied by a factor equal to the CIT rate in effect in the year the dividend is paid divided by one minus the CIT rate, and (y) the amount recorded by the distributing company as an imputation credit carryforward as of December 31 of the year in which the dividend is paid, reduced by any imputation credits associated with previous dividends paid during the same calendar year.

The amount of the imputation credit shall be added to the dividend amount for the purposes of calculating the 35% WHT from which the imputation credit is deducted in determining the tax liability payable.

The following table has an example calculation on the dividend tax calculation in case of a treaty resident shareholder:

| a) Dividend amount | 1,000,000 |
|---|---|
| (b) Lesser of (i) credit factor, and (ii) imputation credit carryforwards | 369,860 |
| (c) Taxable dividend amount | 1,369,860 |
| (d) Tax at 35% rate | 479,451 |
| (e) Full imputation credit (b) x 100% | 369,860 |

---

[35] Full list of Chile tax treaties in effect can be found at http://www.sii.cl/normativa_legislacion/convenios_internacionales.html.

| (f) Dividend tax payable (d) – (e) | 109,591 |
|---|---|
| **Effective tax rate (f) / (a)** | **10.9%** |
| **Total effective tax rate on the income generated (b) + (f) / (c)** | **35%** |

As a result of the full imputation credit rules described above and the grossing-up of the dividend for the amount of imputation credit available, in a scenario where the amount of (x) is equal or greater than the amount of (y), which for example would be the case if dividends are paid out of retained earnings that have paid the 27% corporate tax when earned, the dividend withholding tax will be payable at an **effective rate of 10.9%.**

For a full imputation credit to be deducted in determining the dividend withholding tax liability, the treaty resident Holder would need to provide to Chile Newco with the documentation evidencing that such Holder is entitled to benefit from the respective CDT, including a tax residency certificate, an affidavit stating that it is a beneficiary of the treaty, etc. If the tax residence certificate and declaration are not provided, Chile Newco would be required to determine the WHT as applicable to non-tax treaty country residents, which as explained, requires considering an imputation credit limited to 65% of the full amount.

If the amount in (y) is zero, which can be the case when dividends are paid out of financial retained profits that have not been subject to tax because of temporary or permanent book to tax differences (e.g. tax depreciation different than under IFRS, expensing rules, amortization, valuation methodologies, etc.), then no credit will be available and no grossing up of the dividend amount shall be made. As a consequence, the dividend WHT will be payable at an effective rate of 35% on the dividend amount with no gross-up.

*Disposition of the Chile Newco Units*

➢ Disposition by Chilean residents

Capital gains from a sale or transfer of shares of a Chilean entity would generally be subject to the "general tax" regime (i.e. 27% CIT, and a non-resident dividend WHT at the time of remittance

142

of such income to a non-resident shareholder or PIT when such income is distributed to a resident shareholder, with a partial imputation credit for the CIT paid if the shareholder is a resident individual or a resident in a non-treaty jurisdiction or a full imputation credit for a shareholder resident in a treaty country). The capital gain in this scenario is determined by the difference between the sale's price and the tax value of the shares recorded by the Chilean owner of Chile Newco stock in its tax accounting records. This tax value should be given by the amount of cash paid by such Holder to purchase the New Convertible Notes representative of the units being transferred, duly adjusted to reflect inflation, and increased or decreased by increases or decreases in capital subscribed by the respective Holder in Chile Newco.

If the Chilean resident holder is the PIF, capital gains arising will not be subject to CIT (PIF is not a CIT taxpayer).

If the Chilean resident holder is an individual, capital gains should be subject to PIT at progressive rates ranging from 0 to 40%.

➢ Disposition by non-Chilean residents

As a general rule, gains from the sale of Chile Newco stock by its owner will be taxable in Chile with WHT at a 35% rate unless tax relief is available for the seller under a tax treaty in force between Chile and the jurisdiction of residence of such seller.

In this case, the taxable gain is calculated, generally, as the difference between the amount realized on the disposition and the non-Chilean Holder's tax basis in such Chile Newco stock. Non-Chilean Holder's tax basis should be determined as explained above.

The acquirer of the shares, whether foreign or Chilean entity or individual, would have to comply with WHT obligations (10% over the gross amount or 35% over the net gain amount, according to Article 74 No. 4 of the Chilean ITL).

(vii)   *Intercompany Claims Considerations*

In accordance with the Plan, Intercompany Claims shall be either reinstated or cancelled, released, and extinguished without any distribution. The Plan also states that all assets of Kenbourne shall be transferred to WOM, or

143

another entity owned directly or indirectly by New Holdco as determined by the Required Consenting Noteholders, and thereafter Kenbourne may be wound down and dissolved by the Reorganized Debtors.

- **Tax Considerations in a reinstatement scenario**

According to the Plan, "*Reinstatement*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code.

This implies that, in this scenario, the Plan should leave unaltered the legal, equitable, and contractual rights of the holders of the Intercompany Claim, and therefore no significant additional tax implications should arise in Chile.

However, depending on how the reinstatement of the Intercompany Claims is executed, the risk of triggering stamp tax could arise (e.g., if new promissory notes are issued and conditions substantially different from the conditions that are currently in place for the Intercompany Claims are agreed upon).

- **Tax Considerations in a cancellation scenario**

*Considerations for the debtor*

As a general rule, Chilean taxpayers who benefit from a debt cancellation, forgiveness or discharge should be subject to the general taxation regime on the cancelled amount (i.e., Corporate Income Tax at a rate of 27%, and WHT or PIT upon distribution to Final Taxpayers). If the Chilean taxpayer benefiting from the debt forgiveness has net operating losses available, the same can be used to offset the income.

Cancellation of debt taxable income should not arise with respect to accrued and unpaid interest that has not been deducted as tax expense by the Chilean debtor. In this sense, as explained above, interest owed to related parties abroad can be deducted by Chilean debtors only upon actual payment of the interest and applicable WHT.

*Considerations for the creditor*

Tax implications may also arise in Chile for the creditor, depending on the circumstances (e.g., local/foreign creditor).

Local creditors should be able to deduct the waived debt as a tax expense provided that they are able to prove that the cancellation was necessary for the interest, development or maintenance of their business and not

solely by virtue of creditor's free will, which is subject to verification by the Chilean IRS in the corresponding audit instance. This has been expressly instructed by Chilean IRS in Ruling No. 1868 of 2022[36]. If these requirements are not fulfilled, the amount of the waived debt should constitute a non-deductible tax expense and should be reincorporated for purposes of determining the CIT basis.

This constitutes an exception to the general rules of Article 31 No. 4 of ITL, under which related-party debts can only be waived and deducted as tax expense to the extent that the collection channels for the waived debt were prudently exhausted (which requires, for credits over approx$2,000 app., to have judicially challenged the debtor). Indeed, while the ITL contains provisions authorizing the deduction as tax expense of debts waived when the relevant debt has been unpaid for more than 365 days from their maturity date, these rules are not applicable for debts maintained with related parties.

If the creditor is a non-resident entity, based on the guidelines from the Chilean IRS'[37] no withholding obligations should be triggered as no effective payment or distribution abroad is verified.

(viii)   *Tax Considerations on assignment of Kenbourne's assets to WOM S.A. or other entity owned directly or indirectly by New Holdco*

- **Assignment to WOM S.A.**

The assignment of Kebourne's assets to WOM would result in WOM acquiring Kenbourne's receivable against WOM Mobile.

As a general rule, WHT on the accrued interest payable to a non-resident is triggered upon payment, capitalization or making available such interest.

The assignment by a foreign creditor of receivables against a local debtor should not trigger withholding tax on the portion of accrued interest. However, the Chilean IRS has interpreted[38] that the Chilean assignee must be subject to CIT on the interest accrued, starting from the business year where the assignment took place.

---

[36] The ruling states that: "*subject to the review of the corresponding audit authorities, to accept as an expense the cancellation of debt with a related company, carried out in the framework of a liability restructuring process subject to the related company, carried out within the framework of a liability restructuring process subject to the provisions of Chapter XI of the U.S. Bankruptcy Code, it must be demonstrated that such forgiveness has been necessary for the interest, development or necessary for the interest, development or maintenance of the business of the company that carries it out.*"

[37] Ruling No. 1953 of 2011.

[38] Ruling No. 801 of 2024.

If the assignment is verified at a discount, it should be considered that the nature and source of a discount have not been addressed clearly under Chilean law. However, the Chilean IRS has assessed in several rulings that a discount in the form of an original issue discount or in the sale of debt titles at a discount is analogous to interest income. This interpretation is based on the broad legal definition of "interest" (under Law No. 18,010) as any amount that the lender receives or is entitled to receive, for any title, in excess of the principal.

Thus, WOM should be subject to CIT (27%) on the discount. Article 29 of ITL states that the positive difference between the nominal value and the acquisition value in transactions corresponding to the purchase of debt securities should be taxed on a cash basis, except if the same is verified between related parties, where taxation on an accrued basis should apply. The cash basis could still apply to related parties if it is evidenced that the transactions were verified following normal market prices or values that would have been agreed upon by unrelated parties.

- **Assignment to other entity owned directly or indirectly by New Holdco**

If Kenbourne's receivables are transferred to another local related entity, the tax considerations should be broadly the same as the ones described above.

If, on the other hand, the receivables are assigned to a related foreign company, a Chilean-source income should be verified for the amount of accrued and unpaid interest, subject to taxation in accordance with the general rules (i.e., 4% WHT if Kenbourne is an FFI).

If the assignment is verified at a discount, the Chilean IRS has interpreted[39] that the discount earned by a non-resident assignee from the acquisition of receivables against Chilean debtors corresponds to a Chilean-source income and should be classified as an interest[40]. The WHT rate applicable to the interest should depend on the situation of the assignee (e.g., FFI status, tax residence, etc.)

(ix)    *Other general considerations: Information Reporting and Withholding*

In general terms, information reporting requirements before the Chilean IRS apply to distributions or payments that may be verified under the Plan, including in connection with

---

[39]    Ruling No. 1944 of 2024.
[40]    The ruling specifies that the discount should be classified as a business profit if the relevant receivable is incorporated into an invoice (because the assignment of invoices does not constitute a money credit transaction by virtue of Law No. 19,983).

payments of dividends, interest, and the proceeds of a sale or other disposition of the entities of the structure, Chilean or foreign.

Also, to the extent not previously obtained, entities receiving Chile Newco Units when converting their respective New Convertible Notes would need to obtain a Chilean Tax Identification Number that is issued by the Chilean IRS. Any non-Chilean entities need to appoint a local representative with authority to act before the Chilean IRS for this purpose.

## VII.    SOLICITATION AND VOTING PROCESS

This Disclosure Statement, which is accompanied by a Ballot to be used for voting on the Plan, is being distributed to the Holders of Claims in those Classes that are entitled to vote to accept or reject the Plan. The procedures and instructions for voting and related deadlines are set forth in the proposed Disclosure Statement Order.

The discussion of the solicitation and voting process set forth in this Disclosure Statement is a summary only. Please refer to the Proposed Disclosure Statement Order, filed concurrently herewith, for a more comprehensive description of the solicitation and voting process.

### A.    Holders of Claims Entitled to Vote on the Plan

Under the Bankruptcy Code not all holders of claims against or interests in a debtor are entitled to vote on a chapter 11 plan. Only "impaired" classes are entitled to vote on the Plan.

As shown in the table in Article I.D of this Disclosure Statement, the Debtors are soliciting votes to accept or reject the Plan only from holders of Claims in Class 3 (Unsecured Notes Claims) and Class 4 (General Unsecured Claims) (each, a "**Voting Class**," and together, the "**Voting Classes**"). The Holders of Claims in the Voting Classes are impaired under the Plan and have the right to vote to accept or reject the Plan.

### B.    Voting Record Date

The voting record date is January 22, 2025 (the "**Voting Record Date**"). The Voting Record Date is the date on which it will be determined which holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan and whether Claims have been properly assigned or transferred under Bankruptcy Rule 3001(e) such that an assignee or transferee, as applicable, can vote to accept or reject the Plan as the holder of a Claim.

Holders in Classes 3 and 4 are entitled to vote to accept or reject the Plan except to the extent that (i) as of the Voting Record Date, such creditor's Claim is zero ($0.00), (ii) as of the Voting Record Date, such creditor's Claim has been disallowed, expunged, disqualified or suspended, (iii) such creditor has not timely filed a proof of claim in accordance with the Bar Date Order as of the Voting Record Date and the Debtors have not scheduled such creditor's Claim or scheduled such creditor's claim in an undetermined amount or as contingent, unliquidated, or disputed; or (iv) such creditor's Claim is subject to an objection or request for estimation, subject to the procedures set forth in the Solicitation Procedures.

C.      **Voting Deadline**

Ballots for voting to accept or reject the Plan must be received by February 27, 2025 at 4:00 p.m. (prevailing Eastern Time) (the "**Voting Deadline**"). In order to be counted as votes to accept or reject the Plan, all ballots must be properly executed, completed, and delivered, as directed, so that your ballot is actually received by the Claims Agent on or before the Voting Deadline.

D.      **Ballots**

All Holders within such Classes have been sent a Ballot together with this Disclosure Statement. Such Holders should read the Ballot carefully and follow the instructions contained therein. Please use only the Ballot that accompanies this Disclosure Statement to cast your vote.

**ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE OR THAT IS OTHERWISE NOT IN COMPLIANCE WITH THE SOLICITATION PROCEDURES WILL <u>NOT</u> BE COUNTED.**

**VIII.   CERTAIN RISK FACTORS TO CONSIDER BEFORE VOTING**

**HOLDERS OF CLAIMS AND INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH BELOW BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. ALTHOUGH THERE ARE MANY RISK FACTORS DISCUSSED BELOW, THESE FACTORS ARE NOT THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE PLAN AND ITS IMPLEMENTATION.**

The following provides a summary of various important considerations and risk factors associated with the Plan; it is, however, not exhaustive. In considering whether to vote to accept or reject the Plan, Holders of Claims should read and carefully consider the factors set forth below, as well as all other information set forth or otherwise incorporated by reference in this Disclosure Statement and the Plan.

A.      **Certain Bankruptcy Law Considerations**

It is impossible to predict with certainty the amount of remaining time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. The occurrence or non-occurrence of any or all of the following contingencies and any others could affect distributions available to Holders of Allowed Claims and Interests under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or require a re-solicitation of the votes of Holders of Claims and Interests in such Impaired Classes.

1.      <u>Risk of Non-Confirmation or Delay of the Plan</u>

Although the Debtors believe that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion, that modifications of the Plan will not be required for Confirmation or that such modifications would not necessitate re-solicitation of votes.

2.    <u>Proposed Releases and Exculpation under the Plan</u>

Subject to entry of the Confirmation Order and the Debtors' ongoing investigations, the Plan proposes to release the Released Parties and to exculpate the Exculpated Parties. As defined in the Plan, the Released Parties and the Exculpated Parties, respectively, are as follows:

- Releasing Parties:

    o  each Debtor;
    o  New Holdco;
    o  each Reorganized Debtor;
    o  each direct or indirect subsidiary of the Debtors or Reorganized Debtors;
    o  the DIP Agents;
    o  each DIP Lender;
    o  the Unsecured Notes Trustees;
    o  each Consenting Noteholder;
    o  all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that opt in to granting releases;
    o  each current and former Affiliate of each Entity above; and
    o  each Related Party of each Entity above, provided, however, that each Related Party shall be a Releasing Party only with respect to claims or Causes of Action that it could have properly asserted on behalf of the Entities identified above.

- Released Parties:

    o  each Debtor;
    o  New Holdco;
    o  each Reorganized Debtor;
    o  each direct or indirect subsidiary of the Debtors or Reorganized Debtors;
    o  the DIP Agents;
    o  each DIP Lender;
    o  the Unsecured Notes Trustees;
    o  each Consenting Noteholder;
    o  the Committee and its members;
    o  each current and former Affiliate of each Entity above; and
    o  each Related Party of each Entity above (which, for the avoidance of doubt, includes each of the Ad Hoc Group Advisors).

For the avoidance of any doubt, any holder of a Claim or Interest that does not opt-in to the releases and each of the Non-Released Parties shall not be a Released Party.[41]

---

[41]    "**Non-Released Parties**" means: (i) Novator Partners LLP and any of its direct and indirect non-Debtor affiliates and managed entities; (ii) all direct and indirect holders of equity interests in any the Debtors, including, but not limited to, (a) The Telco Holdings Trust, its settlor and beneficiaries and (b) any other trust that owns any such equity interests, its settlor and beneficiaries; (iii) Novator (Luxembourg) S.à r.l.; (iv) Novator Two L.P.; (v) WOM Colombia S.A.S. and any of its direct and indirect affiliates; (vi) Björgólfur Thor Björgólfsson; (vii) Thomas

149

- Exculpated Parties:

    o   the Debtors;
    o   the Special Committee and its members;
    o   the Committee and its members; and
    o   with respect to each of the above, such Entity and its officers, directors, managers, principals, members, agents, advisory board members and the Professionals of the foregoing, each in their capacity as such.

For the avoidance of any doubt, none of the Non- Released Parties shall be an Exculpated Party, except for in their capacities as directors of any of the Debtors from and after the Petition Date.

3.    Risk of Failing to Satisfy Vote Requirement

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek Confirmation of the Plan as promptly as practicable thereafter. However, if sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction. There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the Holders of Claims as those proposed in the Plan.

(i)    *Failure to Satisfy Administrative Claims or Otherwise Agree to Alternative Treatment and Other Factors that May Impact Administrative Solvency*

To confirm a chapter 11 plan, section 1129(a)(9) of the Bankruptcy Code requires, among other things, that "except to the extent that the holder of a particular claim has agreed to a different treatment of such claim," claims entitled to administrative priority under section 507(a)(2) or 507(a)(3) must be paid in full in order for a debtor to confirm a chapter 11 plan. To the extent that a Debtor is unable to pay such claims in full or otherwise agree to treatment with the applicable Holder, such Debtor may be unable to confirm a chapter 11 plan. Furthermore, certain factors could also impact the Debtors' administrative solvency, including reconciliation of Administrative Claims, which may impact the Debtors' ability to confirm a chapter 11 plan for all or certain of the Debtors. If no plan can be confirmed, one or more of these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code.

(ii)    *Non-Consensual Confirmation*

If any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponent's request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does

---

Leslie; (viii) Jaroslav Valiukevic; (ix) Kristopher Brigham; (x) Serdar Cetin; (xi) Graham Bruce McInroy; (xii) Alvaro Araya; (xiii) PurpleCrest Investments LLP; (xiv) any former directors of any of the Debtors as of the Petition Date (other than Chris Bannister); and (xv) any subsequent transferee of each Person or Entity in clause (i) through (xiv).

not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. The pursuit of nonconsensual Confirmation or consummation of the Plan may result in, among other things, increased expenses relating to professional compensation and delays in the Confirmation schedule. Notwithstanding such efforts, there can be no assurance that the Bankruptcy Court will reach the conclusion that the Plan is fair and equitable or does not unfairly discriminate against a dissenting impaired class.

(iii)    *The Conditions Precedent to the Effective Date of the Plan May Not Occur.*

Article IX of the Plan contains the conditions that must be satisfied before the Effective Date of the Plan can occur. Conditions precedent to the Effective Date include: that the final version of each of the Plan, the Definitive Documents, and all documents contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein, shall have been executed or filed, as applicable; the Debtors and the Consenting Noteholders shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan; the Plan Sponsor Agreement and the Backstop Agreement shall each remain in full force and effect and shall not have been terminated at any time; and numerous others. If such conditions precedent are not waived or satisfied, the Effective Date will not take place and the Plan will not be in force.

(iv)    *Conversion to Chapter 7*

If the Plan cannot be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of Holders of Claims and Interests, one or more of the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a chapter 7 trustee would be appointed or elected to liquidate the applicable Debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. See Article IX.B hereof, as well as the Liquidation Analysis annexed hereto as **Exhibit C**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims and Interests.

(v)    *Continued Risk Upon Confirmation and Potential Appeal of Confirmation*

Even if the Plan is consummated, there may be continued risks, including certain risks that are beyond the control of the Debtors or the Reorganized Debtors, such as further deterioration or other changes in economic conditions, potential revaluing of their assets due to chapter 11 proceedings, and increase in expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

Even if the Plan is confirmed, there is no guarantee that the Reorganization Transactions will be implemented, and the Debtors may continue to face uncertainty. Specifically, it is possible

that the Plan's Confirmation is appealed and its implementation subsequently paused until further litigation takes place.

(vi)    *One or More of the Chapter 11 Cases May Be Dismissed*

If the Bankruptcy Court finds that the Debtors have incurred substantial or continuing loss or diminution to the estate and lack of a reasonable likelihood of rehabilitation of the Debtors or the ability to effectuate substantial consummation of a confirmed plan or otherwise determines that cause exists, the Bankruptcy Court may dismiss one or more of the Chapter 11 Cases. In such event, the Debtors would be unable to confirm the Plan with respect to the applicable Debtor or Debtors, which may ultimately result in significantly smaller distributions to creditors than those provided for in the Plan.

(vii)    *Risk of Non-Occurrence of the Effective Date*

The Effective Date will occur on the date that (a) all conditions precedent to the occurrence of the Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan, and (b) the Plan is declared effective by the Debtors. Although the Debtors believe that the Effective Date will occur within fifteen calendar days of the Confirmation Date, there can be no assurance as to the timing or as to whether the Effective Date will, in fact, occur.

(viii)    *The Debtors May Object to the Amount or Classification of a Claim or Interest.*

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan. Any Holder of a Claim or Interest that is subject to an objection cannot rely on the estimates in the Disclosure Statement. As a result, any Holder of a Claim or Interest that is subject to an objection may not receive its expected share of the estimated distributions described in this Disclosure Statement.

(ix)    *Contingencies Could Affect Allowed Claims Classes*

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies could affect distributions available to Holders of Allowed Claims under the Plan but may not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, including that the actual Allowed amounts of Claims equals the scheduled amount of those Claims. The actual Allowed amounts of Claims may significantly differ from the estimates and would affect the recovery estimates in this Disclosure Statement. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect,

152

among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

(x)     *Estimated Recoveries May Change Due to Litigation Arising Out of the Claims Allowance and Reconciliation Process.*

Only Allowed Claims will receive distributions pursuant to the Plan. If the Holder of a Claim pursues litigation and seeks an Allowed Claim in excess of the amount of the Holder's Claim on the Debtors' books and records, the Holder will not receive any recovery until such dispute is fully and finally resolved. To account for such litigation and Holders who are asserting Allowed Claims for more value, the Debtors and the Post-Effective Date Debtors will need to reserve sufficient resources to account for Holders that are asserting Allowed Claims of greater value. Accordingly, the estimated distributions will likely occur over time as Claims are resolved and reserves can be distributed.

4.    Risks Related to Recoveries Under the Plan

(i)     *If the Reorganization Transactions are Not Implemented, the Debtors Will Consider All Available Alternative Restructuring Proposals, and such Alternatives May Result in Lower Recoveries for Holders of Claims Against the Debtors*

If the Reorganization Transactions do not occur, the Debtors will consider all other restructuring alternatives available, which may include the filing of an alternative chapter 11 plan, conversion to chapter 7, or any other transaction or proceeding that would maximize the value of the Debtors' estates. Any alternative restructuring proposal may be on terms less favorable to Holders of Claims against the Debtors than the terms of the Plan as described in this Disclosure Statement.

Any material delay in Confirmation of the Plan, or the Chapter 11 Cases, or the threat of rejection of the Plan by the Bankruptcy Court, could add substantial expense and uncertainty to the process.

The uncertainty surrounding a prolonged restructuring could also have other adverse effects on the Debtors.

(ii)    *Regulatory Approvals May Not be Granted*

Consummation of the Reorganization Transactions may depend on obtaining regulatory approvals in foreign jurisdictions. Failure by any governmental authority to grant a necessary or advisable regulatory approval could prevent or impose limitations or restrictions on consummation of the Reorganization Transactions and Confirmation of the Plan.

The Debtors and the Consenting Noteholders are currently engaging with the applicable governmental units and regulatory bodies, many of whom, while reserving all rights, have expressed an openness to working with the Debtors towards achieving the consummation of the Reorganization Transactions.

(iii)   *Certain Tax Implications of the Plan*

Holders of Claims should carefully review Article VI of this Disclosure Statement, to

determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Debtors and/or have an impact on creditors' personal tax obligations. The Debtors do not know your specific tax situation. If you have any questions about the discussion of taxes in this Disclosure Statement, you should consult a tax professional.

5.    Country-Specific Risk Factors

(i)    *Currency exchange rate fluctuations could have a material adverse effect*

The Debtors' business is exposed to fluctuations in currency exchange rates. Nearly all of the Debtors' revenues are denominated in Chilean pesos, while the Debtors' significant expenditures, such as the Debtors' borrowings, the purchase of handsets, purchases of network equipment, IT system costs, roaming costs and the cost of certain leases of office space and sites are denominated in Chilean pesos or U.S. dollars. A depreciation of the Chilean peso against the U.S. dollar would increase these costs.

The Chilean peso has been subject to volatility in the past and could be subject to significant fluctuations in the future given the prevalence of a free float exchange regime. The main drivers of exchange rate volatility in past years were the significant fluctuations of commodity prices as well as general uncertainty and trade imbalances in the global markets and, more recently, the impact of the COVID-19 pandemic. For example, in 2015 the value of the Chilean peso fell precipitously on market fears of a drop in copper prices, but the Chilean Central Bank declined to intervene at that time. The Chilean Central Bank has intervened more recently in 2019 and 2020 in response to the political uncertainty caused by social unrest and the COVID-19 pandemic, but the Chilean peso has nevertheless fluctuated during this period. The value of the Chilean peso against the U.S. dollar may continue to fluctuate significantly in the future. Any significant currency devaluations or foreign exchange fluctuations in the future may adversely affect the performance of the Chilean economy and the Debtors' business, financial condition and results of operations.

(ii)    *A severe earthquake or tsunami in Chile could adversely affect the Chilean economy and the Debtors' network infrastructure*

Chile lies on the Nazca tectonic plate, one of the world's most seismically active regions. Chile has been adversely affected by powerful earthquakes in the past, including a 9.5 magnitude earthquake in 1960 which is the largest earthquake ever recorded, an 8.0 magnitude earthquake that struck Santiago in 1985, an 8.8. magnitude earthquake in 2010 in the central and south central regions of Chile, an 8.3 magnitude earthquake in 2014 in the northern part of Chile and an 8.3 magnitude earthquake in 2015 in the central region of Chile, which impacted the services of the then-existing Chilean mobile network operators. A severe earthquake could also cause a tsunami in coastal regions of Chile (for example, Valparaiso) which could also have a catastrophic effect on these regions and potentially the country as a whole. The occurrence of any of these, or other, natural disasters in the future could have an adverse impact on the Chilean economy and on us, including Debtors' business, results of operations and financial condition.

(iii)    *Developments in Chile or other emerging markets may adversely affect the Debtors*

Developments in Chile or other emerging markets, particularly in Latin America, may adversely affect the market for the Debtors' securities and the availability of foreign capital in Chile. We cannot predict whether events in other markets will adversely affect the price of, or market for, Debtors' securities.

Unfavorable general economic conditions, including an eventual recession in the United States and a recent financial crisis that affected the global banking system and financial markets, caused a decrease in the amount of foreign capital invested in emerging markets, including Chile and Latin America. In turn, this caused securities markets in many emerging markets, including Chile and Latin America, to decrease in value and led to depreciation of emerging market currencies compared to the U.S. dollar as a consequence of the COVID-19 pandemic. Further, significant concerns regarding the sovereign debt of numerous countries have developed recently and required some of these countries to seek emergency financing. Because international investors' reactions to the events occurring in one market sometimes affect other regions or disfavor certain investments, the Chilean economy could be adversely affected by negative economic or financial developments in other countries.

The Debtors operate in markets and regions that have been impacted by unrest and violence, including protests, organized crime, and terrorist attacks. Actions by groups or communities against governmental authorities or private entities may result in infrastructure being vandalized. This has the potential to materially and adversely affect the Debtors' business, assets, prospects and results of operations.

The Debtors cannot assure you that negative developments in Chile, Latin America or other emerging markets will not occur or that such negative developments would not adversely affect the securities markets in which the Debtors' securities trade or affect the Debtors' access to sources of financing.

(iv)     *Inflation and government measures to curb inflation may adversely affect the Chilean economy and the Debtors' business and results of operations*

Although Chilean inflation has been limited in the last ten years, Chile has experienced high levels of inflation in the past (mostly since Chile enacted exceptional laws during the COVID-19 pandemic that allowed pensioners to make early withdrawals from their pension accounts). High levels of inflation in Chile could adversely affect the Chilean economy and have an adverse effect on the Debtors' results of operations if such inflation is not accompanied by a matching devaluation of the local currency. The Debtors cannot assure you that Chilean inflation will not revert to prior levels in the future.

The measures taken in the past by the Chilean Central Bank to control inflation have included maintaining a tight monetary policy with high interest rates, thereby restricting the availability of credit and economic growth. Inflation, measures to combat inflation and public speculation about possible additional actions have also contributed materially to economic uncertainty in Chile and to heightened volatility in its securities markets. Periods of higher inflation may also slow the growth rate of the Chilean economy, which could lead to reduced demand for the Debtors' products and services and decreased sales. Inflation is also likely to increase some of the Debtors' costs and expenses, given that the majority of the Debtors' supply contracts are

155

denominated in foreign currencies or are indexed to the Chilean consumer price index, and the Debtors may not be able to fully pass any such increases on to the Debtors' subscribers and customers, which could adversely affect the Debtors' operating margins and operating income.

(v)    *Consumer protection laws may limit Debtors' ability to pass on fully any increases in prices due to inflation which may adversely affect Debtors' business and results of operation*

Under Law No. 19,496 on the Protection of Consumer Rights ("**CPA**"), consumers have the right to truthful and timely information regarding products and services, particularly regarding applicable prices and/or fees. This law sets out that standard form agreements (such as the ones WOM uses with its subscribers) may not include certain provisions that allow suppliers to unilaterally modify an agreement at its sole discretion or establish price increases for services, accessories, financing or surcharges, unless such increases correspond to additional services that may be accepted or rejected on a case-by-case basis. The National Consumer Service (*Servicio Nacional del Consumidor*) ("**SERNAC**") (the authority which oversees compliance with the CPA), has the power to supervise compliance with consumer protection regulations and to pursue the imposition of applicable fines and request damages and compensation for consumers before a court of law.

Under the CPA, operators may modify their prices or service fees based on objective conditions such as inflation rates or other indexation formulas, but these modifications must comply with the following requirements to be valid and enforceable against consumers: (i) any price adjustment or modification formula applicable to the contract must be clearly set out for the consumer in the purchase or service agreement and expressly accepted by the consumer; (ii) the operator must base the price adjustment on objective conditions that do not depend on the sole criterion of the supplier; and (iii) the price adjustment formula must be proportionate and reasonable in relation to the original price, and not entail excessive increases. If the Debtors are not able to predict accurately or cover for the inflation of prices in the Debtors' agreements with consumers, the Debtors may not be able to subsequently modify the agreements which may limit the Debtors' ability to pass on increases in prices to the Debtors' subscribers and have an adverse effect on the Debtors' business and results of operations.

(vi)    *Changes in tax laws or their interpretation could affect the Debtors' financial condition and the cash flows available to the Debtors in Chile*

Tax regulations in Chile are complex and are subject to frequent changes. The tax authorities' interpretation of the tax law is not homogenous and there are rather significant discrepancies between the judicial decisions issued by courts. There is a risk that the tax interpretations already obtained and applied by the Debtors in Chile will be changed or deprived of their protective power, which could lead to tax exposure for the Debtors. Consequently, there can be no assurance that the tax authorities will not question the accuracy of the Debtors' tax reporting and tax payments in Chile, in the scope of tax liabilities not barred by the statute of limitations, and that they will not determine tax arrears of the Debtors, which may have a material adverse effect on the business, financial standing, growth prospects or results of the Debtors.

156

(vii)   *Changes in the Chilean Labor Code may negatively impact the Debtors*

Labor regulations in Chile are subject to frequent changes. Recently enacted labor laws could affect employment-related costs of the Debtors:

- Effective April 26, 2024, Law No. 21,561 will gradually reduce the statutory working week from 45 to 40 hours in a 5-year term. The current maximum of 44 hours will be valid until 2026, when it will be reduced to 42. The final reduction to 40 hours is planned for 2028. This regulatory change could increase operational and labor costs by requiring adjustments to workforce management, also considering its implementation cannot result in the reduction of the employees' remunerations.

- Effective July, 2024, Law No. 21,578 increased the Monthly Minimum Wage ("**MMW**") from CLP 460,000 to CLP 500,000. Per the dispositions of such law, an automatic adjustment of the MMW according to the variation of the Consumer's Price Index between July and December 2024 was made effective on January 1, 2025, resulting in a current amount of CLP 510,510. This could increment the labor costs of the Debtors, since all full-time employees are entitled to a base salary equal to or higher than the MMW; other associated remunerations (e.g., legal profit-sharing) may vary per this minimum, if it is included in their calculation base.

- Effective from August 1, 2024, Law 21,643 on prevention, investigations and sanctioning of sexual and labor harassment and workplace violence, introduced several amendments and/or new regulations on said matters. Although these changes may not have a direct impact on the Debtors' costs, they could potentially lead to higher administrative expenses and an increase in litigation or claims.

Additionally, future labor laws could also affect employment-related costs of the Debtors:

- A bill of law is being discussed in the Chilean Congress to eventually modify the profit-sharing schemes regulated in the Chilean Labor Code. The current profit-sharing alternatives are the following: (a) according to Articles 47 and 48 of the Chilean Labor Code, distributing among the employees every fiscal year at least 30.0% of the net profits earned by the employer during that particular year, and (b) according to Article 50 of the Chilean Labor Code, paying to each employee an amount equal to 25.0% of the monthly wages accrued by the relevant employee during the fiscal year, limited to 4.75 times the MMW. According to this bill, companies will have to distribute to their employees between 8.0% to 15.0% of their annual net profits, a percentage that will depend on the amounts invoiced by the company during the respective annual period. The amount payable to each employee annually will be capped at 20 times the MMW. Furthermore, companies will have to make monthly payouts equal to 25.0% of the employee's monthly remuneration, capped annually at six times the MMW. This monthly payment will be attributable to the annual payment, in case the latter turns out to be higher.

It is unlikely that this bill will be passed or enacted in the near future.

Case 24-10628-KBO    Doc 1055    Filed 01/23/25    Page 168 of 189

SOLICITATION VERSION

- Also, in November 2022, the then-recently installed Chilean government proposed a bill to "*Create a new Combined Pension System and a Social Insurance in the contributing pension aid, improve the Guaranteed Universal Pension ("**GUP**") and establish benefits and regulatory amendments*".

Currently, the social security system in Chile is composed of: (i) a mandatory contribution of the employee's burden, equal to 10% of the employee's monthly remuneration, which is transferred to the employee's individual capitalization account with the Pension Fund Administrator ("**AFP**"). In case of dependent employees, the employer has the obligation to retain the corresponding sums and transfer them to the respective AFP; (ii) a voluntary contribution, that enables employees to voluntarily complement their pension funds; and (iii) a welfare contribution or pension aid ("*pilar solidario*"), which is a State's contribution to complement the pension funds of the poorest 60% of the population in Chile.

Main topics of the pension reform include: (i) gradual increase of the GUP to CLP 250,000; (ii) new contribution of the employer's burden calculated upon the employee's gross income - additional to the aforementioned 10% corresponding to the mandatory contribution of the employee's burden- to be implemented in a 9-year period; and (iii) reorganization of the AFP industry.

According to the most recent amendments introduced to the bill of law, the new contribution of the employer's burden would amount to 8.5% of each employee's gross remuneration, distributed as follows: (a) 4.5% to the employee's individual capitalization account, and, (b) 4% to a Social Insurance with the following breakdown: (i) 1.5% for a temporary repayable loan, intended to improve pensions of current retirees, and, (ii) 2.5% for the "Disability and Survival Insurance", which will also be partly destined to a new compensation to improve women's pensions.

Note that the "Disability and Survival Insurance" already exists and its approximate current contribution of 1.5% of the employee's remuneration, is of the employer's burden. Therefore, the actual increase of this new contribution is 7%.

The bill on the pension reform could be passed or enacted during 2025.

(viii) *The Chilean Government could seize or expropriate the Debtors' assets under certain circumstances*

Pursuant to Article 19 No. 24 of the Chilean Constitution, the Chilean government may exercise its eminent domain powers in respect of private assets, in the event such action is required to protect public interests. According to Decree Law No. 2,186 of 1978, eminent domain powers may be exercised through an administrative expropriation process, the result of which can be appealed before a court of law. In the case of expropriation, the Debtors would be entitled to compensation for the expropriated assets. However, the compensation may be lower than the price for which the expropriated asset could be sold in a free market sale or the value of the asset as part of an ongoing business, which may have a material adverse effect on the business, financial standing, growth prospects or results of the Debtors.

   (ix) *Exchange controls and restrictions thereof could impede the Debtors' ability to make payments under the Unsecured Notes*

  Exchange control risks may include: availability risk (the risk that even though the Debtors have sufficient Chilean peso-denominated revenues to meet the Debtors' obligations, U.S. dollars are not available for conversion); convertibility risk (the risk that a Chilean government entity will restrict, condition or terminate the Debtors' legal right to convert Chilean pesos into U.S. dollars); and transferability risk (the risk that a Chilean government entity will allow the Debtors to convert currency into U.S. dollars, but will place restrictions or prohibitions on those U.S. dollars leaving the country).

  There can be no assurance that further Chilean Central Bank regulations or legislative changes to the current foreign exchange control regime in Chile will not trigger certain exchange control risks, including by restricting or preventing the Debtors from acquiring U.S. dollars; or that further restrictions applicable to the Debtors will not affect the Debtors' ability to remit U.S. dollars for payment.

  There can be no assurance, nor can there be any assessment of the duration or impact of such restrictions if imposed.

   (x) *Changes in the Chilean regulatory environment may adversely affect the Debtors' business*

  The Debtors' business is highly regulated and depends substantially upon the regulatory environment in Chile. High levels of government regulation may limit the scope of its operations and its growth plans.

  The Debtors' business, financial condition, and results of operations may be adversely affected by changes in policy or regulations at the national, regional, provincial, or municipal level in Chile, involving or affecting factors such as:

- interest rates;
- currency fluctuations;
- monetary policies;
- inflation;
- liquidity of capital and lending markets;
- tax and social security policies;
- labor regulations; and
- other political, social and economic development in Chile.

  Uncertainty over whether the Chilean government will implement changes in policy or regulations affecting interests rates, taxes, social security, price controls, currency exchange and remittance controls, devaluations, capital controls and limits on imports or other factors may contribute to economic uncertainty in Chile. It may also contribute to heightened volatility in the relevant securities markets and securities issued abroad. These and other developments may adversely affect the Debtors and its business and results of operations.

(xi)    *Enforcement of the Plan and Confirmation may be difficult with respect to foreign creditors and tax authorities; no Chilean recognition of the Reorganization Transactions*

Even if the transaction is approved by the Bankruptcy Court, there may be no bankruptcy protection in Chile, as the U.S. bankruptcy proceeding has not been recognized in Chile and will not necessarily be accepted by Chilean creditors. Therefore, any protection granted to the sale or the Debtors under U.S. law and its effects on credits and claims will not automatically apply in Chile.

Many of the Debtors' creditors are located in Chile, and Debtors WOM Mobile, WOM, Conect and Multikom, are Chilean taxpayers. Foreign creditors with no connections with the United States may be unfamiliar with the protections afforded to chapter 11 debtors under the Bankruptcy Code or the extraterritorial application thereof. While any Confirmation Order would apply extraterritorially, foreign creditors may assert that they are not subject to U.S. jurisdiction and/or have minimal ties to the United States. Therefore, these creditors may consider not respecting the automatic stay and/or the resolutions of the US Bankruptcy Court (including the Confirmation Order),  challenging the Plan, initiating executive or bankruptcy proceedings against the Chilean Debtors in Chile, or pursuing litigation or claw-back actions, any of which could force the Debtors to commence additional actions and incur additional costs in order to enforce the Plan and Confirmation Order as to these creditors and avoid the commencement of local insolvency proceedings.

(xii)    *Risk relating to invocation of guaranties by SUBTEL for the 5G Project*

As detailed in Articles III.A and IV.K above, the Company has disputed SUBTEL's attempts to call certain guaranties submitted by WOM, totaling approximately $47.14 million, due to delays in completion of the 5G Project.

Should SUBTEL be permitted to call these guaranties, there is a significant risk that the Company's ability to restructure its debts and continue operations would be severely impacted, the Company may not be able to complete the 5G Project and other ongoing projects, and the Company's capacity to address unforeseen circumstances could be hindered. These outcomes could be catastrophic and eventually lead the Company into liquidation.

(xiii)    *Risks related to the Debtors' industry, business and regulation*

- **Macroeconomic conditions in Chile and the global financial markets could have a material and adverse effect on WOM's business, financial condition and results of operations.**

The Debtors operate in a heavily regulated market in Chile, where all its operations, property and customers are located. The Debtors are not geographically diversified, and, as a result, the business, financial condition and results of operations depend primarily on the macroeconomic and political conditions prevailing in Chile. In spite of the growth of the Chilean economy for the ten years preceding the COVID-19 outbreak (which caused a contraction of the Chilean economy for the year ended December 31, 2020), it cannot be assured that Chile's economy will resume its

160

growing path in the future, nor can be assured that future developments in or affecting the Chilean economy will not impair the ability to proceed with the business plan of the Debtors or materially adversely affect the business, financial condition or results of operations.

Although Chile has been relatively stable for several decades, starting in October 2019, protests took place throughout Chile, initially sparked over an increase in Santiago metro system fares. The protests and associated violence caused commercial disruptions throughout the country, especially in Santiago and other major cities, including Valparaiso and Concepcion, and mall closures and curfews, reducing foot traffic and business activities. In the last 5 years Chile has not experienced social disturbances or protests similar to the 2019 social unrest. It cannot be assured, however, that such disruptions could not happen again in the future.

As a company marketing its products and services solely to Chilean consumers, unfavorable economic conditions in Chile could materially affect the affordability of and demand for some of the Debtors' products and services. In response to difficult economic conditions, consumers may seek to reduce discretionary spending by forgoing purchases of such products, electing to use fewer premium services or obtaining products and services under lower-cost programs offered by competitors. Furthermore, adverse economic conditions may lead to an increased inability of WOM's customers to pay for services provided. If any of these events were to occur, they could have a negative effect on the Debtors' business and financial condition and results of operations.

Volatility in the global financial markets in recent periods has also resulted in volatility in the credit, equity, and fixed income markets. This volatility has limited Debtors' access to funding from time to time. For example, the outbreak of COVID-19 resulted in major disruptions in the global financial markets, including in Europe and the United States. If access to credit tightens and borrowing costs rise, the Debtors' costs could be adversely affected. Difficulties arising because of volatile financial markets may also adversely affect the financial health of the other telecommunications carriers to which the Debtors offer interconnection and other services, such as roaming.

For these reasons, macroeconomic and social conditions in Chile and the global financial markets may have a material impact on the Debtors' business, financial condition, and results of operations.

- **The impact of the COVID-19 pandemic has had an adverse effect on the Debtors' business and its financial results.**

In March 2020, the COVID-19 virus was declared a pandemic by the World Health Organization with cases around the world. Governments in affected areas took unprecedented steps to put restrictions on international, national and local travel and social gatherings, in each case, leading to economic, business and societal slowdowns and, in some cases, shutdowns. This had a material impact on Chile, as well as the Debtors' customers and local and international suppliers.

The Debtors' commercial business, mainly new sales, and its operating environment, were affected by COVID-19 pandemic-related lockdowns. Total gross additions decreased by 0.7% from the nine months that ended September 30, 2019, compared to the nine months that ended

September 30, 2020, due to the lower commercial activity during and after the COVID-19-related lockdowns in the main regions of Chile during the second and third quarters of 2020.

Continued disruptions to the Debtors' operations, the shift in focus to electronic commerce, and the impact on Debtors' customers, local and international suppliers, and the Chilean economy may materially impact the business, financial condition and results of operations.

- **The Chilean telecommunications industry is highly competitive, and increased competition could adversely affect the Debtors' business, financial condition and results of operations.**

The Chilean telecommunications industry market is highly competitive. The Debtors' competitors could provide handset subsidies or aggressive commercial promotions, provide free airtime or other services, or expand their networks or develop and deploy improved mobile technologies faster. In particular, the Debtors face significant competition with respect to the mobile voice and data offering and with respect to the mobile broadband offering.

We expect that competition in the Chilean market will continue to be high.

An increase in competition could lead to smaller operating margins, greater choices for subscribers and increasing movement of subscribers among competitors, which may make it more difficult for the Debtors to retain subscribers or add new subscribers. The cost of adding new subscribers may also continue to increase, and thus reduce profitability. In addition, as it costs more to acquire new subscribers than to maintain existing subscribers, high levels of subscriber deactivations could have an adverse effect on the Debtors' results of operations, even if the Debtors obtain one new subscriber for each lost subscriber.

While the Debtors' financial and operational performance in 2024 has been generally in line with the business plan distributed to potential bidders in July 2024, the Debtors' ability to continue to compete successfully will depend on their network coverage, the quality of the network and service, its rates, customer service, marketing and the ability to anticipate and respond to various competitive factors affecting the telecommunications industry, including new services and technologies, changes in consumer preferences, demographic trends, economic conditions and discount pricing strategies by competitors. If the Debtors are unable to respond to competition and compensate for declining prices by adding new subscribers, increasing usage and offering new services, the Debtors' business, financial condition and results of operations could be adversely affected.

- **The withdrawal of the Debtors' telecommunications concessions and licenses may adversely affect the business, financial condition or results of operations.**

Although the Debtors' telecommunications concessions and licenses are for a definite (but renewable) time, they may be revoked/cancelled because of the Debtors' past or future conduct. The Debtors require permits for the use of radio electric and radio magnetic spectrum, which are used for the operation of the Debtors' networks. The Debtors provide telecommunications services pursuant to the applicable telecommunications law and the terms and conditions of the concessions and licenses require the Debtors to provide such services in accordance with numerous technical requirements, minimum service quality standards and all other applicable laws.

162

These permits, concessions and licenses specify the operating conditions that the Debtors must meet, including the types of services the Debtors are permitted to offer and minimum specified quality and service conditions, and, upon certain circumstances, some aspects of such permits, concessions and licenses may be subject to review, interpretation, modification or termination by the relevant governmental authorities. If the Debtors fail to comply with these requirements, Chilean authorities could impose sanctions, such as fines or the revocation/cancellation of such concessions and licenses. In the event a concession or license is revoked/cancelled, the Debtors would be banned from applying for additional concessions or licenses for a period of five years following the date of such revocation/cancellation. Any nonrenewal, revocation/cancellation or modification of any of the governmental permits, concessions or licenses may adversely impact the Debtors' operations, their revenues, or their financial condition.

- **The Debtors expect a portion of their inflow of cash to be derived from state subsidies, including support under SUBTEL's Universal Service Fund. To the extent the Debtors are not successful in obtaining future subsidies, the Debtors' operating cash flow could be materially and adversely impacted.**

In October 2019, SUBTEL's Universal Service Fund (Fondo de Desarrollo de las Telecomunicaciones) (the "**FDT**") launched the FON Project to deploy 10,000 kilometers of optical fiber in specified regions of Chile. In April 2020, the Debtors were awarded subsidies in connection with the FON Project.

Currently, the Debtors have deployed the FON Project in certain macrozones, which are already providing services. The Debtors expect the FON Project to be fully completed in short order, taking into account the project's magnitude. However, if the Debtors are unable to achieve their commitments under the FON Project, subsidies may not be granted to the Debtors as expected, and performance bonds could be collected and fines could be imposed by the telecommunications authority, each of which could have a material adverse effect on the Debtors' business or results of operations.[42]

- **Debtors rely on national roaming to offer mobile telecommunications services to certain of Debtors' subscribers.**

The Debtors have entered into national roaming agreements with other telecommunication operators. Under these roaming agreements the Debtors are provided with network services that allow them to offer better mobile telecommunications services or network coverage to its subscribers in areas where the Debtors do not own radio network coverage.

While the Debtors have these national roaming agreements in place, they do not have direct control over the quality of the networks of other operators and the national roaming services they provide. Any difficulties or delays, or the failure of any operator to provide reliable services to the Debtors on a consistent basis, could result in a reduction of subscribers or a decrease in traffic, which would reduce the Debtors' revenues and could have a material adverse effect on the

---

[42]    Please refer to Article IV.K of the Disclosure Statement for the recent collection of the FON performance bonds.

business, financial condition, and results of operations.

- **The mobile telecommunications industry is subject to rapid technological change, which could adversely affect the Debtors' ability to compete effectively and/or affect its future financial performance.**

Companies in the telecommunications industry must adapt to rapid and significant technological changes that may be difficult to anticipate. These changes include, among others, evolving industry standards, ongoing improvements in the capacity and quality of digital technology, shorter development cycles for new products, and changes in end-user needs and preferences. New services and technological advances may also offer additional opportunities for competitors of the Debtors on the basis of cost, quality or functionality. It may not be practicable or cost-effective for the Debtors to replace or upgrade its installed technologies in response to competitors' actions.

If the Debtors are unable to meet future advances in competing technologies quickly and at an acceptable cost or if these services fail to gain acceptance in the marketplace, its ability to retain and attract subscribers could be reduced, adversely affecting the Debtors' business, financial condition and results of operations.

- **If the Debtors are unable to retain existing pre-paid subscribers and manage churn levels, these circumstances may have a material adverse effect on the business and operating results.**

Pre-paid subscribers do not enter into service contracts, which has historically made pre-paid subscribers more susceptible than post-paid subscribers to switching mobile service providers. If the Debtors are unable to retain existing pre-paid subscribers and manage churn levels, these circumstances could have a material adverse effect on the Debtors' business, financial condition and results of operations.

In the Chilean mobile market, it is common for pre-paid subscribers to rotate between SIM cards from multiple providers to avoid paying higher prices for calls made to numbers outside of a single network of subscribers, or off-net calls, what is known as "SIM card switching." Historically, off-net calls have been more expensive than calls made to numbers within a single network of subscribers, or on-net calls. For this reason, many pre-paid subscribers in Chile engage in SIM card switching, resulting in lower ARPU (average revenue per user/unit), which has negatively affected the Debtors' revenues with respect to subscribers who use Debtors' network as their primary service provider. If the Debtors are unable to effectively price and market its services, they could lose a larger percentage of the revenues due to a lower ARPU, which could have a material adverse effect on the Debtors' business, financial condition and results of operations.

- **If the Debtors are unable to maintain and enhance their brand's reputation, it may harm the business and operating results.**

As a consumer-oriented business, the Debtors' success depends on its brand recognition, and maintaining and enhancing the brand is critical to the business. In particular, the Debtors rely on subscribers as primary drivers of subscriber-driven marketing strategy, including through social

media platforms such as Facebook and Instagram, and any negative change to the perception of the brand among subscribers could have a material adverse effect on the business. A significant decrease in such social media interaction or an increase in the competitors' social media interactions, negative media attention or any negative comments online regarding customer service or other services could have a significant adverse effect on the Debtors' brand.

Likewise, if related dealers or third-party call centers do not maintain the stores or provide customer service up to Debtors' standards, it could adversely affect the brand's reputation.

The successful promotion of the Debtors' brand depends largely upon the quality of the services provided, the ability to differentiate Debtors from its competitors and the effectiveness of the marketing and public relations efforts. If the Debtors are not successful at maintaining and enhancing their brand, it could adversely affect the ability to attract new subscribers, and the Debtors could lose subscribers, third-party suppliers and dealers.

- **High levels of penetration of mobile phone services in the Chilean market could inhibit further growth.**

Although there are opportunities for further growth and gaining subscribers from other operators, high penetration rates in the Chilean market could lead to further slowdowns in growth. A failure to attract new subscribers and increase the ARPU of existing subscribers through the successful development of innovative value-added products and the services and implementation of state-of-the-art technology could have an adverse impact on the business, financial condition and results of operations.

- **A system failure could cause service delays or interruptions, which could cause the Debtors to incur fines and lose subscribers.**

To provide an effective service, Debtors need to continue to provide its subscribers with reliable service over its network. Some of the risks to the Debtors' network and infrastructure include:

- physical damage to infrastructure and networks from natural disasters such as earthquakes, tsunamis, floods and volcanic eruptions, among others;
- power surges or outages;
- software defects;
- breaches of security such as intentional acts of vandalism and theft transmission of computer viruses;
- software or connection disruptions beyond Debtors' control;
- limitations on the use of Debtors base stations; and
- disruptions due to changes in obsolete equipment.

The Debtors' operations rely on a stable supply of utilities. It cannot be assured that future supply instability or interruptions will not impair the Debtors' ability to procure the required utility services in the future, which could adversely impact their operations.

The Debtors' operations also rely on third parties for transmission through their fiber optic

network and for national roaming services. Despite the non-discrimination principle mandated by SUBTEL and contained in the Debtors' national roaming agreements, subscribers on the national roaming network roam on the network which is available in any given area. If these third parties limit the Debtors' transmission through their fiber optic networks or their national roaming services, the Debtors' ability to provide uninterrupted services could be negatively affected, which in turn could have a material adverse effect on the Debtors' operations.

Prolonged service interruptions can also affect the Debtors' business. The Debtors rely heavily on their network equipment, other telecommunications providers, data and software to support all its functions. In this sense, the Debtors can deliver their services only to the extent that they can protect their network systems against damage from power or data failures, computer viruses, natural disasters, unauthorized access, terrorist acts and other disruptions.

Article 27 of the General Telecommunications Law requires that telecommunication operators provide uninterrupted service to their subscribers. If a network outage lasts more than 48 hours (continuous or discontinuous) in a month (unless as a consequence of a force majeure event), the operator must reimburse subscribers three times the amount of their daily subscription fees during the period of such network outage as restitution. In the event of a network outage shorter than two days, the General Telecommunications Law requires operators to reimburse subscribers the amount of their subscription fees if the outage event exceeds six consecutive hours, or if multiple outage events exceed 12 non-consecutive hours in any given month. If the network outage lasts over three days, without SUBTEL's prior authorization and as consequence of causes unrelated to force majeure, SUBTEL can adopt all measures necessary to ensure the continuity of the service. If such measures are not effective within three months, the President of Chile may revoke/cancel the operator's concessions and order a public auction of the corresponding equipment, installations and assets. Debtors cannot make assurances that such revocations/cancellations of concessions and reimbursements will not be take place in the future.

The Debtors endeavor to prepare for failures of their network by creating backup systems and procedures, but they cannot guarantee that such backup systems and procedures will operate satisfactorily in an emergency. Should the Debtors experience a prolonged failure, it could seriously jeopardize their ability to continue operations. In particular, should a significant service interruption occur, the Debtors may be obligated to make material reimbursements, its subscribers may choose a different provider, the Debtors' reputation may be damaged, reducing their attractiveness to new subscribers, and the business, financial condition and results of operations of the Debtors' may be materially adversely affected.

- **The Debtors depend on third-party providers to provide network, services, equipment, and content to their subscribers.**

The Debtors' success and ability to grow their subscriber base depends on their ability to provide high-quality, reliable services, for which the Debtors rely, in part, on third-party providers of network, services, equipment and content over whom the Debtors have no direct operational or financial control. If any of these third-party providers fail to maintain their networks, offerings, or services properly, or fail to respond quickly to the Debtors' requirements, their subscribers may experience service interruptions, which could adversely affect the perceived reliability of the Debtors' services and, therefore, adversely impact their brand, reputation and growth.

166

The Debtors also rely on agreements with suppliers of handsets and devices. The Debtors do not have any direct operational or financial control over their key suppliers and have limited influence with respect to the way these key suppliers conduct their businesses. The Debtors' reliance on these suppliers also exposes them to risks related to delays in the delivery of their services. If any of the third parties that the Debtors rely on becomes unable to or refuses to provide the agreed services, facilities and equipment that the Debtors depend on in a timely and commercially reasonable manner or at all, it may result in temporary service interruptions or service quality problems. It cannot be guaranteed that these or other risks to the reputation of, and value associated with, the Debtors' brand will not materialize. If the Debtors' key suppliers are unable to provide adequate equipment and supplies, or to provide them in a timely manner, the Debtors' ability to attract subscribers or provide attractive offers could be negatively affected, which in turn could have a material adverse effect on the Debtors' business, financial condition, and results of operations.

- **The Debtors are subject to potential liabilities relating to their third-party service providers, which could have a material adverse effect on the business, financial condition and results of operations.**

The Debtors are subject to potential liabilities relating to their third-party service providers, including contractors that provide sales services, dealers, and site-building services contractors. Such potential liabilities may involve claims by employees of third-party service providers directly against the Debtors as if the Debtors were the direct employers of such employees, as well as claims against the Debtors for secondary liability for, among other things, wage parity, or overtime pay, in the event that such third-party service providers fail to meet their obligations with their employees. Significant judgments against the Debtors could have a material adverse effect on the Debtors' business, financial condition, and results of operations.

- **The Debtors are subject to delinquencies on their accounts receivable. If unable to limit payment delinquencies by their subscribers, or if delinquent payments by their subscribers increase, the Debtors' financial condition and results of operations could be adversely affected.**

The Debtors' business depends significantly on the subscribers' ability to pay their bills and comply with their obligations.

For this purpose, the Debtors rely on a wide range of bad debt management activities, including the ability to suspend their subscribers' account five days after payment is overdue, third-party collection as soon as 30 days after a payment is overdue, the deactivation of services between 90 and 120 days after a payment is overdue, publication of the name of Debtors' small and medium enterprise customers in the Commercial Information Directory ("**DICOM**") (which deters overdue payment as it makes the names of business debtors publicly available in Chile), and pursuing appropriate legal remedies. The Debtors maintain a provision for estimated credit losses based on formalized procedures which consider various factors that determine the probability of a subscriber's ability to pay receivables.

SUBTEL regulations may also prevent the Debtors from implementing certain policies that could have the effect of reducing delinquency, such as limitations on the publication of the names

167

of individuals in DICOM (as mobile telecommunications are considered a utility, this is not permitted), or implementing service restrictions or limitations on the types of services provided based on a subscriber's credit record. If the Debtors are unable to successfully implement policies to limit subscriber delinquencies or otherwise select its subscribers based on their credit records, persistent subscriber delinquencies and bad debt will continue to adversely affect the Debtors' operating and financial results.

In addition, if the Chilean economy declines due to, among other factors, a reduction in the level of economic activity, depreciation of the Chilean peso, an increase in inflation or an increase in domestic interest rates, a greater portion of the Debtors' subscribers may not be able to pay their bills on a timely basis, which would require an increase of their provisions for doubtful accounts and adversely affect the Debtors' financial condition and results of operations.

- **The Debtors' operations depend on their ability to maintain, upgrade and efficiently operate accounting, billing, customer service, information technology and management information systems.**

Sophisticated information processing systems are vital to the Debtors' growth and their ability to monitor costs, create monthly invoices for their services, process customer orders, provide customer service and achieve operating efficiencies. The proper functioning of the Debtors' accounting information and processing systems is critical to their business and their ability to compete effectively. Any failure in the Debtors' accounting, information and processing systems could impair their ability to collect payments from subscribers and respond satisfactorily to subscribers' needs, which could adversely affect their business, financial condition, and results of operations.

Backup data of the Debtors' key information and data processing systems are kept by Debtors which could be used in the event of a catastrophe or failure of the Debtors' primary systems, and Debtors have established alternative communication networks, where available. However, it cannot be assured that the business of the Debtors and their activities would not be materially disrupted if there were a partial or complete failure of any of these primary information technology systems or communication networks. Such failures could be caused by, among other things, software bugs, computer virus attacks or conversion errors due to system upgrading. In addition, any security breach caused by unauthorized access to information or systems, or intentional malfunctions or loss or corruption of data, software, hardware or other computer equipment, could have a material adverse effect on the Debtors' business, results of operations and financial condition.

The ability to remain competitive and achieve further growth will depend in part on the ability of the Debtors to upgrade their information technology systems and increase the Debtors' capacity on a timely and cost-effective basis. Any substantial failure to improve or upgrade information technology systems effectively or on a timely basis could materially and adversely affect the Debtors' competitiveness, results of operations, and financial condition.

- **The intellectual property rights the Debtors, their suppliers, or their service providers use may infringe on intellectual property rights owned by others.**

Some of the Debtors' products and services use intellectual property of the Debtors or licenses from third parties. Content services provided, such as ring tones or wallpapers, are received from content distributors, and the Debtors outsource certain services, including billing and customer care functions that incorporate or utilize intellectual property. The Debtors and some of their suppliers, content distributors and service providers have received, and may receive in the future, assertions and claims from third parties that the products or software utilized by the Debtors or their suppliers, content distributors and service providers infringe on the patents or other intellectual property rights of these third parties. These claims could require the Debtors or an infringing supplier, content distributor, or service provider to cease engaging in certain activities, including selling, offering, and providing the relevant products and services. Such claims and assertions could also make the Debtors subject to costly litigation and significant liabilities for damages or royalty payments or require the Debtors to cease certain activities or to cease selling certain products and services.

- **The Debtors could experience cyber-attacks, subscriber database piracy, other attacks of terrorism or vandalism or database security breaches, which may materially adversely affect their reputation, lead to subscriber lawsuits or loss of subscribers or hinder their ability to gain new subscribers and thereby materially adversely affect the business.**

The Debtors have been and may in the future be exposed to database piracy, unauthorized access or other database security breaches which could result in the leakage and unauthorized dissemination of information about their subscribers, including their names, addresses, home phone numbers, passport details and individual tax numbers. In addition, the breach of security of the Debtors' database and illegal sale or other unauthorized release of their subscribers' personal information could materially adversely impact their reputation, prompt lawsuits against the Debtors by individual and corporate subscribers, lead to violations of data protection laws and adverse actions by the telecommunications regulators and other authorities, lead to a loss in subscribers and hinder their ability to attract new subscribers. If severe customer data security breaches are detected, the regulatory authority may impose penalties for such breaches. In addition, the Debtors' network and IT infrastructure may be exposed to cyber-attacks, computer virus attacks or acts of terrorism or vandalism. Please be advised that some base stations have been subject to acts of vandalism and/or terrorism in politically active regions of the country. These risks are particularly applicable to the Debtors' base stations because they are spread across a wide variety of locations. This leads to risk of theft or vandalism at these sites, including by protestors who are concerned about health risks relating to base stations. Any such attack could result in equipment failures or disruptions in the Debtors' operations.

In addition, in early 2024 external consultants to WOM identified a cybersecurity issue in which personal information regarding a subset of WOM's new clients may have been exposed. The problem was solved by developing a microservice software with a 15-minute token to obtain the contracts with an encrypted URL. The microservice software was implemented, and since the implementation no further information has been exposed.

169

Likewise, between October 21, 2020 and November 17, 2020, Entel repeatedly accessed FIGMA (a WOM virtual platform) through an Entel institutional email account, where WOM stored confidential information regarding the development of a WOM TV project. As a result, WOM filed a lawsuit against Entel for acts of unfair competition related to unauthorized access and downloading confidential information of the WOM TV project from the collaborative platform FIGMA. WOM accused Entel of intervening in this platform to obtain confidential information regarding WOM's streaming TV project. The court issued an unfavorable ruling to WOM in the first instance (Rol C-9411-2021, 21st Civil Court of Santiago), and in August 2024 WOM filed an appeal before the Court of Appeals of Santiago.

Additionally, the Company recently filed criminal actions against former employees hired by competitors, where sensitive commercial and technical information may have been transferred.

In this regard, any inability to operate the network as a result of such events may result in significant expense or loss of market share. These factors, individually or in the aggregated, could have a material adverse effect on the Debtors' business, financial condition and results of operations.

- **The Debtors collect and process subscriber data as part of their routine business operations and the leakage of such data may violate laws and regulations which could result in fines, loss of reputation and subscriber churn and have a material adverse effect on their business, financial condition or results of operations.**

The Debtors collect, store and use data in the ordinary course of their operations, which is protected by Chilean Law No. 19.628 regarding Protection of Private Life and Personal Data (substantially amended in August 2024). Although the Debtors take precautions to protect subscriber data in accordance with applicable law, data privacy is a rapidly evolving area of focus for legislators and certain subscriber data may be leaked as a result of human error, willful misconduct, unauthorized access, or technological failure, or otherwise be used inappropriately. The Debtors work with independent and third-party suppliers, partners, dealers, service providers, and call centers, and the risk that such third parties could experience system failures involving the transmission of proprietary information or personal data cannot be discarded. If the Debtors or one of their partners or suppliers violates applicable data protection laws, this could result in fines, reputational harm and subscriber churn and could have a material adverse effect on the Debtors' business, results of operations or financial condition.

- **The Debtors' insurance coverage may not adequately cover losses resulting from the risks for which it is insured.**

The Debtors maintain insurance for the principal network facilities and other assets. Insurance coverage protects the Debtors in the event they suffer certain losses resulting from theft, fraud, expropriation, natural disasters, or other similar events. The Debtors cannot assure, however, that such insurance will be sufficient or will adequately cover all potential losses.

170

- **The Debtors are continually involved in disputes and legal proceedings that, if determined unfavorably, could have a material adverse effect on their business, financial condition and results of operations.**

The Debtors may also be exposed to litigation relating to labor, regulatory, tax and administrative proceedings, governmental investigations, tort claims and contract disputes, criminal prosecution, among other matters. The Debtors are continually involved in disputes and legal proceedings, including disputes and legal proceedings initiated by regulatory, competition and tax authorities as well as proceedings with competitors and other parties. Certain of these disputes may relate to key operational matters. In the context of these proceedings, the Debtors may not only be required to pay fines or money damages but also be subject to complementary sanctions or injunctions affecting the Debtors' ability to continue their operations. While the Debtors may contest these matters vigorously and make insurance claims when appropriate, litigation and other proceedings are inherently costly and unpredictable, making it difficult to accurately estimate the outcome of actual or potential litigation or proceedings.

Any such disputes or legal proceedings, whether with or without merit, could be expensive and time-consuming, could divert the attention of management and, if resolved unfavorably with respect to the Debtors, could harm the reputation and increase their costs, all of which could result in a material adverse effect on the Debtors' business, financial condition and results of operations.

- **The Debtors rely on the experience and talent of their managers and skilled employees, and the loss of some or all of these individuals could harm the business.**

The successful operation of the Debtors as well as the successful implementation of their strategy is dependent on the experience of their managers and key personnel. The future success of the Debtors depends in part on the ability to retain managers who have had a significant impact on the business development, as well as on the ability to attract and retain skilled employees able to effectively operate this business. There is intense competition for skilled personnel in the Chilean and global telecommunications industry. The Debtors cannot guarantee that they will be able to attract and retain such managers or skilled employees in the future. The loss of some or all of the key managers, or the inability to attract and appropriately train, motivate and retain qualified professionals, or any delay in doing so, could have a material adverse effect on the Debtors' business, financial results, results of operations and prospects.

- **Labor disruptions or increased labor costs could have a material adverse effect on the Debtors' business, financial condition, and results of operations.**

If the Debtors experience a material labor disruption, strike or material dispute with their employees, or labor costs are significantly increased in the business operations due to work stoppages or other such events that may affect the ability to conduct business, the Debtors may not be able to timely or cost effectively meet subscriber demands and provide the standard level of customer care, which could ultimately reduce their profitability. The Debtors have been in the past a party to labor disputes with sub-contractors and some of their employees on an individual basis. The Debtors cannot assure that these claims or future claims by employees will not have an adverse effect on the Debtors' business, financial conditions or results of operations. Additionally, labor issues that affect third parties that Debtors rely on for services and technology could also have a

171

material adverse effect on the Debtors if those issues interfere with Debtors' ability to obtain necessary services and technology on a timely basis. In addition, new regulations or changes in the existing labor laws may adversely affect the Debtors' business and their financial condition.

- **Alleged health risks of wireless communications devices could lead to decreased wireless communications usage or increased difficulty in obtaining sites for base stations.**

The Debtors are aware of various reports alleging that there may be health risks associated with the effects of electromagnetic signals from antenna sites and from handsets and other mobile telecommunications devices. The Debtors cannot assure that further medical research and studies will not establish a link between electromagnetic signals or radio frequency emissions and these health concerns. The actual or perceived risk of mobile telecommunications devices, press reports about risks or consumer litigation relating to such risks could adversely affect the size or growth rate of the Debtors and result in decreased mobile usage, reduction in the number of subscribers, increased difficulty in obtaining sites for transmitters and exposure to potential litigation or other liabilities or increased costs resulting from potential new regulations in this respect. If any of the above risks were to materialize, it may have a material adverse effect on the Debtors' business, financial condition, results of operations or prospects. In addition, these health concerns may cause the Chilean authorities to impose stricter regulations on the construction of the components of the Debtors' network, such as telecommunications network infrastructure, which may hinder the completion or increase the cost of network roll out and deployment and the commercial availability of new services.

- **The Debtors operate in a highly regulated environment and changes in regulation (either in Chile or internationally) may adversely affect the business, financial condition and results of operations.**

The telecommunication business is subject to extensive government regulation and can be adversely affected by changes in law, regulation, or regulatory policy. The licensing, construction, operation, sale, resale, competition, billing, environmental impact, radio frequency emissions and interconnection arrangements of wireless telecommunications systems in Chile are regulated to varying degrees by government or regulatory authorities.

New regulations or changes in the existing regulatory model may adversely affect the Debtors' business, financial condition, or results of operations.

The Debtors may also be subject to adverse changes in laws or regulations (or in the interpretation or enforcement thereof), which may allow more favorable conditions for the Debtors' competitors. In addition, Chilean regulators could expand their reach to markets which are currently not subject to regulation or impose additional restrictions on the Debtors' or the industry generally. It is difficult to predict the impact of any new laws or regulations affecting the Debtors' services, as well as any amendments to, or new interpretations of, the existing laws and regulations covering related activities. The same applies to new tax laws or tax regulations (or a change in the interpretation of existing tax laws and regulations by the tax authorities and tax courts). Such changes could increase the Debtors' costs of regulatory compliance or their tax burden, affect their ability to introduce premium and advanced services, or force the Debtors to

172

change their marketing and other business practices, which in turn could have a material adverse effect on the Debtors' business, financial condition, and results of operations.

SUBTEL has recently reorganized the radioelectric spectrum within the 3.5GHz frequency band. This reorganization is particularly significant because the 3.5GHz band is designated by Chilean regulations for providing 5G services in Chile. As a result of this refarming, some competitors of Debtors have gained access to a continuous 100MHz band, compared to the 50MHz currently held by the Debtors in the same band. If the Debtors are not able to acquire an additional 50MHz to achieve a continuous 100MHz spectrum in the 3.5GHz band, this may adversely affect their business, financial condition, or operational results.

    6.    <u>Additional Factors to be Considered</u>

        (i)    *The Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

        (ii)    *No Representations Outside the Disclosure Statement Are Authorized*

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court, or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

        (iii)    *No Legal or Tax Advice Is Provided to You by This Disclosure Statement*

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or Interests should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters concerning his, her, or its Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation of the Plan.

        (iv)    *No Admission Made*

Nothing contained in the Plan or Disclosure Statement will constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on Holders of Claims or Interests, or on the rights of any other Person or Entity.

        (v)    *Failure to Identify Litigation Claims or Projected Objections*

173

No reliance should be placed on the fact that a particular litigation Claim of the Debtors or Cause of Action or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement or in the Plan or Plan Supplement. The Debtors may seek to investigate, file, and prosecute Causes of Action, Claims and objections to Claims and Interests after the Confirmation Date or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Causes of Action, Claims, or objections to such Claims or Interests.

(vi)    *No Waiver of Right to Object or Right to Recover Transfers and Assets*

The vote by a Holder of a Claim or Interest for or against the Plan does not constitute a waiver or release of any claims, causes of action, or rights of the Debtors (or any entity, as the case may be) to object to that Holder's Claim or Interest, or for the Debtors to recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any claims or causes of action of the Debtors or their respective estates are specifically or generally identified in this Disclosure Statement, the Plan, or the Plan Supplement.

(vii)    *Risks Associated with Forward Looking Statements*

The financial information contained in this Combined Disclosure Statement and Plan has not been audited. In preparing the Disclosure Statement and Plan, the Debtors relied on financial data derived from its books and records that was available at the time of such preparation. Although the Debtors have used their reasonable business judgment to ensure the accuracy of the financial information provided in the Disclosure Statement and Plan, and while the Debtors believe that such financial information fairly reflects the financial condition of the Debtors, the Debtors are unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

(viii)    *Information Was Provided by Debtors and Was Relied Upon By the Debtors' Advisors*

The Debtors' advisors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

## IX.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have evaluated several alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming Confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative chapter 11 plan, or (ii) a liquidation under chapter 7 of the Bankruptcy Code.

### A.    Alternative Chapter 11 Plan

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to

file a Chapter 11 plan has expired or has been terminated), any other party in interest could attempt to formulate a different plan. Such alternative plan might involve either a reorganization and continuation of the Debtors' business, or an orderly liquidation of the Debtors' assets.

Alternatively, if the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell some or all of their assets under section 363 of the Bankruptcy Code. Upon analysis and consideration of this alternative, and having concluded an extensive marketing process, the Debtors do not believe that a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for Holders of Claims than what they would receive under the Plan.

### B.    Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law

If no plan can be confirmed, one or more of these Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The effect a chapter 7 liquidation would have on the recovery of Holders of Allowed Claims and Interests is set forth in the liquidation analysis attached hereto as **Exhibit C** (the "**Liquidation Analysis**").

The Debtors believe that reorganizing the Debtors' business under the Plan will provide Holders of Allowed Claims with a larger, more timely recovery because of the fees and expenses that would be incurred in a chapter 7 liquidation, including the potential added time and expense incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors and their estates and the complexities and uncertainties to carry out a liquidation of a going concern entity with respect to assets located in a foreign jurisdiction. The Debtors believe that, in the event of a liquidation under chapter 7, before creditors receive any distribution, additional administrative expenses involved in the appointment of a chapter 7 trustee and its retained professionals would cause a substantial diminution in the value of the Debtors' assets and the assets available for distribution to creditors would be reduced by such additional expenses. Further, a liquidation would result in the Debtors receiving less proceeds for certain assets the Debtors expect to recover following the Effective Date of the Plan.

Accordingly, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan; and that the Plan is in the best interests of creditors.

## X.    CONFIRMATION OF THE PLAN

### A.    General Requirements for Confirmation

Section 1129 of the Bankruptcy Code requires that, in order to confirm the Plan, the Bankruptcy Court must make a series of findings concerning the Plan and the Debtors, including that the Plan (a) complies with applicable provisions of the Bankruptcy Code, (b) has been proposed in good faith and not by any means forbidden by law, (c) is accepted by the requisite votes of holders of Claims (except to the extent that cramdown is available under section 1129(b) of the Bankruptcy Code); (d) is feasible and not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the

Plan, unless such liquidation is proposed in the Plan, (e) is in the "best interests" of all Holders of Claims and Interests impaired under the Plan; and (f) all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court, have been paid or the Plan provides for the payment of such fees on the Effective Date. The Debtors believe that the Plan satisfies section 1129 of the Bankruptcy Code.

### B.  Acceptance of the Plan

The Bankruptcy Code defines "acceptance" of a plan by a class of (i) Claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Claims that cast ballots for acceptance or rejection of the Plan and (ii) Interests as acceptance by interest Holders in that class that hold at least two-thirds (2/3) in amount of the Interests that cast ballots for acceptance or rejection of the Plan. Holders of Claims or Interests that fail to vote are not counted in determining the thresholds for acceptance of the Plan.

### C.  Confirmation Without Necessary Acceptances; Cramdown

If any impaired Class of Claims or Interests does not accept the Plan (or is deemed to reject the Plan), the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cram down" provisions set forth in section 1129(b) of the Bankruptcy Code. The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards that must be satisfied in order for the Plan to be confirmed, depending on the type of claims or interests in such class. The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the plan:

- **Secured Creditors**. Each holder of an impaired secured claim either (a) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such secured claim, (b) has the right to credit bid the amount of its claim if its property is sold and retains its lien on the proceeds of the sale, or (c) receives the "indubitable equivalent" of its allowed secured claim.

- **Unsecured Creditors**. Either (a) each holder of an impaired unsecured claim receives or retains under the plan, property of a value, as of the effective date of the plan, equal to the

amount of its allowed claim or (b) the Holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- **Interests**. Either (a) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such equity interest and (ii) the value of the equity interest or (b) the Holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the plan.

**IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED.**

### D.    Best Interests Test

The Bankruptcy Code requires that each holder of an impaired claim or interest either (i) accepts the plan or (ii) receives or retains under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is customarily referred to as the "best interests test."

The Debtors believe that the value of any distributions to Holders of Allowed Claims and Interests in a chapter 7 case would be less than the value of distributions under the Plan.

The Liquidation Analysis is a comparison of (i) the estimated recoveries for creditors and equity holders of the Debtors that may result from the Plan and (ii) an estimate of the recoveries that may result from a hypothetical chapter 7 liquidation. The Liquidation Analysis is based upon a number of significant assumptions which are described therein. The Liquidation Analysis is solely for the purpose of disclosing to Holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that the Bankruptcy Court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### E.    Feasibility

The Bankruptcy Code requires that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. This requirement is often referred to as the "feasibility" requirement. The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtors or any successor under the Plan.

To demonstrate feasibility of the Plan, the Debtors, in consultation with their advisors, have prepared the financial projections (the "**Financial Projections**"), attached hereto as **Exhibit D**. The Financial Projections are necessarily based on many estimates and assumptions, though considered reasonable at the time of preparation, may not be achieved and are subject to significant

uncertainties and contingencies, many of which are outside of the Debtors' control. Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect actual financial results. Therefore, the actual results may vary materially from the projected results and such variations may be material and adverse.

### F.   Notices and Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a chapter 11 plan. The Confirmation Hearing is scheduled on March 6, 2025 at 9:30 a.m. (prevailing Eastern Time). The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing, at any subsequent adjourned Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules for the Bankruptcy Court, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' estates or property, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, together with proof of service thereof, and served on the Debtors, counsel to the Consenting Noteholders, counsel to the Committee and certain other parties, by no later than February 27, 2025, at 4:00 p.m. (prevailing Eastern Time), pursuant to the notice of the Confirmation Hearing that accompanies this Disclosure Statement.

If to the Debtors, to:

WOM S.A.
General Mackenna 1369
Santiago, Chile
Attention: Eduardo Andrés Jara Arnal
eduardo.jara@wom.cl

*and*

Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attention: John Knight, Amanda Steele
knight@rlf.com; steele@rlf.com

White & Case LLP
200 South Biscayne Blvd., Suite 4900
Miami, FL 33131
Attention: John K. Cunningham; Richard S. Kebrdle
jcunningham@whitecase.com;
rkebrdle@whitecase.com

*and*

White & Case LLP
1221 Avenue of the Americas
New York, NY 10020
Attention: Phil Abelson; Andrea Amulic
phillip.abelson@whitecase.com;
andrea.amulic@whitecase.com

If to the Committee, to:

Willkie Farr & Gallagher LLP
787 Seventh Avenue

McDermott Will & Emery LLP
The Brandywine Building

New York, New York 10019
Attention: Brett Miller; Todd Goren; James H.
Burbage c
bmiller@willkie.com;    tgoren@willkie.com;
jburbage@willkie.com

1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Attention: David Hurst
dhurst@mwe.com

If to the Consenting Noteholders, to:

Dechert LLP
1095 Avenue of the Americas
New York, New York 10036
Attention: Allan Brilliant, Stephen Wolpert
allan.brilliant@dechert.com;
stephen.wolpert@dechert.com;

Young Conaway Stargatt & Taylor, LLP
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Attention: Robert Brady, Robert Poppiti
rbrady@ycst.com; rpoppiti@ycst.com

---

> **UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

## XI.    CONCLUSION AND RECOMMENDATION

The Debtors believe that the Plan is in the best interests of the Debtors, their estates, and all stakeholders, and urge Holders of Claims in Classes 3 and 4 to vote in favor thereof.

Dated: January 23, 2025

Respectfully submitted,

WOM S.A., on behalf of itself and each of the other Debtors

By:  _/s/ Christopher S. Sontchi_
Name: Christopher S. Sontchi

Member, Special Committee of each of the Debtors and Debtors-in-Possession, solely in his capacity as such