**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| WOM S.A., *et al.*, | Case No. 24-10628 (KBO) |
| | (Jointly Administered) |
| Debtors. [1] | |
| | **Re: Docket Nos. 1054, 1055** |

**OBJECTION OF BANCO DE CRÉDITO E INVERSIONES TO
CONFIRMATION OF THE AMENDED JOINT CHAPTER 11 PLAN OF
REORGANIZATION FOR WOM S.A. AND ITS AFFILIATED DEBTORS**

Banco de Crédito e Inversiones ("BCI"), a creditor in one of the above-captioned jointly administered cases,[2] by and through its undersigned counsel, hereby submits this objection (the "Objection") to confirmation of the *Amended Joint Chapter 11 Plan of Reorganization for WOM S.A. and Its Affiliated Debtors* [Docket No. 1054] (the "Plan"). The Debtors' Plan is substantially flawed, as it fails to meet the Bankruptcy Code's requirements for confirmation in multiple respects. For the reasons set forth below, BCI respectfully urges the Court to deny confirmation of the Plan. In support of this Objection and incorporated herein by reference is the *Motion of Banco de Crédito e Inversiones for Allowance and Payment of Administrative Expense* (the "Admin Claim Motion") [Docket No. 1158][3] and *Declaration of José Miguel de la Cerda in Support of the Motion of Banco de Crédito e Inversiones for Allowance and Payment of Administrative Expense* (the "Cerda Decl.") [Docket No. 1158-1]. In further support of this Objection, BCI states as follows:

---

[1] The Debtors in these chapter 11 cases (the "Chapter 11 Cases") are as follows: Kenbourne Invest S.A.; NC Telecom II AS; WOM Mobile S.A.; WOM S.A.; Conect S.A.; and Multikom S.A. The location of the Debtors' service address in these Chapter 11 Cases is: General Mackenna No. 1369, Santiago, Chile.

[2] BCI is also a member of the Official Committee of Unsecured Creditors (the "Committee").

[3] Undefined terms herein shall have the same meaning ascribed to them in the Admin Claim Motion [Docket No. 1158].

# BACKGROUND

## A.    WOM, BCI, and the BCI's Claims

1.    WOM S.A. ("WOM") is a large Chilean telecommunications provider.  It filed a voluntary Chapter 11 petition in this Court on April 1, 2024 (the "Petition Date"), along with its two parent companies and three other affiliates (collectively, the "Debtors").

2.    A corporate organizational chart is included the *Disclosure Statement for Amended Joint Chapter 11 Plan of Reorganization for WOM S.A. and its Affiliated Debtors* [Docket No. 1055] (the "Disclosure Statement") at Exhibit B.   It shows the two parent companies of WOM to be debtor WOM Mobile S.A. (with 99.99% of the equity of WOM) and debtor NC Telecom II AS (with 0.01 % of the equity of WOM).  The other three debtor-affiliates are: Kenbourne Invest S.A., Conect S.A., and Multikom S.A.  *See* Disclosure Statement, Ex. B.

3.    BCI is a Chilean bank.  Prepetition, BCI performed substantial banking services for WOM. *See* Cerda Decl. ¶ 4.

4.    BCI holds both general unsecured claims and an administrative expense claim against WOM.  BCI's general unsecured claims against WOM fall into three categories, one of which is comprised of contingent claims.  All four categories of its claims (three general unsecured, one post-petition administrative expense) are described in the proof of claim that BCI submitted on September 27, 2024, as Claim No. 137 (the "BCI Claim") and the Admin Claim Motion.[4]

5.    The Debtors filed objections (the "Claim Objection") to the contingent portion of BCI's claim ion February 4, 2025 [Docket No. 1088].  BCI filed a response in opposition to the Claim Objection on February 25, 2025 (the "Claim Objection Response") [Docket No. 1155], which is fully incorporated herein by reference.

---

[4] The BCI Claim is attached as Exhibit 4 to the Cerda Decl.

6.      In the Claim Objection, the Debtors purport to describe BCI's Claim, although they only described the three categories of BCI's general unsecured claim.  The combined value (in U.S. dollars) of the two non-contingent parts of BCI's claim against WOM amount to approximately $56.5 million.  In their Claim Objection, the Debtors acknowledge that BCI is entitled to vote that amount in the class of general unsecured creditors.  *See* Claim Objection, ¶ 13, n.5.

7.      The contingent pat of BCI's claim is based on Boletas de Garantía that BCI issued on behalf of WOM to various Bond Beneficiaries. These Boletas de Garantía have varying expiration dates, with the last one expiring in December 2026.  Currently, there are 48 Boletas de Garantía still in force, with a total value of approximately $5.15 million.  *See* Cerda Decl., Ex. 1. When BCI filed its proof of claim, there were 142 Boletas de Garantía that were outstanding. *See* Admin Claim Motion ¶ 22.

8.      The basic terms that apply to all these Boletas de Garantía were set in an overarching, master credit agreement between WOM and BCI that the parties entered into in 2020 – a "*contrato de apertura de línea de crédito destinada a cubrir eventuales pagos de boletas de garantía.*"  Admin Claim Motion ¶ 6.

9.      BCI's administrative expense claim originated from the April 12, 2024 presentment by Apple Chile Comercial Limitada ("Apple"), to BCI of a Boletas de Garantía[5] issued on behalf of WOM.  This Boletas de Garantía facilitated WOM's purchase of Apple products and led to the execution of a promissory note from WOM to BCI, dated April 12, 2024 (the "Apple Promissory Note").  The current value of BCI's administrative expense claim, based on the Apple Promissory

---

[5]  The Debtors have referred to Boletas de Garantía as "Surety Bonds" – although their characteristics are more like letters of credit.

17202124/5

Note, is approximately $4.7 million.  *See generally* Cerda Decl.

10. The Debtors' Claim Objection does not address the Apple Promissory Note claim, nor does it include its $4.7 million value in the calculation of the general unsecured claim that BCI would be eligible to vote on regarding the Plan.

11. On February 25, 2025, BCI filed its Admin Claim Motion. However, their expectation that the motion would go unchallenged was quickly dispelled.  The Debtors informed BCI that they would oppose the motion, asserting that the claim should be treated as a prepetition claim. *See* Docket No. 1163.

12. In addition to BCI's claims against WOM, the Debtors scheduled BCI with an undisputed claim against debtor Conect S.A. in the *de minimus* amount of $7,791.95.

13. Aside from BCI's claims against WOM and the *de minimus* scheduled claim against debtor Conect S.A., BCI holds no claims against any other debtor in these cases.

## OBJECTION

14. BCI objects to confirmation of the Plan on several grounds and urges the Court to deny its confirmation.  The Debtors have opted for a Plan that caters heavily in favor of the Ad Hoc Group, while relegating the holders of general unsecured claims to treatment that is inequitable and inadequate, and likely not be feasible relative to what the Debtors have represented will be the distributions to general unsecured creditors.

**I.     The Debtors' Assets and Liabilities, and Substantive Consolidation Fail to Demonstrate that Creditors Are Better Off under the Plan than they Would in a Chapter 7 Liquidation.**

15. At the outset of these cases, this Court entered an *Order Directing Joint Administration of the Debtors' Chapter 11 Cases for Procedural Purposes Only* (the "Joint Admin Order") [Docket No. 58], which states: "[t]he procedural consolidation shall be for administrative

purposes only and nothing contained in the Motion or this Order shall be deemed or construed as directing or otherwise effecting the substantive consolidation of the Chapter 11 Cases."  Joint Admin Order ¶ 6.

16.    The Debtors each filed schedules of their assets and liabilities. The excerpts of Debtors' summary of assets and liabilities (the "Summary Schedules") [Docket No. 487], attached hereto as **Exhibit A**, show what the Debtors have represented as the assets and liabilities of each Debtor. The Summary Schedule for WOM shows *assets* exceeding liabilities by approximately $66,000. *Id.*  Kenbourne is also shown as net-positive—but that appears to be based on the guarantees of the other debtors rather than its own assets.

17.    By contrast, the other debtors are shown to be woefully in the red, with *liabilities* exceeding their assets, in each case, by over $600 million. *Id.*

18.    It appears that while BCI is a creditor only of WOM, the Debtors' Plan attempts a substantive consolidation.

19.    The Plan states:

> The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

Plan, Art. IV, Part A (emphasis added).

20.    A Chapter 11 debtor must demonstrate that creditors are better off under the plan than they would in a Chapter 7 liquidation, typically shown through a "liquidation analysis" included with the plan or disclosure statement. *See* 11 U.S.C. § 1129(a)(7).  However, in this case, there is no evidence supporting the non-consolidation of the Debtors. The Plan proposes a single class of general unsecured creditors for all Debtors combined, ensuring uniform treatment for all within that class. Additionally, the Debtors have only provided a single, consolidated liquidation

analysis for all the Debtors (the "Liquidation Analysis"), which is attached as Exhibit C to the

Disclosure Statement.  The Debtors attempt to justify this based on purported cross-guarantees for

Kenbourne's debt, but this fails to explain how WOM would fare in a stand-alone bankruptcy.

### a.    The Plan Improperly Attempts a *Sub Rosa* Substantive Consolidation

21.    The substantive consolidation of multiple affiliated debtors in the same bankruptcy

case is, though not entirely impermissible, highly discouraged, and the standard to be met for a

court to allow it is a strict one.  *See In re Owens Corning*, 419 F.3d 195, 208-209 (3d Cir. 2005)

(*as amended*) ("there appears nearly unanimous consensus that it is a remedy to be used

'sparingly.'"). That is why the Debtors' Plan insists that there is no substantive consolidation being

done here.

22.    In its leading case on the subject, the Third Circuit explained:

> [Substantive consolidation] brings all the assets of a group of entities into a single
> survivor. Indeed, it merges liabilities as well. "The result," to repeat, "is that claims
> of creditors against separate debtors morph to claims against the consolidated
> survivor." *In re Genesis Health Ventures,* 402 F.3d at 423. The bad news for certain
> creditors is that, instead of looking to assets of the subsidiary with whom they dealt,
> they now must share those assets with all creditors of all consolidated entities,
> raising the specter for some of a significant distribution diminution.

*In re Owens Corning*, 419 F.3d at 206, citing *In re Genesis Health Ventures, Inc.*, 402 F.3d 416 (3d

Cir. 2005).

23.    The Third Circuit cited several key principles applicable to consideration of

whether substantive consolidation should be permitted.   One of them is:

> Limiting the cross-creep of liability by respecting entity separateness is a
> "fundamental ground rule[ ]." …. As a result, the general expectation of state law
> and of the Bankruptcy Code, and thus of commercial markets, is that courts respect
> entity separateness absent compelling circumstances calling equity (and even then
> only possibly substantive consolidation) into play.

*Id*. at 211.

24.     Another key principle is:

Mere benefit to the administration of the case (for example, allowing a court to simplify a case by avoiding other issues or to make postpetition accounting more convenient) is hardly a harm calling substantive consolidation into play.

*Id*.

25.     The standard set by the Third Circuit is as follows:

In our Court what must be proven (absent consent) concerning the entities for whom substantive consolidation is sought is that (i) prepetition they disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity,[19] or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors.

*Id*.

26.     To the extent the Debtors seek to confirm a sub rose plan, they cannot meet this standard— nor have they attempted to.  Instead, they have simply declared, counter-factually, that their consolidation of all the creditors from all six debtors into one large class with the same treatment is not what it seems.  They have made no attempt to provide BCI and other creditors only of WOM, the entity with the assets, the benefit of being creditors of WOM and not the other debtors.  That is not permissible.

**II.     The Plan Fails to Adequately Address the Distinct Claims of WOM's Creditors.**

27.     In Chapter 11 reorganizations, it is common practice for the debtor's equity interests to be canceled when equity holders cannot make a sufficient contribution of new value to retain their ownership interest.  In the Debtors' Plan, this is precisely what happens to the equity interests of WOM's parent companies—NC Telecom II and WOM Mobile.  *See* Plan, Art. III, Part G, § 6.  But that is not what is being proposed for WOM itself.  Instead, WOM's *equity* interests are transferred to the sponsor of the Plan (in other words certain members of the ad hoc group).  This approach would not be problematic if only the parent companies were in bankruptcy.

However, BCI is a creditor of WOM, not its parent companies. The Plan does not propose to pay BCI (or other creditors solely of WOM) in full.

### III. The Plan Fails to Provide an Adequate Reserve for Administrative Claims and is Therefore Is Not Feasible.

28.     According to the Debtors' Liquidation Analysis, the Debtors have planned for making payments for three specific categories of administrative expense claims (*i.e.*, claims allowable under 11 U.S.C. § 503 that, if allowed, must be paid on a plan's effective date). Those three categories are: (i) intercompany administrative claims ($22.5 million); (ii) backstop put premium and expenses reimbursement ($76.1 million); and (iii) section 503(b)(9) claims ($6.3 million).

29.     As detailed the Admin Claim Motion, BCI's administrative expense claim is based, alternatively, on sections 346(a) and 503(b)(1) of the Bankruptcy Code. *See* Admin Claim Motion. On April 12, 2024, BCI extended credit for the benefit of WOM post-petition to pay Apple on a Boletas de Garantía, issued for WOM's benefit, which Apple presented for collection. Pursuant to WOM's agreement with BCI, a post-petition promissory note was executed on that date, covering the amount collected plus interest, expenses and stamp tax payments. Although the original amount was CLP 9,000,000,000, the principal amount owed was later reduced by nearly half. On May 29, 2024, an agreement was reached between Apple, WOM and BCI, confirmed by email, whereby Apple refunded nearly half to BCI. BCI then issued a new Boletas de Garantía to Apple for the amount that was refunded, and the principal amount owed by WOM to BCI under the "Apple Promissory Note" was also reduced by the amount that Apple refunded. All of these transactions constituted credit transactions in the "ordinary course," as expressly authorized by this Court when it granted, on an interim and then final basis [Docket Nos. 86, 218 and 421], the Debtor's first day motion seeking authority to continue their "surety bond" programs post-petition,

in the ordinary course of business [Docket No. 11] (the "<u>Surety Bonds Motion</u>").   The Surety Bond Motion expressly referred to, among others, the surety bonds issued by BCI for Apple as beneficiary.

30.    The principal amount that WOM owes BCI under the Apple Promissory Note is approximately $4.7 million.   That represents roughly 75% of the total allocated for section 503(b)(9) claims—except that it is not a section 503(b)(9) claim, and there is no indicated reserve for paying it.

31.    The Notes to the Liquidation Analysis expressly states: "Other Administrative Claims are likely to be asserted, but this Liquidation Analysis makes no assumptions regarding such other Claims."  Disclosure Statement, Ex. C. Note III.C.

32.     Furthermore, the Plan provides that the "Administrative Claims Bar Date"— deadline for filing requests for allowance of administrative expense claims—is 30 days after the Effective Date of the Plan. So, the actual amounts theoretically due on the Effective Date might not be known until after that date, and consequently it will remain unknown whether the sponsors of the Plan have in their discretion left enough aside to pay them.  *See* Plan, Art. I, Part A, § 11 (definition of "Administrative Claim Estimate")*; see also* Plan, Art. II, Part B, § 1 (stating allowed administrative claims to be paid in full by the Reorganized Debtors, "as soon as reasonably practicable after the Effective Date").

33.    Under the Plan, the general unsecured creditors are to be paid, *pro rata*, from a "GUC Cash Pool" *See* Plan, Art. II., Part B, § 4.  The GUC Cash Pool is defined, in Art. I, Part A, § 101, to start at $72.5 million, but then be reduced by a complicated formula that includes, in part, the amounts paid as Administrative Expenses.  This reduction makes the represented range of distribution for Class 4 creditors in the Disclosure Statement likely infeasible, as it does not

account for the $4.7 million administrative expense owed to BCI.

**b. The Plan's Failure to Adequately Provide for Payment of Administrative Expenses Renders the Feasibility of the Plan Dubious and Likely Increases the Disparity of Treatment between Classes 3 and 4.**

34.     All allowed administrative expenses are, under the Bankruptcy Code, entitled to be paid in full on the effective date of the Plan.  11 U.S.C. § 1129(a)(9)(A).

35.     Nominally, the Plan says the Debtors intend to pay all the allowed administrative expense claims by the Effective Date or as soon as practicable after that. But the Debtors have known for about eleven months about BCI's administrative expense claim—and their ordinary course of business obligation, as approved by the Bankruptcy Court in the Surety Bonds Motion, including specifically the obligation arising from the Boletas de Garantía issued by BCI to Apple— which the Debtor expressly referred to in the schedule accompanying their Motion.

36.     Yet there is no reserve identified to pay it, and no information on the source of the funds to pay it.   Indeed, the Debtors do not intend to gather all the administrative claims until 30 days after the Effective Date.  The Plan indicates that someone is making an "estimate" of the likely administrative expense claims, but there is no evidence that it will consider the obligation to pay BCI's administrative expense claim.

37.     Without clear evidence on this, the Debtors should not be able to rely on just wishful thinking.  There is simply no assurance that such funds as will be made available to pay the administrative expense claims will be sufficient to pay those claims in full or even close to full.

38.     The Plan purports to treat Classes 3 and 4, both of which are classes of unsecured claims, roughly equally, so as to avoid running afoul of the requirement that similar claims be treated similarly. *See* 11 U.S.C. § 1129(b)(1); *In re Barney & Carey Co.*, 170 B.R. 17, 25–26 (Bankr. D. Mass. 1994) (stating the debtor could not establish that the disparate treatment did not

constitute unfair discrimination).

39.     Here, in view of the formula for the GUC Cash Pool, under which the starting figure may be reduced under a formula that in part takes into account administrative expense payments made, the Cash Pool that will ultimately be available may be materially reduced from the starting $72.5 million.  The effect of that could both be to render unfeasible the projected recoveries and also materially increase the disparity of treatment between Class 3 and Class 4.   For that reason, the Plan cannot be confirmed in its present form.

## IV.     The Plan Violates the Absolute Priority Rule.

40.     Section 1129(a)(8) of the Bankruptcy Code requires, for confirmation, either that each class of claims either has accepted the plan or is unimpaired by the plan.  11 U.S.C. § 1129(a)(8).  But if neither of those alternatives is satisfied, a plan can still be "crammed down" on the non-accepting class if a non-insider class has accepted the plan, and the plan is "fair and equitable" with respect to the impaired, non-accepting class. 11 U.S.C. § 1129(b)(1).

41.     The plan may be found 'fair and equitable" as to a non-accepting class of unsecured creditors if either the plan provides for payment in full or that no holders of interests that are junior to the claims will receive or retain any property.  11 U.S.C. § 1129(b)(2)(B). *See In re Union Meeting Partners*, 165 B.R. 553, 569 (Bankr. E.D. Pa. 1994), *subsequently aff'd,* 52 F.3d 317 (3d Cir. 1995).  This is often referred to as the "absolute priority rule."

42.     The Plan violates the absolute priority rule as to creditors of WOM. It does not cancel the equity interest in WOM. To the contrary, those interests are fully retained and passed along, as if just another set of assets, from the current parent companies to a "newco' that will hold the equity instead.   If only the parent companies were in bankruptcy, that would not violate § 1129(b)(2)(B). But WOM itself is in bankruptcy; and BCI, as a creditor is not being paid in full,

11

while the equity interests in WOM are retained.  That renders this Plan unconfirmable.

**V.    The Boletas de Garantía Credit Agreements between WOM and BCI Are Executory; and They Should Either Be Assumed or Rejected.**

43.    The 2020 "*contrato de apertura de línea de crédito destinada a cubrir eventuales pagos de boletas de garantía*" between WOM and BCI—the master credit agreement setting the terms applicable to all the Boletas de Garantía and any promissory notes if a Boletas de Garantía is presented for collection—is executory.  There are obligations clearly due on both sides.  *See In re Evans Prods. Co.*, 91 B.R. 1003, 1006 (Bankr. S.D. Fla. 1988).

44.    On January 30, 2025, the Debtors filed their list of executory contracts that they will or may assume. [Docket No. 1072]. The "*contrato de apertura de línea de crédito destinada a cubrir eventuales pagos de boletas de garantía*" is not included on this list, indicating that the Debtors are rejecting it.

45.    As noted above, the "*contrato de apertura de línea de crédito destinada a cubrir eventuales pagos de boletas de garantía*" was not on the list that the Debtors filed of executory contracts they might assume.  In this instance, due to the fact that there are Boletas de Garantía outstanding that were issued for WOM's benefit and held by third parties.

46.    As set forth more fully in BCI's Claim Objection Response, if WOM, upon emerging from bankruptcy, does not intend to honor its contracts with BCI going forward, it would be an outrageous and improper use of bankruptcy to proceed as if, *post*-bankruptcy, BCI should still be held to pay out the amount stated in a Boletas de Garantía upon presentment by its beneficiary, but have no recourse against a reorganized WOM.  As a result, these contracts should be assumed, or, alternatively, rejected.

47.    During the bankruptcy case, the Debtors deemed this issue sufficiently important that they submitted a first day motion to ensure that they could continue to honor their agreements

12

with BCI and other sureties.  To leave BCI's obligations in place even while WOM is rejecting any ongoing obligations would be an abuse of the bankruptcy process. BCI reserves all rights on this issue.

## JOINDER

48.     BCI hereby joins in the plan objections filed by the Excluded Noteholders as well as any other plan objections not inconsistent with those set forth herein.

## RESERVATION OF RIGHTS

49.     BCI reserves the right to amend and supplement this Objection and make such other and further objections, as it deems necessary or appropriate. BCI further reserve the right to join any objections filed by others that are not inconsistent with the objections raised herein.

WHEREFORE, for the foregoing reasons, BCI respectfully objects to the Debtors' Plan, submits that the Plan cannot be confirmed in its present form, and  requests  that  the  Court  deny its confirmation and grant such other relief as it deems just and proper.

Dated:  February 27, 2025

**MORRIS JAMES LLP**

*/s/ Tara C. Pakrouh*
Eric J. Monzo (DE Bar No. 5214)
Tara C. Pakrouh (DE Bar No. 6192)
Douglas N. Candeub (DE Bar No. 4211)
Siena B. Cerra (DE Bar No. 7290)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801
Telephone: (302) 888-6800
Facsimile: (302) 571-1750
E-mail: emonzo@morrisjames.com
          tpakrouh@morrisjames.com
          dcandeub@morrisjames.com
          scerra@morrisjames.com

-and-

17202124/5

**RIED FABRES LTDA.**
José Miguel Ried, Esq. (admitted *pro hac vice*)
Cristián Fabres, Esq. (admitted *pro hac vice*)
Ricardo Abogabir, Esq. (admitted *pro hac vice*)
Av. El Bosque 500 Piso 14
Las Condes, 7550049
Santiago, Chile
Telephone: (562) 64659649
E-mail: jmried@riedfabres.cl
         cfabres@riedfabres.cl
         rabogabir@riedfabres.cl

*Counsel to Banco de Crédito e Inversiones*

17202124/5