# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>WOM S.A., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-10628 (KBO)<br><br>(Jointly Administered)<br>Hearing Date: March 6, 2025, at 9:30 a.m. (ET)<br>Re: D.I. 1054, 1110, 1111 |

## AMENDED OBJECTION OF AD HOC GROUP OF EXCLUDED NOTEHOLDERS TO THE AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR WOM S.A. AND ITS AFFILIATED DEBTORS

The Benesch Ad Hoc Group of Noteholders (the "Excluded Noteholders"), by and through their undersigned counsel, hereby submit this amended objection, which shall supersede and replace their Preliminary Objection in its entirety,[2] to the to the *Amended Joint Chapter 11 Plan of Reorganization for WOM S.A. and its Affiliated Debtors* [D.I. 1054] (the "Plan"),[3] filed by the above-captioned debtors (collectively, the "Debtors") on January 23, 2025, and in support state as follows:[4]

---

[1] The Debtors in these chapter 11 cases (these "Chapter 11 Cases"), and each Debtor's federal tax identification number in their applicable jurisdiction of incorporation, are as follows: Kenbourne Invest S.A. (2018 2206 815); NC Telecom II AS (59.208.720-0); WOM Mobile S.A. (99.517.000-0); WOM S.A. (78.921.690-8); Conect S.A. (96.965.220-k); and Multikom S.A. (78.456.640-4). The location of the Debtors' service address in these Chapter 11 Cases is: General Mackenna No. 1369, Santiago, Chile.

[2] The "Preliminary Objection" is the *Preliminary Objection of Ad Hoc Group of Excluded Noteholders to the Amended Joint Chapter 11 Plan of Reorganization for WOM S.A. and its Affiliated Debtors* [D.I. 1110]. For the avoidance of doubt, this Objection, and the arguments herein, is intended to supersede the Preliminary Objection in its entirety, and the Excluded Noteholders only intend to press the narrow arguments set forth in this Objection at the hearing to consider confirmation of the Plan. As such, the Excluded Noteholders also no longer intend to rely on, or introduce, the *Declaration of Joshua Nahas of Dundon Advisers, LLC in Support of Preliminary Objection of Ad Hoc Group of Excluded Noteholders to the Amended Joint Chapter 11 Plan of Reorganization for WOM S.A. and its Affiliated Debtors* [D.I. 1111] in connection with the confirmation hearing.

[3] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

[4] Certain of the Excluded Noteholders elected to participate in the Rights Offering in order to maximize their recoveries in the event that this Objection is overruled, and the Plan is confirmed and consummated. However, such participation should not be construed as a waiver of this Objection or as an acceptance of the Plan.

**PRELIMINARY STATEMENT**

1.  As set forth in their Preliminary Objection, the Excluded Noteholders initially had concerns regarding the manner in which the transactions contemplated by the Plan, and the BCA and PSA, were selected by the Debtors and the Special Committee. However, after hearing from other stakeholders in these Chapter 11 Cases and reviewing discovery materials that have been produced by the parties to date, the Excluded Noteholders no longer intend to press these issues by and through this Objection. In short, the Excluded Noteholders recognize that a Court-approved marketing process was run during these Chapter 11 Cases and that—like it or not—the bid submitted by the Ad Hoc Group of WOM Noteholders (the "Favored Noteholders"), now memorialized by the Plan, appears to have been the only viable option on the table, in light of the Court's February 25th hearing on the Excluded Noteholders' Motion to Compel.[5]

2.  That said, the simple fact that the Plan was purportedly the 'only show in town' does not *per se* mean that it complies with the Bankruptcy Code's mandates for confirming a plan of reorganization. And it does not. As further detailed below and in their Backstop Objection,[6] the Excluded Noteholders respectfully submit that the Plan violates section 1123(a)(4) of the Bankruptcy Code by conferring substantial compensation and other benefits upon the Favored Noteholders that are not being made available to *identically* situated creditors (*i.e.*, holders of the very same unsecured notes). In short, the Favored Noteholders stand to receive a substantial premium to other noteholders in Class 3 due to the lucrative Backstop Put Premium and other

---

[5] *Motion of Ad Hoc Group of Excluded Noteholders for Entry of an Order Compelling the Debtors to Provide Access to Virtual Data Room and Other Non-Public Information in Accordance With the Fiduciary Out Provisions of the Support Agreements* [D.I. 1122] (the "Motion to Compel").

[6] *Objection of Ad Hoc Group of Excluded Noteholders to Debtors' Motion for Entry of an Order (I) Authorizing and Approving (A) Entry Into the Plan Sponsor Agreement, (B) Entry Into the Backstop Commitment Agreement, and (C) Incurrence of Certain Payment and Indemnification Obligations and (II) Granting Related Relief* [D.I. 912] (the "Backstop Objection").

Commitment Obligations exclusively conferred upon them through the Plan and the BCA. They are also being granted effectively full and complete control over the Reorganized Debtors and their Board.

## OBJECTION[7]

3.      "Equality of distribution among creditors is a central policy of the Bankruptcy Code." *In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013); *see also Begier v. IRS*, 496 U.S. 53, 58 (1990) (same). Accordingly, section 1123(a)(4) of the Bankruptcy Code provides that a plan of reorganization "*shall*," among other things, "provide the same treatment for each claim or interest of a particular class." 11 U.S.C. § 1123(a)(4) (emphasis added). This provision "embodies the principle that all similarly situated creditors in bankruptcy are entitled to equal treatment." *In re Energy Future Holdings Corp.*, 648 F. App'x 277, 283 (3d Cir. 2016). Courts have interpreted the Bankruptcy Code's mandate of equal treatment of all claimants in a class to include an "*equal opportunity* to recover on their claims." *W.R. Grace*, 729 F. 3d at 327 (emphasis added) (referencing *In re Dana Corp.*, 412 B.R. 53, 62 (S.D.N.Y. 2008) ("The key inquiry under § 1123(a)(4) is not whether all of the claimants in a class obtain the same thing, but whether they have the same opportunity" to recover on their claims)).

4.      Unequal treatment exists when a nominally independent pre-plan transaction allocates a preferential recovery to one group of creditors over a similarly situated group of creditors in exchange for an affirmative plan vote. In *Pacific Drilling*, Judge Wiles applied these

---

[7] On December 20, 2024, this Court issued its *Order (I) Authorizing and Approving (A) Entry into the Plan Sponsor Agreement (B) Entry into the Backstop Commitment Agreement, and (C) Incurrence of Certain Payment and Indemnification Obligations and (II) Granting Related Relief* [D.I. 959] (the "Backstop Order") which fully reserved the rights of parties in interest, including the Excluded Noteholders, to object to the Plan or any of its provisions at confirmation. Backstop Order at ¶ 16. This Court also indicated at the hearing to approve the BCA that the Excluded Noteholders' Plan objections were preserved for confirmation: "Plan objections raised by the excluded noteholders are preserved and will be addressed at confirmation, if and when that occurs. I'll take them seriously and I'll listen to them, and I'll make my decisions based on the law at that time." December 20, 2024 Hr'g Tr., at 51:1–5, *In re WOM S.A.*, No. 24-10628 (KBO). A copy of this transcript is attached as **Exhibit A**.

3

principles to a backstopped rights offering he evaluated in connection with a proposed plan of reorganization, elaborating that:

> The theory of the Bankruptcy Code is that when the big creditors sit in a room and negotiate a deal, the little creditors who are in the same boat get the same deal. The Bankruptcy Code does not permit the unequal treatment of creditors in the same class; it also does not permit the payment of extra compensation to large creditors in exchange for their commitment to vote for a plan. The problem with special allocations in rights offerings, or with private placements that are limited to the bigger creditors who sat at the negotiating table, or big backstop fees that are paid to the bigger creditors who sat at the negotiating table but that are not even open to other creditors (and in particular to other creditors in the same class), is that it is far too easy for the people who sit at the negotiating table to use those tools primarily to take for themselves a bigger recovery than smaller creditors in the same classes will get. The Code allows for reasonable financing terms but they must be reasonable, and they cannot just be a disguised means of giving bigger creditors a preferential recovery.

*In re Pac. Drilling S.A.*, Case No. 17-13193 (MEW), 2018 WL 11435661, at *2 (Bankr. S.D.N.Y. Oct. 1, 2018). In such cases, the transaction forms part of a "package deal" that permits one creditor group to capture the lion's share of the class recovery under the plan at the expense of similarly situated class members who are preemptively excluded from the transaction.

5. Indeed, recent case law has similarly found that the disparate treatment analysis is one of substance rather than form. It can encompass a proposed plan distribution that appears on its face to treat similarly situated creditors alike, but which, in substance, grants meaningfully greater recoveries to one subset of creditors over another. For example, in *Excluded Lenders v. Serta Simmons Bedding, L.L.C. (In re Serta Simmons Bedding, L.L.C.)*, the Fifth Circuit Court of Appeals found that a plan which provided class members with a settlement indemnity whose effective value "varied dramatically" between class members based on whether such members had participated in a prepetition financing transaction "violated the [Bankruptcy] Code's requirement of equal treatment" because "some class members received settlements with higher effective values than their co-class members." 125 F.4th 555, 591-92 (5th Cir. 2024). The result was that,

for those class members that had participated in the financing transaction, "the indemnity was potentially worth millions or even tens of millions of dollars," whereas for those who had not, "the indemnity was worth little or even nothing." *Id.* In "look[ing] below the surface to determine whether the distributions were in fact equal in value," the Fifth Circuit held that the practical effect of the plan's settlement indemnity violated section 1123(a)(4)'s requirement of equal treatment. *Id. See also In re Quigley Co.*, 437 B.R. 102, 148 (Bankr. S.D.N.Y. 2010) (plan resulted in unequal treatment of similarly situated creditors, because non-settling claimants, unlike settling claimants, had to release "valuable" derivative claims and therefore pay greater consideration to get the same distribution); *In re Dow Corning Corp.*, 280 F.3d 648, 659-60 (6th Cir. 2002), *overruled on other grounds*, *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204 (2024), (plan violated section 1123(a)(4) when it "accorded far more effective recovery rights" to Canadian governmental payers than to similarly situated creditors in the United States, because plan integrated practical mechanisms to allow Canada to recover on its claims, while "leav[ing] the United States with a highly uncertain and contingent mechanism to protect its interests"); *In re Aov Indus.*, 792 F.2d 1140, 1152 (D.C. Cir. 1986) (explaining it is "disparate treatment when members of a common class are required to tender more valuable consideration . . . in exchange for the same percentage of recovery" as plan class members who are required to tender less valuable consideration).

6.  Under the foregoing analysis, the Plan unequivocally violates section 1123(a)(4)'s requirement of equal treatment. *First*, the Plan provides an outsized recovery to the Favored Noteholders through the Backstop Commitment Agreement (the "BCA") and the Backstop Put Premium at the expense of other holders of the Debtors' unsecured notes in Class 3 and other general unsecured claimants in Class 4. Specifically, the Plan provides that all Unsecured Notes Claims in Class 3 and General Unsecured Claims in Class 4 will receive, among other things, their

5

share of the "New Secured Notes/Equity Treatment." This, in turn, entitles the claimant to a share of (a) take back secured notes, (b) reorganized equity, and (c) subscription rights in the rights offering. However, under the BCA, the Favored Noteholders are also receiving the Backstop Put Premium, which entitles them to an additional $62.5 million in the form of Backstop Put Premium Notes. This is simply a disguised direct allocation of the same new notes that are offered to other Class 3 and 4 claimants as part of the rights offering. Thus, by definition, the Favored Noteholders will receive more than the Excluded Noteholders, along with any other members of Class 3 or 4, because they are afforded the opportunity to acquire substantially more new notes than the remaining claimants in those classes. Arguments made by the Debtors that the Backstop Put Premium and other backstop fees are being paid to the Favored Noteholders solely as consideration for their backstop commitments, rather than on account of their prepetition claims, are belied by the fact that all of the comparable rights offerings backstop arrangements listed in the Debtors' supplemental declaration in support of the BCA involve backstop commitments from existing creditors or stakeholders—rather than from third parties.[8] Under each such scenario, a prepetition creditor's backstop commitment is inextricably linked to its recovery under the plan, and thus forms part of its distribution on account of its prepetition claim.

7. *Second*, the Plan also effectively gives the Favored Noteholders full corporate authority and control over the Reorganized Debtors. Specifically, the Plan provides that the initial board of directors (the "Board") of the Reorganized Debtors shall consist of five (5) directors, including a CEO and the "Initial AHG Directors," or "one director appointed by each member of the Ad Hoc Group." *See* Plan Art. I, § A(115) (defining "Initial AHG Directors"); Plan, Art. IV,

---

[8] *Supplemental Declaration of Marcelo Messer in Support of the Debtors' Motion for Entry of an Order (I) Authorizing and Approving (A) Entry into the Plan Sponsor Agreement, (B) Entry into the Backstop Commitment Agreement, and (C) Incurrence of Certain Payment and Indemnification Obligations and (II) Granting Related Relief* [D.I. 938-1].

§ I ("Officers and Boards of Directors"). This memorializes the terms of the "Governance Term Sheet" appended to the PSA, which sets forth the incredibly one-sided governance terms secured by the Favored Noteholders in addition to the benefits bestowed upon them under the BCA and in exchange for their support of their favored Plan construct. *See* PSA, Ex. D, Annex IV (New HoldCo Governance Term Sheet).

8.  And that term sheet makes crystal clear that the Favored Noteholders will have full control over any significant actions requiring Board approval, by designating the vast majority of such actions as "Supermajority Board Matters" that conveniently require the approval of only four out of the five total Board members (*i.e.*, the Favored Noteholders' directors alone). *See* PSA, Ex. D, Annex IV, Annex A (Approval Matrix). This includes certain decisions with respect to the New Convertible Notes being issued in connection with the Plan's Rights Offering that the Favored Noteholders themselves will largely control post-emergence.[9] Thus, not only will the Favored Noteholders be allocated an outsized portion of the Reorganized Debtors' capital structure, they will also unilaterally control the Reorganized Debtors' Board and go-forward governance. And, in sum, the Plan clearly and unequivocally confers a disproportionate share of the value of the Debtors' estates to the Favored Noteholders.

9.  The Debtors' and the Favored Noteholders' position is that the Backstop Put Premium and the other Commitment Obligations are being afforded to the Favored Noteholders based on their commitments in the BCA, rather than on account of their prepetition claims. In support, they have referred to cases such as *In re LATAM Airlines Grp., S.A.*, 643 B.R. 756, 767-

---

[9] The Plan, of course, makes clear that any claimants that stand to receive the New Equity Securities to be issued—including the Excluded Noteholders and other holders of the Debtors' unsecured notes—are deemed to be bound by these governance terms and the related New HoldCo Organizational Documents. Plan, Art. IV, § E(2). Any such recipients are also required to execute the New HoldCo Shareholder Agreement as a condition to their receipt of those securities. The Plan makes clear that the New HoldCo Shareholder Agreement must mirror the favorable treatment afforded to the Favored Noteholders and memorialized in the Support Agreements and the New HoldCo Governance Term Sheet. *See* Plan, Art. I, § A(150).

69 (S.D.N.Y. 2022); *In re Peabody Energy Corp.*, 933 F.3d 918, 925-26 (8th Cir. 2019). But these cases are not binding on this Court. The Excluded Noteholders also respectfully submit that, to the extent the court in *LATAM* found that similarly-situated creditors were not receiving unequal treatment on account of their prepetition claims, that portion of the opinion was incorrectly decided. And, as set forth further above, other courts in the same jurisdiction have seemingly reached a different result, but have simply approved similar arrangements where no constituents objected. *See, e.g.*, *Pac. Drilling*, 2018 WL 11435661, at *5. The Eighth Circuit's opinion in *Peabody* is also distinguishable because, as the court there noted, the objecting group of noteholders "could have participated in the Private Placement [at issue] at any phase had they timely taken the necessary actions to qualify." 933 F.3d at 926. Not so here. The Excluded Noteholders have repeatedly sought to be included in the group of Backstop Parties, but have been stonewalled by the Favored Noteholders and their counsel.

10.     This is intentional and highlights the inherently inequitable nature of the BCA: the Favored Noteholders wish to preserve all of the lucrative benefits it provides for themselves, notwithstanding the willingness of other similarly situated creditors to participate on identical terms. *See* Sept. 18, 2018 Hr'g Tr., at 102:25–103:7, *In re Pac. Drilling S.A.*, No 17-13193 (MEW) (Bankr. S.D.N.Y. Sept. 18, 2018) ("Everybody's fighting to keep the opportunity for themselves because it's such . . . a plum opportunity that they don't want to share with other people. . . . They want to keep it for themselves because it is valuable.").[10] Indeed, the issue is not simply that the Favored Noteholders are exclusively being afforded the Backstop Put Premium and other Commitment Obligations; the issue is that they are exclusively being afforded the opportunity to receive those benefits.

---

10    A copy of this transcript ruling is attached hereto as **Exhibit B**.

11.     The Debtors' and the Favored Noteholders' position also elevates form over substance: the transactions contemplated by the Plan and the BCA are clearly tied. Collectively, they make clear that the Debtors secured the Favored Noteholders' affirmative votes for the Plan—a right that is linked to a holder's prepetition claims—in exchange for the lucrative compensation they are given under the BCA. *See, e.g.*, PSA § 4(c) (milestone requiring approval of BCA by December 20th); PSA § 5(a) (Favored Noteholders' agreement to support plan and related "Reorganization Transactions"); BCA § 6.1(i) (automatic termination if PSA terminated). As the Fifth Circuit did in *Serta*, this Court should "look below the surface" at the aggregate value of the benefits that are being provided to the Favored Noteholders at the expense of the Excluded Noteholders and the other members of Classes 3 and 4. 125 F.4th at 592. When properly viewed from this lens, it becomes clear that the Plan violates section 1123(a)(4) of the Bankruptcy Code.

*[Remainder of page intentionally blank]*

## **CONCLUSION**

WHEREFORE, for the reasons set forth above, the Excluded Noteholders respectfully request that the Court deny confirmation of the Plan.

Dated: February 27, 2025　　　　　　　**BENESCH, FRIEDLANDER,**
　　　　Wilmington, Delaware　　　　　　　　**COPLAN & ARONOFF LLP**

　　　　　　　　　　　　　　　　　　　　 /s/ Steven L. Walsh
　　　　　　　　　　　　　　　　　　　Michael J. Barrie (DE #4684)
　　　　　　　　　　　　　　　　　　　Steven L. Walsh (DE #6499)
　　　　　　　　　　　　　　　　　　　1313 N. Market Street, Suite 1201
　　　　　　　　　　　　　　　　　　　Wilmington, Delaware 19801
　　　　　　　　　　　　　　　　　　　Telephone: (302) 442-7010
　　　　　　　　　　　　　　　　　　　Email: mbarrie@beneschlaw.com
　　　　　　　　　　　　　　　　　　　　　　　swalsh@beneschlaw.com

　　　　　　　　　　　　　　　　　　　-and-

　　　　　　　　　　　　　　　　　　　Sven T. Nylen (*pro hac vice*)
　　　　　　　　　　　　　　　　　　　71 S. Wacker Drive, Suite 1600
　　　　　　　　　　　　　　　　　　　Chicago, Illinois 60606
　　　　　　　　　　　　　　　　　　　Telephone: (312) 212-4949
　　　　　　　　　　　　　　　　　　　Email: snylen@beneschlaw.com

　　　　　　　　　　　　　　　　　　　*Counsel for the Benesch Ad Hoc Group of Noteholders*