**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>WOM S.A., *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 24-10628 (KBO)<br><br>(Jointly Administered) |

**OBJECTION AND RESERVATION OF RIGHTS OF PHOENIX TOWER INTERNATIONAL CHILE SPA TO PLAN AND DEBTORS' NOTICE OF CURE AMOUNTS AND POTENTIAL ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH CHAPTER 11 PLAN**

Phoenix Tower International Chile SpA ("**PTI**"), by and through its undersigned counsel, files this objection and reservation of rights (the "**Objection**") to the (i) *Amended Joint Chapter 11 Plan of Reorganization for WOM S.A and its Affiliated Debtors* [D.I. 1054] (including any exhibits, schedules, and supplements thereto and as may be amended, restated, supplemented, or otherwise modified from time to time, the "**Plan**")[2] and (ii) *Notice of (i) Potential Executory Contracts or Unexpired Leases to be Assumed Pursuant to the Plan, (ii) Fixing of the Cure Costs Related Thereto, and (iii) Deadline to Object Thereto* [D.I. 1072] (including any exhibits and

---

[1] The Debtors in these chapter 11 cases (these "**Chapter 11 Cases**"), and each Debtor's federal tax identification number in their applicable jurisdiction of incorporation, are as follows: Kenbourne Invest S.A. (2018 2206 815); NC Telecom II AS (59.208.720-0); WOM Mobile S.A. (99.517.000-0); WOM S.A. (78.921.690-8); Conect S.A. (96.965.220-k); and Multikom S.A. (78.456.640-4). The location of the Debtors' service address in these Chapter 11 Cases is: General Mackenna No. 1369, Santiago, Chile.

[2] Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in the Plan.

schedules thereto and as may be amended, restated, supplemented, or otherwise modified from time to time, the "**Assumption Schedule**").[3]

## PRELIMINARY STATEMENT

1. PTI is the Debtors' largest tower lessor with over 3,000 telecommunications infrastructure sites leased to WOM. Through the Assumption Schedule, the Debtors propose to assume all of their contracts with PTI and offer a cure amount of approximately USD $44 million. PTI believes that the cure amounts are significantly higher but has been engaged in constructive discussions with the Debtors and their advisors (and more recently the Ad Hoc Group's advisors) to negotiate the terms of the Debtors' and PTI's go forward contracts and an agreement on cure amounts. PTI is hopeful that those negotiations can be finalized and the parties can achieve consensus soon. PTI files this Objection to preserve its rights in the event that an agreement cannot be reached.

2. As described in further detail below, PTI asserts that the correct cure amount is no less than USD $129,258,990. Consistent with the Debtors' Assumption Schedule and Plan, to the extent that the Debtors dispute PTI's asserted cure amount, the Court should direct the Debtors to pay the undisputed cure amount of USD $44,007,525 on the Effective Date of the Plan and reserve the balance of PTI's asserted cure amount (USD $85,251,465) in an escrow account pursuant to an escrow agreement reasonably acceptable to PTI. In addition, PTI objects to the portion of Section VII.D of the Plan and any other provision of the Plan or Confirmation Order that purports to give the Debtors or the Ad Hoc Group the right to modify their decision to assume PTI's contracts in the event the Court determines a cure amount in excess of the Debtors' asserted

---

[3] PTI is a member of the Official Committee of Unsecured Creditors (the "**UCC**") appointed in these chapter 11 cases and one of the UCC's co-chairs. PTI files this objection solely in its own capacity and not on behalf of the UCC.

cure amount or resolves the cure dispute unfavorably to the Debtors. Section 365(d)(4) mandates that the Debtors make a final irrevocable determination regarding the assumption of non-residential real property leases at or before the applicable 365(d)(4) deadline, which has passed.

## BACKGROUND

3. PTI and its affiliates comprise a global wireless infrastructure platform that owns and operates wireless tower infrastructure in 25 countries and has both active tower construction and M&A activity. PTI is the Debtors' largest tower lessor. In July 2022, WOM S.A. ("**WOM**") entered into a sale and leaseback agreement with PTI to sell 3,800 of its network towers to PTI. Pursuant to this transaction, WOM sold a total of 2,597 network towers for a net payment of approximately USD $670 million in 2022. The agreement contemplated a further sale of 1,203 network towers from WOM by December 31, 2024 for which WOM would receive additional proceeds. To date, WOM has sold an additional 482 network towers to PTI in exchange for approximately USD $85 million in net proceeds.

4. Pursuant to the Sale-Leaseback Agreements (as defined below), the Debtors lease, sublease, or have been granted the right to access and utilize certain space on, PTI's telecommunications infrastructure, associated facilities and/or sites owned and/or operated by PTI in order to install and operate their own equipment for the purposes of operating telecommunications networks.

5. WOM and PTI are parties to certain unexpired leases and executory contracts that govern the sale-leaseback transaction, including (i) that certain Asset Purchase Agreement, dated July 1, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "**APA**"), pursuant to which PTI purchased from WOM various cell tower sites and infrastructure located in Chile; (ii) that certain Master Lease Agreement, dated August 12,

2022 (as amended, restated, supplemented or otherwise modified from time to time, the "**MLA**"), pursuant to which WOM leases various cell tower sites and infrastructure located in Chile from PTI; (iii) that certain side letter to the MLA and the APA, dated November 21, 2023 (as amended, restated, supplemented or otherwise modified from time to time, the "**November 2023 Side Letter**"); (iv) that certain side letter to the MLA and APA, dated January 9, 2024 (as amended, restated, supplemented or otherwise modified from time to time, the "**January 2024 Side Letter**"); and (v) the agreements and arrangements entered into by the parties at each Subsequent Transfer (as defined in the APA) (as amended, restated, supplemented or otherwise modified from time to time, the "**Subsequent Transfers Arrangements**" and, collectively with the APA, MLA, the November 2023 Side Letter and the January 2024 Side Letter, the "**Sale-Leaseback Agreements**").

6. The Debtors' obligations under the Sale-Leaseback Agreements are comprised of (i) base rent and reimbursement for ground rent, (ii) the applicable value added tax, (iii) use of land/space fees arising in connection with the Debtors' use of site locations, (iv) certain other interest, fees and reimbursements due set forth in the Sale-Leaseback Agreements (such obligations described in clauses (i) – (iv), the "**Monthly Rent**") and (v) the sale by WOM of additional network towers to PTI and the lease of such sites back to WOM. Pursuant to the MLA, all payments made to PTI shall be made in CLP and, for each invoiced amount calculated in USD, the calculation for conversion of that USD amount into CLP shall be made according to the '*dólar observado*' exchange rate between USD and CLP most recently published by the Central Bank of Chile as at the date the relevant invoice was issued. MLA § 7.3(a)(ii)(C), 7.5(a).

7. The Debtors failed to pay the prepetition Monthly Rent due and owing under the Sale-Leaseback Agreements from and after January 2024.

8. On April 1, 2024 (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code with the United States Bankruptcy Court for the District of Delaware (the "**Court**").

9. On September 27, 2024, PTI filed protective proofs of claim numbers 141, 156, 158, 163, 164 and 167 (collectively, the "**Proofs of Claim**") in the event the Sale-Leaseback Agreements were rejected, against each Debtor, asserting a general unsecured claim based on the Sale-Leaseback Agreements in the amount of no less than CLP $98,599,843,589.

10. PTI hereby asserts an updated cure amount of USD $129,258,990 (the "**Cure Amount**").[4] The Cure Amount includes prepetition Monthly Rent, interest due and payable under the Sale-Leaseback Agreements through the Effective Date[5], amounts owed to PTI on account of sites delivered that are not in compliance with the terms of the APA, other damages, rent and amounts as a result of non-compliance with the APA and professional fees incurred by PTI in connection with these chapter 11 cases. Specific details of each of PTI's asserted defaults have been provided to the Debtors, their advisors and the Ad Hoc Group's advisors.

11. On January 23, 2025, the Debtors filed the Plan and, in connection with the Plan, the Debtors filed the Assumption Schedule on January 30, 2025. The Assumption Schedule includes the Sale-Leaseback Agreements as contracts to be assumed.[6] The original deadline for parties to object to the Plan and the Assumption Schedule was February 27, 2025 (the "**Objection**

---

[4] The Cure Amount is calculated using the exchange rate from CLP to USD as of February 27, 2025.

[5] For purposes of the Cure Amount calculation, PTI assumed an Effective Date of April 4, 2025. To the extent the Effective Date does not occur on April 4, 2025, PTI reserves the right to update the Cure Amount asserted herein accordingly.

[6] The Assumption Schedule lists "Multiple" as the contract title/name for the Sale-Leaseback Agreements, other than the APA.

5

**Deadline**"). The Debtors have extended PTI's Objection Deadline to 9 a.m. (ET) on March 4, 2025.

12. The Assumption Schedule lists USD $44,007,525 as the amount of cash or other property necessary to cure all monetary defaults by the Debtors under the scheduled Sale-Leaseback Agreements and to permit the Debtors to assume such agreements. PTI understands that the Debtors believe this amount represents unpaid prepetition rent plus accrued prepetition interest.

## OBJECTION

A. PTI Objects to the Debtors' Proposed Cure Amount

13. Under section 365(b)(1)(A) of the Bankruptcy Code, if there has been a default in an executory agreement, a debtor-in-possession may not assume such agreement unless, at the time of assumption of such agreement, the debtor cures or provides adequate assurance that it will promptly cure such default. See 11 U.S.C. § 365(b)(1)(A).

14. WOM is in default under the Sale-Leaseback Agreements and owes PTI the amount of no less than USD $129,258,990. The Cure Amount includes (i) Monthly Rent due and owing under the Sale-Leaseback Agreements from and after January 2024, (ii) interest due and payable under the Sale-Leaseback Agreements through the Effective Date,[7] (iii) amounts owed to

---

[7] Under the terms of the MLA, unpaid amounts incur interest at a monthly rate of 1.5%. MLA § 7.9. PTI has calculated the Cure Amount to include postpetition interest due and owing under the Sale-Leaseback Agreements through the date of assumption on the Effective Date. *See In re Valley View Shopping Ctr., L.P.*, 260 B.R. 10, 24-26 (Bankr. D. Kan. 2001) (holding that the cure of a default under an unexpired lease is more akin to a condition precedent to assumption than it is to a claim in bankruptcy and therefore, as part of a cure payment, the debtor must pay interest on prepetition amounts due until such amounts are paid, in accordance with the underlying lease); *In re J.W. Mays, Inc.*, 30 B.R. 769, 771-72 (Bankr. S.D.N.Y. 1983) ("Although Section 502(b)(2) of the Bankruptcy Code adopts the accepted proposition that there is a suspension of the accrual of interest as of the date of the filing of the petition, such rule applies to claims filed against the debtor as distinguished from defaults to be cured under assumed executory contracts."). To be clear, PTI's proofs of claim did not include postpetition interest because such claims were only applicable in the event PTI's

PTI on account of sites delivered that are not in compliance with the terms of the APA, (iv) other damages, rent and amounts as a result of non-compliance with the APA and (v) professional fees incurred by PTI in connection with these chapter 11 cases.  The Cure Amount is comprised of the following:

| Claim Type | Amount in USD |
|---|---|
| Past Due Rent Plus Interest | $53,656,244[1][2] |
| Sites Delivered Not In Compliance | $43,478,189 |
| Other Damages, Rent and Amounts Due To Non-Compliance | $27,624,557 |
| Professional Fees | $4,500,000 |
| **Total Cure Amount:** | **$129,258,990** |

(1) Exchange rate at February 27, 2025, per Central Bank of Chile.
(2) Assumed Effective Date of April 4, 2025.

15.     To the extent that the Debtors continue to dispute the Cure Amount in accordance with section VII.D of the Plan, the Court should direct the Debtors to pay the undisputed cure amount of USD $44,007,525 on the Effective Date of the Plan and reserve the balance of PTI's asserted cure amount (USD $85,251,465) in an escrow account pursuant to an escrow agreement reasonably acceptable to PTI.

B.  The Debtors Cannot Later Modify Their Decision to Assume PTI's Contracts

16.     PTI objects to the portion of Section VII.D of the Plan and any provision in the Plan which states that, to the extent that an Assumption Dispute is resolved or determined unfavorably to the Debtors, the Debtors may reject the applicable Executory Contract or Unexpired Lease after such determination, which rejection shall supersede, nullify, and render of no force or effect the earlier assumption. Pursuant to section 365(d)(4) of the Bankruptcy Code, debtors are only permitted a limited period of time (initially 120 days and subject to an additional 90 day extension) to assume or reject unexpired leases of non-residential real property.  Pursuant to

---

contracts were rejected by the Debtors.  PTI did not waive its right to postpetition interest in the event of assumption of PTI's contracts.

agreements between the parties, the Debtors' 365(d)(4) deadline expired on January 31, 2025. On January 30, 2025, the Debtors filed the Assumption Schedule which includes the Sale-Leaseback Agreements.

17. The Debtors are not permitted to assume an unexpired lease of non-residential real property prior to the 365(d)(4) deadline, only to later reject the same lease after the deadline has passed, without the consent of the landlord counterparty. *See In re Lucky's Market Parent Company, LLC*, No. 20-10166 (Bankr. D. Del.) (Sept. 14, 2020 Hr'g Tr. at 11:11–16) ("[Y]ou have to file a motion that unequivocally states that you're going to assume and assign the leases; that would stay the period. But you didn't do that because your form of order says you have the right to reject them after that date, and that's not what 365(d)(4) provides.").[8]  "[T]he deadline provisions of 11 U.S.C. § 365(d)(4) are intended to set a 'bright line' regarding how much time the trustee has to decide whether to assume or reject a lease." *Filene's Basement*, 2014 WL 1713416, at *8–9 (quoting *Cousins Properties, Inc. v. Treasure Isles HC, Inc. (In re Treasure Isles EC, Inc.)*, 462 B.R. 645, 650 (B.A.P. 6th Cir. 2011)).[9]

18. Accordingly, any provision of the Plan or Confirmation Order allowing the Debtors to reject the Sale-Leaseback Agreements post-confirmation on any basis, after they have already been assumed on the Effective Date, must be rejected.

---

[8] For the convenience of the Court, a copy of the transcript is attached as **Exhibit A** to this Objection.

[9] Even if the Sale-Leaseback Agreements are not determined to be non-residential real property leases, section 365(d)(2) of the Bankruptcy Code requires the Debtors to assume or reject an "executory contract…at any time ***before confirmation of the plan*** … ." 11 U.S.C. 365(d)(2) (emphasis added).

C. The Sale-Leaseback Agreements Must Be Assumed *Cum Onere*

19. Bankruptcy courts have described the assumption of an unexpired lease as "an all-or-nothing proposition – either the whole contract [or lease] is assumed or the entire contract [or lease] is rejected." *See, e.g., In re CellNet Data Systems, Inc.*, 327 F.3d 242, 249 (3d Cir. 2003). If a debtor decides to assume a lease, it must generally assume all the terms of the lease and may not pick and choose only favorable terms to be assumed. *In re Buffets Holdings, Inc.*, 387 B.R. 115, 119 (Bankr. D. Del. 2008). Accordingly, the Debtors must be required to comply with all of the contractual obligations in the Sale-Leaseback Agreements as-is and the Debtors must timely pay all post-petition rent and additional amounts due under the Sale-Leaseback Agreements.

20. The Sale-Leaseback Agreements are holistic, integrated agreements that must be assumed together. The determination of whether a contract or lease is indivisible for purposes of assumption or rejection is determined by the state law governing the agreement. *In re Buffets Holdings, Inc.*, 387 B.R. 115 (Bankr. D. Del. 2008). Under Delaware law, "[w]hether or not a contract is entire or divisible is a question of construction to be determined by the court according to the intention of the contracting parties as ascertained from the contract itself and upon a consideration of all the circumstances surrounding the making of it." *In re Dickinson Theatres, Inc.*, No. 12-22602, 2012 Bankr. LEXIS 4798, at *6 (Bankr. D. Kan. Oct. 12, 2012) (citing *Blakesley v. Johnson*, 227 Kan. 495, 500-501 (1980)). The APA and MLA were entered into around the same time by the same parties and were intended to govern one holistic transaction pursuant to which PTI purchased certain tower sites from WOM and leased those sites back to WOM. Each of the Sale-Leaseback Agreements references the MLA and/or the APA, as applicable, in the recitals as the context for entry into such agreement. In addition, each Sale-Leaseback Agreement contains a multitude of references to the MLA and/or the APA, as

applicable, throughout the applicable document, cross-referencing applicable provisions in the MLA and APA and explaining how the Sale-Leaseback Agreements work together—particularly economically—as an indivisible contract. For example, the rent payments and other go-forward lease terms applicable to the additional sites that WOM was required to sell to PTI by December 31, 2024 under the APA and the Subsequent Transfer sites under the APA are detailed in the MLA.

## PTI IS NOT A "RELEASING PARTY"

21. Notwithstanding anything to the contrary in the Plan, any other Definitive Document or the Confirmation Order, PTI is not a "Releasing Party" under the Plan and has not opted into—and shall not be deemed to have opted into—the releases under the Plan.

## CONFIRMATION ORDER

22. To the extent the Plan is confirmed, the following language should be added to the Confirmation Order:

> "**Provisions Regarding PTI.** Notwithstanding anything to the contrary herein, in the Plan or in the Definitive Documents:
>
> a. Pursuant to section 365 of the Bankruptcy Code, as of the date hereof, the Debtors hereby assume *cum onere* each of the following agreements entered into with Phoenix Tower International Chile SpA ("**PTI**"): (i) that certain Asset Purchase Agreement, dated July 1, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "**APA**"); (ii) that certain Master Lease Agreement, dated August 12, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "**MLA**"); (iii) that certain side letter to the MLA and the APA, dated November 21, 2023 (as amended, restated, supplemented or otherwise modified from time to time, the "**November 2023 Side Letter**"); (iv) that certain side letter to the MLA and APA, dated January 9, 2024 (as amended, restated, supplemented or otherwise modified from time to time, the "**January 2024 Side Letter**"); and (v) the agreements and arrangements entered into by the parties at each Subsequent Transfer (as defined in the APA) (as amended, restated, supplemented or otherwise modified from time to time, the "**Subsequent Transfers Arrangements**" and, collectively with the APA, MLA, the November 2023 Side Letter, and the

    January 2024 Side Letter, the "**PTI Sale-Leaseback Agreements**"). The Debtors' assumption of the PTI Sale-Leaseback Agreements is final and irrevocable, despite any resolution of the PTI Cure Objection (as defined below) that may be unfavorable to the Debtors. The Debtors shall continue to abide and be bound by all terms of the PTI Sale-Leaseback Agreements as if the Debtors had not filed any bankruptcy.

  b. The Debtors' assumption of the PTI Sale-Leaseback Agreements is subject to dispute as to the appropriate cure amount owed to PTI, as detailed in the *Objection and Reservation of Rights of Phoenix Tower International Chile SpA to Plan and Debtors' Notice of Cure Amounts and Potential Assumption and Assignment of Executory Contracts and Unexpired Leases in Connection with Chapter 11 Plan* [D.I. [\_\_]] (the "**PTI Cure Objection**"). The PTI Cure Objection, and all of PTI's rights to object to the amount of the cure claim owed to PTI, shall be preserved in all respects.

  c. On the date hereof, the Debtors shall pay to PTI the undisputed cure amount of USD $44,007,525 and shall reserve in an escrow account the balance of PTI's asserted cure amount (USD $85,251,465) pursuant to an escrow agreement reasonably acceptable to PTI, pending resolution of the PTI Cure Objection by the parties or the Bankruptcy Court.

  d. PTI shall not be a Releasing Party under the Plan and has not opted into—and shall not be deemed to have opted into—the releases under the Plan.

## **RESERVATION OF RIGHTS**

23. PTI will continue to work with Debtors to address these issues, but, to the extent an agreement cannot be reached, PTI reserves its rights to request an adjournment of the confirmation hearing to allow more time to negotiate or prosecute PTI's claims.

24. PTI further reserves the right to amend and/or supplement this Objection on any basis, including, without limitation, by amending the Cure Amount or contesting confirmation of the Plan.

*[Remainder of page intentionally left blank]*

**WHEREFORE,** PTI respectfully requests that the Court enter an order (i) sustaining the objection, (ii) conditioning the assumption of the Sale-Leaseback Agreements on the Debtors promptly paying the Cure Amount or reserving the disputed amount in escrow as detailed herein; and (iii) granting such other and further relief as the Court deems just and proper.

Dated: March 4, 2025

| | |
|---|---|
| */s/ Sunny Singh* | **GELLERT SEITZ BUSENKELL & BROWN, LLC**<br><br>*/s/ Ronald S. Gellert* |
| **WEIL GOTSHAL & MANGES LLP**<br>Sunny Singh (*pro hac vice* pending)<br>767 5th Ave., 2nd Floor<br>New York, NY 10153<br>Telephone: (212) 310-8000<br>Email: sunny.singh@weil.com | Ronald S. Gellert (DE 4259)<br>1201 North Orange Street, Suite 300<br>Wilmington, DE 19801<br>Telephone: (302) 425-5806<br>Facsimile: (302) 425-5814<br>Email: rgellert@gsbblaw.com |

*Counsel to Phoenix Tower International Chile SpA*