**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re<br><br>WOM S.A., *et al.*,[1]<br><br>　　　　　　　Debtors. | Chapter 11<br><br>Case No. 24-10628 (KBO)<br><br>(Jointly Administered)<br><br>**Re: Docket No. 1054** |

**DECLARATION OF CHRISTOPHER S. SONTCHI IN SUPPORT**
**OF CONFIRMATION OF SECOND AMENDED JOINT CHAPTER 11 PLAN**
**OF REORGANIZATION FOR WOM S.A. AND ITS AFFILIATED DEBTORS**

I, Christopher S. Sontchi, declare as follows:

**I.      Background**

1.      I am an independent director and member of the boards of directors of all six debtors and debtors-in-possession (collectively, the "**Debtors**"). I am over the age of 18 and qualified to submit this declaration (the "**Declaration**").

2.      I submit this Declaration in support of confirmation of the *Second Amended Joint Chapter 11 Plan of Reorganization for WOM S.A. and Its Affiliated Debtors*[2] (as may be amended, modified or supplemented from time to time in accordance with its terms, the "**Plan**").[3]

---

[1]    The Debtors in these chapter 11 cases (these "**Chapter 11 Cases**"), and each Debtor's federal tax identification number in its applicable jurisdiction of incorporation, is as follows: Kenbourne Invest S.A. (2018 2206 815) (Luxembourg); NC Telecom II AS (59.208.720-0) (Norway); WOM Mobile S.A. (99.517.000-0) (Chile); WOM S.A. (78.921.690-8) (Chile); Conect S.A. (96.965.220-k) (Chile); and Multikom S.A. (78.456.640-4) (Chile). The location of the Debtors' service address in these Chapter 11 Cases is: General Mackenna No. 1369, Santiago, Chile.

[2]    The Debtors will file the *Second Amended Joint Chapter 11 Plan of Reorganization for WOM S.A. and Its Affiliated Debtors* prior to the Confirmation Hearing.

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan, the *Disclosure Statement for the Amended Joint Chapter 11 Plan of Reorganization for WOM S.A. and Its Affiliated Debtors* [Docket No. 1055] (the "**Disclosure Statement**") or the *Debtors' Memorandum of Law in*

3. Unless otherwise indicated, all statements set forth in this Declaration are based on (i) my personal knowledge, (ii) information learned from my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, and/or (iii) information I received from the Debtors, their advisors, or the Special Committee's independent legal counsel, Richards, Layton & Finger P.A.[4] If called to testify, I would testify competently to the facts and opinions set forth in this Declaration.

4. I previously submitted the (i) *Declaration of Christopher S. Sontchi in Support of Debtors' Motion for Entry of an Order (I) Authorizing and Approving (A) Entry into the Plan Sponsor Agreement, (B) Entry into the Backstop Commitment Agreement, and (C) Incurrence of Certain Payment and Indemnification Obligations and (II) Granting Related Relief* [Docket No. 886] (the "**Support Agreements Declaration**") and the (ii) *Declaration of Christopher S. Sontchi in Support of Debtors' Motion Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order Approving a Settlement Between the Debtors, the Official Committee of Unsecured Creditors, the Ad Hoc Group of WOM Noteholders, the Novator Entities, and the Novator Individuals* [Docket No. 1105] (the "**Novator Settlement Declaration**"). I verify that the information contained in the Support Agreements Declaration and the Novator Settlement Declaration remains true and correct to the best of my knowledge, information and belief, and hereby incorporate the Support Agreements Declaration and the Novator Settlement Declaration by reference herein.

---

*Support of Confirmation of The Second Amended Joint Chapter 11 Plan of Reorganization for WOM S.A. and Its Affiliated Debtors* filed contemporaneously herewith, as applicable.

[4] For the avoidance of doubt, I do not, and do not intend to, waive the attorney-client privilege or any other applicable privilege by submitting this Declaration.

5.  Based on my work with the Debtors, I am generally familiar with Debtors' business, financial condition, day-to-day operations, and books and records. Together with the Debtors' counsel and other advisors, I have reviewed, and I am generally familiar with, the terms and provisions of the Plan, the Disclosure Statement, including the exhibits thereto, the documents comprising the Plan Supplement, and the requirements for confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

6.  I am not being specifically compensated for this testimony other than through monthly payroll payments received as part of my regular compensation for my position as an independent director of each of the six Debtors.

**II.     Qualifications**

7.  I received a Juris Doctor from the University of Chicago Law School in 1992.

8.  I have over thirty years of corporate bankruptcy, restructuring, and reorganization experience. I am a former Judge of the United States Bankruptcy Court for the District of Delaware, where I served for sixteen years, including one term as the Chief Judge. During my tenure, I presided over numerous significant chapter 11 cases, including Catholic Diocese of Wilmington, American Home Mortgage, Energy Future Holdings Corp., Visteon, Six Flags, Molycorp, Borden Dairy, Exide Technologies, Brooks Brothers, and Eagle Hospitality.

9.  I am currently an International Judge of the Singapore International Commercial Court, where I focus on insolvency matters. I am also the sole member of Sontchi, LLC, where I conduct mediations and arbitrations, provide expert services, and serve as an independent fiduciary. I have also served as the court-appointed mediator in many chapter 11 cases, including Mallinckrodt, MD Helicopters, the Roman Catholic Bishop of Oakland, the Roman Catholic Archbishop of San Francisco, and the Roman Catholic Church of the Archdiocese of New Orleans.

3

10. I am a Lecturer in Law at The University of Chicago Law School, and I have taught restructuring to international judges associated with the World Bank Group. My previous experience also includes testifying before Congress on the safe harbors for financial contracts, as well as publishing articles on creditors' committees, valuation, asset sales, and safe harbors.

### III. General Background and Development of the Plan

11. The Debtors commenced these Chapter 11 Cases with the goal of deleveraging the Debtors' balance sheet and improving liquidity. Throughout these Chapter 11 Cases, the Debtors have focused on preserving and maximizing the value of their estates for the benefit of all stakeholders.

12. In early June 2024, the Debtors' respective boards of directors each formed the Special Committee. In each case, the Special Committee consists of myself and Timothy O'Connor, and I am the Chair.

13. Upon its formation, the Special Committee received the exclusive authority to, among other things, undertake, direct and oversee all actions taken by the Debtors in connection with the Chapter 11 Cases regarding the evaluation, negotiation and selection of any and all proposals or agreements concerning a proposed chapter 11 plan, sale, lease, use or other disposition or reorganization of the Debtors or a material portion of their assets, to be presented for the Court's consideration.

14. Following the Court's entry of the Bidding Procedures Order, at the direction of the Special Committee, and with the assistance of their investment banker, Rothschild & Co. US Inc, the Debtors conducted an extensive public marketing process over the course of several months. This marketing process was designed to solicit bids for all available transactions. Throughout the marketing process, the Debtors engaged with several interested parties, including strategic and

financial institutions, competitors, and the Official Committee of Unsecured Creditors (the "**Committee**").

15. Ultimately, the Ad Hoc Group of WOM Noteholders (the "**AHG**") submitted the only "Qualified Bid" (as defined in the Bidding Procedures Order) for a whole-company transaction pursuant to the Court-approved Bidding Procedures. Following extensive and good faith discussions and negotiations with the AHG, the Special Committee determined, on behalf of the Debtors, that the bid submitted by the AHG was the highest and best offer received by the Debtors and the transactions contemplated thereunder would maximize value for the Debtors' stakeholders.

16. The Debtors and the AHG executed the Support Agreements on December 6, 2024.

17. Subsequently, the Debtors and the AHG engaged in additional, arms'-length, good faith negotiations with the Committee, which led the Committee to execute a joinder to the Plan Sponsor Agreement on January 15, 2025. Accordingly, the Committee supported the Debtors' entry into the Support Agreements and supports confirmation of the Plan.

**A. There Is a Sound Business Purpose for Confirming the Plan**

18. Based upon the lengthy, thorough and independent sale process overseen by the Special Committee, I believe that the Plan is the best achievable path for the Debtors to emerge from these Chapter 11 Cases. The substantial agreements and compromises embodied in the Plan, along with the broad-based support for the Plan among the Debtors' major stakeholders, dispel any suggestion of bad faith or collusion.

19. The Plan, the Plan Supplement, and all documents necessary to implement the Plan were developed after months of analysis and negotiations between the Debtors, the AHG, and the Committee, and were proposed with the legitimate and honest purpose of maximizing the value of the Debtors' Estates and carrying out a successful reorganization of the Debtors' operations.

20. Based on the foregoing, it is my opinion that the Plan has been proposed in good faith.

IV. **Evaluation of Certain Plan Terms**

21. I have reviewed each of the Debtor Releases (Plan Art. VIII.E), the Third-Party Releases (Plan Art. VIII.F), the Exculpation Provision (Plan Art VIII.G), and the Injunction Provision (Plan Art. VIII.H) in the Plan. As set forth more fully below, I believe that the Plan, including the Debtor Releases, the Third-Party Releases, the Exculpation Provision, and the Injunction Provision, is reasonable under the circumstances and in the best interest of the Debtors, their Estates, and all the Debtors' stakeholders.

A. **The Debtor Releases**

22. The Debtor Releases in Article VIII.E of the Plan are a product of arms'-length negotiations throughout the course of the Plan process among the Debtors, the AHG, the Committee, and other stakeholders. Such parties were unwilling to support the Plan without the assurance that, in the case of the Released Parties,[5] such Released Parties would not be subject to post-emergence litigation or other disputes related to the restructuring, and that in the case of the Non-Released Parties,[6] the Retained Causes of Action would be preserved for further investigation

---

[5] "***Released Parties***" means collectively, and in each case in its capacity as such: (a) each Debtor; (b) New Holdco, each Reorganized Debtor, and each direct or indirect subsidiary of the Debtors or Reorganized Debtors; (c) the DIP Agents, and each DIP Lender; (d) the Unsecured Notes Trustees; (e) each Consenting Noteholder; (f) the Committee and its members; (g) each current and former Affiliate of each Entity in clause (b) through (f); and (h) each Related Party of each Entity in clause (a) through (g) (which, for the avoidance of doubt, includes each of the Ad Hoc Group Advisors); *provided* that (x) any holder of a Claim or Interest that does not opt in to granting the releases or is not otherwise a Releasing Party and (y) each of the Non-Released Parties shall not be a Released Party. Plan Art. I.A.194.

[6] "***Non-Released Parties***" means: (i) Novator Partners LLP and any of its direct and indirect non-Debtor affiliates and managed entities; (ii) all direct and indirect holders of equity interests in any of the Debtors, including, but not limited to, (a) The Telco Holdings Trust, its settlor and beneficiaries and (b) any other trust that owns any such equity interests, its settlor and beneficiaries; (iii) Novator (Luxembourg) S.à r.l.; (iv) Novator Two L.P.; (v) WOM Colombia S.A.S. and any of its direct and indirect affiliates; (vi) Björgólfur Thor Björgólfsson; (vii) Thomas Leslie; (viii) Jaroslav Valiukevic; (ix) Kristopher Brigham; (x) Serdar Cetin; (xi) Graham Bruce McInroy; (xii) PurpleCrest Investments LLP; (xiii) any former directors of any of the Debtors as of the Petition

6

and potential pursuit by the Plan Trustee.  Further, the Plan provides that the Debtors shall transfer all of their rights, title, and interests in and to all the LT Claims[7] (to the extent they exist) to the Plan Trust on the Effective Date for the benefit of the Plan Trust Beneficiaries, and the Plan does not release the Avoidance Actions (which may only be used in the Claims reconciliation process for Claim reduction, setoff, or defensive purposes), and all claims and Causes of Action in connection with the ICSID Arbitration.

23.     Each of the Released Parties as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed and has substantially contributed to the success of the Debtors' reorganization. The Released Parties' assistance is critical to facilitating and implementing the Plan.  The Released Parties not only spent significant time and resources analyzing and negotiating the terms of the Support Agreements and the Plan, but also provided material benefits to ensure the success of the Debtors' Chapter 11 Cases.  For example, the DIP Lenders and the DIP Agents contributed value by providing the DIP Credit Facility and consenting to the Debtors' use of cash collateral.  The Consenting Noteholders agreed to fund the Rights Offering, ensuring the necessary liquidity for the Debtors to make distributions under the Plan, repay the DIP Credit Facility in full, and operate upon emergence.  The Debtors' directors, officers, employees, professionals, and other agents who served in such capacity on or

---

Date (other than Chris Bannister); and (xiv) any subsequent transferee of each Person or Entity in clause (i) through (xiii).  *See* Plan Art. I.A.163. In addition, pursuant to the *Order Approving a Settlement Between the Debtors, the Official Committee of Unsecured Creditors, the Ad Hoc Group of WOM Noteholders, the Novator Entities and the Novator Individuals* [Docket No. 1197], upon the Effective Date of the Plan, the Debtors will have released certain Novator related entities and individuals as set forth therein.  Plan Art. I.A.164.

[7]  "***LT Claims***" means all Causes of Action of the Debtors and their Estates (including, without limitation, Avoidance Actions and breach of fiduciary duty claims) against the Non-Released Parties, whether arising before or after the Petition Date, except for (a) any such Causes of Action that the Special Committee (in consultation with the Committee) (i) has settled or (ii) has determined should not be pursued, and (b) any claims or Causes of Action to enforce or recover contractual obligations (including, without limitation, any contractual obligations of Partners Telecom Latam II S.à.r.l.), obligations to repay money loaned (including, without limitation, any money loaned to Partners Telecom Latam II S.à.r.l.), or ordinary course receivables.  *See* Plan Art. I.A.137.

after the Petition Date have been instrumental in operating the Debtors' business post-petition and negotiating, formulating, and implementing the Reorganization Transactions under the Plan. These measures, among others, improved the Debtors' liquidity throughout the Chapter 11 Cases and enabled the Debtors to implement a largely consensual, value-maximizing restructuring.

24. The Plan provides for meaningful recoveries for all creditors affected by the Debtor Releases. Further, the Debtor Releases are narrowly tailored considering, among other things, the value provided by the Released Parties to the Debtors' Estates, the critical nature of the Debtor Releases to the Plan, the carve-outs of actual fraud, gross negligence, or willful misconduct, and the exclusion of the Non-Released Parties. These carve-outs are similarly the product of arms' length negotiations with the AHG as well as the Committee, and are essential elements of the Plan.

25. Based on the foregoing and under the circumstances, I believe that the Debtor Releases are an integral part of the Plan, constitute a sound exercise of the Debtors' business judgment, represent a good-faith settlement and compromise of the Claims and Causes of Action, if any, held by the Debtors, and are fair, reasonable, and in the best interests of the Debtors and their stakeholders.

B. **The Consensual Third-Party Releases**

26. The Third-Party Releases in Article VIII.F of the Plan are the product of arms'-length negotiations among the Debtors, the AHG, the Committee, the United States Trustee, and other stakeholders. Further, the Third-Party Releases are consensual and provide for an "opt-in" mechanism for all Holders of Claims or Interests entitled to vote on the Plan, as well as each Consenting Noteholder, the Unsecured Notes Trustee, the DIP Agents, and each DIP Lender.

27. The Third-Party Releases (and their fully opt-in structure) were a core negotiation issue and were integral in developing the Plan. I believe the Third-Party Releases are a sound

exercise of the Debtors' business judgment and offer protection to parties who constructively participated in the Debtors' restructuring process by, among other things, supporting the Plan.

28. For these reasons, I believe that the Third-Party Releases are reasonable.

**C.    The Exculpation Provision**

29. The Exculpation Provision in Article VIII.G of the Plan was proposed and formulated following extensive good-faith, arms'-length negotiations with key constituents. The Exculpation Provision is limited in scope and necessary to protect the Exculpated Parties[8] who have made substantial contributions to the Debtors' reorganization (including the Debtors' fiduciaries and all the members of the boards of directors who have been instrumental in supporting the Debtors' business as well as the restructuring throughout the Chapter 11 Cases).

30. I therefore believe the Exculpation Provision constitutes a reasonable exercise of the Debtors' business judgment and there is a good-faith reason for its inclusion in the Plan.

**D.    The Injunction Provision**

31. The Injunction Provision in Article VIII.H of the Plan is necessary to enjoin parties in interest from taking any action to interfere with the implementation of the Plan and to enforce the Releases and Exculpation Provision. The Injunction Provision is deemed consensual as to any party that did not specifically object thereto and is narrowly tailored to achieve its purpose.

32. For these reasons, I believe the Injunction Provision constitutes a reasonable exercise of the Debtors' business judgment and there is a good-faith reason for its inclusion in the Plan.

---

[8] "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Special Committee and its members; (c) the Committee and its members; and (d) with respect to each of the foregoing, such Entity and its officers, directors, managers, principals, members, agents, advisory board members, and the Professionals of the foregoing, each in their capacity as such; *provided* that none of the Non-Released Parties shall be an "Exculpated Party," except for in their capacities as directors of any of the Debtors from and after the Petition Date. *See* Plan Art 1.A.91.

## V.      Confirmation of the Plan Is in the Best Interests of the Debtors and Their Estates

33. The Plan is the culmination of the Debtors' restructuring efforts, including an extensive, public marketing and sale process over the course of several months pursuant to the Court-approved Bidding Procedures. Under the sale process the Debtors solicited bids for all available transactions, which ultimately culminated in the Special Committee's designation of AHG's proposal as the highest and best proposal received by the Debtors and the Debtors' subsequent entry into and the Court's approval of the Support Agreements. Moreover, the Plan is supported by the AHG, the Committee, and other key stakeholders.

34. Based on my involvement in these Chapter 11 Cases, it is my opinion that the Plan was negotiated in good faith and is the best achievable outcome for the Debtors, their creditors and all other parties in interest.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: March 4, 2025

*/s/ Christopher S. Sontchi*
Christopher S. Sontchi
