# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| WOM S.A., *et al.*,[1] | Case No. 24-10628 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: March 6, 2025 at 9:30 a.m. ET** |
| | **Re: Docket Nos. 1054, 1131, 1139, 1165, 1181, 1182, 1183, 1184, 1193, 1195, 1196, 1201** |

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION OF THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR WOM S.A. AND ITS AFFILIATED DEBTORS

**RICHARDS, LAYTON & FINGER, P.A.**
John H. Knight (No. 3848)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
Alexander R. Steiger (No. 7139)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
knight@rlf.com
steele@rlf.com
schlauch@rlf.com
steiger@rlf.com

*Co-Counsel to Debtors and Debtors-in-Possession*

**WHITE & CASE LLP**
John K. Cunningham (admitted *pro hac vice*)
Richard S. Kebrdle (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
jcunningham@whitecase.com
rkebrdle@whitecase.com

Philip M. Abelson (admitted *pro hac vice*)
Andrea Amulic (admitted *pro hac vice*)
Lilian Marques (admitted *pro hac vice*)
Claire M. Campbell (admitted *pro hac vice*)
Peter Strom (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
philip.abelson@whitecase.com
andrea.amulic@whitecase.com
lilian.marques@whitecase.com
claire.campbell@whitecase.com
peter.strom@whitecase.com

*Co-Counsel to Debtors and Debtors-in-Possession*

---

[1] The Debtors in these chapter 11 cases (these "**Chapter 11 Cases**"), and each Debtor's federal tax identification number in their applicable jurisdiction of incorporation, is as follows: Kenbourne Invest S.A. (2018 2206 815) (Luxembourg); NC Telecom II AS (59.208.720-0) (Norway); WOM Mobile S.A. (99.517.000-0) (Chile); WOM S.A. (78.921.690-8) (Chile); Conect S.A. (96.965.220-k) (Chile); and Multikom S.A. (78.456.640-4) (Chile). The location of Debtors' service address in these Chapter 11 Cases is: General Mackenna No. 1369, Santiago, Chile.

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ..................................................................................................................4

    A.    The Chapter 11 Cases ................................................................ 4

    B.    The Development of the Debtors' Plan .................................... 5

    C.    Plan Solicitation ....................................................................... 8

    D.    Plan Supplement ....................................................................... 8

    E.    The Voting Results ................................................................... 9

    F.    Immaterial And Non-Adverse Modifications To The Plan ...................... 10

BASIS FOR RELIEF ..........................................................................................................12

    I.    The Plan Satisfies the Requirements for Confirmation Under Section 1129(a) of the Bankruptcy Code ..................................................................13

        A.    Section 1129(a)(1): The Plan Complies with Applicable Provisions of the Bankruptcy Code .................................................................... 13

            1.    Section 1122: The Plan Complies with the Classification Requirements of Section 1122 of the Bankruptcy Code............... 14

            2.    The Plan Complies with All Requirements of Section 1123(a) of the Bankruptcy Code ................................................ 15

                i.    Section 1123(a)(1): The Plan Designates Classes of Claims and Interests. .......................................................... 15

                ii.    Section 1123(a)(2): The Plan Specifies Classes that Are Not Impaired by the Plan. .................................................. 15

                iii.    Section 1123(a)(3): The Plan Specifies Treatment of Classes that are Impaired by the Plan. ............................ 16

                iv.    Section 1123(a)(4): The Plan Provides Equal Treatment for Claims and Equity Interests Within Each Class.......... 16

                v.    Section 1123(a)(5): The Plan Provides Adequate Means for Implementation............................................................ 17

                vi.    Section 1123(a)(6): Issuance of Non-Voting Securities. .. 17

                vii.    Section 1123(a)(7): Provisions Regarding Directors and Officers. ........................................................................ 18

             3.    The Plan Incorporates Certain Discretionary Provisions of Section 1123(b) of the Bankruptcy Code...................................... 19

                i.    Section 1123(b)(1): Impairment of Claims and Interests.  19

i

ii.     Section 1123(b)(2): Assumption or Rejection of Executory Contracts and Unexpired Leases. .................... 19

iii.    Section 1123(b)(3)(A): Settlement of Any Claim by the Debtors. ................................................................ 20

iv.    Section 1123(b)(3)(B): Retention of Claims or Interests by the Debtors. .................................................. 21

v.     Section 1123(b)(4): Sale of All or Substantially All of the Debtors' Assets. ........................................... 21

vi.    Section 1123(b)(5): Modification of the Rights of Holders of Claims and Interests. ...................................... 21

vii.   Section 1123(b)(6): Provisions Not Inconsistent with the Bankruptcy Code. ............................................. 22

    a.    The Releases, Exculpation, and Injunction Provisions ......................................................... 22

        (A)    The Debtor Releases ................................ 23

        (B)    The Consensual Third-Party Releases ...... 26

        (C)    The Exculpation Provision ........................ 30

        (D)    The Injunction Provision ........................... 31

4.    The Plan Complies with Section 1123(d) of the Bankruptcy Code ...................................................... 32

B.    Section 1129(a)(2): The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code .......................................... 33

1.    The Debtors Have Complied with the Disclosure and Solicitation Requirements of Section 1125 .................................. 33

2.    The Debtors Have Satisfied the Plan Acceptance Requirements of Section 1126 ............................................................ 35

C.    Section 1129(a)(3): The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law ........................................... 36

D.    Section 1129(a)(4): The Payment of Certain Services or for Certain Costs and Expenses is Subject to Court Approval .................................... 39

E.    Section 1129(a)(5): All Necessary Information Regarding Post-Effective Date Governance ........................................................ 39

F.    Section 1129(a)(6) of the Bankruptcy Code Is Not Applicable ................ 40

G.    Section 1129(a)(7): The Plan Is in the Best Interests of Creditors and Interest Holders ........................................................................... 40

H.    Section 1129(a)(8) Does Not Preclude Confirmation of the Plan ............ 43

I.    Section 1129(a)(9): The Plan Provides for Payment in Full of Allowed

|  |  | Administrative Claims and Allowed Priority Tax Claims | 44 |

| | J. | Section 1129(a)(10): At Least One Impaired Class of Claims Has Accepted the Plan | 44 |
| | K. | Section 1129(a)(11): The Plan Is Feasible | 45 |
| | L. | Section 1129(a)(12): The Plan Provides for Payment in Full of All Statutory Fees | 48 |
| | M. | Sections 1129(a)(13) through 1129(a)(16) Do Not Apply | 49 |
| | N. | Section 1129(b): The Plan Satisfies the Cramdown Requirements | 50 |
| | | 1. The Plan Does Not Discriminate Unfairly | 50 |
| | | 2. The Plan is Fair and Equitable | 53 |
| | O. | The Plan Complies with Section 1129(c) of the Bankruptcy Code | 54 |
| | P. | The Plan Complies with Section 1129(d) of the Bankruptcy Code | 54 |
| | Q. | The Plan Complies with Section 1129(e) of the Bankruptcy Code | 54 |
| II. | | The Objections Should Be Overruled | 55 |
| | A. | The Benesch AHG Objection Should be Overruled | 55 |
| | B. | The BCI Objection Should be Overruled | 62 |
| | C. | The PTI Objection Should be Overruled | 67 |
| III. | | Cause Exists to Waive a Stay of the Confirmation Order | 69 |
| CONCLUSION | | | 70 |

# TABLE OF AUTHORITIES

Page(s)

## CASES

*In re 203 N. LaSalle St. Ltd. P'ship.*,
   190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) ........................................................ 50

*In re Adelphia Comms Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007) ............................................................... 55

*In re Alecto Healthcare Servs., LLC*,
   Case No. 23-10787, 2024 Bankr. LEXIS 670 (Bankr. D. Del. Mar. 20, 2024) .................. 21

*In re Am. Cap. Equip., LLC*,
   688 F.3d 145 (3d Cir. 2012) .............................................................................. 45

*In re AOV Indus., Inc.*,
   792 F.2d 1140 (D.C. Cir. 1986) ........................................................................ 57

*Argonaut Ins. Co. v. Falcon V (In re Falcon V, LLC.)*,
   44 F.4th 348 (5th Cir. 2022) ............................................................................. 66

*In re Armstrong World Indus., Inc.*,
   348 B.R. 111 (D. Del. 2006) ............................................................... 12, 45, 50

*In re Armstrong World Indus., Inc.*,
   348 B.R. 136 (Bankr. D. Del. 2006) ................................................................ 14

*In re Aztec Co.*,
   107 B.R. 585 (Bankr. M.D. Tenn. 1989) .......................................................... 51

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
   526 U.S. 434 ( 1999) ....................................................... 41, 41, 51, 53, 53

*In re Boy Scouts of Am. & Del. BSA, LLC*,
   650 B.R 87 (D. Del. 2023) ................................................................................ 11

*In re Buttonwood Partners, Ltd.*,
   111 B.R. 57 (Bankr. S.D.N.Y. 1990) ............................................................... 51

*In re Cardinal Indus., Inc.*,
   146 B.R. 720 (Bankr. S.D. Ohio 1992) ............................................................ 67

*In re Century Glove, Inc.*,
  Case No. 90-400, 1993 WL 239489 (D. Del. Feb. 10, 1993) ............................................. 10

*Chase Manhattan Mortg. & Realty Tr. v. Bergman (In re Bergman)*,
  585 F.2d 1171 (2d. Cir. 1978)............................................................ 46

*In re CHC Grp., Ltd.*,
  Case No. 16-31854, 2017 WL 11093971 (Bankr. N.D. Tex. Mar. 3, 2017) ...................... 56

*In re Chemtura Corp.*,
  439 B.R. 561 (Bankr. S.D.N.Y. 2010)................................................................ 31, 37

*Clarkson v. Cooke Sales & Serv. Co.*,
  767 F.2d 417 (8th Cir. 1985) ......................................................................... 46

*In re Coal Stripping, Inc.*,
  215 B.R. 500 (Bankr. W.D. Pa. 1997) ............................................................... 66

*In re Coastal Broad. Sys., Inc.*,
  570 F. App'x. 188 (3d Cir. 2014)................................................................... 14

*In re Coram Healthcare Corp.*,
  271 B.R. 228 (Bankr. D. Del. 2001) ................................................................ 37

*In re Diocese of Camden*,
  653 B.R. 309 (Bankr. D. N.J. 2023) ................................................................ 41

*In re Dow Corning Corp.*,
  280 F. 3d 648 (6th Cir. 2002) ....................................................................... 57

*In re Drexel Burnham Lambert Grp.*,
  138 B.R. 723 (Bankr. S.D.N.Y. 1992)............................................................. 47

*In re Elec. Components Int'l, Case*,
  Case No. 10-11054, 2010 WL 3350305 (Bankr. D. Del. May 11, 2010).......................... 47

*In re Evans Prods. Co.*,
  91 B.R. 1003 (Bankr. S.D. Fla. 1988) ............................................................. 66

*Excluded Lenders v. Serta Simmons Bedding, LLC (In re Serta Simmons Bedding, LLC)*,
  125 F.4th 555 (5th Cir. 2024) ....................................................................... 57

*In re Exide Techs.*,
  303 B.R. 48 (Bankr. D. Del. 2003) .................................................................. 23

*In re Fed.-Mogul Glob. Inc., Case*,
 Case No. 01-10578, 2007 WL 4180545 (Bankr. D. Del. Nov. 16, 2007) ........................ 11

*Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship)*,
 116 F.3d 790 (5th Cir. 1997) ............................................................................................ 46

*In re Frascella Enters., Inc.*,
 360 B.R. 435 (Bankr. E.D. Pa. 2007) ................................................................................ 37

*In re Freymiller Trucking Inc.*,
 190 B.R. 913 (Bankr. W.D. Okla. 1996) ........................................................................... 51

*In re Genesis Health Ventures, Inc.*,
 266 B.R. 591 (Bankr. D. Del. 2001) .................................................................................. 37

*In re Govt. Securities Corp.*,
 972 F.2d 328 (11th Cir. 1992) ........................................................................................... 66

*In re Govt. Securities Corp.*,
 111 B.R. 1007 (S.D. Fla. 1990) ......................................................................................... 66

*Harrington v. Purdue Pharma L.P.*,
 144 S. Ct. 2071 (2024) ....................................................................................................... 26

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II)*,
 994 F.2d 1160 (5th Cir. 1993) ..................................................................................... 12, 46

*In re Heron, Burchette, Ruckert & Rothwell*,
 148 B.R. 660 (Bankr. D. D.C. 1992) ................................................................................. 57

*In re Indianapolis Downs, LLC*,
 486 B.R. 286 (Bankr. D. Del. 2013) .................................................................................. 27

*Internal Revenue Serv. v. Kaplan (In re Kaplan)*,
 104 F.3d 589 (3d Cir. 1997)............................................................................................... 45

*In re Ion Media Networks, Inc.*,
 419 B.R. 585 (Bankr. S.D.N.Y. 2009)......................................................................... 53, 63

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*,
 987 F.2d 154 (3d Cir. 1993)............................................................................................... 14

*In re Johns-Manville Corp.*,
 68 B.R. 618 (Bankr. S.D.N.Y. 1986) ................................................................................ 51

*In re LATAM Airlines Grp S.A.,*
    Case No. 20-11254 (JLG), 2022 WL 2206829 (Bankr. S.D.N.Y. June 18, 2022) .. 56, 59, 59

*In re LATAM Airlines Grp S.A.,*
    Case No. 20-11254 (JLG), 2022 WL2541298 (Bankr. S.D.N.Y. July 7, 2022) .................. 56

*Liberty Nat'l Enters. v. Ambanc La Mesa L.P. (In re Ambanc La Mesa L.P.),*
    115 F.3d 650 (9th Cir. 1997) ........................................................................................ 51

*In re Mayer Pollock Steel Corp.,*
    174 B.R. 414 (Bankr. E.D. Pa. 1994) ............................................................................ 46

*Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.),*
    25 F.3d 1132 (2d Cir. 1994) ......................................................................................... 34

*In re New Power Co.,*
    438 F.3d 1113 (11th Cir. 2006) .................................................................................... 11

*In re NII Holdings,*
    288 B.R. 356 (Bankr. D. Del. 2002) ............................................................................. 45

*In re Nutritional Sourcing Corp.,*
    398 B.R. 816 (Bankr. D. Del. 2008) ............................................................................. 13

*In re Pac. Drilling S.A.,*
    Case No. 17-1393 (MEW), 2018 WL 11435661 (Bankr. S.D.N.Y. Oct. 1, 2018) ............. 59

*In re Peabody Energy Corp.,*
    933 F.3d 918 (8th Cir. 2019) ........................................................................................ 56

*In re Piece Goods Shops Co.,*
    188 B.R. 778 (Bankr. M.D.N.C 1995) ........................................................................... 60

*In re PPI Enter. (U.S.), Inc.,*
    339 B.R. 347 (Bankr. D. Del. 1998) .............................................................................. 36

*In re PWS Holding Corp.,*
    228 F.3d 224 (3d Cir. 2000) .................................................................................... 30, 36

*In re Quigley Co., Inc.,*
    437 B.R 102 (Bankr. S.D.N.Y. 2010) ............................................................................ 57

*In re Sears Holdings Corp.,*
    661 B.R. 298 (S.D.N.Y. 2024) ...................................................................................... 68

*In re Serta Simmons*,
  125 F.4th 591 ............................................................................................ 57

*In re Simbaki, Ltd.*,
  520 B.R. 241 (Bankr. S.D. Tex. 2014) ................................................. 68

*In re Smallhold, Inc.*,
  665 B.R. 704 (Bankr. D. Del. 2024) ............................................. 27, 27

*In re Smith*,
  357 B.R. 60 (Bankr. M.D.N.C. 2006) ................................................... 41

*In re Smith*,
  Case No. 1:07CV30, 2007 WL 1087575 (M.D.N.C. Apr. 4, 2007) .................................... 41

*Solow v. PPI Enters. (U.S.) (In re PPI Enters. (U.S.))*,
  324 F.3d 197 (3d Cir. 2003) ................................................................... 36

*In re Spansion, Inc.*,
  426 B.R. 114 (Bankr. D. Del. 2010) ............................................. 21, 23

*In re TCI 2 Holdings, LLC*,
  428 B.R. 117 (Bankr. D.N.J. 2010) ...................................................... 56

*In re Texaco, Inc.*,
  84 B.R. 893 (Bankr. S.D.N.Y. 1988) ................................................... 46

*In re Thomas B. Hamilton Co., Inc.*,
  969 F.2d 1013 (11th Cir. 1992) ........................................................... 67

*In re Toy & Sports Warehouse, Inc.*,
  37 B.R. 141 (Bankr. S.D.N.Y. 1984) ................................................... 33

*In re Tribune Co.*,
  464 B.R. 126 (Bankr. D. Del. 2011) ................................................... 24

*In re Tribune Co.*,
  972 F.3d 228 (3d Cir. 2020) ................................................................. 50

*U.S. v. Reorganized CF&I Fabricators of Utah, Inc.*,
  518 U.S. 213 (1996) ............................................................................. 41

*In re U.S. Truck Co.*,
  47 B.R. 932 (E.D. Mich. 1985) ............................................................ 46

*In re U.S. Truck Co.*,
    800 F.2d 581 (6th Cir. 1986) ........................................................................ 46

*U.S. v. Energy Res. Co.*,
    495 U.S. 545 (1990) .................................................................................... 45

*In re W.R. Grace & Co.*,
    475 B.R. 34 (D. Del. 2012) ........................................................ 37, 37, 46, 50

*In re Wash. Mut., Inc.*,
    461 B.R. 200 (Bankr. D. Del. 2011) ............................................................ 37

*In re Wash. Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ...................................................... 27, 30

*In re Young Broad., Inc.*,
    430 B.R. 99 (Bankr. S.D.N.Y. 2010) ........................................................... 47

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) .............................................................. 23

## FEDERAL STATUTES

11 U.S.C. § 101 ........................................................................................... 1, 28

11 U.S.C. § 365 ......................................................................... 19, 32, 67, 69

11 U.S.C. § 507 ............................................................................................... 49

11 U.S.C. § 1103 ............................................................................................ 30

11 U.S.C. § 1107 .............................................................................................. 4

11 U.S.C. § 1108 .............................................................................................. 4

11 U.S.C. § 1114 ............................................................................................ 49

11 U.S.C. § 1122 ................................................................................. 13, 15, 15

11 U.S.C. § 1123 ..................................................................................... *passim*

11 U.S.C. § 1125 ................................................................... 12, 33, 33, 34

11 U.S.C. § 1126 ..................................................................................... *passim*

11 U.S.C. § 1127 ................................................................................... 10, 12

11 U.S.C. § 1129 ............................................................................................ *passim*

11 USC § 101 ........................................................................................................ 55

28 U.S.C. § 1930 .................................................................................................. 48

## FEDERAL RULES

Fed. R. Bankr. P. 1015 ........................................................................................... 4

Fed. R. Bankr. P. 3019 ..................................................................................... 10, 12

Fed. R. Bankr. P. 3020 ..................................................................................... 69, 69

Fed. R. Bankr. P. 6004 ......................................................................................... 69

Fed. R. Bankr. P. 6006 ......................................................................................... 69

## OTHER AUTHORITIES

3 COLLIER ON BANKRUPTCY ¶ 365.02 (16th ed. 2025) ...................................... 66

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977) ................................... 13, 33

S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978) ............................................ 33

The debtors and debtors-in-possession in the above-captioned cases (collectively, the "**Debtors**") hereby file this memorandum of law (this "**Memorandum**") in support of confirmation of the *Second Amended Joint Chapter 11 Plan of Reorganization for WOM S.A. and its Affiliated Debtors*[2] (together with all exhibits and schedules thereto and as may be amended, modified, or supplemented from time to time, the "**Plan**"),[3] pursuant to sections 1125, 1126, and 1129 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**"). In support of confirmation of the Plan and in response to the unresolved objections to the Plan filed by (i) an ad hoc group holding approximately 5% of the Unsecured Notes Claims (the "**Benesch AHG**") [Docket No. 1184] (the "**Benesch AHG Objection**")[4] and (ii) Banco de Crédito e Inversiones ("**BCI**") [Docket No. 1183] (the "**BCI Objection**" and, together with the Benesch AHG Objection, the "**Plan Objections**"), the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Plan is the culmination of months of arm's-length, hard-fought negotiations and memorializes the best available restructuring transactions for the Debtors and their stakeholders.  The transactions embodied in the Plan (particularly, the Rights Offering) will result in a significant reduction in debt, meaningful distributions to Holders of Allowed Claims, and working capital to fund the Reorganized Debtors' ongoing operations post-emergence.

2.      The Plan enjoys broad stakeholder support, including the support of the Ad Hoc Group of WOM Noteholders (the "**AHG**") and the Official Committee of Unsecured Creditors

---

[2]    The Debtors will file the *Second Amended Joint Chapter 11 Plan of Reorganization for WOM S.A. and its Affiliated Debtors* prior to the Confirmation Hearing.

[3]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan or the Disclosure Statement (as defined herein), as applicable.

[4]    The Benesch AHG Objection amends, supersedes, and replaces in its entirety the Benesch AHG's preliminary objection [Docket No. 1110] and does not rely on the declaration of Joshua Nahas that had been filed in support of its preliminary objection [Docket No. 1111].  *See* Benesch AHG Obj. at 1 n.2.

(the "**Committee**").  The AHG and the Committee are parties to the Support Agreements approved by this Court following an extensive, public marketing and sale process conducted pursuant to the Bidding Procedures approved by this Court.

3.     The evidentiary record demonstrates that (a) Holders of Allowed Claims will obtain a recovery through the Plan that is greater than the recovery that they would receive if the Debtors' assets were liquidated under chapter 7 of the Bankruptcy Code, and (b) consummation of the Plan will maximize recoveries to all Holders of Allowed Claims.

4.     As provided in detail below and in the *Declaration of Christopher S. Sontchi in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization for WOM S.A. and its Affiliated Debtors* (the "**Sontchi Declaration**"), the *Declaration of Marcelo Messer in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization for WOM S.A. and its Affiliated Debtors* (the "**Messer Declaration**"), the *Declaration of Robert Wagstaff in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization for WOM S.A. and its Affiliated Debtors* (the "**Wagstaff Declaration**"), and the *Declaration of Alex Orchowski of Kroll Restructuring LLC Regarding the Preliminary Rights Offering Results and the Solicitation of Votes and Tabulation of Ballots Cast on the Amended Joint Chapter 11 Plan of Reorganization for WOM S.A. and Its Affiliated Debtors* (the "**Voting Report**" and, together with the Sontchi Declaration, the Messer Declaration, and the Wagstaff Declaration, the "**Confirmation Declarations**"),[5] the Plan satisfies all applicable requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

---

[5]     The Debtors may also file additional declarations or offer additional evidence in support of confirmation as the Debtors deem appropriate.

5.     As described further herein and in the Voting Report, the Debtors have received overwhelming support for the Plan from Holders of Claims in the two Classes that were entitled to vote on the Plan.  Specifically, Class 3 (Unsecured Notes Claims) voted to accept the Plan by 96.89% in number and 93.95% in amount.  Although Class 4 (General Unsecured Claims) against WOM S.A. voted to reject the Plan, within that subclass, there were 88.89% of Holders of Allowed General Unsecured Claims against WOM S.A. (by number) and 64.24% of such Holders (by amount) who voted in favor of the Plan.  The majority of the rejecting claims in Class 4 came from one creditor, BCI.  Notably, only the Benesch AHG and BCI have filed objections to Plan confirmation.[6]  As described in greater detail below, both Plan Objections lack merit and should be overruled.

6.     The Debtors also received seven formal objections to cure amounts proposed for assumption of Executory Contracts or Unexpired Leases under the Plan (the "**Cure Objections**").[7] The Debtors also received informal objections regarding cure amounts or other modifications to the Schedule of Assumed Contracts and Leases from several counterparties.  As of the date of the filing of this Memorandum, the Debtors have consensually resolved two of the Cure Objections and ten informal objections.  Such resolutions are variously reflected in the *Supplemental Notice of (I) Potential Executory Contracts or Unexpired Leases to Be Assumed Pursuant to the Plan, (II) Fixing the Cure Costs Related Thereto, and Deadline to Object Thereto* filed contemporaneously (the "**Amended Assumption Notice**"), the stipulations filed with this Court [Docket Nos. 1199, 1200], the Plan, and the Confirmation Order.  All changes made to the Schedule of Assumed

---

[6]   Prior to the Plan Objection Deadline, the Debtors received certain informal comments to the Plan from parties in interest.  The Debtors have consensually resolved all such comments through modifications to the Plan or the Confirmation Order (as defined herein).

[7]   For the convenience of this Court, the Debtors have attached as **Exhibit A** to this Memorandum, a chart summarizing the main points of each Cure Objection and the resolution or status thereof.

Contracts and Leases attached to the *Notice of (I) Potential Executory Contracts or Unexpired Leases to be Assumed Pursuant to the Plan, (II) Fixing of the Cure Costs Related Thereto, and (III) Deadline to Object Thereto* [Docket No. 1072] (the "**Initial Assumption Notice**") are detailed in a blackline attached as a separate exhibit to the Amended Assumption Notice.   The Debtors are working to consensually resolve the remaining Cure Objections and informal cure objections.   Any Cure Objections or informal cure objections that remain unresolved by the Confirmation Hearing will be adjourned to the March 26, 2025 omnibus hearing or such later hearing as the parties may agree or this Court may direct.  *See* Plan Art. VII.D.

7.      For the reasons set forth herein and in the Confirmation Declarations, and in light of any other evidentiary support to be offered at the Confirmation Hearing, the Debtors respectfully request that this Court (i) find that the Plan satisfies all applicable provisions of section 1129 of the Bankruptcy Code and otherwise complies with the applicable sections of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, and (ii) enter the order, substantially in the form filed contemporaneously herewith (the "**Confirmation Order**"), confirming the Plan.

## BACKGROUND

### A.      The Chapter 11 Cases

8.      The Debtors commenced these Chapter 11 Cases on April 1, 2024 (the "**Petition Date**") by filing voluntary petitions under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "**Court**").  These Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Bankruptcy Rules**").  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  On April 12, 2024, the Office of the United States Trustee (the "**United States Trustee**") appointed the Committee.  *See Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 115].  No trustee or examiner has been appointed in these Chapter 11 Cases.

9.      Additional factual background regarding the Debtors, including their business operations and the events leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Robert Wagstaff in Support of Debtors' Chapter 11 Petitions and Requests for First Day Relief* [Docket No. 3].

### B.      The Development of the Debtors' Plan

10.     Throughout these Chapter 11 Cases, the Debtors have focused on preserving and maximizing the value of their estates for the benefit of all stakeholders.  In early June 2024, the Debtors formed the Special Committee and delegated to it exclusive authority to, among other things, (i) select the highest or otherwise best proposal for the sponsorship of a chapter 11 plan of reorganization or an asset sale, and (ii) lead negotiations with the Debtors' stakeholders to achieve an efficient exit from these Chapter 11 Cases through the confirmation of such plan or consummation of such asset sale.  *See* Sontchi Decl. ¶¶ 12-13.

11.     At the direction of the Special Committee and with the assistance of the Debtors' investment banker, Rothschild & Co. US Inc., the Debtors conducted an extensive, public marketing process to solicit bids for all available transactions.  Sontchi Decl. ¶ 14; Messer Decl. ¶ 9; *see also* Bidding Procedures Order [Docket No. 536].  Over the course of several months, the Debtors engaged with multiple potential bidders, including strategic and financial institutions and competitors.  Sontchi Decl. ¶ 14; *see* Messer Decl. ¶ 10.  The Debtors also engaged with the Committee throughout the process. Sontchi Decl. ¶ 14; *see* Messer Decl. ¶ 13.

12.     Ultimately, the AHG submitted the only "Qualified Bid" for a whole-company transaction.  Sontchi Decl. ¶ 15.  Following extensive and good faith discussions and negotiations,

the Special Committee determined, on behalf of the Debtors, that the bid submitted by the AHG was the highest and best offer received by the Debtors and the transactions contemplated thereunder would maximize value for the Debtors' stakeholders. *Id.*

13.    On December 6, 2024, the Debtors and the AHG entered into the Support Agreements. Sontchi Decl. ¶ 16. On December 19, 2024, the Debtors filed the *Joint Chapter 11 Plan of Reorganization of WOM S.A. and Its Affiliated Debtors* [Docket No. 945] (the "**Initial Plan**") and *Disclosure Statement for the Joint Chapter 11 Plan of WOM S.A. and Its Affiliated Debtors* [Docket No. 946]. The Initial Plan and Disclosure Statement incorporated the terms of the Support Agreements.

14.    Subsequently, the Debtors engaged in additional negotiations with the Committee, which led the Committee to execute a joinder to the Plan Sponsor Agreement and file a statement in support of this Court's approval of the Support Agreements. Sontchi Decl. ¶ 17; *Statement of the Official Committee of Unsecured Creditors in Support of the Debtors' Motion for Entry of an Order (I) Authorizing and Approving (A) Entry Into the Plan Sponsor Agreement, (B) Entry Into the Backstop Commitment Agreement, and (C) Incurrence of Certain Payment and Indemnification Obligations and (II) Granting Related Relief* [Docket No. 932]; *Notice of Filing of Revised Plan Sponsor Agreement* [Docket No. 1011].

15.    On December 20, 2024, this Court entered the Backstop and PSA Order, approving the Debtors' entry into, and performance under, the Support Agreements and overruling the objections of BCI and the Benesch AHG. *See* Docket No. 959.[8]

---

[8]    Benesch AHG filed an objection to the approval of the Support Agreements. *See* Docket No. 936.

16.     On January 9, 2025, this Court entered the Rights Offering Procedures Order, authorizing the Debtors to commence the Rights Offering in connection with the Plan.  *See* Docket No. 995.

17.     Following negotiations with the Committee and other parties in interest, the Debtors filed amended and modified versions of the Initial Plan and Disclosure Statement on January 21, 2025 and January 23, 2025.  *See* Docket Nos. 1027, 1028, 1040, 1041.

18.     On January 23, 2025, this Court entered the *Order (I) Approving Disclosure Statement, (II) Approving the Solicitation Procedures and Form of Ballots for the Plan, (III) Approving the Solicitation Packages and Prescribing the Form and Manner of Notice and Distribution Thereof, (IV) Scheduling Confirmation Hearing and Establishing Related Deadlines and Procedures, (V) Approving Assumption and Cure Procedures, and (VI) Granting Related Relief* [Docket No. 1051] (the "**Disclosure Statement Order**").  Among other things, the Disclosure Statement Order fixed February 27, 2025 as the deadline for (i) objections to confirmation of the Plan (the "**Plan Objection Deadline**"), and (ii) all Ballots to accept or reject the Plan and opt-in to the Third-Party Releases (as defined below) to have been received by the Claims Agent.  In addition, this Court set March 6, 2025 as the date of the Confirmation Hearing.

19.     On January 23, 2025, the Debtors filed the solicitation versions of the Initial Plan [Docket No. 1055] and the approved Disclosure Statement [Docket No. 1054] (as amended, the "**Disclosure Statement**").

20.     Contemporaneously with the filing of this Memorandum, the Debtors have filed a further revised Plan, which incorporates limited immaterial and non-adverse modifications, as set forth more fully herein.

**C.      Plan Solicitation**

21.     On January 30, 2025, the Debtors commenced solicitation of votes on the Plan by causing the Debtors' Claims Agent to serve the Solicitation Materials containing, among other things, the Disclosure Statement, the Confirmation Hearing Notice, and applicable Ballots to all Holders of Claims in Class 3 (Unsecured Notes Claims) and Class 4 (General Unsecured Claims) in accordance with the Disclosure Statement Order.  *See* Voting Report ¶¶ 5-7; *Affidavit of Service of Solicitation Materials* [Docket No. 1120] (the "**Solicitation Affidavit**") ¶ 1.

22.     The Debtors caused the Confirmation Hearing Notice to be published in English in the *New York Times* and in Spanish in *El Mercurio* on February 6, 2025.  *See Certificate of Publication* [Docket No. 1114].

**D.      Plan Supplement**

23.     On February 20, 2025, the Debtors filed the Plan Supplement [Docket No. 1131], which included the following documents and agreements: (i) New Corporate Governance Documents; (ii) New Secured Notes Documents; (iii) New Convertible Notes Documents; (iv) Plan Trust Agreement; (v) Schedule of Assumed Contracts and Leases; (vi) Schedule of Assumed Employee Obligations; (vii) LT Claims Schedule; (viii) Schedule of Retained Causes of Action; (ix) Form of Letter of Transmittal; (x) List of directors and officers of New Holdco and the Reorganized Debtors; and (xi) Management Incentive Plan Term Sheet.  On February 20, 2025, the Debtors caused the Plan Supplement to be served upon parties in interest.  *See* Docket No. 1186.

### E.    The Voting Results

24.    As noted, pursuant to the Disclosure Statement Order, the Debtors solicited votes on the Plan from Holders of Allowed Claims in Class 3 (Unsecured Notes Claims) and Class 4 (General Unsecured Claims) (collectively, the "**Voting Classes**").

25.    Contemporaneously herewith, the Debtors filed the Voting Report, which is summarized below in detail:[9]

| Debtor | Class | Class Description | Number Accepting % | Number Rejecting % | Amount Accepting % | Amount Rejecting % | Class Voting Result |
|---|---|---|---|---|---|---|---|
| WOM SA | 3 | Unsecured Notes Claims | 187 | 6 | $514,852,400.20 | $33,139,599.80 | Accept |
| | | | 96.89% | 3.11% | 93.95% | 6.05% | |
| | 4 | General Unsecured Claims | 32 | 4 | $126,296,544.07 | $70,292,307.13 | Reject |
| | | | 88.89% | 11.11% | 64.24% | 35.76% | |
| Kenbourne Invest S.A. | 3 | Unsecured Notes Claims | 187 | 6 | $514,852,400.20 | $33,139,599.80 | Accept |
| | | | 96.89% | 3.11% | 93.95% | 6.05% | |
| | 4 | General Unsecured Claims | 1 | 0 | $6,136,352.61 | $0.00 | Accept |
| | | | 100% | 0% | 100% | 0% | |
| NC Telecom II AS | 3 | Unsecured Notes Claims | 187 | 6 | $514,852,400.20 | $33,139,599.80 | Accept |
| | | | 96.89% | 3.11% | 93.95% | 6.05% | |
| | 4 | General Unsecured Claims | 1 | 0 | $6,136,352.61 | $0.00 | Accept |
| | | | 100% | 0% | 100% | 0% | |
| WOM Mobile S.A. | 3 | Unsecured Notes Claims | 187 | 6 | $514,852,400.20 | $33,139,599.80 | Accept |
| | | | 96.89% | 3.11% | 93.95% | 6.05% | |
| | 4 | General Unsecured Claims | 1 | 0 | $6,136,352.61 | $0.00 | Accept |
| | | | 100% | 0% | 100% | 0% | |

---

[9]    The Debtors extended the Voting Deadline for Phoenix Tower International Chile SpA to March 5, 2025 at 9:00 a.m. (ET).

| Debtor | Class | Class Description | Number Accepting % | Number Rejecting % | Amount Accepting % | Amount Rejecting % | Class Voting Result |
|---|---|---|---|---|---|---|---|
| Conect S.A. | 3 | Unsecured Notes Claims | 187 | 6 | $514,852,400.20 | $33,139,599.80 | Accept |
| | | | 96.89% | 3.11% | 93.95% | 6.05% | |
| | 4 | General Unsecured Claims | 1 | 0 | $6,136,352.61 | $0.00 | Accept |
| | | | 100% | 0% | 100% | 0% | |
| Multikom S.A. | 3 | Unsecured Notes Claims | 187 | 6 | $514,852,400.20 | $33,139,599.80 | Accept |
| | | | 96.89% | 3.11% | 93.95% | 6.05% | |
| | 4 | General Unsecured Claims | 3 | 0 | $6,152,892.95 | $0.00 | Accept |
| | | | 100% | 0% | 100% | 0% | |

26.     As set forth in the Voting Report, Class 3 voted to accept the Plan.  Voting Report, Ex. A.

### F.     Immaterial And Non-Adverse Modifications To The Plan

27.     Section 1127(a) of the Bankruptcy Code provides that a plan proponent may modify its plan "at any time before confirmation, but may not modify such plan so that such plan as modified fails to meet the requirements of sections 1122 and 1123 of [the Bankruptcy Code].  After the proponent files a modification of such plan with the court, the plan as modified becomes the plan."  11 U.S.C. § 1127(a).

28.     Additionally, Bankruptcy Rule 3019 provides that post-solicitation plan modifications do not require resolicitation if the modifications do not adversely change the treatment of parties who previously voted for the plan.  *See* Fed. R. Bankr. P. 3019.  Courts have accordingly found that only "material" and "adverse" plan modifications require resolicitation. *See In re Century Glove, Inc.*, Case No. 90-400, 1993 WL 239489, at *12 (D. Del. Feb. 10, 1993) (upholding bankruptcy court's finding that section 1127 did not require further disclosure and resolicitation of votes where "the modification at issue did not materially and adversely impact

any creditors who had previously voted for the Plan"); *In re Fed.-Mogul Glob. Inc.*, Case No. 01-10578, 2007 WL 4180545, at *39 (Bankr. D. Del. Nov. 16, 2007) (additional disclosure under section 1125 is not required where plan "[m]odifications do not materially and adversely affect or change the treatment of any [c]laim against or [e]quity [i]nterest in any Debtor").

29.    Plan modifications are immaterial unless they "so affect a creditor or interest holder who accepted the plan that such entity, if it knew of the modifications, would be likely to reconsider its acceptance."  *In re Boy Scouts of Am. & Del. BSA, LLC*, 650 B.R 87, 168 (D. Del. 2023) (internal citation omitted); *see also In re New Power Co.,* 438 F.3d 1113, 1117-18 (11th Cir. 2006) (explaining that a party's "vote for or against a plan" may be applied to a modified plan "unless the modification materially and adversely changes" the party's treatment).

30.    As noted above, following the solicitation process, the Debtors made certain modifications to the Plan (collectively, the "**Plan Modifications**").[10] The Plan Modifications resolve comments to the Plan by the AHG, the Committee, and certain other parties in interest. The Plan Modifications, among other things, provide that Alvaro Araya, a former officer of the Debtors, shall be a Released Party with respect to the Debtor Releases (as defined below), but not the Third-Party Releases (as defined below).  *See* Plan Art. I.A.194; Plan Art. VIII.F.  In addition, the Plan Modifications ensure that the Plan accurately reflects foreign corporate law requirements required to implement the Reorganization Transactions. The Plan Modifications also include certain documents filed with the Plan Supplement revising provisions that are inconsistent with the Plan Term Sheet.  The Plan Supplement was filed seven days in advance of the Plan Objection Deadline and such inconsistencies have been consented to by the Required Consenting Noteholders and the Debtors.

---

[10]    The Debtors will file a redline of the Plan showing the Plan Modifications prior to the Confirmation Hearing.

31.     The Plan Modifications do not materially or adversely affect the treatment of Holders of Claims and Interests, *see* Wagstaff Decl. ¶ 65, and therefore comply with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and do not require additional disclosure under section 1125 of the Bankruptcy Code or resolicitation of votes with respect to the Plan under section 1126 of the Bankruptcy Code.  Accordingly, no additional solicitation or disclosure is required on account of the Plan Modifications, and the Plan Modifications should be deemed accepted by all creditors that previously accepted the Plan.

**BASIS FOR RELIEF**

32.     To obtain confirmation of the Plan, the Debtors must demonstrate that the Plan satisfies the applicable provisions of section 1129 of the Bankruptcy Code by a preponderance of the evidence.  *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II* (*In re Briscoe Enters., Ltd. II*), 994 F.2d 1160, 1165 (5th Cir. 1993) ("The combination of legislative silence, Supreme Court holdings, and the structure of the Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown."); *see also In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006) ("[T]he debtor's standard of proof that the requirements of § 1129 are satisfied is preponderance of the evidence.").

33.     The evidentiary record of these Chapter 11 Cases, including, the Confirmation Declarations, and the testimony and other evidence that may be presented at the Confirmation Hearing, along with other filings made with this Court, demonstrates, by a preponderance of the evidence, that all applicable subsections of section 1129 of the Bankruptcy Code have been satisfied with respect to the Plan.

34.     This Memorandum is divided into three parts.  In <u>Part I</u>, the Debtors address the applicable requirements for confirmation of the Plan under section 1129 of the Bankruptcy Code,

including the requirements for approval of releases, exculpation, and injunction provisions under section 1123 of the Bankruptcy Code, and demonstrate how the Plan satisfies each requirement and achieves the objectives of chapter 11.   In Part II, the Debtors respond to each of the Plan Objections.  In Part III, the Debtors establish that cause exists to justify a waiver of the stay of the entry of the Confirmation Order such that the Confirmation Order will be effective immediately upon its entry.

I.      **THE PLAN SATISFIES THE REQUIREMENTS FOR CONFIRMATION UNDER SECTION 1129(A) OF THE BANKRUPTCY CODE**

35.      As addressed in detail herein, the Plan satisfies the applicable requirements for confirmation as set forth in section 1129 of the Bankruptcy Code.

A.      **Section 1129(a)(1): The Plan Complies with Applicable Provisions of the Bankruptcy Code**

36.      Section 1129(a)(1) of the Bankruptcy Code provides that a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(1).  The legislative history of section 1129(a)(1) explains that this provision incorporates the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern classification of claims and contents of a plan, respectively.  *See* H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977); *see also In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008) ("For the court to confirm a plan, the plan proponents must establish by a preponderance of the evidence that the plan satisfies each of the requirements of 11 U.S.C. § 1129(a)," which "requires that a plan comply with 11 U.S.C. §§ 1122 and 1123.").

37.      As demonstrated below, the Plan fully complies with the requirements of sections 1122 and 1123 and all other applicable provisions of the Bankruptcy Code.

1.     **Section 1122: The Plan Complies with the Classification Requirements of Section 1122 of the Bankruptcy Code**

38.     Section 1122(a) of the Bankruptcy Code provides that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  11 U.S.C. § 1122(a).

39.     For a classification structure to satisfy section 1122 of the Bankruptcy Code, it is not necessary that all substantially similar claims or interests be designated to the same class, but only that all claims or interests designated to a particular class be substantially similar to each other.  *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 159-60 (Bankr. D. Del. 2006).  A plan proponent has significant flexibility in classifying claims and interests into multiple classes, as long as there is a reasonable basis to do so and all claims or interests within a given class are "substantially similar." *In re Coastal Broad. Sys., Inc.*, 570 F. App'x. 188, 193 (3d Cir. 2014); *see also John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158–59 (3d Cir. 1993) (explaining that as long as each class represents a voting interest that is "sufficiently distinct and weighty to merit a separate voice in the decision whether the proposed reorganization should proceed," the classification is proper.).

40.     The Plan provides for separate classification of Claims and Interests based on differences in the legal nature and/or priority of such Claims and Interests.  The Plan designates the following classes of Claims and Interests: Class 1 (Other Secured Claims); Class 2 (Other Priority Claims); Class 3 (Unsecured Notes Claims); Class 4 (General Unsecured Claims); Class 5 (Intercompany Claims); Class 6 (Existing Equity Interests); and Class 7 (Intercompany Interests).

41.     As reflected in the respective definitions of each Class of Claims and Interests, each of the Claims or Interests in each Class is substantially similar to the other Claims or Interests in

such Class. *See* Plan Art. III. In addition, valid business, legal, and factual reasons justify the separate classification of the particular Claims and Interests into the Classes created under the Plan. *See* Wagstaff Decl. ¶¶ 10-14. The separate classification of Claims against, and Interests in, the Debtors is based upon the differences in the legal nature and/or priority of such Claims and Interests in accordance with applicable law. *Id*. ¶ 11. The Debtors' proposed classification system set forth in Article III of the Plan follows the Debtors' capital and corporate structure, thereby taking into account the relative priority among Claims and Interests, including the relative priority between secured and unsecured claims, and classifies debt and equity separately. *Id*. Accordingly, the classification scheme of the Plan complies with section 1122 of the Bankruptcy Code.

### 2. The Plan Complies with All Requirements of Section 1123(a) of the Bankruptcy Code

42. Section 1123(a) of the Bankruptcy Code sets forth seven (7) requirements with which every chapter 11 plan must comply. *See* 11 U.S.C. § 1123(a). As demonstrated herein, the Plan fully complies with each such requirement.

### i. Section 1123(a)(1): The Plan Designates Classes of Claims and Interests.

43. Section 1123(a)(1) requires that a plan must designate classes of claims and classes of equity interests subject to section 1122 of the Bankruptcy Code. 11 U.S.C. § 1123(a)(1). As discussed above, the Plan designates five (5) Classes of Claims and two (2) Classes of Interests in compliance with section 1122. Plan Art. III.G; Wagstaff Decl. ¶ 15. Accordingly, the Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

### ii. Section 1123(a)(2): The Plan Specifies Classes that Are Not Impaired by the Plan.

44. Section 1123(a)(2) requires a plan to specify which classes of claims or interests are unimpaired by the plan. 11 U.S.C. § 1123(a)(2). Article III of the Plan specifies that: Class 1

(Other Secured Claims); Class 2 (Other Priority Claims); Class 5 (Intercompany Claims); and Class 7 (Intercompany Interests) are Unimpaired.[11]    Plan Art. III.G; Wagstaff Decl. ¶ 16. Accordingly, the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

### iii.    Section 1123(a)(3): The Plan Specifies Treatment of Classes that are Impaired by the Plan.

45.    Section 1123(a)(3) requires a plan to specify how classes of claims or interests that are impaired by the plan will be treated.  11 U.S.C. § 1123(a)(3).  Article III of the Plan sets forth the treatment of Impaired Claims in Class 3 (Unsecured Notes Claims), Class 4 (General Unsecured Claims), Class 5 (Intercompany Claims), Class 6 (Existing Equity Interests), and Class 7 (Intercompany Interests).[12]  Plan Art. III.G; Wagstaff Decl. ¶ 17.  Accordingly, the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

### iv.    Section 1123(a)(4): The Plan Provides Equal Treatment for Claims and Equity Interests Within Each Class.

46.    Section 1123(a)(4) requires that a plan provide the same treatment for each claim or equity interest within a particular class unless any claim or equity interest holder agrees to receive less favorable treatment than other class members.  11 U.S.C. § 1123(a)(4).  Pursuant to the Plan, the treatment of each Claim against or Interest in the Debtors, in each respective Class, is the same as the treatment of each other Claim or Interest in such Class.  *See* Plan Art. III.G; Wagstaff Decl. ¶ 18.  Accordingly, the Plan satisfies the requirements of section 1123(a)(4) of the Bankruptcy Code.

---

[11]    Class 5 (Intercompany Claims) and Class 7 (Intercompany Interests) shall be rendered either Unimpaired or Impaired at the Debtors' election with the consent of the Required Consenting Noteholders.  Plan Art. III.G.

[12]    Class 5 (Intercompany Claims) and Class 7 (Intercompany Interests) shall be rendered either Unimpaired or Impaired at the Debtors' election with the consent of the Required Consenting Noteholders.  Plan Art. III.G.

v.    **Section 1123(a)(5): The Plan Provides Adequate Means for Implementation.**

47.    Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide "adequate means for the plan's implementation." 11 U.S.C. § 1123(a)(5). Article IV of the Plan provides adequate and proper means for implementation of the Plan by providing for, among other things, the sources for distributions under the Plan, the issuance and distribution of the Plan Securities, the establishment of the Plan Trust, the vesting of assets in the Reorganized Debtors, the cancellation, redemption, or reinstatement of existing securities and agreements, the authorization for the Debtors or the Reorganized Debtors, as applicable, to take corporate actions necessary to effectuate the Plan, and the wind-down of Kenbourne. *See* Wagstaff Decl. ¶¶ 19-21. In addition, Article VI of the Plan also provides for the establishment of reserves with respect to allowed and disputed claims. The mechanisms contemplated by the Plan are designed to maximize the value of the Debtors' assets and provide sufficient capital and liquidity for the Reorganized Debtors. *See id*. at ¶ 21. Accordingly, the Plan, together with the documents and agreements contemplated by the Plan and the Plan Supplement, provide the means for implementation of the Plan as required by and in satisfaction of section 1123(a)(5) of the Bankruptcy Code.

vi.    **Section 1123(a)(6): Issuance of Non-Voting Securities.**

48.    Section 1123(a)(6) of the Bankruptcy Code prohibits the issuance of non-voting equity securities and requires amendment of a debtor's charter to so provide. *See* 11 U.S.C. § 1123(a)(6). This section also requires that a corporate charter provide an appropriate distribution of voting power among the classes of securities possessing voting power. *See id.* In accordance with section 1123(a)(6) of the Bankruptcy Code and pursuant to Article IV.H of the Plan, the New Corporate Governance Documents have been, or will be amended on or prior to the Effective Date, to prohibit the issuance of non-voting securities and set forth an

appropriate distribution of voting power among classes of equity securities possessing voting power.  *See* Plan Art. IV.H; Wagstaff Decl. ¶ 22.  Drafts of the New Corporate Governance Documents are included in the Plan Supplement.  *See* Plan Supp., Ex. A (New Corporate Governance Documents).  Accordingly, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code.

### vii.  Section 1123(a)(7): Provisions Regarding Directors and Officers.

49.    Section 1123(a)(7) of the Bankruptcy Code requires that a plan "contain only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director, or trustee." 11 U.S.C. § 1123(a)(7).  Article IV.I of the Plan provides that the New Board will initially consist of five (5) individuals, including the Chief Executive Officer of WOM Mobile S.A. and the Initial AHG Directors.[13]  The Debtors have disclosed the list of directors and officers New Holdco constituting the New Board and management prior to the Confirmation Hearing.  *See* Plan Supp., Ex. J.  *See* Plan Supp., Ex. J, Wagstaff Decl. ¶ 23.  None of the Initial AHG Directors are members of the AHG nor affiliated or employed by any members of the AHG, and none of the non-officer directors of New Holdco will be insiders.  The selection of the directors and officers of New Holdco by the plan sponsors, and the independence of the non-officer directors, is consistent with the interests of all Holders of Claims and Interests and public policy.  Wagstaff Decl. ¶ 23.  The Plan therefore satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

---

[13]  "***Initial AHG Directors***" means four directors of New Holdco, with one director appointed by each member of the Ad Hoc Group.  *See* Plan Art. I.115.

### 3. The Plan Incorporates Certain Discretionary Provisions of Section 1123(b) of the Bankruptcy Code

50.     Section 1123(b) of the Bankruptcy Code sets forth certain discretionary provisions that may be incorporated into a chapter 11 plan.  11 U.S.C. § 1123(b).  The contents of the Plan are consistent with these provisions.

### i.      Section 1123(b)(1): Impairment of Claims and Interests.

51.     Section 1123(b)(1) of the Bankruptcy Code provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests."  11 U.S.C. § 1123(b)(1).  Article III of the Plan provides that Claims in Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims) are Unimpaired.  *See* Plan Art. III.G; Wagstaff Decl. ¶ 24.  The Plan also provides that Claims in Class 3 (Unsecured Notes Claims), Class 4 (General Unsecured Claims), and Interests in Class 6 (Existing Equity Interests) are Impaired, and Claims in Class 5 (Intercompany Claims) and Interests in Class 7 (Intercompany Interests) are either Impaired or Unimpaired.  *See* Plan Art. III.G; Wagstaff Decl. ¶ 24.  Accordingly, the Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

### ii.     Section 1123(b)(2): Assumption or Rejection of Executory Contracts and Unexpired Leases.

52.     Section 1123(b)(2) of the Bankruptcy Code allows a plan to provide for assumption, assumption and assignment, or rejection of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code.  11 U.S.C. § 1123(b)(2).  Article VII.A of the Plan provides that, as of the Effective Date, all Executory Contracts and Unexpired Leases shall be rejected except those that: (i) have been previously assumed, assumed and assigned, or rejected by a Final Order; (ii) are the subject of a motion to assume Executory Contracts or Unexpired Leases that is pending on the Effective Date; (iii) the Debtors have, as of the Effective Date, received authority to assume pursuant to an order of this Court and the effective date of such assumption is after the

Effective Date; (iv) are listed on the Schedule of Assumed Contracts and Leases and are not removed from such schedule prior to the Effective Date at the option of the Required Consenting Noteholders (in consultation with the Debtors); and (v) provide for payment of severance or other benefits to former employees of the Debtors whether in the form of a plan or individual agreement. *See* Plan Art. VII.A; Wagstaff Decl. ¶ 27.

53.     Article VII.D of the Plan also provides procedures for resolving disputes related to assumption and Cure Claims.  Plan Art. VII.D.  Specifically, pursuant to the Plan, disputes regarding (i) the amount of any Cure Claims, (ii) adequate assurance of future performance, or (iii) any other matter pertaining to assumption or Cure Claims shall be resolved by Final Order or agreement between the Debtors and the counterparty.  *See id.*  The Plan further provides that, where an Assumption Dispute relates solely to a Cure Claim amount, the Debtors may proceed with assumption provided they reserve sufficient Cash for the asserted cure payment, subject to this Court's authority to resolve disputes regarding such reserve.  *See id*.  To the extent that the Assumption Dispute is resolved or determined unfavorably to the Debtors, the Plan also provides that the Debtors may reject the applicable Executory Contract or Unexpired Lease with the consent of the Required Consenting Noteholders.  *See id.*; *see also* Wagstaff Decl. ¶ 28.  These provisions of the Plan are consistent with section 1123(b)(2) of the Bankruptcy Code.

iii.     **Section 1123(b)(3)(A): Settlement of Any Claim by the Debtors.**

54.     Section 1123(b)(3)(A) of the Bankruptcy Code expressly authorizes a plan to provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A).  Pursuant to this authority, the Plan provides for the settlement and release of certain claims belonging to the Debtors, subject to important carve-outs for actual fraud, willful misconduct, and gross negligence.  *See* Plan Art. VIII.E.  Courts consistently recognize that section 1123(b)(3)(A) of the Bankruptcy Code authorizes debtors to release claims

as part of a chapter 11 plan where "the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate." *In re Spansion, Inc.*, 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Alecto Healthcare Servs., LLC*, Case No. 23-10787, 2024 Bankr. LEXIS 670, at *13 (Bankr. D. Del. Mar. 20, 2024) (same).  As discussed more fully below, the Debtor Releases (as defined below) satisfy the prevailing judicial standards and represent a proper exercise of the Debtors' authority under section 1123(b)(3)(A).

> iv.    **Section 1123(b)(3)(B): Retention of Claims or Interests by the Debtors.**

55.    Section 1123(b)(3)(B) of the Bankruptcy Code provides that a plan may provide for "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose" of any claim or interest.  11 U.S.C. § 1123(b)(3)(B).  The Reorganized Debtors will retain all of the Retained Causes of Action.  *See* Plan Art. IV.P; Sontchi Decl. ¶ 22; *see also* Plan Supp., Ex. H (Schedule of Retained Causes of Action).  In addition, the Plan transfers LT Claims that have not been settled, waived, and/or released as of the Effective Date to the Plan Trust.  *See* Plan Art. IV.P; Sontchi Decl. ¶ 22; *see also* Plan Supp., Ex. G (LT Claims Schedule). These provisions are expressly permitted by section 1123(b)(3)(B) of the Bankruptcy Code.

> v.    **Section 1123(b)(4): Sale of All or Substantially All of the Debtors' Assets.**

56.    Section 1123(b)(4) of the Bankruptcy Code provides that a plan may "provide for the sale of all or substantially all of the property of the estate, and the distribution of the proceeds of such sale among holders of claims or interests." 11 U.S.C. § 1123(b)(4).  Section 1123(b)(4) of the Bankruptcy Code is inapplicable because the Plan does not provide for the sale of all or substantially all of the Debtors' property.  *See* Wagstaff Decl. ¶ 59.

> vi.    **Section 1123(b)(5): Modification of the Rights of Holders of Claims and Interests.**

21

57.     Section 1123(b)(5) of the Bankruptcy Code provides that a plan may modify the rights of secured and unsecured claimholders.  11 U.S.C. § 1123(b)(5).  In accordance and compliance with section 1123(b)(5) of the Bankruptcy Code, the Plan: (i) modifies the rights of Holders of Claims in Class 3 (General Unsecured Notes Claims) and Class 4 (General Unsecured Claims) and Interests in Class 6 (Existing Equity Interests), as applicable, each of which constitutes an Impaired Class under the Plan; (ii) leaves unimpaired the rights of Holders of Claims in Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims), which are Unimpaired under the Plan; and (iii) modifies or leaves unimpaired the rights of Holders of Claims in Class 5 (Intercompany Interests) and Interests in Class 7 (Intercompany Interests), which are either Unimpaired or Impaired under the Plan.  *See* Plan Art. IV; Wagstaff Decl. ¶ 32.

vii.     **Section 1123(b)(6): Provisions Not Inconsistent with the Bankruptcy Code.**

58.     Section 1123(b)(6) of the Bankruptcy Code provides that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1123(b)(6).  The Plan includes various provisions necessary or appropriate to effectuate the Plan.  No provision of the Plan is inconsistent with the Bankruptcy Code.

### a.   The Releases, Exculpation, and Injunction Provisions

59.     In accordance with section 1123(b)(6) of the Bankruptcy Code, Article VIII of the Plan contains certain release, exculpation, and injunction provisions consistent with the applicable provisions of the Bankruptcy Code and the law in the Third Circuit.  The release, exculpation, and injunction provisions are the product of good-faith, arm's-length negotiations between the Debtors, the AHG, the Committee, and other stakeholders.  *See* Sontchi Decl. ¶¶ 22, 24, 26, 27, 29.  These provisions are fair and reasonable under the circumstances, supported by consideration, and essential to the reorganization in the Chapter 11 Cases.

**(A)     The Debtor Releases**

60.     Section 1123(b)(3)(A) of the Bankruptcy Code states that a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A).   A debtor may release a claim under section 1123(b)(3)(A) of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."  *In re Spansion, Inc.,* 426 B.R. at 143.

61.     In determining whether a debtor release is proper, courts in Delaware and elsewhere generally consider the following five factors: (i) whether an identity of interest exists between the debtor and the third party; (ii) whether the non-debtor has made a substantial contribution to the debtor's reorganization; (iii) whether the release is essential to the debtor's reorganization; (iv) whether there is an agreement by a substantial majority of creditors to support the release; and (v) whether a plan provides for payment of all or substantially all of the claims in the class or classes affected by the release.  *E.g.*, *In re Zenith Elecs. Corp*., 241 B.R. 92, 110 (Bankr. D. Del. 1999) (internal citations omitted); *In re Exide Techs.*, 303 B.R. 48, 72 (Bankr. D. Del. 2003) (finding that *Zenith* factors are not exclusive or conjunctive requirements).

62.     Article VIII.E of the Plan provides for the release by the Debtors of, among other things, certain claims, rights, and Causes of Action that the Debtors may have against the Released Parties (the "**Debtor Releases**").[14]   The Debtor Releases satisfy each of the *Zenith* factors.

---

[14]   "***Released Parties***" means collectively, and in each case in its capacity as such: (a) each Debtor; (b) New Holdco, each Reorganized Debtor, and each direct or indirect subsidiary of the Debtors or Reorganized Debtors; (c) the DIP Agents, and each DIP Lender; (d) the Unsecured Notes Trustees; (e) each Consenting Noteholder; (f) the Committee and its members; (g) each current and former Affiliate of each Entity in clause (b) through (f); and (h) each Related Party of each Entity in clause (a) through (g) (which, for the avoidance of doubt, includes each of the Ad Hoc Group Advisors); *provided* that (x) any holder of a Claim or Interest that does not opt in to granting the releases or is not otherwise a Releasing Party and (y) each of the Non-Released Parties shall not be a Released Party.  Plan Art. I.A.193.

63.    *First*, an identity of interests exists between the Debtors and the Released Parties. Each Released Party, as a stakeholder and critical participant in the Plan process, shares a common goal with the Debtors in seeing the Plan succeed.  Sontchi Decl. ¶ 23; *see also In re Tribune Co*., 464 B.R. 126, 187 (Bankr. D. Del. 2011) (finding an identity of interests where parties "share[d] the common goal of confirming the [plan] and implementing the [settlement]"); *In re Zenith*, 241 B.R. at 110 (finding an identity of interests where released parties "were instrumental in formulating the Plan" and shared an interest with the debtors "in seeing that the Plan succeed and the company reorganize").

64.    *Second*, each of the Released Parties has made a substantial contribution to the Debtors and their estates.  Sontchi Decl. ¶ 23.  The Debtor Releases are narrowly tailored to stakeholders whose assistance was critical to facilitate and implement the Plan.  *See id* ¶ 24.  The Released Parties played an integral role in some or all of the Debtors' marketing process, Rights Offering, and formulation of the Plan.  The Released Parties not only spent significant time and resources analyzing and negotiating the terms of the Support Agreements and the Plan, but many also gave up material economic interests to ensure the success of the Debtors' Chapter 11 Cases.  *See id*.  For example, the DIP Lenders and the DIP Agents contributed value by providing the DIP Credit Facility and consenting to the Debtors' use of cash collateral.  *See id*.  The Consenting Noteholders agreed to fund the Rights Offering and support the Plan, ensuring the liquidity necessary for the Debtors to make distributions under the Plan and operate upon emergence.  *See id*. ¶ 23.  The Debtors' directors, officers, employees, professionals, and other agents who served in such capacity on or after the Petition Date have been instrumental in operating the Debtors' business post-petition and negotiating, formulating, and implementing the Reorganization Transactions under the Plan.  *See id*.  These measures, among others, improved the Debtors'

liquidity throughout the Chapter 11 Cases and have enabled the Debtors to implement a largely consensual, value-maximizing restructuring. *See id.*

65. Moreover, the Debtor Releases exclude any claims or Causes of Action arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, in each case, solely to the extent determined by a Final Order. *See* Plan Art. VIII.E, *see also* Sontchi Decl. ¶ 24. The Debtor Releases also do not release any entity other than the Released Parties, their respective Affiliates and each of their Related Parties, as applicable, and do not release claims or Causes of Action in connection with the ICSID Arbitration or against any Non-Released Parties.[15] *See* Sontchi Decl. ¶ 22; Plan Art. VIII.E; Plan Art. I.A.194. These carve-outs are the product of arm's-length negotiations with the AHG and the Committee and are essential elements of the Plan. *See* Sontchi Decl. ¶ 24.

66. ***Third***, the Debtor Releases are essential to the success of the Plan. The Debtor Releases are the product of arm's-length negotiations between the Debtors and their key stakeholders throughout the Plan process and are integral to achieving final resolution of potential disputes that would otherwise negatively affect the Debtors' estates and the recoveries available to creditors under the Plan. *See* Sontchi Decl. ¶¶ 22, 24. The Debtors, in their business judgment, therefore determined that the Debtor Releases were necessary to achieve consensus on the Plan. *See* Sontchi Decl. ¶ 25. Accordingly, the Debtor Releases provide finality and underpin significant support for the Plan, and therefore inure to the benefit of all of the Debtors' stakeholders.

---

[15] "***Non-Released Parties***" means: (i) Novator Partners LLP and any of its direct and indirect non-Debtor affiliates and managed entities; (ii) all direct and indirect holders of equity interests in any of the Debtors, including, but not limited to, (a) The Telco Holdings Trust, its settlor and beneficiaries and (b) any other trust that owns any such equity interests, its settlor and beneficiaries; (iii) Novator (Luxembourg) S.à r.l.; (iv) Novator Two L.P.; (v) WOM Colombia S.A.S. and any of its direct and indirect affiliates; (vi) Björgólfur Thor Björgólfsson; (vii) Thomas Leslie; (viii) Jaroslav Valiukevic; (ix) Kristopher Brigham; (x) Serdar Cetin; (xi) Graham Bruce McInroy; (xii) PurpleCrest Investments LLP; (xiii) any former directors of any of the Debtors as of the Petition Date (other than Chris Bannister); and (xiv) any subsequent transferee of each Person or Entity in clause (i) through (xiii). *See* Plan Art.I.A.164.

67.      ***Fourth***, as evidenced by the Voting Report and noted herein, Class 3 voted to accept the Plan.  *See* Voting Report, Ex. A.  Further, no party has objected to the Debtor Releases contained in the Plan.  Given the critical nature of the Debtor Releases, this degree of consensus evidences the Debtors' stakeholders' support of the Debtor Releases and for the Plan.

68.      ***Fifth***, the Plan provides for meaningful recoveries for all creditors affected by the Debtor Releases.  *See* Sontchi Decl. ¶ 24.  Each of the *Zenith* factors therefore supports approval of the Debtor Releases through Plan confirmation.

69.      For these reasons, the Debtors have reasonably exercised their business judgment, and the Debtor Releases are fair, equitable, and necessary to the success of these Chapter 11 Cases, and appropriate under prevailing Third Circuit law.

### (B)      The Consensual Third-Party Releases

70.      Article VIII.F of the Plan provides for the release of the Released Parties by the Releasing Parties[16] to the extent set forth in the Plan (the "**Third-Party Releases**" and, together with the Debtor Releases, the "**Releases**").  The Third-Party Releases are granted only by Holders of Claims or Interests who are eligible to vote to accept or reject the Plan and affirmatively opt in to granting the Third-Party Releases, as well as each Consenting Noteholder, the Unsecured Notes Trustee, the DIP Agents, and each DIP Lender.  *See* Sontchi Decl. ¶ 26; Plan Art. I.A.194.

71.      Third-party releases may be approved if, as here, they are consensual and appropriately tailored.  *See, e.g.*, *Harrington v. Purdue Pharma L.P.,* 144 S. Ct. 2071, 2074 (2024)

---

[16]   "***Releasing Parties***" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) New Holdco, each Reorganized Debtor, and each direct or indirect subsidiary of the Debtors or Reorganized Debtors; (c) the DIP Agents and each DIP Lender; (d) the Unsecured Notes Trustees; (e) each Consenting Noteholder; (f) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that opt in to granting releases, (g) each current and former Affiliate of each Entity in clause (a) through (f), and (h) each Related Party of each Entity in clause (a) through (g); provided, however, that each Entity identified in part (h) shall be a Releasing Party only with respect to claims or Causes of Action that it could have properly asserted on behalf of the Entities identified in (a) through (g) hereof.  *See* Plan Art. I.A.194.

("[N]othing in [this opinion] should be construed to call into question consensual third-party releases offered in connection with a bankruptcy reorganization plan."); *In re Smallhold, Inc.,* 665 B.R. 704, 708 (Bankr. D. Del. 2024) (noting that consensual releases are "commonplace"); *In re Washington Mut., Inc.,* 442 B.R. 314, 352 (Bankr. D. Del. 2011) (observing that consensual third-party release are permissible).   Consensual releases are permissible under general principles of contract law.   *In re Smallhold, Inc.,* 665 B.R. at 708 ("Some opinions have adopted a 'contract model, concluding that a finding of consent required an affirmative indication that the creditor consented to the release. To comply with this view, a creditor was typically required affirmatively to check a box on its ballot indicating that it intended to 'opt in' to the third-party release"); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2013) (collecting cases).   A third-party release is consensual if the releasing party indicates its consent by an affirmative act.   *E.g.*, *In re Smallhold*, 665 B.R. at 711 ("[A] creditor cannot be deemed to consent to a third-party release without some affirmative expression of the creditor's consent").

72.     Courts in this district have found that consent to third-party releases may be obtained through an opt-in mechanism.   *See, e.g.*, *In re Exp OldCo Winddown, Inc.*, Case No. 24-10831 (KBO) (Bankr. D. Del. Dec. 17, 2024) [Docket No. 1150] (approving third-party releases that required the releasing parties to affirmatively opt-in via a ballot or opt-in form); *In re SunPower Corp.*, *et al.*, Case No. 24-11649 (CTG) (Bankr. D. Del. Oct. 18, 2024) [Docket No. 872] (approving third-party releases that required the releasing parties to affirmatively opt-in by voting to accept the plan or by completing and returning the applicable opt-in form); *In re Casa Systems, Inc.*, Case No. 24-10695 (KBO) (Bankr. D. Del. June 5, 2024) [Docket No. 421] (same); *see also In re First Mode Holdings, Inc.*, Case No. 24-12794 (KBO) (Bankr. D. Del. Feb. 6, 2025) [Docket No. 266] Hr'g. Tr. at 37:14–38:9; 41:14-23 (overruling disclosure statement objection,

finding that opt-in mechanism for third-party releases is the "gold standard" and potentially "appeal-proof").

73.     Here, the Third-Party Releases were obtained consensually through an opt-in mechanism and are appropriately narrowly tailored. ***First***, all parties in interest were provided sufficient notice of these Chapter 11 Cases, the Plan, and the deadline to object to confirmation of the Plan.  *See* Wagstaff Decl. ¶ 37; Disclosure Statement Order ¶¶ A, H.  Moreover, the Disclosure Statement, the Confirmation Hearing Notice, and the Ballots provided recipients with timely and adequate notice of the Third-Party Releases.  *See* Disclosure Statement Order ¶ D; Disclosure Statement, Ex. 3B.    The Confirmation Hearing Notice and the Ballots quoted the entirety of the Third-Party Releases in bold, conspicuous font.  *See* Docket No. 1056 (Confirmation Hearing Notice); Disclosure Statement, Ex. 3B.  The Debtors required all Holders of Claims or Interests that wished to grant a Third-Party Release to affirmatively opt-in to the Third-Party Releases by checking an opt-in box on the Ballot and submitting the Ballot, regardless of whether such Holders voted to accept or reject the Plan. *See* Disclosure Statement Order, Ex. 3B.  The Debtors provided Holders of Claims eligible to vote with ample notice and instructions on how to do so.  *See* Wagstaff Decl. ¶ 36; *see also* Disclosure Statement Order ¶ D.  As of the time of the filing of this Memorandum,161 parties have affirmatively opted into the Third-Party Releases by completing and returning a Ballot with the applicable box checked.  *See* Voting Report, Ex. C-1, C-2.  No parties have objected to the Third-Party Releases contained in the Plan.

74.     For these reasons, the inclusion of "Holders of Claims who affirmatively opt-in to the releases provided by the Plan" as "Releasing Parties" under the Plan with respect to the Third-Party Releases is appropriate.  The Debtors submit that the inclusion of "Affiliates"[17] and "Related

---

[17]    "***Affiliate***" has the meaning set forth in section 101(2) of the Bankruptcy Code: an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor,

Parties" as "Releasing Parties" is also appropriate.  *See* Plan Art. I.A.195.  Courts in this district regularly approve releases that include such parties, so long as the Plan specifies that such entities are releasing parties solely if they can be bound by the releasing party to which they are related under principles of applicable agency law, so that a hypothetical future court may intelligibly interpret the plan to determine whether a party was released.  *See, e.g.*, *In re Virgin Orbit Holdings, Inc.*, Case No. 23-10405 (KBO) (Bankr. D. Del. July 31, 2023) [Docket No. 604].  The Plan provides that Affiliates and Related Parties are Releasing Parties "only with respect to claims or Causes of Action that it could have properly asserted on behalf of the Entities identified [as Releasing Parties]." Plan Art. I.A.195.  Affiliates and Related Parties should also be included as Releasing Parties granting the Third-Party Releases.

75.    ***Second***, the scope of the Third-Party Releases is narrowly tailored to exclude any claims or Causes of Action arising out of, or related to, any act or omission of a Released Party that is determined by Final Order to have constituted actual fraud, willful misconduct, or gross negligence.  *See* Plan Art. VIII.F.  The Third-Party Releases are the product of arm's-length negotiations among the Debtors, the AHG, the Committee, and the United States Trustee, and integral to the Plan.  *See* Sontchi Decl. ¶¶ 26-27. The Third-Party Releases are therefore appropriate under the circumstances and consistent with Third Circuit law.

76.    For the foregoing reasons, the Third-Party Releases are voluntary, consensual, consistent with applicable law and should be approved.

---

except where such entity (i) holds the securities in a fiduciary or agency capacity without sole discretionary power to vote such securities, or (ii) holds the securities solely to secure a debt and has not in fact exercised such power to vote.  *See* Plan Art.I.A.13; 11 U.S.C. § 101(2).

**(C)     The Exculpation Provision**

77.     Article VIII.G of the Plan (the "**Exculpation Provision**") provides, among other things, that each Exculpated Party[18] is exculpated from any Cause of Action for any claim relating to any act or omission arising on or after the Petition Date and prior to the Effective Date in connection with or relating to the Chapter 11 Cases, except for acts or omissions that constitute actual fraud, willful misconduct, or gross negligence, as determined in a Final Order.

78.     The Exculpation Provision is standard, appropriate, and should be approved.  It is well established that exculpation is appropriate for fiduciaries of a bankruptcy estate, including the debtors, their directors, officers, and professionals, the creditors' committee, and its members and professionals.  *In re PWS Holding Corp.*, 228 F.3d 224, 245-47 (3d Cir. 2000) (finding that an exculpation provision is "apparently a commonplace provision in Chapter 11 plans" that is consistent with the Bankruptcy Code because it does not affect the liability of these parties, but rather reflects the limited immunity implicitly granted to committee members and professionals under section 1103(c) of the Bankruptcy Code); *In re Wash. Mut.,* 442 B.R. at 350-51 (holding that an exculpation clause that encompassed "the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the [c]ommittees and their members, and the [d]ebtors' directors and officers" was appropriate).

79.     The Exculpation Provision is necessary to protect parties (including the Debtors' directors, who have been leading the Debtors through these Chapter 11 Cases) who have made substantial contributions to the Debtor's reorganization from collateral attacks related to good faith

---

[18]   "***Exculpated Parties***" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Special Committee and its members; (c) the Committee and its members; and (d) with respect to each of the foregoing, such Entity and its officers, directors, managers, principals, members, agents, advisory board members, and the Professionals of the foregoing, each in their capacity as such; *provided* that none of the Non-Released Parties shall be an "Exculpated Party," except for in their capacities as directors of any of the Debtors from and after the Petition Date. *See* Plan Art I.A.89.

acts or omissions related to the Chapter 11 Cases.  *See In re Chemtura Corp.*, 439 B.R. 561, 610

(Bankr. S.D.N.Y. 2010) (recognizing that "exculpation provisions are included so frequently in

chapter 11 plans because stakeholders all too often blame others for failures to get the recoveries

they desire; seek vengeance against other parties; or simply wish to second guess the decision-

makers in the chapter 11 case").  Further, the scope of the Exculpation Provision is appropriately

tailored to cover only acts or omissions between the Petition Date and the Effective Date and will

not release any liability that arises from actual fraud, willful misconduct, or gross negligence, as

determined by a Final Order.  *See* Plan Art. VIII.G.  None of the Debtors' creditors have objected

to the scope of the Exculpation Provision.  The Exculpation Provision is, therefore, consistent with

applicable law and should be approved in connection with confirmation of the Plan.

### (D)    The Injunction Provision

80.    Article VIII.H of the Plan enjoins all Holders of Claims and Interests and other

parties in interest, along with their respective representatives, from taking any action to interfere

with the implementation of the Plan (the "**Injunction Provision**").  The Injunction Provision

implements the Releases and Exculpation Provision embodied in the Plan by permanently

enjoining all persons and entities from commencing or continuing in any manner any claim that

was released or exculpated pursuant to such provisions.  *See* Plan Art. VIII.H.1.

81.    On and after the Effective Date, the Injunction Provision permanently enjoins

parties in interest, with respect to Claims, Interests, and Causes of Action extinguished or released

under the Plan, from: (i) commencing, conducting, or continuing any suit, action, or other

proceeding affecting the Debtors, the Reorganized Debtors, the Plan Trust, or their property or

estates; (ii) enforcing, levying, attaching, collecting, or otherwise recovering, any judgment,

award, decree, or order against the Debtors, the Reorganized Debtors, the Plan Trust, or their

property or estates; (iii) creating, perfecting, or otherwise enforcing, any encumbrance against the

Debtors, the Reorganized Debtors, the Plan Trust, or their property or estates; (iv) asserting any right of setoff against any obligation due from the Debtors or the Reorganized Debtors, or against their property, unless otherwise permitted by the Plan; or (v) acting or proceeding, in any place, in a manner that does not conform with the Plan. *See* Plan Art. VIII.H.2. The Injunction Provision also enjoins Non-Released Parties from (i) interfering with the Plan Trustee's administration of the Retained Causes of Action and the LT Claims that have not been settled, waived, and/or released as of the Effective Date and (ii) taking any action to interfere with the consummation of the Plan or any Reorganization Transactions. *See* Plan Art. VIII.H.3

82.     The Debtors submit that the Injunction Provision is necessary to preserve and enforce the Releases and Exculpation Provision and is narrowly tailored to achieve that purpose. *See* Sontchi Decl. ¶ 31. Accordingly, this Court should approve the Injunction Provision in the Plan.

### 4.     The Plan Complies with Section 1123(d) of the Bankruptcy Code

83.     Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default, the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law." 11 U.S.C. § 1123(d).

84.     Article VII.C of the Plan provides for the satisfaction of all monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan in accordance with section 365 of the Bankruptcy Code: (i) by payment of the default amount in Cash on the Effective Date or as soon thereafter as practicable; or (ii) on such other terms as agreed to by the parties to such Executory Contract or Unexpired Lease. *See* Plan Art. VII.C; Wagstaff Decl. ¶ 26. The Debtors, in accordance with the Solicitation Procedures and the Plan, distributed notices of proposed assumption to the applicable non-Debtor counterparties. *See* Initial Assumption Notice; *Affidavit of Service* [Docket No. 1130]. The Court-approved Cure and Assumption Notice

included procedures for objecting to the proposed assumptions of Executory Contracts and Unexpired Leases and any Claim for cure costs, as well as a process for resolving any disputes with this Court. *See* Disclosure Statement Order, Ex. 6. Accordingly, the Debtors submit that the Plan complies with section 1123(d) of the Bankruptcy Code.

**B.     Section 1129(a)(2): The Debtors Have Complied with the Applicable Provisions of the Bankruptcy Code**

85.     Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponent "compl[y] with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a)(2). The legislative history of section 1129(a)(2) informs that this provision is intended to encompass the disclosure and solicitation requirements under sections 1125 and 1126 of the Bankruptcy Code. *See* H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 412 (1977); S. Rep. No. 95-989, 95th Cong., 2d Sess. 126 (1978) ("Paragraph (2) [of section 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also In re Toy & Sports Warehouse, Inc*., 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984). The Debtors have complied with section 1129(a)(2) of the Bankruptcy Code by distributing the Disclosure Statement, and by soliciting acceptances of the Plan through the Claims Agent, all in accordance with the procedures approved by this Court pursuant to the Disclosure Statement Order. *See* Voting Report ¶ 7. Furthermore, pursuant to the Disclosure Statement Order, this Court approved the content of the Disclosure Statement as containing adequate information in compliance with section 1125 of the Bankruptcy Code. *See* Docket No. 1051. For these reasons, the Debtors have satisfied the requirements of section 1129(a)(2) of the Bankruptcy Code.

**1.     The Debtors Have Complied with the Disclosure and Solicitation Requirements of Section 1125**

86.     Section 1125 of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization "unless, at the time of or before such solicitation, there is

33

transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information." 11 U.S.C. § 1125(b). Section 1125 ensures that parties in interest are fully informed regarding the debtor's condition so that they may make an informed decision whether to approve or reject the plan. *See Momentum Mfg. Corp. v. Emp. Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994) (finding that section 1125 of the Bankruptcy Code obliges a debtor to engage in full and fair disclosure that would enable a hypothetical reasonable investor to make an informed judgment about the plan).

87. Section 1125 is satisfied here. On January 23, 2025, before the Debtors solicited votes on the Plan, this Court entered the Disclosure Statement Order and approved the Disclosure Statement as "containing adequate information in accordance with section 1125 of the Bankruptcy Code." *See* Disclosure Statement Order ¶ 2. This Court also approved the contents of the Solicitation Materials provided to Holders of Claims entitled to vote on the Plan, the non-voting materials provided to parties not entitled to vote on the Plan, and the relevant dates for voting and objecting to the Plan. *See generally* Disclosure Statement Order. As stated in the Voting Report, the Debtors, through the Claims Agent, complied with the content and delivery requirements of the Disclosure Statement Order, thereby satisfying sections 1125(a) and (b) of the Bankruptcy Code. *See* Voting Report ¶ 7; Wagstaff Decl. ¶ 36; *see also* Solicitation Affidavit. The Debtors also satisfied section 1125(c) of the Bankruptcy Code, which provides that the same disclosure statement must be transmitted to each holder of a claim or interest in a particular class. Here, the Debtors caused the Disclosure Statement to be transmitted to all parties entitled to vote on the Plan. *See* Solicitation Affidavit. The Debtors did not solicit acceptances of the Plan from any creditor or equity interest Holder prior to transmission of the Disclosure Statement.

88.     Based on the foregoing, the Debtors submit that they have complied in all respects with the solicitation requirements of section 1125 of the Bankruptcy Code and the Disclosure Statement Order.

### 2.      The Debtors Have Satisfied the Plan Acceptance Requirements of Section 1126

89.     Section 1126 of the Bankruptcy Code provides that only holders of allowed claims and interests in impaired classes that will receive or retain property under a plan on account of such claims or interests may vote to accept or reject a plan.  *See* 11 U.S.C. § 1126.  As set forth in the Disclosure Statement Order, the Debtors did not solicit votes on the Plan from the following Classes:

- Class 1 (Other Secured Claims) and Class 2 (Other Priority Claims), which are Unimpaired under the Plan (collectively, the "**Unimpaired Classes**").  *See* Plan Art. III.C, Art. III.G.1 and Art. III.G.2.  Pursuant to section 1126(f) of the Bankruptcy Code, Holders of Claims in the Unimpaired Classes are conclusively presumed to have accepted the Plan and therefore were not entitled to vote on the Plan. *See* Disclosure Statement Order ¶ F.

- Class 6 (Existing Equity Interests) is Impaired under the Plan and will not receive any distributions or retain any property under the Plan (the "**Impaired Class**"). *See* Plan Art. III.C, Art. III.G.6. Pursuant to section 1126(g) of the Bankruptcy Code, Holders of Claims and Interests in the Impaired Class are deemed to have rejected the Plan and therefore were not entitled to vote on the Plan. *See* Disclosure Statement Order ¶ F.

- Class 5 (Intercompany Claims) and Class 7 (Intercompany Interests) are either Unimpaired or Impaired (the "**Impaired or Unimpaired Classes**").  *See* Plan Art. III.C, Art. III.G.5, Art. III.G.7. Pursuant to sections 1126(f) and 1126(g) of the Bankruptcy Code, Holders of Claims and Interests in the Impaired or Unimpaired Classes are conclusively presumed to have accepted or deemed to have rejected the Plan and therefore were not entitled to vote on the Plan.  *See* Disclosure Statement Order ¶ F.

90.     Accordingly, the Debtors solicited votes only from the Voting Classes because each of these Classes is Impaired and entitled to receive a distribution under the Plan.  *See* Plan

Arts. III.C, III.G; *see also* Disclosure Statement Order ¶ E.  With respect to the Voting Classes, section 1126(c) of the Bankruptcy Code provides that:

> A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of [section 1126], that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of [section 1126], that have accepted or rejected such plan.

11 U.S.C. § 1126(c).

91.    The Voting Report reflects the results of the voting process in accordance with section 1126 of the Bankruptcy Code with respect to Classes 3 and 4.  *See generally* Voting Report. The Voting Report sets forth that 96.89% in number and 93.95% in amount of the valid Ballots received in Class 3 (Unsecured Notes Claims) and shows that Class 4 (General Unsecured Claims) (against WOM S.A.) voted to reject the Plan.  Within the subclass of Class 4 (General Unsecured Claims) (against WOM S.A.), there were 88.89% of claimants (by number) and 64.24% of claimants (by amount) who voted in favor of the Plan.  *See* Voting Report, Ex. A.  Based on the foregoing, the Debtors submit that they have satisfied the requirements of section 1129(a)(2).  No Classes of Equity Interests were entitled to vote on the Plan.  *See* Plan Arts. III.C, III.G.  The Debtors therefore do not need to comply with section 1126(d) of the Bankruptcy Code.

### C.    Section 1129(a)(3): The Plan Has Been Proposed in Good Faith and Not by Any Means Forbidden by Law

92.    Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  To demonstrate that a plan was proposed in good faith, "there [must be] a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." *In re PPI Enter. (U.S.), Inc.*, 339 B.R. 347 (Bankr. D. Del. 1998), *subsequently aff'd*, 324 F.3d 197 (3d Cir. 2003); *see also PWS Holding*, 228 F.3d at 242 ("[F]or purposes of determining good faith under

section 1129(a)(3) . . . the important point of inquiry is the plan itself and whether such a plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code.") (citation omitted). "Whether a [chapter 11] plan has been proposed in good faith must be viewed in the totality of the circumstances, and the requirement of [s]ection 1129(a)(3) speaks more to the process of plan development than to the content of the plan." *In re Chemtura Corp.*, 439 B.R. at 608. The court exercises "considerable discretion in finding good faith." *In re W.R. Grace & Co.*, 475 B.R. 34, 87 (D. Del. 2012) (quoting *In re Coram Healthcare Corp.,* 271 B.R. 228, 234 (Bankr. D. Del. 2001)). Courts in the Third Circuit examine three factors to determine whether a plan was proposed in good faith: (1) the plan "fosters a result consistent with the Bankruptcy Code's objectives;" (2) the plan "has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected;" and (3) the debtors "exhibited a fundamental fairness in dealing with the creditors." *Id.* at 87-88 (citing *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 609 (Bankr. D. Del. 2001)); *In re Wash. Mut., Inc.*, 461 B.R. 200, 239 (Bankr. D. Del. 2011); *accord In re Frascella Enters., Inc.*, 360 B.R. 435, 446 (Bankr. E.D. Pa. 2007).

93.     To the contrary, the evidence shows that the Plan has been proposed in good faith because it is the product of an extensive restructuring process and reflects a result consistent with the Bankruptcy Code's objectives: reorganization and value maximization. *See In re W.R. Grace*, 475 B.R. at 88 ("The Supreme Court of the United States has specifically identified two purposes of Chapter 11 as: (1) preserving going concerns; and (2) maximizing property available to satisfy creditors.").

94.     The Debtors have met their good faith obligation under the Bankruptcy Code. Throughout these cases, the Debtors have focused on maximizing value for their various stakeholders. *See* Wagstaff Decl. ¶ 39; Sontchi Decl. ¶ 11. The Plan, Plan Supplement, and all

documents necessary to implement the Plan were developed after months of analysis and negotiations between the Debtors, the Special Committee, the AHG, and the Committee and were proposed with the legitimate and honest purpose of maximizing the value of the Debtors' estates and carrying out a successful reorganization of the Debtors' operations.  *See* Sontchi Decl. ¶ 19.  As set forth above, the Plan is the result of an extensive public marketing process conducted pursuant to the Bidding Procedures approved by this Court, pursuant to which the Debtors solicited bids for all available transactions for an asset sale or plan sponsorship transaction over several months.  *See* Messer Decl. ¶ 9.  After engaging with several interested parties, including strategic and financial institutions, competitors, and the Committee, the Special Committee determined that the AHG's proposal was the highest and best offer received by the Debtors and the transactions proposed thereunder would maximize value for all the Debtors' stakeholders.  *See* Sontchi Decl. ¶ 15.  Following several weeks of extensive good faith and arm's-length negotiations, the Debtors and the AHG entered into the Support Agreements, which this Court approved on December 20, 2024.  *See* Backstop and PSA Order.  The Support Agreements provide the liquidity necessary for the Debtors to make distributions under the Plan and are the basis for a comprehensive restructuring of the Debtors.  Messer Decl. ¶ 14.

95.    From the outset of these Chapter 11 Cases, the Debtors have been clear that they sought bankruptcy protection to maximize the value of their estates and provide meaningful recoveries to their creditors.  *See* Wagstaff Decl. ¶ 39.  The Plan will achieve a result consistent with the overall objectives and purposes of the Bankruptcy Code and therefore has been proposed in good faith.  Accordingly, the Plan satisfies Section 1129(a)(3) of the Bankruptcy Code.

**D.     Section 1129(a)(4): The Payment of Certain Services or for Certain Costs and Expenses is Subject to Court Approval**

96.     Section 1129(a)(4) of the Bankruptcy Code states that "[a]ny payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable."  11 U.S.C. § 1129(a)(4).

97.     The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.  First, the Plan provides that all payments made or to be made by the Debtors on account of Professional Claims and corresponding payments are subject to this Court's approval.  *See* Plan Art. II.C.2.  The Plan provides Professional Claim applications be filed no later than forty-five (45) days after the Effective Date, thereby providing an adequate period of time for interested parties to review the requests for payment of Professional Claims.  *See* Plan Art. II.C.3.  Furthermore, all monthly and interim compensation of Professionals by the Debtors prior to final allowance of such Professional Claims have been or will be approved by this Court and paid in accordance with the procedures established by the *Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses for Chapter 11 Professionals and Committee Members* [Docket No. 422] or as otherwise provided in the Plan.

**E.     Section 1129(a)(5): All Necessary Information Regarding Post-Effective Date Governance**

98.     Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that the plan proponent disclose "the identity and affiliations" of the proposed officers and directors of the reorganized debtor, and section 1129(a)(5)(A)(ii) requires that any such appointment be "consistent with the interests of creditors and equity security holders and with public policy."   11 U.S.C. § 1129(a)(5)(A)(i)-(ii).  Section 1129(a)(5)(B) of the Bankruptcy Code requires a plan proponent

to disclose the identity of an insider to be employed or retained by a successor to the debtor, and the nature of any compensation for such insider.

99.     The Initial AHG Directors are four directors of New Holdco, with one director appointed by each member of the AHG.[19]   Messer Decl. ¶ 16.  None of the Initial AHG Directors are members of the AHG nor affiliated or employed by any members of the AHG, and none of the non-officer directors of New Holdco will be insiders The Debtors disclosed the identity and affiliations of the individuals proposed to serve (i) on the New Board and (ii) as officers of the Chile Newco in Exhibit J of the Plan Supplement.  *Id*.  Each such individual will serve from an after the Effective Date pursuant to applicable law and the terms of the New Governance Documents and the other constituent and organizational documents of the applicable Reorganized Debtors.  *Id*.  Based on the foregoing, the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

## F.     Section 1129(a)(6) of the Bankruptcy Code Is Not Applicable

100.     Section 1129(a)(6) of the Bankruptcy Code requires that "[a]ny governmental regulatory commission with jurisdiction, after confirmation of the plan, over the rates of the debtor has approved any rate change provided for in the plan, or such rate change is expressly conditioned on such approval." 11 U.S.C. § 1129(a)(6).  Section 1129(a)(6) is inapplicable because, to the extent any Debtor is subject to the jurisdiction of any governmental regulatory commission with respect to any rates, no rate changes are proposed in the Plan.

## G.     Section 1129(a)(7): The Plan Is in the Best Interests of Creditors and Interest Holders

101.     Section 1129(a)(7) of the Bankruptcy Code is known as the "best interests test" or the "liquidation test," and provides:

---

[19]    The AHG will collectively hold a majority of shares in NewCo.

> With respect to each impaired class of claims or interests –
>
> (A) each holder of a claim or interest of such class –
>
>> (i) has accepted the plan; or
>>
>> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date…

11 U.S.C. § 1129(a)(7).

102.    The best interests test focuses on individual dissenting creditors or equity interest holders rather than classes of claims or equity interests.  *See Bank of Am. Nat'l Trust & Savs. Ass'n v. 203 N. Lasalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999).   Under the best interests test, each non-accepting creditor or equity holder must "receive …on account of such claim…property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive…if the debtor were liquidated under chapter 7…on such date."  *Id*. (citing section 1129(a)(7)); *U.S. v. Reorganized CF&I Fabricators of Utah, Inc*., 518 U.S. 213, 228 (1996).  The best interests test is generally satisfied by a liquidation analysis showing that an impaired class will receive no less under the plan than under a hypothetical chapter 7 liquidation.  *See In re Smith*, 357 B.R. 60, 67 (Bankr. M.D.N.C. 2006), *appeal dismissed*, Case No. 1:07CV30, 2007 WL 1087575 (M.D.N.C. Apr. 4, 2007) ("In order to show that a payment under a plan is equal to the value that the creditor would receive if the debtor were liquidated, there must be a liquidation analysis of some type that is based on evidence and not mere assumptions or assertions.") (citations omitted); *In re Diocese of Camden*, 653 B.R. 309, 341 (Bankr. D. N.J. 2023) ("Section 1129(a)(7), the 'best interest of creditors test,' is a protection for individual creditors whose claims are impaired"); *203 N. LaSalle St.*, 526 U.S. at 442 n.13 ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan").

103.    As section 1129(a)(7) makes clear, the liquidation analysis applies only to non-accepting impaired claims or equity interests.  The only parties that could raise such objection are Holders of Claims in the Impaired Class 5 (Intercompany Claims) Class 6 (Existing Equity Interests) or Class 7 (Intercompany Interests).  No such Holder has raised any such objection.

104.    The Debtors, with the assistance of their financial advisors, have prepared a liquidation analysis comparing the range of recoveries generated under the Plan with a hypothetical chapter 7 liquidation that was filed as Exhibit C to the Disclosure Statement (the "**Liquidation Analysis**").  *See* Disclosure Statement, Ex. C; Wagstaff Decl. ¶¶ 42-49.

105.    As demonstrated in the Liquidation Analysis and as set forth in the Wagstaff Declaration, confirmation of the Plan will provide each Holder of an Impaired Claim with an equal or greater recovery than the value of any distributions if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code.  *See* Disclosure Statement, Ex. C.; Wagstaff Decl. ¶ 43.  Each Holder of a Claim or Interest in an Impaired Class will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount such Holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.  As set forth more fully in the Wagstaff Declaration, the Debtors believe that the estimated liquidation values set forth in the Liquidation Analysis are fair and reasonable estimates of the value of the Debtors' Assets upon a hypothetical liquidation under chapter 7 of the Bankruptcy Code and that, based on those estimates, each Class of Claims and Interests under the Plan will receive under the Plan at least as much as that Class would receive in a hypothetical chapter 7 liquidation.  *See* Wagstaff Decl. ¶¶ 42-49.

106.    The uncontroverted assumptions and estimates in the Liquidation Analysis are appropriate in the context of these Chapter 11 Cases and are based upon the expertise of the

Debtors' professionals and personnel who have extensive knowledge of the Debtors' business and financial affairs as well as relevant industry and financial experience.  *See id*. ¶¶ 48, 42,44-45.

107.    The Liquidation Analysis is sound and reasonable, and incorporates justified assumptions and estimates regarding the Debtors' assets and claims, such as (i) the additional costs and expenses that would be incurred by the Debtors as a result of a chapter 7 trustee's fees and retention of new professionals in familiarizing themselves with the Debtors and their estates and the complexities and uncertainties to carry out a liquidation of a going concern entity with respect to assets located in a foreign jurisdiction, (ii) the delay and associated costs that would be incurred as a result of a conversion of these Chapter 11 Cases to cases under chapter 7, and (iii) the potential for additional claims to arise in a chapter 7 liquidation.  *Id*. ¶¶ 44-46.  The estimates regarding the Debtors' assets and liabilities that are incorporated into the Liquidation Analysis are based upon the knowledge and familiarity of the Debtors' advisors with the Debtors' business and their relevant experience in chapter 11 proceedings*.  See id.* ¶ 44.  As such, the Debtors' Liquidation Analysis should be afforded deference.

108.    In sum, conversion of these Chapter 11 Cases to chapter 7 would likely prolong these proceedings, delay distributions to creditors, and result in far greater costs and expenses. Accordingly, because the recoveries provided under the Plan are greater than the recoveries available in a hypothetical chapter 7 liquidation, the Plan satisfies section 1129(a)(7) of the Bankruptcy Code.

**H.    Section 1129(a)(8) Does Not Preclude Confirmation of the Plan**

109.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims or equity interests either accept a plan or be unimpaired under a plan.  11 U.S.C. § 1129(a)(8). Pursuant to section 1126(c) of the Bankruptcy Code, a class of impaired claims accepts a plan if holders of at least two-thirds in dollar amount and more than one-half in number of the allowed

claims in that class that actually submit ballots vote to accept the plan. 11 U.S.C. § 1126(c). A class that is not impaired under a plan, and each holder of a claim or interest in such class, is conclusively presumed to have accepted the plan. 11 U.S.C. § 1126(f). Conversely, a class is deemed to have rejected a plan if the plan provides that the holders of claims or interests of such class are not entitled to receive or retain any property under the plan on account of such claims or interests. 11 U.S.C. § 1126(g).

110. As set forth in the Voting Report, each of the Voting Classes voted to accept the Plan. The Classes deemed to reject the Plan are Class 5 (Intercompany Claims), Class 6 (Existing Equity Interests), and Class 7 (Intercompany Interests).

111. While section 1129(a)(8) of the Bankruptcy Code is not satisfied, the Plan is confirmable because the Debtors have met the requirements of sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. As discussed more fully below, the Debtors have satisfied section 1129(a)(10) of the Bankruptcy Code—because at least one Impaired Class accepted the Plan for each of the Debtors—and section 1129(b) of the Bankruptcy Code—because the Debtors have satisfied the conditions needed to "cramdown" any rejecting classes.

**I.      Section 1129(a)(9): The Plan Provides for Payment in Full of Allowed Administrative Claims and Allowed Priority Tax Claims**

112. Unless the holder of a particular claim agrees to a different treatment with respect to such claim, section 1129(a)(9) of the Bankruptcy Code requires a plan to satisfy administrative claims, other priority claims, and priority tax claims in full in cash. *See* 11 U.S.C. § 1129(a)(9). The Plan satisfies these requirements. *See* Plan Art. II.B; Plan Art. II. D.

**J.      Section 1129(a)(10): At Least One Impaired Class of Claims Has Accepted the Plan**

113. Section 1129(a)(10) of the Bankruptcy Code provides that if any class of claims is impaired under a plan, at least one impaired class of claims must accept the plan, excluding

44

acceptance by any insider.  11 U.S.C. § 1129(a)(10).  As set forth in the Voting Report, Class 3

(Unsecured Notes Claims) and Class 4 (General Unsecured Claims) voted to accept the Plan.

Accordingly, the Plan satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

### K.       Section 1129(a)(11): The Plan Is Feasible

114.      Section 1129(a)(11) of the Bankruptcy Code requires that, as a condition to

confirmation, the bankruptcy court determine that a plan is feasible.  Specifically, the bankruptcy

court must determine that:

> Confirmation of the plan is not likely to be followed by the
> liquidation, or the need for further financial reorganization, of the
> debtor or any successor to the debtor under the plan, unless such
> liquidation or reorganization is proposed in the plan.

U.S.C. § 1129(a)(11).

115.      The statute requires the bankruptcy court to determine whether a plan is workable

and has a reasonable likelihood of success.  *See In re Armstrong World Indus.*, 348 B.R. at 158,

167 (holding a chapter 11 plan is feasible because the cash flow projections show that the debtors

will be able to satisfy its obligations under the chapter 11 plan after confirmation); *In re NII

Holdings*, 288 B.R. 356, 364 (Bankr. D. Del. 2002) (holding a chapter 11 plan is feasible because

the financial projections and supporting declarations show that the debtors will be able to satisfy

its obligations and its capital needs for the conduct of its business); *see also U.S. v. Energy Res.

Co.*, 495 U.S. 545, 549 (1990) (holding that a bankruptcy court must "assure itself that

reorganization will succeed").

116.      To demonstrate that a plan is feasible, it is not necessary for a court to find a

guarantee of success.  *See In re Am. Cap. Equip., LLC*, 688 F.3d 145, 155–56 (3d Cir. 2012)

(explaining that section 1129(a)(11) does not require "a plan's success to be guaranteed," but does

require a "'realistic and workable framework'") (citations omitted); *Internal Revenue Serv. v.

45

*Kaplan (In re Kaplan)*, 104 F.3d 589, 597 (3d Cir. 1997); *In re W.R. Grace*, 475 B.R. at 115 ("[T]he bankruptcy court need not require a guarantee of success, but rather only must find that 'the plan presents a workable scheme of organization and operation from which there may be reasonable expectation of success.'") (citations and alterations omitted); *see also In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986) ("'Feasibility' does not, nor can it, require the certainty that a reorganized company will succeed."). Rather, a debtor must provide only a reasonable assurance of success. *See Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir. 1985) ("[T]he feasibility test contemplates 'the probability of actual performance of the provisions of the plan . . .. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts.'") (*citing Chase Manhattan Mortg. & Realty Tr. v. Bergman (In re Bergman)*, 585 F.2d 1171, 1179 (2d Cir. 1978)); *In re Texaco, Inc.*, 84 B.R. 893, 910 (Bankr. S.D.N.Y. 1988) ("All that is required is that there be reasonable assurance of commercial viability.").

117.    While the debtor bears the burden of proving plan feasibility, the applicable standard is by a preponderance of the evidence, which means presenting proof that a given fact is "more likely than not." *See Fin. Sec. Assurance Inc. v. T-H New Orleans Ltd. P'ship (In re T-H New Orleans Ltd. P'ship),* 116 F.3d 790, 801 (5th Cir. 1997)*.* A number of courts have held that this constitutes a "relatively low threshold of proof." *In re Mayer Pollock Steel Corp.*, 174 B.R. 414, 423 (Bankr. E.D. Pa. 1994) (stating that the debtors "have established that they meet the requisite low threshold of support for the plan as a viable undertaking"); *see also In re Briscoe Enters.*, 994 F.2d at 1166 (upholding the bankruptcy court's ruling that reorganization that had only a "marginal prospect of success" was feasible because only "a reasonable assurance of commercial viability" was required). A court may find that a plan is feasible if "the information

in the [d]isclosure statement, the [s]upporting [d]eclaration, and the evidence proffered or adduced at the Confirmation Hearing (i) is persuasive and credible; (ii) has not been controverted by other evidence; and (iii) establishes that . . . the [p]lan is feasible and that there is a reasonable prospect of the [r]eorganized [d]ebtor being able to meet their financial obligations." *In re Elec. Components Int'l*, Case No. 10-11054, 2010 WL 3350305, at *9 (Bankr. D. Del. May 11, 2010).

118.    Applying the foregoing standards of feasibility, courts have identified the following nonexclusive factors as probative with respect to the feasibility of a plan:

  a)  the adequacy of the capital structure;

  b)  the earning power of the business;

  c)  economic conditions;

  d)  the ability of management;

  e)  the probability of the continuation of the same management; and

  f)  any other related matters which will determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.

*See, e.g., In re Young Broad., Inc.*, 430 B.R. 99, 129 (Bankr. S.D.N.Y. 2010); *see also In re Drexel Burnham Lambert Grp.*, 138 B.R. 723, 762-63 (Bankr. S.D.N.Y. 1992) (finding that the factors are nonexclusive).

119.    The Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.  *See* Messer Decl. ¶¶ 19-23.  As set forth in Article X.E of the Disclosure Statement and in the Messer Declaration, the Debtors thoroughly analyzed their post-confirmation ability to meet their obligations under the Plan and continue as a going concern without the need for further financial restructuring.  Messer Decl. ¶¶ 19, 23.  To conduct this analysis, the Debtors, with the assistance of their financial advisors, prepared financial projections for the period between

September 1, 2024 through December 31, 2029 (the "**Financial Projections**"), which are annexed to the Disclosure Statement as Exhibit D.  Messer Decl. ¶ 19.

120.    The Financial Projections demonstrate that, upon emergence, the Debtors possess sufficient liquidity to meet the necessary distributions required under the Plan and to sustain viable business operations going forward.  Messer Decl. ¶ 23.  This conclusion is not surprising given that the Plan will extinguish over $650 million in prepetition funded indebtedness of the Debtors. *See* Messer Decl. ¶ 16.  In accordance with the terms of the Plan Support Agreements and Plan, the Debtors will use the proceeds of the Rights Offering to (i) repay the DIP Loan Facility; (ii) fund distributions to Holders of all Allowed Claims in accordance with the treatment of such Claims, and subject to the terms provided in, the Plan; (iii) provide liquidity to the Reorganized Debtors upon emergence; and (iv) fund the Plan Trust.  Messer Decl. ¶ 17.  Following the closing of the Reorganization Transactions, the Reorganized Debtors will be poised to generate cash flow from their ordinary course operations, will be managed and overseen by the qualified individuals identified in the Plan Supplement, and will be adequately capitalized as a result of the Rights Offering.  Messer Decl. ¶ 22.  Accordingly, confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors.  Messer Decl. ¶ 23. The Debtors respectfully submit that the Plan is feasible and satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

**L.      Section 1129(a)(12): The Plan Provides for Payment in Full of All Statutory Fees**

121.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under [28 U.S.C. § 1930], as determined by the court at the hearing on confirmation of the plan."  11 U.S.C. § 1129(a)(12).  Section 507 of the Bankruptcy Code provides that "any fees

and charges assessed against the estate under [28 U.S.C. § 1930]" are afforded priority as administrative expenses.  11 U.S.C. § 507(a)(2).

122.    In accordance with these provisions, Article II.H of the Plan provides that all fees payable pursuant to 28 U.S.C. § 1930 shall be paid by the Debtors in full in Cash on the Effective Date.  The Plan further provides that, on and after the Effective Date, the Reorganized Debtors and the Plan Trust shall be jointly and severally liable for paying any and all Quarterly Fees in full in Cash when due in each Chapter 11 Case for each quarter (including any fraction thereof) until the earliest of such Chapter 11 Case being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.  *See* Plan Art. II.H.  After the Effective Date, the Reorganized Debtors and the Plan Trust shall file with this Court a post-confirmation quarterly report for each Chapter 11 Case for each quarter (including any fraction thereof) such case is pending.  *See* Plan Art. II.H. Based on the foregoing, the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

### M.    Sections 1129(a)(13) through 1129(a)(16) Do Not Apply

123.    Section 1129(a)(13) of the Bankruptcy Code requires chapter 11 plans to continue all retiree benefits (as defined in section 1114 of the Bankruptcy Code).  The Debtors will not have any obligations to pay such retiree benefits after consummation of the Plan and, as such, section 1129(a)(13) does not apply to the Plan.  *See* Wagstaff Decl. ¶ 60.  Sections 1129(a)(14) and (15) of the Bankruptcy Code relate to the payment of domestic support obligations, and apply only in cases in which the debtor is an "individual" (as defined in the Bankruptcy Code) and therefore do not apply here.  *See id*. ¶ 61.  Section 1129(a)(16) of the Bankruptcy Code applies only to debtors that are nonprofit entities or trusts; as the Debtors are moneyed, business, or commercial corporations, this section is not applicable.  *See id*.  ¶ 62.

**N.       Section 1129(b): The Plan Satisfies the Cramdown Requirements**

124.     As set forth in the Voting Report, Class 3 (Unsecured Notes Claims) voted to

accept the Plan at each Debtor.  *See* Voting Report*,* Ex. A.  Class 4 (General Unsecured Claims)

voted to reject the Plan only at Debtor WOM S.A.  *Id.*  Since Class 6 is deemed to reject the Plan

at each Debtor, Class 4 voted to reject the Plan only at Debtor WOM S.A. and Classes 5 through

7 are either deemed to accept or reject the Plan at each Debtor, this Court must find that the

cramdown requirements of section 1129(b) of the Bankruptcy Code are satisfied.   Section

1129(b)(1) of the Bankruptcy Code provides that if a plan of reorganization meets all applicable

requirements of section 1129(a) (other than the requirement set forth in section 1129(a)(8)) of the

Bankruptcy Code, the plan may be confirmed so long as it does not discriminate unfairly and is

fair and equitable with respect to each class of claims and interests that is impaired and has not

accepted the plan.  11 U.S.C. 1129(b).  *In re W.R. Grace*, 475 B.R. at 173-75.  The Plan satisfies

the requirements under section 1129(b) because the Plan does not discriminate unfairly and is fair

and equitable with respect to the Classes that are Impaired under, and are deemed to reject, the

Plan.

**1.       The Plan Does Not Discriminate Unfairly**

125.     Section 1129(b)(1) of the Bankruptcy Code requires that a dissenting class should

receive relative value equal to the value given to other similarly situated classes.  *In re Tribune.*

*Co.*, 972 F.3d 228, 240 (3d Cir. 2020) ("Generally speaking, this standard ensures that a dissenting

class will receive relative value equal to the value given to all other similarly situated classes.")

(citation omitted); *see also In re Armstrong World Indus.*, 348 B.R. at 121 (same).  The Bankruptcy

Code does not provide a standard for determining when "unfair discrimination" exists.  *See In re*

*203 N. LaSalle St. Ltd. P'ship*., 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995) (noting "the lack of any

clear standard for determining the fairness of a discrimination in the treatment of classes under a

Chapter 11 plan" and that "the limits of fairness in this context have not been established"), *rev'd on other grounds, Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship.*, 526 U.S. 434 (1999).  Rather, courts typically examine the facts and circumstances of the particular case to determine whether unfair discrimination exists.  *See e.g.*, *In re Freymiller Trucking Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (finding that determination of unfair discrimination requires court to "consider all aspects of the case and the totality of all the circumstances"); *In re Aztec Co.*, 107 B.R. 585, 589-91 (Bankr. M.D. Tenn. 1989) (same).  At a minimum, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so.  *See Liberty Nat'l Enters. v. Ambanc La Mesa L.P. (In re Ambanc La Mesa L.P.)*, 115 F.3d 650, 654-55 (9th Cir. 1997); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986) (stating that interests of objecting class were not similar or comparable to those of any other class and there was no unfair discrimination).  Accordingly, between two classes of claims or two classes of interests, there is no unfair discrimination if (a) the claims or interests in one class are dissimilar from those in the other class, or (b) taking into account the particular facts and circumstances of the case, there is a reasonable basis for disparate treatment of otherwise similar claims or interests. *See In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990).

126.    Class 4 consists of General Unsecured Claims.  *See* Plan Art. III.G.4.  As more fully described in the Disclosure Statement and the Wagstaff Declaration, the separate classification of Class 3 Unsecured Notes Claims from Class 4 General Unsecured Claims was determined by the Debtors after good faith, arm's-length negotiations among the Debtors, the Committee, and the AHG.  Wagstaff Decl. ¶ 13, 53.  Although both Classes are unsecured, the legal character and nature of the Claims in each of these Classes differ significantly. *Id.* Among other things, the

Holders of Unsecured Notes Claims have recourse to each of Debtors (whereas Holders of General Unsecured Claims do not) and have rights that are different from General Unsecured Claims. Holders of Claims in Class 3 hold unsecured Claims against Kenbourne, as issuer of the Unsecured Notes, and each of the other Debtors, as guarantors of the Unsecured Notes, and are therefore entitled to the Guaranty Claim Enhancement. *Id.* ¶ 13. Holders of Class 3 Unsecured Notes Claims are therefore contractually entitled to assert the full amount of their Claims against each of the Debtors. No creditors other than the holders of the Unsecured Notes Claims are in the same or similar position. No other Class is similarly situated to Class 4 and is receiving better treatment than Class 4. *See id.*

127.    Class 5 consists of Intercompany Claims. *See* Plan Art. III.G.5. Class 5 is the only Class of Claims against a Debtor held by another Debtor that is classified and treated under the Plan. *See* Wagstaff Decl. ¶ 54. No other Class is similarly situated to Class 5 and is receiving better treatment than Class 5. *See id.*

128.    All Existing Equity Interests held by non-Debtors in each Debtor are classified within Class 6 and will receive the same treatment under the Plan. *See* Wagstaff Decl. ¶ 55. No other Class is similarly situated to and is receiving better treatment than Class 6. *See id.*

129.    Class 7 consists of Intercompany Interests. *See* Plan Art. III.G.7. Class 7 is the only Class of Interests in a Debtor held by another Debtor that is classified and treated under the Plan. *See* Wagstaff Decl. ¶ 56. No other Class that is similarly situated to and is receiving better treatment than Class 7. *See id.*

130.    The Plan therefore does not discriminate unfairly against any rejecting classes in contravention of section 1129(b)(1) of the Bankruptcy Code.

### 2.    The Plan is Fair and Equitable

131.    Section 1129(b)(2)(C)(ii) of the Bankruptcy Code provides that a plan is fair and equitable with respect to a class of impaired interests if the plan provides that holders of any interests that are junior to the interests of such class will not receive or retain any property under the plan on account of such junior interests.    *See* 11 U.S.C. § 1129(b)(2)(C)(ii).  This "absolute priority rule" requires that, if the holders of claims or interests in a particular class that votes to reject a plan receive less than the full value of their stakes, then no holder of claims or interests in a junior class may receive property under the plan on account of such claims or interests.  *See 203 N. LaSalle*, 526 U.S. at 441-42 (explaining that, under the absolute priority rule, "a plan may be found to be 'fair and equitable' only if the allowed value of the claim [in a dissenting class of impaired unsecured creditors] is to be paid in full . . . or, in the alternative, if 'the holder of any claim or interest that is junior to the claims of such [impaired unsecured] class will not receive or retain under the plan on account of such junior claim or interest any property'") (citations omitted).

132.    Here, the Plan is "fair and equitable" with respect to holders of Claims in Class 4 (solely with respect to WOM S.A.) and Claims and Interests in Classes 5 through 7 for each Debtor. Holders of Interests in Class 6 will receive no recovery under the Plan.  *See* Wagstaff Decl. ¶ 57. Holders of Interests in Class 6 will receive no recovery under the Plan.  *See* Wagstaff Decl. ¶ 57. Although the Allowed Intercompany Interests in Class 7 may be reinstated, such reinstatement would be solely for the purpose of effectuating the corporate structure contemplated by the Plan. As described in Section II.B *infra*, reinstatement of intercompany equity interests in a plan for structuring purposes is common and does not violate the Bankruptcy Code.  *See In re Ion Media Networks, Inc.*, 419 B.R. 585, 601 (Bankr. S.D.N.Y. 2009) (overruling plan objections, confirming a chapter 11 plan, and finding that "[t]he [p]lan's retention of intercompany equity interests for holding company purposes constitutes a device utilized to allow the [d]ebtors to maintain their

53

organizational structure and avoid the unnecessary cost of having to reconstitute that structure"). The Holders of Claims and Interests that are junior to the interests of Class 4, Class 5 and Class 6 will not receive or retain any property under the plan on account of such junior interests. Accordingly, the Plan satisfies the requirements for cramdown under section 1129 of the Bankruptcy Code.

### O.    The Plan Complies with Section 1129(c) of the Bankruptcy Code

133.    Section 1129(c) of the Bankruptcy Code provides, as applicable, that a bankruptcy court may confirm only one plan.  *See* 11 U.S.C. § 1129(c).  The Plan is the only chapter 11 plan filed by any party in these Chapter 11 Cases and the only one submitted to this Court for confirmation.  Section 1129(c) therefore permits confirmation of the Plan.

### P.    The Plan Complies with Section 1129(d) of the Bankruptcy Code

134.    Section 1129(d) of the Bankruptcy Code provides that "the court may not confirm a plan if the principal purpose of the plan is the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933."  *See* 11 U.S.C. § 1129(d).  The principal purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act.  *See* Wagstaff Decl. ¶ 58.  Moreover, no governmental unit or any other party has requested that this Court decline confirmation the Plan on such grounds.  Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

### Q.    The Plan Complies with Section 1129(e) of the Bankruptcy Code

135.    The provisions of section 1129(e) of the Bankruptcy Code apply only to "small business cases."  *See* 11 U.S.C. § 1129(e).  These Chapter 11 Cases are not "small business cases"

as defined in the Bankruptcy Code.[20]  *See* Wagstaff Decl. ¶ 63.  Accordingly, section 1129(e) of

the Bankruptcy Code is inapplicable to these Chapter 11 Cases.

## II.    THE OBJECTIONS SHOULD BE OVERRULED

### A.    The Benesch AHG Objection Should be Overruled

136.    The Benesch AHG asserts that the Plan violates section 1123(a)(4) of the

Bankruptcy Code because it provides an "outsized recovery" to the AHG on account of (i) "the

Backstop Commitment Agreement and the Backstop Put Premium," Benesch AHG Obj. ¶ 6, and

(ii) "one-sided governance terms" permitting the AHG to appoint the Board of the Reorganized

Debtors.  Benesch AHG Obj. ¶ 7.  Many of the argument raised by the Benesch AHG Objection

were rejected by this Court in connection with this Court's approval of the Support Agreements.

As it did then, the Benesch AHG Objection conflates the benefits received by parties for their

separate commitment to provide new value to the Debtors with the distributions those parties are

receiving on account of Allowed Unsecured Notes Claims.   Once again, the Benesch AHG's

Objection should be rejected.

137.    Section 1123(a)(4) requires that a plan "provide the same treatment for each claim

or interest of a particular class, unless the holder of a particular claim or interest agrees to a less

favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).  Importantly,

"the requirements of section 1123(a)(4) apply only to a plan's treatment *on account of particular*

*claims* or interests in a specific class—not the treatment that members of the class may separately

receive under a plan on account of the class members' other rights or contributions."  *In re*

*Adelphia Comms Corp.*, 368 B.R. 140, 249-50 (Bankr. S.D.N.Y. 2007) (emphasis in original).

Thus, while disparate treatment of similarly situated creditors in the same class on account of their

---

[20]    A small business case is "a case filed under chapter 11 of this title in which the debtor is a small business debtor and has not elected that subchapter V of chapter 11 of this title shall apply." 11 USC § 101(51C).

existing prepetition claims is prohibited, section 1123(a)(4) does not apply to disparate treatment of creditors on account of their new contributions or commitments. *See In re TCI 2 Holdings, LLC,* 428 B.R. 117, 133 (Bankr. D.N.J. 2010) (holding that backstop fee was not a distribution to creditors on account of their claims and finding no violation of section 1123(a)(4)).

138.   The treatment that creditors receive on account of their claims and the value received by creditors in other capacities (*i.e.,* in providing new money commitments) are different concepts. As the court in *ConvergeOne Holdings* noted, "[c]reditors should not confuse similar treatment of claims with equal treatment of claimants. Parties can receive the same distribution in a class and then a subset of those creditors can receive other forms of compensation for matters unrelated to their claim assuming there's a justification for it." *In re ConvergeOne Holdings, Inc.*, Case No. 24-90194-11 (CML) (Bankr. S. D. Tex. May 23, 2024) [Docket No. 417] Hr'g Tr. at 16:13-18.

139.   Courts have consistently overruled disparate treatment objections where certain parties in a class receive consideration for providing a new financing commitment, even where the opportunity to provide new money is not available to all holders. *See, e.g.*, *In re Peabody Energy Corp.*, 933 F.3d 918, 925 (8th Cir. 2019) ("[A] reorganization plan may treat one set of claimholders more favorably than another so long as the treatment is not for the claim but for distinct, legitimate rights or contributions from the favored group separate from the claim."); *In re LATAM Airlines Grp S.A.,* Case No. 20-11254 (JLG), 2022 WL 2206829, at *36 (Bankr. S.D.N.Y. June 18, 2022), *corrected*, Case No. 20-11254 (JLG), 2022 WL2541298 (Bankr. S.D.N.Y. July 7, 2022) (holding that backstop fees and consideration were distributed to certain creditors "in consideration for their commitments described in" approved backstop agreements and did not violate section 1123(a)(4)); *In re CHC Grp., Ltd.*, Case No. 16-31854 (BJH), 2017 WL 11093971,

at *12 (Bankr. N.D. Tex. Mar. 3, 2017) (finding that put option premium payable to plan sponsors as consideration for commitment to backstop rights offering was not a distribution on account of plan sponsors' claims); *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 672 (Bankr. D. D.C. 1992) ("The objectors fail to distinguish between a [claimant's] treatment under the plan on account of a claim or interest and treatment for other reasons.  Only the former is governed by § 1123(a)(4).").

140.    The Benesch AHG mistakenly relies on *Serta Simmons* to suggest that disparate treatment is a matter of "substance rather than form."  Benesch AHG Obj. ¶ 5 (citing *Excluded Lenders v. Serta Simmons Bedding, LLC (In re Serta Simmons Bedding, LLC)*, 125 F.4th 555, 591-592 (5th Cir. 2024)).  The Fifth Circuit determined that an indemnity provided to all prepetition claims in certain classes violated the equal treatment requirement because it was worth millions to class members that had participated in a challenged prepetition transaction and nothing to members that did not.  *See In re Serta Simmons*, 125 F.4th at 591-592.  Here, the Plan provides for *identical* treatment of Class 3 Claims.  Indeed, each member of the Benesch AHG and each member of the AHG will receive the same treatment and recoveries on account of their prepetition claims, irrespective of the postpetition Court-approved Support Agreements.  *See* Plan Art. III.G.3; *see also* Disclosure Statement at Art. V.B.3(iii) (describing Class 3 treatment).  In addition, in *Serta*, the indemnity was provided as treatment under the Plan, whereas here, consideration under the BCA was approved months before votes on the Plan were solicited and does not constitute treatment on account of any Claims under the Plan.[21]

---

[21]    The additional cases cited by the Benesch AHG are also unavailing—each apply section 1123(a)(4) in the context of plan distributions or claim resolution procedures.  *See In re Quigley Co., Inc.*, 437 B.R 102, 146 (Bankr. S.D.N.Y. 2010) (plan violated section 11234(a)(4) when it required specific claimholder to give up valuable causes of action to receive same distribution as claims in the same class); *In re AOV Indus., Inc.*, 792 F.2d 1140, 1152-54 (D.C. Cir. 1986) (same and clarifying that the court did "not hold that all class members must be treated

141.    Indeed, this Court has already determined that the terms of the Support Agreements are "reasonable, market-based, and customary . . . in light of the significant monetary commitments and the opportunity costs and economic risks associated with the commitments," and as such, the commitment obligations "are necessary inducements for the significant benefits that the [D]ebtors are obtaining from the [Support Agreements], the pathway to fund the [D]ebtors and their exit that will realize substantial benefits to all stakeholders if the [P]lan is in fact confirmed."  Docket No. 970 (Dec. 20, 2024 Hr'g Tr.) at 50:15-23.

142.    Without any evidence or support, the Benesch AHG alleges that Debtors secured the AHG's "affirmative votes" on the Plan with "lucrative compensation" under the BCA. Benesch AHG Obj. ¶ 11.  Regardless, however, it is well-settled that creditors committing new money financing can be required to vote in a favor of a plan as a condition to participating in that financing.  *See, e.g.*, *In re TCI 2 Holdings LLC*, Case No. 09-13654 (JHW) (Bankr. N.J. Jan. 5, 2010) [Docket Nos. 1076-5] (approving backstop agreement requiring investors to vote in favor of the noteholders' proposed plan); *In re Aleris Int'l, Inc.*, Case No. 09-10478 (BLS) (Bankr. D. Del. Mar. 23, 2010) [Docket No. 1692-1] (same).  Moreover, the Benesch AHG disregards (and fails to rebut) this Court's findings, which provide that each of Support Agreements were negotiated in good-faith and at arm's length.  *See* Backstop and PSA Order ¶¶ C, D.  Following a contested hearing on approval of the Support Agreements, this Court concluded: "the "Support Agreements [were] part and parcel of a binding bid after the [D]ebtors market-tested their assets pursuant to the Bankruptcy Court's order.  No suggestion has been made that the process was tainted . . . The [D]ebtors' independent directors reached a similar conclusion, and no facts have

---

precisely the same in all respects"); *In re Dow Corning Corp.*, 280 F. 3d 648, 659-61 (6th Cir. 2002) (plan violated section 1123(a)(4) when it provided more effective claims resolution procedures to certain members of class).

been provided that would cause me to disagree[.]" Docket No. 970 (Dec. 20, 2024 Hr'g Tr.) at 50:8-14 (emphasis added).

143.    The Benesch AHG's continued reliance on *Pacific Drilling* is also unavailing.  *See* Benesch AHG Obj. ¶¶ 4, 9-10.  In *Pacific Drilling*, the court questioned the propriety of a proposed backstop fee after the debtor had rejected a competing offer but failed to market test the proposal. *In re Pac. Drilling S.A*., Case No. 17-13193 (MEW), 2018 WL 11435661, at *1 (Bankr. S.D.N.Y. Oct. 1, 2018).  As this Court has recognized, the terms of the Support Agreements are not only reasonable and market-based but also were secured after an extensive sale and marketing process conducted pursuant to the Bidding Procedures Order.  Docket No. 970 (Dec. 20, 2024 Hr'g Tr.) at 50:25-51:1.  Indeed, these were the only terms available to the Debtors.  *Id.*  Moreover, when faced with an identical argument, the court in *LATAM Airlines* noted that "*Pacific Drilling* does not suggest that compensating Backstop Parties through the . . . Backstop Fees implicates section 1123(a)(4)."  *In re LATAM Airlines Grp. S.A.,* 2022 WL 2206829, at *37.  In overruling this equal treatment argument, the *LATAM Airlines* court emphasized that, like this Court, it had already approved compensation for the backstop parties' commitments in a context unrelated to Plan treatment. *Id.* at *37; *see also* Backstop and PSA Order.  Faced with this reality, the Benesch AHG seems to suggest that because the consideration approved in the Backstop and PSA Order is being paid to existing creditors, such consideration constitutes Plan treatment.[22]  *See* Benesch AHG Obj. ¶ 6.  This cannot be the rule.  If it were, debtors would face the risk of an unconfirmable plan whenever they obtained and paid for committed financing from an existing stakeholder.  This is particularly true here, where the Debtors market-tested their assets pursuant to the Bidding

---

[22]    Although the Benesch AHG Objection were preserved when this Court entered the Backstop and PSA Order, this does not recharacterize the compensation in the Backstop and PSA Order as Plan treatment. Preserved or not, the Benesch AHG objection fails.

Procedures Order, and this Court agreed with the Special Committee's determination that the AHG offer was the "highest and best" offer available to the Debtors. *Id.* at 50:11; 51:16-21.

144.    The Benesch AHG also argues that the Plan violates section 1123(a)(4) of the Bankruptcy Code because it contains "one-sided" governance terms such that the AHG will "effectively exercise full corporate authority and control over the Reorganized Debtors." Benesch AHG Obj. ¶¶ 7-8. The Benesch AHG Objection seems to equate the AHG's *selection* of the Initial AHG Directors with *control* of the Initial AHG Directors. To the contrary, as disclosed in the Plan Supplement, the Initial AHG Directors are independent of the AHG and have considerable industry experience and expertise. *See* Plan Supp., Ex. J. None of the Initial AHG Directors are members of the AHG nor affiliated or employed by any members of the AHG. *See id.* The Benesch AHG raises no objection to the identity or qualifications of the Initial AHG Directors. *See generally* Benesch AHG Obj.

145.    Also, when reorganized equity is being distributed to a class it is only natural that certain creditors with larger claims will receive more of the equity being distributed and it is a truism of corporate law that parties with a larger stake have a more significant (and sometimes controlling) say in the administration of the reorganized debtor. *See In re Piece Goods Shops Co.,* 188 B.R. 778, 790 (Bankr. M.D.N.C 1995) (majority equity control in reorganized debtor might be more valuable than minority holding but does not constitute unequal treatment). This is exactly what is happening here—Class 3 and Holders of Class 3 received equal treatment within their respective classes because the same terms applied to each of them, allowing each of them to receive their pro rata share of distributions under the Plan. Here, the AHG's ability to appoint the Initial AHG Directors is not a result of unequal treatment, but "rather from the natural consequences of corporate law." *Id.* at 790.

146.    Moreover, the corporate governance provisions of the Plan do not constitute treatment on account of any party's claims against the Debtors, and the Benesch AHG fails to suggest otherwise.   The selection of directors and management is a natural and practical consequence of plan sponsorship.   Courts in this district and elsewhere consistently confirm chapter 11 plans that provide for the appointment of directors and officers by backstop parties or plan sponsors.  *See, e.g.*, *In re 24 Hour Fitness Worldwide, Inc.*, Case No. 20-11558 (KBO) (Bankr. D. Del. Dec. 22, 2020) [Docket No. 1508-1 at Art. IV.G] (confirming plan providing for a new board comprised of the reorganized debtors' CEO and six directors designated by an ad hoc group of commitment creditors); *In re Quiksilver, Inc.*, Case No. 15-11880 (BLS) (Bankr. D. Del. Jan. 29, 2016) [Docket No. 740-1 at Art. 6.13] (confirming plan providing that the reorganized debtors' new board of directors to be appointed exclusively by the plan sponsor); *In re LATAM Airlines Group S.A.*, Case No. 20-11254 (JLG) (Bankr. S.D.N.Y. June 18, 2022) [Docket No. 5754-1 at Art. 5.13(b)] (confirming plan that contemplated a 9-member post-emergence board for the reorganized debtors, with 5 directors nominated by certain commitment creditors and 4 directors nominated by certain backstop shareholders); *In re Garrett Motion Inc.*, Case No. 20-12212 (MEW) (Bankr. S.D.N.Y. Apr. 26, 2021) [Docket No. 1161, Ex. A at Art. 7.3] (confirming plan providing for nomination of the new board of directors of the reorganized debtors in accordance with the plan sponsor agreement); *In re Windstream Holdings, Inc.*, Case No. 19-22312 (RDD) (Bankr. S.D.N.Y. June 26, 2020) [Docket No. 2243, Ex. 1 at Art. IV.L] (confirming plan providing for the appointment of the new board by the requisite backstop parties in accordance with the governance term sheet).

147.    Accordingly, for all of the reasons outlined above, the Debtors respectfully submit that the Benesch AHG Objection should be overruled.

### B.     The BCI Objection Should be Overruled

148.     The BCI Objection demonstrates a fundamental misunderstanding of the Plan and provides no basis to deny confirmation.  Although BCI's arguments are not entirely clear, the Debtors believe that BCI attempts to raise the following points the Plan: (i) substantively consolidates the Debtors' estates; (ii) improperly distributes the equity of WOM S.A. to holders of Allowed Unsecured Note Claims; (iii) does not include an adequate reserve for Allowed Administrative Expense Claims; and (iv) fails to assume or reject BCI's surety bonds.  Each of these arguments lacks merit.

149.     *First*, BCI argues that the Plan improperly results in the substantive consolidation of the Debtors' estates.  The Plan, however, is very clear that it is "joint" for administrative purposes only and constitutes a separate chapter 11 plan for each Debtor and the classification of Claims and Interests in the Plan applies separately to each of the Debtors.  *See* Plan Art. IV.A. Accordingly, votes on the Plan were tabulated on a Debtor-by-Debtor basis. *See* Voting Report ¶ 6. The Debtors do not seek, and this Court has not ordered, substantive consolidation of the Debtors.

150.     As is common in chapter 11 cases, the Plan provides for class treatment without unnecessarily providing debtor-by-debtor treatment.  *See* Plan Art. III.G.  This is neither unusual nor improper.  Accordingly, for example, Holders of the Unsecured Notes Claims have recourse to each of the Debtors (whereas Holders of General Unsecured Claims do not) and have rights that are different from those of Holders of General Unsecured Claims. Wagstaff Decl. ¶ 13.  Holders of Claims in Class 3 hold unsecured Claims against Kenbourne, as issuer of the Unsecured Notes, and each of the other Debtors, as guarantors of the Unsecured Notes, and are therefore entitled to the Guaranty Claim Enhancement.  Wagstaff Decl. ¶ 13; *See* Plan Art. III.   The Guaranty Claim Enhancement accounts for each Unsecured Notes Claim against each Debtor, including on account of deemed recoveries by the issuer and guarantors of the Unsecured Notes on their Intercompany

Claims against each other Debtor.  *See* Plan Arts. III.G.3-4; Wagstaff Decl. ¶ 13.  Thus, rather than eliminating Intercompany Claims, as a debtor would in a substantive consolidation, the Plan accounts for such Claims by way of the Guaranty Claim Enhancement, which is the product of extensive arm's-length negotiations between the Debtors, the AHG, and the Committee (of which BCI is a member).  Wagstaff Decl. ¶ 13.

151.    Moreover, BCI fails to articulate how it is impacted by the structure of the Plan or why that structure is objectionable—it merely repeats the conclusion that there is substantive consolidation.  For some reason, BCI focuses heavily on the Liquidation Analysis, even though the Liquidation Analysis was prepared on a Debtor-by-Debtor basis, and the Plan contemplates a going-concern reorganization and not liquidation.  *See id.*  ¶ 42; *see also* Disclosure Statement, Ex. C; Plan Art. III.I.

152.    ***Second***, BCI argues that the retention of WOM's equity by the to-be-formed parent companies of the Reorganized Debtors is inappropriate as a violation of the absolute priority rule.[23]  The Plan provides that all (i) Intercompany Interests in WOM held by NC Telecom II shall be cancelled, released, and extinguished and all (ii) Intercompany Interests in WOM held by WOM Mobile shall be reinstated.  *See* Plan Art. III.G.7.  The reinstatement of intercompany equity interests in a plan for corporate structuring purposes is a common convention in chapter 11 and does not violate the Bankruptcy Code, particularly here where the equity of the Reorganized Debtors will be owned by creditors and not retained by the ultimate parent company or shareholders.  *See In re Ion Media Networks, Inc.*, 419 B.R. 585, 601 (Bankr. S.D.N.Y. 2009) (overruling plan objections, confirming a chapter 11 plan, and finding that "[t]he [p]lan's retention

---

[23] BCI inexplicably repeats this argument in both Section II and Section IV of the BCI Objection.  In Section IV, the absolute priority rule is identified as the legal basis for BCI's argument, while Section II omits any mention of the law.

of intercompany equity interests for holding company purposes constitutes a device utilized to allow the [d]ebtors to maintain their organizational structure and avoid the unnecessary cost of having to reconstitute that structure").

153.     **Third**, BCI contends that the Plan is not feasible because the Liquidation Analysis fails to account for, and the Plan provides "no information on the source of the funds to pay," BCI's purported $4.7 million administrative expense claim.[24]  BCI Obj. ¶ 28-39.[25]  BCI does not even attempt to rebut the Financial Projections or uncontroverted testimony of the Debtors' investment banker on the feasibility of the Plan.  *See* Messer Decl. ¶ 19; *supra* ¶¶ 119-120.  Instead, BCI focuses solely on the Debtors' Liquidation Analysis as evidence that the Plan is not feasible.  But a Liquidation Analysis is entirely irrelevant to the question of feasibility.   Indeed, the Liquidation Analysis tests whether recoveries to creditors under the Plan are greater than the recoveries available in a hypothetical chapter 7 liquidation and in the best interest of creditors pursuant to section 1129(a)(7) of the Bankruptcy Code.  It does not analyze (nor does it purport to analyze) whether the Plan is feasible under section 1129(a)(11) of the Bankruptcy Code.

154.     Regardless, the Plan is feasible even considering BCI's alleged administrative expense claim.[26]  As illustrated in the Financial Projections (which BCI fails to rebut) and as discussed more fully in the Plan, the Disclosure Statement, and the Messer Declaration, the

---

[24]   Although this dispute is for another day, the Debtors want to be clear that they vigorously reject the existence of BCI's alleged administrative expense claim.  Indeed, the Debtors dispute that there is a claim at all, as BCI admits that its alleged claim is based on an undrawn, now expired letter of credit.  Because nothing was drawn (or will be drawn because it is expired), no claim can arise from the mere issuance of a letter of credit.

[25]   BCI also objects to post-confirmation estimation and allowance of its Administrative Expense Claim.  BCI Obj. ¶¶ 32, 36.  As this Court recently noted, however, there is no "need to determine the amounts and the allowability of BCI's claims before the adjudication of Plan confirmation." *In re WOM S.A.*, Case No. 24-10628 (KBO) (Bankr. D. Del. Feb. 27, 2025) Feb. 27, 2025, Hr'g Tr. at 13:11-13.

[26]   As set forth in the Messer Declaration, given that the Plan is based on a $1.6 billion enterprise valuation of the Debtors, BCI's purported $4.7 million administrative expense claim has no material impact on the feasibility of the Plan (even if the claim were allowed in full).  *See* Messer Dec. ¶ 22.

Debtors will rely on the proceeds of the Rights Offering to fund distributions under the Plan, repay the DIP Loan Facility in full, and provide liquidity to the Reorganized Debtors upon emergence.[27] The Debtors prepared the Financial Projections to analyze their post-confirmation ability to meet their obligations under the Plan and continue as a going concern without the need for further restructuring. Messer Decl. ¶¶ 22-23; *supra* ¶ 119-120. The Financial Projections demonstrate that, upon emergence, the Debtors possess sufficient liquidity to meet the necessary distributions required under the Plan and to sustain viable business operations going forward. *See* Messer Decl. ¶¶ 20-21. Despite its objection, BCI is, and has been, generally aware of the source of funding available to fund distributions under the Plan, not only because the Plan and the Disclosure Statement contain sufficient information, but because BCI objected to the approval of the Support Agreements[28] and resolved unrelated disclosure concerns by working with the Debtors to amend the Disclosure Statement prior to solicitation.[29]

155.    ***Finally***, BCI argues that the contingent surety bonds (or the credit agreement related thereto) that BCI has issued on behalf of the Debtors, the *boletas de garantia* (the "**BCI Surety Bonds**"), are executory contracts that must be assumed or rejected under the Plan. *See*

---

[27]    *See, e.g.*, Plan Art. IV.C.3 ("Except as otherwise provided in the Plan or the Confirmation Order, the Reorganized Debtors shall fund distributions or make payments under the Plan with (i) Cash on hand from the Debtors, including Cash from business operations, and (ii) Cash proceeds from the Rights Offering."); Disclosure Statement Arts. I.C., V.C.3 ("In order to fund distributions under the Plan, the Debtors will conduct a Rights Offering"); Rights Offering Procedures Approval Motion ¶ 25 ("The Rights Offering will provide up to $500 million to fund the Debtors' (i) anticipated distributions under the Plan and (ii) operations and capital needs upon emergence from these Chapter 11 Cases"); Backstop and PSA Motion ¶ 38 ("The BCA will ensure that the Rights Offering will be fully funded, which will enable the Debtors to fund anticipated distributions under the Plan and their operations and capital needs upon emergence."); *see also* Sontchi Decl. ¶ 23; Messer Decl. ¶ 17.

[28]    *See Debtors' Omnibus Reply in Support of Debtors' Motion for Entry of an Order (I) Authorizing and Approving (A) Entry into the Plan Sponsor Agreement, (B) Entry into the Backstop Commitment Agreement, and (C) Incurrence of Certain Payment and Indemnification Obligations and (II) Granting Related Relief* [Docket No. 937] ¶ 2 (In reply to BCI's objection, stating the Rights Offering will fund the Plan with "500 million of exit financing committed by the AHG to satisfy the Plan's cash payment obligations").

[29]    *See* Docket No. 1061 (Jan. 23, 2025 Hr'g Tr.) at 7:1-7; 17:3-6 3 (Debtors' counsel explaining that "the concerns raised in BCI's reservation of rights" (Docket No. 1014) were resolved by including additional language in the Disclosure Statement, as agreed with BCI's counsel).

BCI Obj. ¶¶ 43-47.  To the contrary, "a surety bond for which the debtor has paid the premium in full is not an executory contract."  3 COLLIER ON BANKRUPTCY ¶ 365.02 (16th ed. 2025). Given that the Debtors owe no obligation under the BCI Surety Bonds, the BCI Surety Bonds are not executory contracts.

156.    To support its contention that the agreements are executory, without any explanation or evidence, BCI simply states that there are "obligations clearly due on both sides" under the BCI Surety Bonds.  *See* BCI Obj. ¶ 43 (citing *In re Evans Prods. Co.,* 91 B.R. 1003, 1006 (Bankr. S.D. Fla. 1988)).[30]  The Debtors do not have any ongoing obligations with BCI under the *boletas de garantia* issued by BCI.  *See* Wagstaff Decl. ¶ 67.  Although prepetition *boletas de garantia* were issued under a credit line agreement with BCI, BCI issued several new *boletas de garantia* post-petition, which are fully cash-collateralized.  *Id*. Moreover, it is well-settled that surety bonds, such as the BCI Surety Bonds, are not executory contracts and, therefore, cannot be assumed or rejected pursuant to the Plan.  *See, e.g.*, *Argonaut Ins. Co. v. Falcon V, LLC. (In re Falcon V, LLC.)*, 44 F.4th 348, 354 (5th Cir. 2022) (holding that surety bonds are not executory contracts); *In re Coal Stripping, Inc.*, 215 B.R. 500, 502-03 (Bankr. W.D. Pa. 1997) (holding that an annual premium agreement between the debtor and surety was not an executory contract because the bond was posted and irrevocable and the only obligation under the contract was to pay money).

---

[30]    BCI's reliance on *Evans Products* is unpersuasive.  In that case, the court permitted a surety to enforce a $2.3 million obligation that the liquidating debtor had assumed pursuant to a chapter 11 plan and where the court characterized the debtor's failure to pay the premium owed to the surety as an "abrupt, unilateral disavowal of its obligation."  In contrast, here, the Debtors have not purported to assume the BCI Surety Bonds and there are no obligations owed by the Debtors under the BCI Surety Bonds.  *See also In re Gov't. Securities Corp.*, 111 B.R. 1007, 1012 (S.D. Fla. 1990), *aff'd*, 972 F.2d 328 (11th Cir. 1992) (distinguishing *Evans Products*, stating that debtors' continued obligation to make premium payments is the sole basis for determining that a fidelity bond is executory).

157.    Even if the BCI Surety Bonds (or the credit agreement related thereto) were executory contracts (which they are not), the BCI Surety Bonds (or the credit agreement related thereto) cannot be assumed pursuant to section 365(c)(2) of the Bankruptcy Code. *See* 11 U.S.C. § 365(c)(2) (prohibiting assumption or assignment of a contract "to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor").  Courts have consistently held that "loan commitments, guaranty and surety contracts, and other contracts, [where] the principal purpose of which is to extend financing to or guarantee the financial obligations of the debtor are contracts to extend financial accommodations within the meaning of § 365(c)(2)" and, therefore, cannot be assumed by a debtor. *In re Thomas B. Hamilton Co., Inc.*, 969 F.2d 1013, 1019 (11th Cir. 1992); *see also In re Cardinal Indus., Inc.*, 146 B.R. 720, 731 (Bankr. S.D. Ohio 1992) (holding that a credit agreement between the debtor and a bank was a revolving line of credit and therefore not assumable under section 365(c)(2) of the Bankruptcy Code).  Given that BCI issued the BCI Surety Bonds and the credit agreement related thereto to extend financing or guarantee the financial obligations of the Debtors under the BCI Surety Bonds, section 365(c)(2) provides that if the BCI Surety Bonds were executory contracts, they may not be assumed by the Debtors.

158.    Accordingly, the BCI Objection should be overruled.

**C.      The PTI Objection Should be Overruled**

159.    On March 4, 2025, Phoenix Tower International Chile SpA ("**PTI**") filed an objection and reservation of rights to Debtors' asserted cure amount of approximately $44 million and to the provisions of the Plan that permit the Debtors to assume or reject Unexpired Leases and Executory Contracts until the Effective Date [Docket No. 1201] (the "**PTI Objection**") (citing Plan Art. VII.D).  The Debtors have been working tirelessly to resolve the outstanding issues with PTI, including several in-person meetings between advisors and principals.  The Debtors

understand the critical importance of PTI to the go-forward business, but performance under the master lease agreement, asset purchase agreement, and related ancillary agreements is one of the more complicated aspects of the Debtors' business. Building, selling, and operating cell towers requires careful planning, negotiation with third party ground lessors, careful compliance with permitting and other regulatory requirements, and financial planning to be able to have the capex available to meet all associated challenges. The Debtors have always known that a solution with PTI is necessary for the reorganized business, and they are looking forward to a productive future business relationship together.

160.    Despite all this, the Debtors cannot be hamstrung by PTI's allegations that an additional $85 million must be reserved for alleged non-compliance with the asset purchase agreement between the parties. The Debtors believe that they are very close to resolving the outstanding issues, but the complicated nature of the negotiations of amendments to these important documents – which PTI insists must be completed rather than entry into a term sheet to negotiate the documents further post-emergence – has taken longer than expected. The Debtors will continue to work with PTI to make sure that their business partner is appropriately compensated without risking the business.

161.    Additionally, PTI is not correct that the Debtors' decision to include them in the Assumption Notice is irrevocable. PTI Obj. ¶ 2. The Bankruptcy Code sets a time limit for a debtor to "*indicate its intention* to assume a non-residential lease." *In re Sears Holdings Corp.*, 661 B.R. 298, 317 (S.D.N.Y. 2024); *see also In re Simbaki, Ltd.*, 520 B.R. 241 (Bankr. S.D. Tex. 2014) ("Once the trustee files the motion within 210 days, the lessor will know whether the trustee intends to assume or reject, and can plan accordingly."). The Debtors have always intended to assume PTI's agreements and have been clear and upfront about this in all discussions. The

Debtors entered into several stipulations with PTI to extend the statutory deadline to assume or reject to January 31, 2025, and made their intention known to the Court by including them on the Assumption Schedule filed on January 30, 2025. The Debtors *still* intend to assume the agreements with PTI so long as it can reach agreement on the cure amount and other amendments to the relevant agreements. This assumption, however, must be done prudently and not at the expense of the go-forward business. If PTI pushed to be paid $130 million as a cure amount, the Debtors would be required to reject their contracts as is their right under the terms of the Plan. The Debtors will continue to negotiate with PTI in good faith to reach a resolution that benefits both parties.

### III.    CAUSE EXISTS TO WAIVE A STAY OF THE CONFIRMATION ORDER

162.    The Debtors respectfully request that this Court cause the Confirmation Order to become effective immediately upon its entry, notwithstanding the 14-day stay imposed by Bankruptcy Rule 3020(e). Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise." Fed. R. Bankr. P. 3020(e). As such, and as the Advisory Committee Notes to Bankruptcy Rule 3020(e) state, "[t]he court may, in its discretion, order that Rule 3020(e) is not applicable so that the plan may be implemented and distributions may be made immediately." Adv. Comm. Notes to 1999 Amendment to Bankr. R. 3020(e). Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale, or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code. Each rule also permits modification of the imposed stay upon court order. *See* Fed. R. Bankr. P. 3020(e), 6004(h), 6006(d).

163.    The Debtors submit that good cause exists for waiving and eliminating any stay of the Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006, so that the

Confirmation Order will be effective immediately upon its entry.  The Reorganization Transactions contemplated in the Plan were extensively negotiated among sophisticated parties and are premised on preserving the value of the Debtors as a going concern.  The Debtors require the ability to immediately enter into and consummate the documents and transactions related to the Plan in order to facilitate the closing of the Reorganization Transactions in accordance with the milestones under the Support Agreements.  *See* Wagstaff Decl. ¶ 64.  The milestones under the Support Agreements require, among other things, that the Plan go effective no later than 15 days following entry of the Confirmation Order.  PSA Secs. 4(j); 11.  Absent extension or waiver of this milestone by the Required Consenting Noteholders, failure to achieve this milestone (subject to certain exceptions pursuant to paragraph 7 of the Backstop and PSA Order) would (i) permit the AHG to terminate the Support Agreements, and (ii) may entitle the AHG to the $62.5 million Cash Put Premium Amount, plus payment of obligations under the Expense Reimbursement (as defined in the BCA).  *See* PSA Sec. 8(a)(11); BCA Secs. 6.1(b); 6.5(a).

164.     Accordingly, the Debtors request that this Court cause the Confirmation Order to become effective immediately upon its entry.

## CONCLUSION

165.     The Debtors submit that the Plan satisfies all applicable requirements of the Bankruptcy Code and request that this Court enter the Confirmation Order, confirming the Plan and granting such other and further relief as is just and proper.

Dated: March 4, 2025


Respectfully submitted,


/s/ *John H. Knight*


**RICHARDS, LAYTON & FINGER, P.A.**          **WHITE & CASE LLP**

John H. Knight (No. 3848)          John K. Cunningham (admitted *pro hac vice*)
Amanda R. Steele (No. 5530)          Richard S. Kebrdle (admitted *pro hac vice*)
Brendan J. Schlauch (No. 6115)          Southeast Financial Center
Alexander R. Steiger (No. 7139)          200 South Biscayne Boulevard, Suite 4900
One Rodney Square          Miami, FL 33131
920 North King Street          Telephone: (305) 371-2700
Wilmington, DE 19801          jcunningham@whitecase.com
Telephone: (302) 651-7700          rkebrdle@whitecase.com
knight@rlf.com
steele@rlf.com          Philip M. Abelson (admitted *pro hac vice*)
schlauch@rlf.com          Andrea Amulic (admitted *pro hac vice*)
steiger@rlf.com          Lilian Marques (admitted *pro hac vice*)
          Claire M. Campbell (admitted *pro hac vice*)
          Peter Strom (admitted *pro hac vice*)
*Co-Counsel to Debtors and*          1221 Avenue of the Americas
*Debtors in Possession*          New York, NY 10020
          Telephone: (212) 819-8200
          philip.abelson@whitecase.com
          andrea.amulic@whitecase.com
          lilian.marques@whitecase.com
          claire.campbell@whitecase.com
          peter.strom@whitecase.com


          *Co-Counsel to Debtors and*
          *Debtors in Possession*