**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| WOM S.A., *et al.*, | ) ) | Case No. 24–10628 (KBO) |
| Debtors.¹ | ) ) | Jointly Administered |
|  | ) ) | **Ref. Docket No. 1054, 1183, 1184** |

**JOINDER OF AD HOC GROUP OF WOM NOTEHOLDERS TO THE
DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF CONFIRMATION
OF THE SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR
WOM S.A. AND ITS AFFILIATED DEBTORS AND STATEMENT IN SUPPORT OF PLAN**

The Ad Hoc Group of WOM Noteholders (the "Ad Hoc Group"),² by and through its undersigned counsel, respectfully submits this joinder (the "Joinder") to the *Debtors' Memorandum of Law in Support of Confirmation of the Second Amended Joint Chapter 11 Plan of Reorganization for WOM S.A. and its Affiliated Debtors*, filed contemporaneously herewith (the "Debtor Memorandum of Law"),³ including the responses in the Debtor Memorandum of Law to the objections filed by (i) Banco de Crédito e Inversiones ("BCI") [Dkt. No. 1183] (the "BCI Objection"); and the (ii) the Ad Hoc Group of Excluded Noteholders (the "Benesch AHG" and

---

¹ The Debtors in the above-captioned chapter 11 cases (the "Chapter 11 Cases") and, where applicable, the last four digits of their respective taxpayer identification numbers, are as follows: Kenbourne Invest S.A. ("Kenbourne") (2018 2206 815); NC Telecom II AS ("NC Telecom II") (59.208.720-0); WOM Mobile S.A. ("WOM Mobile") (99.517.000-0); WOM S.A. ("WOM") (78.921.690-8); Conect S.A. ("Conect") (96.965.220-k); and Multikom S.A. ("Multikom") (78.456.640-4). The location of the debtors' service address in these Chapter 11 Cases is: General Mackenna No. 1369, Santiago, Chile.

² The members of the Ad Hoc Group are certain holders, or investment managers for holders, of a majority of the aggregate outstanding principal amount of the 6.875% Senior Notes due 2024 (the "2024 Notes") and the 4.7% Senior Notes due 2028 (the "2028 Notes," and together with the 2024 Notes, the "Unsecured Notes") issued by Kenbourne and guaranteed by NC Telecom II AS, WOM Mobile, WOM, Conect, and Multikom. Aggregate holdings of the Ad Hoc Group represent approximately 61.65% of the total outstanding amount of the Unsecured Notes.

³ The Ad Hoc Group hereby joins in the legal arguments and assertions set forth in the Debtor Memorandum of Law.

together with BCI the "Objecting Parties") [Dkt. No. 1184] (the "Benesch Objection" and together with the BCI Objection, the "Plan Objections") to the *Second Amended Joint Chapter 11 Plan of Reorganization for WOM S.A. and its Affiliated Debtors*, filed contemporaneously herewith (the "Plan")[4] and statement in support of the Plan (the "Statement"). In support of this Joinder and Statement, the Ad Hoc Group respectfully states as follows:

## JOINDER

1. After an open, fair, and robust marketing process for the sale of the Debtors' assets or sponsorship of a plan of reorganization, and intense, arms' length negotiations between the Special Committee of the Debtors' board of directors and the Ad Hoc Group, the Special Committee selected the Ad Hoc Group's bid as the highest and best bid. The cornerstone of the Ad Hoc Group's value-maximizing bid was the commitment to backstop up to $500 million in new-money financing to provide meaningful creditor distributions, finance the Debtors' emergence from Chapter 11, and fund the Reorganized Debtors' ongoing operations. Although numerous potential bidders, including all parties in interest, had ample opportunity to provide a similar or better commitment, none did so.

2. The Debtors and the Ad Hoc Group agreed to implement the Ad Hoc Group's bid through execution of a Plan Sponsor Agreement ("PSA") and Backstop Commitment Agreement ("BCA", together with the PSA, the "Support Agreements"). After the Court's approval of the Support Agreements, further hard-fought, arms' length negotiations resulted in the Official Committee of Unsecured Creditors (the "UCC") signing on to the PSA.

3. The Plan before the Court is supported by all of the Debtors' largest creditor

---

[4] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

constituencies and almost all of the creditors that voted on the Plan, other than BCI and the Benesch AHG. In addition, the Debtors' ultimate equity holders, Novator (as defined in the Novator Settlement Motion), have agreed to cooperate with the implementation of the Plan, pay the Debtors $1 million, waive any claims against the Debtors, and eliminate their equity interests.[5]

4. Only BCI and the Benesch AHG maintain objections to confirmation of the Plan.[6] The Benesch AHG, comprised of three funds holding approximately 5% in aggregate of the total outstanding amount of Unsecured Notes, first appeared in these Chapter 11 Cases eight and a half months after the Petition Date,[7] after the Debtors' extensive, Court-approved marketing process was completed. The Benesch AHG does not hide the fact that it has objected in these cases in an ill-founded attempt to exert leverage to obtain a portion of the Backstop Put Premium, despite playing no part in the arduous, months-long process of formulating, negotiating, and agreeing on the commitments under the Backstop Agreement. *See* Dkt No. 970 (Dec. 20, 2024 Hr'g Tr.) at 32:15-18 ("[T]he ad hoc group is keeping all of the value of those backstop fees to themselves to the exclusion of other noteholders, including my clients, who are willing to participate."). BCI, meanwhile, is a Chilean Bank and member of the UCC, and like all general unsecured creditors had the right to elect under the Plan to receive a pro rata cash recovery or to elect to receive new

---

[5] *See Debtors' Motion Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for Entry of an Order Approving a Settlement Between the Debtors, the Official Committee of Unsecured Creditors, the Ad Hoc Group of WOM Noteholders, the Novator Entities, and the Novator Individuals* [Dkt. No. 1104] (the "Novator Settlement Motion"), which was approved by the Court on March 3, 2025 [Dkt. No. 1197].

[6] The objection filed by Phoenix Tower International Chile SpA ("PTI") [Dkt. No. 1201] is more in the nature of a cure objection than a substantive objection to confirmation of the Plan. As PTI notes, the Debtors, the Ad Hoc Group and PTI have been working constructively to negotiate a resolution of PTI's cure objection, and hope to have negotiations finalized in the very near term.

[7] The Benesch AHG appeared for first time in these Chapter 11 Cases on December 12, 2024 [Dkt. No. 897] and filed a Rule 2019 Statement on December 13, 2024 [Dkt. No. 905], reflecting aggregate holdings of roughly $34 million of the Unsecured Notes, which represents approximately 5% of the total outstanding amount of Unsecured Notes.

equity interests and new notes and to participate in the Rights Offering.

5.    The voting results indicate that, but for the rejecting votes of these two disgruntled parties, the Plan would have nearly unanimous acceptance.  The holders of Unsecured Notes Claims in Class 3 overwhelmingly voted in favor of the Plan.  Based on the claim amounts voted, it appears that the members of the Benesch AHG were the only holders of Unsecured Notes to vote to reject the Plan (even though, as noted in the Benesch Objection, certain of the Benesch AHG members elected to participate in the Rights Offering).   In addition, in Class 4 at WOM S.A., 32 out of 36 holders of General Unsecured Claims, or 88.9% in number of holders, holding over 62% in dollar amount of creditors voting in the class, voted in favor of the Plan.  Due to BCI's $56.5 million General Unsecured Claim, Class 4 failed to meet the two-thirds in claim amount threshold under section 1126(c) of the Bankruptcy Code.  The Plan, however, clearly has broad creditor support and meets the requirements for confirmation under sections 1129(a) and (b).  The Court, therefore, should overrule both objections and confirm the Plan.

6.    In its objection, the Benesch AHG merely rehashes the arguments it made in its objection to the Support Agreements (the "Benesch Support Agreement Objection"),[8] which were already rejected by the Court.  Despite the fact that the Court already found that the Backstop Put Premium and the other Backstop Commitment Obligations were made on account of the Backstop

---

[8]    See Benesch AHG's *Objection of Ad Hoc Group of Excluded Noteholders to Debtors' Motion for Entry of an Order (I) Authorizing and Approving (A) Entry into the Plan Sponsor Agreement, (B) Entry into the Backstop Commitment Agreement, and (C) Incurrence of Certain Payment and Indemnification and Obligations and (II) Granting Relief* [Dkt. No. 912], which the Court denied on December 20, 2024 [Dkt. No. 959] (*Order (I) Authorizing and Approving (A) Entry into the Plan Sponsor Agreement, (B) Entry into the Backstop Commitment Agreement, and (C) Incurrence of Certain Payment and Indemnification Obligations and (II) Granting Related Relief*.)  See also Benesch AHG's *Motion of the Ad Hoc Group of Excluded Noteholders for Entry of an Order Compelling the Debtors to Provide Access to Virtual Data Room and Other Non-Public Information in Accordance with the Fiduciary Out Provisions of the Support Agreements* [Dkt. Non. 1122] which the Court denied on February 27, 2025 [Dkt. No. 1178] (*Order Denying Motion of Ad Hoc Group of Excluded Noteholders for Entry of an Order Compelling the Debtors to Provide Access to Virtual Data Room and Other Non-Public Information in Accordance with the Fiduciary Out Provisions of the Support Agreements*).

Parties' obligations under the BCA, the Benesch AHG alleges that the Plan violates the principle of equality of distribution as required by section 1123(a)(4) of the Bankruptcy Code by providing the Backstop Parties with outsized recoveries on their Claims through the Backstop Commitment Obligations. Benesch Objection, ¶¶ 6-11. The Benesch AHG does so without providing any testimony or evidence that the Backstop Commitment Obligations were not within market parameters for such a backstop commitment or any reason that the Courts' prior ruling is not dispositive on these issues.

7. As the Court stated in overruling the Benesch Support Agreement Objection, and the unrebutted, credible testimony of Marcelo Messer proves, the Backstop Commitment Obligations are "reasonable, market-based, and customary in circumstances such as this" and "necessary inducements for the significant benefits that the debtors are obtaining from the plan support agreement and the backstop agreement." Dkt No. 970 (Dec. 20, 2024 Hr'g Tr.) at 50:15-24. Thus, following the substantial body of case law holding that the benefits and burdens of a commitment to backstop funds are not a result of the claims held by the backstop parties,[9] the Court found that the Backstop Commitment Obligations were on account of the Backstop Parties' "significant monetary commitments and the opportunity costs and economic risks associated with the commitments," which necessarily means they are not on account of their Unsecured Notes Claims. Dkt No. 970 (Dec. 20, 2024 Hr'g Tr.) at 50:15-24.

8. The Benesch AHG repeatedly cites *In re Pacific Drilling S.A.*, Case No. 17-13193 (MEW), 2018 WL 11435661, at *2 (Bankr. S.D.N.Y. Oct. 1, 2018). There, the Court was

---

[9] *See, e.g.*, *In re TPC Grp., Inc.*, Case No. 22- 10493 (Bankr. D. Del. Oct. 5, 2022) [Dkt. No. 934] (approving commitment premium of 12% of the amount of a rights offering); *In re Revlon, Inc.*, Case No. 22-10760 (Bankr. S.D.N.Y. Feb. 21, 2023) (authorizing backstop commitment premium of 12.5%) [Dkt. No. 1513]; *In re LATAM Airlines Grp. S.A.*, Case No. 20-11254, 2022 WL 790414 at *34 (Bankr. S.D.N.Y. Mar. 22, 2022) (authorizing backstop premium of 20%).

concerned for "little creditors" who may be denied opportunities when "big creditors sit in a room to negotiate a deal." *Id*. Here, however, the Debtors proposed, and the Court approved, a marketing process that was designed to level the playing field so that the "little creditors" would have the same access and opportunity as the "big creditors." The Benesch AHG could have participated in that process, but it did not. Instead, it chose to sit on the sidelines for over eight months until the Ad Hoc Group's proposal was made public, and then attempt to swoop in at the eleventh hour to seek the benefit of the Ad Hoc Group's considerable efforts and commitments. This should not be countenanced.

9. Moreover, the results of the Rights Offering confirm that the "economic risks" of the Backstop Commitments were real, and that the Backstop Commitment Obligations were far from a mere giveaway by the Debtors to the Backstop Parties on account of their Unsecured Notes Claims. Based on current figures, a considerable portion of the Rights Offering was unsubscribed, leaving approximately $130 million in aggregate Unsubscribed Rights Offering Securities that the Backstop Parties have agreed, subject to the terms and conditions of the BCA, to purchase pursuant to the Backstop Commitments.[10] Thus, absent the Backstop Commitments, the Debtors would not have been able to fund the Plan. And although the Backstop Commitment Obligations would have been earned in all circumstances, the results of the Rights Offering leave no doubt that the Backstop Parties have provided a tangible, massively valuable benefit to the Debtors' estates in exchange for those obligations.

10. The Benesch AHG also argues that the Plan violates section 1123(a)(4) by allowing

---

[10] *See Declaration of Alex Orchowski of Kroll Restructuring Administration LLC Regarding the Preliminary Rights Offering Results and the Solicitation of Votes and Tabulation of Ballots Cast on the Amended Joint Chapter 11 Plan of Reorganization for WOM S.A. and its Affiliated Debtors* [Dkt. No. 1208].

the members of the Ad Hoc Group to select four out of five members of the initial board of directors of the Reorganized Debtors.  *See* Benesch Objection, ¶ 7.  While each member of the Ad Hoc Group has the right to appoint a member of the Initial Board of Directors of WOM Cayman Holdings Ltd., that right is individual and does not pertain to the Ad Hoc Group as a whole.  The members of the Ad Hoc Group have not entered into a joint action agreement with respect to the management of the Reorganized Debtors, they are independent among themselves (they are not part of the same enterprise group, nor do they necessarily share a common interest in the management of their investments), and as a result, they lack the "full corporate authority and control over the Reorganized Debtors."  The fact that each member has an individual right to appoint a director, that some members have decided to appoint independent directors, that the CEO of WOM SpA (currently WOM S.A.) will be a member of the Board, and that there is no joint action agreement between the members of the Ad Hoc Group, confirms that the AHG will not have the full corporate authority and control over the Reorganized Debtors.  In addition, the right of any individual Ad Hoc Group member to appoint a director falls away in the event its equity holdings fall below 50% of its holdings on the Effective Date of the Plan, and, after three years, holders of a majority of the issued and outstanding voting securities, (regardless of who holds them) will have the right to remove and appoint one director initially appointed by an Ad Hoc Group member per year.  Further, the Benesch AHG ignores other aspects of the post-reorganized corporate structure, such as that the Reorganized Debtors will be owned by Chile Newco and that in turn Chile Newco will be owned by a Chilean Public Fund, which will have two committees, an oversight committee (*comite de vigilancia*) and an investment committee (*comite de inversion*).

11.     In any event, the corporate governance contained in the Plan is entirely appropriate here where each of the members of Ad Hoc Group individually will likely be the largest equity

holders—and the members will own, in the aggregate, approximately 85% of the ultimate equity interests in the Reorganized Debtors on a fully diluted basis (assuming conversion of the New Convertible Notes to be held by the Ad Hoc Group members)—as a result of the distributions of New Holdco Units under the Plan and their Rights Offering participation. Where creditors convert part of their claim into equity, governance rights to the largest equity holders of a reorganized debtor are not benefits that flow from "unequal treatment" but rather from the "natural consequences of corporate law." *In re Piece Goods Shops Co., L.P.*, 188 B.R. 778, 790 (Bankr. M.D.N.C. 1995). "Accordingly, non-economic attributes of equity ownership should not be germane to the analysis of equality of treatment under Section 1123(a)(4) of the Bankruptcy Code." *Id*.

12. BCI's objections are also unfounded. *First*, BCI complains that the Debtors' liquidation analysis attached to the Disclosure Statement (the "DS Liquidation Analysis") substantively consolidates the Debtors' estates. Although the DS Liquidation Analysis does show the Debtors on a consolidated basis, the unrebutted testimony in Mr. Wagstaff's declaration makes clear that the Debtors meet the requirements of section 1129(a)(7) on a Debtor-by-Debtor basis.

13. *Second*, BCI argues that the Plan improperly substantively consolidates the Debtors. This is not true. The Plan explicitly provides that it "is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor," and that it "is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan." *See* Plan at Article IV.A. Because the Unsecured Notes have guarantee claims in the same amount at each of the Debtors, Class 3 voting was tabulated and reported on a consolidated basis. However, Class 4 General Unsecured Claims voting was tabulated and reported on a Debtor-by-

Debtor basis.

14. *Third*, the Plan meets the requirements for confirmation under section 1129(b) notwithstanding that Class 4 did not approve the Plan, because it does not discriminate unfairly between Class 3 and 4, and the plan is fair and equitable. Although BCI asserts that the plan fails to satisfy the absolute priority rule, the ultimate equity holder, Novator, is having its equity eliminated under the Plan while WOM S.A. is being reorganized and its equity interests—as BCI acknowledges—are effectively being transferred for the benefit of holders of Unsecured Notes Claims in Class 3. *See* BCI Objection, ¶ 42 (equity of WOM SA is being "fully retained and passed along…from the current parent company to a "newco" that will hold the equity instead."). Since the creditors are receiving the benefit of WOM S.A.'s equity interests, and Novator does not retain any equity or receive a distribution on account of the equity, the absolute priority rule is met. *See*, *e.g. In re Ion Media Networks, Inc.,* 419 B.R. 585, 601 (Bankr. S.D.N.Y. 2009) (maintaining intercompany equity interests permissible under a plan to maintain the Debtors' corporate structure and "avoid the unnecessary cost of having to reconstitute that structure.").

15. *Finally*, BCI argues that the Plan is not feasible because it does not provide a specific reserve for its asserted $4.7 million administrative expense claim (the validity of which will be disputed by the Debtors and the Ad Hoc Group). BCI provides no support for this argument, does not describe how the $4.7 million claim (if allowed) would affect the Plan's feasibility, and does not even attempt to estimate what the shortfall would be as a result. These circumstances cannot demonstrate that the Plan violates section 1129(a)(11), given that the provision only requires a Plan to have a "reasonable assurance of success." *See In re Emerge Energy Servs. LP*, No. 19-11563 (KBO), 2019 WL 7634308 at *15 (Bankr. D. Del. Dec. 5, 2019). Indeed, the Debtors' financial projections and the Messer Declaration demonstrate that the Debtors

will have adequate liquidity to pay all administrative claims and fund continuing obligation in the ordinary course post-emergence. Moreover, that the potential GUC Cash Pool may be reduced by an increase in administrative expense claims has nothing to do with the feasibility of the Plan.

16. Accordingly, the BCI Objection lacks merit and should be overruled.

## CONCLUSION

For the foregoing reasons, the Ad Hoc Group respectfully requests that the Court overrule the Objections, confirm the Plan, and grant such other and further relief as the Court deems appropriate.

Dated: March 4, 2025

*/s/ Robert F. Poppiti, Jr.*
Robert S. Brady (No. 2847)
Robert F. Poppiti, Jr. (No. 5052)
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
rbrady@ycst.com
rpoppiti@ycst.com

-and-

Allan S. Brilliant (admitted *pro hac vice*)
Stephen M. Wolpert (admitted *pro hac vice*)
Isaac D. Stevens (admitted *pro hac vice*)
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
allan.brilliant@dechert.com
stephen.wolpert@dechert.com
isaac.stevens@dechert.com

*Counsel to the Ad Hoc Group of WOM Noteholders*