# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

WOM S.A., *et al.*,[1]

Debtors.

Chapter 11

Case No. 24-10628 (KBO)

(Jointly Administered)

## THIRD AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION FOR WOM S.A. AND ITS AFFILIATED DEBTORS

**RICHARDS, LAYTON & FINGER, P.A.**
John H. Knight (No. 3848)
Amanda R. Steele (No. 5530)
Brendan J. Schlauch (No. 6115)
Alexander R. Steiger (No. 7139)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
knight@rlf.com
steele@rlf.com
schlauch@rlf.com
steiger@rlf.com

*Co-Counsel to Debtors and Debtors-in-Possession*

**WHITE & CASE LLP**
John K. Cunningham (admitted *pro hac vice*)
Richard S. Kebrdle (admitted *pro hac vice*)
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
jcunningham@whitecase.com
rkebrdle@whitecase.com

Philip M. Abelson (admitted *pro hac vice*)
Andrea Amulic (admitted *pro hac vice*)
Lilian Marques (admitted *pro hac vice*)
Claire M. Campbell (admitted *pro hac vice*)
Peter Strom (admitted *pro hac vice*)
1221 Avenue of the Americas
New York, New York 10020
Telephone: (212) 819-8200
philip.abelson@whitecase.com
andrea.amulic@whitecase.com
lilian.marques@whitecase.com
claire.campbell@whitecase.com
peter.strom@whitecase.com

*Co-Counsel to Debtors and Debtors-in-Possession*

Dated:    March 5, 2025
           Wilmington, Delaware

---

[1]    The Debtors in these chapter 11 cases (these "**Chapter 11 Cases**"), and each Debtor's federal tax identification number in its applicable jurisdiction of incorporation, are as follows: Kenbourne Invest S.A. (2018 2206 815) (Luxembourg); NC Telecom II AS (59.208.720-0) (Norway); WOM Mobile S.A. (99.517.000-0) (Chile); WOM S.A. (78.921.690-8) (Chile); Conect S.A. (96.965.220-k) (Chile); and Multikom S.A. (78.456.640-4) (Chile).  The location of the Debtors' service address in the Chapter 11 Cases is: General Mackenna No. 1369, Santiago, Chile.

**TABLE OF CONTENTS**

Page

ARTICLE I DEFINITIONS AND INTERPRETATION. ........................................................1
    A.    Definitions.....................................................................................................1
    B.    Interpretation; Application of Definitions and Rules of Construction.............26
    C.    Controlling Document .......................................................................27

ARTICLE II ADMINISTRATIVE CLAIMS, PROFESSIONAL CLAIMS, DIP CLAIMS,
    PRIORITY TAX CLAIMS, AND U.S. TRUSTEE FEES. ........................................27
    A.    Unclassified Claims .....................................................................27
    B.    Administrative Claims ..................................................................28
    C.    Professional Claims .....................................................................29
    D.    Priority Tax Claims......................................................................30
    E.    DIP Claims...................................................................................30
    F.    Foreign Vendor Claims.................................................................31
    G.    Restructuring Expenses.................................................................31
    H.    U.S. Trustee Fees. ........................................................................31

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS. .32
    A.    Classification of Claims and Interests............................................32
    B.    Formation of Debtor Groups for Convenience Only .......................32
    C.    Summary of Classification............................................................32
    D.    Special Provision Governing Unimpaired Claims...........................33
    E.    Subordinated Claims.....................................................................33
    F.    Non-Debtor Intercompany Claims.................................................33
    G.    Treatment of Claims and Interests**.**.............................................33
    H.    Voting Classes; Deemed Acceptance by Non-Voting Classes.........38
    I.    Voting; Presumptions; Solicitation ...............................................38
    J.    Confirmation Pursuant to Sections 1129(a)(10) and 1129(b)
        of the Bankruptcy Code ...............................................................39
    K.    Elimination of Vacant Classes ......................................................39
    L.    Separate Classification of Other Secured Claims ...........................39
    M.    Controversy Concerning Impairment .............................................39

ARTICLE IV MEANS FOR IMPLEMENTATION. ..................................................40
    A.    No Substantive Consolidation........................................................40
    B.    Reorganization Transactions; Effectuating Documents....................40
    C.    Sources of Consideration for Plan Distributions .............................41
    D.    Rights Offering ............................................................................41
    E.    Issuance and Distribution of the Plan Securities.............................42
    F.    Corporate Existence .....................................................................46
    G.    Exemption from Registration.........................................................46
    H.    New Corporate Governance Documents ........................................47
    I.    Officers and Boards of Directors ...................................................48
    J.    Management Incentive Plan...........................................................48
    K.    Vesting of Assets in the Reorganized Debtors ...............................48
    L.    Cancellation of Existing Documents, Instruments, and Securities ...48
    M.    Corporate Action..........................................................................51
    N.    Wind-Down of Kenbourne Estate..................................................51

O.      Exemption From Certain Taxes and Fees ........................................................52
P.      Preservation of Causes of Action.................................................................52
Q.      Insurance Policies ..................................................................................53
R.      Indemnification of Directors, Managers, Officers, and Employees ................55
S.      Employee Obligations...............................................................................55
T.      Workers' Compensation Programs. ...............................................................56
U.      Closing of the Chapter 11 Cases. .................................................................56
V.      Plan Trust ...............................................................................................56
W.      Retention of Books and Records..................................................................58

ARTICLE V DISTRIBUTIONS..............................................................................59
A.      Timing and Calculation of Amounts to Be Distributed ...................................59
B.      Rights and Powers of Distribution Agent .....................................................61
C.      Delivery of Distributions and Undeliverable or Unclaimed Distributions ......61
D.      Withholding and Reporting Requirements; Compliance Matters....................63
E.      Claims Paid or Payable by Third Parties .......................................................64
F.      Setoffs and Recoupment .............................................................................65
G.      Allocation between Principal and Accrued Interest.........................................66
H.      Foreign Currency Exchange Rate ................................................................66

ARTICLE VI PROCEDURES FOR DISPUTED CLAIMS. ........................................66
A.      Objections to Claims..................................................................................66
B.      Allowance of Claims..................................................................................66
C.      Estimation of Claims .................................................................................67
D.      Elimination of Duplicate Claims ................................................................67
E.      No Distributions Pending Allowance ...........................................................67
F.      Distributions After Allowance ....................................................................67
G.      No Postpetition Interest..............................................................................68
H.      Resolution of Claims.................................................................................68
I.       Disputed Claims Reserve ............................................................................69
J.       Disallowance of Claims .............................................................................70
K.      Amendments to Claims and Late Filed Claims .............................................70
L.      Single Satisfaction of Claims......................................................................70

ARTICLE VII EXECUTORY CONTRACTS AND UNEXPIRED LEASES. ...................70
A.      Assumption and Rejection of Executory Contracts and Unexpired Leases .....70
B.      Claims Based on Rejection of Executory Contracts or Unexpired Leases.......72
C.      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ....72
D.      Assumption Dispute Resolution ..................................................................73
E.      Pre-Existing Payment and Other Obligations ...............................................74
F.      Indemnification Obligations .......................................................................74
G.      Contracts and Leases Entered into After the Petition Date..............................74
H.      Modifications, Amendments, Supplements, Restatements,
         or Other Agreements...................................................................................75
I.       Reservation of Rights.................................................................................75
J.       Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4) ..........75

ARTICLE VIII SETTLEMENT, RELEASES, INJUNCTIONS, AND RELATED
         PROVISIONS. ............................................................................................75

**Page**

A.     Compromise and Settlement of Claims, Interests, and Controversies ............ 75
B.     Release of Liens. ................................................................................... 76
C.     Discharge and Satisfaction of Claims .................................................... 76
D.     Term of Injunctions or Stays ................................................................. 77
E.     **Releases by the Debtors** ...................................................................... 77
F.     **Releases By Holders of Claims.** .......................................................... 78
G.     **Exculpation** ........................................................................................ 79
H.     Injunction .............................................................................................. 79
I.     Securities and Exchange Commission ................................................... 81
J.     Protection Against Discriminatory Treatment. ...................................... 81

ARTICLE IX CONDITIONS PRECEDENT TO THE EFFECTIVE DATE. ........................ 81
A.     Conditions Precedent to the Effective Date ........................................... 81
B.     Waiver of Conditions Precedent ........................................................... 84
C.     Substantial Consummation ................................................................... 85
D.     Effect of Vacatur of Confirmation Order ............................................... 85

ARTICLE X RETENTION OF JURISDICTION. ................................................................ 85

ARTICLE XI MISCELLANEOUS PROVISIONS. ............................................................. 87
A.     Subordinated Claims ............................................................................ 87
B.     Dissolution of Committee ..................................................................... 87
C.     Amendments ......................................................................................... 87
D.     Revocation or Withdrawal of the Plan ................................................... 88
E.     Severability of Plan Provisions Upon Confirmation .............................. 88
F.     Governing Law. .................................................................................... 88
G.     Time ..................................................................................................... 88
H.     Reference to Monetary Figures .............................................................. 89
I.     Additional Documents. ......................................................................... 89
J.     Immediate Binding Effect. .................................................................... 89
K.     Successor and Assigns. ......................................................................... 89
L.     Entire Agreement ................................................................................. 89
M.     Notices ................................................................................................. 89

Each of the Debtors proposes the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code.  Capitalized terms used herein shall have the meanings set forth in <u>ARTICLE IA</u>.

**ARTICLE I**
**DEFINITIONS AND INTERPRETATION.**

*A.    Definitions.*

1.    "*2024 Notes*" means the 6.875% senior unsecured notes due 2024 issued by Kenbourne and guaranteed by the Debtor Guarantors pursuant to the 2024 Notes Indenture.

2.    "*2024 Notes Claim*" means any Claim evidenced by or arising under or on account of the 2024 Notes or the 2024 Notes Indenture.

3.    "*2024 Notes Indenture*" means that certain indenture, dated as of November 26, 2019, by and among Kenbourne, as the Issuer, each of the Debtor Guarantors party thereto, as Debtor Guarantors, and U.S. Bank Trust Company, N.A., as Trustee, Principal Paying Agent, Transfer Agent and Registrar (each as defined in the 2024 Notes Indenture), as amended and supplemented and in effect from time to time.

4.    "*2028 Notes*" means the 4.700% senior unsecured notes due 2028 issued by Kenbourne and guaranteed by the Debtor Guarantors pursuant to the 2028 Notes Indenture.

5.    "*2028 Notes Claim*" means any Claim evidenced by or arising under or on account of the 2028 Notes or the 2028 Notes Indenture.

6.    "*2028 Notes Indenture*" means that certain indenture, dated as of January 22, 2021, by and among Kenbourne, as the Issuer, each of the Debtor Guarantors party thereto, as Debtor Guarantors, and U.S. Bank Trust Company, N.A., as Trustee, Principal Paying Agent, Transfer Agent and Registrar (each as defined in the 2028 Notes Indenture), as amended and supplemented and in effect from time to time.

7.    "*Ad Hoc Group*" means that certain ad hoc group of Consenting Noteholders represented by the Ad Hoc Group Advisors.

8.    "*Ad Hoc Group Advisors*" means, collectively, Dechert LLP, Young Conaway Stargatt & Taylor, LLP, Bofill Mir Abogados (and Fischer y Cia, outside tax counsel to Bofill Mir Abogados), Ogier (Cayman) LLP, Advokatfirmaet BAHR AS, Ducera Partners LLC, and Chris Bannister.

9.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b) (including 503(b)(9)), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date to preserve the Estates and operate the Debtors' businesses and (b) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

10.    "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which (i) with respect to Administrative Claims other than (a) Professional Claims, (b) Administrative Claims that have been Allowed on or before the Effective

Date, (c) Section 503(b)(9) Claims, (d) Administrative Claims arising, in the ordinary course of business, out of the employment by one or more Debtors of an individual from and after the Petition Date, but only to the extent that such Administrative Claims are solely for outstanding obligations under any Employee Obligation Documents, (e) DIP Claims and (f) Administrative Claims held by the United States Trustee, shall be the Business Day that is thirty (30) days after the Effective Date; and (ii) with respect to Section 503(b)(9) Claims, was the General Bar Date.

11.     "*Administrative Claims Estimate*" means an estimate of the aggregate dollar amount of (a) all Allowed Cure Claims for executory contracts and unexpired leases assumed in the Chapter 11 Cases *plus* (b) all Allowed Administrative Claims (including, without limitation, Professional Claims, Restructuring Expenses, and Quarterly Fees, but excluding (i) DIP Claims, (ii) claims for goods or services provided to the Debtors after the Petition Date in the ordinary course of business, or (iii) claims otherwise payable pursuant to a Bankruptcy Court order granting a motion filed by the Debtors as permitted under the Plan Sponsor Agreement and the Backstop Agreement, other than Restructuring Expenses and Professional Claims) that will be unpaid as of the Plan Effective Date, determined in good faith by the Debtors no later than five (5) days prior to the commencement of the Rights Offering, which estimate shall be subject to the consent of the Required Consenting Noteholders (not to be unreasonably withheld, conditioned or delayed).

12.     "*Administrative Claims Objection Deadline*" means the final deadline for objecting to an Administrative Claim, which shall be on the date that is the later of (i) 180 days after the Effective Date or (ii) such later date as may be set by the Bankruptcy Court.

13.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

14.     "*Allowed*" means, with reference to any Claim or Interest, or any portion thereof, a Claim or Interest: (i) arising on or before the Effective Date as to which (A) no objection to allowance or priority, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed and not withdrawn within the applicable period fixed by the Plan or applicable law, or (B) any objection has been determined in favor of the Holder of the Claim or Interest by a Final Order; (ii) that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or the Reorganized Debtors, as applicable, in accordance with the terms of the Plan and the Confirmation Order; (iii) as to which the liability of the Debtors or the Reorganized Debtors, as applicable, and the amount thereof are determined by a Final Order; (iv) that is listed in the Schedules as liquidated, non-contingent, and undisputed, and is not superseded by a Proof of Claim; or (v) expressly allowed by the Plan; *provided, however*, that, notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to, and shall not exceed the limitations or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) the Debtors or the Reorganized Debtors, as applicable shall retain all claims and defenses with respect to Allowed Claims that are Unimpaired pursuant to the Plan; *provided, further*, that any Claim or Interest listed in the Schedules that has been paid by the Debtors (x) after the Petition Date pursuant to an order of the Bankruptcy Court, or (y) before the Petition Date and was inadvertently listed in the Schedules shall not be considered an Allowed Claim. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or Disputed, and for which no Proof of Claim

or Interest is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court. Notwithstanding anything to the contrary herein, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes. For the avoidance of doubt, a Proof of Claim Filed after the applicable Bar Date shall not be Allowed for any purposes whatsoever absent entry of a Final Order allowing such late-Filed Claim. "Allow," "Allowance," and "Allowing" shall have correlative meanings.

15. "*Anticipated Effective Date*" means the date the Debtors, in consultation with the Consenting Noteholders and the Committee, anticipate in good faith will be the Effective Date, which date shall be set forth in the Backstop Funding Notice (as defined in the Backstop Agreement).

16. "*Assets*" means all or substantially all of the Debtors' rights, title, and interests in and to property of whatever type or nature (including real, personal, mixed, intellectual, tangible, and intangible property).

17. "*Assumption Dispute*" means an unresolved objection regarding assumption, assignment, Cure Claim disputes, "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or other issues relating to assumption or assignment of an Executory Contract or Unexpired Lease.

18. "*ATOP*" means DTC's Automated Tender Offer Program.

19. "*Avoidance Actions*" means any and all causes of action to avoid a transfer of property or an obligation incurred by any of the Debtors arising under sections 542, 544, 545, and 547 through and including 553 of the Bankruptcy Code or other similar or related state, federal, or foreign statutes and common law.

20. "*Backstop Agreement*" means that certain backstop agreement, dated as of December 7, 2024, by and between the Debtors and the Backstop Parties pursuant to which the Backstop Parties have committed, subject to the terms and conditions thereof, to (a) exercise all Subscription Rights issued to such Backstop Party to subscribe for and acquire Rights Offering Securities issuable in respect of such Subscription Rights in connection with the Rights Offering, and (b) acquire such Backstop Party's percentage, which percentages are set forth on Exhibit A to the Backstop Agreement, of all New Money New Convertible Notes and all New Money New Secured Notes that are not purchased by other Eligible Holders pursuant to the Rights Offering.

21. "*Backstop and PSA Motion*" means the *Debtors' Motion for Entry of an Order (I) Authorizing and Approving (A) Entry into the Plan Sponsor Agreement, (B) Entry into the Backstop Commitment Agreement, and (C) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations and (II) Granting Related Relief* [Docket Nos. 885, 889].

22. "*Backstop and PSA Order*" means the *Order (I) Authorizing and Approving (A) Entry into the Plan Sponsor Agreement, (B) Entry into the Backstop Commitment Agreement, and (C) Payment of Related Fees and Expenses and Incurrence of Certain Indemnification Obligations and (II) Granting Related Relief* [Docket No. 959] entered by the Bankruptcy Court on December 20, 2024.

23.     "*Backstop Parties*" means those parties (which parties shall include certain members of the Ad Hoc Group) that have agreed to backstop the Rights Offering pursuant to the Backstop Agreement, each in its respective capacity as such.

24.     "*Backstop Percentage*" means the percentages as attributable to each Backstop Party as set forth in Exhibit A to the Backstop Agreement.

25.     "*Backstop Put Premium*" means, collectively, the New Secured Notes Backstop Put Premium and the New Convertible Notes Backstop Put Premium.

26.     "*Backstop Put Premium New Convertible Notes*" means New Convertible Notes in the aggregate principal amount of 12.5% of the aggregate principal amount of New Money New Convertible Notes at issuance.

27.     "*Backstop Put Premium New Secured Notes*" means $11.875 million in aggregate principal amount of New Secured Notes.

28.     "*Backstop Put Premium Notes*" means the Backstop Put Premium New Convertible Notes and the Backstop Put Premium New Secured Notes.

29.     "*Ballot*" means the form distributed to each Holder of an Impaired Claim that is entitled to vote to accept or to reject this Plan, on which acceptance or rejection of this Plan is to be indicated.

30.     "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

31.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made under section 157 of title 28 of the United States Code, the unit of such District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

32.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, applicable to the Chapter 11 Cases, and any local rules of the Bankruptcy Court.

33.     "*Bar Dates*" means the General Bar Date, the Governmental Bar Date, the Administrative Claims Bar Date, the Professional Claim Bar Date, and any other dates fixed by order(s) of the Bankruptcy Court (including the Bar Date Order, this Plan, or the Confirmation Order), by which any Persons asserting a Claim against any Debtor must have filed a Proof of Claim or application for allowance of such Claim (as applicable) with the Bankruptcy Court against any such Debtor or be forever barred from asserting such Claim.

34.     "*Bar Date Order*" means the *Order (A) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim, Including Claims Arising Under Section 503(b)(9); (B) Approving Form, Manner, and Procedures of Notice Thereof; (C) Granting Related Relief* [Docket No. 600] entered by the Bankruptcy Court on July 29, 2024.

35.     "*Bidding Procedures*" means the procedures governing the sale process with respect to any Sale Transaction or Plan Transaction (each as defined in the Bidding Procedures

Order) as approved by the Bankruptcy Court pursuant to the Bidding Procedures Order (as such procedures may be altered, amended, modified, or supplemented from time to time in accordance with their terms).

36. "*Bidding Procedures Order*" means the *Order (I)(A) Approving Bidding Procedures, (B) Scheduling Certain Dates With Respect Thereto, (C) Approving the Form and Manner of Notice Thereof, (D) Authorizing the Designation of a Stalking Horse Bidder, (E) Scheduling a Transaction Hearing, and (F) Approving Procedures for the Assumption And Assignment of Executory Contracts and Unexpired Leases and (II) Granting Related Relief* [Docket No. 536] entered by the Bankruptcy Court on July 16, 2024.

37. "*Blue Sky Laws*" means any U.S. state securities laws.

38. "*Business Day*" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, New York City, State of New York, or Santiago, Chile.

39. "*Cash*" or "*$*" means legal tender of the United States of America and equivalents thereof.

40. "*Cause of Action*" means any claim, interest, damage, remedy, cause of action, demand, right, action, controversy, proceeding, agreement, suit, obligation, liability, account, defense, offset, power, privilege, license, lien, indemnity, guaranty, or franchise of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise. Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims under contracts or for breaches of duties imposed by law or in equity; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362, 510, 542, 543, 544 through 550, or 553 of the Bankruptcy Code; (d) such claims and defenses as fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Avoidance Action.

41. "*Chapter 11 Cases*" means the jointly administered cases commenced under chapter 11 of the Bankruptcy Code styled *In re WOM, S.A., et al.*, Case No. 24-10628 (KBO) pending before the Bankruptcy Court.

42. "*Chile Newco*" means a new holding entity organized under the laws of Chile, which shall be wholly owned by New Chile PIF.

43. "*Chile Newco Units*" means the equity interests in Chile Newco.

44. "*Chubb*" means Chubb INA International Holdings Ltd. and/or or any of its foreign subsidiaries.

45. "*Chubb Customer Program*" means certain contractual arrangement(s) including, without limitation, the Acuerdo Marco de Recaudación, Corretaje y Comercialización de Seguros executed on July 15, 2020, between the Debtors and Chubb for the provision of certain accident insurance and related services to the Debtors' customers for damage to such customers' mobile devices.

46.    "*Claim*" means any claim, as defined in section 101(5) of the Bankruptcy Code, against the Debtors.

47.    "*Claims Agent*" means Kroll Restructuring Administration, LLC, in its capacity as the claims, noticing, and solicitation agent in the Chapter 11 Cases for the Debtors and any successors appointed by an order of the Bankruptcy Court.

48.    "*Claims Objection Deadline*" means the final deadline for objecting to a Claim other than an Administrative Claim, which shall be on the date that is 180 days after the Effective Date, subject to extension by the Bankruptcy Court upon a motion by the Reorganized Debtors or the Plan Trustee; *provided, however*, that if the Reorganized Debtors or the Plan Trustee Files such motion before the expiration of the then-effective Claims Objection Deadline, such Claims Objection Deadline shall be tolled pending entry of a further order by the Bankruptcy Court.

49.    "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Claims Agent or the clerk of the Bankruptcy Court.

50.    "*Class*" means a category of holders of Claims or Interests pursuant to section 1122(a) of the Bankruptcy Code.

51.    "*CMF*" means the *Comisión para el Mercado Financiero*.

52.    "*Committee*" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases pursuant to the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 115].

53.    "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

54.    "*Confirmation Date*" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases within the meaning of Bankruptcy Rules 5003 and 9021.

55.    "*Confirmation Hearing*" means the hearing(s) before the Bankruptcy Court under section 1128 of the Bankruptcy Code at which the Debtors seek entry of the Confirmation Order.

56.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code, which shall be in form and substance consistent with the Plan Sponsor Agreement, the Plan Term Sheet, the Backstop Agreement and all annexes to each of the foregoing and otherwise reasonably acceptable to the Required Consenting Noteholders, the Debtors, and the Committee.

57.    "*Consenting Noteholders*" means the holders of Unsecured Notes that are signatories to the Plan Sponsor Agreement.

58.    "*Consummation*" means the occurrence of the Effective Date.

59.    "*Cure Claim*" means a monetary Claim in an amount, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties under an Executory Contract or

Unexpired Lease) at the time such contract or lease is assumed by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

60.     "*D&O Policy*" means all Insurance Policies (including any tail or run-off policy or endorsement) issued or providing coverage at any time, whether expired or unexpired, to any of the Debtors (and any of their predecessors) for certain liabilities of the Debtors and/or their current or former directors, managers, officers, and employees, and all agreements, amendments, modifications, endorsements, or other documents and instruments related thereto.

61.     "*Debtor Guarantors*" means, collectively, NC Telecom II AS; WOM Mobile S.A.; WOM S.A.; Conect S.A.; and Multikom S.A.

62.     "*Debtors*" means, collectively, Kenbourne and the Debtor Guarantors.

63.     "*Definitive Documents*" means the definitive documents governing the Restructuring, including, without limitation, the Plan Sponsor Agreement, the Plan Term Sheet, the Plan, the Disclosure Statement, the Disclosure Statement Motion, the Disclosure Statement and Solicitation Procedures Order, the Confirmation Order, the Solicitation Materials, the Backstop Agreement, the Rights Offering Procedures Approval Motion (and the Rights Offering Procedures, which is an exhibit thereto), the Rights Offering Procedures Order (including the exhibits thereto), the Backstop and PSA Motion, the Backstop and PSA Order, the New Secured Notes Documents, the New Convertible Notes Documents, the Plan Trust Agreement, the Plan Supplement and the documents filed in connection therewith, the Steps Plan, the New Corporate Governance Documents, and any other documents or agreements executed, delivered, assumed, or performed to implement or supplement the Plan or the Reorganization Transactions, each as may be amended, modified, or supplemented from time to time.  The Definitive Documents and any modifications thereto shall be consistent with the Plan Sponsor Agreement, the Plan Term Sheet, the Backstop Agreement and all annexes to the foregoing in all material respects and otherwise in form and substance reasonably acceptable to the Required Consenting Noteholders and the Debtors and, solely with respect to certain Definitive Documents as set forth herein and in the Plan Sponsor Agreement, the Committee.

64.     "*DIP Agents*" means (i) JPMorgan Chase Bank, N.A., in its capacity as administrative agent under the DIP Credit Agreement and (ii) TMF Group New York, LLC, in its capacity as collateral agent under the DIP Credit Agreement, (iii) TMF Chile Asesorías Empresariales Limitada, in its capacity as *agente de garantias* local under the DIP Loan Documents governed by Chilean law, (iv) TMF Luxembourg S.A., a public limited company (*société anonyme*), as collateral agent under the DIP Loan documents governed by  Luxembourg law, etc., and (v) and TMF Norway AS, as collateral agent under the Norway Collateral Documents.

65.     "*DIP Claims*" means all Claims of the DIP Agents and the DIP Lenders arising under, derived from, based upon, relating to, arising under or secured pursuant to the DIP Credit Facility, the DIP Orders or any other DIP Loan Documents, including Claims for all principal amounts outstanding, interest, fees, expenses, costs, and other charges arising thereunder or related thereto.  For the avoidance of doubt, DIP Claims shall include all Obligations (as defined in the DIP Credit Agreement).

66.     "*DIP Credit Agreement*" means that certain Senior Secured Superpriority Debtor-in-Possession Term Loan Credit Agreement, dated as of April 1, 2024, among Kenbourne, as Borrower, the Debtor Guarantors, the DIP Lenders, JPMorgan Chase Bank, N.A., as Administrative Agent, TMF Group New York, LLC, as Collateral Agent, and J.P. Morgan SE., as Sole Lead Arranger and Sole Bookrunner (each as defined in the DIP Credit Agreement).

67.     "*DIP Credit Facility*" means the credit facility provided to the Debtors by the DIP Lenders under the DIP Credit Agreement and in accordance with the DIP Orders.

68.     "*DIP Lenders*" means the lenders party to the DIP Credit Agreement with respect to the DIP Credit Facility.

69.     "*DIP Loan Documents*" shall have the meaning ascribed to it in the Final DIP Order.

70.     "*DIP Orders*" means, together, the Interim DIP Order and the Final DIP Order.

71.     "*DIP Secured Parties*" means, collectively, the DIP Agents and the DIP Lenders.

72.     "*Disallowed*" means a Claim against a Debtor, or any portion thereof, (i) that has been disallowed by a Final Order of the Bankruptcy Court, the Plan, or otherwise, (ii) that is listed in the Schedules at zero or as contingent, disputed, or unliquidated and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or applicable law, or (iii) that is not listed in the Debtors' Schedules and as to which a Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or under applicable law.

73.     "*Disclosure Statement*" means the disclosure statement with respect to the Plan in accordance with, among other things, sections 1125, 1126, and 1145 of the Bankruptcy Code, including all exhibits, schedules, supplements, and annexes thereto, each as may be amended, supplemented, or otherwise modified from time to time, which shall be in form and substance consistent with the Plan Sponsor Agreement, the Plan Term Sheet, the Backstop Agreement and all annexes to each of the foregoing and otherwise reasonably acceptable to the Required Consenting Noteholders, the Debtors, and the Committee.

74.     "*Disclosure Statement and Solicitation Procedures Order*" means the order of the Bankruptcy Court granting the Disclosure Statement Motion, which shall be in form and substance consistent with the Plan Sponsor Agreement, the Plan Term Sheet, the Backstop Agreement and all annexes to each of the foregoing and otherwise reasonably acceptable to the Required Consenting Noteholders, the Debtors, and the Committee.

75.     "*Disclosure Statement Motion*" means the Debtors' motion for an order of the Bankruptcy Court, among other things, (i) approving the Disclosure Statement, (ii) approving the procedures for solicitation of votes to accept or reject the Plan, including the Solicitation Materials and form of Ballots, (iii) establishing a voting record date for the Plan, and (iv) establishing notice and objection procedures for the Confirmation of the Plan, in form and substance consistent with the Plan Sponsor Agreement, the Plan Term Sheet, the Backstop Agreement and all annexes to

each of the foregoing and otherwise reasonably acceptable to the Required Consenting Noteholders and the Debtors.

76.    "*Disputed*" means, with respect to a Claim, a Claim against a Debtor that has neither been Allowed nor Disallowed, and/or: (i) is listed on the Schedules as unliquidated, disputed, and/or contingent for which no Proof of Claim in a liquidated and non-contingent amount has been filed; or (ii) is the subject of an objection or request for estimation Filed by any of the Debtors, the Reorganized Debtors, or the Plan Trustee, as applicable, or any other party-in-interest in accordance with applicable law, and which objection or request has not been withdrawn, resolved, or overruled by a Final Order of the Bankruptcy Court.

77.    "*Disputed Claims Reserve*" means one or more reserves that may be established by the Distribution Agent created to reserve property for purposes of satisfying Disputed Claims pursuant to Article VI.I. of this Plan.

78.    "*Distribution Agent*" means, as applicable, the Reorganized Debtors or any Entity or Entities designated by the Reorganized Debtors to make or to facilitate distributions that are to be made pursuant to the Plan; *provided* that the GUC Cash Pool Distribution Agent shall be the Plan Trust.

79.    "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Reorganized Debtors on or after the Effective Date, upon which the Distribution Agent shall make distributions to Holders of Allowed Claims (other than Allowed GUC Cash Pool General Unsecured Claims) or Allowed Interests entitled to receive distributions under the Plan.

80.    "*Distribution Election Deadline*" means February 27, 2025, as such date may be extended by the Debtors with the consent of the Required Consenting Noteholders.

81.    "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims and Interests against the Debtors are eligible to receive distributions under the Plan, which date shall be 5:00 p.m. (New York City Time) on the date to be agreed among the Debtors and the Required Consenting Noteholders that is no later than five (5) Business Days before the Anticipated Effective Date.  For the avoidance of doubt, the Distribution Record Date shall not apply to publicly traded securities, which shall receive distributions in accordance with the applicable procedures of DTC.

82.    "*DTC*" means The Depository Trust Company.

83.    "*DWAC*" means DTC's "Deposit/Withdrawal at Custodian" service.

84.    "*Election Expiration Time*" has the meaning set forth in the Rights Offering Procedures.

85.    "*Election Form*" has the meaning set forth in the Rights Offering Procedures.

86.    "*Eligible Holder*" means a holder of an Allowed Unsecured Notes Claim or a New Secured Notes/Equity Treatment Electing Creditor that is (i) either (a) a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act, or (b) is not a "U.S. person" within the meaning of Rule 902 under the Securities Act, provided that such Holder of an Allowed Unsecured Notes Claim or an Allowed General Unsecured Claim is not resident in Chile, or (ii) if

such holder of an Allowed Unsecured Notes Claim or a New Secured Notes/Equity Treatment Electing Creditor is resident in Chile, a "Qualified Investor" of the type identified in numbers 1 to 8 of Section II of the General Rule No. 216 of 2008 issued by the CMF.

87. "*Employee Obligation Documents*" means any written individual or collective contracts, agreements, policies, programs, and plans (as from time to time amended or restated) applicable to employees or directors for regular compensation (including wages, salary, commissions, statutory profit-sharing / *gratificación legal* and incentives), allowances of any kind, delivery, use and return of work tools or devices, bonus programs, expense reimbursements, work schedules, internal orders, health and safety regulations, vacation, days off and sick leave benefits, employee and retiree health care, vision, and dental benefits, employee and retiree life insurance benefits, disability insurance benefits, accidental death and dismemberment insurance benefits, retirement programs, nursery and other family-related benefits, employee relocation programs, employee and director vehicle use policies, commuter benefits, adoption assistance benefits, other benefits relating to the employer´s business or activities, employee, director, and retiree discount programs, any program or agreement on deferred compensation, severance, or other employment termination benefits, and other employee welfare plan benefits in effect immediately prior to the Effective Date.

88. "*Employment Agreements*" means the employment agreements in effect on the Effective Date by and between the Debtors and certain employees of the Debtors identified in the Plan Supplement, each of which shall be assumed on the Effective Date; *provided* that the term "Employment Agreement" does not include any employment agreement in connection with service as a director of the Debtors.

89. "*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

90. "*Estate*" means the estate of any Debtor created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Debtor's Chapter 11 Case.

91. "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Special Committee and its members; (c) the Committee and its members; and (d) with respect to each of the foregoing, such Entity and its officers, directors, managers, principals, members, agents, advisory board members, and the Professionals of the foregoing, each in their capacity as such; *provided* that none of the Non-Released Parties shall be an "Exculpated Party," except for in their capacities as directors of any of the Debtors from and after the Petition Date.

92. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption, assumption and assignment, or rejection under sections 365 or 1123 of the Bankruptcy Code.

93. "*Existing Equity Interest*" means an Interest in a Debtor held by a non-Debtor existing as of the Petition Date.

94. "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, compounded annually.

95.    "*File*," "*Filed*," or "*Filing*" means file, filed, or filing, respectively, in the Chapter 11 Cases with the Bankruptcy Court or its authorized designee, or, with respect to the filing of a Proof of Claim or Proof of Interest, file, filed, or filing, respectively, with the Claims Agent.

96.    "*Final DIP Order*" means the *Final Order Pursuant to Sections 105, 362, 363 and 364 of the Bankruptcy Code and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Debtors to Obtain Secured Postpetition Financing and Granting Liens and Superpriority Claims and (B) Granting Related Relief* [Docket No. 428] entered by the Bankruptcy Court on June 20, 2024.

97.    "*Final Order*" means an order or judgment of the Bankruptcy Court, or court of competent jurisdiction with respect to the subject matter, as entered on the docket in any Chapter 11 Case or the docket of any court of competent jurisdiction, and as to which the time to appeal, or seek certiorari or move for a new trial, reargument, or rehearing has expired and no appeal or petition for certiorari or other proceedings for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be timely filed has been withdrawn or resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or the new trial, reargument, or rehearing will have been denied, resulted in no stay pending appeal of such order, or has otherwise been dismissed with prejudice; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed with respect to such order will not preclude such order from being a Final Order.

98.    "*General Bar Date*" means September 27, 2024, at 4:00 p.m. (prevailing Eastern Time).

99.    "*General Unsecured Claim*" means any Claim that is not a DIP Claim, an Administrative Claim, a Professional Claim, a Priority Tax Claim, an Other Priority Claim, an Other Secured Claim, an Unsecured Notes Claim, an Intercompany Claim, or a Foreign Vendor Claim (as defined in the Vendor Order) subject to a Payment Agreement.

100.    "*Governmental Bar Date*" means September 30, 2024, at 4:00 p.m. (prevailing Eastern Time).

101.    "*Governmental Unit*" has the meaning set forth in section 101(27) of the Bankruptcy Code.

102.    "*Guaranty Claim Enhancement*" means a factor of 1.52 to account for the full amount of each Unsecured Notes Claim against each Debtor, including on account of deemed recoveries by the issuer and guarantors of the Unsecured Notes on their Intercompany Claims against each other Debtor.

103.    "*GUC Cash Pool*" means $72.5 million reduced dollar for dollar by the sum of (i) $72.5 million *multiplied by* the quotient of (a) the aggregate dollar amount of all Allowed General Unsecured Claims for which their holders have elected the New Secured Notes/Equity Treatment *divided by* (b) the aggregate dollar amount of all Allowed General Unsecured Claims *plus* (ii) 50% of the amount by which the aggregate of (a) all Allowed Cure Claims for executory contracts and unexpired leases assumed in the Chapter 11 Cases *plus* (b) all Allowed Administrative Claims (including, without limitation, Professional Claims, Restructuring Expenses, and Quarterly Fees,

but excluding (i) DIP Claims, (ii) claims for goods or services provided to the Debtors after the Petition Date in the ordinary course of business, or (iii) claims otherwise payable pursuant to a Bankruptcy Court order granting a motion filed by the Debtors as permitted under the Plan Sponsor Agreement and the Backstop Agreement, other than Restructuring Expenses and Professional Claims) that are unpaid as of the Plan Effective Date exceeds $190 million.

104. "*GUC Cash Pool Distribution Agent*" means the Distribution Agent with respect to the GUC Cash Pool to the GUC Cash Pool Treatment Creditors, which Distribution Agent shall be the Plan Trustee or such Person or Entity designated by the Plan Trustee.

105. "*GUC Cash Pool Final Reconciliation Date*" means the date on which the Plan Trustee and the Reorganized Debtors (each acting reasonably) agree that all Allowed General Unsecured Claims and Allowed Administrative Claims have been reconciled such that the final amount of the GUC Cash Pool (including all reductions required under the definition of "GUC Cash Pool" hereunder) may be calculated.

106. "*GUC Cash Pool General Unsecured Claim*" means a General Unsecured Claim held by a GUC Cash Pool Treatment Creditor.

107. "*GUC Cash Pool Treatment*" means, with respect to each GUC Cash Pool Treatment Creditor, its pro rata share (based on the proportion that the amount of such creditor's Allowed General Unsecured Claim bears to the aggregate amount of Allowed General Unsecured Claims held by all GUC Cash Pool Treatment Creditors) of the GUC Cash Pool.

108. "*GUC Cash Pool Treatment Creditors*" means holders of Allowed General Unsecured Claims that are not Eligible Holders or do not elect the New Secured Notes/Equity Treatment.

109. "*GUC Claims Pool Estimate*" means an estimate of the aggregate dollar amount of all Allowed General Unsecured Claims determined in good faith by the Debtors no later than five (5) days prior to the commencement of the Rights Offering, which estimate shall be subject to the consent of the Required Consenting Noteholders (not to be unreasonably withheld, conditioned or delayed).

110. "*GUC Litigation Proceeds*" means a pro rata share (based on the proportion that (a) the aggregate amount of all Allowed General Unsecured Claims bears to (b) the sum of all Allowed General Unsecured Claims *plus* all Allowed Unsecured Notes Claims (without taking into account the Guaranty Claim Enhancement)) of any cash proceeds actually received by the Debtors through litigation or settlement of LT Claims.

111. "*Holder*" means an Entity holding a Claim against or an Interest in any Debtor.

112. "*ICSID Arbitration*" means the arbitration before the International Centre for Settlement of Investment Disputes commenced by NC Telecom AS, NC Telecom II AS, WOM Mobile S.A., and WOM S.A. on July 5, 2024.

113. "*Impaired*" means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

114. "*Indemnification Obligations*" means each of the Debtors' indemnification obligations in place as of the Effective Date, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment or other contracts, or otherwise, for the directors, managers, and officers that are currently employed by, or serving on the board of directors of, any of the Debtors as of the date immediately prior to the Effective Date, and the employees, attorneys, accountants, investment bankers, and other professionals and agents that are currently employed by any of the Debtors as of the date immediately prior to the Effective Date, each of the foregoing solely in their capacity as such, *except for* any such indemnification obligations to Non-Released Parties.

115. "*Indenture Trustee Charging Lien*" means the Lien against distributions to be made to Holders of Unsecured Notes Claims to which the Unsecured Notes Trustees are entitled under the Section 7.06(d) of the 2024 Notes Indenture and Section 7.06(d) of the 2028 Notes Indenture.

116. "*Indenture Trustee Fees*" means all reasonable and documented compensation, fees, expenses, disbursements and indemnity claims, including, without limitation, attorneys' and agents' fees, expenses and disbursements, incurred by U.S. Bank Trust Company, N.A., as the Unsecured Notes Trustees, to the extent the Debtors are obligated to pay such compensation, fees, expenses, and disbursements under the Unsecured Notes Documents.

117. "*Initial AHG Directors*" means four directors of New Holdco, with one director appointed by each member of the Ad Hoc Group.

118. "*Initial GUC Cash Pool Distribution Date*" means the date, on or after the Effective Date, on which the GUC Cash Pool Distribution Agent shall make initial distributions to Holders of Allowed GUC Cash Pool General Unsecured Claims pursuant to the Plan from the GUC Cash Pool, which date shall be determined by the GUC Cash Pool Distribution Agent with the consent of the Reorganized Debtors (not to be unreasonably withheld); *provided*, that the GUC Cash Pool Distribution Agent shall use commercially reasonable efforts to cause the Initial GUC Cash Pool Distribution Date to occur no later than thirty (30) days after the Effective Date.

119. "*Initial GUC Cash Pool Funding*" means a distribution to the GUC Cash Pool Distribution Agent on the Effective Date of a portion of the GUC Cash Pool equal to 50% of the dollar amount by which $72.5 million exceeds the Initial GUC Cash Pool Funding Reduction.

120. "*Initial GUC Cash Pool Funding Reduction*" means the sum of (i) $72.5 million multiplied by the quotient of (a) the aggregate dollar amount of all Allowed General Unsecured Claims held by New Secured Notes/Equity Treatment Electing Creditors divided by (b) the GUC Claims Pool Estimate plus (ii) 50% of the amount by which the Administrative Claims Estimate exceeds $190 million.

121. "*Insurance Policy*" means each insurance policy, including the D&O Policies, issued or providing coverage at any times to any of the Debtors (or any of their predecessors) and all agreements, documents, or instruments relating thereto.

122.    "*Insured Claim*" means any Claim or portion of a Claim that is, or may be, insured under any of the Debtors' Insurance Policies.

123.    "*Insurer*" means any insurance company that issued or entered into any Insurance Policies, any third-party administrators of claims against the Debtor or asserted under the Insurance Policies, and any respective predecessors and/or affiliates thereof.

124.    "*Intercompany Claim*" means a Claim against any Debtor by another Debtor.

125.    "*Intercompany Interest*" means an Interest in any Debtor held by another Debtor.

126.    "*Interim DIP Order*" means the *Interim Order Pursuant to Sections 105, 362, 363 and 364 of the Bankruptcy Code and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (A) Authorizing the Debtors to Obtain Secured Postpetition Financing and Granting Liens and Superpriority Claims, (B) Granting Related Relief, and (C) Granting Related Relief* [Docket No. 70] entered by the Bankruptcy Court on April 2, 2024.

127.    "*Interim GUC Cash Pool Funding*" means one or more distributions by the Reorganized Debtors to the GUC Cash Pool Distribution Agent of a portion of the undistributed GUC Cash Pool in amounts to be agreed between the Reorganized Debtors and the GUC Cash Pool Distribution Agent (each acting reasonably).

128.    "*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in any Debtor.

129.    "*Investor Eligibility Certification*" means the certification by a Holder of an Allowed Unsecured Notes Claim and/or an Allowed General Unsecured Claim that it meets the requirements to be an Eligible Offeree for the Rights Offering to be delivered to the Debtors in accordance with the Rights Offering Procedures.

130.    "*KEIP/KERP Order*" means the *Order (I) Authorizing Implementation of a Key Employee Incentive Program and a Key Employee Retention Program, (II) Approving the Terms of the Debtors' Key Employee Incentive Program and Key Employee Retention Program, and (III) Granting Related Relief* [Docket No. 645].

131.    "*Kenbourne*" means Debtor Kenbourne Invest S.A.

132.    "*KYC Information*" means documentation and other information that is required by regulatory authorities under applicable "know your customer" and anti-money-laundering rules and regulations, a list of which is attached to the Rights Offering Procedures.

133.    "*Law*" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

134.   "*Letter of Transmittal*" means a letter to be delivered by (a) a beneficial Holder of Allowed Unsecured Notes Claims or (b) a New Secured Notes/Equity Treatment Electing Creditor to the Distribution Agent in which such Holder or New Secured Notes/Equity Treatment Electing Creditor: (a) provides the Investor Eligibility Certification (unless already provided); (b) if applicable, agrees to deliver Unsecured Notes as contemplated in Article IV.E. hereof; and (c) provides any additional certifications and representations consistent with the Plan; provided that a Holder of Allowed Unsecured Notes Claims that has tendered its Unsecured Notes and provided the requisite information through ATOP on or prior to the Distribution Election Deadline will not be required to deliver a Letter of Transmittal for Claims in respect of such Unsecured Notes. The form of the Letter of Transmittal shall be included in the Plan Supplement.

135.   "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

136.   "*Litigation Proceeds*" means all proceeds received by the Plan Trust on account of, without limitation, the prosecution and settlement of the LT Claims.

137.   "*LT Claims*" means all Causes of Action of the Debtors and their Estates (including, without limitation, Avoidance Actions and breach of fiduciary duty claims) against the Non-Released Parties, whether arising before or after the Petition Date, except for (a) any such Causes of Action that the Special Committee (in consultation with the Committee) (i) has settled or (ii) has determined should not be pursued, and (b) any claims or Causes of Action to enforce or recover contractual obligations (including, without limitation, any contractual obligations of Partners Telecom Latam II S.à.r.l.), obligations to repay money loaned (including, without limitation, any money loaned to Partners Telecom Latam II S.à.r.l.), or ordinary course receivables.

138.   "*LT Claims Schedule*" means the schedule to be filed in the Plan Supplement setting forth the LT Claims, if any.

139.   "*Management Incentive Plan*" means the post-restructuring management incentive plan to be adopted by the New Board, which shall be on terms reasonably acceptable to the Required Consenting Noteholders.

140.   "*New Board*" means the board of directors of New Holdco, to be selected in accordance with <u>ARTICLE IV.I</u> of this Plan.

141.   "*New Chile PIF*" means a public investment fund organized under the laws of Chile, which shall be wholly owned by New Holdco upon the Effective Date.

142.   "*New Company Entities*" means, collectively, Chile Newco, New Holdco, and New Chile PIF.

143.   "*New Convertible Notes*" means new convertible notes (consisting of the New Money New Convertible Notes and the Backstop Put Premium New Convertible Notes, each of which constitute a portion of the same series of notes and shall be fungible with each other) issued by Chile Newco which shall (a) be issued to participants in the Rights Offering and the Backstop Parties in accordance with the Plan, the Rights Offering Procedures, and the Backstop Agreement, (b) be convertible into Chile Newco Units or, at the option of Chile Newco, New Holdco Units, and (c) be on terms consistent with the Plan Sponsor Agreement (including, without limitation, Annex III to the Plan Term Sheet), the Backstop Agreement, and all annexes to each of the

foregoing and reasonably acceptable to the Debtors and the Required Consenting Noteholders and subject to the rights of the Committee as set forth in the Plan Sponsor Agreement.

144. "*New Convertible Notes Backstop Put Premium*" means the nonrefundable premium to be paid to the Backstop Parties pursuant to the Backstop Agreement upon the consummation of the Reorganization Transactions on the Effective Date, which premium shall be in an aggregate amount equal to 12.5% of the principal amount of the New Money New Convertible Notes and paid by the issuance of Backstop Put Premium New Convertible Notes to the Backstop Parties.

145. "*New Convertible Notes Documents*" means, collectively, the New Convertible Notes, any indenture or other agreement governing the New Convertible Notes, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, if any, the terms of which documents shall be consistent with the Plan Sponsor Agreement, the Plan Term Sheet, the Backstop Agreement and all annexes to each of the foregoing and otherwise reasonably acceptable to the Debtors and the Required Consenting Noteholders and subject to the rights of the Committee as set forth in the Plan Sponsor Agreement.

146. "*New Corporate Governance Documents*" means, collectively, the new corporate governance documents of New Holdco (including, without limitation, the New Holdco Shareholder Agreement), Chile Newco, New Chile PIF, and the Reorganized Debtors, including, without limitation, the New Holdco Organizational Documents and New Subsidiary Organizational Documents, in each case in form and substance consistent with the Plan Sponsor Agreement, the Backstop Agreement, and all annexes to each of the foregoing and otherwise reasonably acceptable to the Required Consenting Noteholders and the Debtors and subject to the rights of the Committee as set forth in the Plan Sponsor Agreement.

147. "*New Debt Securities*" means the New Convertible Notes and New Secured Notes.

148. "*New Equity Securities*" means the WOM Mobile Units, New Holdco Units, and Chile Newco Units.

149. "*New Holdco*" means a holding entity organized under the laws of the Cayman Islands.

150. "*New Holdco Governance Term Sheet*" means a term sheet outlining the terms of the corporate governance to be implemented through the New Holdco Organizational Documents, attached as Annex IV to Exhibit D to the Plan Sponsor Agreement.

151. "*New Holdco Shareholder Agreement*" means an agreement among New Holdco and its shareholders setting forth certain rights and obligations with respect to the governance of New Holdco in form and substance consistent with the Plan Sponsor Agreement, the Backstop Agreement, and all annexes to each of the foregoing and otherwise reasonably acceptable to the Required Consenting Noteholders and the Debtors and subject to the rights of the Committee as set forth in the Plan Sponsor Agreement.

152. "*New Holdco Units*" means common equity interests in New Holdco which shall be issued on the Effective Date and distributed to Eligible Holders of Allowed Unsecured Notes Claims and New Secured Notes/Equity Treatment Electing Creditors (which New Holdco Units

may be held directly by such Eligible Holder or through a nominee) in exchange for such Eligible Holders' Allowed Unsecured Notes Claims or Allowed General Unsecured Claims, as applicable.

153. "*New Money New Convertible Notes*" means New Convertible Notes in an aggregate principal amount equal to the New Money New Convertible Notes Rights Offering Amount.

154. "*New Money New Convertible Notes Rights Offering Amount*" means New Convertible Notes in an aggregate principal amount of $405 million *minus* the sum of (i) $72.5 million *multiplied by* the quotient of (a) the aggregate dollar amount of all Allowed General Unsecured Claims held by New Secured Notes/Equity Treatment Electing Creditors *divided by* (b) the GUC Claims Pool Estimate *plus* (ii) 50% of the amount by which the Administrative Claims Estimate is less than $190 million *plus* (iii) 50% of any Pre-Rights Offering Agreed Unused Plan Trust Funding.

155. "*New Money New Secured Notes*" means New Secured Notes in an aggregate principal amount equal to the New Money New Secured Notes Rights Offering Amount.

156. "*New Money New Secured Notes Rights Offering Amount*" means $95 million.

157. "*New Secured Notes*" means new first lien secured notes (consisting of the Take Back New Secured Notes, the New Money New Secured Notes, and the Backstop Put Premium New Secured Notes, each of which constitute a portion of the same series of notes and shall be fungible with each other) issued by Reorganized WOM Mobile S.A. and guaranteed by the New Secured Notes Guarantors, which shall (a) be issued to Holders of Unsecured Notes Claims, New Secured Notes/Equity Treatment Electing Creditors, participants in the Rights Offering, and the Backstop Parties in accordance with the Plan, the Rights Offering Procedures, and the Backstop Agreement, (b) be secured by first priority liens on all assets of the New Secured Notes Issuer and the New Secured Notes Guarantors other than the "Excluded Collateral" as defined in the DIP Credit Agreement, and (c) be on terms consistent with the Plan Sponsor Agreement (including, without limitation, Annex II to the Plan Term Sheet), the Backstop Agreement, and all annexes to each of the foregoing and reasonably acceptable to the Debtors and the Required Consenting Noteholders and subject to the rights of the Committee as set forth in the Plan Sponsor Agreement.

158. "*New Secured Notes Backstop Put Premium*" means the nonrefundable premium to be paid to the Backstop Parties pursuant to the Backstop Agreement upon the consummation of the Reorganization Transactions on the Effective Date, which premium shall be in an aggregate amount equal to 12.5% of the aggregate principal amount of the New Money New Secured Notes and paid by the issuance of Backstop Put Premium New Secured Notes to the Backstop Parties.

159. "*New Secured Notes Documents*" means, collectively, the New Secured Notes, any indenture or other agreement governing the New Secured Notes, and any and all other agreements, documents, and instruments delivered or to be entered into in connection therewith, including any guarantee agreements, pledge and collateral agreements, intercreditor agreements, and other security documents, in each case if any, the terms of which documents shall be consistent with the Plan Sponsor Agreement, the Backstop Agreement, and all annexes to each of the foregoing and otherwise reasonably acceptable to the Debtors and the Required Consenting Noteholders and subject to the rights of the Committee as set forth in the Plan Sponsor Agreement.

160. "*New Secured Notes/Equity Treatment*" means the (i) Take Back New Secured Notes, (ii) 100% of the New Holdco Units (subject to dilution by New Holdco Units issued upon conversion of the New Money New Convertible Notes and the Management Incentive Plan), and (iii) the Subscription Rights.

161. "*New Secured Notes/Equity Treatment Electing Creditors*" means Holders of Allowed General Unsecured Claims that elect the New Secured Notes/Equity Treatment; *provided* that any such holder must be an Eligible Holder and elect the New Secured Notes/Equity Treatment for all Allowed General Unsecured Claims that it holds.

162. "*New Secured Notes Guarantors*" means Chile Newco, Reorganized WOM S.A., Reorganized Conect S.A., and Reorganized Multikom S.A.

163. "*New Secured Notes Issuer*" means Reorganized WOM Mobile S.A.

164. "*Non-Released Parties*" means: (i) Novator Partners LLP and any of its direct and indirect non-Debtor affiliates and managed entities; (ii) all direct and indirect holders of equity interests in any of the Debtors, including, but not limited to, (a) The Telco Holdings Trust, its settlor and beneficiaries and (b) any other trust that owns any such equity interests, its settlor and beneficiaries; (iii) Novator (Luxembourg) S.à r.l.; (iv) Novator Two L.P.; (v) WOM Colombia S.A.S. and any of its direct and indirect affiliates; (vi) Björgólfur Thor Björgólfsson; (vii) Thomas Leslie; (viii) Jaroslav Valiukevic; (ix) Kristopher Brigham; (x) Serdar Cetin; (xi) Graham Bruce McInroy; (xii) PurpleCrest Investments LLP; (xiii) any former directors of any of the Debtors as of the Petition Date (other than Chris Bannister); and (xiv) any subsequent transferee of each Person or Entity in clause (i) through (xiii).

165. "*Other Priority Claim*" means any Claim other than an Administrative Claim or a Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

166. "*Other Secured Claim*" means any Secured Claim other than a DIP Claim.

167. "*Payment Agreement*" has the meaning ascribed to it in Article II.F.

168. "*Person*" shall have the meaning ascribed to it in section 101(41) of the Bankruptcy Code.

169. "*Petition Date*" means April 1, 2024.

170. "*Plan*" means the joint chapter 11 plan of reorganization filed by the Debtors as it may be amended or supplemented from time to time, including all exhibits, schedules, supplements, appendices, annexes and attachments thereto, which plan shall be consistent in all material respects with the Plan Sponsor Agreement (including the Plan Term Sheet), and to the extent not consistent with the Plan Sponsor Agreement or the Plan Term Sheet in any material respect, in form and substance reasonably acceptable to the Debtors, the Committee, and the Required Consenting Noteholders.

171. "*Plan Effective Date*" or "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which all conditions precedent under of the Plan have been

satisfied or waived by the Required Consenting Noteholders in accordance with the Plan, and the Reorganization Transactions have been consummated.

172.    "*Plan Securities*" means securities to be issued pursuant to this Plan, including the New Debt Securities and the New Equity Securities.

173.    "*Plan Sponsor Agreement*" means that certain Plan Sponsor Agreement dated as of December 7, 2024, by and between the Debtors and the Consenting Noteholders, as may be amended from time to time, including on January 13, 2025.

174.    "*Plan Supplement*" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan, which shall be filed by the Debtors prior to the Confirmation Hearing, and additional documents filed with the Bankruptcy Court prior to the Effective Date as amendments to the Plan Supplement, each of which shall be consistent in all respects with, and shall otherwise contain, the terms and conditions set forth in the Plan Sponsor Agreement and the Plan Term Sheet, where applicable, and which shall include, without limitation, the New Corporate Governance Documents, the New Secured Notes Documents, the New Convertible Notes Documents, the Plan Trust Agreement, the Schedule of Assumed Contracts and Leases (subject to the Required Consenting Noteholders' rights to add or remove contracts from such schedule at any time prior to the Effective Date), the LT Claims Schedule, the Schedule of Retained Causes of Action, the form of the Letter of Transmittal, and the list of directors and officers of New Holdco and the Reorganized Debtors.

175.    "*Plan Term Sheet*" means the term sheet attached to the Plan Sponsor Agreement as Exhibit D.

176.    "*Plan Trust*" means a trust to be established on or before the Effective Date for the benefit of holders of Allowed General Unsecured Claims and Allowed Unsecured Notes Claims pursuant to the terms of the Plan Trust Agreement and the Plan.

177.    "*Plan Trust Agreement*" means a trust or similar agreement entered into no later than the Effective Date that establishes the Plan Trust and governs the powers, duties, and responsibilities of the Plan Trust and the Plan Trustee, which shall be in form and substance reasonably acceptable to the Debtors, the Committee, and the Required Consenting Noteholders.

178.    "*Plan Trust Assets*" means, collectively, (a) the LT Claims (if any), (b) the Plan Trust Funding, and (c) any other assets as may be agreed to by the Committee and the Required Consenting Noteholders.

179.    "*Plan Trust Avoidance Actions*" means Avoidance Actions included in the Schedule of Retained Causes of Action against GUC Cash Pool Treatment Creditors, which shall be transferred to the Plan Trust solely for the purpose of reducing the GUC Cash Pool General Unsecured Claim of such GUC Cash Pool Treatment Creditors (by setoff or otherwise), *provided* that such Avoidance Actions (i) may not be used to affirmatively seek to recover any property or proceeds from any Person, and (ii) may not be used to reduce any GUC Cash Pool General Unsecured Claim to an amount that is lower than the amount reflected in the Debtors' books and records as of the Petition Date.

180.    "*Plan Trust Beneficiaries*" means the Holders of Allowed Unsecured Notes Claims and Holders of Allowed General Unsecured Claims that receive Plan Trust Interests pursuant to the Plan.

181.    "*Plan Trust Funding*" means $3 million in Cash, which shall be distributed by the Reorganized Debtors on the Effective Date directly to the Plan Trust to pay for all reasonable and documented fees, expenses and costs incurred by the Plan Trust, including with respect to the reconciliation of Class 4 General Unsecured Claims; *provided* that such $3 million may be reduced by agreement of the Debtors (acting through the Special Committee), the Committee, and the Required Consenting Noteholders in the event (a) the Special Committee settles any LT Claims prior to the Plan Effective Date, or (b) the Special Committee determines (by agreement with the Committee and the Required Consenting Noteholders), prior to the Effective Date, that the Plan Trust Interests do not need to be distributed.

182.    "*Plan Trust Interests*" means all beneficial interests in the Plan Trust, as provided for in the Plan Trust Agreement.

183.    "*Plan Trustee*" means the Person or Entity jointly selected by the Committee and the Required Consenting Noteholders to serve as the trustee of the Plan Trust, identified and disclosed in the Plan Supplement, and any successor thereto appointed pursuant to the Plan Trust Agreement, as appointed in accordance with the Plan Trust Agreement.

184.    "*Pre-Rights Offering Agreed Unused Plan Trust Funding*" means, in the event that, prior to the Rights Offering Commencement Date (as defined in the Rights Offering Procedures), (x) the Debtors (acting through the Special Committee), the Required Consenting Noteholders, and the Committee agree that there will be Unused Plan Trust Funding on the Effective Date, and (y) the Required Consenting Noteholders determine that the aggregate principal amount of New Money New Convertible Notes shall be reduced by 50% of such Unused Plan Trust Funding, the agreed dollar amount of such Unused Plan Trust Funding.

185.    "*Priority Tax Claims*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

186.    "*Professional*" means an Entity or Person employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

187.    "*Professional Claim*" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 328, 330, 331, or 503(b)(2) of the Bankruptcy Code.

188.    "*Professional Claim Bar Date*" means forty-five (45) days after the Effective Date unless otherwise ordered by the Bankruptcy Court.

189.    "*Professional Claim Escrow Account*" means an escrow account funded by the Debtors with Cash no later than the Effective Date in an amount equal to the Professional Claim Escrow Amount.

190.    "*Professional Claim Escrow Amount*" means the aggregate amount of (a) Professional Claims for fees and expenses each Professional has incurred that will be unpaid as of the Effective Date and (b) fees and expenses each Professional estimates in good faith as of the Anticipated Effective Date that they will incur prior to and on the Effective Date.

191.    "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

192.    "*Quarterly Fees*" has the meaning set forth in <u>Article II.G</u>.

193.    "*Reinstatement*" or "*Reinstated*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered unimpaired in accordance with section 1124 of the Bankruptcy Code, which, in all instances, shall be reasonably acceptable to the Required Consenting Noteholders.

194.    "*Related Party*" means, with respect to any Person, collectively, its current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, subsidiaries, managed accounts or funds, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, heirs, executors, successors and assigns, and other professionals, in each case solely in their capacities as such, together with their respective past and present directors, officers, shareholders, partners, members, employees, agents, attorneys, representatives, heirs, executors and assigns, in each case solely in their capacities as such.

195.    "*Released Parties*" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) New Holdco, each Reorganized Debtor, and each direct or indirect subsidiary of the Debtors or Reorganized Debtors; (c) the DIP Agents, and each DIP Lender; (d) the Unsecured Notes Trustees; (e) each Consenting Noteholder; (f) the Committee and its members; (g) each current and former Affiliate of each Entity in clause (b) through (f); and (h) each Related Party of each Entity in clause (a) through (g) (which, for the avoidance of doubt, includes each of the Ad Hoc Group Advisors); *provided* that (x) any holder of a Claim or Interest that does not opt in to granting the releases or is not otherwise a Releasing Party and (y) each of the Non-Released Parties shall not be a Released Party.

196.    "*Releasing Parties*" means, collectively, and in each case in its capacity as such: (a) each Debtor; (b) New Holdco, each Reorganized Debtor, and each direct or indirect subsidiary of the Debtors or Reorganized Debtors; (c) the DIP Agents and each DIP Lender; (d) the Unsecured Notes Trustees; (e) each Consenting Noteholder; (f) all holders of Claims or Interests that are eligible to vote to accept or reject the Plan that opt in to granting releases, (g) each current and former Affiliate of each Entity in clause (a) through (f), and (h) each Related Party of each Entity in clause (a) through (g); *provided*, *however*, that each Entity identified in part (h) shall be a Releasing Party only with respect to claims or Causes of Action that it could have properly asserted on behalf of the Entities identified in (a) through (g) hereof.

197.    "*Remaining GUC Cash Pool Funding*" means a distribution of Cash from the Reorganized Debtors to the GUC Cash Pool Distribution Agent in the amount of the difference

between the dollar amount of the GUC Cash Pool (after accounting for all required reductions) and the dollar amount of the sum of (a) the Initial GUC Cash Pool Funding and (b) any Interim GUC Cash Pool Fundings.

198.    "*Reorganized Conect S.A.*" means Conect S.A., or any successor or assign, by merger, consolidation, or otherwise, on or after the Effective Date.

199.    "*Reorganized Debtors*" means collectively, Reorganized Conect S.A., Reorganized Multikom S.A., Reorganized NC Telecom II AS, Reorganized WOM Mobile S.A., and Reorganized WOM S.A.

200.    "*Reorganized Multikom S.A.*" means Multikom S.A., or any successor or assign, by merger, consolidation, or otherwise, on or after the Effective Date.

201.    "*Reorganized NC Telecom II AS*" means NC Telecom II AS, or any successor or assign, by merger, consolidation, or otherwise, on or after the Effective Date.

202.    "*Reorganized WOM Mobile S.A.*" means WOM Mobile S.A., or any successor or assign, by merger, consolidation, or otherwise, on or after the Effective Date.

203.    "*Reorganized WOM S.A.*" means WOM S.A., or any successor or assign, by merger, consolidation, or otherwise, on or after the Effective Date.

204.    "*Reorganization Transactions*" means, collectively, the transactions contemplated by the Plan or that the Debtors and the Required Consenting Noteholders reasonably determine are necessary or appropriate to implement the Plan, in accordance with the terms thereof.

205.    "*Required Consenting Noteholders*" means, as of the relevant date, the holders of a majority of the aggregate principal amount of Unsecured Notes Claims held by all Consenting Noteholders.

206.    "*Restructuring*" means the restructuring of the Debtors, as contemplated by and described in the Plan Sponsor Agreement, the Plan Term Sheet, and the Plan, which will be effectuated through the Reorganization Transactions.

207.    "*Restructuring Expenses*" means (i) all postpetition reasonable and documented fees and expenses of the Ad Hoc Group including, without limitation, any fees and expenses of any Ad Hoc Group Advisors in any way related to the Debtors, the Unsecured Notes, or the Restructuring, including, without limitation, the negotiation, formulation, preparation, execution, delivery, implementation, consummation and enforcement of the Backstop Agreement, the Plan, the Definitive Documents, and the transactions contemplated thereby, and (ii) the Indenture Trustee Fees.

208.    "*Retained Causes of Action*" means the Causes of Action of the Debtors and their Estates set forth on the Schedule of Retained Causes of Action.

209.    "*Rights Expiration Time*" has the meaning set forth in the Rights Offering Procedures.

210.     "*Rights Offering*" means that certain rights offering pursuant to which each Eligible Holder of an Allowed Unsecured Notes Claim and each Eligible Holder of an Allowed General Unsecured Claim that is a New Secured Notes/Equity Treatment Electing Creditor is entitled to receive Subscription Rights to acquire the Rights Offering Securities in accordance with the Rights Offering Procedures.

211.     "*Rights Offering Amount*" means the sum of the New Money New Convertible Notes Rights Offering Amount and the New Money New Secured Notes Rights Offering Amount, which may be increased by mutual consent of the Debtors and the Required Backstop Parties (as defined in the Backstop Agreement).

212.     "*Rights Offering Documents*" means the Backstop Agreement, the Rights Offerings Procedures, the Subscription Forms, the Investor Eligibility Certification, and any and all other agreements, documents, and instruments delivered or entered into in connection with the Rights Offering.

213.     "*Rights Offering Procedures*" means the procedures for the implementation of the Rights Offering approved by the Bankruptcy Court and in the form and substance consistent with the Plan Sponsor Agreement, the Backstop Agreement, and all annexes to each of the foregoing and reasonably acceptable to the Required Consenting Noteholders and the Debtors and subject to the rights of the Committee as set forth in the Plan Sponsor Agreement.

214.     "*Rights Offering Procedures Approval Motion*" means *Debtors' Motion for Entry of an Order (I) Approving Rights Offering Procedures and Related Materials, (II) Authorizing Debtors to Conduct Rights Offering in Connection with the Debtors' Plan of Reorganization, and (III) Granting Related Relief* [Docket No. 950].

215.     "*Rights Offering Procedures Order*" means the *Order (I) Approving Rights Offering Procedures and Related Materials, (II) Authorizing Debtors to Conduct Rights Offering in Connection with the Debtors' Plan of Reorganization, and (III) Granting Related Relief* [Docket No. 995] entered by the Bankruptcy Court on January 9, 2025.

216.     "*Rights Offering Securities*" means, collectively, the New Money New Secured Notes and New Money New Convertible Notes.

217.     "*Schedules*" means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors on June 28, 2024 [Docket Nos. 469-92] under section 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and the Official Bankruptcy Forms of the Bankruptcy Rules, as amended on September 10, 2024 [Docket Nos. 714-15], as such schedules and statements or may be further supplemented or amended from time to time.

218.     "*Schedule of Assumed Contracts and Leases*" means the schedule identifying the Executory Contracts and Unexpired Leases to be assumed by the Reorganized Debtors under this Plan, and the Cure Claims associated with such Executory Contracts and Unexpired Leases, filed as an exhibit to the Plan Supplement, which may be supplemented or modified from time to time by the Required Consenting Noteholders in consultation with the Debtors.

219.     "*Schedule of Retained Causes of Action*" means the schedule setting forth the Causes of Action of the Debtors and their estates that will be transferred to the Reorganized Debtors as of the Effective Date, which shall include, without limitation, all Avoidance Actions

(except as set forth in this Plan, including for the LT Claims that have not been settled, waived, and/or released as of the Effective Date) and all claims and Causes of Action in connection with the ICSID Arbitration.

220.    "*SEC*" means the United States Securities and Exchange Commission.

221.    "*Section 503(b)(9) Claims*" means Claims arising under section 503(b)(9) of the Bankruptcy Code.

222.    "*Secured*" means when referring to a Claim, a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

223.    "*Securities Act*" means the United States Securities Act of 1933, as amended and now in effect and as it may further be amended from time to time prior to the Effective Date.

224.    "*Security*" means a security as defined in Section 2(a)(1) of the Securities Act.

225.    "*Semi-Annual Distribution Date*" means the first Business Day after the end of each six-month period occurring after the Initial GUC Cash Pool Distribution Date.

226.    "*Solicitation Materials*" means the solicitation materials, Ballots, and documents included in the solicitation packages that will be sent to, among others, Holders of Claims and Interests entitled to vote to accept or reject the Plan, in accordance with the Disclosure Statement and Solicitation Procedures Order and in compliance with Bankruptcy Rules 3017(d) and 2002(b), in form and substance reasonably acceptable to the Required Consenting Noteholders and the Debtors and subject to the rights of the Committee as set forth in the Plan Sponsor Agreement.

227.    "*Special Committee*" means the special committee of the independent directors of the board of directors of each Debtor, which is composed of (a) Tim O'Connor and (b) Christopher S. Sontchi.

228.    "*Steps Plan*" means the document outlining the order of Reorganization Transactions to be implemented through this Plan, which shall be in form and substance consistent with the Plan Sponsor Agreement, the Plan Term Sheet, the Backstop Agreement and all annexes to each of the foregoing and otherwise reasonably acceptable to the Required Consenting Noteholders and the Debtors and subject to the rights of the Committee as set forth in the Plan Sponsor Agreement.

229.    "*Subscription Forms*" means the subscription forms delivered under the Rights Offering Procedures by which Holders of Allowed Unsecured Notes Claims and Eligible Holders of Allowed General Unsecured Claims that are New Secured Notes/Equity Treatment Electing Creditors may elect to exercise their Subscription Rights in accordance with the Plan, the Backstop Agreement, and the Rights Offering Procedures.

230. "*Subscription Rights*" means the subscription rights to acquire New Money New Secured Notes and New Money New Convertible Notes offered in accordance with the Rights Offering Procedures.

231. "*Support Agreements*" means the Plan Sponsor Agreement and the Backstop Agreement.

232. "*Take Back New Secured Notes*" means $225 million in aggregate principal amount of New Secured Notes.

233. "*Tax Code*" means the Internal Revenue Code of 1986, as amended from time to time.

234. "*Transfer*" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

235. "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

236. "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that, after the expiration of 365 days after the Effective Date, has not: (a) accepted such distribution; (b) given notice to the Debtors or Reorganized Debtors, as applicable, of an intent to accept such distribution; (c) responded to requests by the Debtors or the Reorganized Debtors, as applicable, for information necessary to facilitate such distribution; or (d) taken any other action necessary to facilitate such distribution.

237. "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired.

238. "*United States Trustee*" means the United States Trustee for the District of Delaware.

239. "*Unsecured Notes*" means the 2024 Notes and the 2028 Notes.

240. "*Unsecured Notes Claims*" means collectively, the 2024 Notes Claims and the 2028 Notes Claims.

241. "*Unsecured Notes Documents*" means the Unsecured Notes, the 2024 Notes Indenture, the 2028 Notes Indenture, or other agreement governing the Unsecured Notes, and any and all other agreements, documents, and instruments delivered or entered into in connection therewith.

242. "*Unsecured Notes Trustees*" means the trustee in respect of the 2024 Notes and the 2024 Notes Indenture and the trustee in respect of the 2028 Notes and the 2028 Notes Indenture.

243. "*Unsecured Notes Litigation Proceeds*" means a pro rata share (based on the proportion that (a) the aggregate amount of all Allowed Unsecured Notes Claims (without taking into account the Guaranty Claim Enhancement) bears to (b) the sum of all Allowed General Unsecured Claims *plus* all Allowed Unsecured Notes Claims (without taking into account the

Guaranty Claim Enhancement)) of any cash proceeds actually received by the Debtors through settlement or litigation of LT Claims (if any).

244.    "*Unsubscribed New Money New Convertible Notes*" means an amount of New Money New Convertible Notes equal to (a) the total number of New Money New Convertible Notes offered under the Rights Offering *minus* (b) such number of New Money New Convertible Notes for which (i) a Subscription Right has been validly exercised and (ii) the purchase price has been duly paid on or before the deadlines set forth in the Rights Offering Procedures.

245.    "*Unsubscribed New Money New Secured Notes*" means an amount of New Money New Secured Notes equal to (a) the total number of New Money New Secured Notes offered under the Rights Offering *minus* (b) such number of New Money New Secured Notes for which (i) a Subscription Right has been validly exercised and (ii) the purchase price has been duly paid on or before the deadlines set forth in the Rights Offering Procedures.

246.    "*Unsubscribed Rights Offering Securities*" means, collectively, the Unsubscribed New Money New Convertible Notes and the Unsubscribed New Money New Secured Notes.

247.    "*Unused Plan Trust Funding*" means the difference between $3 million and the amount of Plan Trust Funding actually funded to the Plan Trust.

248.    "*Vendor Order*" means the *Final Order (I) Authorizing the Debtors to (A) Pay Foreign Vendor Claims, Interconnection Claims, Shipper Claims, and Refund Claims and (B) Continue Other Customer Programs and (II) Granting Related Relief* [Docket No. 593] entered by the Bankruptcy Court on July 26, 2024.

249.    "*Voting Deadline*" means February 27, 2025 at 5:00 p.m. (prevailing Eastern Time), in accordance with the Disclosure Statement and Solicitation Procedures Order.

*250.*    *"WOM Mobile/Kenbourne Unsecured Note Intercompany Claim"* means the Unsecured Notes Claims against Kenbourne contributed to and held by WOM Mobile S.A. pursuant to the Steps Plan.

251.    "*WOM Mobile Units*" means a single class of common equity interests with 100% economic and voting rights in Reorganized WOM Mobile S.A.

B.    *Interpretation; Application of Definitions and Rules of Construction.*

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, portion or clause contained therein. The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein: (i) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (ii) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (iii) unless otherwise specified, all references

herein to "Articles" are references to Articles hereof or hereto; (iv) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (v) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (vi) the words "include," "includes," and "including" shall be deemed to be followed by "without limitation"; (vii) the word "or" shall be deemed to mean "and/or"; (viii) "writing," "written," and comparable terms refer to printing, typing, and other means of reproducing words (including electronic media) in a visible form; (ix) except as otherwise provided in the other Definitive Documents, any requirement that any notice, consent, or other information shall be provided "in writing" shall include e-mail; (x) if any provision of the Plan is held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, in whole or in part, the remaining provisions shall remain in full force and effect; and (xi) the Debtors shall be authorized to and may rely upon any written statement (including by email) from (a) Dechert LLP that confirms or declines a consent, waiver, authorization, or other form of approval by the Required Consenting Noteholders and (b) Willkie Farr & Gallagher LLP that confirms or declines a consent, waiver, authorization, or other form of approval by the Committee.

C.      *Controlling Document.*

        The provisions of the Plan and the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided, however*, that, if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan and shall control and take precedence.  In the event of an inconsistency between the Plan and any Definitive Document other than the Confirmation Order, the New Secured Notes Documents, the New Convertible Notes Documents, the Plan Trust Agreement, the Steps Plan, and the New Corporate Governance Documents, the terms of the Plan shall control.  In the event of an inconsistency between the Plan and any of the New Secured Notes Documents, the New Convertible Notes Documents, the Plan Trust Agreement, the Steps Plan, or the New Corporate Governance Documents, the terms of such Definitive Documents shall control.

## ARTICLE II
## ADMINISTRATIVE CLAIMS, PROFESSIONAL CLAIMS, DIP CLAIMS, PRIORITY TAX CLAIMS, AND U.S. TRUSTEE FEES.

A.      *Unclassified Claims.*

        The following constitute unclassified Claims that are Unimpaired and, therefore, not entitled to vote on this Plan:

        1.      Administrative Claims;

        2.      Professional Claims;

        3.      DIP Claims;

        4.      Priority Tax Claims; and

     5.      Foreign Vendor Claims subject to Payment Agreements.

B.     *Administrative Claims.*

     1.      <u>Administrative Claims Generally</u>.  Subject to the provisions of sections 330(a), 331 and 503(b) of the Bankruptcy Code, each Allowed Administrative Claim shall be paid in full by the Reorganized Debtors, at the election of the Reorganized Debtors, with the consent of the Required Consenting Noteholders (solely as to whether such payment in full shall be made pursuant to the following clauses (i)-(iii)): (i) in Cash, in such amount as such Administrative Claim is Allowed on or as soon as reasonably practicable after the Effective Date or, if such Administrative Claim is not Allowed as of the Effective Date, upon entry of a Final Order allowing such Administrative Claim or as soon as reasonably practicable thereafter; (ii) upon such other terms or in Cash in such other amount as may exist or be incurred in the ordinary course of the Debtors' business; or (iii) upon such other less favorable terms as may be agreed upon in writing between the Holder of such Allowed Administrative Claim and the Debtors or Reorganized Debtors, in each case in full satisfaction, settlement, discharge and release of such Allowed Administrative Claim.

     2.      <u>Deadline to File Administrative Claims</u>.

     Holders of Administrative Claims, other than: (a) Professional Claims; (b) Administrative Claims that have been Allowed on or before the Effective Date; (c) Section 503(b)(9) Claims; (d) Administrative Claims arising, in the ordinary course of business, out of the employment by one or more Debtors of an individual from and after the Petition Date, but only to the extent that such Administrative Claims are solely for outstanding obligations under any Employee Obligation Documents; (e) DIP Claims and (f) Administrative Claims held by the United States Trustee, must File with the Bankruptcy Court and serve upon the Debtors, or the Reorganized Debtors, as applicable, **proof of such Administrative Claim so as to be received by 5:00 p.m. (prevailing Eastern Time) on the applicable Administrative Claims Bar Date**.  Such proof of Administrative Claim must include at a minimum: (i) the name of the applicable Debtor that is purported to be liable for the Administrative Claim; (ii) the name of the Holder of the Administrative Claim; (iii) the asserted amount of the Administrative Claim; (iv) the basis of the Administrative Claim; and (v) supporting documentation for the Administrative Claim.

     **HOLDERS OF ADMINISTRATIVE CLAIMS THAT ARE OR WERE REQUIRED TO, BUT DO NOT OR DID NOT, FILE AND SERVE A REQUEST FOR PAYMENT OF SUCH ADMINISTRATIVE CLAIMS BY THE APPLICABLE ADMINISTRATIVE CLAIMS BAR DATE SHALL BE FOREVER BARRED, ESTOPPED, AND ENJOINED FROM ASSERTING SUCH ADMINISTRATIVE CLAIMS AGAINST THE DEBTORS OR THEIR PROPERTY, AND SUCH ADMINISTRATIVE CLAIMS SHALL BE DEEMED DISCHARGED AS OF THE EFFECTIVE DATE.**

     The Debtors or the Reorganized Debtors, as applicable, may file and serve objections to Administrative Claims on or before the Administrative Claims Objection Deadline.

     3.      <u>Treatment of Allowed Administrative Claims</u>.

     The Reorganized Debtors may settle Administrative Claims in the ordinary course of business without further Bankruptcy Court approval. The Debtors or the Reorganized Debtors, as

applicable, may also choose to object to any Administrative Claim no later than the Administrative Claims Objection Deadline, subject to extensions by the Bankruptcy Court upon a motion by the Reorganized Debtors or an agreement in writing of the parties. Unless the Debtors or the Reorganized Debtors (or other party with standing) object to a timely-Filed and properly served Administrative Claim, such Administrative Claim will be deemed Allowed in the amount requested. In the event that the Debtors or the Reorganized Debtors object to an Administrative Claim, the parties may confer to try to reach a settlement and, failing that, the Bankruptcy Court will determine whether such Administrative Claim should be Allowed and, if so, in what amount.

C.    *Professional Claims.*

1.    <u>Deadline to File Professional Claims</u>.

Any Professional seeking approval by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 328, 330, 331, or 503(b)(2) of the Bankruptcy Code shall File, on or before the Professional Claim Bar Date, final requests for payment of such Professional Claims. The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims in accordance with the procedures established by order of the Bankruptcy Court, the Bankruptcy Code, and/or the Bankruptcy Rules.

2.    <u>Payment of Professional Claims</u>.

The Debtors or the Reorganized Debtors, as applicable, shall pay Professional Claims in Cash to the applicable Professionals in the amounts approved by the Bankruptcy Court, as soon as reasonably practicable after all such Professional Claims are Allowed by entry of a Final Order of the Bankruptcy Court.

3.    <u>Final Fee Applications</u>.

All final requests for allowance and payment of Professional Claims must be Filed with the Bankruptcy Court no later than the Professional Claim Bar Date unless otherwise ordered by the Bankruptcy Court. Any objections to Professional Claims shall be Filed and served no later than twenty-one (21) days after the Filing of final requests for allowance and payment of Professional Claims.

4.    <u>Professional Claim Escrow Account</u>.

No later than the Effective Date, the Debtors shall establish and fund the Professional Claim Escrow Account with Cash equal to the Professional Claim Escrow Amount. The sole source of payment of Allowed Professional Claims shall be the amounts held in the Professional Claim Escrow Account. The Professional Claim Escrow Account shall be maintained in trust solely for the Professionals until all Professional Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the Professionals pursuant to one or more Final Orders of the Bankruptcy Court. No Liens, claims, or interests shall encumber the Professional Claim Escrow Account or Cash held in the Professional Claim Escrow Account in any way. No funds held in the Professional Claim Escrow Account shall be property of the Estates of the Debtors, the Reorganized Debtors, the Plan Trust, or any respective successors thereto, as applicable, except to the extent such funds exceed the Professional Claims Allowed by the Bankruptcy Court. When all Professional Claims Allowed by the Bankruptcy Court have been irrevocably paid in full to the

Professionals pursuant to one or more Final Orders of the Bankruptcy Court, any remaining funds held in the Professional Claim Escrow Account shall be turned over to the Reorganized Debtors to be used for working capital, without any further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.

     5.     <u>Post-Effective Date Fees and Expenses</u>.

Except as otherwise specifically provided in the Plan or the Plan Supplement, from and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable and documented legal, professional, or other fees and expenses related to implementation and Consummation of the Plan incurred by the Debtors or the Reorganized Debtors, as applicable, on and after the Effective Date. Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Plan Trustee may employ and pay any Professional in the ordinary course of business for the period after the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court.

*D.*     *Priority Tax Claims*.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each Holder of an Allowed Priority Tax Claim shall receive, at the option of the Reorganized Debtors, with the consent of the Required Consenting Noteholders (solely as to whether such payment in full shall be made pursuant to the following clauses (i)-(ii)): (i) Cash in an amount equal to such Allowed Priority Tax Claim on the later of (a) the Effective Date (or as soon as reasonably practicable thereafter), (b) the first Business Day after the date that is thirty (30) days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course, or as soon thereafter as is reasonably practicable; or (ii) equal annual Cash payments in an aggregate amount equal to the amount of such Allowed Priority Tax Claim, together with interest at the applicable rate under section 511 of the Bankruptcy Code, over a period not exceeding five (5) years from and after the Petition Date. Except as set forth in the Final DIP Order, the Holders of Allowed Priority Tax Claims shall retain their tax Liens on their collateral to the same validity, extent and priority as existed on the Petition Date until all validly determined taxes and related interest, penalties, and fees (if any) have been paid in full. To the extent a Holder of an Allowed Priority Tax Claim is not paid in the ordinary course of business, payment of the Allowed Priority Tax Claim shall include interest through the date of payment at the applicable state statutory rate, as set forth in sections 506(b), 511, and 1129 of the Bankruptcy Code.

*E.*     *DIP Claims*.

The DIP Claims shall be Allowed as of the Effective Date in an amount equal to the full amount due and owing under the DIP Orders and the other DIP Loan Documents, including, for the avoidance of doubt, (a) the principal amount outstanding under the DIP Loan Documents on such date, (b) all interest accrued and unpaid thereon through and including the date of payment, (c) all accrued and unpaid fees, expenses and noncontingent indemnification obligations payable under the DIP Loan Documents and (d) all other "Obligations" as provided for in the DIP Credit Agreement. The DIP Claims shall be paid in full, in Cash, on the Effective Date in full and final

satisfaction, settlement and release, and in exchange for the DIP Claims.  Upon satisfaction of the DIP Claims as set forth in the preceding sentence, all Liens of the DIP Lender on any property of the Estates shall be deemed fully released without any further action of any party, unless such action is required by Law to deregister Liens on property located in Chile.

On the Effective Date, all Liens and security interests granted by the Debtors to secure the obligations under the DIP Loan Documents shall be of no further force or effect;  provided, that any indemnification and reimbursement obligations under the DIP Loan Documents shall survive any cancellation, conversion, or discharge under the Plan in accordance with its terms, and any rights that the DIP Agents may have under the agency provisions of the DIP Credit Agreement shall survive any such cancellation or discharge, as  further described in Article V.L below, and be paid by the Debtors in Cash as and when due under the DIP Loan Documents.  Notwithstanding anything in this Plan to the contrary, all mortgages, deeds of trust, Liens, pledges, or other security interests granted under the DIP Loan Documents shall continue in full force and effect and shall not be released until all DIP Claims (other than contingent indemnification and reimbursement obligations as to which no claim has been asserted by the Person entitled thereto) have been paid in full in Cash.  For the avoidance of doubt, the DIP Claims shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

*F.      Foreign Vendor Claims.*

The Reorganized Debtors will continue to honor outstanding obligations to make payments after the Effective Date as authorized by the Bankruptcy Court under the Vendor Order pursuant to all postpetition agreements between the Debtors and any Foreign Vendor Claimant (as defined in the Vendor Order) that obligate the Debtors to make such payments (such agreements, the "**Payment Agreements**"). For the avoidance of doubt, such Foreign Vendor Claimants shall not receive any distributions under, or be entitled to vote on, the Plan on account of a Foreign Vendor Claim subject to a Payment Agreement.

*G.      Restructuring Expenses.*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall constitute Allowed Administrative Claims and shall be paid in full in cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid during the course of these Chapter 11 Cases) in accordance with, and subject to the terms of, the Plan and the Backstop Agreement.  Such payment shall not be subject to any requirement that (i) any party file any application with the Bankruptcy Court or (ii) the Bankruptcy Court enter any further orders.

Each invoice for Restructuring Expenses may include a good faith estimate of fees and expenses to be incurred through the Effective Date and all such invoices shall be delivered to the Debtors at least two (2) Business Days before the Anticipated Effective Date; *provided, however*, that any such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses.

*H.      U.S. Trustee Fees.*

All fees under section 1930 of Title 28 of the United States Code plus any interest thereon pursuant to 31 U.S.C. § 3717 ("**Quarterly Fees**") payable on or before the Effective Date shall be paid by the Debtors in full in Cash on the Effective Date. On and after the Effective Date, the Reorganized Debtors and the Plan Trust shall be jointly and severally liable for paying any and all Quarterly Fees in full in Cash when due in each Chapter 11 Case for each quarter (including any fraction thereof) until the earliest of such Chapter 11 Case being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code; *provided* that the Plan Trust shall not be liable for any Quarterly Fees required to be paid on account of any activity of the Reorganized Debtors that does not involve the Plan Trust. The Debtors shall file all monthly operating reports due before the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Reorganized Debtors and the Plan Trust shall file with the Bankruptcy Court a post-confirmation quarterly report for each Chapter 11 Case for each quarter (including any fraction thereof) such case is pending, using UST Form 11-PCR. Notwithstanding anything to the contrary in the Plan, (i) Quarterly Fees are Allowed; (ii) the U.S. Trustee shall not be required to file any proof of claim or any other request(s) for payment with respect to Quarterly Fees; and (iii) the U.S. Trustee shall not be treated as providing any release under the Plan.

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS.

A.      *Classification of Claims and Interests.*

Except for Claims not classified as specified in ARTICLE II, all Claims against and Interests in the Debtors are classified in the Classes set forth in this ARTICLE III for all purposes, including voting, confirmation of the Plan, and distributions pursuant to the Plan and in accordance with section 1122 and section 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

B.      *Formation of Debtor Groups for Convenience Only.*

This Plan (including, but not limited to, ARTICLE II and ARTICLE III) groups the Debtors together solely for the purpose of describing treatment under this Plan, confirmation of this Plan, and distributions to be made in respect of Claims against and Interests in the Debtors under this Plan. Except as provided in ARTICLE IV of the Plan, such groupings shall not affect each Debtor's status as a separate legal entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal entities, or cause the transfer of any assets.

C.      *Summary of Classification.*

A summary of the classification of Claims against and Interests in each Debtor pursuant to the Plan is set forth in the following chart. The Plan constitutes a separate chapter 11 plan for each of the Debtors, and accordingly, the classification of Claims and Interests set forth below applies separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein.

Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in ARTICLE III of the Plan. Voting tabulations for recording acceptances or rejections of the Plan will be conducted on a Debtor-by-Debtor basis.[2]

| Classified Claims and Interests of the Debtors | | | |
|---|---|---|---|
| Class | Claim or Interest | Status | Voting Rights |
| Class 1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| Class 2 | Other Priority Claims | Unimpaired | Deemed to Accept |
| Class 3 | Unsecured Notes Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 | Intercompany Claims | Unimpaired or Impaired | Deemed to Accept or Deemed to Reject |
| Class 6 | Existing Equity Interests | Impaired | Deemed to Reject |
| Class 7 | Intercompany Interests | Unimpaired or Impaired | Deemed to Accept or Deemed to Reject |

D.    *Special Provision Governing Unimpaired Claims*.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

E.    *Subordinated Claims*.

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims against, and Allowed Interests in, the Debtors and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Reorganized Debtors, as applicable, reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

F.    *Non-Debtor Intercompany Claims*.

To the extent any non-Debtor direct or indirect parent or subsidiary entity of a Debtor holds a Claim against a Debtor, such Holder of a Claim will not receive any distributions under the Plan.

G.    *Treatment of Claims and Interests*.

    1.    Class 1 – Other Secured Claims.

        (i)    Classification: Class 1 consists of all Other Secured Claims against the applicable Debtor.

---

[2]    The Debtors reserve the right to separately classify Claims or Interests to the extent necessary to comply with any requirements under the Bankruptcy Code or applicable law.

(ii)    <u>Treatment</u>:  Except to the extent that a Holder of an Allowed Other Secured Claim and the applicable Debtor agree to less favorable treatment, on the Effective Date, each Holder of an Allowed Other Secured Claim shall receive, at the Debtors' option with the consent of the Required Consenting Noteholders, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Other Secured Claim: (a) payment in full in Cash; (b) the collateral securing its Allowed Other Secured Claim; (c) Reinstatement of its Allowed Other Secured Claim; or (d) such other treatment rendering its Allowed Other Secured Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(iii)    <u>Voting</u>:  Class 1 is Unimpaired under the Plan.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

2.    <u>Class 2 – Other Priority Claims</u>.

(i)    <u>Classification</u>:  Class 2 consists of all Other Priority Claims against the applicable Debtor.

(ii)    <u>Treatment</u>:  Except to the extent that a Holder of an Allowed Other Priority Claim and the applicable Debtor agree to less favorable treatment, on the Effective Date, each Holder of an Allowed Other Priority Claim shall receive, at the Debtors' option with the consent of the Required Consenting Noteholders, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Other Priority Claim: (a) payment in full in Cash; (b) Reinstatement of its Allowed Other Priority Claim; or (c) such other treatment rendering its Allowed Other Priority Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code.

(iii)    <u>Voting</u>:  Class 2 is Unimpaired under the Plan.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

3.    <u>Class 3 – Unsecured Notes Claims</u>.

(i)    <u>Classification</u>:  Class 3 consists of all Unsecured Notes Claims against the applicable Debtor.

(ii)    <u>Allowance</u>:  As of the Effective Date, the Unsecured Notes Claims shall be Allowed in the following amounts: (i) the sum of $347.997 million in 2024 Notes Claims *plus* $8,240,762.29 in accrued and unpaid interest and any accrued and unpaid fees on the 2024 Notes through the Petition Date and (ii) the sum of $290 million in 2028 Notes Claims *plus* $2,574,555.56 in accrued and unpaid interest and any accrued and unpaid fees on the 2028 Notes through the Petition Date, in each case *multiplied by* the Guaranty Claim Enhancement.

(iii)   <u>Treatment</u>:  Except to the extent that a Holder of an Allowed Unsecured Notes Claim and the applicable Debtor agree to less favorable treatment, on the Effective Date, each Eligible Holder of an Allowed Unsecured Notes Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Unsecured Notes Claim:

(a)   if, as of the Plan Effective Date, LT Claims exist that the Special Committee (in consultation with the Committee) (A) has not settled and (B) has determined should be pursued:

(1)   its pro rata share of the Plan Trust Interests (based on the proportion that (a) its Allowed Unsecured Notes Claim bears to (b) the aggregate amount of (i) all Allowed Unsecured Notes Claims plus (ii) all Allowed General Unsecured Claims);  and

(2)   its pro rata share (based on the proportion that (a) its Allowed Unsecured Notes Claim bears to (b) the aggregate amount of all Allowed Unsecured Notes Claims) of 50% of the Unused Plan Trust Funding, which 50% of the Unused Plan Trust Funding may, at the option of the Required Consenting Noteholders, (i) be distributed to holders of Unsecured Notes, (ii) reduce the aggregate principal amount of New Money New Convertible Notes, or (iii) be retained by the Reorganized Debtors for working capital purposes; *or*

(b)   if the Special Committee determines (by agreement with the Committee and the Required Consenting Noteholders) prior to the Effective Date that the Plan Trust Interests do not need to be distributed on the Effective Date because the Special Committee (in consultation with the Committee) has settled all potential LT Claims or determined that no potential LT Claims should be pursued as of the Plan Effective Date, or such LT Claims have been settled but such settlement has not closed as of the Plan Effective Date, its pro rata share (based on the proportion that (a) its Allowed Unsecured Notes Claim bears to (b) the aggregate amount of all Allowed Unsecured Notes Claims) of (1) the Unsecured Notes Litigation Proceeds and (2) 50% of the Unused Plan Trust Funding, which in each case of (1) and (2) may, at the option of the Required Consenting Noteholders, (i) be distributed to holders of Unsecured Notes, (ii) reduce the aggregate principal amount of New Money New Convertible Notes, or (iii) be retained by the Reorganized Debtors for working capital purposes); ***and***

(c)   its pro rata share of the New Secured Notes/Equity Treatment (based on the proportion that (a) its Allowed Unsecured Notes Claim bears to (b) the aggregate amount of (i) all Allowed Unsecured Notes

Claims *plus* (ii) all Allowed General Unsecured Claims for which their holders have elected the New Secured Notes/Equity Treatment).

    (iv)    <u>Voting</u>:  Class 3 is Impaired under the Plan.  Holders of Allowed Unsecured Notes Claims are entitled to vote to accept or reject the Plan.

4.    <u>Class 4 – General Unsecured Claims</u>.

    (i)    <u>Classification</u>:  Class 4 consists of all General Unsecured Claims against the applicable Debtor.

    (ii)    <u>Allowance</u>:  The Allowed amount of all General Unsecured Claims will be determined pursuant to the terms of this Plan, the Bankruptcy Code, and other applicable law.

    (iii)    <u>Treatment</u>:  Except to the extent that a Holder of an Allowed General Unsecured Claim and the applicable Debtor agree to less favorable treatment, on the Effective Date, each Eligible Holder of an Allowed General Unsecured Claim shall receive, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed General Unsecured Claim:

    (a)

    (1)    if as of the Plan Effective Date, LT Claims exist that the Special Committee (in consultation with the Committee) (A) has not settled and (B) has determined should be pursued, (1) its pro rata share (based on the proportion that (a) its Allowed General Unsecured Claim bears to (b) the aggregate amount of (i) all Allowed Unsecured Notes Claims plus (ii) all Allowed General Unsecured Claims) of the Plan Trust Interests and (2) its pro rata share (based on the proportion that (a) its Allowed General Unsecured Claim bears to (b) all Allowed General Unsecured Claims) of 50% of the Unused Plan Trust Funding; *or*

    (2)    if the Special Committee determines (by agreement with the Committee and the Required Consenting Noteholders) prior to the Effective Date that the Plan Trust Interests do not need to be distributed on the Plan Effective Date because the Special Committee (in consultation with the Committee) has settled all potential LT Claims or determined any potential LT Claims should not be pursued as of the Plan Effective Date, or such LT Claims have been settled but such settlement has not closed as of the Plan Effective Date, its pro rata share (based on the proportion that (a) its Allowed General Unsecured Claim bears to (b) all Allowed General Unsecured Claims) of (1) the GUC Litigation Proceeds and (2) 50% of the Unused Plan Trust Funding; ***and***

(b)    the GUC Cash Pool Treatment; *provided* that, to the extent the election can be offered and solicited in accordance with applicable securities laws, each holder of an Allowed General Unsecured Claim that is an Eligible Holder shall have the option to elect to receive, in lieu of the GUC Cash Pool Treatment, its pro rata share of the New Secured Notes/Equity Treatment (based on the proportion that (a) its Allowed General Unsecured Claim bears to (b) the aggregate amount of (i) all Allowed Unsecured Notes Claims (which definition includes the Guaranty Claim Enhancement) *plus* (ii) all Allowed General Unsecured Claims for which their holders have elected the New Secured Notes/Equity Treatment).

(iv)   <u>Voting</u>:  Class 4 is Impaired under the Plan.  Holders of Allowed General Unsecured Claims are entitled to vote to accept or reject the Plan.

5.    <u>Class 5 – Intercompany Claims</u>.

(i)    <u>Classification</u>:  Class 5 consists of all Intercompany Claims held by a Debtor against another Debtor.

(ii)   <u>Treatment</u>:  Except to the extent that a Holder of an Allowed Intercompany Claim and the applicable Debtor agree to less favorable treatment, on the Effective Date, each Holder of an Allowed Intercompany Claim shall have its Claim, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Intercompany Claim: (a) Reinstated or (b) cancelled, released, and extinguished and without any distribution, in each case, at the Debtors' election with the consent of the Required Consenting Noteholders.

(iii)  <u>Voting</u>:  Holders of Intercompany Claims are either Unimpaired or Impaired, and such Holders of Intercompany Claims are conclusively presumed to have accepted or deemed to have rejected the Plan under section 1126(f) or section 1126(g) of the Bankruptcy Code, as applicable. Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject the Plan.

6.    <u>Class 6 - Existing Equity Interests</u>.

(i)    <u>Classification</u>:  Class 6 consists of all Existing Equity Interests in each Debtor.

(ii)   <u>Treatment</u>:  Unless otherwise determined by the Required Consenting Noteholders (in consultation with the Debtors), on the Effective Date and in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Existing Equity Interest:

(a)    all Existing Equity Interests in NC Telecom II AS shall be transferred to New Holdco in accordance with applicable law; and

> > (b) all Existing Equity Interests in WOM Mobile S.A. shall be redeemed for no or nominal consideration, cancelled, released, or extinguished.
>
> > (iii) <u>Voting</u>:  Holders of Existing Equity Interests are Impaired, and such Holders of Existing Equity Interests are deemed to have rejected the Plan under section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Existing Equity Interests are not entitled to vote to accept or reject the Plan.

> 7. <u>Class 7 - Intercompany Interests</u>.
>
> > (i) <u>Classification</u>:  Class 7 consists of all Intercompany Interests in each Debtor held by another Debtor.
>
> > (ii) <u>Treatment</u>:  Unless otherwise determined by the Required Consenting Noteholders (in consultation with the Debtors), on the Effective Date and in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for such Allowed Intercompany Interest:
>
> > > (a) all Intercompany Interests in WOM S.A., Conect S.A., and Multikom S.A. held by WOM Mobile S.A. shall be Reinstated;
> >
> > > (b) all Intercompany Interests in WOM S.A., Conect S.A., and Multikom S.A. held by NC Telecom II AS shall be transferred to WOM Mobile S.A.; and
> >
> > > (c) all Intercompany Interests in Kenbourne held by NC Telecom II AS shall be Reinstated.
>
> > (iii) <u>Voting</u>:  Holders of Intercompany Interests are either Unimpaired or Impaired, and such Holders of Intercompany Interests are conclusively presumed to have accepted or deemed to have rejected the Plan under section 1126(f) or section 1126(g) of the Bankruptcy Code, as applicable.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject the Plan.

H. *Voting Classes; Deemed Acceptance by Non-Voting Classes*.

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be deemed accepted by the Holders of such Claims or Interests in such Class.

I. *Voting; Presumptions; Solicitation*.

> 1. <u>Acceptance by Certain Impaired Classes</u>.  Holders of Allowed Claims in Classes 3 and 4 shall receive Ballots containing detailed voting instructions.  Only Holders of Allowed Claims in Classes 3 and 4 are entitled to vote to accept or reject the Plan.  An Impaired Class of Claims shall have accepted the Plan if (a) the Holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders of more than one-half (1/2)

in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

2.  <u>Conclusive Presumption of Acceptance by Unimpaired Classes</u>.  Holders of Claims and Interests in Classes 1 and 2 are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such Holders are not entitled to vote to accept or reject the Plan.

3.  <u>Conclusive Presumption of Rejection by Certain Impaired Classes</u>.  Holders of Existing Equity Interests in Class 6 are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such Holders are not entitled to vote to accept or reject the Plan.

4.  <u>Conclusive Presumption of Acceptance or Rejection by Certain Classes</u>.  Holders of Claims and Interests in Classes 5 and 7 are either Unimpaired or Impaired, and such Holders are conclusively presumed to have accepted or deemed to have rejected the Plan under section 1126(f) or section 1126(g) of the Bankruptcy Code, as applicable.  Accordingly, such Holders are not entitled to vote to accept or reject the Plan.

All votes on the Plan shall be tabulated on a non-consolidated basis by Class and by Debtor for the purpose of determining whether the Plan satisfies sections 1129(a)(8) and/or 1129(a)(10) of the Bankruptcy Code, in accordance with the Disclosure Statement and Solicitation Procedures Order.

*J.*      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*.

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by an Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

*K.*      *Elimination of Vacant Classes*.

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

*L.*      *Separate Classification of Other Secured Claims*.

Each Other Secured Claim, to the extent secured by a Lien on collateral different from the collateral securing another Other Secured Claim, shall be treated as being in a separate sub-Class for purposes of receiving distributions under this Plan.

*M.*      *Controversy Concerning Impairment*.

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

# ARTICLE IV
# MEANS FOR IMPLEMENTATION.

A.    *No Substantive Consolidation*.

The Plan is being proposed as a joint plan of reorganization of the Debtors for administrative purposes only and constitutes a separate chapter 11 plan of reorganization for each Debtor. The Plan is not premised upon the substantive consolidation of the Debtors with respect to the Classes of Claims or Interests set forth in the Plan.

B.    *Reorganization Transactions; Effectuating Documents*.

Prior to, on, or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, and subject to the consent rights of the Required Consenting Noteholders in, and the other terms and conditions of, the Plan Sponsor Agreement and the Backstop Agreement, may take any and all actions as may be necessary or appropriate in the Debtors' or the Reorganized Debtors' reasonable discretion to effectuate the Reorganization Transactions described in, approved by, contemplated by, or necessary to effectuate the Plan, in accordance with the Plan Sponsor Agreement, the Backstop Agreement, and the other Definitive Documents, including: (i) the execution  and delivery of any agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, formation, organization, arrangement, continuance, dissolution, sale, purchase, or liquidation, in each case, containing terms that are consistent with the terms of the  Plan; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan; (iii) the filing of the New Corporate Governance Documents and documents relating to the Plan Trust, including any appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, amalgamation, arrangement, continuance, or dissolution pursuant to applicable state or law; (iv) such other transactions that are required to effectuate the Reorganization Transactions, including any sales, mergers, consolidations, restructurings, conversions, dispositions, transfers, issuance of shares, formations (including the formation of new Entities), organizations, dissolutions, release of liens, or liquidations; (v) the solicitation and implementation of the Rights Offering; (vi) the execution and delivery of the New Secured Notes Documents; (vii) the execution and delivery of the New Convertible Notes Documents; and (viii) all other actions that the Debtors or the Reorganized Debtors, as applicable, determine to be necessary or appropriate, including in connection with making filings or recordings that may be required by applicable law in connection with the Plan. The Reorganization Transactions shall be implemented pursuant to the Steps Plan and structured in a manner that takes into account the tax position, and to maximize all tax efficiencies thereof, of creditors, the Debtors, the Reorganized Debtors, the New Company Entities, and the Backstop Parties.

The Confirmation Order shall and shall be deemed to, pursuant to sections 363, 1123, and 1142(b) of the Bankruptcy Code, authorize and direct, among other things, all actions as may be necessary or appropriate by any necessary parties to effectuate any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Reorganization Transactions, the cancellation or transfer of any Existing Equity Interests or cancellation, redemption or reinstatement of Intercompany Interests (as applicable),  the waiver of any rights of

a shareholder under applicable law, and the transfer of any and all rights of such shareholder in compliance with Bankruptcy Code section 1129(b), this Plan, and the Confirmation Order.

Except as otherwise set forth herein, including Article IV hereof, each of the matters provided for by this Plan involving the corporate structure of the Debtors or corporate or related actions to be taken by or required of the Debtors or the Reorganized Debtors, as applicable, whether taken prior to or as of the Effective Date, shall be authorized without the need for any approvals, authorizations, or consents except for those expressly required pursuant to this Plan and the other Definitive Documents (as applicable) or required under the Debtors' or Reorganized Debtors' applicable corporate documents or applicable foreign nonbankruptcy law, consistent with the terms and conditions of this Plan and the other Definitive Documents (as applicable). Such actions may include (i) the appointment of any officers or directors of any Reorganized Debtor or New Company Entity, (ii) the authorization, issuance and distribution of the Plan Securities and any other securities to be authorized, issued and distributed pursuant to this Plan, and (iii) the approval of any guarantee to be granted under the Definitive Documents.

On and after the Effective Date, the Reorganized Debtors and New Company Entities, and the officers and members of the boards of directors thereof, are authorized to and may issue, execute, deliver, File, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan and the securities issued pursuant to this Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to this Plan and the other Definitive Documents (as applicable) or required under the Debtors' or Reorganized Debtors' applicable corporate documents or applicable foreign nonbankruptcy law consistent with the terms and conditions of this Plan and the other Definitive Documents (as applicable).

C.    *Sources of Consideration for Plan Distributions.*

Except as otherwise provided in the Plan or the Confirmation Order, the Reorganized Debtors shall fund distributions or make payments under the Plan with (i) Cash on hand from the Debtors, including Cash from business operations, and (ii) Cash proceeds from the Rights Offering.

D.    *Rights Offering.*

Following entry of the Rights Offering Procedures Order, the Debtors shall conduct the Rights Offering in accordance with the Rights Offering Procedures and Backstop Agreement. Each Holder of Allowed Unsecured Notes Claims will be issued its pro rata share (based on the proportion that its Allowed Unsecured Notes Claim (which definition includes the Guaranty Claim Enhancement) bears to the aggregate amount of (a) all Allowed Unsecured Notes Claims *plus* (b) all Allowed General Unsecured Claims, for which their Holders have elected the New Secured Notes/Equity Treatment) of Subscription Rights to purchase, pursuant to the terms of the Rights Offering Procedures, its allocation of the Rights Offering Securities, *provided that* the exercise of Subscription Rights shall require such Holder to purchase both New Money New Convertible Notes and New Money New Secured Notes, in each case, in the proportion that each of the New Money New Convertible Notes Rights Offering Amount and the New Money New Secured Notes Rights Offering Amount, as applicable, bears to the Rights Offering Amount. Each Eligible Holder of an

Allowed General Unsecured Claim that is a New Secured Notes/Equity Treatment Electing Creditor will be issued its pro rata share (based on the proportion that (a) its Allowed General Unsecured Claim bears to (b) the aggregate amount of (i) all Allowed Unsecured Notes Claims *plus* (ii) all Allowed General Unsecured Claims for which their Holders have elected the New Secured Notes/Equity Treatment) of Subscription Rights to purchase, pursuant to the terms of the Rights Offering Procedures, its allocation of the Rights Offering Securities, *provided that* the exercise of Subscription Rights shall require such Holder to purchase both New Money New Convertible Notes and New Money New Secured Notes, in each case, in the proportion that each of the New Money New Convertible Notes Rights Offering Amount and the New Money New Secured Notes Rights Offering Amount, as applicable bears to the Rights Offering Amount

Each Eligible Holder of an Allowed General Unsecured Claim that wishes to be a New Secured Notes/Equity Treatment Electing Creditor must make such election on its Election Form (as defined in the Rights Offering Procedures) prior to the Election Expiration Time (as defined in the Rights Offering Procedures), and all eligible participants in the Rights Offering must make any elections to exercise Subscription Rights prior to the Rights Expiration Time.

Any transfer of an Allowed Unsecured Notes Claim prior to the earlier of (i) the transferee making a Binding Rights Election (as defined in the Rights Offering Procedures) or (ii) the Rights Offering Expiration Time (as defined in the Rights Offering Procedures) shall include the applicable Subscription Rights. Any transfer of an Allowed General Unsecured Claim prior to the transferee making an election to receive New Secured Notes/Equity Treatment on its Election Form shall include the applicable Subscription Rights.

Pursuant to and subject to the terms and conditions of the Backstop Agreement, the Backstop Parties agreed, on a several and not joint basis, to (a) exercise all Subscription Rights issued to such Backstop Party in connection with the Rights Offering, and (b) acquire such Backstop Party's Backstop Percentage of the Unsubscribed Rights Offering Securities. In exchange for the Backstop Parties' commitments under the Backstop Agreement, the Backstop Parties will receive the Backstop Put Premium and the Expense Reimbursement (as defined in the Backstop Agreement) pursuant to and subject to the terms and conditions of the Backstop Agreement and the Backstop and PSA Order.

The consummation of the Rights Offering is conditioned on the satisfaction or waiver of the conditions specified in the terms of the Backstop Agreement.

E.    *Issuance and Distribution of the Plan Securities.*

1.    <u>General Requirements for the Issuance and Distribution of the New Equity Securities and New Debt Securities</u>.

As a condition to receiving New Equity Securities and New Debt Securities under the Plan, each (x) Holder of an Allowed Unsecured Notes Claim and (y) Eligible Holder of an Allowed General Unsecured Claim that is a New Secured Notes/Equity Treatment Electing Creditor is required to (i) provide satisfactory KYC Information required for the distribution for the New Equity Securities and New Debt Securities, and (ii) execute the New Holdco Shareholder

Agreement; *provided, however*, that the Backstop Parties are deemed Eligible Holders under the Plan.

To receive its entitlement pursuant to the Plan, each Holder of an Allowed Unsecured Notes Claim is required to take one of the following actions:

(i)     on or prior to the Distribution Election Deadline, (a) tender its Unsecured Notes into ATOP and submit the required information, including the Investor Certification, through ATOP[3] and (b) provide to the Distribution Agent (x) satisfactory KYC Information, and (y) a signature page to the New Holdco Shareholder Agreement; or

(ii)    after the Distribution Election Deadline, but on or prior to the date that is one hundred twenty (120) days after the Effective Date, (a) if ATOP is available, (1) tender its Unsecured Notes into ATOP and submit the required information, including the Investor Certification, through ATOP and (2) provide to the Distribution Agent (x) satisfactory KYC Information, and (y) a signature page to the New Holdco Shareholder Agreement or (b) if ATOP is not available, review, complete, and return to the Distribution Agent a duly-completed Letter of Transmittal together with documents required in connection therewith (including (x) satisfactory KYC Information, and (y) a signature page to the New Holdco Shareholder Agreement) and surrender its Unsecured Notes via DWAC.

On or promptly after the Effective Date, the Debtors will reserve the right to request that DTC impose a "chill order" on any Unsecured Notes positions that have not been validated prior to the Distribution Election Deadline.

To receive its entitlement pursuant to the Plan, each Eligible Holder of an Allowed General Unsecured Claim that is a New Secured Notes/Equity Treatment Electing Creditor is required to review, complete, and return a duly-completed Letter of Transmittal together with the documents required in connection therewith (including (a) satisfactory KYC Information, and (b) a signature page to the New Holdco Shareholder Agreement) and provide its DWAC information on or prior to the date that is one hundred twenty (120) days after the Effective Date.

Any New Equity Securities and New Debt Securities to be issued on the Effective Date on account of Allowed General Unsecured Claims of New Secured Notes/Equity Treatment Electing Creditors or Holders of Allowed General Unsecured Notes Claims that did not participate in the ATOP event and that have not (or have not yet) delivered their duly-completed Letter of Transmittal and associated documentation (including (a) satisfactory KYC Information, and (b) a signature page to the New Holdco Shareholder Agreement) will be issued and held in treasury on the Effective Date and will only distributed to such New Secured Notes/Equity Treatment Electing Creditors upon their satisfaction of the requirements specified in the Plan.

---

[3]     The Debtors will commence an ATOP event on or about February 13, 2025 which will be kept open through the Distribution Election Deadline (and which may be run in conjunction with the Rights Offering).

Any (x) Holder of an Allowed Unsecured Notes Claim and (y) Eligible Holder of an Allowed General Unsecured Claim that is a New Secured Notes/Equity Treatment Electing Creditor that fails to comply with the foregoing procedures, as applicable, shall have forfeited its right to receive a distribution of any New Equity Securities and New Debt Securities under the Plan on account of its Allowed Unsecured Notes Claim and/or Allowed General Unsecured Claim, as applicable. Any New Equity Securities and New Debt Securities issued in respect of such forfeited Allowed Unsecured Notes Claim and/or Allowed General Unsecured Claim that is a New Secured Note/Equity Treatment Electing Creditor shall revert (i) to New Holdco, with respect to the New Equity Securities, and (ii) to the applicable Issuer, with respect to the New Debt Securities and in each case shall be cancelled and extinguished.

2.    Issuance and Distribution of the New Equity Securities.

To the extent permitted by applicable Law, the issuance of the New Equity Securities in accordance with this Plan shall be authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.

On the Effective Date, (i) the WOM Mobile Units will be distributed to Chile Newco and (ii) in lieu of the cancellation of the Existing Equity Interests of NC Telecom II AS and issuance of new equity interests in Reorganized NC Telecom II AS to New Holdco, the Existing Equity Interests of NC Telecom II AS will be transferred to New Holdco, in each case in accordance with the Plan Sponsor Agreement, the Plan Term Sheet and the Plan.

The New Holdco Units shall be deemed distributed upon their issuance in registered form in the name of each (x) Holder of an Allowed Unsecured Notes Claim and (y) Eligible Holder of an Allowed General Unsecured Claim that is a New Secured Notes/Equity Treatment Electing Creditor as of the Distribution Record Date. As soon as practicable on or after the Effective Date, the Distribution Agent shall provide each (x) Holder of an Allowed Unsecured Notes Claim and (y) Eligible Holder of an Allowed General Unsecured Claim that is a New Secured Note/Equity Treatment Electing Creditor as of the Distribution Record Date with notice of their final allocation of New Holdco Units.

Any Person's acceptance of any of the New Equity Securities, as applicable, shall be deemed to be its agreement to be bound by the applicable New Corporate Governance Documents, as the same may be amended or modified from time to time following the Effective Date in accordance with their terms. The New Corporate Governance Documents, as applicable, shall be binding on all Entities receiving, and all holders of, the New Equity Securities (and their respective successors and assigns), whether any such New Equity Securities are received or to be received on or after the Effective Date, in each case, pursuant to the Plan and regardless of whether such Entity executes or delivers a signature page to the applicable New Corporate Governance Documents.

All of the shares of New Equity Securities issued pursuant to the Plan shall be, to the extent applicable, duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Equity Securities under the Plan shall be governed by the terms and conditions set forth in the Plan and the New Corporate Governance Documents applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such

distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

All documents, agreements and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan, including the New Corporate Governance Documents and any other agreement or document related thereto or entered into in connection therewith, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity (other than as expressly required by such applicable agreement, document or instrument, or applicable law).

3.      <u>Issuance and Distribution of the New Debt Securities</u>.

The issuance of the New Debt Securities in accordance with the Rights Offering Procedures, Backstop Agreement, the other Definitive Documents (as applicable), and this Plan shall be authorized without the need for any further corporate action and without any further action by the Holders of Claims or Interests.

Each distribution and issuance of the New Debt Securities under the Plan shall be governed by the terms and conditions set forth in the Plan, the New Secured Notes Documents, and the New Convertible Notes Documents, the Rights Offering Procedures, and the Backstop Agreement, as applicable, to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

All documents, agreements and instruments entered into and delivered on or as of the Effective Date contemplated by or in furtherance of the Plan, including the New Secured Notes Documents, the New Convertible Notes Documents any other agreement or document related thereto or entered into in connection therewith, shall become effective and binding in accordance with their respective terms and conditions upon the parties thereto, in each case, without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity (other than as expressly required by such applicable agreement, document or instrument, or applicable law).

On the Effective Date, the guarantees, pledges, liens, mortgages, and other security interests, as applicable, granted pursuant to the New Secured Notes Documents (whether prior to or on the Effective Date) shall be deemed to have been granted in good faith as an inducement to the Eligible Holders of the New Money New Secured Notes to agree to the treatment contemplated by the Plan and (1) shall be deemed to be approved, (2) shall be legal, binding, and creating or continuing enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the New Notes Documents, (3) shall be deemed perfected on the earlier of the date originally perfected and the Effective Date, subject only to such Liens and security interests as may be permitted under the New Secured Notes Documents, as the case may be, and (4) shall not be subject to recharacterization or equitable subordination for any purposes whatsoever and shall not constitute preferential transfers or fraudulent conveyances under the Bankruptcy Code or any applicable non bankruptcy law, including any applicable law of the

Republic of Chile. The Reorganized Debtors and their affiliates granting such Liens and the persons and entities granted such Liens and security interests are authorized and directed to make all filings and recordings, and to obtain all governmental approvals and consents necessary to continue as perfect or to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection or continuance of perfection shall occur automatically by virtue of the entry of the Confirmation Order and no such filings, recordings, approvals, and consents shall be necessary), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

F.    *Corporate Existence*.

Unless otherwise determined by the Required Consenting Noteholders with the reasonable consent of the Debtors, on or prior to the Effective Date, each of WOM Mobile S.A., WOM S.A., Conect S.A., and Multikom S.A. shall each be converted to a s*ociedad por acciones*.  Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Effective Date, each Reorganized Debtor, as applicable, shall continue to exist as a separate *sociedad anónima*, s*ociedad por acciones*, s*ociété anonyme, aksjeselskap*, corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which the particular Debtor is incorporated or formed and pursuant to their respective certificate of incorporation and bylaws (or other similar formation and governance documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other similar formation and governance documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite formalities, filings, and/or publications required under applicable state, provincial, local, or federal law).

G.    *Exemption from Registration*.

The issuance of the New Secured Notes and the New Convertible Notes (and all shares issuable upon conversion thereof) under the Plan shall be exempt from registration under applicable U.S. securities laws pursuant to section 4(a)(2) of the Securities Act and Regulation S under the Securities Act and similar Blue Sky Laws provisions, as applicable, and any indentures governing such notes shall be exempt from qualification under the Trust Indenture Act of 1939 pursuant to Section 304(b) thereof.

Each of the New Secured Notes and the New Convertible Notes (and all shares issuable upon conversion thereof) will be considered "restricted securities" and may not be offered, sold, resold, pledged, delivered, allotted or otherwise transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as Rule 144A or Regulation S under the Securities Act, or under certain conditions, the resale provisions of Rule 144 of the Securities Act and in compliance with any applicable state securities laws. Such securities shall bear a legend restricting their transferability until no longer required under applicable requirements of the Securities Act and state securities laws.

The issuance of the New Holdco Units under the Plan shall be exempt from registration under applicable securities law pursuant to the exemption provided by section 1145 of the Bankruptcy Code or other exemption from such registration.  The New Holdco Units may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the Holder is an "underwriter" with respect to such Securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

In addition, none of Chile Newco, Reorganized WOM Mobile S.A., the New Convertible Notes (or the shares issuable upon conversion of the New Convertible Notes) nor the New Secured Notes have been or will be registered in the Securities Registry or in the Foreign Securities Registry of the CMF.  The Debtors represent that neither the New Convertible Notes (or the shares issuable upon conversion of the New Convertible Notes) nor the New Secured Notes shall be publicly offered in Chile and, as a result, neither Chile Newco nor Reorganized WOM Mobile S.A. will be overseen by the CMF or make periodic disclosures (which registered issuers are required to make under applicable Law).  Each and all communication used to offer the New Convertible Notes (or the shares issuable upon conversion of the New Convertible Notes) and the New Secured Notes shall include a legend outlining the aforementioned.

To the extent required under applicable Chilean securities law and regulation, prior to the offering of the New Convertible Notes and New Secured Notes, Chile Newco and Reorganized WOM Mobile S.A. shall file a notice to the CMF describing certain information about the applicable Plan Securities, as set forth under applicable Chilean regulation.  No approval or consent from the CMF will be sought.

Should the Reorganized Debtors elect, on or after the Effective Date, to reflect all or any portion of the ownership of the New Holdco Units, the New Secured Notes and/or the New Convertible Notes through the facilities of DTC, the Reorganized Debtors shall not be required to provide any further evidence other than the Plan or Final Order with respect to the treatment of such applicable portion of the New Holdco Units, the New Secured Notes and/or the New Convertible Notes, and such Plan or Confirmation Order shall be deemed to be legal and binding obligations of the Reorganized Debtors, as applicable, in all respects.

DTC shall be required to accept and conclusively rely upon the Plan and Confirmation Order in lieu of a legal opinion regarding whether the New Holdco Units, the New Secured Notes and/or the New Convertible Notes are exempt from registration pursuant to applicable securities Laws and/or eligible for DTC book-entry delivery, settlement, and depository services.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) may require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Holdco Units, the New Secured Notes and/or the New Convertible Notes are exempt from registration.

H.       *New Corporate Governance Documents*.

To the extent permitted by applicable Law, on or immediately prior to the Effective Date, the New Corporate Governance Documents shall be adopted automatically by the Reorganized Debtors and New Company Entities, as applicable.  To the extent required under the Plan or

applicable non-bankruptcy law, the Reorganized Debtors and New Company Entities shall file their respective New Corporate Governance Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation, and comply with any other formality required in accordance with the corporate laws of the respective states, provinces, or countries of incorporation.  The New Corporate Governance Documents shall, among other things: (1) authorize the issuance of the Plan Securities; and (2) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity securities of the Debtors.  After the Effective Date, each Reorganized Debtor may amend and restate its New Corporate Governance Documents as permitted by the laws of its respective jurisdiction of formation and the terms of the New Corporate Governance Documents.

I.    *Officers and Boards of Directors.*

On the Effective Date, the New Board shall initially consist of 5 individuals, consisting of the Chief Executive Officer of WOM Mobile S.A. as of the Effective Date and the Initial AHG Directors.  The composition of the boards of directors or managers, as applicable, of each Reorganized Debtor (if any and to the extent known) shall be identified no later than the Confirmation Hearing or otherwise in accordance with section 1129(a)(5) of the Bankruptcy Code.

J.    *Management Incentive Plan.*

Promptly after the Effective Date, the New Board shall adopt the Management Incentive Plan, with amounts, structure, awards and terms of the Management Incentive Plan to be determined by the New Board in its business judgment and reasonably acceptable to the Required Consenting Noteholders.  All New Holdco Units issued under the Management Incentive Plan will be dilutive of all other New Holdco Units.

K.    *Vesting of Assets in the Reorganized Debtors.*

Except as otherwise provided in the Plan or the Plan Supplement, or in any agreement, instrument or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all Assets in each Debtor's Estate, including all claims, rights, and Causes of Action (other than the Plan Trust Assets, the Initial GUC Cash Pool Funding, and Plan Trust Avoidance Actions included in the Schedule of Retained Causes of Action that may be needed to reconcile Disputed General Unsecured Claims, which shall be transferred to the Plan Trust), all Executory Contracts and Unexpired Leases assumed but not assigned by any of the Debtors, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges and/or other encumbrances, except for Liens held by the DIP Secured Parties which shall be released in accordance with ARTICLE VIII.B hereof. On and after the Effective Date, except as otherwise provided herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise or settle any Claims or Interests with respect to, or Causes of Action vested in, the Reorganized Debtors without further notice to, action, or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

L.    *Cancellation of Existing Documents, Instruments, and Securities.*

Except as otherwise provided in the Plan, or any agreement, instrument, or other document incorporated in the Plan, or the Plan Supplement, on the Effective Date: (i) the Unsecured Notes, the other Unsecured Notes Documents, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing or creating indebtedness or obligations of (or ownership interest in) the Debtors that are Reinstated pursuant to the Plan (if any)) shall be deemed canceled, discharged and of no force or effect, without further action or approval of the Bankruptcy Court, the Debtors, or any Holder and the Unsecured Notes Trustees and their respective agents, successors and assigns shall each be automatically and fully released and discharged of and from all duties as applicable under the respective Unsecured Notes Documents, except, as applicable, as necessary to (a) maintain, enforce, or exercise the rights, Claims and interests (including, without limitation, any right or obligation to compensation, indemnification, expense reimbursement, or contribution, or any other Claim or entitlement that the Unsecured Notes Trustees may have under the Plan) of the Unsecured Notes Trustees, and, as applicable, any predecessor thereof vis-à-vis parties other than the Released Parties, (b) allow the receipt of and distributions under the Plan and, as applicable, the subsequent distribution of such amounts in accordance with the respective terms of the Unsecured Notes Documents, (c) preserve any rights of the Unsecured Notes Trustees and any predecessor thereof as against any money or property distributable to Holders of Unsecured Notes Claims, including any priority in respect of payment and the Indenture Trustee Charging Lien pursuant to the terms of the Unsecured Notes Documents, and (d) allow the Unsecured Notes Trustees to appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court, including, without limitation, to enforce the respective obligations owed to such parties under the Plan or the Unsecured Notes Documents; and (ii) the obligations of the Debtors pursuant, relating, or pertaining to any other contracts, agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, loans, credit facilities (including, without limitation, the DIP Credit Facility), purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors (except such agreements, indentures, certificates, notes, or other instruments or documents evidencing or creating indebtedness or obligations of the Debtors that are Reinstated pursuant to the Plan) shall be released and discharged; except that the DIP Loan Documents shall continue in effect solely for the purpose of: (a) allowing the DIP Lenders to receive distributions from the Debtors under the Plan as set forth in Article V of the Plan; (b) preserving the DIP  Lenders' and the DIP Agents' right to all amounts due under the DIP Loan Documents; and (c) preserving the DIP Agents' and the DIP Lenders' right to indemnification from the Debtors pursuant and subject to the terms of the DIP Loan Documents.

Subsequent to the performance by the Unsecured Notes Trustees of their respective obligations under the Plan, the Unsecured Notes Trustees and their respective agents shall be relieved of all further duties and responsibilities related to the Unsecured Notes.

To the extent the Unsecured Notes Trustees, at the request of the Required Consenting Noteholders or the Reorganized Debtors, provide additional services or incur costs or expenses, including professional fees, related to or in connection with the Plan, the Confirmation Order, the Unsecured Notes Documents from and after the Effective Date, the Unsecured Notes Trustees, in

their respective capacities as such, shall be entitled to receive from the Reorganized Debtors, without further Bankruptcy Court approval, compensation in full for such post-Effective Date services and reimbursement of reasonable and documented out-of-pocket expenses and be indemnified by the Reorganized Debtors against any and all losses, liabilities or expenses (including attorneys' fees and expenses), incurred in connection with such post-Effective Date services. The payment of such compensation and expenses and indemnity will be made promptly by the Reorganized Debtors upon receipt by the Reorganized Debtors of reasonably detailed invoices from the applicable Unsecured Notes Trustee or as otherwise agreed to by the Unsecured Notes Trustees and the Debtors. In connection with any such post-Effective Date services, the Unsecured Notes Trustees shall be entitled to the releases provided herein related to the administration and implementation of the Plan. For the avoidance of doubt, the Debtors, the Reorganized Debtors, the Unsecured Notes Trustees and the Distribution Agent may (x) make post-Effective Date distributions or take such other action to exercise their rights (including asserting the Indenture Trustee Charging Lien against any such post-Effective Date distributions) and discharge their obligations relating to the interests of the Holders of such Claims in accordance with the Plan and the Unsecured Notes Documents and (y) take any other action necessary to implement the terms of the Plan.

If the record Holder of any of the Unsecured Notes is represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then each such Holder of the Unsecured Notes shall be deemed to have surrendered such Holder's note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

The commitments and obligations, if any, of each DIP Lender to extend any further or future credit or financial accommodations to any of the Debtors, any of their respective subsidiaries, or any of their respective successors or assigns under the DIP Loan Documents (as defined in the Final DIP Order), as applicable, shall fully terminate and be of no further force or effect on the Effective Date.

Pursuant to the Steps Plan, the Unsecured Notes Claims shall be contributed to WOM Mobile S.A. through New Holdco, Chile PIF, and Chile Newco to WOM Mobile S.A. Notwithstanding anything set forth in this Plan or the Confirmation Order, the WOM Mobile/Kenbourne Unsecured Note Intercompany Claim shall survive any cancellation, conversion, or discharge under the Plan solely with respect to Kenbourne, and, from and after the Effective Date, the WOM Mobile/Kenbourne Unsecured Note Intercompany Claim shall remain a debt owed by Kenbourne to Reorganized WOM Mobile S.A. The WOM Mobile/Kenbourne Unsecured Note Intercompany Claim shall be extinguished by compensation of claims, discharged, cancelled, and released upon the merger of Reorganized WOM Mobile S.A. and Kenbourne, which shall occur on or after the Effective Date. Nothing in this paragraph shall affect (i) the cancellation of the Unsecured Notes under Article IV.L. of this Plan, or (ii) any provision of Article VIII of this Plan with respect to any Debtor other than Kenbourne. The discharge, injunction, and release provisions of Article VIII of this Plan and all discharge, injunction, and release provisions of the Confirmation Order shall apply on and after the Effective Date to all holders of Claims other than the WOM Mobile/Kenbourne Unsecured Note Intercompany Claim, and all holders of Claims other than Reorganized WOM Mobile S.A. (solely with respect to the WOM Mobile/Kenbourne Unsecured Note Intercompany Claim).

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in the Plan shall be deemed null and void and shall be of no force and effect solely in connection with such cancellations, terminations, satisfactions, releases or discharges. Except as set forth in the Plan and the Confirmation Order, nothing contained in the Plan shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under (i) any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder or (ii) Claims or Interests that are Reinstated pursuant to the terms of the Plan (if any).

M.    *Corporate Action.*

Upon the Effective Date, or as soon thereafter as is reasonably practicable, all actions contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, and the Debtors or the Reorganized Debtors, as applicable, shall be authorized to take all further corporate actions necessary to effectuate the Plan and the Reorganization Transactions, including, as applicable: (i) the issuance of the Plan Securities; (ii) the selection and appointment of the directors and officers for the New Company Entities and the Reorganized Debtors; (iii) implementation of the Reorganization Transactions; and (iv) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date).  To the extent permitted by applicable Law, upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the New Company Entities and the Reorganized Debtors, and any corporate action required by the Debtors, the New Company Entities, or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the shareholders, directors, or officers of the Debtors, the New Company Entities, or the Reorganized Debtors, unless required by applicable Chilean Law. On or before the Effective Date, as applicable, the appropriate officers of the Debtors, the New Company Entities, or the Reorganized Debtors shall be authorized to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan), in the name of and on behalf of the New Company Entities and the other Reorganized Debtors, as applicable and to the extent not previously authorized by the Bankruptcy Court. To the extent permitted by applicable Law, the authorizations and approvals contemplated by this Article IV shall be effective notwithstanding any requirements under non-bankruptcy law.

N.    *Wind-Down of Kenbourne Estate.*

Prior to the Effective Date, unless otherwise determined by the Required Consenting Noteholders, any and all of Kenbourne's Assets shall remain assets of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code and on the Effective Date such Assets shall be transferred to and vest in Reorganized WOM S.A. or another entity owned directly or indirectly by New Holdco as determined by the Required Consenting Noteholders.  The Confirmation Order shall be deemed to, pursuant to sections 363 and 1123 of the Bankruptcy Code, authorize, among other things, the winding down and dissolution of Kenbourne's Estate.

On the Effective Date, the Intercompany Interests in Kenbourne held by NC Telecom II AS shall be Reinstated solely for the purpose of administering the winding down and dissolution of Kenbourne. The Reorganized Debtors shall pay the reasonable and documented expenses associated with the wind down and dissolution of Kenbourne.

O.    *Exemption From Certain Taxes and Fees.*

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code and applicable law, the (i) issuance, transfer or exchange of any securities, instruments, or documents, (ii) the creation of any Lien, mortgage, deed of trust or other security interest, (iii) any transfers (directly or indirectly) of property pursuant to the Plan or the Plan Supplement, (iv) any assumption, assignment, or sale by the Debtors of their interests in Executory Contracts or Unexpired Leases pursuant to section 365(a) of the Bankruptcy Code, (v) the grant of collateral under the New Secured Notes Documents, as applicable, and (vi) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under in furtherance of, or in connection with, the Plan, including the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sale or use tax, mortgage recording tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment.

P.    *Preservation of Causes of Action.*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article VIII, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all of the Retained Causes of Action, including any Retained Causes of Action specifically enumerated in the Plan, the Confirmation Order, the Plan Supplement, or the Disclosure Statement. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Retained Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Retained Causes of Action.

No Entity may rely on the absence of a specific reference in the Plan, the Confirmation Order, the Plan Supplement, or the Disclosure Statement to any Retained Cause of Action against it as any indication that the Debtors or the Reorganized Debtors, as applicable, shall not pursue any and all available Retained Causes of Action against it. Unless such Retained Causes of Action against any Entity are expressly waived, relinquished, exculpated, released, compromised, assigned, or settled in the Plan or a Final Order, all such Retained Causes of Action shall be expressly reserved by the Debtors (pre-Effective Date) or the Reorganized Debtors (post-Effective Date), as applicable, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial,

equitable, or otherwise), or laches, shall apply to any Retained Cause of Action upon, after, or as a consequence of the occurrence of the Confirmation Date or the Effective Date.

The Reorganized Debtors reserve and shall retain such Retained Causes of Action of the Debtors notwithstanding the rejection or repudiation of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. The applicable Reorganized Debtors, through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Retained Causes of Action on and after the Effective Date.

**Notwithstanding anything to the contrary contained in this <u>Article IV.P.</u>, on the Effective Date, all Avoidance Actions other than LT Claims shall be Retained Causes of Action. All LT Claims that have not been settled, waived, and/or released as of the Effective Date and the Plan Trust Avoidance Actions are preserved and shall be transferred to the Plan Trust on the Effective Date to be used solely in the Claims reconciliation process for the purpose of reducing the GUC Cash Pool General Unsecured Claim of such GUC Cash Pool Treatment Creditor (by setoff or otherwise). To the extent that, notwithstanding the foregoing provision, the Plan Trustee recovers any property or proceeds on account of any Plan Trust Avoidance Action, the Plan Trustee shall promptly turn over such property or proceeds to the Reorganized Debtors. To the extent that, notwithstanding the foregoing prohibition, the Plan Trustee recovers any property or proceeds on account of any Plan Trust Avoidance Action, the Plan Trustee shall promptly turn over such property or proceeds to the Reorganized Debtors.**

Q.    *Insurance Policies.*

1.    <u>Director and Officer Liability Insurance</u>.

On the Effective Date, the Reorganized Debtors shall be deemed to have assumed all D&O Policies with respect to the Debtors' directors, managers, officers, and employees, as applicable, who served in such capacity at any time on or prior to the Effective Date pursuant to sections 105 and 365 of the Bankruptcy Code. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of the D&O Policies.

After the Effective Date, none of the Debtors or the Reorganized Debtors shall terminate or otherwise reduce the coverage under any D&O Policies in effect on the Effective Date with respect to conduct occurring prior thereto, and all officers, directors, managers, and employees of the Debtors who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy subject to the terms thereof regardless of whether such officers, directors, managers, or employees remain in such positions after the Effective Date, *provided* that nothing in this paragraph shall (i) preclude a reduction in the amount of available policy proceeds under the D&O Policies through payment of claims under any D&O Policies to or on behalf of the Debtors or the Reorganized Debtors, to the extent each D&O Policy provides for such reduction, or (ii) obligate the Reorganized Debtors to renew any existing D&O Policies.

2.    <u>Assumption of Insurance Policies</u>.

Notwithstanding anything to the contrary in the Definitive Documents, the Bar Date Order, any other document related to any of the foregoing, or any other order of the Bankruptcy

Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, or confers Bankruptcy Court jurisdiction):

> (a)     on the Effective Date, each Insurance Policy shall be assumed by the applicable Reorganized Debtor pursuant to sections 105 and 365 of the Bankruptcy Code in its entirety, such that, on and after the Effective Date, the applicable Reorganized Debtors shall become and remain liable in full for all of their and the Debtors' obligations (as applicable) under the respective Insurance Policy, regardless of whether such obligations arise before or after the Effective Date and Chubb shall only be required to file a Proof of Claim, Administrative Claim or Cure Claim to the extent any amounts become liquidated, due and owing under any applicable Insurance Policy issued by Chubb on or before any applicable bar date; *provided that* nothing in this provision shall change, modify, or otherwise supersede the stipulation between Chubb and the Debtors approved by the Bankruptcy Court and the respective Bankruptcy Court order [D.I. 942].  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the Reorganized Debtors' assumption of each of such Insurance Policies.

> (a)     nothing in the Definitive Documents shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the rights or obligations of any Insurer (b) any rights or obligations of the Debtors or the Reorganized Debtors arising out of or under any Insurance Policy or (c) the terms and conditions of the Insurance Policies;

> (b)     the Insurers, the Debtors, and the Reorganized Debtors, as applicable, shall retain all rights and defenses under the Insurance Policies, and the Insurance Policies shall apply to, and be enforceable by and against, the insureds, Insurers and the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Petition Date, and for all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Insurance Policies shall control; and

> (c)     the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article VIII.D hereof, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit (but in each case, in accordance with the terms of the applicable Insurance Policies and/or applicable non-bankruptcy law): (a) claimants with valid direct action claims against Chubb under applicable non-bankruptcy law to proceed with their claims; (b) Chubb to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court: (i) claims where a claimant asserts a direct claim against any Insurer under applicable non-bankruptcy law, (ii) claims where an order has been entered by this Bankruptcy Court granting a claimant relief from the automatic stay or the injunction set forth in Article VIII.D hereof to proceed with its claim; and (iii) all costs in relation to each of the foregoing; and (c)  solely after the Effective Date, Chubb to cancel any Insurance Policies issued by Chubb, and take other actions relating thereto (including effectuating a setoff or recoupment).

> For the avoidance of doubt, nothing contained in the Plan or the Confirmation Order shall operate to require any Insurer to indemnify or pay the liability for any claim that it would not have been required to pay in the absence of the Plan and Confirmation Order.

3.      <u>Insurance Neutrality</u>.

Nothing in the Plan or the Confirmation Order shall in any way operate to, or have the effect of, impairing, altering, supplementing, changing, expanding, decreasing, or modifying (a) the rights or obligations of any Insurer or (b) any rights or obligations of the Debtors or the Reorganized Debtors arising out of or under any Insurance Policy.  The Insurers, the Debtors, and Reorganized Debtors, as applicable, shall retain all rights and defenses under such Insurance Policies, and such Insurance Policies shall apply to, and be enforceable by and against, the insureds and the Reorganized Debtors in the same manner and according to the same terms and practices applicable to the Debtors, as existed prior to the Effective Date. Further, for all issues relating to insurance coverage, the provisions, terms, conditions, and limitations of the Insurance Policies shall control. For the avoidance of doubt, nothing contained in the Plan or the Confirmation Order shall operate to require any Insurer to indemnify or pay the liability for any claim that it would not have been required to pay in the absence of the Plan and Confirmation Order.

R.      *Indemnification of Directors, Managers, Officers, and Employees*.

For purposes of the Plan, the Indemnification Obligations shall be assumed and irrevocable and shall survive Confirmation of the Plan and the Effective Date.  On and after the Effective Date, the coverage under any of the D&O Policies in effect on the Petition Date shall not be terminated or otherwise reduced by or on behalf of the Debtors, and all directors,  managers, officers, and employees of the Debtors at any time shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors, managers, officers, and/or employees remain in such positions after the Effective Date.

Notwithstanding anything to the contrary herein, any obligation of the Debtors to indemnify, defend, reimburse, or limit the liability of any Non-Released Party in any capacity against any claim, demand, Cause of Action, suit, proceeding, judgment, fine, loss, damage, or other amount, whether under applicable law or in the Debtors' bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment, consultant, or subcontractor agreements or other contracts, or otherwise, shall not be assumed and shall terminate and be discharged upon Confirmation of the Plan.

S.      *Employee Obligations*

The Reorganized Debtors shall honor the Debtors' obligations under the Employee Obligation Documents and, to the extent required by applicable law, the Debtors' obligations under the Employee Obligation Documents shall become obligations of the Reorganized Debtors in accordance with their terms.  The Employee Obligation Documents will be deemed assumed as of the Effective Date and the obligations thereunder shall be paid in the ordinary course consistent with the terms thereof, subject to the rights of the Reorganized Debtors to dispute and contest the validity of all asserted obligations; *provided*, that, the consummation of the Reorganization Transactions and any associated organizational changes shall not constitute a "change of control," "change in control," or other similar event under any of the Employee Obligation Documents. Notwithstanding anything else set forth in this paragraph, the cure provisions of <u>Article VII</u> hereof shall apply to any Employee Obligation Document arising from an Executory Contract assumed in accordance with the provisions of <u>Article VII</u> hereof.

Notwithstanding anything to the contrary in the foregoing paragraph, the Reorganized Debtors shall assume, continue, and maintain in all respects, and shall not in any way reduce or diminish, the bonus programs approved by the Bankruptcy Court pursuant to the KEIP/KERP Order in accordance with the respective terms of such programs, including by timely paying all awards earned by the participants therein in accordance with the terms thereof.

On the Effective Date, each Employment Agreement will be deemed assumed and shall become obligations of the Reorganized Debtors in accordance with their terms.

Notwithstanding anything to the contrary in this Plan, as of the Effective Date, any provision of an Employee Obligation Document that provides for equity-based awards, including any termination-related provisions with respect to equity-based awards, shall be deemed cancelled and shall be of no further force and effect, whether surrendered for cancellation or otherwise.

Notwithstanding anything to the contrary in this Plan, in accordance with section 1129(a)(13) of the Bankruptcy Code, the Reorganized Debtors shall continue to honor all retiree benefits, as such term is defined in section 1114(a) of the Bankruptcy Code, as and to the extent required by the agreements giving rise to such obligations.

T.      *Workers' Compensation Programs.*

As of the Effective Date, the Reorganized Debtors shall continue to honor their obligations under: (i) all applicable workers' compensation laws in jurisdictions in which the Reorganized Debtors operate or the Debtors previously operated; and (ii) the Debtors' (a) written contracts, agreements, and agreements of indemnity, in each case relating to workers' compensation, (b) self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and (c) workers' compensation insurance policies and programs. All Proofs of Claim filed by the Debtors' current or former employees on account of workers' compensation claims shall be deemed withdrawn automatically and without any further notice to or action, order, or approval of the Bankruptcy Court based upon the treatment provided for herein; *provided*, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs and plans.

U.      *Closing of the Chapter 11 Cases.*

On and after the Effective Date, the Reorganized Debtors shall be permitted to close one or more of the Debtors' Chapter 11 Cases in accordance with Bankruptcy Rule 3022.

V.      *Plan Trust*.

1.      <u>Establishment of the Plan Trust</u>.

On or prior to the Effective Date, the Debtors will establish the Plan Trust. The Plan Trust will have no other objectives other than as set forth in the Plan Trust Agreement.  The Plan Trustee shall fulfill the Plan Trust's purpose in accordance with the Plan Trust Agreement, which for the avoidance of doubt shall include the reconciliation of Class 4 General Unsecured Claims.

The Plan Trust Agreement shall be Filed in the Plan Supplement, in form and substance consistent with the Plan Sponsor Agreement, the Backstop Agreement, and all annexes to each of

the foregoing and reasonably acceptable to the Debtors, the Committee, and the Required Consenting Noteholders.  The Plan Trust Agreement shall contain the mechanics for distribution of the Plan Trust Interests and holdbacks of Plan Trust Interests for Disputed Claims.  On the Effective Date, the Plan Trust Agreement shall be executed by the Debtors and the Plan Trustee. On the Effective Date, the Plan Trust Assets and the Initial GUC Cash Pool Funding shall vest in the Plan Trust free and clear of all Claims, Interests, Liens, and other encumbrances, except as otherwise provided under the Plan.  All expenses (including taxes) incurred by the Plan Trust shall be recorded on the books and records (and reported on all applicable tax returns) as expenses of the Plan Trust.

The Reorganized Debtors shall, upon reasonable notice, cooperate with the Plan Trustee in the administration of the Plan Trust, including by providing the Plan Trustee reasonable access, during normal business hours, to the Reorganized Debtors' personnel and books and records, to the extent the Reorganized Debtors have such information and/or documents, to enable the Plan Trustee to perform its duties expressly authorized hereunder and as set forth in greater detail in the Plan Trust Agreement. Access and documents that do not require the Reorganized Debtors or their personnel to expend material time or resources outside the ordinary course of business shall be provided to the Plan Trust and Plan Trustee without charge.  To the extent that the Reorganized Debtors determine that responding to any particular information request from the Plan Trustee requires the Reorganized Debtors or their personnel to expend material time or resources outside the ordinary course of their operations or responsibilities, the Reorganized Debtors or their personnel shall communicate the same to the Plan Trustee, together with a range of expected costs to satisfy such information request. To the extent the parties are unable to reach an agreement on the amount and payment of such costs, the Reorganized Debtors shall not be required to satisfy such request unless otherwise ordered by the Bankruptcy Court.

2.    <u>Purpose of the Plan Trust.</u>

The Plan Trust shall be established for the purposes of: (i) holding, administering, liquidating, and distributing the Plan Trust Assets for the benefit of the Plan Trust Beneficiaries in accordance with the terms and conditions of the Plan, the Confirmation Order and the Plan Trust Agreement; (ii) prosecuting and monetizing the LT Claims (if any) and distributing Litigation Proceeds in a timely manner for the benefit of the Plan Trust Beneficiaries in accordance with the Plan, the Confirmation Order, and the Plan Trust Agreement; (iii) performing such other functions as are provided for in the Plan or the Plan Trust Agreement; (iv) distributing the GUC Cash Pool to GUC Cash Pool Treatment Creditors; and (v) reconciling Class 4 General Unsecured Claims. The liquidation of the LT Claims (if any) may be accomplished either through the prosecution, compromise and settlement, abandonment, or dismissal of any or all LT Claims (if any) or otherwise, in accordance with the Plan, the Confirmation Order, and the Plan Trust Agreement. Distributions of the Plan Trust Assets for the benefit of the Plan Trust Beneficiaries as provided for under the Plan, the Confirmation Order, and the Plan Trust Agreement shall be made in accordance with Treasury Regulations section 301.7701-4(d).  The Plan Trust is intended to qualify as a liquidating trust pursuant to Treasury Regulations section 301.7701-4(d) and shall have no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Plan Trust.  The Plan Trust shall not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein or in the Plan Trust Agreement.

The Bankruptcy Court shall have continuing jurisdiction over the Plan Trust.

3.       The Plan Trustee.

The identity of the Plan Trustee shall be set forth by the Debtors in the Plan Supplement, subject to the consent of the Required Consenting Noteholders and the Committee.  As further set forth in the Plan Supplement, the Plan Trustee shall succeed to all privileges of the Debtors, including but not limited to the attorney-client privilege.

4.       Transferability of Plan Trust Interests

Any and all Plan Trust Interests shall not be evidenced by any certificate, security, receipt or in any other form or manner whatsoever, except on the books and records of the Debtors, Reorganized Debtors, or the Plan Trust, as applicable.  Further, any and all Plan Trust Interests shall be nontransferable and nonassignable except by will, intestate, succession, or operation of law.  To the extent beneficial interests in the Plan Trust are deemed to be "securities" as defined in section 2(a)(1) of the Securities Act, section 101 of the Bankruptcy Code, and applicable securities laws, the exemption provisions of section 1145 of the Bankruptcy Code would be satisfied and such securities would be exempt from registration. To the extent that any Distributable Assets (as defined in the Plan Trust Agreement) cannot be transferred to the Plan Trust because of a restriction on transferability under applicable non-bankruptcy law that is not superseded or preempted by Section 1123 of the Bankruptcy Code or any other provision of the Bankruptcy Code, such Distributable Assets shall be deemed to have been retained by the Debtors or their successor (other than for tax purposes) and the Plan Trustee shall be deemed to have been designated as a representative of the Debtors or their successor pursuant to Section 1123(b)(3)(B) of the Bankruptcy Code for the limited purpose to enforce and pursue such Distributable Assets on the behalf of the Debtors or their successor. Notwithstanding the foregoing, all net proceeds of the Distributable Assets shall be distributed consistent with the provisions of the Plan, the Confirmation Order, and the Plan Trust Agreement.

5.       Certain Tax Matters.

For all U.S. federal income tax purposes, the transfer of the Plan Trust Assets to the Plan Trust shall be made for the benefit and on behalf of the Plan Trust Beneficiaries. The Plan Trust Assets comprising the Plan Trust shall be treated for federal income tax purposes as first being transferred by the Debtors to the Plan Trust Beneficiaries pursuant to the Plan in exchange for their Allowed Claims and then by the Plan Trust Beneficiaries to the Plan Trust. The Plan Trust is intended to qualify as a "grantor trust" for federal income tax purposes with the Plan Trust Beneficiaries treated as grantors and owners of the Plan Trust. As such, the Plan Trust Beneficiaries shall be responsible for the payment (and reporting) of tax on their respective allocable share of the taxable income of the Plan Trust. As soon as reasonably practicable after the Effective Date, the Plan Trustee (to the extent that the Plan Trustee deems it necessary or appropriate in its sole discretion) will determine the fair market value of the Plan Trust Assets as of the Effective Date, and all parties must consistently use such valuation for all U.S. federal income tax purposes, such as in the determination of gain, loss, and tax basis. The Bankruptcy Court shall have jurisdiction over any dispute regarding such valuation.

W.       *Retention of Books and Records*.

Upon the occurrence of the Effective Date, the Debtors' books and records shall be transferred to the Reorganized Debtors, which shall continue to preserve all financial books and records, emails, and other financial documents relating to the Debtors' business that are currently in the Debtors' possession, custody or control.

## ARTICLE V
## DISTRIBUTIONS.

*A.*      *Timing and Calculation of Amounts to Be Distributed.*

1.      <u>GUC Cash Pool Treatment Creditors.</u>

On the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall distribute the Initial GUC Cash Pool Funding to the GUC Cash Pool Distribution Agent.  Until the occurrence of the GUC Cash Pool Final Reconciliation Date, the Reorganized Debtors shall make one or more Interim GUC Cash Pool Fundings, beginning on the date agreed by the GUC Cash Pool Distribution Agent and the Reorganized Debtors that is between the 90th and 180th day after the Effective Date and no more than every six months thereafter, in amounts to be agreed between the Reorganized Debtors and the GUC Cash Pool Distribution Agent (both acting reasonably), taking into account, among other things, the amounts of the then-Disputed General Unsecured Claims and Administrative Claims.  On or as soon as practicable after GUC Cash Pool Final Reconciliation Date, the Reorganized Debtors shall distribute the Remaining GUC Cash Pool Funding to the GUC Cash Pool Distribution Agent. The GUC Cash Pool Distribution Agent shall hold the Initial GUC Cash Pool Funding, any Interim GUC Cash Pool Fundings, and the Remaining GUC Cash Pool Funding in trust for (a) the Holders of Allowed GUC Cash Pool General Unsecured Claims and (b) the Reorganized Debtors, to the extent that, after calculation of the final amount of the GUC Cash Pool on the GUC Cash Pool Final Reconciliation Date, the amounts funded by the Reorganized Debtors to the GUC Cash Pool Distribution Agent exceed the final amount of the GUC Cash Pool.  In the event of any excess funding as provided in (b) in the immediately preceding sentence, the GUC Cash Pool Distribution Agent shall pay over such excess funding to the Reorganized Debtors within three (3) Business Days of the GUC Cash Pool Final Reconciliation Date.

Except (a) as otherwise provided herein, (b) upon a Final Order, or (c) as otherwise agreed to by the Plan Trustee (with the consent of the Reorganized Debtors, not to be unreasonably withheld), and the Holder of the applicable GUC Cash Pool General Unsecured Claim, as soon as reasonably practicable following the Initial GUC Cash Pool Distribution Date, the GUC Cash Pool Distribution Agent shall make initial distributions under the Plan on account of each Holder of an Allowed GUC Cash Pool General Claim up to the full amount of the distributions that the Plan provides for Allowed GUC Cash Pool General Unsecured Claims.

On each Semi-Annual Distribution Date, the GUC Cash Pool Distribution Agent, with the consent of the Reorganized Debtors (not to be unreasonably withheld), shall make the distributions required to be made on account of Allowed GUC Cash Pool General Unsecured Claims under the Plan on such date; *provided* that, that the GUC Cash Pool Distribution Agent may, in its reasonable discretion and with the consent of the Reorganized Debtors (not to be unreasonably withheld), determine not to make a distribution on a Semi-Annual Distribution Date in the event any such distribution would be in an amount determined to be immaterial.

Any distribution that is not made on the Initial General Unsecured Claims Distribution Date or on any other date specified herein because the GUC Cash Pool General Unsecured Claim that would have been entitled to receive that distribution is not an Allowed Claim on such date, shall be distributed on the first Semi-Annual Distribution Date after such Claim is Allowed (to the extent a distribution is made on such Semi-Annual Distribution Date).

The GUC Cash Pool Distribution Agent shall be authorized, with the consent of the Reorganized Debtors (not to be unreasonably withheld), to make partial distributions as soon as reasonably practicable following the Initial GUC Cash Pool Distribution Date and each Semi-Annual Distribution Date on account of Allowed GUC Cash Pool General Unsecured Claims before all GUC Cash Pool General Unsecured Claims are Allowed.  If and to the extent that there are Disputed GUC Cash Pool General Unsecured Claims, the GUC Cash Pool Distribution Agent may establish Disputed Claim Reserves, and distributions on account of any such Disputed GUC Cash Pool General Claims shall be made, pursuant to the provisions set forth in Article VI.

In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

Holders of GUC Cash Pool General Unsecured Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Notwithstanding anything herein to the contrary, on the Effective Date, the Debtors or Reorganized Debtors, as applicable, shall also distribute to the GUC Cash Pool Distribution Agent (i) any GUC Litigation Proceeds and (ii) 50% of any Unused Plan Trust Funding.  The GUC Cash Pool Distribution Agent shall hold such funds in trust for holders of all Allowed General Unsecured Claims and distribute such funds in accordance with the Plan.

2.    All Other Claims.

Except (a) as otherwise provided herein (including, without limitation, in Article V.A.1), (b) upon a Final Order, or (c) as otherwise agreed to by the Debtors or the Reorganized Debtors, as applicable, and the Holder of the applicable Claim, the Distribution Agent shall make initial distributions under the Plan on the Effective Date or as soon as reasonably practicable thereafter to each Holder of an Allowed Claim up to the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class.  If a Claim is not an Allowed Claim on the Effective Date, the Distribution Agent shall make such distribution on the next Distribution Date after such Claim becomes an Allowed Claim, or as soon as reasonably practicable thereafter.  Unless the Bankruptcy Court orders otherwise, if, after an initial payment in respect of a Claim, additional amounts are Allowed in respect of such Claim, the Reorganized Debtors shall make distributions in respect of such additional Allowed amounts on the first Distribution Date after such additional amounts are Allowed or as soon as practicable thereafter. In the event that any payment or distribution under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution may be completed on the following Business Day but shall be deemed to have been completed as of the required date. Except as specifically provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on

or at any time after the Effective Date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VI.

B.    *Rights and Powers of Distribution Agent.*

1.    Powers of the Distribution Agent.

The Distribution Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties and exercise its rights under the Plan; (b) make all distributions contemplated under the Plan; (c) employ professionals to represent it with respect to its responsibilities and powers; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

2.    Expenses Incurred on or after the Effective Date.

Except as otherwise ordered by the Bankruptcy Court, (i) the amount of any reasonable fees and expenses incurred by the GUC Cash Pool Distribution Agent on or after the Effective Date and any reasonable compensation and expense reimbursement claims (including reasonable attorney and/or other professional fees and expenses) made by the GUC Cash Pool Distribution Agent shall be paid in Cash from the GUC Cash Pool and (ii) the amount of any reasonable fees and expenses incurred by any other Distribution Agent on or after the Effective Date and any reasonable compensation and expense reimbursement claims (including reasonable attorney and/or other professional fees and expenses) made by such Distribution Agent shall be paid in Cash by the Reorganized Debtors.  The Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.

C.    *Delivery of Distributions and Undeliverable or Unclaimed Distributions.*

1.    Distributions Generally.

Except as otherwise provided in the Plan, the applicable Distribution Agent shall make distributions to Holders of Allowed Claims at the address for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder.

All distributions to Holders of Unsecured Notes Claims shall be deemed to be made to or by the Unsecured Notes Trustees.  Regardless of whether such distributions are made by the Unsecured Notes Trustees or by the Distribution Agent, the applicable Indenture Trustee Charging Lien shall attach to the property to be distributed to the Holders of Unsecured Notes Claims in the same manner as if such distributions were made through the Unsecured Notes Trustees.

2.    Distributions on Account of Obligations of Multiple Debtors.

For all purposes associated with distributions under the Plan, any obligation that could be asserted against more than one Debtor shall result in a single distribution under the Plan. Any such Claims shall be subject to all potential objections, defenses, and counterclaims, and to estimation

pursuant to section 502(c) of the Bankruptcy Code.  For the avoidance of doubt, nothing in this Article V.C.2. shall affect the Guaranty Claim Enhancement.

      3.      <u>Record Date of Distributions</u>.

The Debtors or the Reorganized Debtors, as applicable, shall, by notice on the docket in the Chapter 11 Cases, establish the Distribution Record Date. On the Distribution Record Date, the various transfer registers for each Class of Claims or Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes in the record Holders of any Claims or Interests. The applicable Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring on or after the Distribution Record Date. In addition, with respect to payment of any Cure Claim or disputes over any Cure Claim, neither the Debtors, the Reorganized Debtors, nor any Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Effective Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Cure Claim.

      4.      [Reserved]

      5.      <u>De Minimis Distributions; Minimum Distributions</u>.

The Distribution Agent shall not make any Cash distributions to any Holder of an Allowed Claim or Interest pursuant to <u>Article III</u> and <u>Article V</u> of this Plan on account of such Allowed Claim or Interest if such distribution is valued, in the reasonable discretion of the Distribution Agent, at less than $50.00, and each Holder of an Allowed Claim or Interest to which this limitation applies shall not be entitled to any distributions under the Plan.

      6.      <u>No Fractional Shares or Subscription Rights</u>.

No fractional Subscription Rights or shares of New Equity Securities shall be distributed, and no Cash shall be distributed in lieu of such fractional shares or rights. When any distribution pursuant to the Plan on account of an Allowed Claim otherwise would result in the issuance of Subscription Rights or New Equity Securities that are not a whole number, such shares or rights, as applicable, shall be rounded as follows: (i) fractions of greater than one-half shall be rounded to the next higher whole number; and (ii) fractions of one-half or less shall be rounded to the next lower whole number with no further payment on account thereof. The total number of Subscription Rights or New Equity Securities in each case, to be distributed pursuant to the Plan shall be adjusted as necessary to account for the foregoing rounding.

      7.      <u>Undeliverable and Unclaimed Distributions</u>.

No distribution to Holders of Allowed Claims or Interests shall be made unless and until the applicable Distribution Agent has determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided, however*, that Unclaimed Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Effective Date. After such date, (i) all unclaimed property that was Cash from the GUC Cash Pool shall revert to the GUC Cash Pool Distribution Agent automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial or state escheat, abandoned,

or unclaimed property laws to the contrary) for distribution to holders of Allowed GUC Cash Pool General Unsecured Claims, and the Claim of any Holder of Claims and Interests to such property or Interest in property shall be discharged and forever barred, and (ii) all other such unclaimed property or interests in property shall revert to the Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder or its successors with respect to such property or interest in property shall not be entitled to any distributions under the Plan.

  8. <u>Manner of Payment Pursuant to the Plan</u>.

  At the option of the Distribution Agent, any Cash payment to be made hereunder may be made by check, wire transfer, automated clearing house, credit card, or as otherwise provided in applicable agreements.

*D.* *Withholding and Reporting Requirements; Compliance Matters*.

  In connection with the Plan, the Debtors, the Reorganized Debtor, or the Distribution Agent, as applicable, and any other applicable withholding and reporting agents shall comply with all tax withholding and reporting requirements lawfully imposed on them by any Governmental Unit, including related interest, penalties, inflation adjustments, and fees (if any) and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, and any other applicable withholding and reporting agents shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements; *provided, however*, that Debtors, the Reorganized Debtors, or the Distribution Agent, as applicable, shall request appropriate documentation from the applicable distributees and allow such distributees a reasonable amount of time to respond. The Debtors, the Reorganized Debtors, or the Distribution Agent, as applicable, and any other applicable withholding and reporting agents reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances. At the reasonable discretion of the Reorganized Debtors or the Distribution Agent, no distribution shall be made to or on behalf of such Holder of a Claim pursuant to this Plan unless and until such Holder of a Claim has made arrangements satisfactory to the Reorganized Debtors for the payment and satisfaction of such tax obligations, and any Cash, Plan Securities and all related documents, and/or other consideration or property to be distributed pursuant to this Plan shall, pending the implementation of arrangements pursuant to the previous clause, be treated as an Unclaimed Distribution, which shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Effective Date. After such date, all such unclaimed property or interests in property shall revert to the Reorganized Debtors or the GUC Distribution Agent in accordance with Article V.C.7. automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable local, state, federal, or foreign escheat, abandoned, or unclaimed property laws to the contrary), and the Claim or Interest of any Holder to such property or interest in property shall not be entitled to any distributions under the Plan.  Notwithstanding any other provision of this Plan to the contrary, (a) each Holder of a Claim that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on

account of such distribution, and (b) any amounts deducted or withheld from any distribution to a Holder by the Reorganized Debtors or the Distribution Agent in respect of any tax shall be treated as if distributed to such Holder in connection with satisfaction of such Holder's Claim.

E.      *Claims Paid or Payable by Third Parties.*

1.      <u>Claims Paid by Third Parties.</u>

The Debtors, the Reorganized Debtors, or the Plan Trustee, as applicable, shall reduce a Claim or Interest, and such Claim or Interest (or portion thereof) shall be Disallowed without an objection to such Claim or Interest having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim or Interest receives a payment on account of such Claim or Interest from a party that is not the Debtors or the Reorganized Debtors, as applicable. To the extent a Holder of a Claim or Interest receives a distribution on account of such Claim or Interest and receives payment from a party that is not the Debtors or the Reorganized Debtors, as applicable, on account of such Claim or Interest, such Holder shall, within ten (10) Business Days of receipt thereof, repay, return, or deliver any distribution held by or transferred to the Holder to the Reorganized Debtors to the extent the Holder's total recovery on account of such Claim or Interest from the third party and under the Plan exceeds the amount of such Claim or Interest as of the date of any such distribution under the Plan. The failure of such Holder to timely repay, return, or deliver such distribution shall result in the Holder owing the Reorganized Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the ten (10) Business Day grace period specified above until the amount is repaid.

2.      <u>Claims Payable by Third Parties.</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is an Insured Claim until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim or Interest (if and to the extent adjudicated by a court of competent jurisdiction or otherwise settled), then, immediately upon such payment, such Claim or Interest may be expunged or reduced on the Claims Register by the Claims Agent to the extent of any such payment without an objection to such Claim or Interest having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      <u>Applicability of Insurance Policies.</u>

Except as otherwise provided herein, payments made to Holders of Claims or Interests shall be made in accordance with the provisions of any applicable Insurance Policy. Nothing contained in the Plan or the Confirmation Order shall constitute or be deemed a release, settlement, satisfaction, compromise, or waiver of any rights, claims, defenses, or Cause of Action that the Debtors, or any other Entity may hold against any other Entity, including insurers, under any policies of insurance, agreements related thereto, or applicable indemnity, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any rights or defenses, including coverage defenses, held by such insurers under the applicable Insurance Policies, agreements related thereto, and applicable non-bankruptcy law.

4.      <u>Chubb Customer Program</u>

Notwithstanding anything to the contrary in the Definitive Documents, the Bar Date Order, any other document related to any of the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, grants an injunction, discharge or release, or confers Bankruptcy Court jurisdiction):

(a)    on and after the Effective Date the applicable Reorganized Debtors shall be deemed to have assumed the Chubb Customer Program pursuant to sections 105 and 365 of the Bankruptcy Code such that the applicable Reorganized Debtors shall become and remain liable in full for all of their and the Debtors' obligations (as applicable) under the Chubb Customer Program, regardless of whether such obligations arise before or after the Effective Date and Chubb shall only be required to file a Proof of Claim, Administrative Claim or Cure Claim to the extent any amounts become liquidated, due and owing under the Chubb Customer Program on or before any applicable bar date; *provided that* nothing in this provision shall change, modify, or otherwise supersede the stipulation between Chubb and the Debtors approved by the Bankruptcy Court and the respective Bankruptcy Court order [D.I. 942]; and

(b)    nothing, alters, modifies or otherwise amends the terms and conditions of the Chubb Customer Program, and any rights and obligations thereunder shall be determined under the Chubb Customer Program and applicable non-bankruptcy law as if the Chapter 11 Cases had not occurred.

F.    *Setoffs and Recoupment.*

Except as otherwise expressly provided for herein, each Debtor, Reorganized Debtor, or the Plan Trustee, as applicable, or such Entity's designee as instructed by such Debtor or Reorganized Debtors or the Plan Trustee, as applicable, may, pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable non-bankruptcy law, or as may be agreed to by the Holder of a Claim, set off against or recoup from an Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, any claims, rights, and Causes of Action of any nature whatsoever that the Debtors, the Reorganized Debtors, or the Plan Trustee, as applicable, may have against the Holder of such Allowed Claim, to the extent such claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Plan or otherwise). Notwithstanding the foregoing, except as expressly stated in Article VIII of this Plan, neither the failure to effect such a setoff or recoupment nor the allowance of any Claim pursuant to the Plan shall constitute a waiver or release by the Debtors, the Reorganized Debtors, or the Plan Trustee of any such claims, rights, or Causes of Action the Debtors, the Reorganized Debtors, or the Plan Trustee may possess against such Holder.  In no event shall any Holder of claims be entitled to set off any Claim against any claim, right, or Cause of Action of the Debtor, the Reorganized Debtor, or the Plan Trust, as applicable, unless such Holder (i) has filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, or (ii) has agreed with the Debtors (with the consent of the Required Consenting Noteholders) on or before the Confirmation Date that such Holder's setoff rights are preserved, *provided* that no such Holder shall be entitled to set off any Claim absent agreement with the Reorganized Debtors (with the consent of the Required Consenting Noteholders) or further order of this Court.

*G.*     *Allocation between Principal and Accrued Interest.*

Except as otherwise provided herein, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof and as determined for federal income tax purposes) and second, to the extent the consideration exceeds the principal amount of the Allowed Claims, to the remaining portion of such Allowed Claims, if any.

*H.*     *Foreign Currency Exchange Rate*

Except as otherwise provided in a Final Order of the Bankruptcy Court, as of the Effective Date, any Claim asserted in a government-issued currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in the Wall Street Journal, National Edition, on the Petition Date.

## ARTICLE VI
## PROCEDURES FOR DISPUTED CLAIMS.

*A.*     *Objections to Claims.*

As of the Effective Date, objections to, and requests for estimation of, Claims (other than Professional Claims) against the Debtors may be interposed and prosecuted by the Reorganized Debtors or, with respect to GUC Cash Pool General Unsecured Claims, the Plan Trustee. Such objections and requests for estimation shall be served and filed on or before the Claims Objection Deadline or the Administrative Claims Objection Deadline, as applicable.

*B.*     *Allowance of Claims.*

After the Effective Date, each of the Reorganized Debtors or, with respect to GUC Cash Pool General Unsecured Claims, the Plan Trustee, shall have and retain any and all rights, claims, Causes of Action and defenses that the Debtors had with respect to any Claim against a Debtor, except with respect to any Claim deemed Allowed under this Plan.  Except as expressly provided in this Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under this Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

Following the Effective Date:

- GUC Cash Pool General Unsecured Claims may be settled or compromised solely by the Plan Trustee in consultation with the Reorganized Debtors; *provided* that in the event the Reorganized Debtors notify the Plan Trustee that they do not agree with a proposed settlement or compromise of any GUC Cash Pool General Unsecured Claim, the Plan Trustee cannot settle or compromise such Claim without approval of the Bankruptcy Court, and the Reorganized Debtors shall have the right to object to any motion seeking such approval; and

- the Reorganized Debtors shall have the exclusive right to settle or compromise all Claims (including Administrative Claims) that are not GUC Cash Pool General

Unsecured Claims in consultation with the Plan Trustee; *provided* that in the event the Plan Trustee notifies the Reorganized Debtors that it does not agree with a proposed settlement or compromise of any Claim that is not a GUC Cash Pool General Unsecured Claim, the Reorganized Debtors cannot settle or compromise such Claim without approval of the Bankruptcy Court, and the Plan Trustee shall have the right to object to any motion seeking such approval.

C.      *Estimation of Claims*.

The Debtors (in consultation with the Committee), the Reorganized Debtors, or, with respect to GUC Cash Pool General Unsecured Claims, the Plan Trustee, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim, pursuant to section 502(c) of the Bankruptcy Code regardless of whether any party in interest previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or the maximum limit of such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors, the Reorganized Debtors, or the Plan Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Elimination of Duplicate Claims*.

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Debtors or the Reorganized Debtors, as applicable, upon stipulation between the parties in interest without a Claims objection having to be filed and without any further notice or action, order, or approval of the Bankruptcy Court. If a Claim has been satisfied, the Debtors or the Reorganized Debtors, or the applicable claimant, as applicable, may amend the Claims Register indicating that such Claim has been satisfied.

E.      *No Distributions Pending Allowance*.

Notwithstanding any other provision of this Plan to the contrary, no payment or distributions of any kind or nature provided under the Plan shall be made with respect to all or any portion of a Disputed Claim or Interest unless and until such Disputed Claim or Interest becomes an Allowed Claim or Interest or has otherwise been resolved by settlement or Final Order; *provided, however*, that, if the Debtors, the Reorganized Debtors, or, with respect to GUC Cash Pool General Unsecured Claims, the Plan Trustee, as applicable, do not dispute a portion of an amount asserted pursuant to an otherwise Disputed Claim or Interest, the applicable Distribution Agent may make a partial distribution on account of that portion of such Claim or Interest that is not Disputed at the time and in the manner that the Distribution Agent makes distributions to similarly situated Holders of Allowed Claims or Interests pursuant to the Plan.

F.      *Distributions After Allowance*.

To the extent that a Disputed Claim or Interest ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim or Interest in accordance with the provisions of the Plan.

With respect to a Disputed GUC Cash Pool General Unsecured Claim that becomes an Allowed Claim, the GUC Cash Pool Distribution Agent shall provide the Holder of such Allowed GUC Cash Pool General Unsecured Claim a distribution on the first Semi-Annual Distribution Date after such Claim is Allowed in accordance with Article V.A.1.

With respect to all other Disputed Claims or Interests, as soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court Allowing such Disputed Claim or Interest becomes a Final Order, the Distribution Agent shall provide to the Holder of such Allowed Claim or Interest the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Allowed Claim or Interest unless required under applicable bankruptcy law.

G.     *No Postpetition Interest.*

Unless otherwise specifically provided for herein or by Final Order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims against the Debtors, and no Holder of a Claim against the Debtors shall be entitled to interest accruing on or after the Petition Date on any such Claim.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim, including with respect to the period from the Effective Date to the date on which a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

H.     *Resolution of Claims.*

Except as otherwise provided herein (including the release and exculpation provisions hereof) or in the Confirmation Order, or in any contract, instrument, release, or other agreement or document entered into in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, on and after the Effective Date, the Reorganized Debtors, or, with respect to GUC Cash Pool General Unsecured Claims, the Plan Trust, as applicable, may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all claims, disputed claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors, the Reorganized Debtors, or the Plan Trust, as applicable, may hold against any Entity, and any contract, instrument, release, indenture, or other agreement entered into in connection herewith.  From and after the Effective Date, and subject to the terms of the Plan Trust Agreement, the Reorganized Debtors may settle or compromise any Disputed Claim without approval of the Bankruptcy Court; *provided* that, for the avoidance of doubt, following the Effective Date:

- GUC Cash Pool General Unsecured Claims may be settled or compromised solely by the Plan Trustee in consultation with the Reorganized Debtors; *provided* that in the event the Reorganized Debtors notify the Plan Trustee that they do not agree with a proposed settlement or compromise any GUC Cash Pool General Unsecured Claim, the Plan Trustee cannot settle or compromise such Claim without approval of the Bankruptcy Court, and the Reorganized Debtors shall have the right to object to any motion seeking such approval; and

- the Reorganized Debtors shall have the exclusive right to settle or compromise all Claims (including Administrative Claims) that are not GUC Cash Pool General Unsecured Claims in consultation with the Plan Trustee; *provided* that in the event the Plan Trustee notifies the Reorganized Debtors that it does not agree with a proposed settlement or compromise of any Claim that is not a GUC Cash Pool General Unsecured Claim, the Reorganized Debtors cannot settle or compromise such Claim without approval of the Bankruptcy Court, and the Plan Trustee shall have the right to object to any motion seeking such approval.

I.      *Disputed Claims Reserve*

On or after the Effective Date,

- the GUC Cash Pool Distribution Agent (with the consent of the Reorganized Debtors, not to be unreasonably withheld) shall be authorized, but not directed, to establish one or more Disputed Claims Reserves from the GUC Cash Pool for any Disputed GUC Cash Pool General Unsecured Claims, which Disputed Claim Reserves shall be administered by the GUC Cash Pool Distribution Agent; and

- the Reorganized Debtors (with the consent of the Required Consenting Noteholders) shall be authorized, but not directed, to establish one or more Disputed Claims Reserves for any Disputed Claims other than GUC Cash Pool General Unsecured Claims, which Disputed Claims Reserves shall be administered by the Reorganized Debtors.

After the Effective Date, the Reorganized Debtors (with the consent of the Required Consenting Noteholders) or, with respect to the GUC Cash Pool, the GUC Cash Pool Distribution Agent (with the consent of the Reorganized Debtors, not to be unreasonably withheld), may hold any property to be distributed pursuant to the Plan, in the same proportions and amounts as provided for in the Plan, in the Disputed Claims Reserve in trust for the benefit of the Holders of Claims ultimately determined to be Allowed after the Effective Date. The Reorganized Debtors or GUC Cash Pool Distribution Agent shall distribute any such amounts or other property (net of any expenses, including taxes related thereto) to Holders of Claims ultimately determined to be Allowed after the Effective Date in accordance with the terms of the Plan, and such amounts will be distributable on account of such Claims as such amounts would have been distributable had such Claims been Allowed Claims as of the Effective Date under Article III of the Plan solely to the extent of the amounts available in the applicable Disputed Claims Reserves.  To the extent property that would otherwise be held in the Disputed Claims Reserve is New Holdco Units, rather than issue such New Holdco Units to be held in the Disputed Claims Reserve, the Reorganized Debtors may instead issue out of "treasury stock" or newly issued New Holdco Units as Disputed Claims become Allowed Claims as of the Effective Date.

To the extent property (e.g., New Holdco Units) is deposited into the Disputed Claims Reserve as opposed to being issued out of "treasury stock" or as newly issued New Common Stock by the Reorganized Debtors directly to Holders of Claims, then with respect to any of the assets that are subject to potential disputed claims of ownership or uncertain distributions (including, in particular, the Disputed Claims Reserve), the Debtors anticipate that such assets will be subject to disputed ownership fund treatment under section 1.468B-9 of the Treasury Regulations, that any

appropriate elections with respect thereto shall be made, and that such treatment will also be applied to the extent possible for state, local, and non-U.S. tax purposes.

J.    *Disallowance of Claims.*

Any Claims or Interests held by an Entity from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN, BY AN ORDER OF THE BANKRUPTCY COURT, OR AS AGREED TO BY THE DEBTORS OR THE REORGANIZED DEBTORS, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT.**

K.    *Amendments to Claims and Late Filed Claims*.

Following the Effective Date, except as otherwise provided in this Plan or the Confirmation Order, as applicable, no Claim may be filed, amended, or supplemented without the approval of the Bankruptcy Court or without the prior written authorization of the Reorganized Debtors, as applicable.

L.    *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claims, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of such Claims. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed one hundred (100) percent of the underlying Allowed Claim plus applicable interest, if any.

## ARTICLE VII
## EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, all Executory Contracts or Unexpired Leases shall be deemed rejected by the applicable Reorganized Debtor pursuant to sections 365 and 1123 of the Bankruptcy Code, other than those Executory Contracts and Unexpired Leases that: (i) have been previously assumed, assumed and assigned, or rejected by a Final Order; (ii) are the subject of a motion to assume Executory Contracts or Unexpired Leases that is pending on the Effective Date; (iii) the Debtors have, as of the Effective Date, received

authority to assume pursuant to an order of the Bankruptcy Court and the effective date of such assumption is after the Effective Date; (iv) are listed on the Schedule of Assumed Contracts and Leases and are not removed from such schedule at the option of the Required Consenting Noteholders (in consultation with the Debtors) prior to the Effective Date; and (v) provide for payment of severance or other benefits to former employees of the Debtors whether in the form of a plan or individual agreement; *provided*, that nothing in the Plan or Confirmation Order shall constitute an admission or finding that any plan or agreement referenced in the immediately preceding clauses constitutes an Executory Contract or Unexpired Lease; and *provided further*, that the Debtors reserve the right to seek enforcement of or other relief with respect to an assumed or assumed and assigned Executory Contract or Unexpired Lease following the Confirmation Date, including but not limited to seeking an order of the Bankruptcy Court for the rejection of such Executory Contract or Unexpired Lease for cause.  The terms of any Final Order entered by the Bankruptcy Court prior to the entrance of the Confirmation Order that provide for the assumption and assignment of nonresidential real property shall control over the terms of the Plan and Confirmation Order.

Entry of the Confirmation Order shall constitute an order of the Bankruptcy Court approving the assumptions of the Executory Contracts and Unexpired Leases set forth on the Schedule of Assumed Contracts and Leases and the rejections of Executory Contracts and Unexpired Leases, as set forth in the Plan and the Schedule of Assumed Contracts and Leases, as applicable, pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Except as otherwise specifically set forth herein, assumptions or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  The Debtors are authorized to abandon any of the Debtors' personal property at or on the leased premises subject to an Unexpired Lease rejected pursuant to the Plan, and the counterparties to rejected leases may dispose of any such personal property remaining at or on the leased premises following the applicable lease rejection date.

Each Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law (in each case, in accordance with applicable law, including by consent of the counterparty to such Executory Contract or Unexpired Lease).  Subject to applicable law, including section 365(d)(4) of the Bankruptcy Code, any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date but may be withdrawn, settled, or otherwise prosecuted by the Reorganized Debtors, with any such disposition to be deemed to effect an assumption, assumption and assignment, or rejection, as applicable, as of the Effective Date.  To the maximum extent permitted by applicable Law, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts, conditions or prevents, or purports to restrict, condition or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "anti-assignment," "change of control," consent right, or similar provision), then such provision shall be deemed modified such that the transaction contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any

other default-related rights with respect thereto. The consummation of the Plan and the implementation of the Reorganization Transactions are not intended to, and shall not, constitute a "change of control," "change in control," or other similar event under any lease, contract, or agreement to which a Debtor is a party.

B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court by the later of thirty (30) days from (i) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, or (ii) the effective date of the rejection of such Executory Contract or Unexpired Lease. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be Disallowed pursuant to the Confirmation Order, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, the Reorganized Debtors, the Estates, or property of the foregoing parties, without the need for any objection by the Debtors or the Reorganized Debtors, as applicable, or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary**. Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III, and such claims may be objected to in accordance with this Plan.

C.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

The Debtors or the Reorganized Debtors, as applicable, shall pay Cure Claims, if any, that are not subject to an Assumption Dispute on the Effective Date, or to the extent necessary, on the later of the Effective Date (or as soon as reasonably practicable thereafter), as such amounts would otherwise come due in the ordinary course of business, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. The Reorganized Debtors may settle any Cure Claims on account of any Executory Contract or Unexpired Lease without any further notice to or action, order, or approval of the Bankruptcy Court.

Except as set forth below, any Cure Claims shall be satisfied for the purposes of section 365(b)(1) of the Bankruptcy Code by payment in Cash of the Cure Claim set forth on the Schedule of Assumed Contracts and Leases for the applicable Executory Contract or Unexpired Lease, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtors or the Reorganized Debtors, as applicable, may otherwise agree or as determined by the Bankruptcy Court by a Final Order. Any Cure Claims shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of such Cure Claims, as applicable.

Unless otherwise provided by an order of the Bankruptcy Court, the Debtors shall use reasonable best efforts to File the Schedule of Assumed Contracts and Leases no later than twenty-eight (28) days prior to the earlier to occur of (a) the Voting Deadline and (b) the deadline for objecting to the Plan. The Debtors shall cause all Filed Schedules of Assumed Contracts and Leases or notices of proposed assumption, proposed amounts of Cure Claims, and proposed rejections to be served by first class mail on counterparties to Executory Contracts and Unexpired

Leases to be assumed or rejected pursuant to the Plan that are identified in such schedule. The Required Consenting Noteholders shall have the right to designate any Executory Contract or Unexpired Lease to be added or removed from the Schedule of Assumed Contracts and Leases at any time prior to the Effective Date after consultation with the Debtors. To the extent that the Required Consenting Noteholders seek to add or remove any Executory Contract or Unexpired Lease, the Required Consenting Noteholders and the Debtors will endeavor to provide the Committee with a draft of the proposed revised Schedule of Assumed Contracts and Leases as soon as practicable prior to the filing of such schedule. Any objection to the assumption or rejection of an Executory Contract or Unexpired Lease under the Plan, including all requests for payment of Cure Claims that differ from the amounts proposed to be paid by the Debtors or the Reorganized Debtors to a counterparty must be Filed, served and actually received by the Debtors by the later of (a) the Confirmation Objection Deadline or (b) with respect to any Executory Contract or Unexpired Lease that is added to the Schedule of Assumed Executory Contract and Unexpired Leases after the date that is fourteen (14) days prior to the Confirmation Objection Deadline, the date that is fourteen (14) days following the filing of the relevant supplement to the Schedule of Assumed Contracts and Leases.

**Any party that fails to timely object to the assumption of its Executory Contract or Unexpired Lease (including the ability of the applicable Reorganized Debtor or assignee to provide "adequate assurance of future performance" under such Executory Contract or Unexpired Lease within the meaning of section 365 of the Bankruptcy Code) or the amount of the Cure Claims listed on the Schedule of Assumed Contracts and Leases as set forth in the paragraph above, shall be (i) deemed to have consented to the assumption of its Executory Contract or Unexpired Lease and to such Cure Claims and (ii) forever barred, estopped, and enjoined from disputing the amount of the Cure Claims set forth on the Schedule of Assumed Contracts and Leases (including a Cure Claim of $0.00) and/or from asserting any Claim against the applicable Debtor or Reorganized Debtor arising under section 365(b)(1) of the Bankruptcy Code.**

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, subject to the payment of the applicable Cure Claims as set forth in the Plan Supplement, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court upon payment of the applicable Cure Claims.

D.    *Assumption Dispute Resolution*

In the event of a timely Filed objection regarding: (i) the amount of any Cure Claims; (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption or payment of a Cure Claim required by section 365(b)(1) of the Bankruptcy Code, such dispute (an "**Assumption Dispute**") shall be resolved by a Final Order of the Bankruptcy Court (which may

be the Confirmation Order) or as may be agreed upon by the Debtors or the Reorganized Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. To the extent an Assumption Dispute relates solely to the amount of a Cure Claim, the Debtors may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of such Assumption Dispute; *provided*, that the Debtors reserve Cash in an amount sufficient to pay the full amount reasonably asserted as the required cure payment by the counterparty or counterparties to such Executory Contract or Unexpired Lease, and *provided further* that the Bankruptcy Court shall have the authority to hear any disputes regarding such reserve. To the extent that the Assumption Dispute is resolved or determined unfavorably to the Debtors, the Debtors, with the consent of the Required Consenting Noteholders, may reject the applicable Executory Contract or Unexpired Lease after such determination, which rejection shall supersede, nullify, and render of no force or effect the earlier assumption and/or assumption and assignment.

For the avoidance of doubt, if the Debtors are unable to resolve an Assumption Dispute relating solely to the amount of a Cure Claim prior to the Confirmation Hearing, such Assumption Dispute may be scheduled to be heard by the Bankruptcy Court after the Confirmation Hearing.

E.    *Pre-Existing Payment and Other Obligations*

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors or Reorganized Debtors, as applicable, under such contract or lease. In particular, notwithstanding any applicable non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide: (a) payment to the contracting Debtors or Reorganized Debtors, as applicable, of outstanding and future amounts owing thereto under or in connection with rejected Executory Contracts or Unexpired Leases or (b) warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected Executory Contracts.

F.    *Indemnification Obligations*

Notwithstanding anything in the Plan to the contrary, each Indemnification Obligation shall be assumed by the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code or otherwise, unless such obligation (i) was rejected by the Debtors pursuant to a Final Order or (ii) is the subject of a motion to reject that is pending as of the Effective Date. Each Indemnification Obligation assumed by the applicable Debtor shall remain in full force and effect, shall not be modified, reduced, discharged, impaired, or otherwise affected in any way, and shall survive Unimpaired and unaffected, irrespective of when such obligation arose.

G.    *Contracts and Leases Entered into After the Petition Date*

Contracts and leases entered into after the Petition Date by the Debtors, and any Executory Contracts and Unexpired Leases assumed by the Debtors and not assigned to a non-Debtor Entity, will be performed by the Debtors or the Reorganized Debtors in the ordinary course of their operations. Accordingly, such contracts and leases (including any assumed Executory Contract and Unexpired Leases) shall survive and remain unaffected by entry of the Confirmation Order.

*H.      Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, and supplements to, or restatements of, prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

*I.      Reservation of Rights*

Neither the inclusion of any Executory Contract or Unexpired Lease on the Debtors' Schedules, the Schedule of Assumed Contracts and Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Reorganized Debtors, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease. For the avoidance of doubt, the Debtors reserve all rights with respect to any Retained Causes of Action or other right with respect to any Executory Contract or Unexpired Lease.

*J.      Nonoccurrence of Effective Date; Bankruptcy Code Section 365(d)(4)*

If the Effective Date fails to occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to further extend the deadline for assuming or rejecting Unexpired Leases under section 365(d)(4) of the Bankruptcy Code.

## ARTICLE VIII
## SETTLEMENT, RELEASES, INJUNCTIONS, AND RELATED PROVISIONS.

*A.      Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to section 1123 of the Bankruptcy Code and in consideration for the distributions and other benefits provided pursuant to the Plan, the Plan is and shall be deemed to be a good-faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. The compromises, settlements, and releases described herein shall be deemed nonseverable from each

other and from all other terms of the Plan. In accordance with the provisions of the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities.

B.      *Release of Liens.*

Except (a) with respect to the Liens securing Allowed Other Secured Claims that are Reinstated under the Plan, or (b) as otherwise provided in the Plan or in any Definitive Document, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised and all rights, titles, and interests of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall revert to the Debtors and vest in the Reorganized Debtors, as applicable, on the Effective Date; *provided, however*, that notwithstanding anything in this Plan to the contrary, all mortgages, deeds of trust, Liens, pledges, or other security interests granted under the DIP Loan Documents shall continue in full force and effect and shall not be released until all DIP Claims (other than contingent indemnification and reimbursement obligations as to which no claim has been asserted by the Person entitled thereto) have been paid in full in Cash, at which time the applicable DIP Secured Parties shall execute a deed of release and any other documentation reasonably requested by the Debtors in order to release such Liens according to applicable law; *provided, further*, that any action taken by any DIP Secured Party under this Article VIII.B shall be without any expenses or representations from any DIP Secured Party.

C.      *Discharge and Satisfaction of Claims and Termination of Interests.*

Pursuant to sections 105 and 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in respect of, the Debtors or any of their Assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, any Claims for withdrawal liability that relate to services performed by employees of the Debtor before the Effective Date or that arise from a termination of employment, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt or right is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has voted to accept or reject the Plan. Any default or "*event of default*" by the Debtors with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.  For the avoidance of doubt, the distributions, rights, and treatment that are provided in the Plan shall not function as a discharge of the Debtors' non-Debtor Affiliates.

*D.*     *Term of Injunctions or Stays.*

Unless otherwise provided, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

*E.*     **Releases by the Debtors**.

**Notwithstanding anything in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released by each of the Debtors, their respective Estates, and any Person seeking to exercise the rights of any of the Debtors or their Estates (including any successors to any of the Debtors or their Estates or any estate representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), in each case, on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons who may purport to assert any claim or Cause of Action, derivatively, by, through, for, or because of any of the foregoing Persons, from any and all claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort or otherwise, that any of the Debtors, the Reorganized Debtors, the Plan Trust, their respective Estates, or any successors to or representatives of the foregoing appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or that any holder of any Claim against or any Interest in, any of the Debtors could have asserted on behalf of any of the Debtors, the Reorganized Debtors, the Plan Trust, or their respective Estates, based on, relating to, or in any manner arising from, in whole or in part, any of the Debtors (including the capital structure, management, ownership, or operations thereof), any Security of any of the Debtors, the subject matter of, or the transactions or events giving rise to, any such claim or  Cause of Action, the business or contractual arrangements between any Debtor and a Released Party, any of the Debtors' restructuring efforts, any Avoidance Actions held by any of the Debtors or their Estates, any intercompany transactions performed by any of the Debtors, the Chapter 11 Cases (including the Filing thereof and any relief obtained by the Debtors therein), the formulation, preparation, dissemination, negotiation, or Filing of the Plan (including, for the avoidance of any doubt, the Plan Supplement), the Disclosure Statement, the Bidding Procedures Order (and the procedures approved thereby), any Definitive Document, or any other contract, instrument, release, or other agreement or document (including any legal opinion requested by any Person regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order with respect to the Plan in lieu of such legal opinion) created or entered into, whether before or during the Chapter 11 Cases, in connection with the Filing of the Debtors' Chapter 11 Cases, the Bidding Procedures Order, the Disclosure Statement, the Plan (including, for the avoidance of any doubt, the Plan Supplement), the Plan Sponsor Agreement, the Backstop Agreement, the DIP Loan Documents, any Reorganization Transactions, any other Definitive Document, the solicitation of votes with respect to the Plan, the pursuit of Confirmation of the Plan, the pursuit of Consummation of the Plan, and**

the administration and the implementation of the Plan, including the issuance or distribution of the Plan Securities or any other property pursuant to the Plan, or any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Effective Date other than claims or Causes of Action resulting therefrom arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, in each case, solely to the extent determined by a Final Order.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (a) any post-Effective Date Claims or obligations of any Person under the Plan, the Confirmation Order with respect to the Plan, any Reorganization Transactions, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, or (b) any right of objection, defense, mandatory counterclaim, or right of setoff to any Claim against or Interest in the Debtors.

Notwithstanding anything to the contrary contained herein, nothing in the Plan shall release, waive, or otherwise limit the LT Claims (if any) or the Retained Causes of Action.

F.    *Releases By Holders of Claims.*

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released by each Releasing Party from any and all claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, any of the Debtors (including the capital structure, management, ownership, or operation thereof), any security of any of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the assertion or enforcement of rights and remedies against any of the Debtors, the Debtors' in-or out-of-court restructuring efforts, any Avoidance Actions held by any of the Debtor(s) or their Estates, intercompany transactions between or among a Debtor and another Debtor, the formulation, preparation, dissemination, negotiation, or Filing of the Chapter 11 Cases, the Bidding Procedures, the Bidding Procedures Order, Disclosure Statement, the Plan (including, for the avoidance of any doubt, the Plan Supplement), the Plan Sponsor Agreement, the Backstop Agreement, the DIP Loan Documents, any other Definitive Document, any Reorganization Transactions, any contract, instrument, release, or other agreement or document created or entered into, whether before or during the Chapter 11 Cases, in connection with the Filing of the Debtors' Chapter 11 Cases, the Bidding Procedures, the Bidding Procedures Order, the Disclosure Statement, the Plan (including, for the avoidance of any doubt, the Plan Supplement), the Plan Sponsor Agreement, the Backstop Agreement, the DIP Loan Documents, any other Definitive Document, any Reorganization Transactions, the solicitation of votes with respect to the

**Plan, the pursuit of Confirmation of the Plan, the pursuit of Consummation of the Plan, and the administration and implementation of the Plan. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this <u>Article VIII.F.</u> shall not be construed as: (i) releasing any Released Party from claims and Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence; (ii) releasing any post-Effective Date obligations of or under (A) any party or Entity under the Plan, (B) any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order, or (C) any document, instrument, or agreement executed to implement the Plan; (iii) releasing any rights to distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order; or (iv) releasing or discharging any properly-pled direct claim (other than claims against the Debtors) held by a creditor that is not a Releasing Party.  For purposes of this <u>Article VIII.F.</u> only, Alvaro Araya shall not be considered a Released Party.**

G.      *Exculpation*.

**Effective as of the Effective Date, to the fullest extent permissible under applicable law and without affecting or limiting either the Debtor release or the third party release, and except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is exculpated from any Cause of Action for any act or omission arising on or after the Petition Date and prior to the Effective Date based on, without limitation, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation or filing, or consummation of the Disclosure Statement, the Bidding Procedures, the Bidding Procedures Order, the Plan (including, for the avoidance of any doubt, the Plan Supplement), the Plan Sponsor Agreement, the Backstop Agreement, the DIP Loan Documents, any other Definitive Document, any Reorganization Transactions, any contract, instrument, release, or other agreement or document created or entered into, without limitation, in connection with the Disclosure Statement, the Bidding Procedures, the Bidding Procedures Order, the Plan (including, for the avoidance of any doubt, the Plan Supplement), the Plan Sponsor Agreement, the Backstop Agreement, the DIP Loan Documents, any other Definitive Document, any Reorganization Transactions, the filing of the Chapter 11 Cases, the administration of the Claims reconciliation process, the implementation of orders of the Bankruptcy Court entered during the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation of the Plan, the administration of the Chapter 11 Cases, the administration and implementation of the Plan, including the issuance of the Plan Securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement (including, for the avoidance of any doubt, providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion), except for Causes of Action related to any act or omission that is determined in a Final Order of a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.**

H.      *Injunction*.

1.      Upon entry of the Confirmation Order, all Holders of Claims and Interests and other parties in interest, along with their respective present or former employees, members, managers, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan in relation to any Claim, Interest or Cause of Action extinguished or released pursuant to the Plan.

2.      Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors and a Holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether or not proof of such Claims or Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, members, managers, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, or released pursuant to the Plan from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Reorganized Debtors, the Plan Trust, or the property of any of the Debtors, the Reorganized Debtors, the Plan Trust, or their respective properties or Estates, as applicable; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtors, the Reorganized Debtors, the Plan Trust, or the property of any of the Debtors or their respective Estates, the Reorganized Debtors, or the Plan Trust; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtors, the Reorganized Debtors, the Plan Trust, or the property of any of the Debtors, the Reorganized Debtors, the Plan Trust, the Reorganized Debtors, or against their respective Estates; (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtors, the Reorganized Debtors, as applicable, or against property or interests in property of any of the Debtors, the Reorganized Debtors, or the Reorganized Debtors, as applicable except as contemplated or allowed by the Plan, and except to the extent a setoff is asserted in a Filed proof of Claim or by way of a motion filed prior to the confirmation of the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

3.      The Non-Released Parties and each of their Affiliates are enjoined from interfering with the Debtors' or Reorganized Debtors', as applicable, administration of the Retained Causes of Action (including the claims and Causes of Action in connection with the ICSID Arbitration) and the LT Claims (if any), and may not take any action to interfere with Consummation of the Plan or any of the Reorganization Transactions.

4.      By accepting distributions pursuant to the Plan, each Holder of an Allowed Claim or Interest extinguished, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in this Article VIII.H.; *provided*, *however*, that the acceptance of these distributions shall not be construed as an agreement to, and does not constitute an opt-in or consent to, any third party release under Article VIII.F. hereof.

5.      The injunctions in this <u>Article VIII.H.</u> shall extend to any successors of the Debtors or the Reorganized Debtors, as applicable, and their respective property and interests in property.

*I.      Securities and Exchange Commission and Comisión para el Mercado Financiero.*

Notwithstanding any language to the contrary herein, no provision shall: (a) preclude the SEC or CMF, as applicable, from enforcing its police or regulatory powers; or (b) enjoin, limit, impair or delay the SEC or CMF, as applicable, from commencing or continuing any claims, causes of action, proceeding, or investigations against any non-Debtor person or non-Debtor entity in any forum.

*J.      Protection Against Discriminatory Treatment.*

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

## ARTICLE IX
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE.

*A.      Conditions Precedent to the Effective Date.*

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

1.      the Bankruptcy Court shall have entered the Confirmation Order, which shall be a Final Order, in form and substance consistent in all respects with the Plan Sponsor Agreement and the Plan Term Sheet and otherwise in form and substance reasonably acceptable to the Required Consenting Noteholders, the Debtors and the Committee, which shall:

> a.  authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan in a manner consistent in all respects with the Plan Term Sheet, the Plan Sponsor Agreement, and the Backstop Agreement and subject to the consent rights set forth herein and therein;

> b.  decree that the provisions in the Confirmation Order and the Plan are nonseverable and mutually dependent;

> c.  authorize New Holdco, New Chile PIF, Chile Newco, the Debtors, or Reorganized Debtors, as applicable/necessary, to: (i) implement the Reorganization Transactions; (ii) distribute all securities pursuant to the exemption from registration under the Securities Act of 1933 provided by section 1145 of the Bankruptcy Code or other exemption from such registration or pursuant to one or more registration statements; (iii) make all distributions

and issuances as required under the Plan; and (iv) enter into any agreements, transactions, and sales of property as set forth in the Plan Supplement, in each case, in a manner consistent in all respects with the terms of the Plan Term Sheet, the Plan Sponsor Agreement, and the Backstop Agreement, and subject to the consent rights set forth herein and therein;

d.   authorize the implementation of the Plan in accordance with its terms, including, without limitation, directing all necessary parties required to consummate the Reorganization Transactions under applicable Law; and

e.   provide that, pursuant to section 1146 of the Bankruptcy Code, the assignment or surrender of any lease or sublease, and the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of assets contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax, to the extent permissible under applicable Law;

2.      the Plan Sponsor Agreement and the Backstop Agreement shall each remain in full force and effect and shall not have been terminated at any time;

3.      the Debtors and the Consenting Noteholders shall have obtained all authorizations, consents, regulatory approvals, rulings, or documents that are necessary to implement and effectuate the Plan;

4.      the Rights Offering shall have been completed in accordance with the Rights Offering Procedures Order, and shall have, together with the purchase of the Unsubscribed Rights Offering Securities (as defined in the Backstop Agreement), resulted in gross proceeds of at least the Rights Offering Amount;

5.      (i) Debtor NC Telecom II AS shall have taken all actions (including executing all documents) and provided all consents necessary under local law or otherwise to effectuate the cancellation and release of the Intercompany Interests in WOM Mobile S.A., (ii) NC Telecom AS shall have taken all actions (including executing all documents) and provided all consents necessary under local law or otherwise to effectuate, as applicable, the transfer, redemption, cancellation, or release of the Existing Equity Interests in WOM Mobile S.A. and NC Telecom II AS, (iii) all shareholders' meetings required to effectuate (A) the transfer, redemption, cancellation or release of Existing Equity Interests and Intercompany Interests, as applicable, in accordance with Plan and (B) any other Reorganization Transactions shall have occurred, and all resolutions necessary to effectuate the foregoing shall have passed;

6.      the final version of each of the Plan, the Definitive Documents, and all documents contained in any supplement to the Plan, including the Plan Supplement and any exhibits, schedules, amendments, modifications, or supplements thereto or other documents contained therein, shall have been executed or filed, as applicable, in form and substance consistent in all respects with the Plan Sponsor Agreement, the Plan Term Sheet and the Plan, and comply with the applicable consent rights set forth in the Plan Sponsor Agreement, the Plan Term Sheet and the Plan for such documents, and shall not have been modified without the consent of the Required Consenting Noteholders;

7.      the New Secured Notes Documents and the New Convertible Notes Documents shall have been duly executed and delivered by all of the Entities that are parties thereto and all conditions precedent (other than any conditions related to the occurrence of the Effective Date) to the effectiveness of such documents shall have been satisfied or duly waived in writing in accordance with the terms of each of such documents and the issuance of each of the New Secured Notes and the New Convertible Notes shall have occurred;

8.      the Debtors have not (i) entered into any agreement to sell any assets with a value greater than (x) $5 million individually or (y) $10 million in the aggregate without the prior written consent of the Required Consenting Noteholders (not to be unreasonably withheld) or (ii) filed with the Bankruptcy Court after the date of the Backstop Agreement any motion or application seeking authority to use, sell, abandon or otherwise dispose of any assets, whether outside the ordinary course of business or otherwise, which motion or application is not reasonably acceptable to the Required Backstop Parties;

9.      the DIP Loan Documents and the Final Order approving the DIP Credit Facility shall remain in full force and effect and no event of default shall have occurred and be continuing thereunder;

10.     the Debtors shall have paid all accrued but unpaid fees and expenses required to be paid under the DIP Loan Documents for which an invoice has been delivered to the Debtors prior to the Effective Date (which invoices may include a reasonable, good faith estimate of such fees and expenses through the Anticipated Effective Date);

11.     (i) no government regulator, authority or Chilean authority shall have imposed any action, charge, collection of performance or surety bond, Sanction, levy, or fine (including, but not limited to, relating to the Chilean Agreements (as defined in the Backstop Agreement) or the Debtors' business operations or transactions) that has resulted in: (A) a material and adverse effect on the ability of the Debtors to conduct their business operations in a manner substantially consistent with their current practices, other than as a result of a delay in the deployment of the North Macrozone and the Arica y Parinacota Macrozone of the FON project, (B) the imposition of felony criminal liability on any of the Debtors or any current Senior Executive (as defined in the Backstop Agreement) of any such Debtor or such Senior Executive's direct reports (in each case, in their respective capacities as executive or employees of the Debtors), (C) tax or labor liability on any of the Debtors in an amount in excess of $10 million becoming due and payable, or (D) other than in connection with a delay in the deployment of the North Macrozone and the Arica y Parinacota Macrozone of the FON project, the aggregate cash costs of all fines, penalties, remedial measures, consumer liability, tax liability, labor liability, or other obligations associated with such action, charge, collection of performance or surety bonds, Sanction, levy or fine becoming due and payable in excess of $10 million, unless the Debtors have challenged such collection of performance or surety bonds, Sanction, levy, or fine within ten (10) Business Days of the date of such issuance, and such collection of performance or surety bonds, Sanction, levy, or fine is permanently enjoined, withdrawn, reversed or cancelled within fifteen (15) Business Days of the date of its occurrence; or (ii) other than in connection with a delay in the deployment of the North Macrozone and the Arica y Parinacota Macrozone of the FON project, none of the Debtors shall have received any official communication from any government regulator, authority or Chilean authority after the date of the Backstop Agreement of any threat of a material action, charge, collection of performance or surety bonds, Sanction, levy, or fine that, if sustained by any

applicable court, government authority, or regulator of competent jurisdiction would have the effects described in any of the foregoing clauses (A) through (D);

12.    the Required Backstop Parties shall have received evidence, in form and substance reasonably acceptable to the Required Backstop Parties, establishing that, as of the Effective Date, all rights to pursue, prosecute, and control the ICSID Arbitration (to the extent still pending or otherwise unresolved), and all rights to receive any injunctive relief or damages from any award in favor of any party that is, on or at any time prior the Effective Date, a claimant in the ICSID Arbitration, shall belong to an entity owned directly or indirectly by New Holdco;

13.    from and after the date of execution of the Plan Sponsor Agreement, the Debtors have not taken any action to assume or reject any Executory Contracts or Unexpired Leases under Section 365 of the Bankruptcy Code without the prior approval of the Required Consenting Noteholders (not to be unreasonably withheld, conditioned or delayed);

14.    the Required Backstop Parties shall be satisfied, in their reasonable discretion, that, other than payments approved under the KEIP/KERP Order, no severance, change of control payments, stay bonuses, retention bonuses, long term incentive payments, other transaction-related bonuses, or other similar compensation in an aggregate amount in excess of $2,000,000 shall be due and payable by the Debtors to any current or former employees of or service providers that provide employment, consulting or similar services to the Debtors, as a result of the consummation of the Reorganization Transactions or the Plan;

15.    the Debtors' estimate of the aggregate prepetition amounts owed to Foreign Vendor Claimants (whether paid or unpaid) does not exceed the caps set forth in paragraph 3 of the Vendor Order;

16.    all Restructuring Expenses shall have been paid in full in cash;

17.    the Reorganized Debtors and New Company Entities shall be established and validly existing;

18.    all Professional Claims that, as of the Effective Date, were due and payable under an order of the Bankruptcy Court shall have been paid in full, other than any Professional Claims subject to approval by the Bankruptcy Court after the Effective Date;

19.    the Debtors shall have funded the Professional Claim Escrow Account in accordance with Article II.C herein;

20.    all authorizations, consents, regulatory approvals, rulings or documents that are necessary to implement and effectuate the Plan as of the Effective Date shall have been received, waived or otherwise resolved; and

21.    all documents and agreements necessary to implement the Plan, including those set forth in the Plan Supplement, shall have (i) been tendered for delivery and (ii) been effectuated or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

B.    *Waiver of Conditions Precedent.*

Each of the conditions precedent in this <u>Article IX</u> may be waived in writing by the Debtors (in consultation with the Committee), with the consent of the Required Consenting Noteholders. Any such waivers may be effectuated at any time, without notice, without leave or order of the Bankruptcy Court and without any formal action.

C.      *Substantial Consummation*.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

D.      *Effect of Vacatur of Confirmation Order*.

If the Confirmation Order is vacated, (i) no distributions under the Plan shall be made, (ii) the Debtors and all Holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) all the Debtors' obligations with respect to the Claims and the Interests shall remain unchanged and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other entity or to prejudice in any manner the rights of the Debtors or any other entity in any further proceedings involving the Debtors or otherwise.

## ARTICLE X
## RETENTION OF JURISDICTION.

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding the entry of the Confirmation Order and occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, to:

1.      hear and determine motions and/or applications for the assumption or rejection of Executory Contracts or Unexpired Leases and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

2.      resolve any matters related to Executory Contracts or Unexpired Leases, including: (i) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure Claims or other Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (ii) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (iii) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

3.      determine any motion, adversary proceeding, application, contested matter, or other litigated matter pending on or commenced after the Confirmation Date, including any such motion, adversary proceeding, application, contested matter, or other litigated matter brought by the Reorganized Debtors;

4.      ensure that distributions to Holders of Allowed Claims are accomplished as provided herein;

5.      consider Claims or the allowance, classification, priority, compromise, estimation or payment of or objection to any Claim;

6.    enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

7.    issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to (a) restrain interference by any Person with the Consummation, implementation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court and (b) direct any necessary party to take all such actions required to consummate the Plan, including the execution of documents required by applicable law to release liens, encumbrances, and Interests;

8.    hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

9.    hear and determine all applications under sections 330, 331, and 503(b) of the Bankruptcy Code for awards of compensation for services rendered and reimbursement of expenses incurred before the Effective Date;

10.    hear and determine disputes, including regulatory disputes, arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

11.    take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan or to maintain the integrity of the Plan following Consummation, including directing any necessary party to act in furtherance of consummating the Plan;

12.    determine such other matters and for such other purposes as may be provided in the Confirmation Order;

13.    hear and determine matters concerning state, local, foreign, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

14.    adjudicate any and all disputes arising from or relating to distributions under the Plan;

15.    hear and determine any other matters over which the Bankruptcy Court has jurisdiction;

16.    enter one or more final decrees closing the Chapter 11 Cases;

17.    recover all assets of the Debtors and property of the Debtors' Estates, wherever located;

18.    hear and determine any rights, claims or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory;

19.    hear and determine all matters related to, including all matters pursued by, the Plan Trust;

20.    hear and determine any other matters that may arise in connection with or relate to the Plan, the Plan Supplement, the Disclosure Statement, the Confirmation Order, Rights Offering Procedures Order (and any Final Orders approving the same), or any contract, instrument, release, indenture, or other agreement or document created in connection therewith;

21.    resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, the Disclosure Statement Supplement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to the amount of a cure, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purposes; and

22.    enforce all orders, judgments, injunctions, releases, exculpations, indemnifications and rulings entered in connection with the Chapter 11 Cases.

### ARTICLE XI
### MISCELLANEOUS PROVISIONS.

A.    *Subordinated Claims.*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right for the Reorganized Debtors to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

B.    *Dissolution of Committee.*

On the Effective Date, the Committee shall dissolve, and the members thereof and the professionals retained by the Committee or the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided, however*, that after the Effective Date, the Committee shall continue to exist and have standing and a right to be heard for the following limited purposes: (a) to pursue applications, and any relief related thereto, for payment of Professional Claims of Committee Professionals and requests for allowance of Administrative Claims for substantial contribution pursuant to section 503(b)(3)(D) of the Bankruptcy Code; and (b) any appeals of the Confirmation Order or other appeal to which the Committee is a party.

C.    *Amendments.*

1.    <u>Plan Modifications</u>. The Plan may be amended, modified or supplemented by the Debtors (in consultation with the Committee) prior to the Effective Date, in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code, subject to the consent of the Required Consenting Noteholders. In addition, after the Confirmation Date, the Debtors or the Reorganized Debtors may institute proceedings in the Bankruptcy Court to remedy any defect or omission or

reconcile any inconsistencies in the Plan or the Confirmation Order, with respect to such matters as may be necessary to carry out the purposes and effects of the Plan.

2.    <u>Other Amendments</u>. Subject to the conditions and limitations set forth in the Support Agreements, before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and any of the documents prepared in connection herewith without further order or approval of the Bankruptcy Court.

D.    *Revocation or Withdrawal of the Plan*.

Subject to the conditions and limitations set forth in the Support Agreements, the Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any Debtor or all Debtors, prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall: (A) constitute a waiver or release of any Claims or Interests; (B) prejudice in any manner the rights of the Debtors, the Debtors' Estates, or any other Entity; or (C) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Debtors' Estates, or any other Entity.

E.    *Severability of Plan Provisions Upon Confirmation*.

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (i) valid and enforceable pursuant to its terms; (ii) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors, as applicable; and (iii) not severable and mutually dependent.

F.    *Governing Law*.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto provides otherwise, the rights, duties and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

G.    *Time*.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

H.    *Reference to Monetary Figures*

All references in the Plan to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

I.    *Additional Documents.*

On or before the Effective Date, the Debtors may, after consultation with the Required Consenting Noteholders, file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors and all Holders of Claims or Interests and all other parties in interest shall, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

J.    *Immediate Binding Effect.*

Subject to <u>ARTICLE IX</u> and the applicable provisions of the Bankruptcy Code, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon, and inure to the benefit of the Debtors, the Reorganized Debtors, the Holders of Claims and Interests, the Releasing Parties, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtors.

K.    *Successor and Assigns.*

The rights, benefits and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or permitted assign, if any, of each Entity.

L.    *Entire Agreement*

On the Effective Date, the Plan and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

M.    *Notices*

All notices, requests and demands to or upon the Debtors to be effective shall be in writing (including by email but excluding facsimile transmission, which is not permitted) and, unless

otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by email, when received, addressed as follows:

Debtors

WOM S.A.
General Mackenna No. 1369
Santiago, Chile
Attn: Martín Vaca Narvaja
martin@wom.cl

Counsel to Debtors

WHITE & CASE LLP
Southeast Financial Center
200 South Biscayne Boulevard, Suite 4900
Miami, Florida 33131
Attn: John K. Cunningham; Richard S. Kebrdle
jcunningham@whitecase.com
rkebrdle@whitecase.com

-and-

WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Attn: Philip M. Abelson; Andrea Amulic
philip.abelson@whitecase.com
andrea.amulic@whitecase.com

-and-

RICHARDS, LAYTON & FINGER, PA
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn: John Knight; Amanda Steele
knight@rlf.com
steele@rlf.com

Counsel to the Ad Hoc Group

DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036-6797
Attn: Allan S. Brilliant, Esq.; Stephen M. Wolpert, Esq.
allan.brilliant@dechert.com
stephen.wolpert@dechert.com

-and-

YOUNG CONAWAY STARGATT & TAYLOR, LLP
1000 North King Street
Wilmington, DE 19801

Attn: Robert S. Brady, Esq.; Robert F. Poppiti, Jr., Esq.
rbrady@ycst.com
rpoppiti@ycst.com

Counsel to the Committee        WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York 10019-6099
Attn: Brett H. Miller; Todd M. Goren; James H. Burbage
bmiller@willkie.com
tgoren@willkie.com
jburbage@willkie.com

-and-

MCDERMOTT WILL & EMERY LLP
The Brandywine Building
1000 N. West Street, Suite 1400
Wilmington, Delaware 19801
Attn: David R. Hurst
dhurst@mwe.com

After the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities: (i) who have filed renewed requests and to those Entities who are required to be served under Local Rule 2002-1(b) and/or (ii) whose rights are affected by such documents.

Dated: March 5, 2025

Respectfully submitted,

By: */s/ Christopher S. Sontchi*
_____
Christopher S. Sontchi


Member, Special Committee of each of the Debtors and Debtors in Possession, solely in his capacity as such